UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CAMBRIA COUNTY EMPLOYEES RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  vs.<br><br>VENATOR MATERIALS PLC, SIMON TURNER, KURT D. OGDEN, STEPHEN IBBOTSON, RUSS R. STOLLE, PETER R. HUNTSMAN, SIR ROBERT J. MARGETTS, DOUGLAS D. ANDERSON, DANIELE FERRARI, KATHY D. PATRICK, HUNTSMAN (HOLDINGS) NETHERLANDS B.V., HUNTSMAN INTERNATIONAL LLC, HUNTSMAN CORPORATION, CITIGROUP GLOBAL MARKETS INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, GOLDMAN SACHS & CO. LLC, and J.P. MORGAN SECURITIES LLC,<br><br>    Defendants. | Civil Action No.: _____<br><br><br>JURY DEMAND |

## CLASS ACTION COMPLAINT

Plaintiff Cambria County Employees Retirement System ("Cambria County" or "Plaintiff") alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, including the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' (defined below) United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by Venator Materials PLC ("Venator" or the "Company"), analyst reports and advisories about the Company, media reports about the Company, and information from the internet. Plaintiff believes

that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of a class of all persons and entities who purchased or otherwise acquired Venator ordinary shares between August 2, 2017, and October 29, 2018, both dates inclusive (the "Class Period"), including those who purchased or otherwise acquired Venator ordinary shares pursuant and/or traceable to the registration statements and prospectuses issued in connection with Company's August 3, 2017 initial public offering (the "IPO") and December 4, 2017 secondary public offering (the "SPO") (collectively, the "Offerings").  This action asserts violations of the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Venator is a global chemical company primarily focused on the development and production of titanium dioxide ("$TiO_2$") and performance additives, including functional additives, color pigments, timber treatments, and water treatments.  Venator ordinary shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "VNTR."  Prior to the IPO, Venator operated as a division of Defendant Huntsman Corporation ("Huntsman").

3.      Prior to its spin-off from Huntsman, Venator operated a major $TiO_2$ manufacturing facility in Pori, Finland (the "Facility").  The Facility's output constituted a substantial percentage of Venator's business.

4.      On January 30, 2017, the Facility was engulfed by a massive fire (the "Fire").  After the Fire, Huntsman assured the public that the Fire had been "quickly" extinguished and that the Facility was "insured for property damage as well as earnings losses."  Huntsman also assured investors that it was "committed to repairing the [F]acility as quickly as possible."

5.      On August 3, 2017, less than eight months after the Fire, Huntsman spun-off Venator by completing the IPO.  In connection with the IPO, Huntsman raised $522 million in proceeds by issuing more than 26 million shares at a price of $20.00 per share.

6.      In the prospectus and registration statement issued in connection with the IPO (the "IPO Documents"), Defendants made various statements downplaying the damage done by the Fire.  Specifically, the IPO Documents assured investors that Venator was "committed to repairing the [F]acility as quickly as possible" and that the Company expected a gradual return to functionality, with the Facility being restored to "approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018."  The IPO Documents also stated that the Facility would be repaired with insurance proceeds and within the insurance policy limits.

7.      While later admitting that the cost of repairing the Facility would exceed the insurance policy limits, the Company continued to downplay the adverse impact of the Fire in its prospectus and registration statement issued in connection with its December 4, 2017 SPO (the "SPO Documents") (together with the IPO Documents, the "Offerings Documents"), which raised $533 million.  The SPO Documents reiterated that the Company still intended to "restore manufacturing of the balance of [the Facility's] more profitable specialty products by the fourth quarter of 2018," and reassured investors that the escalating costs related to the Fire were primarily due to "prevailing strong market conditions."

8.      Throughout the Class Period, the Company continued to issue misleading updates in investor presentations, conference calls, and SEC filings—suggesting that the Facility would be, and was being, successfully repaired.

9.      Notwithstanding these representations, investors began to learn the truth of Defendants' misleading statements through a series of disclosures.  For example, on July 31, 2018,

the Company revealed that the Facility was much more severely damaged by the Fire than had previously been disclosed.  Specifically, the Company admitted that "a full rebuild and commissioning may require more self-funding than [the Company's] previous estimate of $325 to $375 million."  On this news, the price of Company shares declined $0.73 per share, or approximately 4.8%, from a close of $15.35 per share on July 30, 2018, to close at $14.62 per share on July 31, 2018.

10.     Later, on September 12, 2018, the Company informed investors that it was now abandoning its attempts to repair the Facility because production capacity at the Facility had not meaningfully improved since the Offerings.  Defendants also admitted that, due to this decreased capacity, Venator was no longer a leading producer of $TiO_2$.  Additionally, Defendants announced that the Company would incur up to $150 million in additional costs to close the Facility.  On this news, the price of Company shares declined $0.54 per share, or approximately 4.8%, from a close of $11.35 per share on September 11, 2018, to close at $10.81 per share on September 12, 2018.

11.     Then, on October 30, 2018, the Company disclosed that, in addition to more than $500 million in Fire-related costs and lost business covered by the Company's insurance policy, the Company incurred an additional restructuring charge of approximately $415 million and would incur further charges of $220 million through 2024 related to the closure of the Facility.  On this news, the Company's share price declined $1.53 per share, or 19%, from a close of $8.00 per share on October 29, 2018, to close at $6.47 per share on October 30, 2018.

12.     This action alleges that Defendants' Class Period representations, including the Offering Documents, were materially false and misleading because they failed to disclose that: (1) the Fire was far more damaging to the Facility than had been represented to investors, resulting in over $1 billion in damage and rendering the Facility beyond repair; (2) the damage to the Facility

4

exceeded the Company's insurance policy limits by hundreds of millions of dollars; (3) the Company had lost, with essentially no hope of restoration, approximately 80% of the Facility's $TiO_2$ production capacity; (4) the Company incurred tens of millions of dollars in costs in connection with attempts to repair the Facility; (5) the Company's reported annual $TiO_2$ production capacity was inflated by approximately 15%; and (6) as a result, the Company would incur over $600 million in restructuring expenses and other charges associated with the closure and replacement of the Facility.

13.     As a result of Defendants' wrongful acts and omissions, Plaintiff and other members of the Class have suffered damages in the form of the precipitous and sustained decline in the price of Venator ordinary shares since the Company's IPO.

## II.     **JURISDICTION AND VENUE**

14.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

16.     Venue is proper in this District pursuant to Section 22 of the Securities Act, and 28 U.S.C. § 1391(b), because certain of the Defendants reside, are headquartered, and/or maintain substantial operations in this District.  Defendants' wrongful acts also arose in and emanated from, in part, this District, including the dissemination of materially misleading statements in this District.

17.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Plaintiff

18.     Cambria County, as set forth in the accompanying certification, incorporated by reference herein, purchased Venator ordinary shares at artificially inflated prices during the Class Period and traceable to the IPO and SPO, and has been damaged thereby.

### B.    Venator

19.     Defendant Venator is incorporated under the laws of England and Wales, with its principal executive offices located at Titanium House, Hanzard Drive, Wynyard Park, Stockton-On-Tees, TS22 5FD, United Kingdom.  Venator Americas LLC, an indirect Venator subsidiary, maintains offices in The Woodlands, Texas.

### C.    Individual Defendants

20.     Defendant Simon Turner ("Turner") was, at all relevant times, the Company's President, Chief Executive Officer, and a Company director.

21.     Defendant Kurt D. Ogden ("Ogden") was, at all relevant times, the Company's Executive Vice President and Chief Financial Officer.

22.     Defendant Stephen Ibbotson ("Ibbotson") was, at all relevant times, the Company's Vice President and Corporate Controller.

23.     Defendant Russ R. Stolle ("Stolle") was, at all relevant times, the Company's Executive Vice President, Chief Compliance Officer, and General Counsel.

24.     Defendants Turner, Ogden, Ibbotson, and Stolle are referred to herein as the "Officer Defendants."

25.     The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Venator's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  Each Officer Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and/or were being concealed from, the public, and that the positive representations that were being made were then materially false and misleading.

26.     Defendant Venator is liable for the acts of the Officer Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency, as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

27.     The scienter of the Officer Defendants and other employees and agents of the Company is similarly imputed to Venator under the doctrine of *respondeat superior* and agency principles.

28.     Defendant Peter R. Huntsman was, at all relevant times, a Company Director, and signed the false and misleading Offerings Documents.

29.     Defendant Sir Robert J. Margetts ("Margetts") was, at all relevant times, a Company Director, and signed the false and misleading Offerings Documents.

30.     Defendant Douglas D. Anderson ("Anderson") was appointed as a Company Director on August 2, 2017, and signed the false and misleading SPO Documents.

31.     Defendant Daniele Ferrari ("Ferrari") was appointed as a Company Director on August 2, 2017, and signed the false and misleading SPO Documents.

32.     Defendant Kathy D. Patrick ("Patrick") was appointed as a Company Director on October 1, 2017, and signed the false and misleading SPO Documents.

33.     Peter R. Huntsman, Margetts, Anderson, Ferrari, and Patrick are referred to herein as the "Director Defendants."

34.     Defendants Turner, Ogden, Ibbotson, Stolle, Peter R. Huntsman, Margetts, Anderson, Ferrari, and Patrick are referred to herein as the "Individual Defendants."

**D.     Shareholder Defendants**

35.     Defendant Huntsman is an international manufacturer and seller of chemicals and chemical products, and was the parent company of Venator prior to the IPO.  Huntsman is a Delaware corporation, with principal executive offices located at 10003 Woodloch Forest Drive, The Woodlands, Texas 77380.

36.     Defendant Huntsman International LLC ("Huntsman International") is a wholly-owned subsidiary of Huntsman.  Huntsman International is a Delaware corporation, and also maintains principal executive offices at 10003 Woodloch Forest Drive, The Woodlands, Texas 77380.

37.     Defendant Huntsman (Holdings) Netherlands B.V. ("Huntsman Holdings") is a wholly-owned subsidiary of Huntsman.

38.     Defendants Huntsman, Huntsman International, and Huntsman Holdings are collectively referred to herein as the "Shareholder Defendants."  The Shareholder Defendants beneficially owned all of Venator's ordinary shares prior to the IPO, and controlled the Company's

business and operations prior to, during, and immediately after the Offerings.  The Shareholder Defendants also appointed Venator's Board of Directors and selected its executive management prior to the IPO.

### E.   Underwriter Defendants

39.   Defendant Goldman Sachs & Co. LLC is a financial services company that acted as an underwriter of Venator's Offerings.

40.   Defendant J.P. Morgan Securities LLC is a financial services company that acted as an underwriter of Venator's Offerings.

41.   Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is a financial services company that acted as an underwriter of Venator's Offerings.

42.   Defendant Citigroup Global Markets Inc. is a financial services company that acted as an underwriter of Venator's Offerings.

43.   Defendants named in paragraphs 39–42 are referred to herein as the "Underwriter Defendants."

44.   The Underwriter Defendants are investment banks that specialize in, *inter alia¸* the underwriting of public securities offerings.  Collectively, as underwriters of the Offerings, the Underwriter Defendants reaped millions in commissions.

45.   The Underwriter Defendants also secured an agreement from Venator that the Company would indemnify and hold harmless the Underwriter Defendants from liability under the Securities Act.

46.   The Underwriter Defendants, through their representatives and agents, represented that they had conducted reasonable due diligence into the operations and business of the Company.

47.   The Underwriter Defendants caused the registration statements for the IPO and SPO to be filed with the SEC and declared effective.

48.     Venator, the Individual Defendants, the Shareholder Defendants, and the Underwriter Defendants are collectively referred to herein as "Defendants."

## IV.   SUBSTANTIVE ALLEGATIONS

### A.     Background

49.     Venator, a United Kingdom corporation headquartered in Stockton-On-Tees, United Kingdom, is a global chemical company primarily focused on the development and production of $TiO_2$, an opaque mineral used to enhance whiteness, opacity, and brightness in thousands of manufactured items, and performance additives, including functional additives, color pigments, timber treatments, and water treatments.  $TiO_2$ is used in a diverse range of industries, and is found in a range of products including foods, fibers, papers, coatings, and polymers.

50.     Prior to its spinoff from Huntsman in the IPO, Venator operated a major $TiO_2$ manufacturing facility in Pori, Finland.  The Facility was capable of producing up to 130,000 metric tons of $TiO_2$ annually—representing approximately 17% of the Company's total $TiO_2$ production capacity and an amount equivalent to approximately 2% of the global demand for $TiO_2$.

51.     The Facility was material to Venator's operations, with one UBS Securities analyst later suggesting that the Facility's $TiO_2$ production value would have accounted for 24% of the Company's income during 2017.

52.     A massive fire engulfed the Facility on January 30, 2017, resulting in significant structural damage.  The Fire was one of the largest in Finnish history, and, according to media reports, left the building's walls smoldering for at least a week after the initial blaze was extinguished.

53.     Huntsman assured the public that the Fire had been extinguished "quickly" and that the Facility had sufficient insurance coverage limits to cover both "property damage as well as

earnings losses."  Huntsman also told investors at the time that it was "committed to repairing the [F]acility as quickly as possible."

**B.      Defendants' False and Misleading Statements**

54.      The Class Period begins on August 2, 2017, when the SEC declared the Company's IPO registration statement effective.

55.      Venator completed its IPO on or about August 3, 2017, raising approximately $522 million in gross proceeds from investors by selling more than 26 million Venator ordinary shares at a price of $20.00 per share.  On August 4, 2017, Defendants filed the final prospectus for the IPO, which forms part of the IPO Documents, with the SEC on Form 424B4.  As set forth below, Venator offered, sold, and/or solicited sales of Venator ordinary shares in connection with the IPO.

56.      The IPO Documents contained misleading statements of material fact, and omitted material facts required by governing regulations and which were necessary to make statements in the IPO Documents not misleading.

57.      Notwithstanding the importance of the Facility to Venator's operations, the IPO Documents downplayed the extent of the damage caused by the Fire.  Specifically, the IPO Documents assured investors that Venator was "committed to repairing the [F]acility as quickly as possible" and that the Company expected a gradual return to functionality, with the Facility being restored to "approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018."  The IPO Documents also stated that the Facility would be repaired with insurance proceeds and within insurance policy limits.

58.      The IPO Documents further reported that the Company did not expect the cost of repairing the damage or the Facility's diminished output capacity to have "a material impact on our second quarter Segment Adjusted EBITDA as related losses have been offset by the proceeds of business interruption insurance."

59.     Defendants also claimed that the Company was "well-positioned to capitalize on recovering $TiO_2$ demand and prices" due to the Company's claimed production capacity of 782,000 metric tons of $TiO_2$.  Defendants reported that this claimed production capacity gave the Company a "leading position in differentiated markets."  However, Defendants concealed that this production capacity figure was only accurate with the Facility operating at its full capacity.

60.     Moreover, in the IPO Documents, the Company only identified as a "Risk Factor[]" the possibility that the Company's earnings could be harmed "if the [insurance] proceeds do not fully cover our [losses]."

61.     Pursuant to Item 303 of SEC Regulation S-K and the SEC's related interpretive releases thereto, an issuer is required to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  Such disclosures are required to be made by an issuing company in registration statements filed in connection with public offerings.

62.     The IPO Documents failed to disclose material information about known trends and uncertainties pursuant to Item 303.  As alleged herein, the IPO Documents failed to disclose that the damage to the Facility significantly reduced the Company's $TiO_2$ production capacity, would result in mounting lost-business losses, and would affect the Company's earnings and market share.

63.     Pursuant to Item 3 of Form S-1, the IPO Documents were required to furnish the information required by Item 503 of Regulation S-K, which requires the registrant to disclose, among other things, a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c).  Item 503 also required that Defendants "[e]xplain how the risk

affects the issuer or the securities being offered."  However, the IPO Documents failed to disclose information regarding material risks pursuant to Item 503.

64.     As a result, the Defendants had a duty to disclose these currently known, adverse factors, listed in paragraph 12 above.  Defendants failed to disclose the nature and magnitude of Venator's risk from the damage to the Facility, and gave no meaningful indications of the Company's real vulnerability to uninsured losses and the likelihood that the Facility was beyond repair.  Because the IPO Documents failed to make the requisite disclosures, Defendants violated Item 503.

65.     On August 28, 2017, the Company filed its financial results for the quarter ended June 30, 2017, with the SEC on Form 10-Q.  The Form 10-Q was signed by Defendants Ibbotson and Ogden, and also included certifications signed by Defendants Ogden and Turner, as required by the Sarbanes Oxley Act of 2002.  Accordingly, Defendants Ogden and Turner certified, among other things, that: (1) each reviewed the Form 10-Q; (2) to the best of their knowledge the Form 10-Q did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading"; and (3) the Form 10-Q "fairly present[ed] in all material respects the financial condition, results of operations, and cash flows of" Venator.

66.     The August 28, 2017 Form 10-Q also included material misrepresentations about the condition of the Facility and the impact of the damage caused by the Fire.  Among other things, Defendants restated Venator's commitment to "repair[] the [F]acility as quickly as possible" and reiterated that the Facility would be repaired with insurance proceeds and within the insurance policy limits.

67.     On September 6, 2017, the Company gave a presentation at the UBS Global Chemicals & Paper and Packaging Conference held in New York, New York.   Venator's presentation, which was also posted to the Company's web page, restated that the Facility was expected to be restored to its full operational capacity by the fourth quarter of 2018.

68.     On October 27, 2017, the Company issued a press release disclosing its financial results for the quarter ended September 30, 2017.   Therein, the Defendants revealed for the first time that the costs associated with the Fire would likely exceed limits of the Facility's insurance policy by a range of $100 million to $150 million.   However, Defendants claimed that these excess amounts represented escalating lost profits attributable to a strong market and increasing prices for $TiO_2$, as opposed to increasing repair costs.

69.     On the Company's earnings call with investors and analysts later that day, Defendants revealed that the more profitable parts of the Facility, which produced "specialty" products, would be repaired by the end of 2018.   When asked by analysts about repairing the remainder of the Facility, Defendant Turner stated that "we're not saying it's going to be delayed" and that the Company was not conceding that "we won't do it."   Separately, addressing the rapidly escalating loss totals attributed to the Fire, Defendant Ogden reassured investors that the limits of the Facility's $500 million insurance policy were "more than enough to cover the rebuild on its own," but that, due to positive trends in $TiO_2$ market conditions, the insurance policy was no longer enough to cover lost profits.

70.     Then, on November 3, 2017, the Company filed its financial results for the quarter ended September 30, 2017, with the SEC on Form 10-Q.   The Form 10-Q was signed by Defendants Ibbotson and Ogden, and included certifications signed by Defendants Ogden and Turner that the Form 10-Q was accurate and complete.

14

71. In the November 3, 2017 Form 10-Q, Defendants stated that while the Facility was "currently not fully operational," the Company "continue[d] to repair the [F]acility."

72. Venator filed a registration statement for its SPO with the SEC on November 27, 2017, which was declared effective by the SEC on November 29, 2017. On December 4, 2017, the Company completed its SPO, selling more than 23.7 million ordinary shares and generating $533 million in gross proceeds.

73. The SPO Documents contained misleading statements of material fact, and omitted material facts required by governing regulations and necessary to make statements in the SPO Documents not misleading. Specifically, the SPO Documents restated previous misleading statements that the Facility would be repaired, again stating that while the Facility was still "currently not fully operational," the Company "continue[d] to repair the [F]acility." Defendants also reiterated that the more profitable "specialty"-product-producing parts of the Facility would be repaired by the fourth quarter of 2018.

74. Separately, the SPO Documents claimed that the Company was "well-positioned to capitalize" on the growth opportunities in the $TiO_2$ market, including recovering demand and prices, due to the Company's claimed production capacity of 782,000 metric tons of $TiO_2$. However, Defendants again failed to disclose that this production capacity figure was only accurate with the Facility operating at its full capacity, and that, given the current state of the Facility, this figure was overstated by as much as 15%. Defendants falsely portrayed Venator as the "leader in the specialty $TiO_2$ industry segment," basing this portrayal on its inflated claims of the Company's production capacity.

75. Pursuant to Item 303 and the SEC's related interpretive releases thereto, an issuer is required to disclose "any known trends or uncertainties that have had or that the registrant

reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  Such disclosures are required to be made by an issuing company in registration statements filed in connection with public offerings.

76.    The SPO Documents failed to disclose material information about known trends and uncertainties pursuant to Item 303.  As alleged herein, the SPO Documents failed to disclose that the damage to the Facility significantly reduced the Company's $TiO_2$ production capacity, would result in mounting lost-business losses, and would affect the Company's earnings and market share.

77.    Pursuant to Item 3 of Form S-1, the SPO Documents were required to furnish the information required by Item 503 of Regulation S-K, which requires the registrant to disclose, among other things, a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c).  Item 503 also required that Defendants "[e]xplain how the risk affects the issuer or the securities being offered."  However, the SPO Documents failed to disclose information regarding material risks pursuant to Item 503.

78.    As a result, the Defendants had a duty to disclose these currently-known, adverse factors, listed in paragraph 12 above.  Defendants failed to disclose the nature and magnitude of Venator's risk from the damage to the Facility, and gave no meaningful indications of the Company's real vulnerability to uninsured losses and the likelihood that the Facility was beyond repair.  Because the SPO Documents failed to make the requisite disclosures, Defendants violated Item 503.

79.    On February 23, 2018, the Company filed its annual report for the year ended December 31, 2017, with the SEC on Form 10-K (the "2017 Annual Report").  The 2017 Annual

Report was signed by Defendants Turner, Ibbotson, and Ogden, and included certifications signed by Defendants Ogden and Turner that the 2017 Annual Report was accurate and complete.

80.     The 2017 Annual Report, as well as the accompanying press release, continued to mislead investors about the irreparability of the Facility and the resulting impact on Venator's business.  For example, in the press release, Defendant Turner assured investors that Venator "remain[ed] on schedule to restore our specialty business capacity, and ultimately full operation of the remaining capacity" at the Facility.  Defendants admitted that the losses associated with the Fire were now expected to exceed the limits of the Facility's insurance policy by as much as $375 million, and revealed that the Company was now "paying a fast-track premium" to accelerate the repair of the more-profitable specialty segments.  However, Defendants continued to claim that these escalating losses primarily represented additional lost profits, as opposed to increasing repair and reconstruction costs.  Defendants also continued to espouse that the Company's intent was to "restore manufacturing of the balance of these more profitable specialty products by the end of 2018," and to eventually repair the rest of the Facility.  For example, Defendant Turner remarked that "despite significant rebuild cost escalation, we remain on schedule to restore our specialty business capacity, and ultimately full operation" at the Facility.

81.     On the Company's earnings call with analysts and investors that same day, Defendant Turner reiterated that the "[c]onstruction on the rebuild of the specialty products portion of the [F]acility" was on pace to be completed in 2018.

82.     On May 1, 2018, the Company filed its financial results for the quarter ended March 31, 2018, with the SEC on Form 10-Q.  The Form 10-Q was signed by Defendants Ibbotson and Ogden, and included certifications signed by Defendants Ogden and Turner that the Form 10-Q was accurate and complete.  In the Form 10-Q, the Company and the Officer Defendants made

misleading representations that the Company expected "some of this specialty capacity to be producing finished product during the second half of [2018] and the remaining specialty capacity to be restored and producing finished product during 2019."  The Form 10-Q also stated that the Company expected to eventually rebuild the "commodity portion of the [F]acility" by 2020.

83.     On the Company's earnings call with investors that same day, Defendant Turner assured investors that the Company had "confidence" that the total Fire-related losses not covered by the Facility's insurance policy would fall within the range of $325 million to $375 million.

84.     The statements set forth above in paragraphs 54–83 were materially false and misleading.  Specifically, Defendants failed to disclose that: (1) the Fire was far more damaging to the Facility than had been represented to investors, resulting in over $1 billion in damage and rendering the Facility beyond repair; (2) the damage to the Facility exceeded the Company's insurance policy limits by hundreds of millions of dollars; (3) the Company had lost, with essentially no hope of restoration, approximately 80% of the Facility's $TiO_2$ production capacity; (4) the Company incurred tens of millions of dollars in costs in connection with attempts to repair the Facility; (5) the Company's reported annual $TiO_2$ production capacity was inflated by approximately 15%; and (6) as a result, the Company would incur over $600 million in restructuring expenses and other charges associated with the closure and replacement of the Facility.

## C.     The Truth Begins to Emerge

85.     Investors began to learn the truth of the Company's misleading statements through a series of disclosures.  For example, on July 31, 2018, the Company issued a press release revealing that the Facility was much more severely damaged by the Fire than had previously been disclosed.  Defendants admitted that "a full rebuild and commissioning may require more self-funding than [the Company's] previous estimate of $325 to $375 million."  The press release also

stated that the Company was "reviewing options within our manufacturing network, including the option of transferring the production of [the Facility's] specialty and differentiated products to elsewhere in our network."  On this news, the price of Company shares declined $0.73 per share, or approximately 4.8%, from a close of $15.35 per share on July 30, 2018, to close at $14.62 per share on July 31, 2018.

86.     However, Defendants continued to mislead investors about the true impact of the Fire on Venator's business and prospects, as Defendant Turner reassured investors in the Company's July 31, 2017 press release that the Company was still "well positioned to capitalize on the positive trends" in the profitability of the $TiO_2$ industry.

87.     Then, on September 12, 2018, the Company informed investors that it was now abandoning its attempts to repair the Facility, as production capacity at the Facility had not meaningfully improved since the Offerings.  The Company admitted in its Pori Strategic Review Update published that day that the "[e]stimated cost of the full reconstruction of [the Facility] is not economically viable" for the Company.  In addition to being unable to repair the Facility, Venator announced that it would incur up to $150 million in additional costs to close the facility. Defendants also admitted that, due to the decreased production capacity caused by the damage to the Facility, Venator was no longer a leading producer of $TiO_2$.  On this news, the price of Company shares declined $0.54 per share, or approximately 4.8%, from a close of $11.35 per share on September 11, 2018, to close at $10.81 per share on September 12, 2018.

88.     Then, on October 30, 2018, the Company disclosed that, in addition to more than $500 million in Fire-related costs and lost business covered by the Company's insurance policy, the Company incurred an additional restructuring charge of approximately $415 million and would incur further additional charges of $220 million through 2024 related to the closure of the Facility.

On this news, the Company's share price declined $1.53 per share, or 19%, from a close of $8.00 per share on October 29, 2018, to close at $6.47 per share on October 30, 2018.

## V.     PLAINTIFF'S CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Venator ordinary shares during the Class Period, pursuant or traceable to the IPO, and/or pursuant or traceable to the SPO (the "Class"). Excluded from the Class are Defendants, their agents, directors and officers of Venator and Huntsman, and their families and affiliates.

90.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  According to the Company's Form 10-K filed with the SEC on February 20, 2019, the Company had over 106 million ordinary shares outstanding, owned by thousands of persons.

91.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

a.   Whether Venator, the Officer Defendants, and the Shareholder Defendants violated the Exchange Act;

b.   Whether Defendants violated the Securities Act;

c.   Whether Defendants omitted and/or misrepresented material facts;

d.   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

e.   Whether Venator or the Officer Defendants knew or recklessly disregarded that their statements were false and misleading;

f.   Whether the price of Venator ordinary shares was artificially inflated; and

g.   The extent of damage sustained by the Class members and the appropriate measure of damages.

92.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

93.   Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

94.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VI.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

95.   Plaintiff will rely upon the presumption of reliance establish by the fraud-on-the-market doctrine in that, among other things:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   The omissions and misrepresentations were material;

c.   The Company's ordinary shares traded in an efficient market;

d.   The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ordinary shares; and

e.   Plaintiff and other members of the Class purchased Venator ordinary shares between the time Defendants misrepresented or failed to disclose material facts and

the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

96.     At all relevant times the market for Venator ordinary shares was efficient for the following reasons, among others: (1) as a regulated issuer, Venator filed periodic public reports with the SEC; and (2) Venator regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## VII.   NO SAFE HARBOR

97.     Defendants' "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability. Defendants are also liable for any false or misleading forward-looking statements pleaded because, at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Venator who knew that the forward-looking statement was false.  None of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

98.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of Venator ordinary shares

significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  It was also foreseeable that the disclosure of this information, and the materialization of concealed risks associated with Defendants' misconduct, would cause the price of Venator ordinary shares to decline as the inflation caused by Defendants' earlier misrepresentations and omissions was removed from the price of Venator ordinary shares. As a result of their purchases of Venator ordinary shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.* damages, under the federal securities laws.

## IX.   SCIENTER ALLEGATIONS

99.   During the Class Period, Venator and the Officer Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, Venator and the Officer Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of Venator ordinary shares during the Class Period.

## X.   CLAIMS AGAINST DEFENDANTS

### A.   EXCHANGE ACT CLAIMS

### COUNT I

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
against Venator and the Officer Defendants**

100.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.   During the Class Period, Venator and the Officer Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did:

(1) deceive the investing public, including Plaintiff and other members of the Class, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Venator ordinary shares at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, these Defendants took the actions set forth herein.

102.    Venator and the Officer Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's ordinary shares in an effort to maintain artificially high market prices thereof, in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### against the Officer Defendants and the Shareholder Defendants

103.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

104.    The Officer Defendants and the Shareholder Defendants acted as controlling persons of Venator within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Officer Defendants and the Shareholder Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Officer Defendants and the Shareholder Defendants were provided with or had

unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

105.    As set forth above, Venator and the Officer Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Officer Defendants and the Shareholder Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of this wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Venator ordinary shares during the Class Period.

### B.    SECURITIES ACT CLAIMS

106.    Plaintiff brings the claims in Counts III, IV, and V under Sections 11, 12(a)(2), and 15 of the Securities Act, respectively, individually and on behalf of all persons and entities who purchased Venator ordinary shares pursuant or traceable to the materially false and misleading Offerings Documents, and were damaged thereby.

107.    Plaintiff's non-fraud claims brought under the Securities Act are based on the fact that the Offerings Documents contained untrue statements of material fact and omitted other facts necessary to make statements therein not materially false or misleading.   Specifically, the Offerings Documents contained untrue statements of material fact and omitted material facts because they failed to disclose that: (1) the Fire was far more damaging to the Facility than had been represented to investors, resulting in over $1 billion in damage and rendering the Facility beyond repair; (2) the damage to the Facility exceeded the Company's insurance policy limits by hundreds of millions of dollars; (3) the Company had lost, with essentially no hope of restoration, approximately 80% of the Facility's $TiO_2$ production capacity; (4) the Company incurred tens of

25

millions of dollars in costs in connection with attempts to repair the Facility; (5) the Company's reported annual $TiO_2$ production capacity was inflated by approximately 15%; and (6) as a result, the Company would incur over $600 million in restructuring expenses and other charges associated with the closure and replacement of the Facility.

## COUNT III

### Violation of Section 11 of the Securities Act
### against All Defendants

108.    Plaintiffs incorporate paragraphs 1–97 and paragraphs 106–07 by reference.

109.    This claim is premised on the remedies available under Section 11 of the Securities Act, 15 U.S.C. § 77k, and expressly excludes and disclaims any allegation that Defendants acted with fraudulent intent or recklessness.

110.    The Offerings Documents contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and/or omitted facts required to be stated therein.

111.    Each of Defendants named herein is responsible for and are liable for the contents and dissemination of the Offerings Documents.

112.    Defendants Turner, Ogden, Ibbotson, Stolle, Peter R. Huntsman, and Margetts signed the IPO Documents and caused them to be declared effective by the SEC on or about August 2, 2017.

113.    The Individual Defendants each signed the SPO Documents and caused them to be declared effective by the SEC on or about November 29, 2017.

114.    Venator is the registrant for the Offerings and as issuer of the shares is strictly liable to Plaintiff and the Class for the misstatements and omissions.

115.     The Underwriter Defendants underwrote the Offerings and their failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

116.     Defendants caused the Offerings Documents to be filed with the SEC and to be declared effective, resulting in the aggregate issuance and sale of over 51 million ordinary shares, which were purchased by Plaintiff and the Class.

117.     None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offerings Documents were true and did not omit any material facts required to be stated therein or facts that were necessary to make the statements made therein not false or misleading.

118.     By reason of the conduct herein alleged, each Defendant violated Section 11 of the Securities Act.

## COUNT IV

### Violation of Section 12(a)(2) of the Securities Act
### against the Underwriter Defendants

119.     Plaintiffs incorporate paragraphs 1–97 and paragraphs 106–07 by reference.

120.     This claim is premised on the remedies available under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), and expressly excludes and disclaims any allegation that Defendants acted with fraudulent intent or recklessness.

121.     The Underwriter Defendants were sellers of Venator ordinary shares that were registered in the Offerings pursuant to the Offerings Documents.  By means of the Offerings Documents, the Underwriter Defendants sold, offered, and/or solicited sales of Venator ordinary shares sold in the offerings.  The Underwriter Defendants were motivated by their own financial interests at all relevant times.

122.    None of the Underwriter Defendants conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Offerings Documents, and identified above, were true, were without omissions of material fact, and were not misleading.

123.    The Offerings Documents contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and/or omitted facts required to be stated therein.

124.    By reason of the conduct herein alleged, each Underwriter Defendant violated Section 12(a)(2) of the Securities Act.

## COUNT V

**Violation of Section 15 of the Securities Act**
**against the Individual Defendants and the Shareholder Defendants**

125.    Plaintiffs incorporate paragraphs 1–97 and paragraphs 106–07 by reference.

126.    This claim is premised on the remedies available under Section 15 of the Securities Act, 15 U.S.C. § 77o, and expressly excludes and disclaims any allegation that Defendants acted with fraudulent intent or recklessness.

127.    Each of the Individual Defendants and the Shareholder Defendants was a control person of Venator by virtue of its position as a director, senior officer, or controlling shareholder with the Company.

128.    The Shareholder Defendants and Defendants Turner, Ogden, Ibbotson, Stolle, Peter R. Huntsman, and Margetts oversaw all operations and financial controls at Venator at the time of the IPO, and Venator could not have completed the IPO without these Defendants signing or authorizing their signatures on the IPO Documents.

129.    The Individual Defendants and the Shareholder Defendants each oversaw all operations and financial controls at Venator at the time of the SPO, and Venator could not have completed the SPO without the Individual Defendants and Shareholder Defendants signing or authorizing their signatures on the SPO Documents.

130.    By reason of the conduct herein alleged, each Individual Defendant and Shareholder Defendant violated Section 15 of the Securities Act.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.      Awarding compensatory damages and equitable relief in favor of Plaintiff and other members of the Class against all Defendants, jointly and severally, for all damages caused by Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.      Such other and further relief as the Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 13, 2019                    Respectfully Submitted,

**AJAMIE LLP**

*s/ Thomas R. Ajamie*
Thomas R. Ajamie, Attorney-in-Charge
Texas Bar No. 00952400
S.D. Tex. No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
S.D. Tex. No. 38095

Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, TX 77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

**KESSLER TOPAZ
   MELTZER & CHECK, LLP**
Naumon A. Amjed
Darren J. Check
Jonathan R. Davidson
Ryan T. Degnan
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
namjed@ktmc.com
dcheck@ktmc.com
jrdavidson@ktmc.com
rdegnan@ktmc.com

*Attorneys for Plaintiff*