**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: VENATOR MATERIALS PLC SECURITIES LITIGATION | Civil Action No. 4:19-cv-03464 |
| | Chief Judge Lee H. Rosenthal |
| | <u>CLASS ACTION</u> |

**CONSOLIDATED CLASS ACTION COMPLAINT**

## <u>TABLE OF CONTENTS</u>

I.    PRELIMINARY STATEMENT ............................................................................ 2

II.   JURISDICTION AND VENUE ........................................................................... 7

III.  PARTIES ............................................................................................................. 8

    A.    Lead Plaintiff ........................................................................................... 8

    B.    Defendants ................................................................................................ 9

        1.    Venator Defendants ....................................................................... 9

        2.    Director Defendants ..................................................................... 11

        3.    Selling Shareholder Defendants................................................... 12

        4.    Underwriter Defendants ............................................................... 14

IV.   FORMER VENATOR EMPLOYEES ............................................................... 16

V.    EXCHANGE ACT ALLEGATIONS................................................................ 17

    A.    Background On Venator ......................................................................... 17

    B.    The TiO2 Manufacturing Process.......................................................... 19

    C.    Huntsman's Pori Facility Was A Critical Part of the Venator Spin-Off.............. 24

    D.    The Pori Facility Burns Down ............................................................... 25

    E.    Recognizing That Pori Had Been Destroyed, Huntsman Switches Transaction Structures In Order To Dispose Of Its Interest In The Pigments Business And Accelerates The Separation............................................. 28

    F.    Huntsman Reassures Investors It Is "Committed To Rebuilding The Facility As Quickly As Possible" And Would Not Proceed With A Separation "Under Any Cloud Of Uncertainty" About Pori ................................ 30

    G.    Huntsman Rushes To Complete The Venator IPO Before Completing Its Investigation Into The Fire................................................................. 32

        1.    Huntsman Separates Venator through the IPO .......................... 35

H.    Following The IPO, Defendants Assured Investors That Pori Would Be Rebuilt, That Tio2 Prices Were Increasing Due To Improving Demand, That Pori Was At 20% Capacity, And That Insurance Would Cover The Rebuild ........................................................................................................ 38

    1.    Venator Repeated False Assurances About Pori To Promote The SPO ...................................................................................................... 41

    2.    After The SPO, Defendants Claimed That Pori Was Operating At 20% Capacity, That The Pori Rebuild Was "On Pace" And "On Track," And That Increased Insurance Costs Were Due To The "Fast-Track" Program ........................................................................ 42

I.    In Truth, Pori Never Regained The Ability To Produce Any Tio2 Capacity After The Fire—Let Alone The 20% Capacity Defendants Falsely Claimed—Was Never "On Pace" To Be Rebuilt, And Could Not Have Economically Been Rebuilt ........................................................................ 45

    1.    Pori Was Damaged Beyond Repair and Would Never Again Reach 20% Capacity .......................................................................... 45

    2.    Venator Went to Great Lengths to Create the False Appearance of 20% Capacity ................................................................................ 47

    3.    Senior Management Closely Tracked the Pori "Shuffle" and Knew the Rebuild Never Got Off the Ground ...................................... 51

    4.    Pori's Closure Caused a Surge in TiO2 Prices .......................... 52

J.    Venator Reassures Investors That The Pori Rebuild Is "On Track" While Disclosing Costs May Exceed Insurance Policy Limits Due To The "Fast Track" Premium ........................................................................................ 53

K.    Venator Continues To Mislead Investors Concerning The Progress Of The Pori Rebuild ............................................................................................. 57

VI.    The Truth Regarding Pori Emerges ................................................................ 58

A.    Venator Announces The Cost Of Rebuilding The Pori Facility Will Exceed The Company's Insurance Policy By More Than $375 Million.............. 58

B.    Venator Discloses That It Will Not Reopen Pori And That Pori Would Only "Finish" TiO2.................................................................................... 61

C.    Venator Discloses Skyrocketing Costs Beyond Insurance Associated With Pori And Reveals that TiO2 Demand Was Lower Than Previously Stated ......... 65

VII.  POST-CLASS PERIOD EVENTS ............................................................. 67

VIII. SUMMARY OF SCIENTER ALLEGATIONS .................................... 69

IX.  DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ........... 75

    A.    Defendants Misrepresented That The Pori Facility Was Operating at "20% Capacity" Following The Fire ............................... 75

    B.    Defendants Misrepresented The Company's Timeline To Rebuild Pori, The Company's Purportedly "On Pace" and "On Track" Progress, And The Magnitude Of The Damage To The Pori Facility.......................... 79

    C.    Defendants Misrepresented The Cause Of Rising TiO2 Prices And Concealed Pori's Impact On TiO2 Prices .............................. 84

    D.    Defendants Misrepresented The Manner In Which The Company Was Spending Its Insurance Proceeds, The Costs Associated With Rebuilding The Pori Facility, And The Overall Impact Of The Pori Fire On Venator's Business ...................................... 87

X.  LOSS CAUSATION ............................................................................. 93

XI.  PRESUMPTION OF RELIANCE ...................................................... 95

XII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........ 97

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ............... 98

XIV. SECURITIES ACT ALLEGATIONS ............................................... 101

    A.    The IPO Materials Contained Material Misstatements and Omissions ............. 103

        1.    Misstatements About Venator's Capacity ............... 103

        2.    Misstatements About The Progress Of The Pori Rebuild...................... 106

        3.    Misstatements About TiO2 Demand ....................... 106

        4.    Misstatements About Insurance Coverage And Pori's Impact on Venator's Business....................... 107

        5.    The IPO Risk Warnings Were Inadequate And Contained Material Misstatements ..................... 107

    A.    The SPO Materials Contained Material Misstatements and Omissions ............. 108

1. Misstatements About Venator's Capacity ............................................... 109

2. Misstatements About The Progress Of The Pori Rebuild...................... 110

3. Misstatements About TiO2 Demand ....................................................... 110

4. Misstatements About Insurance Coverage And Pori's Impact on Venator's Business.................................................................................. 111

5. The SPO Risk Warnings Were Inadequate And Contained Material Misstatements ........................................................................................ 112

B. The Securities Act Defendants Failed to Exercise Reasonable Care or Conduct a Reasonable Investigation in Connection with the IPO and SPO ... 113

XV. CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ............................................ 115

XVI. CLASS ACTION ALLEGATIONS ................................................................. 121

XVII. PRAYER FOR RELIEF ......................................................................... 123

XVIII. JURY DEMAND ............................................................................... 123

Plaintiffs City of Miami General Employees' & Sanitation Employees' Retirement Trust, the Fresno County Employees' Retirement Association, and the City of Pontiac General Employees' Retirement System (collectively, "Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, allege the following against Venator Materials PLC ("Venator" or the "Company"); Simon Turner, Kurt D. Ogden, Stephen Ibbotson, Mahomed Maiter, and Russ R. Stolle (the "Executive Defendants" and collectively with Venator the "Venator Defendants"); Peter R. Huntsman, Douglas D. Anderson, and Kathy D. Patrick (collectively, the "Director Defendants"); Huntsman Corporation ("Huntsman"), Huntsman (Holdings) Netherlands B.V., Huntsman International LLC (collectively, the "Huntsman Defendants"); and Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Goldman Sachs & Co. LLC, and J.P. Morgan Securities LLC (collectively, the "Underwriter Defendants" and, together with the Venator Defendants and the Huntsman Defendants, "Defendants"), upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than themselves and their own acts is based upon the investigation conducted by and through their counsel, which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, and other public statements issued by or concerning Defendants; (ii) research reports issued by financial analysts concerning the Company; (iii) reports filed publicly by Venator and the Huntsman Defendants with the U.S. Securities and Exchange Commission ("SEC"); (iv) interviews with former employees of Venator and individuals with knowledge of the January 30, 2017 fire at Venator's Pori, Finland manufacturing facility; (v) Venator's corporate website; (vi) pleadings, evidence and testimony in *In the Matter of Tronox/Cristal USA*, Docket

No. 9377, *Federal Trade Commission v. Tronox Ltd.*, No. 18-cv-01622-TNM (D.D.C.), *Macomb County Employees' Retirement System v. Venator Materials PLC*, No. DC-19-02030 (134th District Court, Dallas County Texas, Feb. 8, 2019) and other litigation involving Defendants; (vii) consultations with relevant experts and consultants; and (viii) other publicly available information. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  PRELIMINARY STATEMENT

1.       This case arises from Defendants' scheme to dispose of a business that suffered a catastrophic fire at its most valuable and important manufacturing plant—Venator's facility in Pori, Finland ("Pori")—which produced the Company's most important and profitable products. In that effort, Defendants led investors to believe that the damaged facility had returned to producing 20% of its prior capacity, was "on pace" to restoring full production in just months, and that Venator's insurance would fully cover the rebuild expense and any lost profits. Unfortunately for investors, none of those facts were true. Ultimately, Venator investors incurred massive damages, as the Company's shares lost over 70% of their value when the truth concerning the Pori fire and its impact on Venator's business came to light.

2.       Before its initial public offering ("IPO") in August 2017, Venator existed as the pigments and additives division of the chemical conglomerate Huntsman Corporation. The pigments division was focused on the production of titanium dioxide, or TiO2, a white pigment that is used in numerous everyday products, from paint to sunscreen. As was only revealed after the end of the Class Period, Defendants' misrepresentations concealed the fact that fire at Pori in

January 2017 had damaged the facility beyond repair, eliminating nearly 17% of Venator's TiO2 production capacity and the source of over one-third of the Company's earnings.

3.     The devastating impact of the Pori fire was clear to Huntsman's senior executives immediately after it occurred—and indeed, prompted Huntsman to abandon a longstanding plan to spin-off the pigments business to existing Huntsman shareholders.  Instead, recognizing the permanent damage caused by the fire, Huntsman determined to sell the pigments business to public investors through the IPO of Venator.  In fact, rather than take the time to carefully investigate the fire, assess the damage, and rehabilitate the facility, Huntsman accelerated the IPO process—and then obtained waivers from its underwriter banks in order to rapidly conduct a follow-on secondary public offering of Venator stock ("SPO")—so that Huntsman could exit the irreparably damaged pigments and additives business as quickly and profitably as possible.

4.     In order to successfully sell the pigments business to the investing public, Defendants created a false narrative about the damage caused by the fire, the progress the Company purportedly made in rebuilding Pori, the amount of TiO2 Pori was producing, and the extent to which Venator's insurance would fully cover both rebuilding the facility and any lost business. Because Defendants knew that investor confidence in Pori's return was absolutely critical, Huntsman CEO Peter Huntsman told investors that management was "committed to rebuilding the facility as quickly as possible," that Huntsman would never conduct "a spin that takes place under any sort of cloud of uncertainty" about Pori, and that the IPO would only go forward after Huntsman had "absolute clarity and certainty about where we're going and how we are operating."

5.     But Defendants never gained any comfort about Pori's return—indeed, there was no hope for that possibility.  Instead, Defendants made a series of misrepresentations to convince investors that the facility would quickly return to its prior production levels so that they could exit

the business as quickly and profitably as possible.  Most significantly, in the summer of 2017, Venator told investors that Pori had been quickly rehabilitated and was already operating at 20% of its prior capacity—a "milestone" Defendants told investors had been "achieved" months before the IPO.  As a result, Defendants claimed Venator was "well-positioned to capitalize on recovering TiO2 demand and prices," and the Company would "benefit from our attractive market positioning throughout the cycle."  Venator followed up these statements by reporting record earnings, which grew 37% over the prior quarter and were "28% ahead of expectations."  Analysts uniformly praised the Company's performance, raised their earnings estimates and price targets, and complemented the "strong showing in VNTR's first earnings period as a public company."

6.     Based on these statements and others like them, Huntsman sold over $520 million worth of Venator shares in the IPO and approximately $471 million in a follow-on secondary offering hurriedly conducted just four months later.  In total, Huntsman raised over $1.7 billion in proceeds from these offerings and a related debt restructuring.   That influx of cash enabled Huntsman to quickly shore up its balance sheet and reduce its debt load—cutting its leverage ratio in half in a matter of months—and report vast improvement in the key financial metrics that determined Peter Huntsman's compensation.

7.     In reality, and as detailed in the Finnish Safety Authority report obtained by Lead Plaintiff after the end of the Class Period, nearly every corner of the facility at Pori, including all four production lines, suffered extensive damage in the fire.  In fact, the "Moore" section of the plant—which served as the critical component of the manufacturing process for all four separate production lines—suffered near "complete destruction."  According to numerous former Venator employees, the only part of the Pori facility that could function at all at any point after the fire was

a small component of the "white end" finishing portion of just one of the facility's four production lines.

8.       Instead of rebuilding Pori, Defendants created the false appearance of actual production so that they could profitably price the Venator stock offerings.  In doing so, Venator went to extraordinarily expensive and ultimately unsustainable lengths to ship "intermediate" TiO2 manufactured at its facility in Scarlino, Italy to Pori, where the intermediate product would then be "finished" at the one part of the facility that actually worked.  But industry participants have never understood "finishing" TiO2—the last stage of the manufacturing process—to mean a plant's actual "capacity" to manufacture and produce TiO2, nor had Venator ever suggested as much.  In fact, Venator said the opposite, and made clear that "finishing" TiO2 did not result in any actual "capacity."  Among other things, this is because "finishing" TiO2 is the least costly and least labor-intensive part of the manufacturing process.

9.       Moreover, as explained by numerous Venator employees who worked at Pori before and after the fire, even the limited "finishing" conducted at Pori did not come close to reaching 20% of the finishing activity conducted at Pori prior to the fire.  As those former employees recounted, production never reached 20%, Venator's activities at Pori following the fire seemed to be part of a "scam," and Venator was not using insurance proceeds to actually rebuild the facility but to prop up the Company's financial position.

10.       As Venator insiders knew, there was never any possibility that the facility would be rebuilt on the timeline Defendants represented to investors, and Venator was never "on track" or "on pace" to accomplish the impossible task of returning Pori to 100% production capacity by the end of 2018, as Defendants falsely claimed.  In reality, and as numerous Venator former employees reported, the preliminary demolition work—the first step in the reconstruction

5

process—was still ongoing in July 2018, with little to no work at all conducted on three of the four production lines throughout the entire Class Period. Indeed, Venator had not even completed its investigation into the Pori fire—let alone developed a plan to rebuild the facility—by the time of the Company's IPO.

11.     While investors were completely in the dark about the true facts, Defendants Turner and Maiter and other senior executives attended meetings about the Pori rebuild and received detailed updates concerning the work (or lack thereof) at Pori on a weekly basis, and senior management had "monthly meetings to review site activities" with Venator's insurers. As Defendant Maiter testified in an injunction proceeding brought by the Federal Trade Commission ("FTC"), he knew that Venator had been "shuffling" intermediate TiO2 from Scarlino to be finished at Pori, and that even by March 2018, the finishing process at Pori was not fully intact.

12.     The truth about Pori and its impact on Venator's business was revealed in a series of corrective disclosures that triggered dramatic declines in the price of the Company's shares. Specifically, beginning in 2018, Venator disclosed skyrocketing costs related to the Pori rebuild and admitted that the costs to return the facility to prior operating capacity would be hundreds of millions of dollars above insurance limits. Ultimately, Venator was forced to disclose that Pori would never be rebuilt, that hundreds of employees would lose their jobs, and that the Company never generated any profit whatsoever on the sale of products shipped to (at tremendous cost) and then "finished" at Pori. In fact, the impressive earnings that Venator reported during the Class Period had been secretly buoyed by a temporary surge in prices for TiO2 that had been triggered by the drastic elimination of TiO2 supply resulting from the Pori outage.

13.    In response to these disclosures, Venator stock price collapsed—falling over 70%, from $22 per share at the time of the SPO to $6.47 on November 1, 2018—wiping out hundreds of millions of dollars in shareholder value.

14.    While Venator has been a disaster for investors, Defendants reaped nearly $2 billion dollars in proceeds by concealing the truth about Pori.  Indeed, by selling its stake through the Venator spin-off, Huntsman garnered over $1.7 billion in proceeds that were used to pay down Huntsman debt, enabling Huntsman to cut its leverage ratio in half—from 3.8 in 2015 to 1.4 in 2018—the first time in Huntsman's history it was eligible to obtain an "investment grade" rating. Those actions also impacted the financial metrics that determined Peter Huntsman's compensation, and allowed the Huntsman family to avoid over $150 million in losses.  Indeed, Peter Huntsman took home nearly $17 million in compensation in 2017—including bonuses specifically paid in recognition of the "significant value" Huntsman obtained through the Venator IPO—the largest amount he has made in any year since becoming CEO in 2000.

15.    Lead Plaintiff brings this action to recover the damages to Venator investors caused by Defendants' misconduct.

## II.    JURISDICTION AND VENUE

16.    The claims alleged herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§77k, 77l(a)(2) and 77o, as well as Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

17.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C.§ 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

18.     Venue is proper pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 17 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged violations of the securities laws or their effects have occurred in this District.  Many of the acts charged in this Complaint, including the dissemination of materially false or misleading information, occurred in, or emanated from, this District.  In addition, certain of the Defendants reside, are headquartered, and/or maintain substantial operations in this District.

19.     In connection with the acts alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including without limitation the mails, interstate telephone communications, and the facilities of the national securities exchanges.

## III.    PARTIES

### A.    Lead Plaintiff

20.     The City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami") is a government entity that was founded in 1985 to provide benefits—including retirement, death, and disability benefits—to eligible employees of the government of the City of Miami, Florida.  Miami manages more than $704 million in assets for the benefit of active and retired members.  As set forth in its certification, Miami purchased a significant amount of Venator securities during the Class Period, and suffered substantial losses as a result of the violations of the federal securities laws alleged in this action.  In particular, Miami purchased approximately 25,050 shares of Venator common stock traceable to the IPO on August 3, 2017 and purchased shares in the SPO on November 30, 2017.  ECF No. 4-2.

21.     The Fresno County Employees' Retirement Association ("FCERA") is a government entity that was founded in 1945 to provide benefits—including retirement, death, and

disability benefits—to eligible employees of the government of the County of Fresno, California. FCERA manages more than $4.9 billion in assets for the benefit of active and retired members. As set forth in its certification, FCERA purchased a significant amount of Venator securities during the Class Period, and suffered substantial losses as a result of the violations of the federal securities laws alleged in this action.  In particular, FCERA purchased approximately 26,270 shares of Venator common stock traceable to the IPO between October 2017 and November 2017 and purchased shares in the SPO on November 30, 2017.  ECF No. 4-2.

22.    The City of Pontiac General Employees' Retirement System ("Pontiac") is a government entity that was founded in 1946 to provide benefits—including retirement, death, and disability benefits—to eligible employees of the government of the City of Pontiac, Michigan. Pontiac manages more than $496 million in assets for the benefit active and retired members. As set forth in its certification, Pontiac purchased a significant amount of Venator securities during the Class Period, and suffered substantial losses as a result of the violations of the federal securities laws alleged in this action.  In particular, Pontiac purchased approximately 14,970 shares of Venator common stock traceable to the IPO during November 2017 and purchased shares in the SPO on November 30, 2017.  ECF No. 4-2.

23.    Miami, FCERA, and Pontiac are collectively referred to herein as "Lead Plaintiff."

**B.    Defendants**

1.    Venator Defendants

24.    Defendant Venator Materials PLC ("Venator" or the "Company,") is a manufacturer and marketer of chemical products that derives the vast majority of its revenues from the sale of titanium dioxide, or TiO2.  Specifically, during the Class Period, the Company's Titanium Dioxide segment contained eight manufacturing facilities across the globe and accounted for more than 70% of the Company's total reported revenues.  Prior to the IPO in August 2017,

Venator was organized as the Pigments & Additives division within Defendant Huntsman, a multinational manufacturer of chemical products based Woodlands, Texas.  At that time, Huntsman was the second-largest pigments producer in the world after acquiring more than $1 billion in TiO2 plants from New York-based Rockwood Holdings in 2014 (the "Rockwood Acquisition"), which included Venator's facilities in Pori, Finland, Duisburg, Germany, and Uerdingen, Germany (the "Rockwood Facilities").  In connection with the IPO, Venator was incorporated under the laws of England and Wales as a public limited company.

25.     Defendant Simon Turner ("Turner") is the current Chief Executive Officer at Venator and was, at all relevant times, a Director of Venator.  Prior to the separation of Venator, Turner worked at Huntsman from 1999 until 2017, most recently serving as the senior-most executive of Huntsman's Pigments and Additives division from November 2008 until August 2017.

26.     Defendant Kurt D. Ogden ("Ogden") is the current Executive Vice President and Chief Financial Officer at Venator.  Prior to the IPO, Ogden worked at Huntsman for 13 years, most recently serving as the Vice President of Investor Relations and Finance from February 2009 until August 2017.

27.     Defendant Mahomed Maiter ("Maiter") served as the Senior Vice President of Venator's White Pigments Division Business Operations and is now Executive Vice President, Business Operations.  Prior to the IPO, Maiter served as Vice President, Revenue/Global Sales and Marketing at Huntsman since May 2008 and in other various senior leadership capacities with Huntsman since August 2004.  As Maiter stated in his March 8, 2018 deposition, discussed further below, Maiter provided "input" into Venator's presentations for "investors, potential investors [and] lenders."

28.     Defendant Stephen Ibbotson ("Ibbotson") served as Vice President and Corporate Controller for Venator.  Ibbotson signed the IPO Registration Statement and the SPO Registration Statement, as well as the Company's financial reports on Forms 10-K and 10-Q filed with the SEC during the Class Period

29.     Defendant Russ R. Stolle ("Stolle") is the current Senior Vice President, General Counsel, and Chief Compliance Officer at Venator.  Prior to the IPO, Stolle served as Senior Vice President and Deputy General Counsel at Huntsman.

30.     Defendants Turner, Ogden, Maiter, Ibbotson and Stolle are referred to collectively as the "Executive Defendants," and collectively with Venator, the "Venator Defendants."

        2.     Director Defendants

31.     Defendant Peter R. Huntsman ("Peter Huntsman") was, at all relevant times, Chairman of Venator's Board of Directors.  Peter Huntsman has served as the CEO of Huntsman Corporation since 2000. Peter Huntsman signed the IPO Registration Statement and SPO Registration Statement.  During the Class Period and around the time of the Venator IPO, Peter Huntsman also owned approximately 6 million shares of Huntsman Corporation stock worth approximately $165 million.

32.     Defendant Douglas D. Anderson ("Anderson") was, at all relevant times, a member of Venator's Board of Directors.  He was appointed to the Board of Directors on August 2, 2017 and has served as the Chair of the Audit Committee and as a member of the Nominating & Corporate Governance Committee of the Board of Directors. Anderson signed the SPO Registration Statement.

33.     Defendant Kathy D. Patrick ("Patrick") was, at all relevant times, a member of Venator's Board of Directors.  She was appointed to the Board of Directors on October 1, 2017 and has served as Chair of the Nominating & Corporate Governance Committee and as a member

11

of the Compensation Committee of the Board of Directors. Patrick signed the SPO Registration Statement.

34.     Defendant Sir Robert J. Margetts ("Margetts") was, at all relevant times, a member of Venator's Board of Directors. He has served as a Director of Huntsman since August 2010. Margetts has served as a member of the Audit Committee and Nominating & Corporate Governance Committee of the Board of Directors. Margetts signed the IPO Registration Statement and SPO Registration Statement.

35.     Defendant Daniele Ferrari ("Ferrari") was, at all relevant times, a member of Venator's Board of Directors. He was appointed to the Board of Directors on August 2, 2017 and has served as Chair of the Compensation Committee and as a member of the Audit Committee of the Board of Directors. Ferrari signed the SPO Registration Statement.

36.     Defendants Peter Huntsman, Anderson, Patrick, Margetts, and Ferrari are referred to collectively as the "Director Defendants." The Executive Defendants and the Director Defendants are referred to collectively as the "Individual Defendants."

            3.      Selling Shareholder Defendants

37.     Defendant Huntsman Corporation ("Huntsman") is a multinational manufacturer and marketer of chemical products for consumers and industrial customers. Huntsman was founded by Jon Huntsman, Sr., whose family—the Huntsmans—owns a substantial portion of the company. Specifically, in addition to Peter Huntsman, Jon Huntsman's son and the current CEO, the Huntsmans own, through the holdings of several family members and family-run enterprises, approximately 11% of Huntsman's equity, which is worth over half a billion dollars.

38.     Venator was separated from Huntsman in connection with the IPO—although Huntsman controlled and maintains control of Venator—and Huntsman sold the shares offered in

12

the IPO and the SPO through its wholly-owned subsidiaries Defendant Huntsman Holdings and Defendant Huntsman International (defined below).

39.     Throughout the Class Period, Huntsman exerted control over Venator.  As Venator acknowledged in its amended Form S-1, filed July 24, 2017, "Huntsman will continue to control a majority of the voting power of our ordinary shares. As a result, we will be a 'controlled company' within the meaning of the New York Stock Exchange listing standards."  Venator further acknowledged Huntsman's control in the Company's Form 10-K filed February 23, 2018, after the SPO, stating, "So long as Huntsman beneficially owns ordinary shares representing at least a majority of the votes entitled to be cast by the holders of our outstanding ordinary shares, Huntsman can effectively control and direct our board of directors."  Huntsman took advantage of this control, and Defendants Peter Huntsman and Margetts, who both served on the board of Huntsman, were appointed to Venator's board.  Venator further noted the control that Huntsman exerted over more internal Venator functions, stating that "by virtue of Huntsman's controlling ownership and the tax matters agreement, Huntsman effectively controls all of our tax decisions in connection with any tax reporting group tax returns in which we (or any of our subsidiaries) are included."

40.     Defendant Huntsman (Holdings) Netherlands B.V. ("Huntsman Holdings") is a wholly-owned subsidiary of Defendant Huntsman.  Huntsman Holdings sold shares offered in the IPO and the SPO.

41.     Defendant Huntsman International LLC ("Huntsman International") is a wholly-owned subsidiary of Defendant Huntsman.  Huntsman International sold shares offered in the IPO.

42.     Huntsman exerted its control over Venator, in part, through Huntsman Holdings and Huntsman International.  As stated in Venator's amended Form S-1, filed July 24, 2017, "Upon

the completion of this offering, we will be a stand-alone public company and Huntsman, through one or more subsidiaries, including HHN, will be our controlling shareholder."

43.     Defendant Huntsman, together with Defendant Huntsman Holdings and Defendant Huntsman International, are referred to collectively as the "Selling Shareholder Defendants."

44.     The Selling Shareholder Defendants controlled Venator before, during, and immediately after both the IPO and the SPO.  Prior to the IPO, the Selling Shareholder Defendants beneficially owned all of Venator's ordinary shares.  Through the IPO, completed on August 8, 2017, the Selling Shareholder Defendants sold 26,105,000 shares of Venator at an offering price of $20 per share and received all of the proceeds, which totaled approximately $522 million.  Through the SPO, which completed on December 4, 2017, the Selling Shareholder Defendants sold 21,764,000 shares of Venator at an offering price of $22.50 per share and received all the proceeds, which totaled approximately $490 million.  On December 4, 2018, the Selling Shareholder Defendants sold an additional 4,4334,389 shares of Venator and received all the proceeds, which totaled approximately $19 million.  Following these transactions, and the exercise of options by the underwriters in connection with the IPO and SPO, Huntsman owned approximately 48.3% of the Company's shares.  In total, the Selling Shareholders Defendants received approximately $1.03 billion for the sale of Venator shares.

4.     Underwriter Defendants

45.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as a lead underwriter for the IPO and the SPO and sold millions of Venator shares in each of the IPO and SPO, receiving certain fees and commissions.  In the IPO, Citigroup was allocated 5,522,910 shares to sell to the investing public.  In the SPO, Citigroup was allocated 5,163,404 shares to sell to the investing public.  Citigroup acted as a representative of the underwriters in the IPO and SPO.

14

46.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as a lead underwriter for the IPO and the SPO and sold millions of Venator shares in each of the Offerings, receiving certain fees and commissions.  Specifically, in the IPO, Merrill Lynch was allocated 3,075,850 shares to sell to the investing public.  In the SPO, Merrill Lynch was allocated 5,163,404 shares to sell to the investing public.  Merrill Lynch acted as a representative of the underwriters in the IPO and SPO.

47.     Defendant Goldman Sachs & Co. LLC ("Goldman") served as a lead underwriter for the IPO and the SPO and sold millions of Venator shares in each of the Offerings, receiving certain fees and commissions.  In the IPO, Goldman was allocated 5,522,910 shares to sell to the investing public.  In the SPO, Goldman was allocated 5,163,404 shares to sell to the investing public.  Goldman acted as a representative of the underwriters in the IPO and SPO.

48.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as a lead underwriter for the IPO and the SPO and sold millions of Venator shares in each of the Offerings, receiving certain fees and commissions.  In the IPO, J.P. Morgan was allocated 3,075,850 shares to sell to the investing public.  In the SPO, J.P. Morgan was allocated 2,816,402 shares to sell to the investing public.  J.P. Morgan acted as a representative of the underwriters in the IPO and SPO.

49.     The Defendants referenced in ¶¶ 45-48 are collectively referred to as the "Underwriter Defendants." The Underwriter Defendants are investment banking houses which specialize, inter alia, in underwriting public offerings of securities.   They served as the underwriters of the IPO and SPO and shared more than $48 million in fees paid to the underwriting syndicate.

## IV.    FORMER VENATOR EMPLOYEES[1]

50.    Certain of the Complaint's allegations are based on information provided by former Venator employees interviewed by Lead Counsel.

51.    Former Employee 1 ("FE 1") was a Project Coordinator and Transformation Coach at the Pori facility from 2009 until January 2019.  FE 1 served in a managerial role at Pori after the fire.

52.    Former Employee 2 ("FE 2") worked in production at the Pori facility from March 1994 until December 2018.  Following the fire, FE 2 worked in the water works and had direct knowledge of the Pori facility's power usage.

53.    Former Employee 3 ("FE 3") worked as a Warehouse Manager and Purchaser at the Pori facility from January 2005 until December 2018.

54.    Former Employee 4 ("FE 4") worked as the North American Market Manager for Huntsman and then Venator from July 2016 until December 2018.  FE 4 handled all the sales activity for Venator's ink and fiber businesses in the United States and his/her work was directly impacted by the Pori outage.

55.    Former Employee 5 ("FE 5") worked as the Director of Supply Chain in Venator's Specialty Business Unit from 2017 until 2018, in which FE 5 oversaw part of the product stream coming out of Pori.

---

[1] For ease of readability while preserving the former employees' anonymity, the Complaint uses the terms "he/she" and "his/her" to refer to all former employees.

## V.   EXCHANGE ACT ALLEGATIONS

### A.   Background On Venator

56.     Venator is a manufacturer and marketer of chemical products, particularly TiO2—a white inert pigment that provides whiteness, opacity and brightness to a range of everyday products, including plastics, paints, coatings, inks, fibers, food and personal care products.  The TiO2 market is divided into two distinct segments: (i) commoditized or functional TiO2 and (ii) specialty or differentiated TiO2.  The most significant difference between the two types of TiO2 is that the prices for commoditized TiO2 follow a boom-and-bust economic cycle, and sometimes fall to severe, unprofitable lows.   Commoditized TiO2's price follows this cycle because commoditized TiO2 products are generally uniform in quality, even between different producers, and customers can easily substitute functional TiO2 produced by different manufacturers.  As a result, the price for commoditized TiO2 closely tracks global demand.  Further, when demand decreases, producers cannot take production offline to reduce supply and help stabilize prices because the fixed-cost of operating TiO2 factories is high and taking production offline does not decrease the overall operating cost.  Instead, TiO2 producers are forced to sell the commoditized TiO2 at a cheaper price, which further decreases prices throughout the market.

57.     By contrast, specialty TiO2 generally sells at a much higher margin than functional TiO2, and these margins are more stable.  Specialty TiO2 is used in end products such as fibers, catalysts, food, pharmaceuticals and cosmetics.   These products often require TiO2 that is produced with unique qualities; for example, pharmaceutical TiO2 must be safe for human consumption.  As a result, consumers of specialized TiO2 products cannot simply switch to whichever product is the cheapest on the marketplace.  In fact, for certain specialized TiO2 products, only one option is available.  As a result, producers of specialized TiO2 products can

17

demand a premium compared to commoditized TiO2 for their product, which protects specialized TiO2 from the dramatic price swings in the commoditized market.

58.     As Venator explained in its SEC filings, the Company differentiated itself from its competitors by focusing primarily on specialty TiO2, noting that the Company's higher margin and more reliably profitable specialty TiO2 products insulated it from the boom-and-bust cycles that characterize the functional TiO2 market.  Specifically, Venator claimed to be the "leading differentiated TiO2 producer in the world," having developed a specialty TiO2 portfolio that "has allowed us to reduce our exposure to more commoditized TiO2 applications, while growing our position in the higher value differentiated applications where there is a greater need for technical expertise and client service."  According to Venator, the Company's specialty TiO2 business was three times larger than that of the Company's next closest competitor during the Class Period.  A Huntsman spokesman highlighted this feature prior to Venator's IPO, explaining at a May 16, 2017 investor conference that what sets Venator apart from its peers is its "150,000 tons of what we'd consider to be specialty [capacity]," which carries a "$1,000 per ton price premium."

59.     Venator's TiO2 facility in Pori, Finland was a vital component of Venator's TiO2 manufacturing segment—and by extension, its entire business—because of its production of specialty TiO2.  Prior to the fire at Pori (discussed in depth in Section V.D. below), Pori was Venator's second largest TiO2 facility, with a nameplate capacity of 130,000 metric tons per year, and accounted for approximately 17% of Venator's total nameplate capacity and 2% of global TiO2 demand.[2]  Moreover, 60% of the facility's capacity was dedicated to producing specialty

---

[2] Nameplate capacity represents a facility's maximum production capabilities.

TiO2, with Venator reporting that, on average, those specialty products contributed greater than 75% of the site's profit or EBIDTA.[3]

60.     Further, as detailed by multiple former employees of Venator, including FE 1, a former project coordinator and transformation coach at Venator from 2016 to 2019, and FE 5, a supply chain director of Venator's specialty business unit from 2017 to 2018, at Pori, Venator produced certain highly specialized, cutting-edge products, including pharmaceutical grade TiO2 products. These products could not be manufactured at any other Venator facilities because they lacked the requisite equipment, personnel, and expertise. As Defendant Turner explained during Huntsman's Investor Day on March 2, 2016, prior to the sale of the Venator business, "Pori is probably the best sulfate plant in the world, this is a plant that's not only got efficiency and scale, it's got fantastic revenue streams coupled up with a cosmetics and food and pharma application."

### B.     The TiO2 Manufacturing Process

61.     TiO2 is manufactured in two different processes, the sulfate process and chloride process. The majority of Venator's facilities produced TiO2 using the sulfate process, which entails a three-step production process to turn the raw iron ore "feedstock" into TiO2. First, the iron feedstock is treated with sulfuric acid to extract the TiO2 pigment, although the resulting TiO2 is still hydrated and must be separated from the processing liquids. This process occurs in the "black end" of the manufacturing facility. Second, the TiO2 is filtered out from the processing

---

[3] EBIDTA refers to Earnings Before Interest Expense, Interest Income, Income Tax Expense/Benefit, Depreciation and Amortization, and net income attributable to non-controlling interests. In reporting its quarterly financial results, Venator provided investors with adjusted EBIDTA, a non-GAAP measure which it defined as "net income (loss) from continuing operations before interest, income tax and depreciation and amortization." According to Venator, adjusted EBIDTA, which is comparable to net income under GAAP, is used by management and provided to investors because it excludes certain items that Venator claims are not indicative of operational profitability and that may obscure underlying business results and trends.

liquids using "Moore" filters and sent to a calciner, a rotating steel cylinder inside a heated furnace, where the newly created TiO2 crystals can grow and the remaining water can be extracted. Finally, and only after the TiO2 has dried in the calciner, the TiO2 can begin the "finishing" phase, where it is milled and chemically treated based on the product's intended end use. The third and final finishing phase occurs in the "white end" of the manufacturing facility.

62.    The finishing phase is the least costly and least labor-intensive part of the manufacturing process and is not even necessary in all instances. As Jean-Francious Turgeon, COO of rival TiO2 manufacturer Tronox Holdings PLC ("Tronox"), testified before the FTC, "The finishing is only, I mean, 10 to 15 percent of the work, you know, and of the cost, because the hard work in making pigment is achieving the 100 percent TiO2 product, the molecule. And it's true in both sulfate and chloride pigment."

63.    In fact, TiO2 can be sold without proceeding through the finishing process at all. Kronos Worldwide, Inc. ("Kronos"), one of the world's five largest TiO2 manufacturers, stated in the Company's Forms 10-K filed for the years 2010 through 2018 that, "[a]fter separation from the impurities in the ore (mainly iron), the TiO2 is precipitated and calcined to form an intermediate base pigment ready for sale or can be upgraded through finishing treatments."

64.    Venator, Huntsman, other industry participants, analysts and investors understand that the amount of TiO2 end-product produced by completing this three-step process represents a manufacturing facility's total "capacity," and use the term "capacity" when referring to the complete production process.

65.    For example, prior to its separation, when Venator still existed as the Pigments and Additives division of Huntsman, Huntsman made the decision to close only the "black end" of its TiO2 facility in Calais, France while continuing to operate the "white end" of the facility. Before

closing the "black end" at the Calais facility, Huntsman reported that the Calais factory had an annual "capacity" of approximately 95,000 metric tons.  After closing the "black end" of the facility, Huntsman reported that the Calais facility had an annual capacity of *zero* – "0" – even though the "white end" of the facility was still finishing TiO2.

66.     In doing so, Huntsman executives—including Defendants Peter Huntsman, Turner and Ogden—made clear that closing only the "black end" portion of the facility would eliminate the facility's entire capacity, telling investors that the "black end" closure "will reduce our titanium capacity by approximately 100 kilotons, or 13% of our European capacity."  Defendants also made clear that even though the "finishing" portion of the Calais facility was still operational, the "finishing" process did not generate any TiO2 "capacity" whatsoever, and instead was designated deliberately and solely as a "finishing facility" in Huntsman's and Venator's SEC filings.  For example, in Huntsman's annual report and Form 10-K for 2015, Huntsman described the Calais facility solely as a TiO2 finishing facility that did not generate any TiO2 capacity whatsoever, as highlighted below:

| Site | Annual Capacity (metric tons) | | | Process |
|------|------|------|------|------|
| | EAME | North America | APAC | |
| Greatham, U.K. | 150,000 | | | Chloride TiO2 |
| Pori, Finland | 130,000 | | | Sulfate TiO2 |
| Uerdingen, Germany | 107,000 | | | Sulfate TiO2 |
| Duisburg, Germany | 100,000 | | | Sulfate TiO2 |
| | 100,000 | | | Functional additives |
| Calais, France | 0 | | | TiO2 finishing plant |
| Huelva, Spain | 80,000 | | | Sulfate |
| Scarlino, Italy | 80,000 | | | Sulfate |
| Umbogintwini, South Africa | 25,000 | | | Sulfate |
| Lake Charles, Louisiana(1) | | 75,000 | | Chloride |
| Teluk Kalung, Malaysia | | | 60,000 | Sulfate |
| Total | 772,000 | 75,000 | 60,000 | |

67.     Similarly, in the prospectus Venator filed in connection with its IPO, Venator did not even list the Calais facility when detailing the Company's "[p]roduction capacities," and only referenced the Calais facility in a footnote, calling it a "finishing plant":

22

| Site | Annual Capacity (metric tons) | | | Process |
|---|---|---|---|---|
| | EAME(1) | North America | APAC | |
| Greatham, U.K. | 150,000 | | | Chloride TiO2 |
| Pori, Finland(3) | 130,000 | | | Sulfate TiO2 |
| Uerdingen, Germany | 107,000 | | | Sulfate TiO2 |
| Duisburg, Germany | 100,000 | | | Sulfate TiO2 |
| Huelva, Spain | 80,000 | | | Sulfate TiO2 |
| Scarlino, Italy | 80,000 | | | Sulfate TiO2 |
| Lake Charles, Louisiana(2) | | 75,000 | | Chloride TiO2 |
| Teluk Kalung, Malaysia | | | 60,000 | Sulfate TiO2 |
| Total | 647,000 | 75,000 | 60,000 | |

(1) Excludes a sulfate plant in Umbogintwini, South Africa, which closed in the fourth quarter of 2016, and our TiO$_2$ finishing plant in Calais, France.

(2) This facility is owned and operated by LPC, a manufacturing joint venture that is owned 50% by us and 50% by Kronos. The capacity shown reflects our 50% interest in LPC.

(3) In January 2017, our TiO$_2$ manufacturing facility in Pori, Finland experienced fire damage, and it is currently not fully operational. We are committed to repairing the facility as quickly as possible and we anticipate that some level of production will have resumed prior to completion of the separation and we estimate that the Pori facility will be fully operational around the end of 2018. The Pori facility has nameplate capacity of up to 130,000 metric tons per year, which represents approximately 17% of our total TiO$_2$ nameplate capacity and approximately 2% of total global TiO$_2$ demand.

68.     Further, in its Prospectus, Venator clarified that "finishing" process encompasses only the *final step* in TiO2 production.  Venator stated that "[o]nce an intermediate TiO2 pigment has been produced using either the chloride or sulfate process, it is 'finished' into a product with specific performance characteristics for particular end-use applications."  Venator repeated this explanation in the Company's prospectus filed prior to the SPO on December 1, 2017, and in the Company's Forms 10-K for 2017 and 2018 filed February 23, 2018 and February 20, 2019, respectively.

69.     Similarly, Venator's competitors delineated the "finishing" process as the *final step* when discussing TiO2 production with investors, and referred to "capacity" exclusively in

connection with the entire manufacturing process.  For example, in Tronox's Forms 10-K filed on February 28, 2013 and February 27, 2014, the company stated:

> In the sulfate process, batch digestion of ilmenite ore or titanium slag is carried out with concentrated sulfuric acid to form soluble titanyl sulfate. After treatment to remove soluble and insoluble impurities and concentration of the titanyl sulfate, hydrolysis of the liquor forms an insoluble hydrous titanium oxide. This precipitate is filtered, bleached, washed and calcined to produce a base pigment that is then forwarded to the finishing step.

70.    As reflected above, and as made clear in Huntsman's and Venator's SEC filings, as well as filings from other TiO2 manufacturers, a facility's TiO2 production "capacity" does not include products that are merely "finished" at that facility.

### C.    Huntsman's Pori Facility Was A Critical Part of the Venator Spin-Off

71.    Huntsman initially intended to spin-off its pigments business—including Huntsman's TiO2 business segment—to its shareholders, including the Huntsmans, in order to capture the economic benefit of a strengthening TiO2 market.  For example, on October 28, 2016, Huntsman disclosed that it would separate its pigments and additive business through a U.S. tax-free spin-off to Huntsman shareholders, stating in a press release that the "shares of the spin-off corporation that will be distributed to Huntsman shareholders in the spin-off are expected to be listed and traded on the New York Stock Exchange."  As Huntsman's largest shareholders, the Huntsmans would be the largest benefactors of the spin-off—and would own an equivalent stake in the spin-off company.

72.    At the time, TiO2 were prices were seeing some improvement, and as Peter Huntsman explained to investors on Huntsman's third quarter earnings call held October 28, 2016, Huntsman's plan to spin-off the pigments business to existing Huntsman shareholders—as opposed to selling it to public investors through an IPO—would benefit Huntsman shareholders by enabling them to "capture the appreciation in value associated with an improving titanium

dioxide cycle."  Defendant Ogden similarly explained at a Bank of America Merrill Lynch America Leveraged Finance Conference on November 30, 2016 that Huntsman wanted to "preserve the economic upside as the $TiO_2$ cycle improves."  He added that "we didn't want to give the [TiO2] business away at the bottom of the cycle."

73.     Shortly thereafter, Huntsman solidified its plans to spin-off the Venator business to existing Huntsman shareholders in the first half of 2017.  At a Bank of America Merrill Lynch America Leveraged Finance Conference on November 30, 2016, Defendant Ogden told investors that Huntsman planned "to complete [the Venator] spinoff in the ***first half of 2017***."  Huntsman then publicly confirmed that the company would separate its pigments business by spinning-off Venator to Huntsman shareholders on January 17, 2017 in a press release filed that day.  Huntsman also announced through the press release that the spin-off would be called Venator Materials Corporation.

**D.     The Pori Facility Burns Down**

74.     On January 31, 2017, Huntsman announced that a seemingly inconsequential fire had damaged its Pori facility.  As Huntsman disclosed in a press release, the fire had started the previous morning, January 30, 2017, and the "fire brigade responded quickly and extinguished the fire."  Huntsman stated that it was "committed to repairing the facility as quickly as possible to ensure that customers can continue to receive the quality products by [the] Pori site."

75.     Based on the information provided by Huntsman shortly following the fire, analysts presented positive assessments for the Pori facility restarting.  Wells Fargo analysts stated that the closure would only last "several months," while J.P. Morgan analysts expected the plant to be "offline for 60-90 days."  The estimates would have been wildly unrealistic had investors been told the true extent of fire's damage.

76. Indeed, Huntsman's press release and other reassurances to investors concealed the severity of the damage of the damage caused by the fire, and the reality of the devastating impact on the Venator business. In fact, rather than having been quickly "extinguished" at the time the press release was issued, the fire was still smoldering in some portions of the facility, and Huntsman could not even re-enter the facility because of the potential that radiation could leak from the damaged instruments.

77. In truth, Pori had been destroyed. As detailed by the fire inspection report, or "onnettomuustutkintalautakunta," conducted by the Finnish Safety Authority obtained by Lead Plaintiff through a records request, the fire sparked from one of the Facility's electrical filters in the central building and spread quickly through Pori's pipe network and through the manufacturing halls. The fire rose up through the central structure, which measured three to five stories throughout the building, and eventually reached the roof, setting alight the "process gas pipes" there, which "burned rapidly, spreading the fire." "Within minutes, the fire spread across the entire width of the building," setting 15,000 square meters of the facility's roof ablaze, as well as the indoor spaces below the burned roof.

78. FE 1 and FE 2, both of whom worked at Pori for over a decade and both before and after the fire, explained that this central facility detailed in the Finnish accident report was Pori's "Moore" facility. All four of Pori's production lines connected through the "Moore" facility, from the precipitator in the "black end" of the Facility to the finishing area in the "white end."

79. By the time the first fire teams arrived at the scene at 5:54 a.m. (GMT +2) on January 30, 2017, the fire was already widespread. The central building, where the fire originated, was in flames and the "flames extended from ground level up to the ceiling." Along the roof, "the process-gas pipes were burning intensely," and "pipes leading to the adjacent powerplant building,

and to the high smokestack, burned with open flames."  Further, "hot metal objects, and molten fiberglass" fell from the burning roof, igniting the other floors in the Facility below.  These falling, flaming objects were joined by "[s]everal explosions" that fire inspectors stated were likely caused by "heat-induced damage to various pressure vessels."

80.     The size and intensity of the fire made it difficult to extinguish.  The plant is very large—over the length of a football field at almost 400 meters, and an average of 20 meters high, with the highest burning roofs at a height of 30 meters—and the "fire spread over a wide area with a damaged roof area of 15,000 square meters."  Over 300 rescue team personnel spent more than 20 hours on the primary extinguishing efforts, not including the on-site fire brigade, which took over combating the remaining fire approximately 48 hours after the fire had started.  The fire remained out of control until a helicopter could be deployed at 12:50 p.m. (GMT +2) to combat the fire spreading across the facility's roof.  Smoldering and burning was still detected within the walls of the plant buildings "a full week after the fire," feeding off of the insulation inside the facility's walls.

81.     The entire Pori facility was damaged during the fire except for one small, auxiliary building.  However, the middle "Moore" section of the facility suffered the worst damage, with some areas suffering "complete destruction."  As confirmed by both FE 3, who worked as a purchaser and warehouse manager at the Pori facility from 2005 until 2018, and FE 2, who also worked in production at Pori during the time of the fire, the fire destroyed all four of the facility's production lines.  Only the "white-end" finishing portion of the "CD" production line survived.

82.     At least one month elapsed before the premises were declared safe enough to enter so that the damage could be assessed.  FE 1 explained that some of the instruments used in the Pori facility and damaged in the fire had the potential to leak radioactive material as a result of the fire

damage, and the danger had to be assessed before the factory could safely be re-entered.  As the Finnish Safety Authority report noted, two weeks after the fire, on February 16, 2017, the Radiation and Nuclear Safety Authority ("STUK") conducted a readiness inspection to assess the radiation risk.  According to the report, there were 41 sources of radiation in the fire area, and in connection with the inspection, "no area damaged by the fire was reached, so complete assurance of the condition of the radiation sources was not obtained."  As a result, STUK required Huntsman to develop a plan to clear the burned areas so as not to compromise radiation safety.

83.     In fact, the Finnish Safety Authority noted that while Huntsman had "set up its own internal investigation team to investigate the fire," the Huntsman investigation team's report "***was not completed during the accident investigation***" conducted by Finnish authorities and still had not been completed its investigation by September 22, 2017—weeks after the Venator IPO.

### E.     Recognizing That Pori Had Been Destroyed, Huntsman Switches Transaction Structures In Order To Dispose Of Its Interest In The Pigments Business And Accelerates The Separation

84.     The damage to Pori and its impact on the pigments business was immediately apparent to Huntsman insiders.  Senior Huntsman executives visited the facility in the weeks after the fire, including Peter Huntsman, who gave a speech to Pori workers on February 8, 2017. Huntsman senior executives formed a task force to deal with the Pori outage, and recognized that the damage to the Pori facility would have a severe and lasting impact on the pigments business. However, rather than pause to assess how and whether Pori could return to normal operating capacity, Huntsman's senior executives determined to dispose of the pigments business as quickly and profitably as possible.

85.     In doing so, Huntsman determined to alter the transaction structure for the separation of the pigments business that it had previously said it would use.  Even though the IRS approved the spin-off structure on February 16, 2017—permitting Huntsman to retain a 40%

economic interest in the business tax-free in distributing the remaining interest to existing Huntsman shareholders—Huntsman decided to pursue an alternative plan to separate the pigments business as an IPO to public shareholders.

86.     By separating from the Venator business through an IPO (rather than through a shareholder spin-off as originally planned and the IRS approved), the Huntsmans would avoid being saddled with an equity interest in a newly separated company whose business had been imperiled by the destruction of the Pori facility.   At the time, the Huntsman family owned approximately 27.5 million Huntsman shares, or approximately 11% of the company's outstanding equity worth over half a billion dollars, and a spin-off would have given the Huntsmans an equivalent stake in the new company.   By contrast, an IPO would allow the Huntsmans to dispose of their interest in the doomed pigments business while also raising substantial cash from the investing public to pay off Huntsman debt—an objective that took on heightened urgency in light of the merger discussions that Huntsman was having with rival specialty chemicals maker Clariant AG ("Clariant").

87.     Specifically, while Huntsman had for nearly 10 years entertained the possibility of merging with Clariant, those discussions accelerated in the beginning of 2017.   Rumors of a potential merger first surfaced on March 28, 2017 when then-Huntsman Chairman Jon Huntsman Sr. told investors at an investor conference that the Company was "seriously looking at the possibility of doing a merger," which Jon Huntsman said would follow a spin-off of the pigments business.   On May 21, 2017, *The Wall Street Journal* reported that Clariant and Huntsman were in discussions to merge.   The next day, on May 22, 2017, the two companies formally announced the proposed transaction in a joint call held by Huntsman CEO Defendant Peter Huntsman and Clariant CEO Hariolf Kottmann.   As the two disclosed that day, under the proposed transaction,

Peter Huntsman would be installed as the CEO of the combined company, which would become the second largest chemical company in the world.

88.    Just before the proposed merger was announced, on April 26, 2017, Huntsman disclosed that it had abruptly changed plans for the future of Venator. Instead of pursuing a tax-free spin-off, Huntsman now planned to separate by conducting an initial public offering, selling Huntsman's interest in the Venator business to the investing public rather than spinning it off directly to existing Huntsman shareholders. With the IPO proceeds, Huntsman could quickly pay off a significant portion of its existing debt, achieve an investment grade rating, and appease the activist investors who were opposed to the Huntsman-Clariant deal precisely because of Huntsman's overburdened balance sheet.

### F.    Huntsman Reassures Investors It Is "Committed To Rebuilding The Facility As Quickly As Possible" And Would Not Proceed With A Separation "Under Any Cloud Of Uncertainty" About Pori

89.    Even though Huntsman had dramatically changed the transaction structure for the Venator separation due to the impact of the Pori fire, Defendants knew that disclosing the truth about Pori would doom the IPO. Instead, Huntsman executives explained that the change was driven supposedly legitimate factors, such as the "rebound" in the TiO2 market, and repeatedly assured investors that the Pori fire had no impact. Indeed, before anyone at Huntsman could even enter the facility—let alone conduct the necessary inspection to assess the damage—Huntsman told investors that the Venator separation would not occur unless and until there was a near certainty that Pori would return to its full prior operating capacity.

90.    Specifically, on February 26, 2017, two weeks following the fire and before anyone could safely reenter Pori, Peter Huntsman confirmed on Huntsman's fourth quarter 2016 earnings call that Huntsman still planned to conduct the tax-free spin-off its TiO2 business. During the call, Peter Huntsman assured investors that Huntsman was "committed to rebuilding the facility as

quickly as possible" and that if the Venator spin-off happened before "the restart and demonstration of Pori coming back online," then Huntsman management would "have to be very, very certain that we were very close to startup, and that there wasn't a lot of start-up risk."  Further, Peter Huntsman told investors that the fact that Huntsman would retain a significant 40% economic interest in the separated company reflected its "vote of confidence in what we believe will be a successful spin-off."

91.     Peter Huntsman also made clear that the Venator separation would not occur if management was not entirely confident about the ability to rebuild the Pori facility, as Huntsman did not want "a spin that takes place under any sort of cloud of uncertainty."  In response to an analyst's question, Peter Huntsman specifically told investors that Huntsman would not proceed with the Venator separation until it had "absolute clarity and certainty about where we're going and how we are operating."

92.     Huntsman executives reassured investors—who repeatedly asked about the Pori facility and its impact on the separation—that Pori's capacity would quickly come back online. For example, on March 27, 2017, Huntsman disclosed a timeline for restarting the Facility that reaffirmed Peter Huntsman's earlier comments downplaying the extent of the damage caused by the fire.  Specifically, Huntsman represented that the entire facility would return to 100% capacity in a year and a half—with approximately 20% of capacity restored by the end of the second quarter 2017, an additional 40% brought online by the end of the first half 2018, and the final 40% completed and the site returning to full 100% capacity by the end of 2018.

93.     Even though Huntsman told investors that the separation would not take place "under any sort of cloud of uncertainty," Huntsman accelerated the separation timeline after announcing it would be pursued as an IPO.  For example, Peter Huntsman mentioned multiple

times in the call announcing the proposed Huntsman-Clariant merger on May 22, 2017 that the merger would "not impact our expected IPO of our Pigments & Additives business this summer." In fact, Huntsman began the process of monetizing the separation from the Venator business just weeks later on June 26, 2017 by launching a private offer for an aggregate $375 million in senior notes through the soon-to-be separated business. According to a Huntsman press release announcing the private offer, the company planned to use the proceeds from these senior notes to "repay intercompany debt owed to Huntsman, to pay a dividend to Huntsman and its subsidiaries and to pay related fees and expenses."

G.    **Huntsman Rushes To Complete The Venator IPO Before Completing Its Investigation Into The Fire**

94.    Despite Huntsman's repeated reassures investors concerning the Pori timeline and progress of the rebuild, Huntsman still had not completed its own investigation into the fire. The Finnish fire report on Pori, completed after the IPO, stated that the "factory owner, the American Huntsman Group, set up its own international investigation team to investigate the fire. ***The investigation team's report was not completed during the accident investigation by the Accident Investigation Authority.***"

95.    Notwithstanding the fact that Huntsman had not even completed its own investigation into the fire—and thus could not possibly have properly assessed the damage or its ability to rebuild—Huntsman sped ahead with the IPO process. For instance, Venator filed a Form S-1 with the SEC on May 5, 2017 which reiterated the timeline for the Pori completion that Peter Huntsman had provided investors just weeks before. In response to SEC comments, Venator filed a series of amendments to the S-1 on June 13, June 30, and July 14—each reiterating the timeline in which 20% of the Pori was operational by the end of the second quarter, and the facility would be fully operational by the end of 2018.

96.     While the SEC had several comments to the S-1 and the amendments, one particular criticism stood out.  Specifically, in a June 13, 2017 letter from the SEC, the agency requested that Venator provide better disclosures to investors concerning the Company's earnings and operating expenses.  The SEC specifically cited a lack of clarity concerning the material drivers impacting the Company's earnings, and asked that Venator "ensure your disclosures discuss the main cost drivers affecting your operating expenses and quantify in dollars how those increases/decreases in costs impacted your Segment Adjusted EBITDA amounts during each period presented."

97.     As noted below, even after Venator amended its SEC filings in a purported effort to address the agency's concerns, investors were still in the dark about the true drivers of the Company's expenses and their impact on earnings.   The lack of disclosure concerning the Company's operating expenses were particularly problematic given that, during this time, Pori-related expenses were skyrocketing, and the impact of the fire on Pori's earnings was unclear. Instead of providing the disclosures requested by the SEC, Venator made a series of misrepresentations that obfuscated the impact of the Pori outage on TiO2 prices, the allocation and amount of Venator's business interruption insurance, and the resulting impact on earnings.

98.     Indeed, Defendants provided additional assurance to investors concerning Venator's prospects by explaining that insurance would largely cover the cost of both the facility rebuild and any earnings lost from Pori's outage.  As Huntsman told investors before the Class Period, and as Venator explained in the prospectus issued in connection with the IPO and in other SEC filings throughout the Class Period, the Pori facility was insured for $500 million, which covered both property damage and business interruption losses.  As a result, Venator repeatedly told investors that the "fire at our Pori facility did not have a material impact" on quarterly operating results "as losses incurred were offset by insurance proceeds."  Moreover, as Venator

noted in those filings, Company management had "established a process with our insurer that provides timely advance payments for the reconstruction of Pori manufacturing facility and recovery of business interruption losses."   And as Peter Huntsman told investors on Huntsman's April 26, 2017 first quarter 2017 earnings call, "[b]eginning the second quarter, we expect to be ***reimbursed by our insurers for all lost margins going forward.***"   But in truth, Huntsman used the insurance policy to prop up Venator's earnings—so that it could capitalize in the fully subscribed and generously priced IPO and SPO—rather than rebuild Pori.

99.   Indeed, Defendants' statements concealing the true impact from Pori—and the repeated and definitive timeline for Pori's return—gave analysts confidence in the to-be-separated company's prospects, with Wells Fargo analysts commenting in a June 27, 2017 report that "[w]e still expect the Pori facility to come back online by late 2018."

100.   Consistent with the timeline for separating the pigments business before the fire— and before Huntsman had completed its investigation of the fire—on August 2, 2017, Venator entered into an underwriting agreement with the Underwriter Defendants in which it would sell a 25% stake in the business for half a billion dollars.   Huntsman's agreement with the Underwriter Defendants included a lock-up agreement which barred "Huntsman and its directors and executive officers, and the selling shareholders and their directors and executive officers" from selling any Venator shares for 180 days after the date of the IPO.[4]   Importantly, however, the lock-up could be waived by agreement of three of the four Underwriter Defendants, in which case Huntsman could sell its shares "at any time without notice."

---

[4] A lock-up agreement is a contractual provision barring insiders of a company from selling their shares for a specified period of time.

### 1.    *Huntsman Separates Venator Through the IPO*

101.    In the IPO, Huntsman marketed Venator based on its three main factors: (i) its significant TiO2 production, both globally and in Europe, (ii) the quality of its specialty products, which strongly positioned Venator in comparison to peers that were more focused on commoditized products, and (iii) its strong customer base, which resulted from the first two factors, *i.e.*, the Company's strong production capabilities and superior specialized products.

102.    First, sheer production numbers were an important part of Huntsman's pitch. Venator would be "among the three largest global TiO2 producers, with nameplate production capacity of approximately 782,000 metric tons per year, accounting for approximately 11% of global TiO2 production capacity."

103.    Second, Venator would be supported by the strength of its specialty products and associated customers.   The IPO materials marketed Venator as "the leader in the specialty $TiO_2$ industry segment, which includes products that sell at a premium and have more stable margins," with a specialty business "three times larger than that of our next closest competitor." According to the IPO registration statement, "specialty and differentiated products" would account for "approximately half of our 2016 TiO2 sales."

104.    Third, these specialty products would allow Venator to cultivate a more stable and specialized customer base.   According to the IPO materials, Venator's "focus is on marketing products and services to higher growth and higher value applications . . .such as fibers and films, catalysts, cosmetics, pharmaceuticals and food, where customers' needs are complex resulting in fewer companies that have the capability to support them."   As fewer companies could fulfill these product requirements, Venator occupied a niche position and had the ability to become a sole supplier for those customers.

35

105. Pori was critical to all three aspects of the Venator investment proposition. At the time, Pori was the second largest facility at Venator with a nameplate capacity of 130,000 metric tonnes and would help Venator "take advantage of an improvement in the TiO2 industry cycle," noting this fact was one of the Company's "Competitive Strengths." Venator's filing noted that TiO2 prices had surged by $300 per metric ton in 2016 based on an "approximately 8%" growth in demand, and were projected to grow by an additional "$600 per metric ton, the equivalent of more than 24%, from December 31, 2018 through the end of 2017." According to Venator, "[w]ith approximately 782,000 metric tons of annual nameplate production capacity, we believe that we are well-positioned to capitalize on recovering TiO2 demand and prices." Venator's statement touting the Company's production numbers included Pori's full 130,000 metric tons capacity.

106. Pori also contributed significantly to Venator's earnings. While Venator did not disclose Pori's specific contribution to the Company's earnings, the IPO materials made clear that the facilities acquired through the Rockwood Acquisition, which included Pori, positioned Venator "as a leader in the specialty and differentiated TiO2 industry segments, which includes products that sell at a premium and have more stable margins."

107. The IPO materials also emphasized that Venator was well-positioned to benefit from rising prices in the TiO2 market, and that those prices were on a sustained upward trajectory—a critical concern for investors given the TiO2 boom-and-bust cycle. For example, Venator noted that the Company would benefit from the fact that it had "successfully negotiated four consecutive quarterly TiO2 price increases which took effect beginning in the second quarter of 2016," and cited industry estimates to claim that the Company would continue to benefit from

this favorable upward pricing trend.[5]  According to Venator, TiO2 prices were increasing because "supply/demand fundamentals began improving in 2016 primarily due to strong global demand growth and some capacity rationalizations."  In short, Venator told investors that TiO2 pricing was rising, and would begin a period of sustained price increases.

108.    The above statements concealed the extent of the damage to the Facility and its impact on Venator's business, TiO2 industry dynamics, and Venator's true value.  While the IPO Materials represented that production at Pori had already restarted, with "approximately 20% capacity in the second quarter of 2017," when in fact Pori had no capacity and would never regain the any capacity whatsoever.  Further, rather than proceeding on schedule to return to full capacity by the end of 2018, at the time of the IPO, Venator had not even completed its investigation of the fire and was still a year away from completing the demolition work needed to start the rebuild. And while Venator claimed that rising prices and strengthening TiO2 market dynamics was "primarily due to strong global demand growth," in truth, the Pori outage itself had caused a dramatic but temporary spike in TiO2 prices, as the U.S. District Court for the District of Columbia would later conclude.  As would only be revealed after the Class Period, Venator exploited the rise in TiO2 prices to report higher earnings using business interruption insurance proceeds, and create the illusion that Venator's business was poised for sustained growth.

---

[5]  Venator cited data from TZ Minerals International Pty Ltd ("TZMI"), an independent consulting and publishing company that specializes in the TiO2 industry, suggesting that the market price of global high quality TiO2 would grow by more than $500 per metric ton, of more than 20%, from December 31, 2016 through the end of 2017.

**H.** **Following The IPO, Defendants Assured Investors That Pori Would Be Rebuilt, That Tio2 Prices Were Increasing Due To Improving Demand, That Pori Was At 20% Capacity, And That Insurance Would Cover The Rebuild**

109.    Following the IPO, which closed on August 8, 2017, Defendants Peter Huntsman and Turner, along with other members of Venator's senior management visited the Pori facility, holding an event held on August 27, 2017.   Defendants continued to promote Pori's returning capacity, telling investors that 20% of the facility's production capacity had been restored, and reported results that beat analyst estimates across the board.   According to Venator, the Company was benefitting from increasing TiO2 prices, which had been driven by the "solid demand, good demand around the world" and had provided a "really strong uplift" in Venator's earnings.   These statements buoyed the price of Venator shares, and enabled Huntsman to dump another $470 million of its Venator shares through a secondary offering of stock that Venator rushed to complete before investors learned the truth.

110.    For example, on Venator's first earnings call as a public company on October 27, 2017, Venator reported "strong set of business results"—with earnings per share beating consensus by 37%—driven by the TiO2 segment and higher TiO2 selling prices, and noted that the Company continued to "see good demand" across both specialty and functional products.   Defendants also assured investors that while the improved market dynamics for TiO2 had impacted insurance limits for Pori, Venator was well on its way to returning Pori to its full operating capacity.   For example, on the earnings call, Defendant Ogden reassured investors that at Pori, "[w]e are already running at 20% of previous capacity," and that the Company would "restore manufacture of the balance of these more profitable specialty products as quickly as possible in 2018."

111.    At the same time, Venator highlighted the strengthening TiO2 cycle, telling investors that TiO2 price increases were driven by stronger demand.   For example, Defendant Turner noted that "segment adjusted EBITDA [was] up 37% over the prior quarter, ***primarily***

38

*driven by higher TiO2 selling prices*," and that Venator *"continue to see good demand across the market* for our specialty, differentiated and functional grades, and we are currently implementing price increases for the fourth quarter."  Turner repeated this point later in the call, telling an RBC Capital Markets analyst that the Company's strong earnings "uplift" was "related to *solid demand, good demand around the world.*"  In fact, when asked how the current TiO2 price cycle compared to previous cycles, Turner emphasized that the Company had seen "*better underlying demand this time around*."

112.    Defendants also told investors that the improving demand and price environment had impacted its insurance for the Pori fire.  Specifically, CEO Turner assured investors that "[o]ur $500 million insurance policy is more than enough to cover the costs of the rebuild on its own" but that improving TiO2 market dynamics and "strong market conditions" had led Venator to allocated a greater amount of insurance proceeds to pay for business interruption losses.  According to Turner, the increase over insurance limits had nothing to do with the rebuild itself, and only underscored the underlying strength of Venator's business:

> Our $500 million insurance policy is more than enough to cover the costs of the rebuild on its own, but the insurance policy also covers lost earnings. Due to prevailing strong market conditions, our TiO2 selling prices continue to improve, and our business is benefiting from the improved profitability and cash flows. This also has the effect of increasing our insurance claim for lost earnings from the Pori site.

113.    Defendants further suggested that any additional capital expenditures above policy limits would only be needed to cover the less profitable, commodity capacity at the Facility.  When a Nomura analyst asked whether the "$100 million to $150 million the approximate CapEx you'll need to invest after the end of 2018 to bring the last 40% of commodity capacity?"  Defendant Ogden confirmed that this was "a reasonable way to think about it."  In other words, rebuilding

the specialty portion of Pori, which was responsible for 75% of its earnings, had not been and would not be impacted by the recently disclosed overages.

114.    Analysts credited Defendants' explanations.  For example, Barclays analysts noted in an October 27, 2017 report that Venator had "confirmed they *are already running at ~20% operating rates* [at Pori] (relatively in-line with earlier guidance)[.]"  Similarly, analysts at Deutsche Bank gave Venator a "Buy" in their November 2, 2017 report, noting that "*20% of capacity is running*" at Pori.

115.    Analysts also accepted Defendants' statements that any additional costs above insurance limits simply reflected the fact that the "strong market conditions" required a greater portion of proceeds be allocated to business interruption losses.  For example, in their October 27 and 29 reports, RBC analysts stated that Venator provided had "a strong showing for VNTR's first earnings period as a public company," that its results showed "the strength of the TiO2 business," and that the Pori rebuild program appeared to be "on track."  According to RBC, the "cost overrun of $100-150M" was only the "result of the strength in the TiO2 market"—underscoring the conclusion that "positive TiO2 market dynamics . . . will drive additional margin expansion and offset any uncertainty surrounding Pori cost overruns."  These representations had their intended effect, with Venator shares appreciating over 25% since the IPO to close at $24.81 per share on October 27.

116.    Taking advantage of this inflated share price, Huntsman quickly sought to unload as much of its interest in Venator as quickly as possible.  Despite still being under a 180-day lock-up, Venator moved forward with the SPO by obtaining a waiver from the Underwriter Defendants and, on November 27, 2017, filed a Form S-1 with the SEC for the SPO on November 27, 2017 (the "SPO Registration Statement").  In rushing the secondary offering to market, Huntsman

accelerated the timeline contemplated by the lock-up nearly a third, and obtained permission from the Underwrite Defendants to sell its shares over two months earlier than planned.

1.      *Venator Repeated False Assurances About Pori To Promote The SPO*

117.     In the SPO Materials, Venator repeated assurances to investors regarding: (i) Pori's production capacity; (ii) the status of the facility after the fire, the timeline to reconstruct the facility, and the reconstruction progress, (iii) the financial impact of the fire, and (iv) the extent to which Venator's insurance would cover the damage resulting from the fire.

118.     In the SPO, Venator continued to assert that Pori was operating at "20% prior capacity," stating:

> The Pori facility had a nameplate capacity of up to 130,000 metric tons per year, which represented approximately 17% of our total TiO2 capacity and approximately 2% of total global TiO2 demand.  We are currently operating at 20% of total prior capacity but producing only specialty products, and we currently intend to restore manufacturing of the balance of these more profitable specialty products by the fourth quarter of 2018.  The remaining 40% of site capacity is more commoditized and we will determine if and when to rebuild this commoditized capacity depending on market conditions, costs and projected long term returns relative to our other investment opportunities.

119.     As in the IPO, Venator again stated that Pori had an "Annual Capacity" of "130,000 metric tons" while making clear that Venator's Calais facility—which only performed the "finishing" phase of the TiO2 manufacturing process—was a "finishing facility" that did not generate any TiO2 capacity.[6]  Further, the SPO materials provided TiO2 production totals for Venator's facilities in Uerdingen, Germany; Duisburg, Germany; and Scarlino, Italy.  Specifically, the SPO stated that production capacity for these facilities remained unchanged from the figures

---

[6] Instead, as in the IPO, the SPO Materials stated that Huntsman's decision to shut down the black-end portion of the Calais facility in February 2015 reduced that facility's prior TiO2 capacity to zero.

provided in the IPO at 107,000, 100,000 and 80,000 metric tons, respectively, showing that Pori's semi-restored 20% capacity had not impacted capacity at other Venator facilities.

120.    As part of the SPO Registration Statement, Venator again confirmed that it would repair Pori's remaining specialty product capacity by the end of 2018.  As the SPO Registration Statement stated multiple times, "we currently intend to restore manufacturing of the balance of these more profitable specialty products by the fourth quarter of 2018."

121.    The SPO materials also confirmed that Venator would only exceed its insurance policy by $100 million to $150 million, and that the overage was a result of strong TiO2 prices rather than any cost overruns in repairing the facility.  According to the SPO Materials, as a result of "prevailing strong market conditions, our TiO2 selling prices continue to improve and our business is benefitting from the resulting improved profitability and cash flows [which] *has the effect of increasing our total anticipated business interruption losses from the Pori site*." Venator again stated that it expected to "contain these over-the-limit [insurance] costs within $100 million to $150 million, and to account for them as capital expenditures."

> 2.    *After The SPO, Defendants Claimed That Pori Was Operating At 20% Capacity, That The Pori Rebuild Was "On Pace" And "On Track," And That Increased Insurance Costs Were Due To The "Fast-Track" Program*

122.    Over the next eight months, Defendants repeated the refrain that Pori was operating at 20% capacity.  For example, in Venator's year-end and quarterly SEC filings and earnings calls, the Company stated that Pori was "currently operating at 20% of total prior capacity," while Defendant Turner reiterated that Pori currently had "20% of the total prior site capacity available for production" on the Company's first quarter 2018 earnings call.  These repeated statements reinforced the idea that Pori was producing 20% of the product manufactured onsite prior to the fire, rather than just finishing product that had been shipped from Scarlino, Italy and other Venator sites.

123.    At the same time, Defendants continued to assure investors that Pori was on track to be rebuilt and that the portion of the facility devoted to specialty products would be restored by the end of 2018.  Indeed, on the Company's fourth quarter earnings call on February 23, 2018, Defendants explained that Venator was so committed to adhering to this schedule that it was willing to a pay a "fast track" premium to ensure that Pori's specialty capacity was fully restored by the end of 2018, and that the Company had hit every "milestone" in terms of reconstruction progress so far:

> At Pori, we remain on track with our fast-paced project to restore the higher profitability, 60% specialty capacity by the end of 2018 through our original plan, hitting both the midyear and end-year milestones. The economics to rebuild the remaining 40% of capacity are compelling, and these more commodity products will be reintroduced to the market at a more normalized pace but not before 2020.

124.    Turner repeated this sentiment later in the call, telling a Citi analyst that "the specialty portion of the 60% [Pori] rebuild that we are going at a fast pace to restore, in which we are on pace, that's a very demanding timeline."  Turner's comments matched the statements Venator made in its Form 10-K for 2017, filed February 23, 2018, which stated "we intend to restore manufacturing of the balance of these more profitable specialty products by the end of 2018."

125.    Analysts accepted Defendants' reassuring statements that Pori was operating at 20% capacity and that the rebuild was on track.  In their February 23, 2018 report, SunTrust analysts highlighted that 20% is currently operating" at Pori and that Venator's work on the specialty portion of the facility was "on track."  Likewise, in their February 26, 2018 report, Barclays analysts noted that "VNTR remains *on track* to restart the specialty unit, (60% of total capacity) by the end of 2018."  Deutsche Bank analysts similarly agreed, stating in their February 26, 2018 report that Venator's Pori "issue is transitory as construction for the specialty products portion of the facility (75% of site EBITDA) is [on] track to be completed by end of '18."

126.     While Defendants continued to claim that Pori would still be rebuilt, they now revealed that the cost would exceed the insurance policy by $325 to $375 million because of a "fast-track" premium applied to construction costs at the site.  As Turner explained on Venator's 2017 fourth quarter earnings call, the "fast-track premium" was being spent to return the facility's more valuable "specialty" operations back to normal as fast as possible, as Venator was "paying premium prices where necessary to attain equipment and services, to hit back to fast-paced approach."  In reality, the "fast-track premium" was spent not on rebuilding facility, but on funding an expensive makeshift manufacturing process in which Venator produced product at other facilities—and then shipped that intermediate product to Pori, where it was "finished."

127.     Again, analysts accepted Defendants' assurances that the newly revealed insurance overages were only caused by the "fast-track premium" paid by Venator to bring Pori's specialty capacity online by the end of 2018, and did not suspect that Venator's insurance proceeds were rapidly depleting due to the shipment of intermediate TiO2 by truck across Europe.  For example, RBC analysts in their February 25, 2018 report noted that one of the "[p]rimary cost escalation factors" at Pori was "*fast-tracking the specialty component* (paying a premium to get the 60% specialty portion up)."  Jefferies analysts repeated the same sentiment in their February 26, 2018 report, stating that the costs for the Pori rebuild were increasing, "mostly resulting from *accelerating the timeline for specialty*."

128.     Defendants also continued to assert that the rising prices in the TiO2 market were driven by increases in demand—not as a result of the Pori outage.  For example, on Venator's fourth quarter 2017 earnings call, Defendant Turner told investors that the "Titanium Dioxide segment delivered another great quarter, with TiO2 pricing and business improvement benefits driving the results."  According to Defendant Turner, the stronger TiO2 pricing was supposedly

caused by a "positive underlying demand across the market," with Venator seeing " further price improvement in TiO2" in 2018.

129.    Analysts also credited Defendants' explanation for increasing TiO2 prices based on strengthening demand.  Barclays analysts noted in their February 26, 2018 report that, "Venator reiterated its bullishness on the TiO2 cycle, with expectations for 5% further sequential price improvement in 1Q'18."  Deutsche Bank analysts in their February 26, 2018 report likewise noted that TiO2 price increases were "driven by strong TiO2 industry fundamentals."

**I.     In Truth, Pori Never Regained The Ability To Produce Any Tio2 Capacity After The Fire—Let Alone The 20% Capacity Defendants Falsely Claimed— Was Never "On Pace" To Be Rebuilt, And Could Not Have Economically Been Rebuilt**

130.    Contrary to Defendants' representations, Pori never regained operational capacity of 20%, and could never have been economically or feasibly rebuilt, as Defendants had falsely claimed.  In fact, to conceal the truth about Pori, Venator executives engaged in an elaborate, expensive, and fundamentally unsustainable scheme to create the "appearance" of manufacturing production—and to falsely tout a "20% of total prior capacity" in the IPO and SPO offering documents and in other statements to investors—to enable Huntsman to dump the irreparably damaged pigments business division in the most profitable manner.

*1.     Pori Was Damaged Beyond Repair and Would Never Again Reach 20% Capacity*

131.    Numerous former employees of Venator confirmed that the Company's claim of 20% production capacity had no basis in reality, and that the facility was so irreparably damaged that it could never have been rebuilt.  For example, FE 4, who worked as Venator's North American Market Manger and was responsible for sales activity for Venator's ink and fiber customers in the United States—including the part of the business that was directly impacted by the fire—explained that the facility was never up to 20% capacity.  FE 4 explained that he/she

spoke to numerous Venator employees, all of whom confirmed that the facility never returned to 20% output.

133.    Likewise, FE 2, a production worker at Pori from 1994 to 2018, said he/she did not believe production capacity ever hit 20% after the fire.  According to FE 2, "It wasn't realistic in any way to expect the facility to go back to full capacity by 2018.  When you looked at the way they worked . . . nothing happened, just lots of people hanging around.  I think they just pretended to do something in order to collect money from the insurance company."  According to FE 2, Pori's inability to reach 20% output was discussed among the facility workers directly involved in the finishing process—the only production stage that was functioning at all after the fire.

133.    Similarly, FE 3, who worked at Pori from January 2005 to December 2018 as a purchaser, stated that no production activity could take place at the factory after the fire as all four production lines at the Facility were destroyed from the middle to the end.  Like FE 3, FE 4 said that only the CD-line, which manufactured the specialty pigments such as RDI-S, could operate in the main facility, and only in part.  Put another way, FE 3 reported that, following the fire, the factory never operated at 20% and that this figure was overly optimistic and did not reflect reality.

134.    Nor was there any possibility that the facility could be rebuilt to achieve 20% capacity.  Multiple former Venator employees confirmed that little to no reconstruction actually occurred at Pori following the fire.  For example, FE 1 and FE 2 explained that demolition work was still ongoing at Pori in July of 2018.  In fact, as FE 2 stated, much of Pori was still largely fenced off in July 2018, and almost no work beyond the ongoing demolition had occurred onsite since the fire occurred back in January 2017.  FE 2 confirmed that only one of the facility's four production lines had been worked on at all during this period.  To illustrate, the photographs below were taken in March and April 2018 and show that the ***demolition*** for the core damaged "Moore"

portion of the facility had not even been completed by that time, and infrastructure and other adjoining areas of the facility were exposed.  As April 2018, demolition vehicles from Delete, a Finnish demolition company, were still in the process of tearing down the damaged Moore facility, providing direct evidence that Venator was never "on track" or "on pace" to rebuild Pori:[7]

 

Pori Facility March 5, 2018                      Pori Facility April 13, 2018

      2.      *Venator Went to Great Lengths to Create the False Appearance of 20% Capacity*

135.     Huntsman and Venator executives knew that returning Pori to full capacity was a primary concern for investors, and that Venator had to provide concrete progress toward that goal in order to quickly and profitably separate the pigments business.  To provide that assurance,

---

[7] *See* Delete home page, *available at* https://www.delete.fi/en/.

Venator turned to extreme measures to manufacture the false appearance that the Pori facility was actually "producing" TiO2 by shipping intermediate TiO2 manufactured at other facilities in Italy and Germany to Pori to be "finished."

136.    FE 5, who served as the Director of Supply Chain for the Specialty Chemical Division, explained that Venator shipped intermediate product manufactured at Venator's facilities in Scarlino, Italy and Duisburg, Germany to be finished at Pori because the fire had destroyed Pori's ability to produce any product.   FE 5 confirmed that the decision to ship intermediate product from Germany and Italy was made just weeks after the fire—when it became clear that Pori would not be able to produce any TiO2 itself and existing TiO2 product inventory quickly depleted—and approved by Venator senior management.   According to FE 1, Phil Wrigley, Venator's former Vice President of Environmental, Health and Safety (EHS) and Manufacturing Excellence was involved in this approval.

137.    FE 5 also explained that the plan to produce intermediate product at other facilities in Italy and Germany was discussed with Venator's senior executives—including Defendants Turner and Maiter—who were kept apprised of Venator employees' efforts to fill customer orders following the fire.   FE 5 said that he/she discussed this makeshift approach, termed the "production plan," at weekly meetings with a team of Venator employees who were dealing with the fallout from the fire, including managing the customer relationships that had been impacted.   According to FE 5, the team would provide reports to Venator senior management detailing any dynamic or changing numbers, the timing of production, the capacity of each line, and the resulting production plan based on those numbers.

138.    In fact, Defendant Mahomed Maiter—the senior-most Venator executive responsible for business operations—confirmed in a deposition on March 8, 2018 that after the

48

Pori fire, there was some "shuffling of production from plant to plant," whereby intermediate TiO2 product was manufactured at the Company's Scarlino facility and then shipped to Pori for finishing. Specifically, in March 2018, Maiter testified in the FTC's preliminary injunction proceeding involving the Tronox-Cristal merger that, following the fire, Venator was forced to "produce some semi-differentiated production at our Scarlino factory which we now finish off at our Pori, Finland facility for certain product requirements for our specialty business." Maiter further testified that there were other factories that performed additional "small remixes"—i.e., produced intermediate TiO2 that was then shipped and finished at Pori—"in one or two factories but they would not be major." Defendant Maiter clarified that even the finishing process at Pori had been impacted by the fire, testifying that it was not fully intact, but "largely intact would be a better way" to describe it.

139. Further, as FE 4 recounted, certain grades of TiO2, such as R-DIS, could only be finished at Pori. But because none of the four lines at the facility could function properly—as they had been irreparably damaged in the fire—Venator began shipping intermediate products manufactured from Italy to have them "finished" at Pori. As FE 4 explained, the fire destroyed the "black end" of the Facility and the middle stage, where the processing of the products took place, while certain portions of the facility involved in "finishing" intermediate TiO2 products survived.

140. FE 4 also reported that the intermediate products produced in Italy, and then shipped to and finished at Pori, were of lesser quality and poor replacements for those that were produced at Pori before the fire. As FE 4 explained, after the fire, customers who received TiO2 produced in Italy but finished at Pori were "constantly complaining" about quality, and Venator lost customers as a result.

141.    FE 4 said that he left Venator in part because of the lack of disclosure surrounding the Pori fire and because the Company was not sharing the reality of the situation at Pori with anyone.  According to FE 4, employees at Pori believed insurance proceeds were not being used to fund the reconstruction of the facility, but instead used to prop up the Company's financial condition as Huntsman was trying to separate the business through the Venator spin-off.

142.    FE 1, who was a Project Coordinator and Transformation Coach at Venator from 2016 through January 2019 responsible for Pori (and had previously worked at Huntsman since 2009), confirmed that after the fire, Pori could only "finish" TiO2 products.  FE 1 explained that it was his/her responsibility to ensure the facility was finishing 60 tons of product per day using half-finished product that was manufactured in Italy and then shipped to Pori, while before the fire, Pori was responsible for producing 350 tons of TiO2 per day.

143.    FE 1 confirmed that "finishing" product at Pori was different than manufacturing that product from start to finish.  FE 1 made clear that he/she did not think it was reasonable for the Company to expect to achieve annual production of 130,000 tons of nameplate capacity after the fire, including because a critical part of the factory where the washing part of the process was done was damaged, particularly given the speed of the reconstruction efforts and the levels of investment Venator was devoting to the rebuilding effort.  As FE 1 explained, the middle part of each of the four production lines was completely destroyed, and at least 10 of the motor control centers in the factory that controlled electricity were destroyed by the fire.  These motor control centers were needed to run the production lines in the Moore facility.  Further, only one of four production line's end part was repaired—the so-called CD-line that produces inks—and that this production line was solely used to "finish" half-finished special pigment product from Italy.

144.    In addition, even the finishing activity conducted at Pori did not reach the 20% of

Pori's prior finishing capacity or equate to the same level of output.  As FE 2 explained, the amount

of unfinished product being shipped in from Italy fell below the levels needed to generate 20% of

the prior amount of finished product Pori produced before the facility.  FE 2 said that while the

amount of intermediate $TiO_2$ shipped to Pori varied during the Class Period, it was typically about

two trucks per week—which would not be nearly enough $TiO_2$ material for the plant to have

finished 20% of the product it had before the fire.

> 3.    *Senior Management Closely Tracked the Pori "Shuffle" and Knew the*
> *Rebuild Never Got Off the Ground*

145.    Venator senior management—including Defendants Turner and Ogden—closely

tracked the progress of the Pori rebuild and the Company's efforts to "shuffle" intermediate

product produced in Scarlino that was then shipped and finished at Pori.  FE 5 reported that

progress for filling customer orders was discussed during the task force's weekly meetings, and

that the updates from these meetings were reported to Defendant Turner and other senior Venator

executives each week.  Those reports included details about which products were being produced

in which facilities—e.g., the intermediate products produced in Scarlino and then shipped to

Pori—as well as the actual capacity at the Pori facility, and specifically that Pori's capabilities

were limited to finishing intermediate product manufactured at other facilities.

146.    As FE 5 explained, manufacturing intermediate product in Germany and Italy but

then shipping it to Pori was tremendously expensive.  Making matters worse, during the critical

months after the Venator IPO, intermediate product produced in Italy could only be transported by

truck, as train lines from Scarlino to Pori had been disrupted by the collapse of the tunnel being

built near Rastatt, Germany, which served as a major thorough way of trains from Italy to Pori.

The Rastatt collapse blocked all rail traffic from September 2017 through November 2017, and caused shipping costs to more than double during this time.

### 4.   Pori's Closure Caused a Surge in TiO2 Prices

147.   Venator's inability to produce any TiO2 whatsoever had a dramatic and immediate impact on TiO2 prices, with the complete elimination of the supply of TiO2 from Pori triggering a sustained surge in TiO2 prices.   Contrary to Defendants' representations in the IPO and SPO Materials and to investors throughout the Class Period, TiO2 prices were not benefitting from improved "demand" for TiO2.   Rather, the elimination of the supply from Pori caused the price increases—a fact that Defendants concealed from investors, who were wrongly led to believe that Pori was still operating at 20% capacity.

148.   The cause of the sharp increase in TiO2 prices following the Pori fire—and the fact it was the lack of supply from Pori that caused those increases, as opposed to growing demand or another factor—was the subject of extensive fact and expert discovery in the FTC's action seeking to enjoin the proposed Tronox-Cristal merger announced in December 2017.   Following extensive expert and fact discovery and testimony—a substantial portion of which is under seal and not available to the public—the United States District Court for the District of Columbia issued a thorough opinion concluding that the Pori fire served as a "supply restriction" that led directly to the TiO2 price increases occurring just before the Venator IPO.   Mem. Op., *Fed. Trade Comm'n v. Tronox Ltd.*, Case No. 1:18-cv-01622 (TNM), ECF No. 108 (D.D.C. Sept. 12, 2018).   Specifically, the District Court held that in "January 2017, a fire at a large TiO2 plant in Pori, Finland, decreased the available titanium dioxide in Europe and ***caused a rapid and significant price increase***."

149.   That conclusion was reached after a review of voluminous documentary evidence and several experts and industry participants testified about the significant impact the Pori fire had

on TiO2 pricing.  While much of that evidence is still subject to confidentiality orders, the limited testimony and evidence available to the public confirms the District Court's conclusion that the Pori outage triggered the TiO2 price increases that Venator falsely attributed to "improved supply/demand fundamentals."   For example, chemical industry expert Kenneth M. Stern concluded that while Europe had historically been a net exporter of TiO2, it became a "net importer" in 2017 "*largely as the result of the Pori plant fire*."  Similarly, Dr. Nicholas Hill, an economics expert who testified on behalf of the FTC, explained that once Pori "stopped producing titanium dioxide in Europe… *the price over the course of a year rose 42 percent*."  Dr. Hill's testimony directly linked surging TiO2 prices to the Pori fire not to increased demand.  Indeed, Tronox COO Jean Francois Turgeon concurred with these experts, testifying that "there was a fire at the biggest plant in Europe, the Pori plant, and that create[d] a situation where Europe was lacking pigment, so because it's a global business, Europe, who used to be one of the lowest area price in the world *suddenly switched to become the highest price*."

150.    Naturally, Venator's senior executives closely tracked TiO2 prices, and knew without doubt that the spike in prices for TiO2 was caused by the fact that Pori had not been producing any TiO2 since the fire in January 2017.

**J.    Venator Reassures Investors That The Pori Rebuild Is "On Track" While Disclosing Costs May Exceed Insurance Policy Limits Due To The "Fast Track" Premium**

151.    On Venator's February 23, 2018 earnings call for the fourth quarter of 2017, Defendants stated that the cost of rebuilding the Pori Facility would exceed the limits of the Company's $500 million insurance policy and the estimates the Company had previously disseminated.  Specifically, Defendant Turner announced, "We currently estimate the total cost to rebuild the facility, including the commodity products portion, will exceed the limits of our insurance proceeds. Though, we do not have final cost estimates, we anticipate the cost could be

– exceed our insurance proceeds by as much as $325 million." Further, Defendant Turner explained, "[A]pplying additional contingency for the upper limits of design and our current construction cost estimates, the uninsured portion of the cost it could be as much as $375 million."

152.    Despite the potential for increased costs, on the February 23, 2018 earnings call, Defendant Turner misled investors by reassuring them that the Company still intended to contain the damage and that the Company still expected to be "fully reimbursed" for business interruption losses "within our insurance policy limits."  Turner further stated, "We expect to account for any over-the-insurance-limit costs as capital expenditures. We are aggressively pursuing options to reduce the estimated over-the-insurance-limit costs, and will keep you updated as [to] the material developments."

153.    Defendant Ogden reiterated that the Company still expected to rebuild the Pori facility—regardless of these new cost estimates—and that the schedule to do so remained intact and "on track" and "on schedule."  Specifically, Ogden stated, "At Pori, we remain on track with our fast-paced project to restore the higher profitability, 60% specialty capacity by the end of 2018 through our original plan, hitting both the midyear and end-year milestones. The economics to rebuild the remaining 40% of capacity are compelling, and these more commodity products will be reintroduced to the market at a more normalized pace but not before 2020."

154.    On the call, Defendant Turner stated, "Our Titanium Dioxide segment delivered another great quarter, with TiO2 pricing and business improvement benefits driving the results. Pricing was up 5% compared to the prior year quarter, in line with our expectations. . . . We see further price improvement in TiO2."  Defendant Ogden stated further, "The majority of this [EBITDA] improvement came through higher selling prices. More specifically, an improvement in TiO2 selling prices contributed approximately $90 million."

155.    Seeking clarity about Pori, analysts repeatedly questioned Defendants about the extent to which production capacity had returned, and the Company's expectations about when the plant would be restored to full operating capacity.  For example, a Barclays analyst asked whether Venator would need to address agreements with raw material suppliers as the rest of Pori's full capacity came online—a question that would only make sense if the analyst believed Defendants' representations that the "20% capacity" Defendants touted involved the full production process, i.e., turning raw ore into TiO2.  Further concealing the truth—that Pori did not produce any TiO2 at all, but only "finished" intermediate TiO2—Turner responded that "[t]here will be some **nominal**—not ores, but some raw semi-finished TiO2 to brought into the finished operation during 2018, *a small portion*."  In truth, all of Pori's production in 2018 would come from semi-finished TiO$_2$ rather than only a "small" or "nominal" amount of production coming from semi-finished, imported product.

156.    Defendants' press release that day reiterated these disclosures, as well as Defendants' false reassurances concerning increasing TiO2 prices that hid the fact that the Pori outage had driven them and the reality that Pori had not produced any additional TiO2 capacity whatsoever.  In the press release, Defendant Turner stated, "We continue to see an elongated TiO2 cycle and despite significant rebuild cost escalation, we remain on schedule to restore our specialty business capacity, and ultimately full operation of the remaining capacity as economic conditions warrant at our Pori, Finland site." The press release further stated, "Pori specialty capacity rebuild on schedule but recently experiencing increasing estimates for costs exceeding insurance proceeds."

157.    The Company's Form 10-K filed with the SEC on February 23 further reassured investors that Venator was benefitting from increasing TiO2 prices: "Due to prevailing strong

market conditions, our TiO2 selling prices continue to improve and our business is benefitting from the resulting improved profitability and cash flows."

158.    Analysts credited Defendants' false statements. For instance, Barclays' analysts noted in a February 23, 2018 report that "Results were driven by higher TiO2 selling price[s] . . . Management reiterated their belief in favorable TiO2 industry fundamentals, which should further benefit margins as increasing TiO2 selling price outpaces ore price."  The Barclays analyst also repeated Defendants' false statement that the Pori "rebuild is on schedule to be completed by year end of 2018, and the current TiO2 market has made the rebuilding of the remaining 40% commodity capacity economically favorable."

159.    Morgan Stanley analysts similarly credited Defendants' claims, noting in a February 23, 2018 report that, "Venator now estimates that the total cost to rebuild the entire facility will exceed its insurance proceeds by $325-375 million (up from $100-150 million prior), but continues to believe that business interruption losses will be fully reimbursed through EBITDA.  The company expects this capacity (40% of Pori, or ~50kt) to come back online no sooner than 2020.  The remaining 60% of the facility, focused on specialty TiO2 (75% of facility EBITDA) is still expected to be online by the end of 2018."

160.    Similarly, RBC Capital Markets' analyst noted, "The costs are a result of stronger-than-anticipated TiO2 pricing causing greater-than-expected lost sales and repair costs above VNTR's $500M [P]ori insurance policy. That said, per the release, VNTR still intends to capitalize the additional costs, and we expect this will be across 2018-19." And SunTrust Robinson's analyst reported that "TiO2 price capture was maintained due to strong underlying demand."

### K.     Venator Continues To Mislead Investors Concerning The Progress Of The Pori Rebuild

161.     On May 1, 2018 Venator released its financial results for the first quarter of 2018. On the Company's earnings call, Defendants provided new information about the rebuild of the Pori facility but continued to mask the import of those new disclosures by providing false reassurances about the 20% capacity the facility was supposedly producing and that the rebuild was proceeding "in line" with expectations. On the earnings call, Defendant Turner explained:

> We continue to make progress on the construction phase of the rebuild, and our estimates for the self-funding of the reconstruction and commissioning of Pori remain unchanged at $325 million to $375 million.
>
> We currently have 20% of the total prior site capacity available for production of finished specialty product. We expect to restore additional capacity and be producing some finished specialty product during the second half of 2018. And the remaining specialty capacity be restored and producing finished product during 2019.
>
> Based on current market and economic conditions, associated cost and projected returns, we currently intend to rebuild the commodity portion of the facility. We do not currently expect product from it to be reintroduced to the market prior to 2020.

162.     Analysts were skeptical, however, as to why—despite the disclosure of slowing progress on rebuild—Defendants were comfortable maintaining the $325-375 million estimate. In response to a Wells Fargo analyst who asked Defendant Turner to elaborate on what gave the Company that "confidence," Turner stated,

> We have said for a while that this was a fire in the center of the plant, it requires a lot of reconstruction work in close quarters, there's some shared infrastructure, *and of course, it's fast paced*….And it's the amount of focus that we are looking at, all opportunities to strengthen the process up on the site, and of course, it's a very visible and important part of what we are doing.  So that's really what give us -- gives us the confidence, along with the fact that we continue to use this new information to model a range of outcomes and scenarios around the cost and timeline, and that's what draws us back to reiterate that we are in this range of $325 million to $375 million.

163.     Additionally, a Bank of America analyst peppered Defendant Ogden with questions about the allocation of insurance proceeds for "business interruption versus reconstruction," how those premiums will "flow through the P&L," and whether the extended timeline for the rebuild meant that more insurance would be "used for business interruption rather than reconstruction."  In response, Defendant Ogden stated:

> So let's be clear here. ***The reconstruction is still generally in line with what our expectations have been.*** The additional clarity that we are providing to you now is around when we will have the actual finished product. And we -- as Simon has indicated, we now have greater visibility into when we will have that finished product available.

164.     Defendants' encouraging statements about Pori's 20% operating capacity reassured analysts and buoyed Venator's stock price.  For instance, Barclays' May 1, 2018 analyst report also noted, "[C]urrently 20% of the site's total capacity is now available for production." BMO Capital Markets noted the same, the same day: "Pori is currently operating with 20% of the site's capacity available for production."  RBC Capital Markets reported on May 1, 2018, "20% of the site is available for production." Jefferies wrote on May 1, 2018, "Venator has ~20% of capacity available for specialty products, and another ~40% will come onstream for 2019."

## VI.     The Truth Regarding Pori Emerges

### A.     Venator Announces The Cost Of Rebuilding The Pori Facility Will Exceed The Company's Insurance Policy By More Than $375 Million

165.     On July 31, 2018, Venator began to reveal the truth about the fire damage at the Pori facility, Venator's ability to rebuild the Pori facility and the true costs associated with rebuilding the facility, and the effect of the fire at the Pori facility on Venator's business.  In announcing second quarter earnings, Defendants disclosed that the damage to the Pori facility caused by the fire was far more extensive than they had originally suggested.  As a result, the cost

to rebuild the facility fully would substantially exceed the $375 million in Company-funded costs beyond the insurance policy limits that Defendants had projected.

166.    In a press release issued on July 31, 2018, Defendants stated that "a full rebuild and commissioning may require more self-funding than our previous estimate of $325 to $375 million and may result in a longer period of time for project completion."  The press release also stated that the Company is "reviewing options within our manufacturing network, including the option of transferring the production of Pori's specialty and differentiated products to elsewhere in our network, and are pacing our on-going construction activities at Pori accordingly during this period of review."

167.    The same day, the Company filed its quarterly report with the SEC for the second quarter ended June 30, 2018.  In the Form 10-Q, the Company revealed that "additional damage outside the immediate fire zone leading to increased costs" and "a full rebuild and commissioning of our Pori facility may require more self-funding than our previous estimate of $325 to $375 million, and may result in a longer period of time for project completion."  The Form 10-Q also stated that "the Pori reconstruction and commissioning process is currently under review," and specifically that the Company is "reviewing options within our manufacturing network, including the option of transferring the production of Pori's specialty and differentiated products to elsewhere in our network, and are pacing our on-going construction activities at Pori accordingly during this period of review."

168.    As a result of this disclosure, the price of Venator shares declined 4.75%, from a closing price of $15.35 on July 30, 2018 to close at $14.62 the following day.

169.    Despite the disclosure of this disappointing news, the Company continued to misrepresent the true impact the Pori fire would have on Venator's business. Specifically, in the

July 31, 2018 press release, Defendant Turner stated that the Company remains "well positioned

to capitalize on the positive trends supporting [Titanium Dioxide] industry profitability," despite

the substantial fire damage to the Pori facility.

170.    Venator also continued to conceal the extent to which the Company's business loss

insurance was covering the Company's adjusted EBITDA based on inflated TiO2 prices.   A

Barclays analyst expressed frustration in requesting Defendants to clarify the issue on the earnings

call asking:

> So with Pori, you have been earning money that runs through your EBITDA or
> adjusted EBITDA that you didn't really or you didn't sell those tonnes from
> insurance, both last quarter and LTM. Can you help us -- I mean parse out, what
> was from insurance in both the last quarter's EBITDA for that segment and the
> LTM EBITDA for that segment, so that we can build our model going forward off
> a base that you won't have that insurance flowing through that segment?

Defendant Ogden refused to answer the question, and instead stated that "we're not going

back and identifying [sic] the specific business interruption."  In response, the analyst emphasized

Venator's obfuscation, stating "***I guess that gets to my point because this whole thing has seemed***

***very opaque and very difficult on the outside to model. And I just – that's what I don't***

***understand why can't we get a specific number? What was business interruption?***"

171.    Defendants still refused to answer, with Defendant Turner responding:   "Well, I

think we've tried to provide you with the information that we think will be helpful.  Going forward,

without providing more detail than what we have provided historically."

172.    Following the Company's announcement, analysts and market commentators

connected the uncertainty and confusion around the rebuild of the Pori facility to the Company's

declining stock price:

- BMO Capital Markets' analyst described Venator's "troubles" in the
  "Pori reconstruction saga," including "another setback at Pori" causing
  further delays and rising out-of-pocket reconstruction costs, noting, "we
  would expect the stock to be down" and seeking "clarity . . . around

costs . . . potential recourse . . . and color around the weakness in customer orders" (July 31, 2018);

- J.P.Morgan's analysts commented on the "basketful of puzzles" that Venator's earnings report presented, including "what is the effect of the settlement of the Pori insurance claims on future quarterly adjusted EBITDA; and what exactly are Venator's intentions with respect to the rebuilding of the Pori, Finland plant" (August 1, 2018);

- Barclays' analyst report reiterated Defendants' false statements that "~20% of the [Pori] site's total capacity was available for production, an incremental 40% was expected to come on in phases between 2H,'18/2019, with the final 40% of capacity ('commodity' production) expected to be ready in 2020," but noted that "[n]ow the company is reviewing its full slate of options" (July 31, 2018);

- Jefferies noted, "For now, we continue to model Venator as if it will rebuild Pori," relying specifically on Defendants' false statement that "[t]wenty percent of Pori operated in Q2" (July 31, 2018);

- Morgan Stanley noted Venator's "Pori Uncertainty" (July 31, 2018);

- RBC Capital Markets' analyst also reiterated that "Pori is currently operating at ~20%" (August 1, 2018);

- SunTrust Robinson Humphrey also wrote, "[W]e expect that Pori will continue to operate at 20% near-term." (August 1, 2018).

### B. Venator Discloses That It Will Not Reopen Pori And That Pori Would Only "Finish" TiO2

173.    During a special "Pori Update Conference Call" held on September 12, 2018, Defendant Turner announced that the Company was abandoning Pori altogether, and that Venator would have to pay another $280 million on top of its existing Pori spend as a result. Defendants further revealed part of the truth regarding the damage that Pori suffered during the fire and the true costs associated with rebuilding the facility, as well as the effect of the fire at the Pori facility on Venator's business.  According to Turner, "the timeline to completion have prompted Venator to ***forgo the reconstruction efforts of [] Pori.***"

174.     Additionally, Venator would absorb an expected $130 million in "fixed costs" that were "associated with winding down the reconstruction efforts at the plants."  In order to "maintain Venator's leadership position in the high-quality specialty and differentiated TiO2 market," Venator would also pay "approximately $150 million of CapEx to both upgrade the mix of certain facilities by transferring inks, products and adding incremental high-value production cosmetics, pharmaceutical and food applications."  This $280 million would be in addition to the $550 million in insurance proceeds already spent by Venator on restoring the facility, and would in part pay for the cost of transferring some of the manufacturing technology at Pori to other Venator sites in Europe.  These revelations were in stark contrast with Defendant Ogden's October 27, 2017 assurance that Venator's "$500 million insurance policy is more than enough to cover the costs of the [Pori facility] rebuild on its own."

175.     Defendants also first suggested on this call that, after the fire, the Pori facility never actually produced any TiO2 products, instead merely "finishing" products produced at other Venator facilities that were then shipped to Pori.  On the September 12, 2018 call, Turner claimed that Pori was able to "produce up to 25 kilotons or 20% of the sites operating capacity and will continue to supply the finished product to customers throughout the transition period."  These numbers aligned with Pori's supposed 20% capacity first established during the SPO.  However, when a Barclays analyst asked if Pori would actually "be processing ore there and producing base TiO2," Turner explained, "we will be taking interim product from elsewhere and finishing it [at Pori]."  While Defendant Turner was addressing Venator's future plans for Pori, this disclosure provided the first public indication that Pori's operating capacity may not have reached the 20% amount Defendants previously claimed.

62

176.    Defendants also revealed that none of the TiO2 that was supposedly manufactured at Pori generated any margins for Venator whatsoever.  Indeed, as analysts struggled to understand Pori's actual contributions to Venator's historical results, Defendant Ogden revealed that after the fire, Pori had never generated any earnings but had operated at a "breakeven" level:

> BoA Merrill Lynch Analyst: And you said Pori will run -- it's 25,000 net ton specialty differentiated at breakeven until shutdown, more or less. On the other hand, I see from the slides that it generated $94 million -- I'm sorry -- yes, $94 million in the LTM period when it was presumably absorbing fixed cost of the larger site, which I may or may not have heard, was a $15 million headwind, which might suggest that was $109 million, if I'm supposed to add that together. So how is that running the $25 million breakeven, going forward, compare with the $94 million of LTM EBITDA of the Pori site?
>
> Defendant Ogden: So Roger, as you will recall, prior to -- well, the second quarter of 2018 and in prior quarters, we were recognizing business interruption income associated with the collection in quarterly installments from our insurance underwriter. So we -- now that we have received all those funds, we took a big recognition in the second quarter. And so we'll now no longer be recognizing that business interruption lost EBITDA component in 3Q going forward. But rather, we'll only recognize whatever that site in its reduced state is able to generate, and we estimate that at breakeven.
>
> BoA Merrill Lynch Analyst: Okay. So it sounds like, excluding the insurance proceeds, since you restarted that 25kt, and I guess, Q2 '17, that the plant's been running around breakeven, and you expect that to keep going until the end -- at around breakeven until it's shut down. Is that a fair statement?
>
> Defendant Ogden: Yes.

177.    The same day, the United States District Court for the District of Columbia issued an order granting the FTC's motion for a preliminary injunction to prevent Tronox and Cristal from consummating their merger until the FTC completed its review and any additional judicial proceedings concluded.  In its order, the District Court held that:

> In January 2017, a fire at a large TiO2 plant in Pori, Finland, decreased the available titanium dioxide in Europe and caused a rapid and significant price increase. Producer invoice data suggest that, before the fire, North American TiO2 prices were roughly $200 - $250 per metric ton higher than European prices. After the fire, however, European prices significantly exceeded those in North America. . . .

The Pori fire thus shows a dramatic relative increase in European pries not 'disciplined by customer arbitrage.'

Mem. Op., *Fed. Trade Comm'n v. Tronox Ltd.*, Case No. 1:18-cv-01622 (TNM), ECF No. 108 at 19 (D.D.C. Sept. 12, 2018) (citations omitted).

178.    In response to the above disclosures, the price of Venator shares declined 4.76%, from a closing price of $11.35 on September 11, 2018 to a closing price of $10.81 on September 12, 2018.

179.    Following this disclosure, analysts discussed the closure of the Pori facility as the driver of Venator's steep stock decline:

- BMO Capital Markets noted that "VNTR this morning announced the decision to permanently shut down the rebuild at its 130k mt Pori, Finland facility and the transfer of 45k mt of specialty/differentiated production to other sites within Europe. Pori will continue to operate with its current 20% (25k mt) output through 2021, while the 45k mt of shifted capacity is slated to come online in 2020 (~$30M in EBITDA, hitting a full run-rate by 2023 (~$60M of EBITDA)…." (September 12, 2018);

- RBC Capital Markets downgraded VNTR on the news of the Pori closure, noting its decision to "move to the sidelines awaiting TiO2 price recovery," and "overall weak sentiment, which leads us to believe it could take several quarters before investors are willing to give VNTR a chance" (September 12, 2018);

- SunTrust Robinson Humphrey similarly noted Venator's purported plan to "continue to operate Pori at 20% capacity through 2021" (September 12, 2018);

- UBS's analyst commented, "Instead of rebuilding, VNTR will close its plant in Pori (Finland), which had a fire just prior to VNTR going public. VNTR will restore some of the Pori specialty & differentiated grades capacity at other sites, but the net loss to our 2020E EBITDA is still ~$20M versus our prior partial rebuild base case" (September 12, 2018);

- J.P. Morgan's analyst note reiterated Venator's purported plan "to operate Pori at 20% utilization rate (of the 130kt capacity) through 2021" and "to later transfer the 25kt residual capacity at Pori to other

facilities as well as to add 20kt debottlenecked tons to its existing specialty grade TiO2 capacity network" (September 21, 2018);

- BMO Capital Markets explained that Venator's decision to close Pori was "positive for the industry," but less so for the Company in particular, noting its "anemic valuation" (September 26, 2018).

180.    Venator had never previously disclosed that Pori was only finishing intermediate product when describing Pori's purported return to "20% prior capacity," and the Company's suggestion on the September 12, 2018 call that it would produce intermediate TiO2 at other facilities to be shipped and "finished" at Pori going forward provided the first indication that Defendants' Class Period statements were false.  Indeed, the Company repeatedly told investors during the Class Period that Pori was "***already running at 20% of previous capacity***" without delineating which portions of the facility were operational while simultaneously telling investors that the Calais facility only had "finishing" operations and, as a result, did not generate any "capacity" whatsoever.

181.    As a result of Defendants' misrepresentations, analysts and investors did not appreciate or understand that Pori was merely being used to finish TiO2.  For example, the question from the Barclays analyst who asked whether Pori would be "processing ore" following the shut-down demonstrates a lack of understanding that the "black end" processing function at Pori had been eliminated, as the "black end" portion would be the only part of the facility that would be involved in "processing ore" as the analyst described it.  Indeed, prior to September 2018, the same Barclays analyst repeatedly published reports reflecting his incorrect understanding that Pori had "already [been] running at ~20% operating rates" for months.

### C.    Venator Discloses Skyrocketing Costs Beyond Insurance Associated With Pori And Reveals that TiO2 Demand Was Lower Than Previously Stated

182.    Finally, on October 30, 2018, Defendants announced that, in addition to the over $500 million in costs and lost business associated with the Pori fire that Venator had incurred to

date—which, by that point, had been covered entirely by Venator's insurance policy—the Company incurred an additional $415 million in restructuring expenses, and would incur additional "charges of $220 million through the end of 2024" related to Pori.

183.    Additionally, Defendants revealed that "[s]ales volume declined 18% year-over-year largely relating to slower than expected demand[.]"  Defendants had initially concealed that demand was far weaker than projected by attributing increased TiO2 prices to stronger global demand as opposed to capacity shortages caused by Pori.  As a result, when Chinese TiO2 manufacturers increased capacity to compensate for the vacuum left by Pori, Venator had to acknowledge the weaker than previously stated demands and the impact weaker demand had on Venator's sales.

184.    As a result of the October 30, 2018 disclosure, the price of Venator shares declined more than 19%, on unusually high trading volume, from a closing price of $8.00 on October 29, 2018 to close at $6.47 the following day.

185.    Analysts similarly understood that the October 30, 2018 announcement regarding developments at the Pori facility contributed to the stock decline:

- SunTrust Robinson Humphrey's analysts noted that "significant cash flows are being absorbed to cover Pori facility closure/relocation costs," and highlighted "weaker demand for functional-grade TiO2" (October 30, 2018);

- RBC Capital Markets lowered its Q4 2018 and full year 2018 estimates for Venator "to reflect anticipated sequential headwinds," including "lower volumes," "higher ore costs," "lower TiO2 prices," and "softer than expected TiO2 demand" (October 30, 2018);

- UBS noted, "Pori restructuring; $415M total charge, of which $385M is non-cash charge…VNTR previously announced it will close its plant in Pori (Finland), which had a fire just prior to VNTR going public. VNTR will restore some of the lost Pori specialty & differentiated grades capacity at other sites, but will take a number of years to complete" (October 30, 2018);

- Barclays' analyst explained, "VNTR is struggling to generate cash, which leaves it unable to defend its stock. The FCF generation is hindered by a) lower EBITDA generation, b) cash costs for Pori closure, and c) working capital consuming more cash than expected. Unfortunately, a & b look likely to continue all through 2019" (October 31, 2018).

186.    By October 30, 2018, the price of Venator shares had fallen 68% from their price at the time of the IPO, and 71% from the price at which the Company sold the shares to investors in the SPO—dramatic declines that wiped out hundreds of millions of dollars in shareholder value and caused substantial damage to Lead Plaintiff and the Class.

## VII.   POST-CLASS PERIOD EVENTS

187.    After the end of the Class Period, Venator revealed additional information concerning the impact of the Pori fire on its business.  For example, during an appearance at the Citi Basic Materials Conference on November 27, 2018, Defendants disclosed, for the first time, Venator's "Pori EBITDA adjustment."   Specifically, in an Investor Presentation, Venator disclosed the following adjustments to the Company's quarterly and annual EBITDA history, which reflected a previously undisclosed impact of the Pori fire:



188.    Analysts had previously requested that Venator reveal these numbers, with a SunTrust analyst asking on the February 23, 2018 earnings call, "Could you remind us, what would

be the normalized EBITDA for Pori in 2018? Were there no outage?"  Defendant Ogden refused

to provide the requested EBITDA breakdown at the time and explained, "it's a very good question.

It is one that for commercial reasons, we have not given explicit transparency to."  Following the

November 27, 2018 presentation, J.P. Morgan analysts in their December 3, 2018 report reduced

2018 EBITDA estimate for Venator "from $482m to $439m" and their 2019 EBITDA estimate

"from $379m to $286m."  The J.P. Morgan report also downgraded Venator.

189.     During the course of the FTC's investigation into the merger of Tronox and Cristal,

the United States District Court for the District of Columbia found that the fire at Venator's Pori

facility caused the dramatic increase in prices of TiO2 from which Defendants claimed to be

benefitting.

190.     Also during the FTC's investigation into the merger, Venator went to significant

lengths to keep its business information confidential and indefinitely under seal.  For example,

Defendant Maiter, Venator's Senior Vice President for white pigments, who was deposed by the

FTC as part of its investigation, submitted a declaration requesting that data concerning

Huntsman's presentations to investors regarding the Venator business—including information

directly relating to Pori and the Pori outage on TiO2 prices—be placed under seal.  According to

Defendant Maiter, "if such information were to become part of the public record, Venator would

be significantly harmed in its ability to compete in the titanium dioxide industry," requesting the

information be provided "*in camera* treatment indefinitely, or, at a minimum, for a period of 3

years," and that the material only be made accessible to certain designated individuals.

191.     A state court in Texas recently sustained claims for violations of the Securities Act

against the Venator Defendants, the Huntsman Defendants, and the Underwriter Defendants for

misrepresentations and omissions in Venator's IPO and SPO Materials—the same or overlapping

misstatements contained in the IPO and SPO set forth below.  Specifically, on February 8, 2019, the Macomb County Employees' Retirement System filed suit in the District Court for Dallas County, Texas against the Venator Defendants, the Huntsman Defendants, and the Underwriter Defendants for violations of Sections 11, 12(a)(2), and 15 of the Securities Act (the "Texas Action").  After briefing on a Rule 91A motion to dismiss, the court sustained Macomb County's Securities Act claims in the Texas Action.

## VIII.   SUMMARY OF SCIENTER ALLEGATIONS

192.   Numerous facts, considered collectively, demonstrate that the Venator Defendants knew that the Class Period representations set forth below misrepresented Pori's operational capacity after the fire, its impact on TiO2 prices, the actual progress of the Pori rebuild, and other facts concerning Pori and the fire's impact on the Company business or, at minimum, acted with severe recklessness.  All of these allegations must be considered holistically in evaluating the Venator Defendants' scienter, and the cumulative knowledge of senior executives at Venator is properly imputed to Venator.  These allegations include the following:

193.   *First*, Defendants were repeatedly informed—through meetings and other direct reports—in specific detail about the reconstruction efforts at Pori, the Facility's actual capacity during the reconstruction, and the fact that intermediate TiO2 was produced at other facilities and shipped to Pori only for "finishing."  For example, Defendants held regular internal meetings to discuss the status of the rebuild of Pori and the efforts Venator's sales team had undertaken in order to supply product to customers impacted by the fire.  FE 5 stated that senior management in the United Kingdom, including Defendants Turner and Maiter, attended meetings about the Pori rebuild and related topics.  Venator established these meetings immediately following the fire and continued to hold them on a weekly basis throughout the Class Period for the specific purpose of tracking and handling the rebuild efforts and managing customer orders that could not be filled

because Pori lost all ability to fill customer orders following the fire.  As FE 5 recounted, the key findings and updates discussed at these weekly meetings were reported directly to Defendants Turner and other senior Venator executives.  Indeed, Defendant Maiter admitted under oath that he knew that intermediate product was "shuffled" from Scarlino to Pori to be "finished,"  and Defendants Peter Huntsman, Turner, and other members of Venator's senior management visited Pori shortly after the IPO.

194.    Along similar lines, Venator management had "monthly meetings to review relevant [Pori] activities and interim claims as well as regular progress payments" with its insurers throughout the Class Period.  Given that these insurers were covering both the expenses for rebuilding Pori and business interruption losses, as discussed above, these meetings necessarily would have addressed Venator's lack of progress in rebuilding Pori, the expenses relating to shipping materials to be "finished" at Pori, the only manufacturing function the facility could perform, and the direct and substantial effect that Pori's outage had on TiO2 prices.  The above reports and meetings provided direct evidence to Defendants that the underlying realities at Pori did not match their statements to investors during the Class Period.

195.    ***Second***, Pori was a critical topic of discussion on every earnings call during the Class Period, the subject of both Defendants' and analysts' intense focus, and Defendants professed to know detailed information concerning the status of the Facility's rebuild and the fire's impact on Venator's business.  For example, on the Company's first earnings call as a public company on October 27, 2017, Defendant Ogden stated that Pori was "already running at 20% site capacity," and Defendant Turner confirmed that, "[a]s a priority, we will restore 75% of Pori earnings potential, the total specialty business at Pori by the end of 2018."  Similarly, at least three

different analysts asked specific questions about Pori during this first call, which were answered in detail by Defendants Turner and Ogden.

196.    Detailed questions and responses about Pori, the progress of the rebuild, and the impact on Venator were repeated during every conference call during the Class Period.

197.    In addition, Defendants also made specific statements about the use of insurance proceeds for the Pori fire, providing detail concerning the extent to which those funds were allocated to rebuilding the facility versus business interruption payments.   In all of Venator's quarterly filings with the SEC during the Class Period, Defendants discussed the use of the Pori insurance proceeds in detail and, indeed, were required to under ASX 220-30-45-1 to specifically identify the allocation of those proceeds in Venator's financial statements.

198.    *Third*, Pori's importance to Venator's business supports an inference of scienter. As Turner explained, before the fire, Pori was "one of the most profitable [plants] in Europe," manufactured the most profitable TiO2 products Venator produced, was the sole plant that manufactured numerous high-margin Venator TiO2 materials, accounted for 17% of the Company's total TiO2 manufacturing capacity and—unbeknownst to investors during the Class Period—was responsible for approximately one-third of Venator's earnings every quarter.   In other words, Pori was so material to the Company's business that it would be implausible for Defendants to have been ignorant of the truth.   Indeed, out of Venator's eight facilities, Pori alone accounted for one-third of the Company's earnings.   Pori's staggering importance to the Company's financial well-being, even without accounting for the massive and expensive construction and rebuilding process supposedly occurring throughout most of the Class Period, strongly support and inference of scienter.

199.    Moreover, the magnitude of the reconstruction effort, which ultimately exceeded $1 billion—an amount that is approximately triple the Company's current market capitalization—bolsters a strong inference that the Defendants knew or recklessly disregarded the truth about Pori. Even based on the false estimates Defendants initially provided to investors, the Pori rebuild was to purportedly cost $500 million including business interruption losses, before quickly rising to more than $600 million, and then to $875 million. And once Venator disclosed it would abandon the facility, Venator would incur hundreds of millions of dollars in additional costs to pay for cleanup and site remediation. These were the most significant expenses ever incurred by Venator, strongly suggesting the Defendants knew or at minimum recklessly disregarded the truth about Pori and what these extraordinary sums were being spent on.

200.    **Fourth,** Defendants' false and misleading statements concerned the most significant events and initiatives at Venator. Pori was a critical production facility that generated 17% of the Company's TiO2 total output and WAS one of only two Venator facilities capable of producing the specialty products that were critical to Venator's business model. As FEs 1 and 5 recounted, Pori's specialty production also included a range of products that could be produced at any of the Company's other facilities. Given both the quantity of the TiO2 products produced, and the quality of those products in light of Venator's focus on specialty markets, Pori's production capacities and the reconstruction efforts at the Facility were critical interests for Defendants.

201.    **Fifth**, Defendants went to great lengths to manufacture the false appearance that Pori had been restored to 20% production capacity—including by spending significant sums to manufacture intermediate TiO2 product at the Scarlino facility in Italy and ship it to Pori for finishing. Such a drastic departure from normal business operations could only have been undertaken with direct approval from Venator's senior leadership and, indeed, as former

employees recounted, Defendants Turner, Maiter and other senior managers closely tracked the production and shipment of intermediate TiO2 in Italy that was then sent to Pori.

202.   **Sixth**, Huntsman's efforts to accelerate the Venator spin-off and capitalize on the business separation are probative of scienter.  Huntsman had a significant financial interest in separating the severely damaged Venator business in the most profitable manner.  Huntsman had a particularly acute motive to do so, as the IPO proceeds would be used to deleverage Huntsman's balance sheet—a prerequisite for Huntsman's planned merger with Clariant.  Prior to the fire at Pori and announcing the Clariant merger, Huntsman had approximately $3.8 billion in debt on its balance sheet—representing a 3.8 leverage ratio—and initially disclosed it would spin-off the Venator business to existing Hunstman shareholders, including the Huntsman family.

203.   Following the fire and announcing the planned merger, however, Huntsman generated a significant amount of cash by separating the Venator business, used the proceeds to cut Huntsman's leverage ratio nearly in half—from 3.8 to 2.2—and allowed the Huntsman family to avoid being saddled with the damaged Venator business.  Huntsman generated net proceeds of approximately $475 million through the IPO, an additional $732 million from the Venator debt distribution conducted in connection with the IPO, and approximately $471 million in the secondary offering.  In total, Huntsman generated over $1.2 billion in net proceeds through the IPO and an additional $471 million in the SPO.  Huntsman then used the proceeds to significantly deleverage the Huntsman's balance sheet.  That Huntsman was only able to raise these funds through deception about Pori further supports Defendants' scienter.

204.   **Seventh**, Defendants Huntsman, Turner and Ogden had a powerful personal financial motive to mislead.  To start, Peter Huntsman and the Huntsman Defendants had a significant personal financial interest in ensuring that Venator separated from Huntsman after the

fire as profitably as possible. Immediately before the start of the Class Period, Defendant Peter Huntsman and the Huntsman family collectively controlled approximately 24.75 million shares of Huntsman, or approximately 11% of the outstanding shares. If the Venator separation were to occur as a spin-off in which Venator shares were distributed to existing Huntsman shareholders on a pro rata basis—as Huntsman had originally told investors it would—the Huntsmans would have owned or controlled an equivalent percentage of Venator shares.

205.    Instead, knowing the true damage to the pigments business as a result of the Pori fire, the Huntsmans chose to change the transaction structure to sell Venator shares to public investors through two public offerings—enabling Huntsman to raise over $1.2 billion in cash that was then used to pay off existing Huntsman debt. Through this change in transaction structure, and based on the price of Venator shares at the time of IPO and SPO, the Huntsmans were able to avoid over $150 million in losses.

206.    Further, Defendants Peter Huntsman, Turner and Ogden also had a personal financial incentive to conduct the Venator separation on the terms most financially beneficial to Huntsman. Specifically, by concealing the truth about Pori in separating the pigments business, Huntsman was able to garner over $1.7 billion in proceeds that were used to pay down existing debt, enabling Huntsman to cut its leverage ratio in half, and for the first time in the Company's history qualify for an "investment grade" rating. Notably, the Venator separation enabled Huntsman to improve the key financial metrics that determined Peter Huntsman's compensation. Indeed, as a direct result of the Venator offerings, Peter Huntsman took home nearly $17 million in compensation in 2017—including bonuses specifically paid in recognition of the "significant value" Huntsman was able to obtain through the Venator IPO and SPO—the largest amount he has made in any year since becoming CEO in 2000. Defendants Turner and Ogden likewise

received substantial incentive compensation in connection with the IPO and SPO, garnering hundreds of thousands of dollars each as a result of their "contributions" to the separation.

## IX.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

207.    As summarized in detail below, throughout the Class Period, Venator and the Executive Defendants made materially false and misleading statements and omissions concerning, among other things: (i) the Pori facility's operating at "20% capacity" after the fire; (ii) that the timeline to rebuild Pori was "on pace" and "on track"; (iii) the cause of rising TiO2 prices and Pori's impact on TiO2 prices; and (iv) the manner in which the Company was spending its insurance proceeds, the costs associated with rebuilding the Pori facility and the overall financial impact of the fire on Venator's business.

### A.    Defendants Misrepresented That The Pori Facility Was Operating at "20% Capacity" Following The Fire

208.    Defendants reassured investors about Pori by representing that the facility had already achieved "20% capacity" by the second quarter of 2017—before the Company's IPO— and repeated this false assurance throughout the Class Period.

209.    For example, in the offering materials for the Company's IPO on August 4, 2017— *i.e.*, a full two months after the second quarter ended on June 30, 2017—Venator represented that the plan to rebuild Pori would proceed along the following timeline:

> We are committed to repairing the facility as quickly as possible. We expect the Pori facility to restart in phases as follows: approximately 20% capacity in the second quarter of 2017; approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018.

210.    On September 6, 2017, in its first in-person presentation to the analyst community after the IPO, Venator executives appeared at the UBS Global Chemicals & Paper and Packaging Conference to discuss the Company.  On that day, Venator posted to its investor relations website a slide presentation that Defendants used during their presentation.  In this presentation,

Defendants stated that the Pori "site [is] expected to be fully operational by 4Q 2018 through phased restart" with "~20% capacity 2Q 2017 *achieved*."

211.    On September 13, 2017, the Company appeared at the KeyBanc Basic Materials & Packaging Conference. Venator posted to its investor relations website a slide presentation that Defendants used during their presentation.  In this presentation, Defendants stated "~20% capacity 2Q 2017 *achieved*" at the Pori facility.

212.    On October 27, 2017, Venator announced its financial results for the third quarter of 2017, disclosing earnings that significantly beat market consensus estimates. In the Company's press release discussing the earnings, Venator told investors that "We are already running at 20% of previous capacity."

213.    Also on October 27, 2017, Venator held its earnings call for the third quarter of 2017—its first-ever earnings call as a public company.  On the call, Defendant Ogden and Turner reiterated the Company's impressive earnings, and Defendant Ogden provided an update on Venator's progress on the Pori rebuild, explaining that the Pori facility is "already running at 20% site capacity."

214.    On November 3, 2017, the Company issued its Form 10-Q for the third quarter of 2017, which was signed by Defendants Ogden and Ibbotson and contained certifications as to its accuracy and completeness by Defendants Turner and Ogden.  In the Form 10-Q, Venator stated: "We are currently operating at 20% of total prior capacity but producing only specialty products."

215.    On February 23, 2018, Venator filed its Form 10-K for the year ended December 31, 2017, which was signed by Defendants Ogden and Ibbotson and contained certifications as to its accuracy and completeness by Defendants Turner and Ogden. In the 10-K, Defendants stated,

"[W]e continue to repair the facility . . . . We are currently operating at 20% of total prior capacity producing specialty products."

216.   On May 1, 2018, Venator announced its financial results for the first quarter of 2018. The Company issued a press release, filed with the SEC on Form 8-K, in which Defendant Turner stated, "Currently, 20% of the site's prior total capacity is available for production."

217.   Also on May 1, 2018, Venator filed its Form 10-Q for the first quarter of 2018, which was signed by Defendants Ogden and Ibbotson and contained certifications as to its accuracy and completeness by Defendants Turner and Ogden.  In the Form 10-Q, Defendants stated, "[W]e continue to repair the [Pori] facility." The 10-Q further stated, "We have restored 20% of the total prior capacity, which is dedicated to production of specialty products."

218.   Also on May 1, 2018, the Company released its earnings presentation for the first quarter of 2018, in which it stated, "20% of total prior site capacity is currently available for production of specialty products."

219.   Also, on May 1, 2018, Venator held its earnings call for the first quarter of 2018. On that call, Defendant Turner stated that "20% of the site's prior capacity for the production of finished specialty products was available."

220.   Despite analysts' confusion on the Company's earnings calls, throughout the Class Period, the market incorporated Defendants' false statements about the Pori facility operating at 20% capacity, and analysts repeated this information in their reporting. For instance, on October 27, 2017, Barclays' analyst noted, "The company confirmed they are already running at ~20% operating rates . . .with the remainder of specialty capacity to return 'as quickly as possible in 2018.'" Similarly, on February 23, 2018, SunTrust Robinson's analyst wrote, "20% is currently operating." On May 1, 2018, Barclays' analyst report also noted, "[C]urrently 20% of the site's

total capacity is now available for production." BMO Capital Markets noted the same, on February 23, 2018: "Pori is currently operating with 20% of the site's capacity available for production." RBC Capital Markets reported on May 1, 2018, "20% of the site is available for production." Jefferies wrote on May 1, 2018, "Venator has ~20% of capacity available for specialty products, and another ~40% will come onstream for 2019."

221.    The statements in ¶¶ 209-19 above were false and misleading because, in fact, in the aftermath of the Pori fire, the Pori facility was not operating at 20% capacity, as Defendants falsely stated—it was not producing any TiO2 at all. In reality, the only part of the Pori facility that was functioning at all was the portion that conducted the TiO2 "finishing" process—the least costly and least labor-intensive part of the process—for one of the facility's four production lines. Further, Defendants' representations regarding Pori's purported 20% operating capacity were false because, in truth, Venator was expending extraordinary amounts of money and going to extreme lengths to ship intermediate product—manufactured at other facilities, such as Scarlino and Duisburg—to the Pori facility for the finishing process.  FE 2 stated that employees working on the finishing line laughed when discussing Venator operating at 20% capacity at Pori.

222.    Last, Defendants' statements that the Pori facility was operating at 20% were materially false because they concealed the reality that, instead of actually producing TiO2— whose sale would contribute to Venator's margins and earnings—Defendants' efforts to create the false appearance of production, by shipping intermediate product from other facilities to Pori for finishing, was actually causing a substantial drain on Venator's other facilities in Scarlino and Duisburg, where TiO2 was actually being produced. Venator's efforts to conceal the lack of production at Pori was straining and overwhelming capacity at its other sites.

223.    In addition, Defendant's material misrepresentations about Pori's production capacity—which were largely disseminated to the public prior to Venator's December 2017 SPO—created the impression to investors that the Company had made significant progress in returning Pori to full production capacity, and that the timeline Defendants told investors to expect would be met.  These statements were specifically intended to reassure investors that the Pori fire had not materially impacted Venator's business or capacity for production, and more than justified the valuation of the Company in the IPO and SPO.

**B.    Defendants Misrepresented The Company's Timeline To Rebuild Pori, The Company's Purportedly "On Pace" and "On Track" Progress, And The Magnitude Of The Damage To The Pori Facility**

224.    Defendants also sought to reassure investors concerning the timeline for rebuilding Pori, and repeatedly told investors that the Pori rebuild was proceeding as planned and was "on track" and "on pace."

225.    Starting in the offering materials for the Company's IPO on August 4, 2017, Venator set out the Company's schedule for rebuilding Pori and stated, "We are committed to repairing the facility as quickly as possible. We expect the Pori facility to restart in phases as follows: approximately 20% capacity in the second quarter of 2017; approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018."

226.    On August 28, 2017, the Company issued its Form 10-Q for the second quarter of 2017, which was signed by Defendants Ogden and Ibbotson and contained certifications as to its accuracy and completeness by Defendants Turner and Ogden.  In the Form 10-Q, Venator stated, the Pori Facility is "currently not fully operational," but "[w]e are committed to repairing the facility as quickly as possible."

227.    The Form 10-Q further stated, "A portion of our white end production became operational during the second quarter of 2017, and we expect the Pori facility to restart in phases

as follows: approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018."

228.    On September 6, 2017, the Company appeared at the UBS Global Chemicals & Paper and Packaging Conference. Venator posted to its investor relations website a slide presentation that Defendants used during their presentation.  In this presentation, Defendants stated that the Pori "site [is] expected to be fully operational by 4Q 2018 through phased restart . . . ~20% capacity 2Q 2017 achieved . . . ~40% capacity 2Q 2018 . . . ~100% capacity around year end 2018."

229.    On September 13, 2017, the Company appeared at the KeyBanc Basic Materials & Packaging Conference. Venator posted to its investor relations website a slide presentation that Defendants used during their presentation. In this presentation, Defendants stated that the Pori "site [is] expected to be fully operational by 4Q 2018 through phased restart . . . ~20% capacity 2Q 2017 achieved . . . ~40% capacity 2Q 2018 . . . ~100% capacity around year end 2018."

230.    Venator's October 27, 2017 announcement of its financial results for the third quarter of 2017 stated, "[W]e intend to restore manufacturing of the balance of these more profitable specialty products as quickly as possible in 2018.  The remaining 40% of site capacity is more commoditized and may be reintroduced at a slower pace depending on market conditions, cost and projected long term return."

231.    Also on October 27, 2017 Venator held its earnings call for the third quarter of 2017. Defendant Ogden stated, "[W]e intend to restore manufacture of the balance of these more profitable specialty products as quickly as possible in 2018."

232.    In Venator's November 3, 2017 Form 10-Q, Defendants stated, "[W]e currently intend to restore manufacturing of the balance of these more profitable specialty products by the

fourth quarter of 2018. The remaining 40% of site capacity is more commoditized and we will determine if and when to rebuild this commoditized capacity depending on market conditions, costs and projected long term returns relative to our other investment opportunities."

233.    On February 23, 2018, Venator announced its financial results for the fourth quarter and full year of 2017.   While Venator disclosed that cost estimates for the Pori rebuild had increased, Defendants continued to mislead investors concerning the timeline and expenditures for the rebuild.

234.    For example, in the Company's press release, filed with the SEC on Form 8-K that day, Defendant Turner stated, "We continue to see an elongated [titanium dioxide] cycle and despite significant rebuild cost escalation, *we remain on schedule to restore our specialty business capacity, and ultimately* full operation of the remaining capacity as economic conditions warrant at our Pori, Finland site."

235.    The press release further stated:

> *Construction for the specialty and differentiated products portion of the facility is on pace and we expect it to be complete by the end of 2018, however we are paying a fast-track premium*. Prior to the fire, this part of the facility represented 60% of site capacity and contributed, on average, 75% of the site EBITDA. Current TiO2 business conditions are favorable and provide compelling economics for the rebuild of the remaining 40% commodity portion of site capacity**.** However, this part of the rebuild program will not be accelerated and capacity will be reintroduced to the market no sooner than 2020.

236.    Also on February 23, 2018, Venator filed its Form 10-K for the year ended December 31, 2017, in which the Company stated, "*[W]e intend to restore manufacturing of the balance of these more profitable specialty products by the end of 2018*. The remaining 40% of site capacity is more commoditized and, based on current market and economic conditions, associated costs and projected returns, we currently expect to rebuild this portion of the facility, but do not expect it to be reintroduced into the market prior to 2020."

237.   Also on February 23, 2018, the Company released its earnings presentation for the third quarter of 2017, in which it stated: "Construction for the specialty and differentiated products portion of the facility is **on pace** and we expect it to be complete by the end of 2018 . . . Current TiO2 business conditions provide compelling economics for the rebuild of the remaining 40% commodity portion of the facility . . . Market introduction of commodity portion no sooner than 2020 . . . Estimated reconstruction costs continue to escalate and accuracy improves with elapsed time . . . Actively pursuing options to reduce the over-the-insurance-limit costs."

238.   On Venator's February 23, 2018 earnings call for the fourth quarter and full year of 2017, Defendant Turner stated that the Company planned to restore its "high-value specialty and differentiated products" portion of the Pori facility "as quickly as possible as it provides approximately 75% of site EBITDA" and that "[c]onstruction on the rebuild of the specialty products portion of the facility is on pace" and "expect[ed] to be complete by the end of 2018."

239.   On the same call, Defendant Turner stated that the Company is paying a "fast-track premium" and "remain[s] on track with our fast-paced project to restore the higher profitability, 60% specialty capacity by the end of 2018" but the remaining 40% of the site's commodity capacity "will be reintroduced to the market at a more normalized pace but not before 2020."

240.   On May 1, 2018, Venator announced its financial results for the first quarter of 2018.  The Company issued a press release, filed with the SEC on Form 8-K, in which Defendant Turner stated, "We continue to make progress on the construction phase of our complex Pori project."

241.   The May 1, 2018 press release further stated:

We are focused on restoring an additional 40% of capacity as quickly as possible to reach an aggregate 60% of former site capacity for manufacturing of our higher value specialty products.  .  .  .  Subject to the pace of our progress during commissioning, we expect some of this additional capacity to be producing finished

82

product during the second half of this year, and the remaining specialty capacity to be restored and producing finished product during 2019. Based on current market and economic conditions, associated costs and projected returns, we intend to rebuild the commodity production capacity of the facility, but do not currently expect it to produce product prior to 2020.

242.     Also on May 1, 2018, Venator filed its Form 10-Q for the first quarter of 2018, in which Defendants stated, "[W]e intend to restore manufacturing of the balance of these more profitable specialty products as quickly as possible . . . [s]ubject to the pace of our progress during commissioning, we expect some of this specialty capacity to be producing finished product during the second half of this year and the remaining specialty capacity to be restored and producing finished product during 2019.  Based on current market and economic conditions, associated costs and projected returns, we currently expect to rebuild the commodity portion of the facility, but do not expect it to be reintroduced into the market prior to 2020."

243.     These representations were credited by analysts, who repeatedly relied on Defendants' statements concerning the progress of the Pori rebuild to determine their valuations of the Company's stock, repeating the Company's reassurances that the project remained "on pace" or "on schedule." For example, on October 27, 2017, RBC Capital Markets' analyst wrote, "Pori and the $90M productivity program both appear to be on track." Similarly, on February 23, 2018, Barclays' analyst reported, "The rebuild of Pori specialty capacity (60% of total capacity) is on schedule to be completed by year end of 2018."  The same day, SunTrust Robinson's analyst also noted, "Plans to restore the specialty TiO2 capacity at Pori (60% of total capacity, 75% of site EBITDA) are on track." On May 2, 2018, Jefferies' analyst wrote, "The Pori rebuild is on track for $325-375m."

244.     The statements in ¶¶ 225-41 above were false and misleading because the rebuild of the Pori facility was not proceeding "on pace," nor was the Company paying a "fast track premium" to ensure its timely rebuilding. To the contrary, the effort to repair the Pori facility never

proceeded past the demolition work done on the Moore facility and no additional work was done on the nonoperational production lines.  In fact, as Defendants were saying that "fast track premium(s)" were driving up costs, Venator was actually spending its insurance proceeds on the expensive, undisclosed "shuffle" of unfinished products from Italy to the Pori facility in order to keep up the false appearance that Pori had production capacity.

245.     For example, on February 23, 2018, when Defendants represented that they were "*on pace*" and "*on schedule*" to fully rebuild the specialty portion of Pori, in reality, Venator had not yet even completed the demolition phase of reconstruction at Pori. As FE 2 explained, almost a month later, as of March 2018, the Company had still not yet begun *any* reconstruction efforts on the damaged precipitator section of the factory or on factory lines 1, 2, or 3—a fact that cannot be reconciled with the timeline provide in Defendants' public statements.

246.     Similarly, on May 1, 2018, Defendants represented that Venator "continue[s] to *make progress on the construction phase* of the rebuild," and "we expect some of this specialty capacity to be producing finished product during the second half of this year."  In reality, as FEs 1 and 2 explained, by July 2018, two months after Defendants' May 1, 2018 statements, Venator still had not completed the demolition work at the Venator facility, and the status of the rebuild remained in the same place as it had been in March 2018.  As FE 2 explained, by July 2018, FE 2 could see that no progress was occurring, as FE 2 stated, the rebuilding process was a "scam," and no repairs were made to the production lines 1, 2, or 3 during the Class Period.

### C.     Defendants Misrepresented The Cause Of Rising TiO2 Prices And Concealed Pori's Impact On TiO2 Prices

247.     Defendants attempted to convince investors that rising TiO2 prices stemmed from increased demand and presaged a booming market, when, in truth, the rising TiO2 prices were largely a result of the Pori supply removing a significant amount of TiO2 from the marketplace.

248.    Venator's offering materials for the Company's IPO on August 4, 2017 presented a strong market for TiO2 and stated that, "[w]e realized approximately $300 per metric ton improvement in pricing over the course of 2016. TZMI estimates that the market price of global high quality TiO2 will grow by more than $600 per metric ton, the equivalent of more than 24%, from December 31, 2016 through the end of 2017."

249.    Venator continued promoting the strength of the TiO2 market in the Company's Form 10-Q filed August 28, 2017, which was signed by Defendants Ogden and Ibbotson and contained certifications as to its accuracy and completeness by Defendants Turner and Ogden.  In the Form 10-Q, Venator state, "Average selling prices increased primarily due to continued improvement in business conditions for TiO2."

250.    On August 28, 2017, Venator also issued a press release, in which Defendant Turner stated, "Selling prices for titanium dioxide continue to improve and we continue to work closely with our customers in this regard."

251.    On October 27, 2017, Venator announced its financial results for the third quarter of 2017.  The Company issued a press release, which it filed with the SEC on Form 8-K, in which Defendant Turner stated, "Due to prevailing strong market conditions, our TiO2 selling prices continue to improve and our business is benefitting from the improved profitability and cash flows."

252.    Also on October 27, 2017, Venator held its earnings call for the third quarter of 2017.  On the call, Defendant Turner explained that "segment adjusted EBITDA up 37% over the prior quarter, primarily driven by higher TiO2 selling prices," and added that, "[w]e continue to see good demand across the market for our specialty, differentiated and functional grades, and we are currently implementing price increases for the fourth quarter."  Later in the call Defendant

Turner told a RBC Capital Markets analyst that the Company's strong earnings "uplift" was "***related to solid demand, good demand around the world***."  Defendant Turner emphasized that the Company had seen, "better underlying demand this time around," when asked how the current TiO2 price cycle compared to previous cycles by a Citi analyst.

253.    In Venator's February 23, 2018 Form 10-K, Defendants stated, "[t]he improvement in [TiO2] selling prices reflected continued improvement in business conditions for TiO2, allowing for an increase in prices globally, and improvement from favorable exchange rates, primarily against the Euro."

254.    On Venator's earnings call for the fourth quarter 2017, held February 23, 2018, Defendant Turner stated, "Our Titanium Dioxide segment delivered another great quarter, with TiO2 pricing and business improvement benefits driving the results."  The stronger TiO2 pricing was supposedly caused by a "positive underlying demand across the market," for TiO2 products. Defendant Turner added, "We see further price improvement in TiO2" in 2018.

255.    In Venator's Form 10-Q for the first quarter 2018, filed May 1, 2018, Defendants repeated that, "[t]he increase in selling prices reflects continued improvement in business conditions for TiO2, allowing for an increase in prices globally."  Defendants also noted a "[f]avorable environment for TiO2 price increases in the second quarter of 2018."

256.    On Venator's earnings call held May 1, 2018, Defendant Turner stated that Venator's "Titanium Dioxide segment delivered another great quarter and generated $143 million of adjusted EBITDA, driven by higher TiO2 pricing and additional benefit from our business improvement program.  Pricing increased 23% compared with the prior year quarter and 5% compared to the fourth quarter of 2017, reflecting strong industry fundamentals."

257.    These representations were credited by analysts, who repeatedly relied on Defendants' statements concerning TiO2 prices and demand to determine their valuations of the Company's stock, repeating the Company's reassurances, with Barclays analysts in their October 31, 2017 report noting that, "[m]anagement continues to see a positive picture of the up-cycle: solid demand growth." Jeffries analysts highlighted in their February 23, 2018 report that TiO2 "[s]upply/demand remain[s] strong and pricing should rise." Analysts also repeated Defendants' claims that increased TiO2 demand made this pricing cycle more sustainable, with SunTrust analysts in their October 30, 2017 report, stating "This cycle peak appears more sustainable than the last." To support this, the analysts echoed Defendants and claimed that, "[u]nderlying demand [for TiO2] has been stronger," during this cycle.

258.    The statements in ¶¶ 248-56 above were false and misleading because Defendants because Defendants claimed that the TiO2 market was seeing "improvement" when, in fact, the reduced supply of TiO2 from Pori's closure was actually driving higher TiO2 prices. Defendant's statements that Venator was "benefitting" from "TiO2 selling prices" was materially misleading because, in fact, as the United States District Court for the District of Columbia held, the Pori fire was the cause of the rising TiO2 selling prices.

**D.    Defendants Misrepresented The Manner In Which The Company Was Spending Its Insurance Proceeds, The Costs Associated With Rebuilding The Pori Facility, And The Overall Impact Of The Pori Fire On Venator's Business**

259.    In order to convince investors that the Pori fire would not have a significant impact on Venator, Defendants continuously told investors that insurance payments would cover the Pori rebuild and concealed the damage that losing Pori caused to Venator's overall business.

260.    On August 28, 2017, the Company issued its Form 10-Q for the second quarter of 2017, which was signed by Defendants Ogden and Ibbotson and contained certifications as to its accuracy and completeness by Defendants Turner and Ogden. In the Form 10-Q, Venator stated

the "site is insured for property damage as well as business interruption losses." The Form 10-Q

also stated, "The fire at our Pori facility did not have a material impact on our 2017 second quarter

operating results as losses incurred were offset by insurance proceeds."

261.    On October 27, 2017, Venator announced its financial results for the third quarter

of 2017.  The Company issued a press release, which it filed with the SEC on Form 8-K, in which

Defendant Turner stated, "the combination of increased TiO2 profitability and estimated

reconstruction costs indicate that we will exceed our $500 million insurance limit.  We expect to

contain these over-the-limit costs within $100-150 million and account for them as capital

expenditures."  Defendant Turner also stated that "We are encouraged by our strong sequential

earnings growth in the third quarter, driven by higher price capture, our leading TiO2 position in

Europe and the quality of our specialty TiO2 business."

262.    Also on October 27, 2017, the Company released its earnings presentation for the

third quarter of 2017, in which it stated: "We expect to contain over-the-limit costs within $100-

$150 million."

263.    Also on October 27, 2017, Venator held its earnings call for the third quarter of

2017.  On the call, Defendant Ogden stated, Venator's "$500 million insurance policy is more than

enough to cover the costs of the rebuild on its own, but because the insurance policy also covers

lost earnings," strong market conditions and higher TiO2 selling prices "ha[ve] the effect of

increasing our insurance claim for lost earnings from the Pori site." Defendant Ogden further stated

that the Company "expect[s] to contain these over-the-limit costs within $100 million to $150

million."

264.    Analysts sought further clarification from Defendants on this call about how the

Company was accounting for its insurance proceeds. An analyst from Bank of America asked

Defendant Ogden, "can you break out that $3 million of operating expense? How much of it was insurance proceeds offsetting [selling, general, and administrative expense]?" The analyst also asked, "you have operating expenses of $3 million. And I'm assuming that you got SG&A in there, and you have an offset from insurance proceeds. Is that right? And can you break that out?" Defendant Ogden responded by saying,

> So as far as the income statement goes, ***you ought to think about it as a complete wash in terms of what our cost was and the lost EBITDA. We're fully reimbursed for that.*** So the net impact on the income statement is we have only recognized the lost EBITDA associated with that facility. So the -- that does not apply to the operating expenses that you see there of $3 million in the third quarter.

265.    In Venator's November 3, 2017 Form 10-Q, the Company stated, "***The fire at our Pori facility did not have a material impact on our 2017 third quarter*** operating results as losses incurred were offset by insurance proceeds."

266.    On February 23, 2018, Venator disclosed its fourth quarter and year-end results. In doing In Venator's February 23, 2018 press release, Defendants stated, "Based on current estimates, we expect the total cost to rebuild the Pori facility (including the commodity portion) will exceed the limits of our insurance policy by as much as $325 million, or up to $375 million when providing additional contingency for the upper limits of our current design and construction cost estimates. . . . Based on current and anticipated market conditions, we currently expect our business interruption losses to be fully reimbursed within our insurance policy limits."

267.    The February 23, 2018 Form 10-K stated:

> ***Due to prevailing strong market conditions, our TiO2 selling prices continue to improve and our business is benefitting from the resulting improved profitability and cash flows. This also has the effect of increasing our total anticipated business interruption losses from the Pori site.*** We currently believe the combination of increased TiO2 profitability and recently estimated reconstruction costs will result in combined business interruption losses and reconstruction costs in excess of our $500 million aggregate insurance limit. We currently estimate that the total cost to rebuild the Pori facility (including the commodity portion) will

exceed the limits of our insurance policy by as much as $325 million, or up to $375 million when providing additional contingency for the upper limits of our current design and construction cost estimates.

268.     Venator's February 23, 2018 10-K further stated, "***The fire at our Pori facility did not have a material impact on our 2017 fourth quarter operating results*** as losses incurred were offset by insurance proceeds."

269.     On Venator's February 23, 2018 earnings call, Defendant Turner stated that the cost to rebuild the Pori facility would exceed the Company's insurance proceeds by $325 million and the "cost could be as much as $375 million." On this same call, Defendant Ogden also stated that in the "most likely case" the Company's "current estimates are $325 million to rebuild the entire site," with additional contingency added "simply out of a measure of prudence and conservatism."

270.     Defendants' new estimates about the cost of the Pori rebuild puzzled analysts, who sought clarity on the earnings call. David Begleiter of Deutsche Bank asked Defendant Turner point blank, "[O]n the . . . Pori cost, what happened between the November call and today to increase the cost estimate here?" Turner responded:

> So in effect, we have not got a normal sequential schedule for these projects, but rather, we have to think about design, procurement build and startup and where possible, we wanted to try and rapidly restore these to meet the strong customer demand. So we've got some complexity there in a way these projects are run. ***This fast-track approach, just -- does make it more challenging to accurately estimate the costs.*** And we are paying premium prices where necessary to attain equipment and services, to hit back to fast-paced approach.

271.     Analysts' questions on the new cost estimate continued with a question from Eric Petrie of Citi, who asked Defendant Turner, "And just going back to the cost estimates for the Pori restart sort of range of $325 million to $375 million, versus $100 million to $150 million higher. You noted that, part of it was due to the fast-track premium, but I don't think you've changed your timeline for the restart of the specialty grades. So I'm just wondering, why such a higher -- over 70% above your $500 million insurance policy, why is that?" Turner responded:

[T]he specialty portion of the 60% rebuild that we are going at a fast pace to restore, in which we are on pace, that's a very demanding timeline. And ordinarily, and to think we had a fire at roughly 12 months ago and we'll bring on the first pounds in the second quarter of this year. That's a very fast-paced recovery.

272.     In Venator's May 1, 2018 press release announcing its financial results for the first quarter of 2018, Defendants stated, "We continue to estimate the self-funded portion of the reconstruction and commissioning remain within the range of our previous guidance of $325 to $375 million."

273.     In Venator's May 1, 2018 10-Q, Defendants stated, "We continue to estimate that the total cost to rebuild and commission the Pori facility will exceed the total insurance proceeds received by $325 to $375 million."

274.     The May 1, 2018 10-Q further stated, "The fire at our Pori facility did not have a material impact on our 2018 first quarter or our 2017 year to date operating results as losses incurred were offset by insurance proceeds."

275.     Also on May 1, 2018, Venator held its earnings call for the first quarter of 2018. During the call, Defendant Turner stated that estimates of the reconstruction and commissioning of the Pori site remain unchanged at $325 to $375 million above the insurance proceeds. Defendant Turner stated that the Company has "confidence, along with the fact that we continue to use [ ] new information to model a range of outcomes and scenarios around the cost and timeline, and that's what draws us back to reiterate that we are in this range of $325 million to $375 million."

276.     Analysts continued to be puzzled by the increasingly unclear information that Defendants were disseminating regarding the cost of the Pori rebuild. For instance, Steve Byrne asked Defendant Turner, "[G]iven the Pori reconstruction is taking longer, does that mean more of it will be allocated to business interruption versus reconstruction? And of that $236 million you received a couple of weeks ago, will that flow through the P&L all the way through 2019?" Turner

responded, "Let's be clear, on that final settlement that we have received from our insurer of $236 million, that is a receipt in advance of the needs that we have, both to fund the reconstruction of the capital costs as well as the recognition of business interruption that will continue to take place through 2019."

277.    Byrne, however, sought more granular information, and followed up with Defendant Turner, "[G]iven that it's taking longer to rebuild Pori, does that mean more of that is being used for business interruption rather than the reconstruction?" And Defendant Turner muddied the waters even more: "The reconstruction is still generally in line with what our expectations have been. The additional clarity that we are providing to you now is around when we will have the actual finished product. And we -- as Simon has indicated, we now have greater visibility into when we will have that finished product available."

278.    The statements in ¶¶ 260-77 above were false and misleading because Defendants failed to disclose the line items in Venator's statement of operations in which the proceeds of its business interruption losses insurance were classified, as they were obligated to do under FASB Accounting Standards, ASX 220-30-45-1.  Specifically, Defendants failed to disclose that prices for TiO2 were rising precisely because the Pori facility was not producing TiO2—causing a severe shortage in worldwide supply (as the District Court for the District of Columbia found), and thus the true impact of the Pori fire on Venator's EBITDA was much more extreme than investors had been led to believe.  On October 30, 2018 and, after the Class Period on November 27, 2018, Defendants provided additional detail concerning the impact of the Pori fire on Venator's business by breaking out clearly and visibly the "Pori EBITDA Adjustment" in its financial results. On October 30, 2018, for instance, Defendants disclosed:



And on November 27, 2018, after the Class Period, Defendants disclosed additional historical quarterly and yearly EBITDA adjusted for Pori:



Venator never before disclosed this information, despite its obligations under ASX 220-30-45-1 and the prior requests by the SEC to "ensure your disclosures discuss the main cost drivers affecting your operating expenses and quantify in dollars how those increases/decreases in costs impacted your Segment Adjusted EBITDA amounts during each period presented"

## X.   LOSS CAUSATION

279.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.  Throughout the Class Period, Defendants

made materially false and misleading statements and omissions, and engaged in a scheme to defraud investors.  Defendants' conduct artificially inflated the price of Venator securities and operated as a fraud and deceit on the Class.  During the class period, Plaintiffs and the Class purchased Venator common shares, at artificially inflated prices and were damaged thereby when the price of Venator common shares declined when the truth was revealed.

280.    Specifically, Defendants' materially false and misleading statements misrepresented Pori's production capacity, the extent of the damage resulting from the fire at the facility, the timeline and progress of the facilities reconstruction, and the financial impact of the fire, including the extent to which the Company's insurance would cover rebuilding the facility.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors the price of Venator securities fell significantly.   As a result of the disclosure of the truth of Defendants' fraud, Venator's common shares declined by 68%, from a closing price of $20.89 per share on August 2, 2017, the day Venator shares were sold to investors in the IPO to a closing price of $6.47 on October 30, 2018.  The price of Venator shares also sank by 71% from the day the shares were sold to investors in the SPO to the end of the Class Period, including in response to the following disclosures.

| Date | Corrective Event | Closing Stock Price | Common Stock Price Change | S&P 500 Price Change |
|---|---|---|---|---|
| July 31, 2018 (August 1, 2018) | Defendants disclose that the cost to rebuild Pori will exceed Venator's insurance policy by more than $375 million. | $13.53 | -11.9% | 0.4% |
| September 12, 2018 (September 13, 2018) | Defendants disclose that Venator will not reopen Pori and that Pori was never operating at 20% capacity. | $10.31 | -9.2% | 0.6% |
| October 30, 2018 | Defendants disclose that Venator would incur an additional $415 million in restructuring expenses in order to close down Pori and lower-than-expected demand. | $6.47 | -19.1% | 1.6% |

281.    It was entirely foreseeable to Defendants that their materially false and misleading statements and omissions would artificially inflate the price of Venator's common shares.  It was also foreseeable to Defendants that the revelation of the truth about Pori's production capacity, the extent of the damage resulting from the fire at the Facility, the timeline and progress of the Facility's reconstruction, and the financial impact of the fire, including the extent to which the Company's statements concerning the use of insurance proceeds would cause the price of the Company's securities to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed.  Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## XI.    PRESUMPTION OF RELIANCE

282.    At all relevant times, the market for Venator common stock was efficient for the following reasons, among others:

(a)     Venator stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Venator filed periodic public reports with the SEC and NYSE;

(c)     Venator regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Venator was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

283.    As a result of the foregoing, the market for Venator common stock promptly digested current information regarding Venator from all publicly available sources and reflected such information in the price of Venator stock. Under these circumstances, all purchasers of Venator stock within the defined Class during the Class Period suffered similar injury through their purchase of Venator stock at artificially inflated prices and the presumption of reliance applies.

284.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Pori fire and its impact on Venator—information that Defendants were obligated to disclose—proof of positive reliance is not a prerequisite to discovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Pori facility to Venator's business, as set forth above, that requirement is satisfied here.

96

## XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

285.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the misrepresentations pleaded in this Complaint.  The statements complained of herein were historical statements or statements current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

286.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each such statement was made, the speaker knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of Venator who knew that the statement was false, and/or the statement omitted material adverse information whose disclosure was necessary to render the statement not misleading.   None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF
**For Violation of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Thereunder
(Against Venator, Turner and Ogden)**

287.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

288.     During the Class Period, Defendants Venator, Turner and Ogden carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause economic harm to Plaintiffs and other members of the Class.

289.     Defendants Venator, Turner and Ogden (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

290.     During the Class Period, Defendants Venator, Turner and Ogden, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

291.     During the Class Period, Defendants Venator, Turner and Ogden made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading.

292.   Specifically, these Defendants are liable for the following materially false and misleading statements and omissions made during the Class period as alleged above in Section IX:

(a)   <u>Defendant Venator</u>: Defendant Venator is liable for all the false and misleading statements and omissions made by its spokespersons and Defendants Turner and Ogden, its senior most officers during the Class Period and lead spokesperson for the Company during that time, which are set forth above in Section IX.

(b)   <u>Defendant Turner</u>:  Defendant Turner is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q filed on August 28, 2017, November 3, 2017, and May 1, 2018 and Form 10-K filed on February 23, 2018, the IPO Materials and SPO Materials (defined below) and for statements made in conference calls in which he participated during the Class Period held on October 27, 2017, February 23, 2018, May 1, 2018, and July 31, 2018.

(c)   <u>Defendant Ogden</u>:  Defendant Ogden is liable for the false and misleading statements and omissions made in the Company's Forms 10-Q filed on August 28, 2017, November 3, 2017, and May 1, 2018 and Form 10-K filed on February 23, 2018, the IPO Materials and SPO Materials (defined below) and for statements made in conference calls in which he participated during the Class Period held on October 27, 2017, February 23, 2018, May 1, 2018, and July 31, 2018.

293.   Defendants Turner and Ogden, as senior officers of the Company, are liable as direct participants in the wrongs complained of herein.  Through their high-ranking positions of control and authority as the most senior executive officers of Venator, each of these Defendants was able to control, and did directly control, the content of the public statements disseminated by CenturyLink.  Defendants Turner and Ogden had direct involvement in the daily business of the Company and participated in the preparation and dissemination of Venator's materially false and misleading statements set forth above.

294.   Defendants Venator, Turner and Ogden had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the

true facts that were available to them. Defendants Venator and the Executive Defendants engaged in this misconduct to conceal Venator's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

295.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, the purchased Venator stock and were harmed when the truth about Venator negatively impacted the price of those securities.   Plaintiffs and the Class would not have purchased Venator stock at the prices they paid, or at all, had they been aware of the truth about Venator.

296.    As a direct and proximate result of Defendants Venator, Turner and Ogden's wrongful conduct, Lead Plaintiff and other members of the Class suffered harm in connection with their respective purchases of the Company's stock during the Class Period.

297.    By virtue of the foregoing, Defendants Venator and the Executive Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### SECOND CLAIM FOR RELIEF
**For Violation of Section 20(a) of the Exchange Act**
**(Against the Executive Defendants and Huntsman)**

298.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

299.    As alleged in detail above, throughout the Class Period, the Executive Defendants and the Huntsman  were each controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of each Defendant's voting power, ownership, rights as against Venator, and/or specific acts, the Executive Defendants and Huntsman had the power to control Venator's operations and its decision-making processes.

300.     Specifically, (i) throughout the Class Period, Huntsman maintained a controlling interest in both Venator's common stock and in its voting securities; (ii) Huntsman had the power to appoint, and did appoint, a majority of the Board's directors, including Defendants Peter Huntsman and Margetts, who sat on the board of both Huntsman and Venator during the Class Period; (iii) Huntsman hand-picked Venator's senior executive team, including Defendants Turner, Ogden, and Maiter, who were senior personnel at Huntsman prior to the IPO; and (iv) Huntsman had the power to cause Venator to register and offer securities for sale to the public.

301.     By reason of such conduct, Huntsman is liable pursuant to Section 20(a) of the Exchange Act.

302.     The Executive Defendants also acted as controlling persons of Venator within the meaning of Section 20(a) of the Exchange Act by virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Venator, the Executive Defendants had the power and ability to control the actions of Venator and its employees.

303.     By reason of such conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIV.   SECURITIES ACT ALLEGATIONS

304.     In this section of the Complaint, Plaintiffs Miami, FCERA, and Pontiac assert a series of strict liability and negligence claims based in the Securities Act on behalf of themselves and the members of the Class who purchased or otherwise acquired Venator shares either in or traceable to Venator's IPO, which occurred on or around August 2, 2017, and/or Venator's SPO, which occurred on or around December 4, 2017, and suffered damages as a result.

101

305.     Plaintiffs' claims under the Securities Act do not sound in fraud, and Plaintiffs expressly disavow and disclaim any allegations of fraud, scheme or intentional conduct as part of their claims under the Securities Act, which do not have scienter, fraudulent intent, or motive as required elements.  To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter, or intent of the Defendants to defraud Plaintiffs or members of the Class.

306.     As alleged below, Venator and the other Securities Act Defendants made a series of materially untrue statements and omissions of material facts in Venator's IPO Registration Statement and IPO Prospectus (together, the "IPO Materials") and/or in Venator's SPO Registration Statement and SPO Prospectus (together, the "SPO Materials"), and in the Company's public filings incorporated by reference into and therefore deemed part of the IPO Materials and/or SPO Materials.

307.     Specifically, on or around August 3, 2017, Venator conducted the IPO pursuant to an IPO Registration Statement that the Company filed with the SEC on May 5, 2017 and which, after six amendments, was declared effective by the SEC on August 2, 2017. On August 4, 2017, Venator filed a Prospectus for the IPO on Form 424B4, which incorporated and formed part of the IPO Registration Statement.

308.     The IPO Registration Statement was signed by the Defendants Turner, Ogden, Ibbotson, Huntsman, Margetts.

309.     By means of the IPO Materials, Venator offered and sold more than 26 million ordinary shares (which included the underwriters' exercise in full of their option to purchase an additional 3,405,000 ordinary shares) at $20.00 per share, resulting in over $522 million in gross proceeds for Huntsman.

310.    On or around December 4, 2017, Venator conducted a secondary public offering of ordinary shares pursuant to a registration statement that the Company filed with the SEC on November 27, 2017 which was declared effective by the SEC on November 29, 2017. On December 1, 2017, Venator filed a prospectus for the SPO on Form 424B4, which incorporated and formed part of the SPO Registration Statement.

311.    The SPO Registration Statement was signed by the Defendants Turner, Ogden, Ibbotson, Huntsman, Margetts, Anderson, Ferrari and Patrick.

312.    By means of the SPO Materials, Venator offered and sold more than 23.7 million ordinary shares (which included the underwriters' purchase of an additional 1,948,955 ordinary shares pursuant to a partial exercise of their over-allotment option) at $22.50 per share, resulting in over $533 million in gross proceeds to Huntsman.

A.    **The IPO Materials Contained Material Misstatements and Omissions**

1.    *Misstatements About Venator's Capacity*

313.    The IPO Prospectus contained material misstatements and omissions about Venator's capacity.  The Prospectus stated, "We are committed to repairing the [Pori] facility as quickly as possible. We expect the Pori facility to restart in phases as follows: ***approximately 20% capacity in the second quarter of 2017***; approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018."

314.    Likewise, the IPO Prospectus claimed that the Company's "782,000 metric tons" of annual production capacity, which included full production from the Pori facility, made it the "leader in the specialty [Titanium Dioxide] industry segment, which includes products that sell at a premium and have more stable margins" as well as the "[Titanium Dioxide] market leader in the fibers and films, cosmetics and food end markets, and are at the forefront of innovation in  these

applications, with an exciting pipeline of new products and developments that we believe will further enhance our competitive position."

315.    The Prospectus also included the below table, which included the full capacity for the Company's Scarlino, Italy facility and stated their "TiO2 finishing plant in Calais, France" was excluded:

| | Annual Capacity (metric tons) | | | |
|---|---|---|---|---|
| Site | EAME(1) | North America | APAC | Process |
| Greatham, U.K. | 150,000 | | | Chloride TiO2 |
| Pori, Finland(3) | 130,000 | | | Sulfate TiO2 |
| Uerdingen, Germany | 107,000 | | | Sulfate TiO2 |
| Duisburg, Germany | 100,000 | | | Sulfate TiO2 |
| Huelva, Spain | 80,000 | | | Sulfate TiO2 |
| Scarlino, Italy | 80,000 | | | Sulfate TiO2 |
| Lake Charles, Louisiana(2) | | 75,000 | | Chloride TiO2 |
| Teluk Kalung, Malaysia | | | 60,000 | Sulfate TiO2 |
| Total | 647,000 | 75,000 | 60,000 | |

(1) Excludes a sulfate plant in Umbogintwini, South Africa, which closed in the fourth quarter of 2016, and our TiO$_2$ finishing plant in Calais, France.

(2) This facility is owned and operated by LPC, a manufacturing joint venture that is owned 50% by us and 50% by Kronos. The capacity shown reflects our 50% interest in LPC.

(3) In January 2017, our TiO$_2$ manufacturing facility in Pori, Finland experienced fire damage, and it is currently not fully operational. We are committed to repairing the facility as quickly as possible and we anticipate that some level of production will have resumed prior to completion of the separation and we estimate that the Pori facility will be fully operational around the end of 2018. The Pori facility has nameplate capacity of up to 130,000 metric tons per year, which represents approximately 17% of our total TiO$_2$ nameplate capacity and approximately 2% of total global TiO$_2$ demand.

316.    The Prospectus also stated that Venator "anticipate[s] that some level of production will have resumed prior to completion of the separation [from Huntsman] and we estimate that the Pori facility will be fully operational around the end of 2018."

317.    These statements were false and misleading and omitted material facts because rather than operating at 20% capacity, Pori was in truth only finishing products, as recounted by multiple Venator former employees.  Further, Venator's statements concerning the capacity of other Venator facilities were misleading and omitted material facts because they did not disclose that a substantial portion of the capacity of those other facilities had been used to manufacture intermediate product that was then shuffled to Pori.

318.    In addition, while the Prospectus stated that Venator estimated that Pori had reached 20% capacity over a month earlier, on June 30, 2017, in reality, Pori was not generating any capacity when the Prospectus was filed with the SEC on August 4.  Thus, Venator's "estimate" concerning Pori capacity was demonstrably false when the statement was made.

319.    Moreover, Venator's statements concerning Pori's capacity were misleading and omitted material facts in light of Venator's disclosures concerning the Calais facility, which Venator represented generated zero TiO2 capacity.   In truth, just like at Calais, the only manufacturing activity that took place at Pori during the Class Period was the "finishing" of TiO2.

320.    Venator's statements concerning its other facilities' production capacities were also false and misleading because, in truth, Venator's facility in Scarlino, Italy was manufacturing intermediate TiO2 that was then shipped and "finished" at Pori.  Accordingly, at the time the statements were made, Venator's Scarlino facility did not have "80,000 metric tons" of capacity because a substantial portion of Scarlino's "capacity" was actually being "shuffled" to Pori, and double-counted and included as part of the "20% capacity" that was finished at Pori.  Last, Venator's facilities did not collectively have "782,000 metric tons" of capacity because, in reality, just like the Calais facility, Pori had no capacity whatsoever and could only "finish" TiO2.

### 2. *Misstatements About The Progress Of The Pori Rebuild*

321. The IPO Prospectus stated that Venator "***expect[s] the Pori facility to restart in phases as follows***: approximately 20% capacity in the second quarter of 2017; approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018."

322. This statement was materially false and misleading and omitted material facts because, as described above in ¶94, Venator had not completed its investigation of the Pori fire at the time the statement was made, had not done so as of September 22, 2017, and would not complete demolishing the damaged areas of the facility to begin the reconstruction process until almost a year later. Any "expectation" concerning the timeline for the Pori rebuild was materially false and misleading in light of Venator's failure to disclose these highly material facts.

### 3. *Misstatements About TiO2 Demand*

323. The IPO Prospectus stated that "[w]e believe that our Titanium Dioxide segment is well-positioned to take advantage of an improvement in the [Titanium Dioxide] industry cycle." Similarly, the IPO Prospectus stated that "[w]ith approximately 782,000 metric tons of annual nameplate production capacity, we believe that we are well-positioned to capitalize ***on recovering [Titanium Dioxide] demand and prices***." The IPO Prospectus also stated that "[a]verage selling prices are expected to be higher primarily due to continued improvement in business conditions for titanium dioxide."

324. These statements were materially false and misleading when made because they omitted the highly material fact that prices for TiO2 were increasing as a result of the immediate elimination of TiO2 supply that was triggered by the Pori outage, as the District Court for the District of Columbia would later conclude.

4.     *Misstatements About Insurance Coverage And Pori's Impact on Venator's Business*

325.     The IPO Prospectus stated that Venator had "established a process with our insurer to receive timely advance payments for the reconstruction of the facility as well as lost profits." The IPO Prospectus also stated that:

> On February 9, 2017, we received $54 million as an initial partial progress payment from our insurer. During the first quarter of 2017, we recorded $32 million of income related to insurance recoveries in other operating (income) expense, net in our condensed combined statements of operations and we recorded $22 million as deferred income in accrued liabilities for costs not yet incurred. On May 2, 2017 and July 10, 2017, we received progress payments from our insurer of approximately $76 million and $11 million, respectively.

326.     The IPO Prospectus further stated that Venator did "not expect the fire at our Pori facility to have a material impact on our second quarter Segment Adjusted EBITDA as related losses have been offset by the proceeds of business interruption insurance which was prepaid during the quarter."

327.     These statements were materially false and misleading when made because they omitted the material fact that Venator's insurance proceeds were being used to "shuffle" intermediate product from Scarlino, Italy and other Venator sites to Pori, rather than covering reconstruction of the Pori facility.  Similarly, Venator's statement concerning the impact of the Pori fire on the Company's Segment Adjusted EBIDTA was materially misleading, as that statement omitted to disclose the highly material expense and insurance cost that Venator incurred by shipping intermediate product to Pori.

5.     *The IPO Risk Warnings Were Inadequate And Contained Material Misstatements*

328.     Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), required Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues

or income from continuing operations."  Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."

329.    The failure of the IPO Materials to disclose the true extent of the fire damage at the Pori facility, the time and cost it would take to rebuild the facility or procure a replacement, and the impact of Pori's outage on the supply and prices for TiO2 violated 17 C.F.R. § 229.303(a)(3)(ii) because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.  This failure also violated 17 C.F.R. § 229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Venator shares speculative or risky.

330.    Further, Venator included a "Risk Factor" in the IPO Materials that was materially false and misleading when made.  Specifically, Venator stated that "we *may* experience delays in construction or equipment procurement, and, even if we are able to resume production on this schedule, we may lose customers that have in the meantime found alternative suppliers elsewhere." As FE 2 stated, by September, 2017, two months after Venator filed the final IPO Registration Statement, Venator still had not finished the demolition work at Pori or begun any new construction work on production lines 1, 2, or 3.  Thus, given Venator's stated schedule for bringing more capacity online, construction delays were already realized, rather than a mere possibility, rendering the above "Risk Factor" false when made.

A.    **The SPO Materials Contained Material Misstatements and Omissions**

331.    The SPO Materials, dated December 4, 2017, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not

misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

### 1. *Misstatements About Venator's Capacity*

332.   The SPO Materials stated that Pori was "***currently operating at 20% of total prior capacity***."  The SPO Materials also included a chart with the following production figures for Venator's facilites:

| Site | Annual Capacity (metric tons) | | | |
| | EAME(1) | North America | APAC | Process |
| --- | --- | --- | --- | --- |
| Greatham, U.K. | 150,000 | | | Chloride TiO2 |
| Pori, Finland(3) | 130,000 | | | Sulfate TiO2 |
| Uerdingen, Germany | 107,000 | | | Sulfate TiO2 |
| Duisburg, Germany | 100,000 | | | Sulfate TiO2 |
| Huelva, Spain | 80,000 | | | Sulfate TiO2 |
| Scarlino, Italy | 80,000 | | | Sulfate TiO2 |
| Lake Charles, Louisiana(2) | | 75,000 | | Chloride TiO2 |
| Teluk Kalung, Malaysia | | | 60,000 | Sulfate TiO2 |
| Total | 647,000 | 75,000 | 60,000 | |

(1) Excludes a sulfate plant in Umbogintwini, South Africa, which closed in the fourth quarter of 2016, and our TiO$_2$ finishing plant in Calais, France.

(2) This facility is owned and operated by LPC, a manufacturing joint venture that is owned 50% by us and 50% by Kronos. The capacity shown reflects our 50% interest in LPC.

(3) In January 2017, our TiO2 manufacturing facility in Pori, Finland experienced fire damage and we continue to repair the facility. Prior to the fire, 60% of the site capacity produced specialty products which, on average, contributed greater than 75% of the site EBITDA from January 1, 2015 through January 30, 2017. The Pori facility had a nameplate capacity of up to 130,000 metric tons per year, which represented approximately 17% of our total TiO2 capacity and approximately 2% of total global TiO2 demand. We are currently operating at 20% of total prior capacity but producing only specialty products, and we currently intend to restore manufacturing of the balance of these more profitable specialty products by the fourth quarter of 2018. The remaining 40% of site capacity is more commoditized and we will determine if and when to rebuild this commoditized capacity depending on market conditions, costs and projected long term returns relative to our other investment opportunities.

333.   The above statements were materially false and misleading because Pori was not operating at 20% capacity.  In truth, Pori was only "finishing" intermediate products that had been shipped from Venator's Scarlino facility, as recounted by multiple former Venator employees. Further, Venator's statements concerning the capacity of other Venator facilities were misleading and omitted material facts because they did not disclose that a substantial portion of the capacity at those other facilities, particularly Scarlino, had been used to manufacture intermediate product that was then shuffled to Pori.

### 2.   Misstatements About The Progress Of The Pori Rebuild

334.   The SPO Materials stated that the Company "continue[s] to repair the facility," and "intend[s] to restore manufacturing of the balance of these more profitable specialty products by the fourth quarter of 2018," with the site's less profitable segments to be completed later.

335.   These statements were materially false and misleading when made because Venator had only completed its investigation of the damage to the Pori facility after September 22, 2017 and, according to FE 2, had made almost no progress on the demolition work at Pori between September 2017 and March 2018.  Further, according to FE 2, no material construction work occurred between September 2017 and March 2018 on production lines 1, 2, and 3.  Thus, contrary to Venator's representations implying that the Company had "continued" work in "repairing" the facility, in truth, the reconstruction and repair process had not yet begun.

### 3.   Misstatements About TiO2 Demand

336.   The SPO Materials stated that the Company was "well-positioned to capitalize on recovering TiO2 demand and prices" and that "[a]verage [TiO2] selling prices are expected to be higher primarily due to continued improvement in business conditions for titanium dioxide."

337.   These statements were materially false and misleading when made because Venator was not "well positioned to capitalize on recovering TiO2 demand and prices."  Instead, Venator

was in a highly vulnerable position, as it lacked any ability to manufacture TiO2 at all at its lowest -cost facility.  Further, contrary to Venator's claim that increasing TiO2 prices were driven by improvement in business conditions for titanium dioxide, in truth, the increase in TiO2 prices had been driven by the elimination of supply due to the Pori outage.

4.  *Misstatements About Insurance Coverage And Pori's Impact on Venator's Business*

338.  The SPO Materials represented that the modest increase in estimated costs above the insurance policy limits related to the Pori facility fire was primarily due to favorable market conditions and increased TiO2 selling prices.  In particular, the SPO Materials stated that "[d]ue to prevailing strong market conditions, our [TiO2] selling prices continue to improve and our business is benefitting from the resulting improved profitability and cash flows" but "[t]his also has the effect of increasing our total anticipated business interruption losses from the Pori site." The SPO Materials also stated that the cost estimate to repair the Pori facility now would exceed the aggregate insurance limit but that the Company "expect[s] to contain these over-the-limit costs within $100 million to $150 million."

339.  The SPO Materials further stated that the "fire at the Pori facility did not have a material impact on our 2017 third quarter operating results as losses incurred were offset by insurance proceeds."

340.  These statements were materially false and misleading when made because they omitted to disclose that the increase in TiO2 prices had been driven by the supply restriction triggered by the Pori outage.  Further, these statements were materially misleading because, rather than "benefit" Venator's business, the increase in TiO2 prices materially harmed Venator because it could not take advantage of the increase in TiO2 price because it lacked any ability to produce TiO2 from its lowest-cost facility.  Last, these statements were materially false and misleading

because they omitted the highly material fact that Venator had used the Pori outage to inflate its reported earnings using business interruption insurance proceeds.

5.     *The SPO Risk Warnings Were Inadequate And Contained Material Misstatements*

341.    As with the IPO Materials, the SPO Materials violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."   Similarly, the SPO Materials violated Item 503 of SEC Regulation S-K, 17 C.F.R. § 229.503, to include "adequately describe[] the risk[s]" that make the offering speculative or risky.

342.    Specifically, the failure of the SPO Materials to disclose the true extent of the fire damage at the Pori facility, the time and cost it would take to rebuild the facility or procure a replacement, and the impact of Pori's outage on the supply and prices for TiO2 violated 17 C.F.R. § 229.303(a)(3)(ii) because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations.   This failure also violated 17 C.F.R. § 229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Venator shares speculative or risky.

343.    As in the IPO Materials, certain of the "Risk Factors" included in the SPO Materials were materially false and misleading when made.   For example, Venator stated that "we ***may*** experience delays in construction or equipment procurement, and, even if we are able to resume production on this schedule, we may lose customers that have in the meantime found alternative suppliers elsewhere."   However, as recounted by FE 2, between September 2017 and March 2018, Venator made little progress on the demolition work at Pori and had not yet begun any construction

work on production lines 1, 2, or 3.  Thus, this risk warning was materially misleading because, contrary to Venator's warning of a *potential* "risk" of delay, construction delays had already occurred, and the risk had already materialized.

**B.     The Securities Act Defendants Failed to Exercise Reasonable Care or Conduct a Reasonable Investigation in Connection with the IPO and SPO**

344.    None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Materials and/or the SPO Materials were accurate and complete and not misstated in all material respects.

345.    Due diligence is a critical component of the issuing and underwriting process. Directors, officers, accountants and underwriters are able to perform due diligence because of their expertise and access to the Company's non-public information.  Underwriters must not rely on management statements; instead, they should play a devil's advocate role and conduct a verification process. At a minimum, due diligence for every public offering should involve: (1) interviews of upper and mid-level management; (2) a review of the auditor's management letters; (3) a review of items identified therein; (4) a review of the company's SEC filings (particularly those incorporated by reference); (5) a critical review of the company's financial statements, including an understanding of the company's accounting and conversations with the company's auditors without management present; (6) a review of the company's internal controls; (7) a review of negative facts and concerns within each underwriter's organization and within the underwriter syndicate; and (8) a review of critical non-public documents forming the basis for the company's assets, liabilities and earnings. Red flags uncovered through this process must be investigated. Officers and auditors must participate in the underwriters' due diligence, and non-officer directors are responsible for the integrity of the due diligence process in their capacity as the ultimate governing body of the issuer.

346.    Had the Securities Act Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

347.    Defendants' lack of reasonable care was particularly glaring given the contrasting way that Defendants described Pori's capabilities and the capabilities of Venator's other facilities. For instance, in describing Venator's Calais, France facility, Defendants made clear that the "finishing" process that took place at that facility did not generate any TiO2 "capacity" whatsoever—it was designated deliberately and solely as a "finishing facility"—whereas Defendants falsely claimed that Pori, which, after the fire, was also only "finishing," was producing at 20% capacity. The obvious discrepancy between Defendants' descriptions of the "capacity" achieved at two facilities—both of which contributed only "finishing"—shows that Defendants could not have undertaken sufficient due diligence before making the material misstatements in the IPO and SPO Materials.

348.    The Underwriter Defendants did not conduct a reasonable investigation of the statements contained in and incorporated by reference in the IPO Materials and SPO Materials and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated.

349.    The Underwriter Defendants could not simply rely on the work of Venator's outside auditors because the investing public relies on underwriters to obtain and verify relevant information and then make sure that essential facts are disclosed. The Underwriter Defendants must conduct their own, independent (and reasonable) investigation. Had the Underwriter Defendants conducted a reasonable investigation, they would have known that the IPO Materials and SPO Materials contained material misstatements and omissions concerning the impact of the Pori fire on Venator's business and operations.

114

350.    Similarly, the Securities Act Individual Defendants who signed the Registration Statement and failed to conduct a reasonable investigation into the statements contained in the Registration Statement and documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. Had these Securities Act Individual Defendants conducted a reasonable investigation, they would have known that the IPO Materials and SPO Materials contained material misstatements and omissions about the impact of the Pori fire on Venator's business and operations.

351.    The Securities Act Defendants were sophisticated in financing and internal control issues given their collective industry experience, yet they failed to reasonable inquire as to the Company's misstatements and omissions notwithstanding numerous "red flags," including, among other things, the fact that Venator had not completed its investigation into the Pori fire by the time of the IPO, that only a small portion of one of four production lines was operational at any time before the IPO or the SPO, that the Company was spending tremendous sums to ship intermediate product from other facilities to Pori to be "finished," and that no work actual progress to "rebuild" the facility except preliminary demolition work had been performed at the facility at the time of either the IPO or the SPO.

## XV.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### THIRD CLAIM FOR RELIEF
**For Violation of Section 11 of the Securities Act**
**(Against Venator, Turner, Ogden, Ibbotson, and Stolle, the Director Defendants, and the Underwriter Defendants)**

352.    Plaintiffs repeat and reallege each and every allegation contained above only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

353.    This Count is based on Defendants' statutory liability for false and materially misleading statements or omissions in the Offering Documents. This Claim does not sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the IPO an SPO Materials are specifically excluded from this Count, except that any challenged statements of opinion or belief made in connection with the IPO or SPO is alleged to have been a materially misstated statement of opinion or belief when made and at the time of the offerings.

354.    This claim is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of themselves and all persons and entities that purchased or otherwise acquired Venator common stock either in or traceable to Venator's August 4, 2017 IPO and/or December 4, 2017 SPO during the Class Period and suffered damages as a result, against Venator, Turner, Ogden, Ibbotson, Stolle the Director Defendants (except that claims against Margetts and Patrick are brought only in connection with the SPO), and the Underwriter Defendants, and does not sound in fraud.

355.    The IPO Materials and SPO Materials were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and concealed and failed to adequately disclose material facts as described above.

356.    The Company is the registrant for the IPO and the SPO. As the issuer of the shares, Venator is strictly liable to Plaintiff and to the relevant members of the Class within the scope of this count for the material misstatements and omissions contained in the IPO Materials and SPO Materials.

357.    Defendants Turner, Ogden, Ibbotson, and the Director Defendants, as Directors of Venator at the time of the IPO and SPO and/or as signatories of the IPO Materials and SPO Materials, are liable under Section 11 of the Securities Act, 15 U.S.C. § 77k.

358.     The Underwriter Defendants served as the underwriters for the IPO and SPO and qualify as such according to the definition contained in Section 12(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the IPO Materials and SPO Materials.

359.     Neither Turner, Ogden, Ibbotson, Stolle the Director Defendants nor the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Materials and SPO Materials were true and without omissions of any material facts and were not misleading.

360.     The Defendants named in this claim issued, caused to be issued and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the IPO Materials and SPO Materials, which misrepresented or failed to disclose, *inter alia,* the facts set forth above. By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

361.     Plaintiffs and other members of the Class within the scope of this Count acquired Venator shares pursuant to, or traceable to, the defective IPO Materials and/or SPO Materials.

362.     Plaintiffs and the Class members within the scope of this Count have sustained damages. The value of Venator shares has declined substantially subsequent to and due to the violations described herein.

363.     At the time they purchased Venator shares, Plaintiffs and the other members of the Class within the scope of this Count were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to Venator's subsequent announcements.

364.    This claim is brought within one year of when Plaintiffs discovered or reasonably could have discovered the untrue statements and omissions in the IPO Materials and SPO Materials and within three years of their effective dates.

**FOURTH CLAIM FOR RELIEF**
**For Violation of Section 12(a)(2) of the Securities Act**
**(Against Venator, the Underwriter Defendants and the Selling Shareholders)**

365.    Plaintiff repeats and realleges each and every allegation contained above only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

366.    This Count is based on Defendants' statutory liability for false and materially misleading statements or omissions in the IPO Materials and SPO Materials.  This Claim does not sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the IPO an SPO Materials are specifically excluded from this Count, except that any challenged statements of opinion or belief made in connection with the IPO or SPO is alleged to have been a materially misstated statement of opinion or belief when made and at the time of the offerings..

367.    This claim is brought by Plaintiffs pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all purchasers of Venator common stock in connection with, and traceable to, the IPO and the SPO and does not sound in fraud.

368.    Venator, the Underwriter Defendants and the Selling Shareholder Defendants were sellers, offerors, and/or solicitors of sales of the securities offered pursuant to the IPO Materials and SPO Materials in connection with the IPO and the SPO.

369.    The IPO Materials and SPO Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Venator, the Underwriter Defendants and the Selling

Shareholders' actions of solicitation included participating in the preparation of the untrue and misleading IPO Materials and SPO Materials.

370.    Venator, the Underwriter Defendants, and Selling Shareholders owed to the purchasers of Venator common stock, including Plaintiffs and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the IPO Materials and SPO Materials to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Venator, the Underwriter Defendants and the Selling Shareholder Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the IPO Materials and SPO Materials as set forth above.

371.    Plaintiffs and other members of the Class purchased or otherwise acquired Venator securities pursuant to and traceable to the defective IPO Materials and/or SPO Materials. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the IPO Materials and/or SPO Materials.

372.    Plaintiffs, individually and representatively, hereby offer to tender to Venator, the Underwriter Defendants and Selling Shareholder Defendants those securities that Plaintiffs and other Class members continue to own, on behalf of all members of the Class who continue to own such securities, in return for the consideration paid for those securities together with interest thereon.

373.    By reason of the conduct alleged herein, Venator, the Underwriter Defendants and the Selling Shareholders violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, Plaintiffs and members of the Class who hold Venator securities purchased in the IPO and/or SPO have the right to rescind and recover the consideration paid for

119

their Venator shares and, hereby elect to rescind and tender their Venator securities to Venator, the Underwriter Defendants and Selling Shareholders sued herein. Class members who have sold their Venator common stock are entitled to rescissionary damages.

374.    This claim is brought within one year of when Plaintiffs discovered or reasonably could have discovered the untrue statements and omissions in the IPO Materials and SPO Materials and within three years of their effective dates.

**FIFTH CLAIM FOR RELIEF**
**For Violation of Section 15 of the Securities Act**
**(Against the Defendants Turner, Ogden, Ibbotson, Stolle the Director Defendants**
**and the Selling Shareholder Defendants)**

375.    Plaintiff repeats and realleges each and every allegation contained above only to the extent, however, that such allegations do not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or members of the Class.

376.    This Count is based on Defendants' statutory liability for false and materially misleading statements or omissions in the Offering Documents. This Claim does not sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the IPO an SPO Materials are specifically excluded from this Count, except that any challenged statements of opinion or belief made in connection with the IPO or SPO is alleged to have been a materially misstated statement of opinion or belief when made and at the time of the offerings.

377.    This claim is brought by Plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of themselves and all persons and entities that purchased or otherwise acquired Venator common stock either in or traceable to Venator's August 4, 2017 IPO or December 4, 2017 SPO during the Class Period and suffered damages as a result, against the Securities Act Individual Defendants, and does not sound in fraud.

378.    Each of the Securities Act Individual Defendants was a control person of Venator by virtue of his or her position as a director and/or as senior officer of the Company. Each of the Securities Act Individual Defendants was a control person of Venator within the meaning of Section 15 of the Securities Act by reason of his or her own involvement in the daily business of Venator and/or as senior executives or directors of Venator. The Securities Act Individual Defendants, at the time they held positions with Venator, were able to, and did, exercise substantial control over the operations of Venator, including control of the materially untrue and misleading statements, omissions and course of conduct complained of herein.

379.    Each of the Selling Shareholder Defendants were, at the time of the wrong alleged herein and as set forth herein, controlling persons of Venator within the meaning of Section 15 of the Securities Act.  The Selling Shareholder Defendants were the majority owners and controlled the Company before, during and after the IPO and the SPO.  In addition to controlling a majority of Venator's voting shares, the Selling Shareholder Defendants also appointed and had significant influence over Venator's management and members of its Board of Directors.

380.    Each of the Defendants Turner, Ogden, Ibbotson, Stolle the Director Defendants and the Selling Shareholder Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act as alleged in Claim Three and Four above, based on having signed the IPO Materials and/or SPO Materials and/or having otherwise participated in the process that allowed the IPO and the SPO to be completed successfully.

381.    As a result of the foregoing, Plaintiff and the other members of the Class within the scope of this Count have suffered damages.

## XVI.   CLASS ACTION ALLEGATIONS

382.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who: (i) purchased or otherwise acquired

the publicly traded common stock of Venator between August 2, 2017 and October 29, 2018, inclusive (the "Class Period"); and/or (ii) purchased or otherwise acquired Venator stock either in or traceable to Venator's August 3, 2017 IPO or December 4, 2017 SPOduring the Class Period. Excluded from the Class are Defendants and their families, directors, and officers of Venator and their families and affiliates.

383.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Venator has approximately 106.5 million shares of stock outstanding owned by at least hundreds or thousands of investors.

384.    Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members may include:

(a)    Whether Defendants violated the Exchange Act;

(b)    Whether Defendants violated the Securities Act;

(c)    Whether Defendants misrepresented material facts;

(d)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)    Whether Defendants' misconduct impacted the price of Venator securities that are part of the defined Class;

(g)    Whether Defendants' conduct caused the members of the Class to sustain harm;

(h)    The extent of the harm sustained by Class members and the appropriate measure of harm.

385.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained harm from Defendants' wrongful conduct.

386.     Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

387.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XVII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages and equitable relief in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XVIII. JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: January 17, 2019                          Respectfully submitted,

*/s/ Michael D. Blatchley*
Michael D. Blatchley, Attorney-in-Charge

**BERNSTEIN LITOWITZ BERGER**
**  & GROSSMANN LLP**
Hannah Ross (*Pro Hac Vice Forthcoming*)
Michael D. Blatchley (*Pro Hac Vice*)
Kate W. Aufses (*Pro Hac Vice*)
Nicholas Gersh (*Pro Hac Vice*)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400

123

Fax: (212) 554-1444
Hannah@blbglaw.com
MichaelB@blbglaw.com
Kate.Aufses@blbglaw.com
Nicholas.Gersh@blbglaw.com

*Counsel for Lead Plaintiff and Lead Counsel for
the Class*

Thomas R. Ajamie
Texas Bar No. 00952400
Southern District Bar No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
Southern District Bar No. 38095
**AJAMIE LLP**
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002
Tel: (713) 860-1600
Fax: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for Lead Plaintiff*

Robert D. Klausner (*Pro Hac Vice Forthcoming*)
**KLAUSNER KAUFMAN JENSEN
 & LEVINSON**
7080 Northwest 4th Street
Plantation, FL 33317
Tel: (954) 916-1202
bob@robertdklausner.com

*Additional Counsel for City of Miami General
Employees' & Sanitation Employees' Retirement
Trust*

Cynthia J. Billings-Dunn (*Pro Hac Vice
Forthcoming*)
**ASHERKELLY**
25800 Northwestern Highway
Suite 1100
Southfield, MI 48075
Tel: (248) 746-2747
cbdunn@asherkellylaw.com

*Additional Counsel for the City of Pontiac General Employees' Retirement System*