**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: VENATOR MATERIALS PLC SECURITIES LITIGATION | Civil Action No. 4:19-cv-03464 <br><br> Judge Charles R. Eskridge III |

**LEAD PLAINTIFF'S OPPOSITION TO MAHOMED MAITER AND**
**RUSS R. STOLLE'S MOTION TO DISMISS FOR**
**<u>LACK OF PERSONAL JURISDICTION</u>**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   NATURE AND STAGE OF THE PROCEEDINGS .............................................. 2

III.  STATEMENT OF FACTS ................................................................................... 3

IV.   STATEMENT OF THE ISSUES ......................................................................... 9

V.    ARGUMENT ...................................................................................................... 9

     A.    Authority and Standard of Review ............................................................. 9

     B.    The Moving Defendants Are Subject To General Jurisdiction ................... 13

     C.    The Moving Defendants Are Subject To Specific Jurisdiction ................. 15

     D.    Jurisdictional Discovery Should Be Permitted, If Necessary ................... 18

VI.   CONCLUSION ................................................................................................. 18

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014) ........................................................ 13, 17

*Arena Football League, Inc. v. Roemer*,
947 F. Supp. 337 (N.D. Ill. 1996) ................................................................................ 15

*Asahi Metal Indus. Co. v. Superior Court*,
480 U.S. 102 (1987) ..................................................................................................... 10

*Bullion v. Gillespie*,
895 F.2d 213 (5th Cir. 1990) ........................................................................................ 12

*Busch v. Buchman, Buchman & O'Brien, Law Firm*,
11 F.3d 1255 (5th Cir. 1994) .......................................................................................... 9

*Coury v. Prot*,
85 F.3d 244 (5th Cir. 1996) .......................................................................................... 11

*Das v. Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018) .......................................................................... 17

*Freeman v. Nw. Acceptance Corp.*,
754 F.2d 553 (5th Cir.1985) ......................................................................................... 11

*FTC v. Educare Centre Servs. Inc.*,
414 F. Supp. 3d 960 (W.D. Tex. 2019) ........................................................................ 13

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
564 U.S. 915 (2011) ..................................................................................................... 11

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984) ..................................................................................................... 12

*In AstraZeneca Sec. Litig.*,
559 F. Supp. 2d 453 (S.D.N.Y. 2008) .......................................................................... 18

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 346 (S.D.N.Y. 2005) .......................................................................... 17

ii

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017)................................................................... 18

*In re CINAR Corp. Sec. Litig.*,
   186 F. Supp. 2d 279 (S.D.N.Y. 2002)............................................................. 13, 17

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
   351 F. Supp. 2d 334 (D. Md. 2004) ...................................................................... 18

*In re VEON Ltd. Sec. Litig.*,
   No. 15 Civ. 8672, 2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) ............................... 17

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945)............................................................................................... 10

*Kairalla v. Advanced Med. Optics, Inc.*,
   2008 WL 2879087 (C.D. Cal. June 6, 2008) .......................................................... 10

*Latshaw v. Johnston*,
   167 F.3d 208 (5th Cir. 1999) ................................................................................ 13

*Lew v. Moss*,
   797 F.2d 747 (9th Cir.1986) ................................................................................. 11

*Lewis v. Fresne*,
   252 F.3d 352 (5th Cir. 2001) ................................................................................ 10

*McNamara v. Bre-X Minerals Ltd.*,
   46 F. Supp. 2d 632 (E.D. Tex. 1999)...............................................................*passim*

*Milliken v. Meyer*,
   311 U.S. 457 (1940).............................................................................................. 11

*NextTechnologies, Inc. v. ThermoGenisis, LLC*,
   121 F. Supp. 3d 671 (W.D. Tex. 2015)................................................................... 18

*Rex & Roberta*,
   2019 WL 1407453 (S.D.N.Y. Mar. 28. 2019) ........................................................ 17

*S.E.C. v. Softpoint, Inc.*,
   2001 WL 43611 (S.D.N.Y. Jan. 18, 2001) ............................................................. 10

*San Mateo Cty. Transit Dist. v. Dearman, Fitzgerald & Roberts, Inc.*,
   979 F.2d 1356 (9th Cir. 1992) .............................................................................. 10

*SEC v. Straub*,
    921 F. Supp. 2d 244 (S.D.N.Y. 2013)...........................................................................12

*Texas v. Florida*,
    306 U.S. 398 (1939) ........................................................................................................11

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) .......................................................................................................10

**STATUTES**

15 U.S.C. 77k(a)(1) .............................................................................................................4

15 U.S.C. §77k .................................................................................................................17

## I.    INTRODUCTION

Lead Plaintiff respectfully submits this response in opposition to Defendants Stolle and Maiter's motion to dismiss for lack of personal jurisdiction.[1]  As detailed below and in the Declaration of Michael D. Blatchley, Lead Plaintiff has stated a prima facie case that Defendants Stolle and Maiter are subject to personal jurisdiction.

Specifically, in their roles as controlling persons of Venator, both Stolle and Maiter had sufficient minimum contacts with the United States to satisfy due process, including because both each engaged in activities purposefully directed to the United States, and the claims here arose out of and are related to those activities.  As an initial matter, however, Stolle is "at home" in Texas, and there can be no serious challenge to his Texas domicile, let alone any doubt about personal jurisdiction.  He is a Texas-licensed attorney who has lived in Texas for nearly three decades, has a primary residence in The Woodlands, Texas, and an employment agreement with Venator specifying that the United States is his "home country" and his United Kingdom assignment is "temporary" and expires in July.  In any event, Stolle engaged in the quintessential conduct courts have held give rise to personal jurisdiction in securities cases, including by, among other things, signing numerous documents containing the false and misleading statements that were used to solicit American investors in Venator's IPO and SPO.

---

[1] All defined terms have the same meaning as those in the Consolidated Class Action Complaint (ECF No. 41) ("Complaint").  References to "¶__" are to the Complaint, references to "BD¶__" are the accompany Declaration of Michael D. Blatchley, and references to "Ex.__" are to its exhibits.  References to "DMPJ__" are to Maiter and Stolle's Motion to Dismiss for Lack of Personal Jurisdiction.  ECF No. 57.  All emphasis is added, and citations omitted unless noted.

Similarly, Maiter has substantial connections to the United States through his years overseeing global sales operations for Texas-based Huntsman Corporation's white pigments business, whcih was spun off as Venator.  Moreover, Maiter regularly met with and provided information to Venator investor relations personnel, and Defendants Turner and Ogden concerning the business he oversaw, and testified that he provided "input" into presentations and other materials that were used to solicit U.S. investors in Venator's IPO. Of course, that information would have included the central topic at issue in this case—the fallout from the catastrophic fire at Venator's Pori facility. In fact, as numerous former employees confirmed, before the IPO and throughout the Class Period, Maiter met weekly with Defendant Turner and other senior management to address Venator's efforts to deal with the Pori outage—including the Company's effort to manufacture the appearance of actual capacity at Pori by shipping intermediate $TiO_2$ manufactured at other plants to Pori to be "finished" there (the "Europe-Pori Shuffle").  Given that he was the senior-most executive at Venator responsible for business operations and was involved in the Europe-Pori Shuffle, Maiter unquestionably "controlled" Venator for purposes of Section 20(a) liability.  These facts, some of which Maiter admitted to under oath in a U.S. proceeding during the Class Period, sufficiently establish a prima facie case for personal jurisdiction.

Under these facts, the Court can reasonably exercise personal jurisdiction over Stolle and Maiter, and their motion should be denied.

## II.　NATURE AND STAGE OF THE PROCEEDINGS

On January 17, 2020, Lead Plaintiff filed the Complaint asserting claims under the Securities Act and the Exchange Act on behalf of a class of Venator investors. ECF No.

2

41. Two Defendants, Maiter and Stolle, moved to dismiss the claims asserted against them for lack of personal jurisdiction under Rule 12(b)(2). ECF No. 57.

## III.   STATEMENT OF FACTS

Lead Plaintiff's claims arise from Defendants' scheme to dispose of a business that suffered a catastrophic fire at its most valuable and important manufacturing plant—the Pori facility—which produced Venator's most important products and secretly accounted for over one-third of Venator's profits. ¶¶74-108. After the fire, Defendants made a series of misrepresentations that the damaged facility had returned to 20% of its prior capacity, that the Company was "on pace" to restoring full production in months, and that Venator's insurance would fully cover the rebuild expense and any lost profits. ¶¶109-64. Defendants made these statements to solicit investments in two public offerings of Venator stock—the IPO on August 2, 2017 and SPO on December 4, 2017—in which Defendants raised over $1.7 billion from overwhelmingly U.S. investors, including the three public pension funds serving as Lead Plaintiff here. ¶¶20-23, 101-09, 117-21; BD¶3 (demonstrating that, based publicly reported institutional investor holdings, 98% of Venator's shares as of the third quarter 2017 were owned by U.S. investors). When the truth concerning the Pori fire and its impact on Venator's business came to light, Venator's shares lost over 70% of their value, causing substantial damage to investors and the Class. ¶¶165-86.

Lead Plaintiff asserts claims under the Section 11 of the Securities Act against Stolle for his role as a signatory of Venator's false and misleading offering materials, and as a "control person" of Venator under Section 15 of the Securities Act. ¶¶352-64, 375-81.

Lead Plaintiff alleges claims under Section 20(a) of the Exchange Act against Maiter as a "control person" of Venator.  ¶¶27, 30, 298-303.

**Defendant Stolle**.  As Venator's general counsel, Stolle was intimately involved in preparing and signing the false and misleading offering materials, including by signing numerous drafts of Venator's Registration Statement on Form S-1 for the Company's IPO in The Woodlands, Texas, and as signatory of the Registration Statement on Form S-1 for the Company's SPO filed with the SEC on November 27, 2017.  *See, e.g.*, Ex. B at II-3; Ex. C at II-6 (reflecting Stolle as signatory).  In this capacity, Stolle incurred liability as a "signatory" under Section 11 of the Securities Act. ¶¶352-64; 15 U.S.C. 77k(a)(1)).

Stolle's involvement in the IPO was so integral that he was one of only three Venator executives identified by the Company to receive a bonus—$400,000, an amount approximating his annual salary—for his "significant contributions" to the Venator separation.  BD¶6, Ex. D at 29, 33.  Indeed, during the Class Period and currently, Stolle had "global substantive and administrative responsibilities for the Legal, Compliance, Human Resources and Corporate Communications functions of Venator Materials PLC," meaning that he had responsibility for the corporate communications that included the materially false and misleading statements alleged in the Complaint. BD¶7, Ex. E.

Defendant Stolle is a long-time resident of Texas on "temporary assignment" in the United Kingdom by his employer, Venator.  According to his employment contract, Stolle's "temporary assignment" in the United Kingdom—a brief period away from his "Home Country" in the United States and home in The Woodlands, Texas—is set to expire in a couple months, on July 31, 2020, at which point Stolle will return to work at Venator's

4

U.S. headquarters at 10003 Woodloch Forest Drive, The Woodlands, Texas. Ex. F at §§2.1, 19.0; Ex. E at §8.1; Ex. G at 41 ("This relocation assignment for [Stolle] began on August 1, 2017 and is expected to last for approximately three years."). Stolle's agreement provides substantial compensation and benefits to Stolle specifically to pay for relocation expenses back to Texas. Ex. F at §11.2.

Stolle's temporary assignment agreement, which he executed in The Woodlands, Texas and which is governed by U.S. law, provides that he is entitled to three trips per year to his home in Texas paid for by Venator (and which are forfeited if not used). Ex. F at §12.0. Stolle has taken advantage of these benefits, with Venator spending over $75,000 for Stolle and his family to travel to and from Texas, including $5,000 for use of a company car in the United States during that time. BD¶9. This is not surprising, as Stolle's three children, Michael Stolle, Emma Stolle, and John Stolle, currently live in Houston, Austin, and at Stolle's residence at 2 Hampton Place, The Woodlands, Texas, respectively. BD¶¶10, 12. Stolle currently has substantial property, investments and other business interests in Texas, and owns and pays taxes on at least three properties in Texas (collectively valued at over $2 million), including his primary residence at 2 Hampton Place in The Woodlands. BD¶¶10-11.

Prior to his current position, Stolle resided in Texas while working for Huntsman for 26 years. Ex. EE; Ex. X at 136. Prior to joining Huntsman, Stolle continuously lived in Texas for a decade, working at a law firm in Austin, at a gas company in Houston, and attending the University of Texas at Austin School of Law beginning in 1984. Ex. EE; Ex. X at 136. Stolle is currently licensed to practice law in Texas (and does not have a

5

practicing certification in the United Kingdom) and, as such, is subject to the disciplinary authority of Texas and can be compelled to appear in disciplinary proceedings against him in Texas.  BD¶21. Stolle currently holds a Texas driver's license, is registered to and voted in the last presidential election in Texas, and has contributed to political candidates in Texas.  BD¶¶13-14. In addition, Stolle currently holds positions as an officer and director of numerous U.S. corporations, including several Venator subsidiaries and other corporations headquartered in Texas.  BD¶15.

In his capacities as Venator's general counsel and as an officer of various U.S.-headquartered and incorporated Venator subsidiaries, Stolle exercised control over Venator's operations in a manner purposefully directed at the United States and related to the events giving rise to this suit. ¶¶29, 380; BD¶¶15-20. For example, as general counsel for U.S.-based Venator Materials Corporation, Stolle corresponded with the U.S. Securities and Exchange Commission from Venator's office in The Woodlands, responding to the SEC's criticism of the Venator's pre-IPO filings that Venator ensure more transparent disclosures to investors concerning the Company's earnings and operating expenses. BD¶¶18-19.  In particular, the SEC cited a lack of clarity concerning the material drivers impacting the Company's earnings, and asked that Venator to "ensure your disclosures discuss the main cost drivers affecting your operating expenses and quantify in dollars how those increases/decreases in costs impacted your Segment Adjusted EBITDA"—at a critical time when expenses related to the Pori "shuffle" were in truth skyrocketing. ¶¶95-97; BD¶¶18-19.

6

Further, as general counsel of Venator Materials Corporation, Stolle helped restructure Huntsman's debt in connection with the Venator separation—providing Huntsman over $1.7 billion in cash with which it halved its leverage ratio in months, obtained an investment grade rating, and pursued a merger with Clariant. ¶¶44, 203; BD¶20.

**Defendant Maiter**. Defendant Maiter was the senior-most executive involved in Pori's operations. In this role, he tracked and admitted he knew about the "shuffle" of intermediate TiO2 to Pori, met with Defendant Turner and other senior executives about the progress at Pori, and he testified to providing "input" into investor presentations and other investor communications used to solicit investor interest in Venator's IPO. ¶¶27, 137, 138, 193, 201. During the Class Period he also submitted declarations executed in the U.S. in a U.S. proceeding seeking to keep information included in those investor presentations about Pori indefinitely under seal. ¶190; BD¶22.

At all relevant times, Defendant Maiter served as a high-ranking executive of Venator, which is headquartered in Texas and the United Kingdom. Ex. C at 23. He testified under oath on behalf of Venator in a U.S. proceeding that he is responsible for overseeing Venator's business operations in North America, and described in depth his familiarity with Venator's North American business, demonstrating his substantial, ongoing contact and communications with Venator's U.S. employees, customers and operations. BD¶23. Prior to Venator's separation from its American predecessor company, Huntsman, Defendant Maiter served Huntsman for decades in various high-ranking roles performing similar functions. Ex. DD; Ex. X at 137. Moreover, as one of

7

Venator's top five executives, Defendant Maiter executed numerous SEC filings documenting his insider stock trades on U.S. exchanges in which he identified his address as 10001 Woodloch Forest Drive, Suite 600, The Woodlands, TX 77380.  BD¶26.

Maiter was intimately involved with the wrongdoing at heart of this case, and his activities arising out of and related to that conduct were directed to investors in the United States.  For instance, as the senior-most executive responsible for business operations, Maiter was intimately involved in dealing with the fallout from the Pori fire, including working with the task force specifically set up to deal with Pori's closure.  ¶¶137-38.  In that role, Maiter participated in weekly meetings with the Venator employees who were working to fill customers' orders after the fire, received updated reports providing figures concerning the timing of production, the capacity of each of Pori's production lines, and the resulting production plans based on those numbers.  *Id.*  Indeed, as alleged in the Complaint and as Maiter conceded at deposition, he was involved with and aware of the expensive effort to produce intermediate TiO2 at other facilities that was then shipped to Pori for finishing.  ¶¶137-38, 109-201; BD¶23.

As Maiter admitted, he repeatedly provided "input" into Venator's presentations for "investors, potential investors, [and] lenders" while dealing with the crisis at Pori, and of course knew that these presentations—as with the information he provided to Turner and Ogden in their discussions concerning Pori throughout the Class Period—would be used in communications with U.S. investors.  BD¶23. For example, Maiter testified to having discussions with Venator's investor relations director and CFO to prepare for an Analyst Day Presentation and other investor presentations used in the U.S. "road show" to solicit

8

investment in the IPO—which was provided to investors in presentations in New York, Chicago, Los Angeles, and Baltimore—and specifically testified to providing input into a presentation given to investors in New York. BD¶23. These presentations and other communications contained the same or similar false and misleading statements and omissions about Pori that were incorporated into the IPO and SPO materials, as set forth in the Complaint. *See, e.g.*, ¶¶313-30.

## IV.   STATEMENT OF THE ISSUES

1.   Whether Plaintiffs have pled a prima facie case that Defendants Stolle and Maiter are subject to general jurisdiction.

2.   Whether Plaintiffs have pled a prima facie case that Defendants Stolle and Maiter are subject to specific jurisdiction.

## V.   ARGUMENT

### A.   Authority and Standard of Review

As Moving Defendants point out, in federal securities class action like this one—where there is nationwide service of process—the relevant test for personal jurisdiction is whether the defendant has had "minimum contacts with the United States" to satisfy due process. *McNamara v. Bre-X Minerals Ltd.*, 46 F. Supp. 2d 632, 633 (E.D. Tex. 1999) (quoting *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1257 (5th Cir. 1994)). Due process is satisfied if the defendant has either "engaged in continuous and systematic activities in the [U.S.]" (giving rise to general jurisdiction) or has "purposefully directed [his] activities at . . . [U.S.], and the litigation results from alleged injuries that arise out of or relate to those activities" (giving rise to specific jurisdiction). *Id*.

9

A court must also be satisfied that the exercise of jurisdiction comports with traditional notions of fair play and substantial justice—*i.e.*, that the assertion of jurisdiction would be "reasonable." *Id*. at 632 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987)). However, where the plaintiff alleges violations of the federal securities laws, the "reasonableness" inquiry is largely academic. *See S.E.C. v. Softpoint, Inc.*, 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001). At bottom, the inquiry is designed to test whether the defendants' connection and contacts with the United States "are such that he should reasonably anticipate being haled into court there." *Id*. at *3 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *see also Lewis v. Fresne*, 252 F.3d 352, 358-59 (5th Cir. 2001).

**General Jurisdiction**. General jurisdiction is established where the defendant's contacts with the forum are "continuous and systemic." In federal securities actions alleging control person claims like those here, courts have held that general jurisdiction exists where a "plaintiff makes a non-frivolous allegation that the defendant controlled a person liable for the fraud." *San Mateo Cty. Transit Dist. v. Dearman, Fitzgerald & Roberts, Inc.*, 979 F.2d 1356, 1358 (9th Cir. 1992). Courts in the Fifth Circuit have followed this precedent to hold that "control person liability serves as a basis for finding personal jurisdiction." *McNamara*, 46 F. Supp. 2d at 636 (finding personal jurisdiction over foreign executives who allegedly controlled foreign defendant) (citing *San Mateo*, 979 F.2d at 1358); *see also Kairalla v. Advanced Med. Optics, Inc.*, 2008 WL 2879087, at *14-15 (C.D. Cal. June 6, 2008) (finding general personal jurisdiction where executive

10

defendant traded in U.S. securities markets, conducted business with domestic executives of corporate defendant, and was allegedly involved in misstatements).

Further, as the Supreme Court has noted, for an individual, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).   A person's place of domicile is sufficient to confer personal jurisdiction over that person even if he is not currently located within that state. *Milliken v. Meyer,* 311 U.S. 457, 462 (1940). Once established, a domicile is permanent until superseded by a new one, and a presumption favors the prior established domicile.   *See Texas v. Florida*, 306 U.S. 398, 427 (1939); *Lew v. Moss*, 797 F.2d 747, 751 (9th Cir.1986); Restatement (Second) of Conflict of Law § 19 (1971). A change in domicile requires "physical presence at the new location with . . . an intention to remain there indefinitely," and the burden is on the party resisting jurisdiction to provide evidence sufficient to rebut the presumption of the established domicile. *Moss*, 797 F.2d at 750; 5 Moore's Fed. Practice 3D §102.35[6].

In assessing domicile, courts consider, among other things, the place where the litigant exercises civil and political rights, pays taxes, owns property, has places of business, and maintains a home for his family. *Coury v. Prot*, 85 F.3d 244, 252 (5th Cir. 1996).   A litigant's statement of intent is relevant to the determination of domicile, but it is entitled to little weight if it conflicts with the objective facts. *Freeman v. Nw. Acceptance Corp.,* 754 F.2d 553, 556 (5th Cir.1985); *see also Coury*, 85 F.3d at 252 (though defendant claimed to have moved his family from Texas to France "to avoid transatlantic

11

commuting," "the evidence failed to show an essential requisite of change in domicile, *viz.*, that he formed an intention . . . to remain in France indefinitely").

**Specific Jurisdiction**. A defendant's contacts with a forum that arise from, or are directly related to, the cause of action are sufficient to give rise to specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). Specific jurisdiction may arise even where the nonresident defendant has never set foot in the forum. *Bullion v. Gillespie*, 895 F.2d 213, 216 (5th Cir. 1990).

Moreover, specific jurisdiction in securities cases can be established even where the conduct is not principally directed toward the United States. As one court has held, "[w]here an executive of a foreign securities issuer, wherever located, participates in a fraud directed to deceiving United States shareholders in violation of federal regulations requiring disclosure of accurate information to holders of securities traded in the United States, such direct consequences have occurred," even if the conduct was not principally directed there. *SEC v. Straub*, 921 F. Supp. 2d 244, 255 (S.D.N.Y. 2013).

Moreover, as courts in the Fifth Circuit have held, "control person liability"—such as that alleged against Maiter and Stolle—"serves as a basis for finding personal jurisdiction." *McNamara*, 46 F. Supp. 2d at 636. In *McNamara*, the district court held:

> [I]n undertaking this analysis, the Court will find control person liability if the Plaintiffs make a *prima facie* showing that the Defendant in question had the *power* (whether exercised or not) to control the transactions in question and to control the operations of Bre–X in general. In other words, it is enough if the Defendant simply had the abstract power to control. Actual exercise of that power is not required.

*Id.* at 638; *see also In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 305-06 (S.D.N.Y. 2002) (finding "no clearer example of purposeful availment of the privilege of doing business in the United States" than signing registration statement and contributing to preparing securities offerings on American markets that "would be used and relied upon by American investors"); *Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *8 (S.D.N.Y. Nov. 18, 2014) (jurisdiction proper over foreign executive who "did not sign the public filings at issue" given his involvement in the subject matter of statements, and thus must have been aware they would be made to investors).

**The Prima Facie Standard**. Where a court decides the jurisdictional question based on written evidence—rather than holding an evidentiary hearing—plaintiff satisfies its burden by presenting facts sufficient to constitute a prima facie case of personal jurisdiction. *McNamara*, 46 F. Supp. 2d at 632. Under the prima facie standard, the court must take as true the allegations in the plaintiff's complaint and resolve conflicts between the parties' factual allegations—including those contained in affidavits or other documentation—in plaintiff's favor. *FTC v. Educare Centre Servs. Inc.*, 414 F. Supp. 3d 960, 978 (W.D. Tex. 2019) (citing *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999)).

**B.    The Moving Defendants Are Subject To General Jurisdiction**

Defendants Maiter and Stolle are both subject to the general jurisdiction of this Court because their contacts with the United States have been continuous and systematic enough to satisfy due process.

To start, Defendant Stolle is subject to this Court's jurisdiction because he is domiciled in Texas and has produced no evidence to the contrary. Stolle lived in Texas for

13

nearly all of his adult life until undertaking a "temporary international assignment" to the United Kingdom, which expires in a couple months. BD¶¶7-8, 25. Stolle maintains property in Texas; pays taxes in Texas; he voted in Texas in the 2016 election; is licensed to practice law in Texas (and not the United Kingdom); his employment agreement with Venator is governed by U.S. law; and Venator has spent nearly $75,000 on paying for he and his family to travel back to Texas while overseas, including likely to visit his children who all reside in Texas.  BD¶¶5-6, 10-14.  Stolle currently serves as an officer or director of at least five U.S.-based corporations (including U.S.-based Venator subsidiaries and otherwise) (BD¶15) and has conducted and continues to conduct extensive business with U.S.-based Venator executives, as evidenced by his extensive and ongoing involvement and dealings with U.S. lawyers, bankers, and other U.S. executives at Huntsman and Venator in the operation of Venator's business.  BD¶16-20.

Defendant Maiter similarly has extensive, ongoing and continual contacts with the U.S. through his current role as Venator's Executive Vice President for Business Operations and in his prior decades-long high-ranking positions at Huntsman.  BD¶23-24. Maiter's continual and substantial U.S. contacts were apparent in his testimony as Venator's corporate representative in a deposition in a U.S. proceeding during the Class Period, during which he evidenced his involvement in overseeing Venator's North American business, working with Huntsman's and Venator's U.S.-based employees, communicating with and serving their U.S. customers, and interacting with U.S government regulators.  BD¶23.

14

Stolle and Maiter's continual and substantial contacts with the U.S. are just like those of the executive defendants in *McNamara*, in which the court found similar allegations of control and involvement readily established personal jurisdction.  46 F. Supp. 2d at 640 (foreign executive vice president and vice president who reviewed allegedly false documents subject to jurisdiction); *see also Arena Football League, Inc. v. Roemer*, 947 F. Supp. 337, 341 (N.D. Ill. 1996) (finding general jurisdiction over nonresident general counsel who conferred with company over topics at issue, sought out insurance, and communicated with coworkers in forum state).

### C.     The Moving Defendants Are Subject To Specific Jurisdiction

This Court also has specific jurisdiction over Defendants Maiter and Stolle because both executives of Venator "purposefully directed [their] activities at residents of the [U.S.], and the litigation results from alleged injuries that arise out of or relate to those activities." *McNamara*, 46 F. Supp. 2d at 633.  As alleged in the Complaint, Maiter and Stolle are controlling persons of Venator, and in this Circuit, allegations concerning a defendant's ability to control the operations and decisions of a corporate defendant are sufficient to state a prima facie case for personal jurisdiction. *Id*. at 636-48.

Not only were Stolle and Maiter's contacts with the United States otherwise systemic and continual, but the specifically engaged in extensive conduct directed at the U.S. that is at the heart of the claims in this case.

For instance, in his role as Venator's Executive Vice President for Business Operations, Maiter was one of the Venator executives intimately involved in the fallout from the Pori fire, oversaw the Europe-Pori Shuffle, and tracked efforts to fill customers'

15

orders, and had weekly discussions about these topics with Turner and other senior management at Venator. ¶¶137, 193. Maiter admitted under oath that he was aware that Venator was "shuffling" TiO2 to Pori for finishing, and provided input into numerous investor presentations and other communications that were used to solicit U.S. investors' interests in the IPO. Indeed, Maiter provided input into a lender presentation that Venator used in connection with the IPO, discussed matters to be presented to investors and included in a pre-IPO Analyst Day Presentation in the United States with Venator's investor relations director and Ogden, and provided input into a presentation given to investors in New York. BD¶23. As Maiter knew, these presentations and others like them, would be and were provided to U.S. investors at "roadshow" presentations in the United States in connection with the IPO, including those held in New York, Boston, Chicago, Los Angeles, and Baltimore. *Id.*

Similarly, Stolle signed the documents Venator filed with the SEC to register shares for the IPO and SPO, and was extensively involved in drafting and executing numerous legal documents required to effectuate the Venator separation. ¶¶112, 128; BD¶¶18-20. Stolle was so critical to the Venator separation that he was only one of three executives to be recognized by the Company and rewarded with a $400,000 bonus specifically for his "contributions" to the IPO. BD¶6. In that role, and as his job description makes clear, Stolle obviously knew that the purpose of those filings was to ensure compliance with the U.S. securities laws and to enable Venator to sell shares to U.S. investors—and the documents he executed contained the materially false and misleading statements and

16

omissions at issue here.  ¶¶112, 128; *see also* 15 U.S.C. §77k (making every person who signs a registration statement liable under Section 11 of the Securities Act).

These facts are more than sufficient to establish Maiter's and Stolle's exercise of control over Venator, and leave no doubt about the sufficiency of their activities that were specifically directed at the United States.  *McNamara*, 46 F. Supp. 2d at 639 (defendant "had the ability to control the challenged activities" and "directly exercised control over those activities by issuing allegedly false statements and signing false SEC filings"); *Alpha Capital Anstalt*, 2014 WL 6466994, at *8 (jurisdiction over executive who "did not sign the public filings" given involvement in the subject matter of misstatements).

Indeed, Defendants apparently agree, as their motion concedes that a "defendant signed . . . materially misleading SEC filings [are] sufficient at the pleading stage to establish minimum contacts."  *Rex & Roberta*, 2019 WL 1407453, at *6 (S.D.N.Y. Mar. 28. 2019) (citing *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 801 (S.D.N.Y. 2018) (jurisdiction proper over foreign CEO who signed SEC filings); *In re VEON Ltd. Sec. Litig.*, No. 15 Civ. 8672, 2018 WL 4168958, at *6 (S.D.N.Y. Aug. 30, 2018) (same); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 399 (S.D.N.Y. 2005) (same).

Defendants argue that Stolle's signing SEC filings is insufficient to confer this Court's jurisdiction over him because "Stolle's name appears only because other signatories signed through him as their agent." DMPJ7.  But Stolle indisputably signed the SEC filings on behalf of Venator in order to comply with U.S. law, and obviously knew they would be "would be used and relied upon by American investors."  *CINAR*, 186 F. Supp. 2d at 306. That is more than sufficient at this stage.  In any event, Defendants'

17

irrelevant factual dispute over Stolle's capacity cannot be credited at this stage. *McNamara*, 42 F. Supp. 2d at 632 ("conflicts between the facts . . . resolved in the plaintiff's favor").

Defendants' cases either support Plaintiffs or are inapposite. For example, *Royal Ahold* sustained claims against foreign who signed SEC false filings, just as Defendants did here. 351 F. Supp. 2d 334, 352 (D. Md. 2004). And in *Braskem* and *AstraZeneca*, there were no facts suggesting the foreign defendants had any connection to the alleged misstatements whatsoever beyond their status as an outside corporate shareholder (in *Braskem*) or positions at the company (*AstraZeneca*). *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 770 (S.D.N.Y. 2017); *In AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 467 (S.D.N.Y. 2008).

### D. Jurisdictional Discovery Should Be Permitted, If Necessary

Despite the fact that discovery is currently stayed pursuant to the PSLRA, should the Court require additional evidence, the Court has "broad discretion" to permit Plaintiffs to undertake discovery into issues related to personal jurisdiction. *NextTechnologies, Inc. v. ThermoGenisis, LLC*, 121 F. Supp. 3d 671, 676 (W.D. Tex. 2015).

### VI. CONCLUSION

For the foregoing reasons, Defendants Maiter and Stolle's motion to dismiss for lack of personal jurisdiction should be denied.

Dated: March 24, 2020        Respectfully submitted,

                                */s/ Michael D. Blatchley*
                                Michael D. Blatchley, Attorney-in-Charge

**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
Hannah Ross (*Pro Hac Vice Forthcoming*)
Michael D. Blatchley (*Pro Hac Vice*)
Kate W. Aufses (*Pro Hac Vice*)
Nicholas Gersh (*Pro Hac Vice*)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
Hannah@blbglaw.com
MichaelB@blbglaw.com
Kate.Aufses@blbglaw.com
Nicholas.Gersh@blbglaw.com

*Counsel for Lead Plaintiff and Lead Counsel
for the Class*

Thomas R. Ajamie
Texas Bar No. 00952400
Southern District Bar No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
Southern District Bar No. 38095
**AJAMIE LLP**
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002
Tel: (713) 860-1600
Fax: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for Lead Plaintiff*
Robert D. Klausner (*Pro Hac Vice
Forthcoming*)
**KLAUSNER KAUFMAN JENSEN
 & LEVINSON**
7080 Northwest 4th Street
Plantation, FL 33317
Tel: (954) 916-1202
bob@robertdklausner.com

19

*Additional Counsel for City of Miami General Employees' & Sanitation Employees' Retirement Trust*

Cynthia J. Billings-Dunn (*Pro Hac Vice Forthcoming*)
**ASHERKELLY**
25800 Northwestern Highway
Suite 1100
Southfield, MI 48075
Tel: (248) 746-2747
cbdunn@asherkellylaw.com

*Additional Counsel for the City of Pontiac General Employees' Retirement System*

20

## CERTIFICATE OF WORD COUNT

I certify that the total number of words in the response, exclusive of the caption, prefatory tables, signature block, and the required certifications, is 4,955 words.

*/s/ Michael D. Blatchley*
Michael D. Blatchley

## CERTIFICATE OF SERVICE

I certify that on March 24, 2020, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF Filing System.

*/s/ Michael D. Blatchley*
Michael D. Blatchley

21