# Exhibit BB

*Public-Redacted*

# In the Matter of:

# Tronox and Cristal

*March 8, 2018*
*Mahomed Maiter*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX7015-001

Public-Redacted

Maiter

**Tronox and Cristal** 3/8/2018

**1**

UNITED STATES OF AMERICA

FEDERAL TRADE COMMISSION

In the Matter of:          )

TRONOX LIMITED,          )

a corporation,          )

NATIONAL          )

INDUSTRIALIZATION          )    Docket No. 9377

COMPANY (TASNEE),          )

a corporation,          )

NATIONAL TITANIUM          )

DIOXIDE COMPANY LIMITED    )

(CRISTAL),          )

a corporation,          )

and          )

CRISTAL USA, INC.,

a corporation.

Deposition of Mahomed Maiter

taken on

Thursday, March 8, 2018

at

Arnold & Porter

25 Old Broad St, London EC2N 1HQ, United Kingdom

The above-entitled matter came on for deposition,

pursuant to notice, at 9.11 a.m.

Reported by:  Alan Bell, MBIVR

**2**

APPEARANCES:

ON BEHALF OF THE FEDERAL TRADE COMMISSION:

ROBERT S. TOVSKY, ESQ.

Federal Trade Commission

400-7th Street, S.W.

Washington, D.C.  20024

(202) 326-3505

ON BEHALF OF THE RESPONDENT TRONOX:

ANDREW PRUITT, ESQ.

Kirkland & Ellis, LLP

655-15th Street, N.W.

Washington, D.C.  20005

(202) 879-5123

andrew.pruitt@kirkland.com

ON BEHALF OF THE RESPONDENT CRISTAL:

RYAN Z. WATTS, ESQ.

Arnold & Porter Kaye Scholer

601 Massachusetts Avenue, N.W.

Washington, D.C.  20001

(202) 942-5014

ryan.watts@apks.com

ON BEHALF OF VENATOR MATERIALS:

**3**

WILLIAM R. VIGDOR, ESQ.

EVAN MILLER, ESQ.

Vinson & Elkins LLP

2200 Pennsylvania Avenue N.W.

Suite 500 West

Washington, D.C. 20037-1701

(202) 639-6737

wvigdor@velaw.com

emiller@velaw.com

ALSO PRESENT:

Justin Phillipson, Venator General Counsel

Sarah Kitching, Venator Materials

Pat Kirk, Videographer

Alan Bell, Court Reporter

**4**

I N D E X

| WITNESS: | EXAMINATION: | PAGE: |
|---|---|---|
| Mahomed Maiter | Mr. Watts | 7 |
| | Mr. Tovsky | 102 |
| | Mr. Watts | 194 |
| | Mr. Tovsky | 203 |

| EXHIBITS | DESCRIPTION | FOR ID |
|---|---|---|
| 1 | Subpoena Ad Testificandum Deposition | 14 |
| 2 | E-mail Mr. Vigdor to Meredith Levert (November 27, 2017) | 16 |
| 3 | PowerPoint: "TiO2 Market Overview" | 33 |
| 4 | E-mail Meredith Levert to Mr. Vigdor (October 19, 2017) | 45 |
| 5 | PowerPoint: "China Capacity Estimates" | 75 |
| 6 | PowerPoint: "Business Update (July 6, 2016")| 79 |
| 7 | E-mail Mahomed Maiter to Simon Turner (May 18, 2016) | 81 |
| 8 | Deposition of Mahomed Maiter (June 28, 2012) | 92 |
| 9 | PowerPoint: "TiO2 and FAD Commercial (Update July 6, 2016") | 102 |
| 10 | PowerPoint: "White Pigments Business Unit" | 109 |
| 11 | E-mail Mahomed Maiter to Simon Turner (November 10, 2017) | 224 |

1 (Pages 1 to 4)

**Public-Redacted**

Maiter

Tronox and Cristal                                                    3/8/2018

once within the Huntsman Corporation; is that correct?

A.    Yes.

Q.    Venator became an independent company in August 2017; is that right?

A.    Yes.

Q.    Huntsman Corporation continues to own more than 50% of the voting shares of Venator, right?

A.    Yes.

Q.    Mr. Peter Huntsman is the chairman of Venator; correct?

A.    Yes.

Q.    I'm going to try to use "Venator" to refer to the business overall, including the Huntsman years, where it was selling TiO2, throughout the deposition today.  If at any time where you feel there needs to be a distinction between Venator and Huntsman, would you please let me know?

A.    I will.

Q.    Will you please just tell us what your responsibilities are as Vice-President of white pigment for Venator?

A.    My current responsibilities as

Senior Vice-President for the white pigments business for Venator is I look after all business for what we call our TiO2 and what we call our functional additives business for products sold into the coatings, plastics and paper industries. That includes certain operations, commercial sales marketing and all matters related to that.

Q.    And is it fair to say that your job is to make sure to maximize returns for shareholders of the corporation?

MR. VIGDOR:  Objection, vague.

THE WITNESS:  My role in the business is to operate my business unit to the maximum capability to ensure that we make reasonable returns for the business.

BY MR. WATTS:

Q.    And that means doing what's in the company's best financial interests consistent with the law and ethics; is that right?

MR. VIGDOR:  Objection, vague.

THE WITNESS:  It's in the best interests of shareholders and our employees and associates and the business.

BY MR. WATTS:

Q.    And so we don't have to go through

all of your history, your business experience as described in the Venator 10-K is accurate; is that right?

A.    Yes, that is correct.

Q.    And your responsibilities are global; is that correct?

A.    For my business unit, yes.

Q.    And that includes Europe and the US; is that right?

A.    That's correct.

Q.    How many individuals report to you?

A.    I have a number of direct reports into me and then an organisation under that.

Q.    Roughly how many, direct reports?

A.    I have somewhere between 8 and 10 direct reports.

Q.    You mentioned, of your responsibilities, commercial and sales.  Who are the folks who directly report to you for those functions?

A.    Could you be specific?  Would you like the names?

Q.    Thank you for the question.  I'm looking for the names of the individuals who are responsible for the commercial TiO2 business and

sales of TiO2 that report to you.

A.    I have five direct reports in the commercial sales area in the business.  I have a gentleman called Doug Chamberlain, who looks after my European sales; a gentleman called Lal Pearce, who looks after the American sales; I have a gentleman called Vince Row that looks after our European, Middle East and Africa sales; and I have a gentleman called Eric Chong who looks after our business in Asia Pacific; and I have a gentleman called Stephan David who looks after global marketing for me.

Q.    Whose responsibility is it for pricing for titanium dioxide, TiO2?

MR. TOVSKY:  Objection, vague.

THE WITNESS:  I would need a more specific question around pricing in which area.

BY MR. WATTS:

Q.    That's fair enough.  Let me ask it this way.  When the company is deciding whether to make price increase announcements, who are the folks who are involved in those decisions?

MR. VIGDOR:  Assumes facts not in evidence.

THE WITNESS:  Myself, together with

3 (Pages 9 to 12)

PX7015-004

**Page 21**

Malaysia, right?

A.    Yes.

Q.    And that's a sulfate plant?

A.    Yes.

Q.    And you also have a 50% interest in the plant in Lake Charles, Louisiana; is that correct?

A.    Yes.

Q.    And you are entitled to 75,000 metric tonnes of the capacity of that plant, is that right?

MR. TOVSKY:  Objection, calls for speculation.

THE WITNESS:  Could you restate the question?

BY MR. WATTS:

Q.    Sure that was a poorly stated question.  Your joint venture with Kronos at Lake Charles gives you a right to 50% of the production of that plant every year, is that right?

MR. VIGDOR:  Objection.

A.    Yes, it does.

BY MR. WATTS:

Q.    And the nameplate capacity of that facility is 150,000 metric tonnes; is that

**Page 22**

correct?

A.    Yes.

Q.    And Venator sells to -- talking about just functional TiO2 for a minute, Venator sells to large coatings and plastics companies all over the world; is that right?

MR. VIGDOR:  Objection.

MR. TOVSKY:  Objection, calls for speculation, and vague.

THE WITNESS:  If you could be specific?

BY MR. WATTS:

Q.    Okay, what's causing you to have a problem answering that one?

A.    All over the world.

Q.    All of the words?  Okay, fine. Let's go to some examples.  Venator actually serves large coatings customers like Akzo; is that right?

MR. VIGDOR:  Objection, vague, compound.

A.    Yes.

BY MR. WATTS:

Q.    And you sell functional TiO2 to PPG, right?

**Page 23**

A.    Yes.

Q.    And you sell functional TiO2 to Sherwin Williams?

A.    Yes.

Q.    And those are large coatings companies; correct?

A.    Correct.

Q.    In factor those are some of the largest coatings companies in the world?

MR. VIGDOR:  Objection?

A.    Yes.

BY MR. WATTS:

Q.    And you also sell functional TiO2 to BASF; is that correct?

A.    Yes.

Q.    And you sell to Ampacet?

A.    Yes.

Q.    And you sell functional TiO2 to A. Schulman; correct?

A.    Yes.

Q.    Those are plastics companies; is that right?

A.    Yes.

Q.    And those are some of the largest plastics companies in the world?

**Page 24**

A.    Yes.

MR. VIGDOR:  Objection.

BY MR. WATTS:

Q.    And you serve some of these companies at their plants in the United States, is that correct?

MR. VIGDOR:  Objection.

THE WITNESS:  The question is vague.

BY MR. WATTS:

Q.    In, say, ████████████████████ ████████████████████████████████ ████████████ ?

THE WITNESS:  Yes.

MR. VIGDOR:  Objection, vague.

BY MR. WATTS:

Q.   ██████████████████████████ ██████ ?

A.   ██████████████████████ ██████ .

Q.   ██████████████████████ right?

MR. VIGDOR:  In 2015 again?

BY MR. WATTS:



25

Q.   Yes.
A.   I can't recall accurately whether ▮▮▮▮▮▮.
Q.   That's fair, but you do ▮▮▮▮ ▮▮▮▮▮▮; is that correct?
A.   Yes.
Q.   And you sell ▮▮▮▮ ▮▮▮▮▮▮; is that right?
A.   For the best of my recollection.
Q.   And ▮▮▮▮ ▮▮▮▮▮▮; is that correct?
A.   Yes.
Q.   ▮▮▮▮ ▮▮▮▮▮▮; is that right?
A.   Yes.
Q.   ▮▮▮▮ ▮▮▮▮▮▮; is that right?
A.   I can't recall if they were in the top 5.  They are a customer.
Q.   Okay.  ▮▮▮▮ ▮▮▮▮▮▮; is that correct?
A.   Yes.
Q.   Maybe it makes sense to just pause

26

for a second.  Another definition issue.  I'm going to use the term "North America" from time to time today and if we could, at least for today's purpose, understand that to mean the United States and Canada together.  Is that okay with you?
A.   Yes.
Q.   That's not how you organize it, though, in your business; is that right?
A.   Yes.
Q.   I think you mentioned that you look at all of North America including Mexico.  Is that a specific segment?
MR. TOVSKY:  Objection, vague.
MR. VIGDOR:  I just want to be clear.  You just said you wanted North America to be the US and Canada and now you've just included Mexico in North America.
MR. WATTS:  I'm sorry, let me re-ask the question.  That was a bad question.
BY MR. WATTS:
Q.   So when you are analysing your business, Venator's business, what geographic area does the United States fall into?
A.   Up to recently, North America.
Q.   And what did North America, up to

27

recently, include?
A.   US and Canada.
Q.   And currently what is the geographic area that the United States falls into when you are analysing functional TiO2 at Venator?
A.   Americas.
Q.   And what's in Americas?
A.   The whole of North, Central and South America.
Q.   Okay, so I'll just go back so the record is clear.  When we talk about North America, that will just include the United States and Canada.  Is that fair?
A.   Yes.
Q.   So when -- let me go back ▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮; is that right?
A.   Yes.
Q.   ▮▮▮▮ ▮▮▮▮, right?
A.   Yes.
Q.   ▮▮▮▮ ▮▮▮▮, right?
MR. VIGDOR:  Objection, vague.

28

THE WITNESS:  I cannot testify to that.
BY MR. WATTS:
Q.   Now, Venator makes -- as we discussed earlier, Venator makes TiO2 through the sulfate and chloride processes; is that right?
A.   Yes.
Q.   And that includes functional TiO2 both made through both of those processes; correct?
A.   Yes.
Q.   And Venator's products made with the sulfate process are very competitive, right?
MR. VIGDOR:  Objection, vague.
THE WITNESS:  Yes.
BY MR. WATTS:
Q.   They are excellent products; correct?
MR. TOVSKY:  Objection, vague.
MR. VIGDOR:  Objection, vague.
THE WITNESS:  I think you need to define excellent for me.
BY MR. WATTS:
Q.   I mean, you tell your customers that your sulfate products are excellent, don't

7 (Pages 25 to 28)

Tronox and Cristal                                                      3/8/2018

33

███████████████████████████████████████████████████████████████e

?

MR. TOVSKY: Objection, vague.

THE WITNESS: I cannot testify to that.

BY MR. WATTS:

Q. Let's talk about the United States -- or North America, I'm sorry. North America. Are you aware of customers who buy both sulfate made titanium dioxide and chloride made functional titanium dioxide?

A. Yes.

Q. And are you aware of customers who can use those interchangeably?

A. I have no knowledge of interchangeability with customers.

Q. So you can't say that it doesn't happen?

A. Neither can I say it happens.

(Exhibit 3 marked)

BY MR. WATTS:

Q. Mr. Maiter, the court reporter is handing you a document that has been marked Exhibit 3. Do you have Exhibit 3 in front of you,

34

sir?

A. Yes, I do.

Q. And this document, just for the record, we put a cover sheet on it that said it was produced natively. In other words, I believe it was produced as a Microsoft PowerPoint document, that had the Bates number VEN_S00007753. If you'll turn with me, sir, to the second page of the document, and I'll just say for some of these PowerPoints that were produced natively, we added a page number at the bottom, just to help us reference today.

MR. VIGDOR: Okay. Just for the record, this is a two page document, so I assume it would be 7753 to 7754?

MR. WATTS: I don't think that's how it works. I think, since it was produced natively, it only has --

MR. VIGDOR: One file, one number?

MR. WATTS: Yes.

MR. VIGDOR: Thank you.

BY MR. WATTS:

Q. Looking at Exhibit 3 and what's been marked page 1 of the PowerPoint, that has the title "TiO2 Market Overview". Do you see that?

35

A. Yes.

Q. Have you seen this PowerPoint slide before?

A. Yes.

Q. Did you create this?

A. I don't recall.

Q. If you'll turn with me to page 2, and it says at the very top "Titanium Dioxide Overview", do you see that?

A. Yes.

Q. And then at the right there's a pie graph. Do you see that?

A. Yes.

Q. And it's showing that 85% of TiO2 global demand in 2016 was -- could either use the sulfate -- either could use products made using the sulfate or chloride process; is that right?

MR. VIGDOR: Objection, mischaracterizes the document.

THE WITNESS: If you could please restate the question?

BY MR. WATTS:

Q. Sure. Can you explain to me what the right side of this slide is showing?

A. The right side of the slide shows

36

the necessary preference for certain end use market applications between sulfate and chloride.

Q. Thanks. So just to make sure I'm reading this slide and graphic correctly, for end use -- for global demand in 2016, for end uses in paper, the preference would be either chloride- or sulfate-made TiO2. Is that right?

A. Yes.

Q. And the same answer would be for engineering plastics?

A. Yes.

Q. Same answer for polyolefin plastics?

A. Yes.

Q. And in industrial coatings, the preference is either sulfate or chloride in 2016; is that right?

A. Yes.

Q. And architectural coatings, either chloride or sulfate; is that correct?

A. Yes.

Q. And this is calculating that the demand for those products that we just listed is approximately 80% of TiO2 global demand in 2016, right?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX7015-010

Tronox and Cristal                                                    3/8/2018

41

Q.    That's fair.  Did you ever have a conversation with lawyers at the Federal Trade Commission concerning issues about titanium dioxide in relation to Tronox's acquisition of Cristal?

A.    Yes.

Q.    How many conversations did you have with Federal Trade Commission staff?

A.    Two.

Q.    And just to be clear, I'm only asking about conversations about the transaction with -- let me start that over.

I'm only asking about those conversations that you had with FTC staff about this transaction, no other transaction.  Is that okay?

A.    Yes.

Q.    So you had two such conversations with FTC staff; is that right?

A.    Yes.

Q.    Am I correct that you did not type this declaration; is that right?

A.    Yes.

Q.    In fact, to your knowledge, the individual or individuals who typed this

42

declaration, at least in the first instance, were FTC staff members.  Is that right?

A.    That is my understanding.

Q.    And if you'll look at Exhibit 2, if we go to the second page of the e-mail, so reading the e-mail from the bottom --

MR. VIGDOR:  Can you use a Bates number rather than a page, for the record?

BY MR. WATTS:

Q.    That's fine.  So we're on Exhibit 2, which is the e-mail that attaches your declaration, but the Bates number is FTC-PROD-0029559, and the top is an e-mail from -- we already established, Mr. Vigdor, from Ms. Levert and Mr. Tovsky is cc'd on the e-mail dated November 27, 2017.  We're going to the second page of the e-mail, but just reading from the bottom, Mrs. Levert sends the e-mail to Mr. Vigdor and cc'ing Mr. Tovsky that says:

"Hi Billy, Thank you for meeting with us today.  Attached is the edited declaration for Mahomed's signature."

MR. VIGDOR:  By the way, it says "yesterday".

BY MR. WATTS:

43

Q.    Yes,  thank you:

"... meeting with us yesterday.  Attached is the edited declaration for Mahomed's signature.  As we discussed, please review it with Mahomed and let us know if any additional changes are needed."

Is this -- do you see that, sir?

A.    Yes.

Q.    To your knowledge, is this draft that was sent to Mr. Vigdor on November 7, 2017, is this the first draft of the declaration?

A.    Question's vague.

Q.    Let me try this again.  You had two conversations with FTC staff about this matter; is that right?

A.    Yes.

Q.    Do you recall when the first conversation was?

A.    Not the exact dates.

Q.    Was it before November 7?

A.    I believe it was.

Q.    Were both of the conversations before November 7?

A.    I believe they would be.

Q.    How long was the first conversation

44

with FTC staff?

A.    How long as in duration?

Q.    Yes.

A.    Phone call, probably about an hour, our and a half, approximately.

Q.    And then how much time elapsed between the first meeting, the first discussion, and the second discussion with FTC staff?

A.    I don't have a recollection of the dates and the time.

Q.    How long was the second conversation you had with FTC staff?

A.    Similar duration.

Q.    Do you know whether -- looking back leer at the first e-mail in time on Exhibit 2, dated November 7, is this after both conversations take place?

A.    Yes.

Q.    Again, Exhibit 2 has your signed declaration.  That's correct?

A.    Yes.

Q.    Is everything that you discussed in those two conversations reflected in this declaration?

A.    Yes.

11 (Pages 41 to 44)

Maiter

Tronox and Cristal                                                          3/8/2018

53

BY MR. WATTS:

Q.    Thank you, and to the best of your knowledge, plastics customers can threaten to switch to chloride-based products if you don't keep your TR28 prices competitive. Is that right?

MR. TOVSKY: Objection, vague.

THE WITNESS: Yes.

BY MR. WATTS:

Q.    And that's true for North America, right?

A.    Yes.

Q.    Your declaration includes -- sorry, let me start that again.

You sell chloride products in North America to coatings customers; correct?

A.    Yes.

Q.    And those are the products that are made out of the LPC plant?

A.    Yes.

Q.    But Venator doesn't -- as you state in your declaration, Venator doesn't have slurrying capacity in North America; is that right?

A.    Yes.

Q.    But you are still able to sell to

54

these coatings customers; is that right?

A.    Can I clarify my earlier comment when I said yes, we don't have slurrying capacity? We don't own any slurrying capacity, as Venator, in the North American market.

Q.    Thank you. Thanks for the clarification and I think your declaration speaks to that. I don't mean to muddy the record on that at all. So do you have any knowledge as to why these large coatings customers can buy from you when you -- in North America when you don't have slurrying capacity at Venator?

MR. VIGDOR: Objection, misstates his testimony.

THE WITNESS: Can you restate the question for me.

BY MR. WATTS:

Q.    I'm wondering -- we already established that you sell to large -- you sell to coatings customers in the United States, right?

A.    That's correct.

Q.    Including PPG, right?

A.    Yes.

Q.    And Sherwin Williams, correct?

A.    Yes.

55

Q.    And Valspar, right?

A.    Yes.

Q.    And those are large coatings makers, is that right, in North America?

A.    Yes.

Q.    And you -- when you sell it to them, sell your functional TiO2 to those customers, it is delivered in dry form; is that right?

A.    Yes.

Q.    Do you have any -- do you know why these large coatings customers can take your dry form TiO2 when they buy slurry from others?

A.    We sell, as Venator, fairly small volumes to these large coatings companies in North America. Majority of our sales in North America into the coatings industry is into the small/medium size customers. So exposure to the customers you listed is small relative to their TiO2 purchases in North America.

Q.    But they can still buy dry from you; is that right?

A.    Small volumes.

Q.    And to your knowledge isn't the slurry process, that's just really the first step

56

in making a coatings product, right?

MR. VIGDOR: Objection, foundation.

THE WITNESS: I'm not well versed with the slurry process, as we don't participate in that market.

BY MR. WATTS:

Q.    But you know how your customers make their products to some degree, right? You work with them on getting your products qualified; correct?

A.    I have a working knowledge of how our customers make paint.

Q.    And in Europe, for example, they usually don't buy slurry; is that right?

A.    There's no slurry business in Europe.

Q.    And they're perfectly capable of making paint here in Europe, right?

A.    I'm sure they are.

Q.    They make great paint here, right?

A.    Yes.

Q.    I mean, this is wonderful -- actually, this doesn't look like paint! That looks like wonderful paint, right? The paint here on the wall in the conference room likely has TiO2

14 (Pages 53 to 56)

PX7015-015

*Public-Redacted*

Maiter

Tronox and Cristal                                                                3/8/2018

57

in it too; is that right?

A.   Yes.

Q.   **The paint here in Europe looks fantastic to me.  Would you agree?**

A.   I don't think there's any difference between paint in different parts of the world.  Paint is paint, yes?

Q.   **So it's just a preference at this point in North America that large coatings customers want to buy in slurry form; is that right?**

MR. TOVSKY:  Objection foundation.

THE WITNESS:  I'm not knowledgeable enough on the reasons why large coatings companies in North America buy in slurry form.

BY MR. WATTS:

Q.   **Okay.  You mention in your -- let's go back to Exhibit 2.  You mention in your declaration, I'm on page 3 and it goes on to page 4, on paragraph 18.  You state that:**

**"Because we do not produce slurry, we do not" --**

**I'm on the second sentence of paragraph 18.  It says:**

**"Because we do not produce slurry,**

58

**we do not compete to supply this type of business."**

**Right?**

A.   Yes.

Q.   **And you have two options.  If you wanted to compete in that business, you could either outsource it by sending it to a third party to slurry the product, or you could develop your own internal capabilities to do that.**

MR. VIGDOR:  Are you talking about Venator or a customer?

MR. WATTS:  Talking about Venator.

THE WITNESS:  Yes.

BY MR. WATTS:

Q.   **And you state in your declaration, on the next page, still on paragraph 18, you say the first sentence that appears on the full sentence on page 4, says:**

**"**████████████████████████████ **"  Do you see that?**

A.   Yes.

Q.   **And it goes on.  The reason that you don't do that is because you are selling to customers -- you choose to sell to customers who**

59

don't require the slurry; is that right?

A.   For the record, ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████.

Q.   **I apologize, I didn't want to misstate at all.  Let me ask another question.  If** ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████**?**

MR. VIGDOR:  Objection, vague, calls for speculation.

THE WITNESS:  Could you repeat the question, please?  Maybe a bit more clarity.

BY MR. WATTS:

Q.   **Sure.  I'm looking again at your --** ████████████████████████████████████ ████████████████████████ ████**?**

A.   ████████████.

60

Q.   **Assuming** ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████. **Is that right?**

MR. VIGDOR:  Objection.

THE WITNESS:  I think there's no yes or no answer to that specific question.  I would like to explain our North American strategy and how it fits into the slurry business.  So we have a limited capacity, as you mentioned earlier, 150,000 tonnes of slurry at our Lake Charles facility, of which we get 50% of the production, which is very small for the North American market, and we have selected to position that business into what we call small/medium customers, whether that be plastics or coatings customers.  So our exposure to the large coatings paint companies is fairly small in North America, which is the reason why we don't have slurrying facility, or we actually participate in the slurrying market.

BY MR. WATTS:

15 (Pages 57 to 60)

PX7015-016

Maiter

Tronox and Cristal 3/8/2018

61

Q. That's fair, but what I'm asking is if there were a change. That's given the current conditions of the marketplace; is that right? Your strategy is built upon your understanding of the marketplace and how price and supply and demand function?

A. Our strategy is based on our limited TiO2 production capacity available to us in North America.

Q. But again, since you're trying to deliver value to shareholders, if you found that there was a premium on slurry that you could service profitably, you would do so?

MR. VIGDOR: Objection, vague, assumes facts not in the record.

THE WITNESS: I think that's a fairly broad question. You need to define it maybe a bit more narrow.

BY MR. WATTS:

Q. Okay. If -- again, if holding constant the prices at which you sell to the customers that you target in North America that you just talked about and you found that you would be able to make a significantly increased profit margin by slurrying product and selling it to

62

coatings customers in the United States, that would be an attractive opportunity for Venator. Is that correct?

MR. VIGDOR: Objection.

MR. TOVSKY: Objection, calls for speculation.

THE WITNESS: I would have to speculate, which I'm not prepared to do, on what the price would have to be for us to change fundamentally our strategy in North America, and our strategy in North America is very clear. We sell 50% of the capacity that we can obtain from our LPC facility into what we would call the more small/medium customers. That would have to be a fundamental shift in our strategy and in my experience, I find that difficult to see.

BY MR. WATTS:

Q. That's because, to your knowledge, there's no meaningful price difference between slurry product and the dry product?

A. I'm not knowledgeable in the slurry market to comment on it.

Q. The company -- Venator has looked into investing in slurrying capabilities; is that right?

63

A. To the best of my recollection, we have done it during periods over many years.

Q. So at some time it's been at least something that someone has thought of at the company, a potential way to increase sales?

A. I would assume.

Q. I'm going to ask you some questions about imports and exports and pricing. Would you agree that prices -- functional TiO2 prices around the world tend to move together? In other words, they go up together and they go down together, relatively close in time.

MR. TOVSKY: Objection, vague.

THE WITNESS: I think the historical data would show that is true.

BY MR. WATTS:

Q. And even if you announce price -- even if Venator announces price increases -- well, I'm sorry let me step back.

When Venator announces price increases for functional TiO2 products, does it do so by geographic area?

A. A combination of geographic and global.

Q. And sometimes you might announce or

64

tell customers that you are going to -- that you intend to increase prices in a particular region at a different level -- sorry, let me try that again.

There are times when you might announce to customers that you -- that Venator intends to increase prices in different regions by different amounts. Is that correct?

A. Yes.

Q. That doesn't mean that prices around the world aren't moving in the same direction; is that right?

MR. VIGDOR: Objection, vague.

BY MR. WATTS:

Q. That's a terrible question. Let me try that again. Price increase announcements -- and I'm using that as a general term. I haven't asked you how you tell your customers how you're going to increase prices, but to the extent you tell your customers in advance that you would like to increase prices, that doesn't mean that you're going to get the increased price. Is that right?

A. Yes.

Q. It's a negotiated process after you make the announcement?

16 (Pages 61 to 64)

Tronox and Cristal                                                    3/8/2018

65

A.    Yes.

Q.    And just because you announce a price increase in one region doesn't mean that prices are actually moving in that amount in that region for sure?

A.    Yes.

Q.    That's because of the negotiation process, right?

A.    Yes.

Q.    And just as an example, you can't -- you couldn't continue to announce and get increased prices in, for example, Europe that would be significantly different than prices in other parts of the world, again for functionally equivalent products?

MR. TOVSKY:  Objection, vague.

THE WITNESS:  I'm not sure I understand the question.

BY MR. WATTS:

Q.    That's a bad question.  I'll try something else.  If the prices in one geographic region of the world got out of sync with prices around the globe and increased substantially, then imports would come into that region and defeat that price increase.  Is that right?

66

MR. TOVSKY:  Objection, vague.

THE WITNESS:  I think that the question relates to do we see -- as Venator, do we see the market as a global market where there is sufficient movement of product between regions to ensure that there is a difference between pricing and the market doesn't exceed a certain amount. Then I think the answer to that is yes, that does happen.

BY MR. WATTS:

Q.    And that's true with respect to the United States; is that correct?  Let me restate that.

That's true with respect to prices in North America; is that right?

A.    What is true?  Sorry.

Q.    Sure.  So if prices in North America were to increase substantially, let's say by 10%, and prices around the world did not increase at all, would you expect that price increase in North America to be able to be sustained?

A.    That depends on various factors: pricing between the regions, the currency impact. It's a very difficult question to answer without

67

knowing all the facts around price differential.

Q.    That's fair, but when you said product moves globally, that's true with respect to North America; is that correct?

MR. VIGDOR:  Objection, mischaracterizes.

THE WITNESS:  For Venator we have a very clear strategy with North America in terms of imported product.

BY MR. WATTS:

Q.    Sure, but I'm --

MR. VIGDOR:  I'm sorry, did you finish the answer?

THE WITNESS:  Yes.

BY MR. WATTS:

Q.    I understand that, but I'm talking about functional TiO2 competitively globally. Since you're competing in North America, you need to stay on top of what happens globally; is that correct?

A.    Yes.

Q.    And that's because you compete against imported products in North America.

A.    Yes.

Q.    And you're aware that products --

68

functional TiO2 products manufactured in the United States is exported as well?

A.    Yes.

Q.    And, in fact, you compete in Europe against US-manufactured products; is that right?

A.    Yes.

Q.    And your sulfate products here in Europe have to compete against, for example, Chemours' chloride products that are made in the United States?

A.    Yes.

Q.    And so if you -- if Venator's prices were to increase by 10% in the United States -- sorry, let me start that again because I want to talk about North America, and I won't talk about Venator's prices.

If you saw functional TiO2 prices region-wide in North America going up by 10%, it would not surprise you to see imports increase from outside North America; is that correct?

A.    I'm not at liberty to respond on behalf of the industry.

Q.    Sure but I'm talking about in your commercial experience, that if you saw, again, prices in North America going up 10% and prices

17 (Pages 65 to 68)

PX7015-018

Tronox and Cristal                               3/8/2018

**69**

staying steady elsewhere, that you would expect to see imports into North America?

A. Very much depends on the relative pricing between the regions. As you will be aware, our industry is very volatile. The differential between the North American and European price would make a difference, and the rest of the world.

Q. That's what I'm saying. So holding those things constant, if -- I see what you're saying. So if the differential became substantial between North America and the rest of the world, then you would expect to see imports into the United States?

MR. TOVSKY: Objection, vague.

THE WITNESS: I'm not sure if that's a Venator question or an industry question.

BY MR. WATTS:

Q. Well, as a competitor in North America, it would not surprize you to see an increase in imports in the United States if North American prices somehow became untethered to the global movements in price and went up?

A. If they become decoupled from the rest of the market, I don't see that situation. I

**70**

haven't experienced that situation historically.

Q. It's just I recognize I'm creating a hypothetical that just never happens, right?

A. Haven't seen it.

Q. And that's because product can be moved -- can be imported in, so that you wouldn't expect to see that happen?

A. We haven't seen it happen before, no.

Q. Are prices for functional TiO2 in North America roughly around 3,000 metric tonnes -- $3,000 per metric tonne?

A. At today's pricing?

Q. Yes.

A. Approximately, yes.

Q. And I think you say in your declaration -- if you'll look at Exhibit 2 again, which contains your declaration.

A. Yes.

Q. Your signed declaration.

A. Yes.

Q. On paragraph 20.

A. Yes.

Q. You say that, at the end of that paragraph:

**71**

" ████████████████████████████
████████████████████████████
████████████████████████████."

A. Yes.

Q. And so, just to make it easy, because I'm a terrible maths student, ████████ ████; is that right?

A. It does not say. It said ████ ████, so maybe the calculation is ████████, which is ██. At the time I did the declaration, I don't believe the price was 3,000.

Q. Sure. I'm looking at the total. Maybe I'm misunderstanding what you're saying in your declaration. I understand that last sentence ████████████████████████████ ████████████████████████████ ██████████?

A. Yes. That's an approximation on Venator's behalf.

Q. Sure, and just at today's prices, that's ████████████████████████?

A. Approximately, yes.

Q. I'm using ████████ because it's easy math.

A. Yes, okay.

**72**

Q. And so if -- again, just going back to a hypothetical that no-one has seen before, if North American prices were to go up 10% right now and it looks like that was going to be durable, it would start to look profitable for Venator to export from Europe into North America more product than it already does?

A. Not at this moment in time. Current prices in North America are 10% at least lower than European pricing -- in US dollars.

Q. That's fair. But if that were to change -- now I see your point. I will come back to that. Mr. Maiter, can we turn -- still on Exhibit 2, if we can turn to paragraph 25 of your declaration. Are you there, sir?

A. Yes.

Q. It says:

"Venator does not closely monitor the role of Chinese TiO2 in the North American market. We do know from third party reporting that TiO2 imports from China into North America have grown over the past decade and now account for about 4-8% of North American sales."

Is that correct?

MR. VIGDOR: I believe it says

18 (Pages 69 to 72)

Public-Redacted

Maiter

Tronox and Cristal                                                                    3/8/2018

---

73

6-8%.

MR. WATTS: I'm sorry.

MR. VIGDOR: Is that what yours says?

MR. WATTS: Mine says 6-8% too. I just misread it, and I surely didn't mean to do that.

BY MR. WATTS:

Q. Mr. Maiter, do you see paragraph 25?

A. I do.

Q. Is this all of the sum and substance that you can recall telling the FTC about Chinese competition in North America?

A. I can't recall exactly how much, what discussion we had, but this certainly would be my comment on North America, specifically on Chinese.

Q. Are you aware -- well, let me just ask a couple of questions. Based on what you know from third parties, or from Venator's research, Chinese producers' functional TiO2 quality has improved dramatically over the last 5-10 years. Is that right?

A. I think you would need to clarify

---

74

"dramatically" for me.

Q. That's fair, but it's improved in the last 5-10 years; is that right?

A. That's correct.

Q. And for example Lomon/Billions is beginning to take share in plastics and coatings in North America. Is that your understanding?

A. My understanding is they are increasing their sales in North America. I don't know the specifics around which sector.

Q. And Venator treats the Chinese firms as potential competitors in North America; is that right?

A. Yes.

Q. And in fact competition with Chinese firms for North American customers that Venator serves has been increasing; is that right?

MR. TOVSKY: Objection, vague.

THE WITNESS: Can you restate the question please?

BY MR. WATTS:

Q. Sure. Customers that Venator serves here in North America have informed Venator that they will use Chinese-made titanium dioxide if Huntsman can't supply them -- either can't

---

75

supply them at all or can't supply them at the price that they're willing to pay. Is that correct?

A. Yes, certain customers.

Q. ████████████████████████?

A. Not to my recollection. Do you think I could get a bio break?

MR. WATTS: Yes, that's a great idea. Let's take a break.

THE VIDEOGRAPHER: Going off the record now at 10.43 a.m.

(Break)

THE VIDEOGRAPHER: We are now starting tape 3 in the deposition of Mahomed Maiter going back on the report at 11.04 a.m.

(Exhibit 5 marked)

BY MR. WATTS:

Q. Mr. Maiter, you have Exhibit 5 in front of you, sir.

A. Yes.

Q. And just for the record, Exhibit 5 has -- we put a cover page on it that says it was produced natively as a PowerPoint and it bears the Bates number VEN_S00008204. Do you see that, sir?

A. Yes, I do.

---

76

Q. And then if you turn to page -- this is a PowerPoint that has Venator's name on top and it says "China Capacity Estimates." Do you see that?

A. Yes.

Q. And underneath that it says "TZMI View". Do you see that?

A. Yes.

Q. What is TZMI?

A. They are a set of consultants that report on the feedstock and the titanium dioxide industry.

Q. Was this presentation -- well, have you seen this presentation before?

A. I don't recall.

Q. Have you seen this particular slide before?

A. I don't recall.

Q. What is the practice at Venator when it's -- for this type of material -- I guess what I'm asking is it has Venator's name at the top. Does that mean to you that someone at Venator put this together?

A. It suggests that, yes.

Q. And so, to the best of your

---

19 (Pages 73 to 76)

Public-Redacted

Maiter

Tronox and Cristal                                                    3/8/2018

93

A.    62352.

Q.    And does it have letters in front of that?

A.    CR2R7G.

Q.    So Cristal produced this document to the FTC. And I'll just say this document is obviously protected by the protective order in the litigation in which it was produced and it's also protected by the protective order in this case. Mr. Maiter, Exhibit 8, just for the record, is titled "In Re: Titanium dioxide antitrust litigation from the United States District Court, District of Maryland, Northern Division, Master Docket No 10-cv-00318 RDB. And on the cover it says "Deposition of Mahomed Maiter, June 28, 2012 at 9.30 a.m." Do you see that?

A.    That's correct.

Q.    And this is the transcript of your deposition in the titanium dioxide antitrust case; is that right?

A.    That's correct.

Q.    Do you recall sitting for that deposition, sir?

A.    I do, yes.

Q.    And do you recall answering

94

questions by Huntsman's lawyer at the end of that deposition?

A.    If you are asking me if I can recall what happened in 2012, June, the answer is probably not.

Q.    Thankfully, we have a transcript of it right here. That's why we do these things. If you would please turn with me to -- I'm trying to find the right page. If you turn with me to page 326.

MR. VIGDOR: So Ryan, it's going to be the transcript page, not the Bates?

BY MR. WATTS:

Q.    Thank you for clarifying that. The transcript page 326. It might not be the number on the bottom right. It's the number on the top.

MR. VIGDOR: So I have Bates number 2677, if we go down right.

A.    I've got that.

BY MR. WATTS:

Q.    If you see that there -- actually, you know what, could we take a quick break?

MR. VIGDOR: Sure. How long?

MR. WATTS: Five minutes. I think I can make this go faster.

95

THE VIDEOGRAPHER: Going off the record at 11.34 a.m.

(Break)

THE VIDEOGRAPHER: We are now going back on the record at 11.52 a.m.

BY MR. WATTS:

Q.    Mr. Maiter, do you have Exhibit 8 in front of you sir?

A.    Yes, I do.

Q.    This is the big transcript from the litigation; is that right?

A.    Yes, it is.

Q.    Let me ask this. It might make it go very short. Did you happen to review this transcript in preparation for your deposition?

MR. VIGDOR: Objection, don't answer to the extent that it calls for any attorney client privileged conversations.

THE WITNESS: I haven't.

BY MR. WATTS:

Q.    If you would please turn with me to page 327, and again we are talking about the transcript pages. Actually, let's start with 326. I don't want the leave anything out. Do you recall being asked some questions at the end of

96

that deposition by Huntsman's attorney?

A.    Yes, I do.

Q.    And if you see at the top of page 326, he defines supplier/manufacturer of TiO2 to include Millennium, Du Pont, Kronos, Tronox, Lyondell, Cristal, Kerr-McGee and other suppliers?

A.    Yes, I do.

Q.    He defines those as the competitors, right?

A.    Yes, that is right.

MR. VIGDOR: Object to the characterization of the testimony in the document.

BY MR. WATTS:

Q.    Really what I want to do is ask is all of this true since 2012? But I will go through all of these things and make sure that that's the case. Is that fair?

A.    Yes.

Q.    So for the purposes of your transcript, deposition back in 2012, competitors were defined as Millennium, Du Pont, Kronos, Tronox, Lyondell, Cristal, Kerr-McGee and other supplier/manufacturers of TiO2. Do you understand that?

A.    Yes, I do.

24 (Pages 93 to 96)

PX7015-025

Tronox and Cristal                                                    3/8/2018

137

Q.    I will.  Well, could you just please explain the process for expanding the facility from an approval standpoint?

MR. VIGDOR:  Same objection.

MR. WATTS:  Objection.

THE WITNESS:  The supervisory board, which is equally represented by Kronos and Venator representatives, would review any proposal on expansion coming from the Louisiana Pigment Company management team and we would review the proposals, take it back to our own respective boards, and make a decision on whether we support it or not.

BY MR. TOVSKY:

Q.    Has there been any investment in Louisiana Pigment that Venator has not supported?

MR. WATTS:  Objection to form.

THE WITNESS:  Not that I'm aware of.

BY MR. TOVSKY:

Q.    Has Venator -- does Venator have the ability under the LPC agreement to propose an investment to expand the facility?

MR. VIGDOR:  Objection, vague.

THE WITNESS:  I'm not sure of the

138

details around the joint venture agreement between Venator and Kronos.

BY MR. TOVSKY:

Q.    With respect to LPC, have there been proposed expansions that have not occurred?

A.    There are continuing evaluations of opportunities to optimize the manufacturing, small incremental increases in capacity, and we continue to evaluate each one as it occurs.

Q.    Has Venator ever examined what I would describe as greenfield entry into TiO2 manufacturing in North America?

MR. VIGDOR:  Objection, vague.

THE WITNESS:  Can you define greenfield for me, please?

BY MR. TOVSKY:

Q.    At a new site.

A.    Not that I'm aware of.

Q.    You described a plant in Pori -- I think that's in Finland -- that is within the Specialties Business Unit; is that correct?

A.    That's correct.

Q.    That produces grades that are used within the White Pigments Business Unit?

A.    That is correct.

139

Q.    And that plant is currently idle. Is my understanding correct?

A.    That plant currently, that plant had a fire, unfortunately, in January of '17, and currently is going though a rebuild.

Q.    And what is the timeframe, as far as you know, for the rebuild to be complete?

A.    Our expectation so have part of that facility available by the end of this year.

Q.    Venator previously had a plant in Grimsby in the UK; is that correct?

A.    Yes, we did.

Q.    And that plant closed in 2009?

A.    Yes, that's correct.

Q.    Okay, and then the Umbogintwini plant closed in 2016?

A.    Yes, it did.

Q.    And Calais closed in 2017?

A.    That is correct.

Q.    Did any of those plants export TiO2 to the United States?

A.    I would not know that detail.

MR. VIGDOR:  Are you okay?

A.    I'm okay.

BY MR. TOVSKY:

140

Q.    I will just hand you, Mr. Maiter, what has been marked as PX3025-001 and at the bottom it has a Bates number VEN-SDT0000406 through -- nothing, so it's PowerPoint, I guess, and it's FTC Docket No. 9377.  I will hand that to you and if you just can take your time to review that document.

MR. VIGDOR:  You're not going to have the court reporter mark them, you're just going to keep your PXs?

MR. TOVSKY:  Yes, they don't need to be.

THE WITNESS:  (After a pause) Okay.

BY MR. TOVSKY:

Q.    If you can just turn to the page that's been marked -- and I'm going to use the PX kind of the last three digits -- 003, and it's a slide labelled "2017 Sales Presentation."  Do you see that?

A.    Yes, I do.

Q.    So I notice it's the 2017 sales presentation and the meeting is December 13 of 2016.  So basically, I guess I don't need to look that that slide in particular, but what is the information that's contained in this deck?  What

35 (Pages 137 to 140)

PX7015-036

Maiter

Tronox and Cristal                                                      3/8/2018

141

is it intending to represent?

MR. WATTS: Objection to form.

THE WITNESS: The North American sales team presenting their plans for 2017 -- their sales plan at the customer level and as well as at the product and sales manager level.

BY MR. TOVSKY:

Q. And what is the sales plan based on?

A. The sales plan?

Q. Yes, I think you said it was the individual salespeople who were introducing -- brought in their plans. What is that based on?

MR. VIGDOR: Objection, mischaracterizes testimony.

MR. WATTS: Objection.

BY MR. TOVSKY:

Q. I can start again. To the extent that this document contains information relating to sales for 2017, what is that information based on?

A. Like any sales plans, it's based on the sales manager's view of what they would like to target sales in the year in question.

Q. So are these plans or -- these are

142

plans, then, right?

A. These are plans, yes.

Q. At this point in time, and this was December 2016, and to the extent that you know, to what extent would these plans be the product of negotiations between the sales representatives and the customers?

MR. VIGDOR: Objection, assumes facts not in evidence.

MR. WATTS: Objection to form.

THE WITNESS: It would vary by customer.

BY MR. TOVSKY:

Q. If you look at slide 007. At the top it's "Summary of 2017 NAFTA LPC", so this would reflect at this point in time, December 2016, Venator's plans for the sale of different grades produced at LPC?

A. That's correct.

Q. If you look at the next slide, again it's 2017 NAFTA LPC and top 10 customers. The information provided in this chart would be the projections for sales to these different customers during 2017?

A. The sales plans for these different

143

customers, rather than projections.

Q. Sales plan. And then slide 009 refers to top 10 plastics customers out of LPC. Do you see that?

A. Yes. I do.

Q. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Do you see that?

A. That's correct.

Q. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

A. Could you repeat the question, please?

Q. I'm sorry. The slide that's 009, in terms of this was a plan, right?

A. That is correct.

Q. To what extent did the plan -- did Venator execute against this plan roughly comparably to the plan?

MR. WATTS: Objection to form.

THE WITNESS: If you're asking me off the top of my head to comment on ▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓ I cannot, but I can tell you approximately ▓▓▓▓▓▓▓▓▓▓▓

144

BY MR. TOVSKY:

Q. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

MR. WATTS: Objection to form.

THE WITNESS: It would be TR23 or TR25, or both, because they are the two plastics grades out of LPC.

BY MR. TOVSKY:

Q. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the product go directly from LPC ▓▓▓▓▓▓▓▓▓▓▓▓▓▓?

A. Rather than go through warehouse first, is that the question?

Q. Yes.

A. I don't know.

Q. Then slide 11 refers to NAFTA imports.

A. That's correct.

Q. And the number one, or the highest ranking import, at least in terms of the plan, in December 2016, is TR28. Do you see that?

A. That's right.

Q. Are you able to tell me to whom Venator would be planning to supply that ▓

36 (Pages 141 to 144)

157

the bottom it's VEN-SDT-0004307 through 4316, though 4316 is a deck and therefore has additional pages, so in other words it's going to be 001 through 031. I would ask if you can review the entire document and I'll just clarify it's a family of documents and sometimes, when we print them out, the whole family produces. I'm not actually going to ask you any questions until the page that's marked 018. So now that I've thoroughly confused you, I will hand you the document.

A. Just remind me which page you referenced?

Q. The deck that I was really referring to starts at 018.

A. 018?

Q. Yeah. That's where it kind of goes into sales by customer and sales by grade. (After a pause) Are you good? If I could turn your attention to the slide that's at the bottom marked 025, and at the top it's "Sales By Grade: Europe."

A. Yes.

Q. And do you see that pie chart at the bottom?

158

A. Yes.

Q. This document, I believe, is from -- looks like it's August 2017. I'm sure the deck is as well. Yeah, August 2017. So my point is that I would assume the pie chart is going to reflect somewhere around that time period.

A. I would believe so.

Q. So the pie chart has, for Europe, sales by grade of these different grades, and it looks like TC90 is that one in the top right slice of the pie. Do you see that?

A. Yes, I do.

Q. And what is TC90?

A. It's a coatings grade produced at the Greatham chloride facility.

Q. And do you export that grade to the US?

A. Not that I'm aware of, no.

Q. Have you ever? Has Venator ever?

A. Not to my recollection.

Q. Is there a reason that it does not?

A. It's a general purpose architectural coatings grade and it is very much designed for a European customer base.

Q. To the extent that it's designed

159

for the European customer base, how would that -- what are the implications of that for selling it in NAFTA?

MR. WATTS: Objection to form.

THE WITNESS: The grade that is more comparable to the LPC grades would be TR81. [REDACTED] It's made in the same facility and it's a grade that's more comparable to all the requirements in North America but also, specifically, a similar grade to the one we have at LPC.

BY MR. TOVSKY:

Q. And in what ways would TC90 be less comparable to the grades produced at LPC?

A. It does not have as much durability as TR81, for example.

Q. And for the -- why does the difference in durability matter?

A. In certain applications coating customers want improved durability.

Q. To a greater degree in NAFTA than in Europe?

MR. WATTS: Objection to form.

160

THE WITNESS: Not necessarily, no. All the markets will have similar levels of durability for similar type of applications.

BY MR. TOVSKY:

Q. And then TR92 also -- what is TR92 that's also on the pie chart?

A. That's a coatings grade.

Q. And where is that produced?

A. That's a sulfate coatings grade produced at Scarlino, Italy and at our Uerdingen, Germany facility.

Q. Okay, and does Venator ship TR92 from either Scarlino or Uerdingen to NAFTA?

A. Not that I'm aware of.

Q. Has it ever?

A. I've no recollection.

Q. And do you have any feel for why not?

MR. WATTS: Objection to form.

THE WITNESS: We don't have a large presence of decorative architectural coatings business in North America with imported product out of Europe. So Venator strategy is very clearly to grow a business in North America through imported products that are more

40 (Pages 157 to 160)

PX7015-041

Public-Redacted

Maiter

Tronox and Cristal                                                          3/8/2018

161

specialised and differentiated.  So you will see our growth and our growth strategy is very much geared towards products that give us performance; highly differentiated as well as specialised applications.

MR. WATTS:  Can we just take two seconds off the record?

THE VIDEOGRAPHER:  Going off the record at now 2.42 p.m.

(Break)

THE VIDEOGRAPHER:  We are going back on the record at 2.44 p.m.

MR. TOVSKY:  Would you like to read back where we were?  Because it would help me a lot.

MR. VIGDOR:  Yeah, do you want a readback?

MR. TOVSKY:  Yeah, because I think he was actually in the middle of saying something.

(The reporter read back as directed)

MR. VIGDOR:  So would you do me a favor?  Could you just read back the question too?  You don't have to read back the answer again, just so that I can orient myself.

(The reporter read back as directed)

162

MR. VIGDOR:  So is the question are you done with the answer?

MR. TOVSKY  I think he's done with the answer.

THE WITNESS:  Yes, I am.

BY MR. TOVSKY:

Q.    Let me follow up briefly, then.  Is TR92 a grade that does not offer differentiated performance?

A.    Generally it goes into general purpose architectural applications.  It's a very functional grade.

Q.    On this pie chart, and if you look at the listing of grades, which of these grades also do not offer differentiated performance?

A.    I mentioned TC90, TR92 into coatings applications; and generally FC5 doesn't for plastics applications.

Q.    When you say generally, are there some situations where it does?

A.    It would be, in some situations.

Q.    Can you elaborate on that, please?

A.    I would not have the details around some specific customers that would see some value, increased value from FC5.

163

Q.    When you say increased value, what do you mean?

A.    They would see some significant benefit from using that product in its application, which makes it more differentiated.

Q.    And in some cases is that increased value reflected in pricing?

A.    That is true.

Q.    In other words, the pricing may be higher?

A.    Yes, that is true.

Q.    Now, we talked earlier about TR28. Do you recall that?

A.    That's correct.

Q.    And TR28 is a grade that in your view reflects differentiated performance?

A.    That's correct.

Q.    And I may have asked you this earlier and I apologize if I did, but to what extent is pricing of TR28 reflected in differentiated performance?

A.    The average TR28 price, depending on the customer base in the region, would be higher.

Q.    How about in North America?

164

A.    I beg your pardon?

Q.    In North America?

MR. WATTS:  Objection to form.

THE WITNESS:  I don't have that level of information.

BY MR. TOVSKY:

Q.    And we had referred earlier to the Pori, Finland facility and that there had been a fire there.  Did that fire have an impact on Venator's sales of TiO2?

A.    Yes, it had.

Q.    And is that because it resulted in reduced production overall?

A.    That is correct.

Q.    Did the Pori fire result in any -- I'm going to use a term and please, you know, if you don't understand, just let me know -- shuffling of production from plant to plant to meet obligations?

MR. VIGDOR:  Objection.

BY MR. TOVSKY:

Q.    Do you want me to try again?

A.    I understand the question, I think.

Q.    You do?

A.    So was the question did we remix

41 (Pages 161 to 164)

PX7015-042

Maiter

Tronox and Cristal

3/8/2018

165

our grade production at different factories --

Q. Yes.

A. -- to meet some obligations because of the Pori fire? The answer is yes.

Q. And to the extent you can, could you describe that?

A. We produce some semi-differentiated production at our Scarlino factory which we now finish off at our Pori, Finland facility for certain product requirements four our specialty business.

Q. So the finishing capacity of Pori is intact?

A. Yes, or largely intact would be a better way.

Q. Any other remixing besides the Scarlino production?

A. There would be small remixes in one or two factories but they would not be major.

Q. Okay, and to what extent did Venator make sales from LPC to help adjust -- LPC to Europe, I'm sorry, to adjust to the Pori fire?

A. LPC had no impact due to the Pori fire. Our business from LPC continued as it was prior to the Pori fire.

166

Q. I'm going to hand you a document Mr. Maiter that has been marked as PX3036 and it's 001 through 037 and it's a slide deck which is labelled VEN-SDT-0042743. So I will hand you what's been marked. And, you know, take your time to review the document. Most of my questions are toward the end.

A. (After a pause) Is there any specific page you would refer me to?

Q. So I was just going to try to go through the budget and sales volumes and prices, which is actually the very last slide.

Have you had the opportunity to review what has been marked as PX3036?

A. Yes, I have.

Q. Thank you. And if you look at slide 37, please, I apologize, it's a small chart, or the printing is small. At the top it says:

"White Pigments TiO2 Sales Volume and Price cf. Budget (Revised, Post-Pori)."

And actually I'm going to ask you to look at, I'm sorry, the commercial -- page 002, just to put the document in context. And this deck is entitled "White Pigments Business Unit TiO2/FAD Commercial Report - December 2017". Is

167

this a document you would receive in the ordinary course of business?

A. Yes, I would.

Q. And what is the purpose of this deck?

A. Reviewing the commercial aspects, sales marketing aspects, of our White Pigments Business Unit in respect of both TiO2 and functional additives.

Q. Is this a document that's prepared on a monthly basis?

A. It is.

Q. By whom?

A. One of my team members.

Q. And is this a document that is discussed within Venator?

A. It is discussed within the commercial team within Venator. The white pigments business TiO2 commercial team.

Q. Okay, in any formal setting?

MR. WATTS: Objection to form.

THE WITNESS: Not this specific document.

BY MR. TOVSKY:

Q. So now we can look at the document

168

prepared on page 37. Let me just -- I'll ask you a general question, and again let's take something you know, but what information does your team use in preparing such a slide?

A. That's a very broad question. Do you want to maybe clarify the question?

Q. Sure. If you -- looking at it, there's -- going across, there's a month actual, a year to date actual, then Quarter 1 actual, Quarter 2 actual, and so on and so forth. Then there are numbers in each one of those little boxes. I would look at that as -- well, it doesn't matter how I look at it, but to the extent that this wraps up information, what information does it wrap up?

MR. WATTS: Objection to form.

THE WITNESS: It wraps up three levels of information. It wraps up the monthly data for volume and price; it wraps up the historical year to date data; and, thirdly, it wraps up the budget or targets as we set for the year. So we start every year with a volume, price, target projection. That is what the budget os based on for the year, and we track against that and in this document a specific table is used

42 (Pages 165 to 168)

185

MR. WATTS: Objection to form.

THE WITNESS:   That is true.

BY MR. TOVSKY:

Q.    Is Venator today selling ███ ████ in North America?

MR. VIGDOR: Objection, I think you misspoke, and I may have misheard.

MR. TOVSKY: I can rephrase the question. That would be easier.

MR. VIGDOR: Whatever.

BY MR. TOVSKY:

Q.    ██████████████████████████████████████████████?

A.    I can't recall.

MR. WATTS: Objection.

BY MR. TOVSKY:

Q.    If you look at slide 008, there's a description of the competitive environment. Do you see that?

A.    Yes.

Q.    It describes Cristal:

"Most flexible competitor accepting low price increases and was keen to protect and even regain volume."

Do you know what the basis for that

186

statement is?

A.    I cannot comment on it. No, I do not know what the basis is.

Q.    I am going to introduce two documents, which are PX3000 and PX3009. PX3000 is labelled at the bottom PX3000-001, which is VEN_S00008188 through 8203; and then PX3009-001 through 054 and it's VEN_S00013331 through -- it doesn't because it's a deck. So if you can just look at both of those that have been marked.

(After a pause) Have you reviewed both of the documents?

A.    If you could point me to the slide, it would be easier.

Q.    So what I can do is there are some specific slides on PX3009, such as slide 3, which is just helping to understand the context, and then maybe slide 21 and 29. Probably more slide 29, to be fair.

MR. MILLER: Are you using PX numbers or the actual slide?

MR. TOVSKY: The slide, I'm sorry. I've been using the slide all along.

BY MR. TOVSKY:

Q.    So let me just ask you first about

187

the document that has been marked as PX3009 and is this a document that you had input into?

A.    I possibly would have had input into this document.

Q.    Do you recall seeing this document?

A.    Yes, I do.

Q.    And who else had input into this document.

A.    This document has not been altered by myself. It was prepared by our investor relations and our finance teams. It's a lender presentation as part of the IPO process.

Q.    And what is a lender presentation?

A.    I believe it's a presentation to banks and third parties as part of the IPO process. So before we listed the company as an independent company on the New York Stock Exchange, we had to go out to the banks and raise funding.

Q.    So you were not the author but you had input?

A.    I may have had input in certain areas. My recollection is vague around which areas I would have had input.

Q.    Are you aware of Venator going

188

forward with the lender presentation in connection with the IPO?

A.    Yes, I would be.

Q.    Okay, and so you believe that this document was used in connection with that presentation?

A.    Yes.

Q.    And as far as you know, was the presentation successful?

MR. WATTS: Objection to form.

THE WITNESS:   Did we get the funding prior to IPO? Yes, we did get the funding prior to IPO.

BY MR. TOVSKY:

Q.    And are you aware -- and you are aware of -- strike that.

From which lenders -- do you know which lenders this was presented to?

A.    I would not have that detailed information.

Q.    Then PX3000 is a Private-side Supplement of the same date, June 20, 2017. Do you know what a Private-side Supplement would have been?

A.    No, I don't.

47 (Pages 185 to 188)

189

Q.    Do you recall whether you had input into the Private-side Supplement?

A.    I don't recall providing input into that specific document.

Q.    I'm going to ask you specifically about slide 29, which at the top is titled "Global TiO2 Operating Grade Outlook"?

MR. WATTS:  Just for the record, what exhibit are you on?

MR. TOVSKY:  I'm sorry, PX3009.  I apologize.

MR. MILLER:  So you're on PX29 now?

MR. TOVSKY:  PX3009 slide 29, and it's titled "Global TiO2 Operating Grade Outlook".  Not slide, I'm sorry, dash.  Dash 29, I apologize.

MR. VIGDOR:  It's the Bates number.

MR. TOVSKY:  The Bates number and the slide numbers are too close together.  Not the Bates number.  Slide 28.

THE WITNESS:  I've got it.

BY MR. TOVSKY:

Q.    Let me ask about the reference to the current TiO2 cycle.  There's a reference, for example, or there's a reference to China headwinds, such as environmental moderation.  What

190

is that referring to?

A.    We believe there are environmental inspections in China that has resulted in some sulfate plants being moderated, or shut down, because of environmental pressure from the Government, and that's what it refers to.

Q.    When you say "we believe", who was "we"?

A.    Venator, as a company.

Q.    Are there individuals within Venator who are more knowledgeable about that than others?

A.    The information we have within Venator cones from independent third parties, TZMI being one of them, as consultants in the industry; other third parties, like companies called TCM, that provide reports on the subject; customer intelligence data and we have people in China who give us an update.  So multiple sources of data and we have come to the conclusion that there is moderation of capacity in China.

Q.    And then there's a reference to higher costs.  What is that referring to?

A.    Higher costs in China refers to the fact that these environmental requirements require

191

the TiO2 producers to increase their environmental compliance and in so doing they have to incur higher costs.

Q.    Is that referring to feedstock costs, as far as you know?

A.    As far as I know it refers to multiple costs and that may or may not include feedstock.

Q.    Then there is a reference to supply chain instability.  What does that refer to?

A.    It refers specifically to the China headwinds, of having moderated capacity and having interrupted supply due to that.

Q.    How about technology constraints?

A.    I think that refers specifically to the fact that in order to resolve the environmental issue and inspections, they had to install new equipment and new technologies on environmental compliance.

Q.    The next bullet down refers to:
"Differential of Western and Chinese product quality now transparent to all customers and producers."
So what is that referring to?

A.    That refers to, in functional and

192

commodity markets and applications, I'm thinking about architectural coatings, for example, we see the Chinese producers' quality being fairly close, if not equivalent or similar to what we see from Western producers.  But in the more differentiated performance markets we still see a gap between Chinese producers' quality and what we would see as Western producer quality.

Q.    Mr. Maiter, I will ask you to review what has been marked as PX3035 and it goes from 001 through 069, actually 070, and at the top it's an e-mail from Patrick Steed at citi.com to a long list, including Simon Turner and yourself.

MR. VIGDOR:  Do you want to identify the Bates number of the documents for the record?  If you did that and I forgot, I'm sorry.

MR. TOVSKY:  I did not do that.  I didn't do that.  It is VEN-SDT-0009362 through 9430.

THE WITNESS:  Okay.

BY MR. TOVSKY:

Q.    Have you had the opportunity to review what has been marked as PX3035?

A.    Yes, I have.

Q.    So at the top, as we talked about,

48 (Pages 189 to 192)

PX7015-049

193

it's an e-mail from Patrick Steed. Do you know who Patrick Steed is?

A.    No, I don't personally know who he is.

Q.    Do you recall receiving this e-mail from Patrick Steed?

A.    I don't recall but I see I'm on the circulation list.

Q.    What is an analyst presentation?

A.    We have analysts that review specific sectors and markets within the New York Stock Exchange, so companies that are grouped together and analysts review those companies. And when we do presentations before the IPO process, and this was part of the IPO process, we would have done presentations to analysts. So Simon Turner, our CEO and President, and Kurt Ogden, our CFO would have done presentations to analysts. And the support would have come from the banks, like Citibank, who helped prepare some of these presentations.

Q.    And would you consider this a Venator presentation or a Citibank presentation?

A.    This would be a Venator presentation.

194

Q.    And is this a presentation that you were involved in preparing?

A.    No, I was not involved in preparing the presentation.

Q.    And who would have been involved primarily?

A.    Primarily our investor relations director and our CFO (chief financial officer).

Q.    And would they have talked to you about what they were putting into it or had any kind of discussions with you to help them prepare the presentation.

A.    They may have at various points. My recollection, I can't recall exactly what they did.

Q.    Would you consider an Analyst Day Presentation the sort of presentation that would be important for Venator to provide accurate information in?

MR. WATTS:  Objection, form.

MR. VIGDOR:  Objection, form, vague.

THE WITNESS:  Do you want to clarify the question?

BY MR. TOVSKY:

195

Q.    Well, does Venator have the opportunity of making the Analyst Day Presentation accurate?

MR. WATTS:  Objection.

THE WITNESS:  Any presentation requires me to be accurate. I'm not sure why we treat analyst days any differently.

BY MR. TOVSKY:

Q.    If you look at slide 19, please.

A.    Slide number or PX number?

Q.    I'm sorry, yes, it's a PX number. I keep doing that. I apologize.

A.    That's okay.

Q.    There's a reference to "New Attributes of Leaders" and specifically "Greater transparency".

A.    Yes.

Q.    What do you understand greater transparency to be in this context?

A.    I believe in this context we are seeing, now that the Venator business isn't part of Huntsman, for example, and Chemours is no longer part of Du Pont, that business data information is more readily available to analysts, to investors, to customers and to all

196

stakeholders. So there is more transparency of TiO2 business for these players if they are listed as independent companies, rather than being part of large multinationals, like our pigments and additives division was part of Huntsman, or in the case of Chemours, they were part of Du Pont.

Q.    And would the stakeholders include the TiO2 producers themselves?

MR. WATTS:  Objection to form, calls for speculation.

THE WITNESS:  I cannot comment on that. I'm not sure if that was meant in this.

BY MR. TOVSKY:

Q.    Okay. If you look at the next slide, slide 20. The first bullet, or first arrow if you will, and again it's the PX 20, it refers to capacity flattening out in China. There's a reference to closures and moderations of approximately 400,000 metric tonnes in 2005 to 2017. Do you know what that is referring to?

A.    Yes. I think that is the environmental inspections I referred to earlier and those figures come out of independent third party reports like TZMI.

Q.    And what would the difference be

49 (Pages 193 to 196)

PX7015-050

205

A.    That was in January 2016.

Q.    Thank you.  I will introduce what has been marked as PX3027-001 through 026 and it's VEN-SDT-0001211 through 1235, and I would just ask you to review what has been marked as PX3027. Just for the record, this is an e-mail from Murdo Montgomery to Simon Turner and Kurt Ogden and you are cc'd on it.

A.    (After a pause)  Okay.

Q.    Mr. Maiter, have you reviewed what has been marked as PX3027?

A.    I have.

Q.    And this looks like an e-mail that attaches a China deck of 7/21/17.  Do you recall receiving this e-mail?

A.    Yes, I do.

Q.    And do you recall -- well, actually, let me jump back.  It states -- and I guess who is Murdo Montgomery?

A.    He is our Investor Relations Director for Venator.

Q.    And did he prepare the China deck?

A.    Yes, he did.

Q.    And did you have input into that?

A.    Yes, I did.

207

China deck?

A.    This was pre-IPO process, so if you think of July period, where we were launching the presentations to potential investors in the IPO process in 2017, we would have had presentations at various times to investors, potential investors, lenders.  And a common question from investors and lenders was around China and what was going on in China, production, supply and so on and so forth.  And this deck was aimed at giving the team that is presenting some background information on what the most latest information is available, both from the market, from analysts and from our own sources.  So this is a consolidation of information being put together by Murdo from various sources.

Q.    And the team that was presenting would have been whom?

A.    The team that would have been presenting would be Murdo Montgomery, who is the Investor Relations Director, together with our CEO, Simon Turner, and President, and our CFO Kurt Ogden.

Q.    And would Peter Huntsman have been involved in this?

206

THE VIDEOGRAPHER:  We have two or three minutes till tape change.

MR. TOVSKY:  So maybe we should, because it's probably going to go longer than two or three minutes.

THE VIDEOGRAPHER:  Going off the record at 4.36 p.m.  End of tape 6.

(Break)

THE VIDEOGRAPHER:  We are now starting tape 7 in the deposition of Mahomed Maiter, going back on the record at 4.50 p.m.

BY MR. TOVSKY:

Q.    So when we broke, Mr. Maiter, we were talking about PX3027, which is the China deck.  And I had asked you whether you had any input into this and am I correct that you did?

A.    I had some input.

Q.    And, basically, the input would have been you would have had discussions with Murdo Montgomery?

A.    I would have had discussions with Murdo Montgomery in relation to

Q.    What is your understanding of the purpose of this

208

A.    I don't know for this specific whether he would have been involved in this or not.

Q.    Kurt Ogden, again, is the CFO you said?

A.    Yes, that is correct.

Q.    And the next slide at the top is labelled Index.  Do you see that?

A.    Yes.

Q.    And refers to

A.    Yes.

Q.

A.

Q.

A.    I would not have been involved in that specific question.

Q.

A.

Q.

A.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX7015-053

Tronox and Cristal                                                           3/8/2018



209

Q.    As far as you are aware,

A.

Q.
A.

Q.

A.

Q.

210

A.
Q.

A.    That's right.
Q.    And the first comment, or at least
1,                                        What is
that referring to?
A.

Q.
A.
Q.

A.
Q.    And the first arrow under that is:

What is that referring to?
A.

211

Q.    And then I'm going to go to the
last arrow:

What is that referring to?
A.

Q.    But specifically what is the
perception that                              ?
A.    The perception is that a

.
Q.

?
A.

Q.

A.    No specific reason.
Q.    Then the second bullet point refers
to:

212

And then there's a reference, T
third arrow down:

whatever that three periods means
and then:

What is that referring to?
A.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX7015-054

Maiter

Tronox and Cristal                                                    3/8/2018

213

Q.

A.

[REDACTED]

Q.

A.

[REDACTED]

MR. WATTS:  Objection, vague.

BY MR. TOVSKY:

Q.

[REDACTED]

A.

[REDACTED]

Q.    Mr. Maiter, I will hand to you PX3032-001 through 022, which is VEN-SDT-0005574 through 5795 and ask you to review that.

MR. VIGDOR:  Do you want to direct Mr. Maiter to any aspect of this?  There's a lot in here.

MR. TOVSKY:  Yeah, I'm not going to go through the document other than to put it into context.  It's small printing, I understand.

MR. VIGDOR:  And a long document.

MR. TOVSKY:  I really wasn't going

214

to go through the report.

BY MR. TOVSKY:

Q.    Mr. Maiter, have you had the opportunity to review what has been marked as PX3032?

A.    Yes.

Q.    And this is an e-mail from Kurt Ogden to Peter Huntsman and a group including you?

A.    That's correct.

Q.    Kurt Ogden is the CFO?

A.    He is currently the CFO of Venator, but at the time the document was issued he was the Investor Relations Vice-President for Huntsman, reporting to Peter Huntsman.

Q.    Thank you for clarifying that?  Do you recall receiving this e-mail attaching the Goldman Sachs report back in June of 2016?

A.    I don't specifically recall this report because I received a number of reports from our investor analyst team.

Q.    And would Mr. Ogden typically or on other occasions send you analyst reports?

A.    To the senior team he would send analyst reports, yes.

Q.    And he concluded that this Goldman

215

Sachs report is "one of the better analyst reports"?

A.    As per his e-mail, yes.

Q.    Do you recall anybody responding to that comment?

A.    Could you clarify the question?

Q.    Do you recall did anybody disagree with him?

A.    I don't recall anybody commenting on it.

Q.    And do you agree with his comment that "the report is in-line with the story we've been telling"?

A.    I have no idea what he meant by that comment.

Q.    And is what's been marked as PX3032 a document you would have received, as far as you know?

A.    I'm on the circulation list of the document, yes.

Q.    And is this the sort of document you would have received in the ordinary course of business?

A.    Yes.

MR. TOVSKY:  At this point I have

216

no further questions.

MR. WATTS:  I have a few questions.  Do we want to go off the record for a second or do you want me just to move over?  We will go off for a second.

THE VIDEOGRAPHER:  Going off the record at 5.05 p.m.

(Off the record)

THE VIDEOGRAPHER:  We are going back on the record now at 5.08 p.m.

FURTHER EXAMINATION BY MR. WATTS

Q.    Good afternoon, Mr. Maiter.  A couple of follow-up questions.  There was some discussion about plant closures when Mr. Tovsky was asking you questions.  Do you recall that?

A.    Yes, I do.

Q.    And I'm going to mispronounce some European cities again, so I apologize in advance, but I think I recall you saying that the Grimsby plant was shut down in October 2009; is that correct?

A.    That is correct.

Q.    And what was the reason for that?

A.    The plant was small and uneconomical.

54 (Pages 213 to 216)

PX7015-055