**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: VENATOR MATERIALS PLC SECURITIES LITIGATION | Civil Action No. 4:19-cv-03464 <br><br> Judge Charles R. Eskridge III |

**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**THE CONSOLIDATED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ...................................................................................... 1

II.     NATURE AND STAGE OF THE PROCEEDINGS ................................. 4

III.    STATEMENT OF FACTS ......................................................................... 4

        A.      Huntsman Tells Investors It Will Not Proceed With The Venator
                Separation Without "Absolute Clarity" About Pori And Affirms That
                20% Production Capacity Had Been Achieved ........................................... 5

        B.      Venator Manufactured The False Appearance Of Capacity By "Shuffling"
                Intermediate TiO2 ...................................................................................... 6

        C.      Huntsman Raises Over $1.7 Billion By Concealing The True Facts About
                Pori ............................................................................................................ 7

        D.      In Reality, The Pori Rebuild Was Never "On Track," The Purported
                Increase In TiO2 Demand Was Illusory, And The "Fast Track" Premium
                Masked The Expensive Effort to Shuffle TiO2 To Pori .............................. 8

        E.      The Truth About Pori Was Revealed In A Series Of Corrective
                Disclosures Revealing Pori's Closure, Skyrocketing Costs, The Lack Of
                Legitimate Demand, And Pori's Actual Capacity ...................................... 10

IV.     STATEMENT OF THE ISSUES .............................................................. 10

V.      STANDARD OF REVIEW ....................................................................... 11

VI.     SUMMARY OF THE ARGUMENT ........................................................ 12

VII.    ARGUMENT ............................................................................................ 14

        A.      The Complaint Adequately Alleges Falsity ............................................. 14

        B.      Defendants' Falsity Arguments Are Meritless .......................................... 16

                1.      Defendants' 20% Capacity Representations Are Actionable .......... 16

                2.      Defendants' Timeline And "On Track" Progress Assurances Are
                        Current And Past Statements Of Fact And Otherwise Actionable .. 20

                3.      Defendants' TiO2 Price Statements Are Not Protected Opinions ... 23

i

4.      Defendants' False Accounts Of Insurance Proceed Expenditures Are Not Protected As Forward-Looking Or Opinions ..................... 24

C.      The Complaint Adequately Alleges Scienter .............................................. 25

D.      Defendants' Scienter Arguments Are Meritless .......................................... 29

1.      Ogden and Turner's Scienter Is Highly Particularized ................... 29

2.      The Huntsman Defendants' Motive and Maiter's Scienter Are Highly Relevant And Attributable to Venator ................................ 31

3.      Overwhelming Facts Concerning Defendants' Knowledge About Pori Establish A Cogent And Compelling Inference Of Scienter .... 33

4.      The Complaint Does Not Rely On Group Pleading ......................... 34

E.      Plaintiff's Securities Act Claims Are Timely ............................................ 35

F.      Plaintiff Has Standing To Assert Claims Under Section 12(a)(2) Of The Securities Act ........................................................................................... 36

G.      The Complaint Pleads Control Person Claims ........................................... 37

VIII.   CONCLUSION ................................................................................................ 38

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abrams v. Baker Hughes, Inc.*
292 F.3d 424 (5th Cir. 2002) .................................................................................. 30

*In re Allergan Generic Drug Pricing Sec. Litig.,*
2019 WL 3562134 (D.N.J. Aug. 6, 2019) .................................................................... 24

*In re Ashanti Goldfields Sec. Litig.,*
184 F. Supp. 2d 247 (E.D.N.Y. 2002) ........................................................................ 21

*Brody v. Zix Corp.,*
2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) ............................................................ 27

*Carlton v. Cannon,*
184 F. Supp. 3d 428 (S.D. Tex. 2016) ........................................................................ 20

*In re Charles Schwab Corp. Sec. Litig.,*
257 F.R.D. 534 (N.D. Cal. 2009) ............................................................................... 36

*City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.,*
2016 WL 6075540 (W.D. Tex. Sept. 16, 2016) ........................................................... 23

*In re Cobalt Int'l Energy, Inc.,*
2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ............................................ 11, 23, 30, 36

*Dorsey v. Portfolio Equities, Inc.,*
540 F.3d 333 (5th Cir. 2008) .................................................................................... 28

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.,*
873 F.3d 85 (2d Cir. 2017) ....................................................................................... 35

*Fla. State Bd. Admin. v. Green Tree Fin. Corp.,*
270 F.3d 645 (8th Cir. 2001) .................................................................................... 27

*Holzwasser v. Staktek Holdings, Inc.,*
2006 WL 897746 (W.D. Tex. Mar. 30, 2006) ............................................................. 12

*In re Horsehead Holding Corp. Sec. Litig.,*
2018 WL 4838234 (D. Del. Oct. 4, 2018) .................................................................. 14

*Inst. Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)......................................................................................... 26

*Kaltman v. Key Energy Servs., Inc.*,
  447 F. Supp. 2d 648 (W.D. Tex. 2006).......................................................... 15, 16, 24

*Kohut v. KBR, Inc.*,
  2015 WL 11995250 (S.D. Tex. Sept. 3, 2015) ........................................................... 19

*In re Kosmos Energy Ltd. Sec. Litig.*,
  955 F. Supp. 2d 658 (N.D. Tex. 2013) ....................................................................... 14

*In re Landry's Seafood Rest., Inc.*,
  2001 WL 34115784 (S.D. Tex. Feb. 20, 2001) .......................................................... 25

*Lee v. Active Power, Inc.*,
  29 F. Supp. 3d 876 (W.D. Tex. 2014) *interlocutory appeal denied at* 2014 WL
  4337860 (W.D. Tex. Sept 2, 2014)....................................................................... 32, 33

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes*,
  810 F.3d 951 (5th Cir. 2016) ...................................................................................... 31

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
  238 F.3d 363 (5th Cir. 2001) .......................................................................... 12, 36, 37

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ..............................................................................*passim*

*Marcus v. J.C. Penney Co., Inc.*,
  2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) .......................................................... 27

*McNamara v. Bre-X Minerals Ltd.*,
  46 F. Supp. 2d 632 (E.D. Tex. 1999) ......................................................................... 38

*Merck & Co., Inc. v. Reynolds*,
  559 U.S. 633 (2010) .................................................................................................... 35

*Monroe Cty. Emps.' Ret. Sys. v. Southern Co.*,
  2018 WL 1558577 (N.D. Ga. Mar. 29, 2018)............................................................ 15

*Neiman v. Bulmahn*,
  854 F.3d 741 (5th Cir. 2017) ...................................................................................... 31

*In re OCA, Inc. Sec. & Deriv. Litig.*,
  2006 WL 3747560 (E.D. La. Dec. 14, 2006).............................................................. 27

iv

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    575 U.S. 175 (2015) ................................................................................22, 23, 24

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions,*
    *Inc.*,
    730 F.3d 263 (3d Cir. 2013) ....................................................................... 35

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ..................................................................... 28

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) .............................................................. 21, 22

*Ramirez v. Exxon Mobil Corp.*,
    334 F. Supp. 3d 832 (N.D. Tex. 2018) ...................................................... 26

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ..................................................................... 26

*Rihn v. Acadia Pharms. Inc.*,
    2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ............................................ 21

*Rosenzweig v. Azurix, Corp.*,
    332 F.3d 854 (5th Cir. 2003) ................................................................ 31, 36

*Rubinstein v. Collins*,
    20 F.3d 160 (5th Cir. 1994) ....................................................................... 22

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009) ............................................ 25, 26

*S.E.C. v. Strauss*,
    2011 WL 1158783 (N.D. Miss. Mar. 28, 2011) ........................................ 15

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011) ........................................................ 26

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 365 (5th Cir.2004) ................................................................. 32, 34

*Spitzberg v. Houston Energy Co.*,
    758 F.3d 676 (5th Cir. 2014) ................................................................*passim*

*Stone v. Life Partners Holdings, Inc.*,
    26 F. Supp. 3d 575 (W.D. Tex. 2014) ............................................. 22, 28, 32

*In re Superior Offshore Int'l, Inc. Sec. Litig.*,
2009 WL 82064 (S.D. Tex. Jan. 12, 2009) ................................................................. 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ................................................................................... 12, 29

*In re TETRA Techs. Inc. Sec. Litig.*,
2009 WL 6325540 (S.D. Tex. Jul. 9, 2009) ...................................................... 16, 17, 37

*In re Triton Energy Ltd. Sec. Litig.*,
2001 WL 872019 (E.D. Tex. Mar. 30, 2001) ............................................................. 28

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................................................................... 26

*Va. Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991) ......................................................................................... 24

**STATUTES**

15 U.S.C. § 77m ............................................................................................. 35

## I.    INTRODUCTION

This case arises from Defendants' scheme to dispose of a business that suffered a catastrophic fire at a manufacturing plant in Pori, Finland, which produced its most important and profitable products (TiO2).[1] Defendants led investors to believe that, after the fire, Pori was operating at 20% of its prior capacity, was "on pace" and "on track" to restoring full production in months, and that insurance would fully cover rebuild expenses and lost profits.  Investors credited these assurances, enabling Defendants to pocket $1.7 billion from public investors through the Venator IPO and SPO.  Unfortunately for investors, these statements were false.  In reality, Pori was never "on track" to regaining the capacity to produce TiO2, "nothing happened" on the rebuild, and Venator's $500 million insurance policy was nowhere near sufficient to cover the Company's costs.  When the truth concerning the fire and its impact on Venator's business was finally revealed, Venator's shares lost over 70% of their value.

Contrary to Defendants' representations that the facility had returned to 20% capacity—and in order to conceal the true extent of the damage to Pori's production capacity—Venator went to extraordinarily expensive and unsustainable lengths to ship "intermediate" TiO2, manufactured at its facility in Italy, to Pori, where it was "finished" (the "Europe-Pori Shuffle").  But "finishing" TiO2—the last and least expensive stage of manufacturing—is not the same thing as a plant's actual "capacity" to produce TiO2.  In

---

[1] All defined terms have the same meaning as in the Consolidated Class Action Complaint. ECF No. 41.  References to ¶__ are to the Complaint.  References to "DM__" are to Defendants' Motion to Dismiss (ECF No. 58) and references to "DX__" are to the exhibits to that motion.  All emphasis is added and citations omitted unless noted.

fact, Venator's IPO and SPO offering documents said as much, and represented that "finishing" TiO2 did not result in any actual "capacity."

The Complaint alleges in particularized detail that Defendants' statements were false and (where necessary) made with scienter. For example, former Venator employees, who worked at Pori, provided weekly reports to Defendant Turner and other senior executives, photographs taken during the Class Period show the lack of progress on the rebuild, and Defendant Maiter testified about his knowledge of the Europe-Pori Shuffle and admitted that even the finishing process at Pori was not fully intact. Former employees recounted that production never reached 20%, and that Venator's activities at Pori following the fire a "scam," as Venator was not using insurance proceeds to rebuild the facility but to prop up the Company's financial position.

These allegations state claims under Sections 11, 12 and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act. Ignoring and mischaracterizing the Complaint, Defendants raise several arguments that should be swiftly rejected.

*First*, Defendants claim that not one of their statements are actionable. For example, having represented that Pori had achieved "20% capacity," Defendants contend that investors should have interpreted the term "capacity" differently from the industry-standard—and from Venator's own usage of that term in the same SEC filings. But Defendants cannot credibly claim investors should have discerned an entirely different meaning to "capacity," let alone seek dismissal by arguing this fact-intensive proposition can be decided now as a matter of law. *See Spitzberg v. Houston Energy Co.*, 758 F.3d 676 (5th Cir. 2014).

2

*Second*, Defendants contend their false statements were protected opinions and forward-looking projections. But Defendants' misrepresentations concerned historical, false statements of fact and are otherwise actionable because they omitted critical facts: Pori's inability to generate any TiO2; demolition (the first step in the reconstruction process) had not even been completed before the rebuild was abandoned; and that, in reality, Venator's use of insurance proceeds was a "scam" to prop up Venator's financial condition.

Defendants ignore the Complaint and this Circuit's pleading standards in arguing Plaintiffs fail to allege a strong inference of scienter. Here, the Complaint exactingly details Defendants' knowledge of the fraud—as evidenced by Defendant Turner's and Ogden's receipt of reports concerning Pori, the complicated Europe-Pori Shuffle (undertaken when shipping costs had doubled), and other first-hand accounts of the reality at Pori. And while Defendants misstate the law in seeking to minimize Peter Huntsman's powerful motive to mislead investors—including by helping his family avoid $150 million in losses—under Fifth Circuit law, these allegations are strong evidence of Venator's scienter, and satisfy the PSLRA.

Last, Defendants seek to dismiss Plaintiffs Securities Act claims by arguing that (i) an October 2017 disclosure—before the SPO—triggered the Securities Act's statute of limitations and that (ii) Plaintiffs lack Section 12 standing. The notion that the statute of limitations began running before the false statements were made dooms this nonsensical argument. Under Fifth Circuit precedent, Lead Plaintiff has more than adequately alleged standing under Section 12 of the Securities Act.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs bring claims on behalf of themselves and a class consisting of all persons and entities who: (i) purchased or otherwise acquired the publicly traded common stock of Venator between August 2, 2017 and October 29, 2018, inclusive (the "Class Period"); and/or (ii) purchased or otherwise acquired Venator stock either in or traceable to Venator's August 2, 2017 IPO or December 4, 2017 SPO during the Class Period and were damaged thereby.    On January 17, 2020, Plaintiffs filed the Complaint alleging Defendants' violations of the Securities Act and the Exchange Act.  ECF No. 41.  On February 18, 2020, Defendants filed the instant motion to dismiss for failure to state a claim.  ECF No. 58.

## III.    STATEMENT OF FACTS

Following a devastating fire at its TiO2 plant in Pori, Finland, Huntsman promptly abandoned a longstanding plan to spin-off its pigments business to existing Huntsman shareholders—including one of its largest shareholders, the Huntsman family.  Defendant Peter Huntsman and other senior Venator executives witnessed Pori's near-total destruction when they visited the facility on February 8, 2017.  ¶84.  While they could not physically access the facility because it was still smoldering (¶80) and Finnish regulators prohibited them from doing so because of concerns about radiation (¶82), the destruction was clear.  Almost immediately after it occurred, Defendants Turner, Ogden and other senior management began receiving detailed reports on a weekly basis from a task force set up to handle the Pori crisis—reports that confirmed that Pori was almost totally destroyed and could not produce any TiO2 whatsoever.  ¶136.  With that knowledge,

4

Huntsman changed transaction structures and instead sought to dispose of the business to public investors through the IPO of Venator and a follow-on SPO just months later.

A.    Huntsman Tells Investors It Will Not Proceed With The Venator Separation Without "Absolute Clarity" About Pori And Affirms That 20% Production Capacity Had Been Achieved

In order to spin-off Venator as quickly and profitably as possible, Defendants misrepresented that Pori would be promptly rebuilt, damage was minimal, and insurance would cover any business interruption and the rebuild.  For example, Peter Huntsman told investors in the weeks prior to the IPO, including in response to analyst questions, that Huntsman was "committed to rebuilding the [Pori] facility as quickly as possible" (¶90), that Huntsman would never conduct "a spin that takes place under any sort of cloud of uncertainty" about Pori, and that the IPO would only go forward after Huntsman had "absolute clarity and certainty about where we're going and how we are operating."  ¶91.

Providing further comfort to investors, Huntsman's detailed timeline for the Pori rebuild suggested an in-depth, comprehensive feasibility analysis.  For example, on March 27, 2017, Peter Huntsman represented that the entire facility would return to 100% capacity in a year and a half—with approximately 20% of capacity restored by the end of the second quarter 2017, an additional 40% by the end of the first half 2018, and the final 40% completed and the site returning to full 100% capacity by the end of 2018.  ¶98.

But instead of completing its investigation—or realistically planning for the Pori rebuild—Huntsman accelerated the separation timeline after announcing it would occur as an IPO by concocting the Europe-Pori Shuffle.  ¶92.  As the August IPO neared, Huntsman continued to reassure investors about the Pori timeline and in the August 4, 2017 IPO

5

offering materials, specifically represented that the facility had already achieved "20% capacity" by the second quarter of 2017—*i.e.*, five weeks before the date of the IPO. Defendants' representations reassured investors that the damage from the fire was well understood, manageable, and that Defendants' timeline for full restoration was realistic. ¶¶95-100, 208-09.

**B.      Venator Manufactured The False Appearance Of Capacity By "Shuffling" Intermediate TiO2**

Unknown to investors, instead of returning to 20% capacity, Venator created the false appearance of capacity by producing intermediate TiO2 at facilities in Italy and Germany and then "shuffled" that product at tremendous cost to Pori to be "finished." ¶¶130-46. Defendants Turner and Ogden closely tracked the Pori rebuild and the Europe-Pori Shuffle via reports provided to them after Pori task force weekly meetings, which showed that freight costs more than doubled during the Class Period. ¶¶145-46. In reality, as Maiter testified and former Venator employees confirmed, even the finishing process at Pori was not "intact" or fully restored, and Venator "just pretended to do something in order to collect money from the insurance company." ¶¶132, 138.

As Venator explained in its SEC filings, TiO2 production occurs in three distinct phases. First, iron ore "feedstock" is treated to extract the TiO2 pigment; second, the TiO2 is filtered out using "Moore" filters; and last, during the "finishing" phase of production, intermediate TiO2 is chemically treated based on the product's intended end use. ¶¶61-70. "Finishing" occurs at the "white end" of the manufacturing facility—which is the least costly and labor-intensive aspect of production. ¶62. Venator made this point explicit in

the IPO materials, when it described Huntsman's closure of the "black end" of its TiO2 facility in Calais, France—which, according to Venator—eliminated its *entire* prior production capacity even though the Calais "finishing" process was fully operational. ¶¶66-67.

### C. Huntsman Raises Over $1.7 Billion By Concealing The True Facts About Pori

Defendants' reassurances concerning Pori worked as intended, and in August 2017, Huntsman raised over $475 million through the Venator IPO, and $732 million in cash through a related debt restructuring. ¶¶44, 203, 206. Thereafter and throughout the Class Period, Defendants repeated these false claims about Pori. ¶¶109-29, 208-78.

For example, on Venator's first earnings call as a public company, Defendants reported "record results"—with earnings nearly 30% ahead of expectations—based on a purported "solid demand, good demand around the world" for TiO2, which had provided a "really strong uplift." ¶¶109, 195. On that call, Defendant Ogden repeated the false claim that Pori was "already running at 20% site capacity" (¶195) while Turner reassured investors that Venator's $500 million insurance police was "more than enough," and that business interruption losses increased due to the "strong market conditions" and "good demand around the world." ¶¶111-12. Analysts credited Defendants' representations, and Venator shares appreciated over 25% from the time of the IPO. ¶115.

Taking advantage of the inflated share price, Huntsman unloaded as much of its remaining position in Venator as possible, quickly securing a waiver from the Underwriter Defendants to conduct an SPO of Venator shares over two months earlier than planned.

7

¶116. In the SPO, Venator repeated the false claim that Pori was "operating at 20%," that production from other Venator facilities (including Scarlino) remain unchanged, and that Venator would benefit from "strong market conditions" and underlying TiO2 demand—enabling Huntsman to raise another $471 million.  ¶¶117-21, 203, 332-41.  Altogether, Venator reaped $1.7 billion in proceeds through the Venator separation.  ¶¶88, 206.

Thereafter, Defendants repeatedly told investors that the Pori rebuild was "on track," and that Venator was paying a "fast-track" premium to ensure the prompt "on schedule" return of Pori's specialty product capacity.  ¶¶122-29, 153, 224-46.  Further, while Defendants claimed increased insurance costs had been driven by an increase in TiO2 prices, in truth, prices temporarily skyrocketed because of the "supply restriction" at Pori, as a federal court later concluded.  ¶¶148, 247-58, 323-37, 336-37.

### D.   In Reality, The Pori Rebuild Was Never "On Track," The Purported Increase In TiO2 Demand Was Illusory, And The "Fast Track" Premium Masked The Expensive Effort to Shuffle TiO2 To Pori

Rather than operate at 20% capacity, at the time of the IPO, Venator had not even completed its investigation of the fire.  ¶¶83, 94-95, 351.  The fact that Pori never regained 20% capacity was confirmed by numerous former employees who worked at Pori and sold TiO2 produced there after the fire, and discussed by facility workers directly involved in the finishing process who laughed at the notion Pori was operating at 20%.  ¶¶131-32.  For example, FE3, a Pori manager, explained that no production could take place at Pori after the fire because all four production lines were destroyed from middle to end and under no circumstances could one truthfully suggest that Pori was operating at 20% of its prior capacity.  ¶133.  According to numerous other employees, by July 2018, no progress had

8

occurred—demonstrating that rebuilding was a "scam," and Venator "just pretended to do something in order to collect money from the insurance company" and prop up its financial condition so that Huntsman could spin-off the pigments business.  ¶¶132, 141.  These accounts are confirmed by photographic evidence in the Complaint showing the demolition required to *begin* reconstruction had not been completed by the time Venator disclosed it would close Pori.  ¶134.

Defendants Ogden and Turner and other senior management knew the true status of the rebuild including because they visited the site and saw the evidence of its destruction (¶193); were provided detailed reports about production levels and the Europe-Pori Shuffle; participated in "monthly meetings to review site activities" with Venator's insurers to discuss how insurance proceeds were being spent—and Turner and Ogden discussed Pori in every single investor presentation during the Class Period.  ¶¶136-38, 145-46, 194.

Moreover, despite the SEC's request that Venator provide more transparent disclosures concerning the "cost drivers" affecting expenses (¶¶96-98), and accounting rules requiring Venator to provide that disclosure (¶278), Defendants falsely described Venator's use of insurance proceeds to project the false impression that Pori would soon return to full production capacity.  ¶¶259-78.  Specifically, Turner and Ogden told investors that Venator was paying a "fast-track premium" to return Pori's specialty production lines to full capacity—eating up greater insurance proceeds—while in truth, Venator was spending the insurance on the Europe-Pori Shuffle.  ¶¶123-35, 244, 278.

**E.     The Truth About Pori Was Revealed In A Series Of Corrective Disclosures Revealing Pori's Closure, Skyrocketing Costs, The Lack Of Legitimate Demand, And Pori's Actual Capacity**

On July 31, 2018, Venator disclosed that the cost to rebuild Pori would exceed Venator's insurance coverage by over $375 million; nevertheless, Defendants insisted that the rebuild would still proceed (without telling investors demolition had not yet been completed).  ¶¶165-69.  On September 12, 2018, Venator revealed that the reconstruction of Pori was not only not "on track" but would never be completed—and for the first time suggested that Pori may not have been producing the TiO2 it claimed. ¶¶173-77.  Last, on October 30, 2018, Defendants disclosed that Venator incurred an additional $415 million in restructuring expenses, and that the sustained demand Defendants touted was illusory and had evaporated.  ¶¶182-84.

These disclosures caused decline of over 70% in Venator's stock price.  ¶¶44, 184. While Venator's investors suffered, Defendants thrived: Huntsman reaped nearly $2 billion, enabling it to pay down its balance sheet, cut its debt ratios in half, obtain an investment grade rating and pursue a long-sought after merger.  ¶¶86-88, 203.  Moreover, by concealing the truth about Pori, the Huntsman family avoided over $150 million in losses, and Peter Huntsman personally pocketed $17 million, while Turner and Ogden were rewarded bonuses for their "contributions" to the Venator separation.  ¶¶204-06.

## IV.    STATEMENT OF THE ISSUES

1.     Whether Plaintiffs adequately alleged violations of Section 10(b) of the Exchange Act or Sections 11 and 12(a)(2) of the Securities Act.

2.     Whether Plaintiffs alleged their claims are timely under Sections 11 and 12(a)(2) of the Securities Act.

3.    Whether Plaintiffs alleged that Defendants sold Venator stock to them or solicited their purchases of Venator stock under Section 12(a)(2) of the Securities Act.

4.    Whether Plaintiffs alleged secondary-liability claims under Section 20 of the Exchange Act and Section 15 of the Securities Act.

## V.    STANDARD OF REVIEW

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are "viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).  Ruling on a motion to dismiss, "courts must . . . accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor."  *Id.* Plaintiff need not plead "detailed factual allegations," but merely allegations that, "when assumed . . . true[,] raise a right to relief above the speculative level." *Id.*; *In re Cobalt Int'l Energy, Inc.*, 2016 WL 215476, at *2-3 (S.D. Tex. Jan. 19, 2016).

**Exchange Act Claims**.  Here, Defendants contest only Plaintiffs' Section 10(b) falsity and scienter allegations, thus conceding all other elements of Plaintiff's Section 10(b) claim, including reliance, economic loss and loss causation.

**Falsity**.  The PSLRA requires a plaintiff to plead falsity with particularity: to identify each allegedly misleading statement and explain why it is misleading.  *Lormand*, 565 F.3d at 239.  However, the "disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Id.* at 248.

**Scienter**.  A plaintiff may plead scienter by alleging either an "intent to deceive" or "severe recklessness."  *Spitzberg*, 758 F.3d at 686.  An inference of scienter need not be

11

"irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Rather, a plaintiff may plead scienter without alleging motive, even when reasonable, nonculpable inferences exist.  *Id.* at 325.  In assessing scienter, courts must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.  A strong inference is alleged "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id*. at 324.  Stated differently, "a tie favors the plaintiff."  *Spitzberg*, 758 F.3d at 686.

**Securities Act Claims**.  Section 11 of the Securities Act creates "virtually absolute liability for corporate issuers for even innocent material misstatements."  *In re Superior Offshore Int'l, Inc. Sec. Litig.*, 2009 WL 82064, at *2 (S.D. Tex. Jan. 12, 2009).  A Section 11 plaintiff "need only show a material misstatement or omission to establish her *prima facie* case," and need not plead reliance, causation or scienter.  *Holzwasser v. Staktek Holdings, Inc.*, 2006 WL 897746, at *4 (W.D. Tex. Mar. 30, 2006).  Moreover, Securities Act claims that, as here, "disclaim[] any allegation of fraud" are evaluated under Rule 8 even if the complaint also contains Exchange Act claims.  *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001); *see also* ¶¶304-05 (disclaiming fraud).

## VI.   SUMMARY OF THE ARGUMENT

**Falsity**.  Plaintiffs have adequately alleged that Defendants' representations about Pori's capacity, the rebuild, the impact on TiO2 prices, and use of insurance proceeds were

12

false.  Defendants' argument that its statements are not actionable because investors should have understood that its use of the term "capacity" here differed from industry standards and from its own SEC filings is meritless.  And Defendants' arguments that their other statements are protected "opinions," "forward-looking" or otherwise inactionable are wrong.  All of Defendants statements contained false historical aspects, lacked sufficient cautionary language, and omitted critical facts—including that Pori never generated any capacity, the rebuild went nowhere, and Venator was only shipping TiO2 to Pori for "finishing."

**Scienter**.  Plaintiffs have also more than adequately alleged scienter—an element that applies only to their Exchange Act claims.  The Complaint details Turner's and Ogden's close supervision of the Europe-Pori Shuffle, the reports they received concerning the rebuild, their professed knowledge about the most critical issue facing Venator, and the Huntsmans' powerful motive to conceal the truth.  Defendants' effort to discount these allegations fails.  Indeed, Defendants' urged opposing inference—that Pori's failure simply caught them by surprise—is not only implausible, but irrelevant to their scienter under Fifth Circuit law.  *See Spitzberg*, 758 F.3d at 686.

**Securities Act Claims**.  Plaintiffs' Securities Act claims—which do not sound in fraud and are subject to Rule 8—are timely, as they were filed well within a year of when Plaintiffs could have brought a claim.  Plaintiffs have also alleged Section 12 standing by submitting evidence that they purchased directly in the IPO and SPO.

13

**Control Person Claims**.  Last, Plaintiffs have adequately alleged "control" under the Exchange Act and Securities Act.  Specifically, the Complaint alleges a plethora of facts demonstrating Huntsman's "control" as the driving force of the IPO and SPO.

## VII.    ARGUMENT

### A.    The Complaint Adequately Alleges Falsity

The Complaint alleges four categories of materially false and misleading statements. *First*, Defendants falsely represented that Pori was operating at "20% capacity," was "*already running* at 20%," and that this capacity had been "achieved" before the IPO. ¶¶210-11, 217-19.  These statements are actionable because Pori was neither operating at 20% capacity, nor producing TiO2 at all.  ¶¶131-34.

To the contrary, after the fire, only one of four lines was functional, and could only "finish" TiO2, the least costly and labor-intensive part of the process.  ¶¶62, 135-44. Critically, as Venator repeatedly described to investors in its own SEC filings, simply "finishing" TiO2 does not generate any capacity at all.  ¶¶135-44.  These statements are actionable. *See Spitzberg*, 758 F.3d at 689-91; *In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 667-68 (N.D. Tex. 2013) (sustaining statements that "production was increasing according to plan" when "production was declining"); *In re Horsehead Holding Corp. Sec. Litig.*, 2018 WL 4838234, at *15 (D. Del. Oct. 4, 2018) (sustaining statements concerning capacity).

*Second*, Defendants falsely told investors the Pori rebuild was "on track" to be rebuilt. ¶¶225, 228-29, 230-31. Specifically, after establishing a detailed timeline claiming that 20% capacity had already been achieved, Defendants assured investors—often in

14

response to analysts' concerns about the rebuild's timing and cost—that it was "on pace," and "on schedule." ¶¶239-41, 243, 271. In reality, the Pori rebuild was a disaster and never "on track." As former employees who worked at Pori explained, Venator never **began** reconstruction on factory lines 1, 2, or 3 by March 2018 (¶245) and demolition— the step necessary for rebuilding to commence—was ongoing in July 2018, when Pori was abandoned. ¶246. FE2 described the rebuild as a "scam" and photographic evidence contradicts Defendants' claims of "on schedule" progress. ¶134. These statements are actionable. *See, e.g.*, *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 659-61 (W.D. Tex. 2006) (sustaining statement "[w]e believe that we will continue to execute on a well-defined plan"); *S.E.C. v. Strauss*, 2011 WL 1158783, at *3 (N.D. Miss. Mar. 28, 2011) ("on track" statements false where building had not begun); *Monroe Cty. Emps.' Ret. Sys. v. Southern Co.*, 2018 WL 1558577, at *15-16 (N.D. Ga. Mar. 29, 2018) (sustaining "on track" statement).

*Third*, Defendants misrepresented the impact of Pori's closure on rising TiO2 prices and instead falsely told investors that Venator benefitted from increased TiO2 *demand*— omitting the highly material fact that Pori's closure eliminated all Pori *supply*, and that this drove prices up. ¶¶148-49, 177. For example, Venator told investors that its results were driven by "continued improvement in business conditions for TiO2" (¶249), and higher TiO2 selling prices driven by "solid" and "good demand across the market." ¶¶109-11, 252; *see also* ¶¶251, 254, 255-56. Analysts credited these representations, concluding that this "cycle peak appears more sustainable" than the last, as "[m]anagement continues to see a positive picture of the up-cycle: solid demand growth." ¶257; *see also* ¶¶114-15, 147.

15

These statements are actionable. *Kaltman*, 447 F. Supp. 2d at 660-61 (company poised to benefit from upcycle)**.**

**Fourth**, Defendants falsely claimed that the Company's insurance would fully offset reconstruction costs and lost profits—obscuring that insurance proceeds were funding Venator's secret Europe-Pori Shuffle. ¶¶97-98, 126, 132, 141, 244, 259-78. Defendants' statements that Venator was paying a "fast track premium" to restart production further obscured the Europe-Pori Shuffle and convinced investors that production would return on their false timeline when, in reality, no progress on the rebuild had occurred. ¶¶146-47, 244, 259-78, 325-27, 338-40. These statements are actionable. *See, e.g.*, *In re TETRA Techs. Inc. Sec. Litig.*, 2009 WL 6325540, at *33-35 (S.D. Tex. Jul. 9, 2009) (sustaining statements concerning insurance coverage).

### B.    Defendants' Falsity Arguments Are Meritless

In the face of the Complaint's well-pleaded allegations, Defendants' arguments fail.

### 1.    Defendants' 20% Capacity Representations Are Actionable

In arguing their "capacity" statements are not actionable, Defendants disregard their own representations to investors about the meaning of that term. ¶¶61-70. As Venator disclosed in the IPO and SPO offering materials, when Venator closed the "black end" of its Calais, France plant—but kept the "white end" (or "finishing" portion) open—Calais lost all production capacity. ¶¶64-68. Because only the finishing portion of one of Pori's four production lines was performing after the fire, it was no different than Calais—except, unlike Calais, Pori's finishing operations were barely intact. As such, Defendants' representation that Pori had "achieved" "20% capacity" was false. ¶¶101-44.

16

Analysts relied on these representations, unaware that Pori could only "finish" TiO2. For example, one analyst asked about raw material ore costs in connection with the Pori rebuild—which makes sense only if the analyst understood Pori was turning iron ore into TiO2 instead of just "finishing" it. ¶155. In response, Turner explained, "There will be some *nominal*—not ores, but some raw semi-finished TiO2 to brought into the finished operation during 2018, *a small portion*"—further (falsely) reinforcing the impression that Pori was operating at 20%. *Id.* Analysts modeled the impact of Pori's 20% capacity in valuing Venator, and when Venator revealed Pori's closure—and that its supposed capacity generated no profit—analysts were surprised, downgraded their ratings, and Venator stock declined in a statistically significant manner. ¶¶155-60, 165-81, 220.

Ignoring these facts, Defendants cite FE1 to argue that because Pori was "finishing" 17% of what it produced start-to-finish before the fire, their capacity statements were immaterial. DM18. Not so. FE1 made clear that Pori could only "finish" half-finished product from Italy, and that "finishing" is different from manufacturing. ¶¶142-43. Moreover, even Pori's minimal finishing activity never reached the 20% produced start-to-finish before the fire. As FE2 explained, the amount of unfinished product shipped from Italy was below levels needed to generate 20% and Pori employees on the finishing line laughed at the notion it was operating at 20% (¶¶144, 221)—a fact confirmed by numerous other Venator employees. ¶¶131, 133.

Defendants' argument that "analysts understood that plants do not run at full available capacity" (DM18) wrongly equates product "finished" at Pori post-fire with TiO2 produced start-to-finish beforehand. In fact, the report Defendants cite confirms this, as it

17

models the impact of the Pori closure assuming Pori was *producing* 20% of its prior capacity, not just "finishing" it. DX13 at 1.

Next, Defendants seek dismissal by citing a statement Peter Huntsman made to Huntsman investors nearly six months before Venator's IPO indicating Pori would be "restarting the white end of this facility gradually over the next two months" using raw material from other sites. DX17 at 4. Defendants omit the following sentence, however, in which Peter Huntsman said that restoring the "black end of the Pori site will most likely take several months beyond that" and "as soon as we're in a position to more definitely tell the market a firmer date, we will"—exactly what Venator did by falsely telling investors that Pori had achieved 20% capacity by the time of the IPO. ¶¶90-93, 108; DX17 at 4. Indeed, Huntsman's statement that the "black end" of Pori would take "several months" to restore—and that the IPO would not occur under any "uncertainty"—affirmed for investors that Pori had in fact reached 20% at the time of the IPO six months later. DX 17 at 4.

Similarly, Defendants incorrectly argue that their disclosure indicating that a "portion of [Pori's] white end production became operational *during* the second quarter of 2017" renders their misrepresentations immaterial. DM19. This is wrong. The IPO materials represented that 20% production capacity had been achieved by the end of the second quarter, and the same filing clarified that "finishing" TiO2 results in no additional capacity. ¶¶61-70. The most natural reading of these two statements is that white-end production became operational *during* the second quarter—and full start-to-finish 20% capacity by the end of that quarter. The statements are not contradictory, and are in fact consistent with the timeline Peter Huntsman provided to investors in February 2017.

18

*Spitzberg* is directly on-point. 758 F.3d at 680. There, plaintiffs alleged that defendants' statement describing "reserves of 1 to 4 billion barrels" was misleading by communicating to investors that geological testing had been conducted based on industry uses of the term "reserves." *Id.* at 680-81. Defendants countered that they had not "explicitly represent[ed] that any drilling had yet occurred," that other references to drilling were ambiguous, and that "no investor would understand or did understand the term 'reserves' to mean 'reserves' as defined by the [industry]." *Id.* The Fifth Circuit rejected this argument, citing *Tellabs*' instruction that courts must "accept all factual allegations" as true (*id.* at 684 & n.10) and explaining defendants' reading involved an "industry-specific and inherently fact-bound proposition [that] cannot be verified on the face of the pleadings" (*id.* at 690) and, at minimum, presented an "obvious" danger of misleading investors. *Id.* at 684.

*Spitzberg* applies with particular force here. Not only did industry professionals understand "capacity" as encompassing the entire process (¶¶61-70), but Defendants used this term in this way to describe Venator's Calais facility in the same SEC filing. ¶¶65-68. Defendants cannot now claim investors should have discerned an entirely different meaning as a matter of law. *Spitzberg*, 758 F.3d at 690; *see also Kohut v. KBR, Inc.*, 2015 WL 11995250, at *22-23 (S.D. Tex. Sept. 3, 2015) ("industry-specific practices . . . 'necessarily entail fact-intensive inquiries [that] cannot be resolved' at the pleading stage").

Last, Defendants claim their description of Calais's "zero" capacity was justified because Venator "expected" Pori to regain full capacity in the future—while the decision to close Calais had already been made—and because Venator told investors that Pori was

19

only manufacturing "specialty" products.  DM20-21.  But the Complaint alleges Defendants had the opposite "expectation" (¶¶84-89, 130-46), and Venator never disclosed this supposedly critical distinction.  *See, e.g.*, *Carlton v. Cannon*, 184 F. Supp. 3d 428, 473 (S.D. Tex. 2016) (looking to plaintiffs' allegations to interpret meaning).  Further, Venator's disclosure to investors that Pori was producing only "specialty" products did not reveal that Venator was merely "finishing" them, as Defendants' exhibits make clear.  *See, e.g.*, DX15 at 28.  If anything, Defendants' reference to "specialty" products further lulled investors into trusting Defendants' timeline.  ¶¶58-59, 109-10, 153-60, 224-46.  Finally, these arguments also fail because Defendants' omitted that other facilities were operating beyond capacity to produce TiO2 that was shipped to Pori.  ¶¶119, 122, 222, 317, 320.

### 2.      Defendants' Timeline And "On Track" Progress Assurances Are Current And Past Statements Of Fact And Otherwise Actionable

Defendants claim that their statements concerning the Pori timeline—to restore "20% capacity in the second quarter of 2017," 40% in the second quarter of 2018; and full capacity at the end of 2018 and that they were "on track" to do so—are inactionable "opinions" or "forward-looking."  *See* DM22-23.  This argument fails because these statements were: (i) not forward-looking; (ii) not accompanied by meaningful cautionary language; (iii) omitted highly material facts that rendered any purported "opinions" actionable, and (iv) made with actual knowledge of their falsity.  *Lormand*, 565 F.3d at 243.

*First*, many of the "timeline" statements are *not* forward-looking but concerned present or historical statements of existing facts.  *See, e.g.*, ¶¶161 ("We *continue* to make

20

progress [and] *currently* have 20%"); 163 ("*still generally in line*"); 235 ("*on pace*"); 237 (same); 238 (same).  These statements are not protected.  *See Rihn v. Acadia Pharms. Inc.*, 2016 WL 5076147, at *6 (S.D. Cal. Sept. 19, 2016); *In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 267 (E.D.N.Y. 2002).

*Second*, Defendants' other "progress" statements contain mixed forward-looking and actionably false historical aspects and lacked sufficient cautionary language.  For example, the statement in the August IPO that Venator "expected" Pori to return to full production in phases, with "20% capacity in the second quarter of 2017"—*i.e.*, in June 2017—misrepresented historical fact because Pori never achieved 20%, let alone a full month before this statement was made.  As the Fifth Circuit held in *Spitzberg*, here, because Pori never reached 20% capacity, Venator's 20% statement was backward-looking, and actionably false.  *Spitzberg*, 758 F.3d at 691-92 (mixed statements with future and "backward-looking" aspects actionable); *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141-42 (9th Cir. 2017) (adopting Fifth Circuit standard and refusing to protect historical statements "combine[d]" with forward-looking ones).

Further, any forward-looking elements in Defendants' "timeline" statements were unaccompanied by sufficient cautionary language.  As the Ninth Circuit explained:

> For cautionary language accompanying a forward-looking portion of a mixed statement to be adequate under the PSLRA, that language must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward-looking statement. Where, as here, forward-looking statements are accompanied by non-forward-looking statements about current or past facts, that the non-forward-looking statements are, or may be, untrue is clearly an "important factor" of which investors should be made aware.

21

*Quality Sys.*, 865 F.3d at 1148 (given misrepresentations concerning "current state" of sales, "virtually no cautionary language short of an outright admission" would suffice). Here, after repeatedly misrepresenting that Pori had 20% capacity—despite achieving none—only an "outright admission" of falsity would have sufficed. Instead, Venator's cautionary language—to the extent it mentioned Pori—further bolstered the false notion that Pori had achieved 20%. DM22-23; ¶¶ 328-30, 341-43; *Lormand*, 565 F.3d at 244-45 (warnings containing "litany of generally applicable risk factors" not meaningful); *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994) (defendants "must disclose material, firm-specific adverse facts" impacting validity of prediction); *Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 598 (W.D. Tex. 2014) (language failing to disclose risks of company-specific strategy not meaningful).

Nor are Defendants' "on track" statements protected opinions. An opinion is actionable where predicated upon an untrue supporting statement of fact, or if the statement omits material facts about the speaker's inquiry into or knowledge about it. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). Defendants' purported opinions here were either (1) predicated upon false supporting statements of fact regarding Pori's supposed 20% capacity or (2) omitted material facts undermining the opinion. Those facts include that: (i) only one portion of one of Pori's four production lines operated, and only in part; (ii) no reconstruction progress had been made and even the demolition (the step required before reconstruction could begin) was not completed before Pori was abandoned; and (iii) Venator's "fast-track premium"

22

reflected sums spent on the Europe-Pori Shuffle.  ¶¶126-27, 131-34; *see Omnicare*, 575 U.S. at 189-91.

Regardless, the Complaint alleges Defendants' actual knowledge, and thus the "timeline" statements are actionable even if deemed "forward-looking" or opinions.  *See, e.g.*, ¶¶84, 109, 135-38, 145, 194; *City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, 2016 WL 6075540, at *3 (W.D. Tex. Sept. 16, 2016) (defendants liable if "aware of undisclosed facts that would undermine . . . forward-looking statements"); *Cobalt*, 2016 WL 215476, at *5-6 (statements concerning wells' "potential" not protected where defendants knew limited potential).  Contrary to Defendants' argument, Plaintiffs neither demand Defendants' "clairvoyance" nor that they "present an overly gloomy or cautious picture of the company" (DM23); rather, the Complaint alleges Defendants "actually knew" their statements were misleading.  *Omnicare*, 575 U.S. at 184-85; *Lormand*, 565 F.3d at 244.

### 3.    Defendants' TiO2 Price Statements Are Not Protected Opinions

Defendants do not really dispute that Pori's closure caused a supply drought and surge in TiO2 prices—as a federal court concluded.  Instead, they wrongly claim that their statements attributing the rise in TiO2 prices to a "sustained" increase in *demand* are protected opinions.  DM24-25.  This is wrong.

First, this argument is premised on Defendants' incorrect contention that "Venator's lost capacity at Pori . . . was fully disclosed to investors."  DM24.  To the contrary, Venator hid the relevant facts, misrepresenting that Pori was at 20% when, in fact, it was at zero. Nor do Venator's disclosures in the IPO that it "recently successfully implemented price increases" and that TiO2 prices fluctuate render their statements inactionable.  If anything,

23

these disclosures highlighted the importance of Venator management's views on pricing dynamics—as confirmed by analysts' repeated questions concerning those views. ¶¶114-15, 125-29, 155, 158-60, 257. The Supreme Court and Fifth Circuit have long upheld this type of statement. *See, e.g.*, *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093 (1991) (management statements "reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading"); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *9-10 (D.N.J. Aug. 6, 2019) (statements concerning drivers of pricing actionable where defendant omitted fact that its conduct influenced pricing).

Defendants' effort to cast their statements that Venator was "well positioned" to take advantage of rising TiO2 prices as protected opinions similarly fails. Even if the opinions were honestly held—which, the Complaint alleges, they were not (¶¶130-45, 193-206)—they omitted material facts and are actionable under *Omnicare*. *See* §VII.C, *supra*. In reality, given that Pori had been destroyed and other Venator plants were forced to make up the slack, Venator was in about the worst position possible to take advantage of rising TiO2 prices. ¶¶222, 337; *see, e.g.*, *Omnicare*, 575 U.S. at 184-85; *Lormand*, 565 F.3d at 249 n.14 ("specific benefits" was misleading opinion); *Kaltman*, 447 F. Supp. 2d at 660-62 ("well positioned" statements actionable).

### 4. Defendants' False Accounts Of Insurance Proceed Expenditures Are Not Protected As Forward-Looking Or Opinions

As above, Defendants' false statements describing the expenditures and allocation of Venator's insurance proceeds are not protected as forward-looking or opinions. To the

24

contrary, Defendants' statements concerned then-existing facts—including that the "fast track premium" was actually spent on the Europe-Pori Shuffle and not rebuilding Pori—and omitted critical facts that any investor would have taken from them. ¶126. Defendants argue that Plaintiffs fail to identify what additional information they should have disclosed about the use of insurance proceeds (DM27), but the Complaint does just that. Defendants' statements omitted that Pori was producing no TiO2; the reconstruction of Pori never got off the ground; and Defendants spent millions on the Europe-Pori Shuffle. ¶¶135-46, 244-46, 278, 327, 340.

## C.　**The Complaint Adequately Alleges Scienter**

The Complaint is replete with detailed facts demonstrating Defendants knew their statements were false, or, at minimum, were severely reckless in making them.

***Pori's capacity and its rebuild were the central focus for investors and Defendants.*** Indisputably, Defendants publicly portrayed themselves as knowledgeable about Pori and the reconstruction timeline, its actual capacity, and the market for TiO2. They discussed these topics on every conference call during the Class Period, and investors were intently focused on them. *See* ¶¶123-28, 195-97, 208-78. Defendants further represented that they were monitoring Pori, and would provide frequent updates—which, considering its importance, supports an inference of scienter. ¶¶90-92, 152; *See In re Landry's Seafood Rest., Inc.*, 2001 WL 34115784, at *22 (S.D. Tex. Feb. 20, 2001) ("monitor[ing] the business continuously and closely. . . support[s] a strong inference"); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1258-60 (W.D. Wash. 2009).

25

Analysts and investors focused on the Company's most pressing challenge, repeatedly seeking accurate and more detailed information. *See, e.g.*, ¶¶91 (responding to questions, Peter Huntsman said IPO would not proceed unless there was "absolute clarity and certainty" about Pori); 113 (analyst and Turner discuss Venator's insurance expenditures); 124 (Turner responding to questions about "fast pace to restore" Pori); 162-63 (analysts asking Turner and Ogden to elaborate on "confidence" about Pori rebuild estimate and allocation of insurance); 170 (analyst's frustration at Ogden's refusal to answer questions); 175-76 (in-depth discussions about Pori). Analysts credited Defendants' statements, repeating them—often verbatim—in reports assessing Venator. *See, e.g.*, ¶¶125, 127, 129, 158-60, 164, 172, 179.

These facts are highly probative of scienter. *See, e.g.*, *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 856 (N.D. Tex. 2018) ("in-depth discussions" with analysts shows scienter); *Inst. Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269-70 (3d Cir. 2009); *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014) ("the inference that [defendant] did not have access to the corrosion data is directly contradicted by the fact that she specifically addressed it in her statement"); *S. Ferry*, 687 F. Supp. 2d at 1259-60; *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015). Defendants evaded analysts' questions (¶¶155, 170-71, 188, 270-72), which also bolsters scienter. *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 571 n.28 (S.D.N.Y. 2011).

***Defendants had detailed information contradicting their public statements.*** Defendants had specific information about the reconstruction, Pori's actual capacity, and the Europe-Pori Shuffle. For instance, Defendants Turner and Maiter attended weekly

26

internal meetings and were provided with reports—created by the task force handling the Pori outage—which tracked the plant's reconstruction, capacity, and efforts to supply TiO2 to Venator customers.  ¶¶145, 135-38.  These reports detailed each production line's capacity, the results of the Europe-Pori Shuffle, and resulting production plans.  ¶¶137, 145, 193.  Defendant Maiter admitted during the Class Period that he knew about the Europe-Pori Shuffle and explained that even the "finishing" process at Pori was not fully intact (¶138) and Venator executives met monthly with insurers to review site activity. ¶194.  Defendants Huntsman, Turner and other senior executives visited Pori weeks after the fire (¶84) and several weeks after the IPO (¶109), where they saw Pori's destruction— and the lack of progress on the rebuild—firsthand.  Photographs taken months later confirm what they saw.  ¶134.  These are "classic" facts demonstrating scienter. *See, e.g.*, *Marcus v. J.C. Penney Co., Inc.*, 2015 WL 5766870, at *6 (E.D. Tex. Sept. 29, 2015) (monthly meetings); *Brody v. Zix Corp.*, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006) (tracking reports); *In re OCA, Inc. Sec. & Deriv. Litig.*, 2006 WL 3747560, at *20 (E.D. La. Dec. 14, 2006) ("virtually impossible to believe" defendants did not know falsity of statements about "most important asset"); *Fla. State Bd. Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) (describing "classic" scienter fact pattern).

   *Pori was critical to Venator's business*.  The importance of Pori to the Company's business bolsters scienter.  Pori manufactured Venator's most profitable products, including those could not be made elsewhere; accounted for 17% of the Company's total TiO2 capacity; and was just one of eight plants but secretly generated *over one-third* of Venator's profits. ¶¶24, 67, 138, 198, 200.  The Company ultimately spent over $1

27

billion—nearly triple Venator's market capitalization—on Pori and efforts to manufacture the appearance of capacity. ¶199.  These were the Company's most significant expenses ever, and it is implausible to suggest that its CEO and CFO were blind to them.  *See, e.g.*, *Stone*, 26 F. Supp. 3d at 600 (statements about most important product show scienter); *In re Triton Energy Ltd. Sec. Litig.*, 2001 WL 872019, at *11-12 (E.D. Tex. Mar. 30, 2001) (strong inference where fraud involved "most important assets").

***Defendants closely tracked the expensive and logistically complex Europe-Pori Shuffle***.  Defendants closely tracked the Europe-Pori Shuffle which, as FE5 described, was undertaken just weeks after the fire when they realized Pori could not manufacture TiO2 (¶136) and closely monitored this "makeshift approach." ¶¶137-38, 145-46.  Such an expensive, extreme departure from the Company's normal operations would not have escaped senior executives' attention and, as numerous former employees described, it was undertaken and tracked at their direction.  *See, e.g.*, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342 (5th Cir. 2008) (misrepresented information important to company's health probative of scienter); *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005).

***Defendants had a powerful motive to mislead.***  Peter Huntsman and the Huntsmans were personally motivated to mislead investors.  By misrepresenting Pori's true capacity and the rebuild status, Huntsman obtained over $1.7 billion in proceeds, halved its leverage ratio, and obtained an investment grade rating that enabled it to pursue a merger that would have installed Peter Huntsman as CEO of the world's second largest chemical company. ¶¶202, 206.  Moreover, by spinning off Venator to public investors at a tremendous premium, the Huntsman family avoided over $150 million in losses. ¶¶204-05.  Turner and

Ogden—longstanding Huntsman management installed as the senior leadership at Venator—were generously compensated for their "contributions" to the separation and Peter Huntsman made nearly $17 million in compensation, the most he ever made as CEO. ¶¶203-06. These allegations support scienter. *See Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference").

### D.        Defendants' Scienter Arguments Are Meritless

In response to these detailed allegations, Defendants ask the Court to infer that Defendants lacked knowledge of the reality at Pori and were simply surprised when "the reconstruction of Pori proved to be more costly and time consuming than originally anticipated." DM33. Considering the importance of Pori, this is implausible. Defendants' counterfactual narrative finds no support in the Complaint, requires the Court to disregard well-settled law, and should be rejected.

### 1.        Ogden and Turner's Scienter Is Highly Particularized

Ignoring the Complaint, Defendants contend that Plaintiffs' scienter allegations directed at Turner and Ogden are too generalized, rest solely on Defendants' positions in the Company, and should be discounted even though their statements concerned the most important issue facing the Company. DM30. Defendants are wrong.

*First*, the Complaint provides "meaningful particulars"—notably, that Turner attended "weekly" meetings "to discuss the status of the rebuild of Pori and the efforts Venator's sales team," and "key findings and updates discussed" were reported directly to Turner. ¶193. Moreover, other Venator employees corroborated FE5's account— including four who worked at Pori before and after the fire, who provided the very

29

information about Turner and Ogden's knowledge that this Circuit routinely upholds.  For example, FE5, the Director of Supply Chain in Venator's Specialty Business Unit from 2017 until 2018, was involved in the task force responsible for tracking, directing and reporting on the Europe-Pori Shuffle.  ¶¶55, 136-37.

Four other employees corroborated FE5's account, yet Defendants do not challenge their statements—all of which satisfy this Circuit's standards for witness statements.  These include FE1 (reported that Pori only finished produced and that "finishing" TiO2 was different from producing) (¶¶51, 78, 82, 134, 142-43); FE2 (reported that no construction occurred and that demolition was ongoing when Pori was abandoned, that Company just pretended to do something "to collect money from …insurance," and employees laughed at the notion that Pori operated at 20%) (¶¶52, 78, 81-82, 134, 132, 144, 221); FE3 (20% "did not reflect reality") (¶¶53, 133); and FE4 (left Company because of concerns about lack of disclosure about Pori and that Venator was using insurance prop up finances) (¶¶54, 139-41).

The strength and consistency of these highly particularized accounts bolsters the inference of scienter as to Turner and Ogden's knowledge—particularly in light of the subject's importance and analysts' interest in them.  *See Cobalt*, 2016 WL 215476, at *3-6.  *Abrams v. Baker Hughes, Inc.* is inapposite because, there, the court held that "plaintiffs have not pointed to any particular reports or information."  292 F.3d 424, 433 (5th Cir. 2002).  Here, conversely, senior management established meetings "for the specific purpose of tracking and handling the rebuild efforts," which contained detailed information about the secret Europe-Pori Shuffle and Pori's lack of capacity.  ¶¶136-37, 145, 193.

30

*Next*, Defendants wrongly claim that Pori's importance to investors contributes nothing to scienter and that Turner and Ogden's scienter rests solely on their positions at the Company.  Not so.  Allegations concerning issues that are critical to a business and Turner and Ogden's professed expertise demonstrates scienter.  *See* §VII.C, *supra*. Defendants' suggestion that the Complaint relies on Turner and Ogden's positions ignores the Complaint—the two attended meetings and received reports regarding the status of the Pori rebuild and the Europe-Pori Shuffle (¶¶136-37, 145, 193); met monthly with the Company's insurers concerning "site activity" (¶¶194); tracked TiO2 price dynamics (¶¶154, 194, 249-52, 256-57); and conveyed exactly this knowledge to investors.  If anything, Defendants' argument that their knowledge derives from their involvement in efforts to restart production of "specialty products at Pori" (DM31-32) supports Plaintiffs.

Defendants' cases are inapposite. *Cf. Rosenzweig v. Azurix, Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) (no scienter when company accurately disclosed capital structure and obligations); *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes*, 810 F.3d 951, 957-58 (5th Cir. 2016) (no facts showing executives knew *any* relevant information); *Neiman v. Bulmahn*, 854 F.3d 741, 750 (5th Cir. 2017) (no basis for CW's allegation of knowledge or inference that defendant would "parse through data for . . . hundred or so wells" to discover contrary information).

### 2.    The Huntsman Defendants' Motive and Maiter's Scienter Are Highly Relevant And Attributable to Venator

Citing no law, Defendants wrongly claim that Peter Huntsman's motive to unload the damaged pigments business through the Venator offerings is "irrelevant."  DM32.  This

is wrong.  To the contrary, under Fifth Circuit precedent, Peter Huntsman's scienter—and his motivation (among other things) to avoid over $150 million in losses to his family's fortune—is attributable to Venator.  ¶¶204-06.  The notion that the state of mind of the person most responsible for the Venator IPO—and its Board chair—did not "approve" or "furnish information" for purposes of Venator's statements under *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 365 (5th Cir.2004), departs dramatically from settled law, is illogical, and should be rejected.  *See, e.g.*, *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 883-85, 888 (W.D. Tex. 2014) (scienter and motive of rogue employee who furnished information imputed to company; CEO and CFO's separate desire to report "signs of progress" also established motive) *interlocutory appeal denied at* 2014 WL 4337860 (W.D. Tex. Sept 2, 2014).

The same is true of the other Huntsman Defendants.  ¶¶84-88, 204-06**.**  Contrary to Defendants' argument (DM33), Huntsman's retention of some equity in Venator does not negate its motivation to reap $1.7 billion in proceeds through the offerings.  That motivation is also confirmed by the objective facts that, after Huntsman recognized the impact of the fire, it elected to dispose of the business to public investors (instead of to existing shareholders), accelerated the timeline for the IPO, and then hurriedly conducted the SPO two months earlier than planned.  ¶¶84-88, 94-95, 100, 110, 116.  This hardly suggests innocence.  *Stone*, 26 F. Supp. 3d at 606-07 (selling 30% stake while retaining 50% position established motive).

Defendant Maiter was the senior-most executive involved in Pori's operations, and he closely tracked and admitted his knowledge of the Europe-Pori Shuffle, attended

32

meetings with Defendant Turner about Pori, provided "input" into investor presentations, and sought to keep sealed information about Pori. ¶¶138, 190. His scienter is also attributable to Venator. *See Active Power*, 29 F. Supp. 3d at 883-85; *see also* Plaintiffs' PJ Opp. at 10-12.

### 3. Overwhelming Facts Concerning Defendants' Knowledge About Pori Establish A Cogent And Compelling Inference Of Scienter

Defendants claim they failed to appreciate the extent of Pori's problems, and reported news to investors when they obtained it. DM33. But the Complaint's well-pled allegations—which the Court must take as true—do not permit that inference. Accepting Defendants' counterfactual narrative requires disregarding the facts that Huntsman accelerated the IPO timeline after learning about the fire damage; conducted the IPO without completing its investigation into the fire (after telling investors it would not be conducted under any cloud of "uncertainty"); and hurried the SPO after making repeated assurances about Pori's capacity, the progress of reconstruction, the use of insurance proceeds and TiO2 pricing that were not true. And while Defendants claim "it made zero sense" to spend hundreds of millions of dollars on Pori if they did not believe it have been rebuilt, under Fifth Circuit law, Defendants' subjective belief about Pori's ultimate return is "*irrelevant*" to their scienter for false statements concerning, *inter alia*, Pori's capacity. *See Spitzberg*, 758 F.3d at 685-86 (reversing dismissal on scienter grounds, holding that even if "illogic[al]" to spend funds on testing if defendants did not believe wells would produce oil, those facts were "irrelevant" as to whether defendants misled investors regarding testing).

33

### 4.    The Complaint Does Not Rely On Group Pleading

Last, Defendants argue the Complaint relies on group pleading, running afoul of the requirement that corporate statements be attributable to individual(s) who possess scienter. This is wrong.  While the Complaint utilizes the phrases "Venator executives," "Venator," or "Defendants" to describe the speaker of certain statements, indisputably, "a particular corporate officer was responsible" for making each one.  For example, each of 13 "unattributed misrepresentations" Defendants cite (DM29) was included in an investor presentation (¶¶210, 211, 218, 228, 229, 237, 262) or press release (¶¶212, 230, 235, 241, 266, 272) or in a call during which Turner or Ogden made the same or a substantially similar statement—which more than sufficiently "links" them under *Southland*.  *See, e.g.*, ¶¶213 (Ogden: "already running at 20% capacity"); 214 (Form 10-Q signed by Ogden, Turner); 216 (Turner: "20% of the site's prior total capacity is available"); 219 (Turner: "20%"); 231 (Ogden); 234 (Turner); 238 (Turner); 239 (Turner); 263 (Ogden); 269 (Turner); 275 (Turner).  Indeed, every press release Defendants cite (¶¶212, 230, 235, 241, 266, 272) includes direct quotations from Turner.

Similarly, Defendants cite to six paragraphs of the Complaint to support their contention that Plaintiffs improperly "rely on general allegations about what 'Defendants' or 'Venator' supposedly knew" (DM29), ignoring the rest of the Complaint.  *See* §VII.C, *supra*.  In short, the Complaint fulfills *Southland*'s requirement to allege responsibility for statements in corporate documents.  365 F.3d at 365.

### E.   Plaintiff's Securities Act Claims Are Timely

Claims under the Securities Act must be filed "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m.  Courts around the country have held that the "discovery standard" laid out by the Supreme Court in *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010) applies to Securities Act claims, which holds that the statute of limitations begins to run when a "reasonable plaintiff would have ***discovered sufficient information*** [through investigation] to plead a securities-law violation." *See, e.g.*, *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017); *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 273 (3d Cir. 2013).

Here, Plaintiff did not and could not have discovered sufficient information to plead a securities law violation until, at the very earliest, October 2018, after Venator disclosed that Pori would be shut down, first publicly indicated Pori was not operating at 20%, and revealed that costs would exponentially exceed insurance limits.  These events occurred less than a year before Plaintiffs filed their Complaint on July 31, 2019.

The statute of limitations for Plaintiffs' claims could not have begun running in August 2017—upon Venator's filing of its IPO offering documents—or in October 2017—before the SPO and upon Venator's disclosure of revisions to the timeline to rebuild Pori. DM35.   Defendants' illogical argument suggests Plaintiffs' claims expired before Defendants made most of their false statements.  This is not the law.  Plaintiffs could never have uncovered "sufficient information" to plead Securities Act claims while Defendants

35

were misrepresenting that Pori at 20%. ¶¶114, 115, 257. At best, Defendants' argument raises an issue of fact that cannot be decided here. *See Cobalt*, 2016 WL 215476, at \*9-10. Notably, Defendants neglect to disclose that the Texas state court rejected this argument based on a complaint filed five months earlier than this one. ¶191. It should be rejected here too.

**F.**  **Plaintiff Has Standing To Assert Claims Under Section 12(a)(2) Of The Securities Act**

The Complaint adequately pleads Plaintiffs' standing to assert claims under Section 12(a)(2). Plaintiffs have submitted sworn certifications providing their transactions and showing they bought shares of Venator stock in Venator's public offerings (ECF No. 4-2), a Joint Declaration affirming that fact (ECF No. 4-6), and the underwriter defendants know they sold directly to Lead Plaintiff. Defendants concede that the Complaint alleges that "each Plaintiff purchased Venator common stock 'traceable to the IPO' and 'in the SPO'" (DM36), and the Huntsman entities and Venator itself were actively and directly involved in the offerings, thus soliciting Plaintiffs' purchases. ¶¶84-88, 93-95, 100, 116, 358, 368. This is sufficient. *See, e.g.*, *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 370-71 (5th Cir. 2001); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 549-50 (N.D. Cal. 2009) ("Whether or not defendants actually solicited plaintiffs' sales is a factual question which should generally be left to the jury").

Defendants' reliance on *Rosenzweig* is misplaced, as that case concerned plaintiffs' aftermarket purchases—not like Lead Plaintiff here, whose certifications show they purchased directly in the offerings, at the offering price on the dates of the offerings. 332

36

F.3d at 871; ECF No. 4-2.  To the extent the Court requires more, Plaintiffs respectfully request leave to amend their Complaint to identify from whom Plaintiffs bought their IPO and SPO shares.  *Schlotzsky's*, 238 F.3d at 370-71.

### G.      The Complaint Pleads Control Person Claims

To state a claim under Section 20(a) of the Exchange Act or Section 15 of the Securities Act, a plaintiff must allege primary violation and that the control-person defendant had actual power and influence over the primary violator—allegations that are subject to Rule 8 notice pleading. *See TETRA*, 2009 WL 6326865, at *1.  Except for Huntsman, Defendants' only control person argument is that Plaintiffs have not alleged a primary violation—which, as set forth above, fails.

As to Huntsman, Plaintiffs have alleged its control given that Huntsman (i) "controlled the public dissemination of the [] false statements," (ii) controlled Venator and its board of directors through its 55% share ownership; (iii) controlled Venator's internal functions, including its "tax decisions," (iv) used its power to cause Venator to register and offer securities for sale—and indeed, was the driving force of the IPO and SPO at the heart of this case. ¶¶39, 84-88, 93-95, 100, 116, 202-06. Huntsman's CEO, Peter Huntsman, is the chair of Venator's Board, two of the other four Board members are former Huntsman employees or board members, and Huntsman hand-picked Venator's senior executive team, including Defendants Turner, Ogden, and Maiter (all of whom served in high-ranking positions at Huntsman for years before the IPO).  ¶¶24-27, 29, 31, 34-35, 300.  Far less compelling facts of control are routinely sustained by courts, and they should be upheld

here.  *See, e.g.*, *McNamara v. Bre-X Minerals Ltd.*, 46 F. Supp. 2d 632, 636-37 (E.D. Tex. 1999).

## VIII.  CONCLUSION

For these reasons, Defendants' motion to dismiss should be denied in its entirety. If the Court chooses to dismiss, Lead Plaintiff respectfully requests leave to amend.

Dated: March 24, 2020                    Respectfully submitted,

*/s/ Michael D. Blatchley*
Michael D. Blatchley, Attorney-in-Charge

**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**
Hannah Ross (*Pro Hac Vice Forthcoming*)
Michael D. Blatchley (*Pro Hac Vice*)
Kate W. Aufses (*Pro Hac Vice*)
Nicholas Gersh (*Pro Hac Vice*)
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
Hannah@blbglaw.com
MichaelB@blbglaw.com
Kate.Aufses@blbglaw.com
Nicholas.Gersh@blbglaw.com

*Counsel for Lead Plaintiff and Lead Counsel
for the Class*

Thomas R. Ajamie
Texas Bar No. 00952400
Southern District Bar No. 6165
John S. "Jack" Edwards, Jr.
Texas Bar No. 24040851
Southern District Bar No. 38095
**AJAMIE LLP**
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, Texas 77002

38

Tel: (713) 860-1600
Fax: (713) 860-1699
tajamie@ajamie.com
jedwards@ajamie.com

*Liaison Counsel for Lead Plaintiff*

Robert D. Klausner (*Pro Hac Vice Forthcoming*)
**KLAUSNER KAUFMAN JENSEN**
 **& LEVINSON**
7080 Northwest 4th Street
Plantation, FL 33317
Tel: (954) 916-1202
bob@robertdklausner.com

*Additional Counsel for City of Miami General Employees' & Sanitation Employees' Retirement Trust*

Cynthia J. Billings-Dunn (*Pro Hac Vice Forthcoming*)
**ASHERKELLY**
25800 Northwestern Highway
Suite 1100
Southfield, MI 48075
Tel: (248) 746-2747
cbdunn@asherkellylaw.com

*Additional Counsel for the City of Pontiac General Employees' Retirement System*

39

## CERTIFICATE OF WORD COUNT

I certify that the total number of words in the response, exclusive of the caption, prefatory tables, signature block, and the required certifications, is 9,989 words.

*/s/ Michael D. Blatchley*
Michael D. Blatchley

## CERTIFICATE OF SERVICE

I certify that on March 24, 2020, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF Filing System.

*/s/ Michael D. Blatchley*
Michael D. Blatchley

40