UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE: VENATOR MATERIALS PLC SECURITIES LITIGATION | No. 19 Civ. 3464<br>Hon. Charles R. Eskridge III<br><br>**Oral Argument Requested** |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION
TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

April 14, 2020

**TABLE OF CONTENTS**

*Page*

I. Plaintiffs Fail to Show That Statements About Pori's "Capacity" Were False or Misleading ............................................................................ 1

II. Plaintiffs Fail to Show That Any Other Statements Were False or Misleading ............................................................................................ 5

    A. Statements About the Anticipated Timeline for the Rebuild Are Not Actionable ............................................................. 5

    B. Statements About the Cause of Rising TiO2 Prices Are Not Actionable .................................................................................. 7

    C. Statements About Insurance Are Not Actionable ......................................... 8

III. Plaintiffs Fail to Identify Any Particularized Facts Supporting a Strong Inference of Scienter ................................................................. 9

    A. Plaintiffs Do Not Adequately Plead That Turner and Ogden Acted With Scienter ...................................................................... 9

    B. Plaintiffs' Allegations About Peter Huntsman and Mahomed Maiter Are Insufficient to Plead Corporate Scienter ........... 11

IV. Plaintiffs Fail to Establish That Their Securities Act Claims Are Timely ............. 14

V. Plaintiffs Fail to Establish Standing Under Section 12(a)(2) ................................ 14

VI. Plaintiffs Cannot Save Their Control Person Claims ............................................. 15

**TABLE OF AUTHORITIES**

*Page(s)*

*Abrams* v. *Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ................................................................................ 10

*In re Alamosa Holdings, Inc.*,
382 F. Supp. 2d 832 (N.D. Tex. 2005) .......................................................... 12

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) ........................................................... 4

*Carlton* v. *Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) ............................................................ 15

*Goldstein* v. *MCI WorldCom*,
340 F.3d 238 (5th Cir. 2003) .......................................................................... 15

*Ind. Elec. Workers' Pension Tr. Fund IBEW* v. *Shaw Grp., Inc.*,
537 F.3d 527 (5th Cir. 2008) ...................................................................... 4, 11

*Lee* v. *Active Power, Inc.*,
29 F. Supp. 3d 876 (W.D. Tex. 2014) ............................................................. 12

*Local 210 Unity Pension & Welfare Funds* v. *McDermott Int'l Inc.*,
2015 WL 1143081 (S.D. Tex. Mar. 13, 2015) ............................................... 10

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund* v. *Diodes, Inc.*,
810 F.3d 951 (5th Cir. 2016) .......................................................................... 11

*Lormand* v. *US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ............................................................................ 7

*McNamara* v. *Bre-X Minerals Ltd.*,
46 F. Supp. 2d 632 (E.D. Tex. 1999) ............................................................. 15

*N. Port Firefighters' Pension--Local Option Plan* v. *Temple-Inland, Inc.*,
936 F. Supp. 2d 722 (N.D. Tex. 2013) ............................................................. 7

*Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ................................................................................ 2, 5, 6

*Owens* v. *Jastrow*,
789 F.3d 529 (5th Cir. 2015) .......................................................................... 12

## TABLE OF AUTHORITIES
(*continued*)

*Pinter* v. *Dahl*,
    486 U.S. 622 (1988) .................................................................................. 14

*Rosenzweig* v. *Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ..................................................................... 14

*Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*,
    365 F.3d 308 (5th Cir. 2004) ..................................................................... 13

*Spitzberg* v. *Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ....................................................................... 5

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................. 13

Plaintiffs largely ignore Venator's extensive disclosures about the risks and uncertainties associated with the reconstruction of its Pori facility and fail to show that any statements about Pori were false or misleading, let alone identify particularized factual allegations creating a *strong inference* that anyone responsible for those statements acted with scienter. The focal point of Plaintiffs' case is the statement in the IPO offering documents that Venator expected to restart "approximately 20% capacity" at Pori in the second quarter of 2017. Plaintiffs return to that statement (and later repetitions of it) in defending every aspect of their case. Plaintiffs' contention that this statement implied that Venator restarted "start-to-finish" production at Pori in the second quarter of 2017 ignores Venator's explicit disclosures that only a portion of "white end" production was restored. Having failed to plead a false or misleading statement about Pori's "capacity," Plaintiffs' other categories of alleged misstatements fall away, as do their arguments that Venator's CEO (Turner) or CFO (Ogden)—or any other officer responsible for corporate disclosures—made a knowingly false statement or acted with extreme recklessness.

## I.     Plaintiffs Fail to Show That Statements About Pori's "Capacity" Were False or Misleading.

The opposition focuses on Venator's statement in the IPO offering documents that it "expect[ed] the Pori facility to restart in phases" beginning with "approximately 20% capacity in the second quarter of 2017." (DX1 14.) According to Plaintiffs, this statement "falsely represented that Pori was operating at '20% capacity'" and that "this capacity had been 'achieved' before the IPO" when, in fact, Pori could only "finish" TiO2. (Opp'n 14.)

Plaintiffs' argument ignores clear statements in the offering documents specifying exactly what capacity was restarted in the second quarter. *See Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) ("an investor reads each statement . . . in light of all its surrounding text"). Read as a whole as *Omnicare* requires, the offering documents make clear that the only "capacity" Venator expected to restore in the second quarter of 2017 was "a portion of [its] white end production." The IPO offering documents state:

- "We expect the Pori facility to restart in phases as follows: approximately 20% capacity in the second quarter of 2017; approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018." (DX1 14.)

- "We are committed to repairing the facility as quickly as possible and we anticipate a portion of our white end production will be operational during the second quarter of 2017 and full capacity to be available around the end of 2018." (DX1 24.)

Contrary to Plaintiffs' assertion (Opp'n 18), the "natural reading" of the offering documents' disclosures is that Venator "expect[ed]" or "anticipate[d]" that a portion of Pori's white end (*i.e.*, finishing) production would become operational in the second quarter, not "full start-to-finish" capacity. In fact, the offering documents later repeat that Venator "anticipate[d] a portion of [its] white end production will be operational during the second quarter of 2017." (DX23 at F11 (distinguishing "black end manufacturing" from "white end finishing").)

This reading is confirmed by other disclosures, both before and after the IPO. During a February 15, 2017 Huntsman earnings call, Peter Huntsman stated that "[w]hile we are still assessing the extent of the damage and time to repair, we will be restarting the

white end of [Pori] gradually over the next two months"—into mid-April—"using raw materials from other Huntsman facilities," and that "the more damaged black end of the Pori site will most likely take several more months beyond that," *i.e.* July or later. (DX17 4.)  Nowhere did Peter Huntsman say that black end production would be restarted in the second quarter of 2017.  In its July 2017 Form 10-Q for the second quarter, Huntsman confirmed *before* the IPO that only "a portion of [Pori's] white end production became operational during the second quarter of 2017."  (DX24 19.)  And, just a few weeks after the IPO, Venator disclosed in two separate places in its Form 10-Q for the second quarter that a "portion of our white end production became operational during the second quarter of 2017."  (DX2 11, 32.)  Neither company's Form 10-Qs for the second quarter said anything about restarting black end production during that quarter.  Given these explicit disclosures, Plaintiffs do not dispute that no analyst expressed surprise when Ogden stated on a September 2018 call that Pori would continue "finishing" interim product manufactured elsewhere.  (¶¶175, 179.)

Plaintiffs' reliance on Venator's disclosures about total nameplate capacity (*i.e.*, maximum production capability) is a red herring.  (Opp'n 16.)  The IPO offering documents stated that "until full repairs are made [at Pori], we have lost access to TiO2 nameplate capacity of up to 130,000 metric tons," Pori's pre-fire nameplate capacity. (DX1 80.)  Because Venator was committed to repairing Pori, however, Venator continued to include Pori's production capability in Venator's "total nameplate production capacity," while reiterating that Pori was "currently not fully operational."  (DX23 125-26.)  By contrast, Huntsman closed black end production at the Calais plant in 2015 and announced

in March 2017 that it planned to close Calais' white end production.  (DX1 80.)  Given the decision to close that facility, Venator excluded Calais from its future "total nameplate production capacity" in the IPO offering documents.  (DX23 125.)

Arguing that analysts were "unaware that Pori could only 'finish' TiO2" after the fire, Plaintiffs cite a comment by Venator's CEO during a February 23, 2018 earnings call.  (Opp'n 17.)  In response to a question about Venator's then-plan to restore the 60% of Pori's capacity devoted to specialty products by the end of 2018, Turner stated that there "will be some nominal, not ores, but some raw semi-finished TiO2 brought into the finished operation during 2018."  (DX8 10.)  That exchange about Venator's 2018 plan had nothing to do with the production restored at Pori in the second quarter of 2017.

Plaintiffs' assertion that Pori's "finishing activity never reached . . . 20%" of pre-fire capacity (Opp'n 17) does not state a claim.  According to "FE1," Pori was finishing product at 17% of its capacity at some point after the fire (¶142), which is consistent with Venator's disclosures that only a portion of white end production was restored.  Plaintiffs do not contend that 17% is materially different from the "approximately 20%" disclosed in the offering documents.  Nor can Plaintiffs predicate a claim on the allegations attributed to other former employees, none of whom purports to have known how much finished product Pori actually produced.  *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 720 (W.D. Tex. 2010) (discounting allegations where "CWs simply state their own conclusions" "without giving any meaningful details").

Plaintiffs' reliance on *Spitzberg* v. *Houston American Energy Corp.*, 758 F.3d 676 (5th Cir. 2014), is misplaced.  In *Spitzberg*, the Fifth Circuit held that a statement that an

-4-

oil field had "estimated recoverable reserves of 1 to 4 billion barrels" was false or misleading because it did not specify what was meant by "reserves" and its use of that term was inconsistent with an SEC-adopted, widely used industry definition. *Id*. at 688-89. Here, by contrast, Plaintiffs do not identify any common industry definition of "capacity" (Opp'n 19 (citing ¶¶61-70)), and unlike in *Spitzberg*, Venator made clear in its offering documents and elsewhere exactly what capacity was restored in the second quarter of 2017—a portion of Pori's white end production.

## II.    Plaintiffs Fail to Show That Any Other Statements Were False or Misleading.

### A.    Statements About the Anticipated Timeline for the Rebuild Are Not Actionable.

There is no dispute that Venator constantly reminded investors that "[w]e may experience delays in construction" (DX1 14; DX14 11) and that Venator repeatedly revised its initial estimated timeline for repairs as setbacks occurred. None of Plaintiffs' arguments explains how opinion statements about the estimated timeline are actionable under *Omnicare* or outside the protections of the PSLRA safe harbor for forward-looking statements and the bespeaks caution doctrine.

Ignoring Venator's post-IPO revisions to the initial anticipated timeline, Plaintiffs incorrectly suggest that Venator falsely reassured investors that repairs were "on track," "on pace" and "on schedule." (Opp'n 14-15.) Those statements, however, had nothing to do with the estimated timeline in the August 2017 offering documents. They instead related to Venator's revised plan, announced in October 2017, to restore Pori's 60% specialty capacity by the end of 2018, without any timeline for reintroducing the remaining

40% capacity; four months later, in February 2018, Venator stated that this revised plan was on track.  (¶¶123-25, 153.)

Relying on former employees' statements that reconstruction had begun on only one production line in March 2018 and that some demolition work was ongoing in July 2018, Plaintiffs improperly argue based on hindsight that earlier timeline estimates were false or misleading.  (Opp'n 15 (citing ¶¶ 245-46).)  Even accepting Plaintiffs' allegations as true, they do not show that Venator's estimates were not honestly held opinions when they were expressed.  Plaintiffs likewise cannot rely on two photographs of a portion of the Pori facility supposedly taken in April and May 2018 to show that any prior estimated timelines were not honestly believed when communicated to the market.  (*Id*. (citing ¶134).)  Nor do any of these allegations render Venator's projected timelines actionable by "identify[ing] particular (and material) facts going to the basis for the issuer's opinion" "whose omission makes the opinion statement at issue misleading."  *Omnicare*, 575 U.S. at 194.

Referring again to Venator's "capacity" statements, Plaintiffs argue that Venator's warnings that it could "experience delays in construction" "relative to the expected restart of [Pori]" (DX12 15; DX14 11) were insufficient because, after "misrepresenting that Pori had 20% capacity—despite achieving none—only an 'outright admission' of falsity would have sufficed" (Opp'n 22).  That argument fails because the Complaint does not allege that Venator's revisions to its estimated timeline relied in any way on the production restored in the second quarter of 2017.  In another attempt to bootstrap the "capacity" statements, Plaintiffs contend that Venator's estimated timetables were "predicated upon false

supporting statements of fact regarding Pori's supposed 20% capacity." (*Id*.) The cited paragraphs of the Complaint (¶¶126-27, 131-34), however, do not support that contention.

Because Venator disclosed risks related specifically to the Pori rebuild, Plaintiffs' attempt to avoid application of the PSLRA safe harbor and the bespeaks caution doctrine based on *Lormand* v. *US Unwired, Inc.*, 565 F.3d 228 (5th Cir. 2009), is unsuccessful. "In contrast to the disclaimers in *Lormand*," Venator's cautionary language was "significantly more detailed and specifically identifie[d]" the risk of construction delays. *N. Port Firefighters' Pension--Local Option Plan* v. *Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 760 (N.D. Tex. 2013).

**B. Statements About the Cause of Rising TiO2 Prices Are Not Actionable.**

Plaintiffs cannot dispute that statements attributing TiO2 price increases to improving market conditions or strong demand are inherently opinions, which is why the cause of TiO2 price movements was the subject of expert testimony in an unrelated FTC action. (¶¶ 148-49.) Plaintiffs point to no factual allegations raising a plausible inference that those opinions were not honestly held or omitted material facts about the basis for them. Instead, Plaintiffs repeat their flawed claim about the "capacity" statements, arguing that Venator "misrepresent[ed] that Pori was at 20% when, in fact, it was zero." (Opp'n 23.) That baseless claim, however, does not render materially misleading Venator's opinion that rising TiO2 prices between 2016 and 2018 "reflected" or "related to" "improvement in business conditions" or "good demand." (¶¶248-56.) Venator expressly disclosed the relevant *facts* in the IPO offering documents—that it "had lost access to Pori's

nameplate capacity of up to 130,000 metric tons," which constituted "approximately 2% of total global TiO2 demand." (DX1 80, 92.)

### C.    Statements About Insurance Are Not Actionable.

Plaintiffs contend that Venator falsely reassured investors that "insurance would fully offset reconstruction costs and lost profits." (Opp'n 16.) But that is not what Venator said. The IPO offering documents instead warned that insurance might not "fully cover our property damage, business interruption, lost profits or other losses." (DX1 24.) In October 2017—just two months later—Venator disclosed that it would "exceed [its] $500 million insurance limit" by at least "$100–150 million." (DX3 Ex. 99.1, p.3.)

Plaintiffs also argue that statements during a fourth quarter 2017 earnings call about a "fast track premium" were misleading because "the 'fast track premium' was actually spent" shipping intermediate product to Pori for finishing to saleable TiO2, "not rebuilding Pori." (Opp'n 25 (citing ¶126).) That argument is not based on any well-pled factual allegations: the Complaint simply asserts, with no supporting facts, that "the 'fast-track premium' was spent not on rebuilding [the] facility." (¶126.) Nor does Plaintiffs' argument render any statements about insurance misleading. Insurance also covered business interruption losses, and shipping intermediate product to Pori for finishing enabled Venator to produce its "most profitable products" (Opp'n 27) and maintain customer relationships, thus mitigating those losses.

III.   **Plaintiffs Fail to Identify Any Particularized Facts Supporting a Strong Inference of Scienter.**

    A.   **Plaintiffs Do Not Adequately Plead That Turner and Ogden Acted With Scienter.**

Plaintiffs argue that Turner and Ogden knew their statements about Pori were false or misleading or acted with extreme recklessness because (i) they attended meetings and received reports about Pori, (ii) the plant was important to analysts, investors and Venator, and (iii) they received "generous compensation."  (Opp'n 26-29, 31.)  None of those allegations, alone or together, plead a strong inference of scienter.

*First*, Plaintiffs' assertions that Turner and Ogden "attended meetings and received reports regarding the status of the Pori rebuild and the Europe-Pori Shuffle" (Opp'n 31) are insufficient to plead that they knew their statements were false or misleading or acted with extreme recklessness.  To start, the Complaint fails to identify any specific meeting Ogden attended or any specific report he received (¶¶11, 137, 145, 193, 194), much less any information he obtained that was inconsistent with his contemporaneous statements. Plaintiffs likewise fail to identify any particular information conveyed to Turner in meetings or through reports that contradicted any of his contemporaneous statements or rendered them misleading.  Rather, the Complaint alleges only that Turner "attended meetings about the Pori rebuild" and/or received reports (¶¶193-94), which generally addressed "efforts to fill customer orders," "the timing of production, the capacity of each line, and the resulting production plan" (¶137).  None of these allegations raises a strong inference that Turner received information inconsistent with his statements about Pori's post-fire capacity or anything else.  *Local 210 Unity Pension & Welfare Funds* v.

*McDermott Int'l Inc.*, 2015 WL 1143081, at *9 (S.D. Tex. Mar. 13, 2015) ("[T]he allegation has not been supported by particularized evidence that the individual defendants learned specific bad facts at specific meetings and later made a false statement with knowledge of the truth of those bad facts."). Without "details regarding the contents of allegedly contrary reports," no strong inference of scienter arises. *See Abrams* v. *Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002).

The same is true of statements attributed to former Venator employees, none of whom purports to shed any light on what information Turner or Ogden received, when they received it, or how the information related to their statements. (Opp'n 29-30.) Plaintiffs' suggestion that "Venator executives" may have learned something contrary to their statements at "monthly" meetings with insurers (Opp'n 27) makes no sense. No insurer would have continued to disburse millions of dollars if, as Plaintiffs contend, Venator's plan to rebuild Pori was a "scam." (¶246.)

Plaintiffs do not dispute (Opp'n 33) that it would have made zero sense for Turner and Ogden to authorize the spending of hundreds of millions of dollars on reconstruction (and "over $1 billion—nearly triple Venator's market capitalization—on Pori" generally (Opp'n 27-28)) if they did not believe that Pori could be rebuilt on a reasonable timetable. Plaintiffs instead contend that "Defendants' subjective belief about Pori's ultimate return is '*irrelevant*' to their scienter for false statements concerning, *inter alia*, Pori's capacity." (Opp'n 33.) That contention concedes that the Complaint fails to plead scienter for the statements relating to Pori's expected reconstruction.

*Second*, Plaintiffs' assertion that Turner and Ogden must have known that their statements were false or misleading because of Pori's importance to analysts, investors and Venator's business fails for a similar reason—Plaintiffs plead no particularized facts creating a strong inference that Turner and Ogden had access to information that contradicted their statements or rendered them misleading. The Complaint thus fails to plead that Turner and Ogden must have known (or were severely reckless in not knowing) that their public statements were false or misleading.

*Third*, Plaintiffs' allegation that Turner and Ogden were "generously compensated" for their "contributions" to the IPO and SPO (Opp'n 29 (citing ¶206)) is insufficient to plead scienter. "[G]enerous" compensation does not raise a strong inference of scienter. *Ind. Elec. Workers' Pension Tr. Fund IBEW* v. *Shaw Grp., Inc.*, 537 F.3d 527, 544 (5th Cir. 2008).

### B.      Plaintiffs' Allegations About Peter Huntsman and Mahomed Maiter Are Insufficient to Plead Corporate Scienter.

Unable to plead a strong inference of scienter against Turner or Ogden, Plaintiffs fall back on corporate scienter. They contend that Peter Huntsman was "personally motivated to mislead investors" (Opp'n 28) and that his scienter "is attributable to Venator" (Opp'n 32). According to Plaintiffs, as Venator's chairman and "the person most responsible" for the IPO, Peter Huntsman must have "'approve[d]' or 'furnish[ed] information' for purposes of Venator's statements." (*Id.*) But none of the paragraphs of the Complaint cited by Plaintiffs allege that Peter Huntsman approved or furnished

-11-

information for any Venator statement, let alone knew that such information or statement was false or misleading. (*Id*. (citing ¶¶204-06).)

Plaintiffs' citation to *Lee* v. *Active Power, Inc.*, 29 F. Supp. 3d 876 (W.D. Tex. 2014), is unavailing. The court there imputed to the corporation the knowledge of a manager who knowingly furnished false information for inclusion in corporate statements. *Id.* at 881. Here, Plaintiffs do not plead that Peter Huntsman furnished *any* information to Venator for inclusion in corporate statements, much less that he knowingly provided false information. Although Plaintiffs allege that "Venator filed a Form S-1 with the SEC on May 5, 2017 which reiterated the timeline" "Peter Huntsman had provided investors just weeks before" (¶95), the Complaint does not attempt to state a claim based on that pre-IPO statement, and Huntsman Corporation, not Peter Huntsman, previously provided the referenced timeline on March 27, 2017 (¶92).

Even if his state of mind could be attributed to Venator, Plaintiffs' generalized allegations about Peter Huntsman's supposed desire to raise capital in order to pay down debt and improve Huntsman's balance sheet and about his compensation (which Plaintiffs do not tie to the offerings) do not create a strong inference of scienter. *See Owens* v. *Jastrow*, 789 F.3d 529, 539 (5th Cir. 2015) (no scienter based on allegations that executive "would lose millions in compensation if the stock price dropped" or that "such a drop would accelerate payment on his personal loans."); *Shaw*, 537 F.3d at 544. And a purported motivation to defraud is not enough to plead scienter. *See In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 859-60 (N.D. Tex. 2005).

-12-

Plaintiffs' contention that Maiter's "scienter is . . . attributable to Venator" (Opp'n 33) is even weaker.  Plaintiffs cite allegations that purport to describe Maiter's testimony in an unrelated FTC proceeding, but those paragraphs do not allege that Maiter had any role in Venator's challenged statements.  (Opp'n at 32-33 (citing ¶¶138, 190).) Although the Complaint elsewhere alleges that "Maiter provided 'input'" into unidentified Venator presentations (¶27), Plaintiffs do not even try to connect those presentations to any challenged statement.

Beyond Huntsman and Maiter, Plaintiffs do not contend that the state of mind of any other Venator officer can be attributed to Venator.  Plaintiffs identify only two other individuals possibly responsible for Venator's statements:  Turner and Ogden.  (Opp'n 34.) "[D]ocuments not attributed to any individual" may only be charged to a corporate officer when "specific factual allegations link the individual to the statement at issue."  *Southland Sec. Corp.* v. *INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004).  The Complaint does not do that.

At bottom, Plaintiffs have no response to the common-sense conclusion to be drawn from the Complaint's allegations—that Venator attempted to rebuild Pori while restarting part of the facility in an effort to mitigate its losses but that Venator ultimately changed course when the reconstruction proved to be much more time-consuming and costly than expected.  Plaintiffs fail to "plead facts rendering an inference of scienter *at least as likely as*" the opposing inference.  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 328 (2007).

**IV.     Plaintiffs Fail to Establish That Their Securities Act Claims Are Timely.**

Plaintiffs concede that the one-year statute of limitations applicable to Securities Act claims "began to run when a 'reasonable plaintiff would have *discovered sufficient information* [through investigation] to plead'" a violation. (Opp'n 35.) A reasonable investor would have discovered based on the August 2017 IPO offering documents or Venator's Form 10-Q for the second quarter of 2017 that Pori's restored "20% capacity" consisted only of white end production, and any impression that Venator would "restor[e] full production" around the end of 2018 or "that insurance would fully cover rebuild expenses and lost profits" (Opp'n 1) was dispelled in Venator's October 2017 Form 10-Q. This information was available more than a year before this lawsuit was filed. Plaintiffs respond that this "argument suggests that Plaintiffs' claims expired before Defendants made most of their false statements." (Opp'n 35.) Not so. It means that the one-year limitations period for Securities Act claims, which are based only on statements in the IPO and SPO offering documents, began to run in October 2017 at the latest.

**V.      Plaintiffs Fail to Establish Standing Under Section 12(a)(2).**

Plaintiffs assert that Defendants "solicit[ed] Plaintiffs' purchases" because Defendants were "directly involved in the offerings." (Opp'n 36.) But that is not the law. Mere "involvement" in a transaction is not solicitation. *See Pinter* v. *Dahl*, 486 U.S. 622, 647 (1988). Neither Plaintiffs' allegation that their purchases were "directly traceable" to the offerings nor their PSLRA certifications showing their securities purchases relieve them of the burden to plead that a Defendant "actually passe[d] title" to or "solicit[ed]" Plaintiffs' purchases, which they have not done. *Rosenzweig* v. *Azurix Corp.*, 332 F.3d

-14-

854, 871 (5th Cir. 2003) ("To count as 'solicitation,' the seller must, at a minimum, directly communicate with the buyer."). Nor is this a question for a later stage in the litigation, as Plaintiffs have access to the necessary information.

## VI. Plaintiffs Cannot Save Their Control Person Claims.

Plaintiffs do not dispute that their control person claims fail if they have not adequately alleged a primary violation.

Plaintiffs' attempt to cast Huntsman Corporation as a control person for statements outside the offering documents based on stock ownership and directors' participation on Venator's board (Opp'n 37) also fails: none of Plaintiffs' allegations concerning Huntsman have anything to do with control over statements outside the offering documents such as in Venator's press releases, SEC filings and earnings calls. *See Carlton* v. *Cannon*, 184 F. Supp. 3d 428, 495 (S.D. Tex. 2016). Unlike in *McNamara* v. *Bre-X Minerals Ltd.*, 46 F. Supp. 2d 632, 636 (E.D. Tex. 1999), where plaintiffs alleged "day-to-day" involvement in operations and control over the "content and dissemination of the various statements," Plaintiffs fail to allege that Huntsman had similar involvement in or control over Venator's statements outside the offering documents.

\*        \*        \*        \*

When apprised of the grounds for Defendants' motion beforehand in accordance with this Court's procedures, Plaintiffs elected not to amend their Complaint, and their opposition fails to identify "any additional facts not initially pled that could . . . cure the pleading defects raised" by Defendants' motion. *Goldstein* v. *MCI WorldCom*, 340 F.3d

-15-

238, 255 (5th Cir. 2003).  The Court therefore should reject Plaintiffs' request for leave to

amend (Opp'n 38) and dismiss the Complaint with prejudice.

Dated:  April 14, 2020                    Respectfully submitted,

/ s/ Craig Smyser
Craig Smyser
Attorney-in-Charge
Texas Bar No. 18777575
Southern District Bar No. 848
Razvan Ungureanu
Texas Bar No. 24085630
Southern District Bar No. 2006928
Eugene Zilberman
Texas Bar No. 24110577
Southern District Bar No. 3337101
SMYSER KAPLAN VESELKA, LLP
717 Texas Avenue, Suite 2800
Houston, Texas  77002
Tel: (713) 221-2330
Fax: (713) 221-2320
csmyser@skv.com
rungureanu@skv.com
ezilberman@skv.com

Richard C. Pepperman II (admitted *pro hac vice*)
Andrew J. Finn (admitted *pro hac vice*)
Elizabeth A. Rose (admitted *pro hac vice*)
Elizabeth V. Young (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel: (212) 558-4000
Fax: (212) 558-3588
peppermanr@sullcrom.com
finna@sullcrom.com
rosee@sullcrom.com
younge@sullcrom.com

*Attorneys for Defendants Venator Materials PLC, Simon Turner, Kurt D. Ogden, Stephen Ibbotson, Russ R. Stolle, Peter R. Huntsman, Douglas D. Anderson, Mahomed Maiter, and Kathy D. Patrick*

-16-

*/s/ Thaddeus Behrens*
R. Thaddeus Behrens
Attorney-in-Charge
Texas Bar No. 24029440
Southern District Bar No. 916015
Daniel H. Gold*
Texas Bar No. 24053230
Southern District Bar No. 2707300
Matthew A. McGee*
Texas Bar No. 24062527
Southern District Bar No. 3471193
William D. Marsh*
Texas Bar No. 24092762
Southern District Bar No. 3352950
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas  75219
Tel: (214) 651-5668
Fax: (214) 200-0886
thad.behrens@haynesboone.com
daniel.gold@haynesboone.com
matt.mcgee@haynesboone.com
william.marsh@haynesboone.com
*Of Counsel

*Attorneys for Defendants Huntsman Corporation, Huntsman International LLC, and Huntsman (Holdings) Netherlands B.V.*

*/s/ Jeffrey M. Tillotson*
Jeffrey M. Tillotson
Attorney-in-Charge
Texas Bar No. 20039200 #27831
TILLOTSON LAW
1807 Ross Avenue, Suite 325
Dallas, Texas  75201
Tel: (214) 382-3041
Fax: (214) 292-6564
jtillotson@tillotsonlaw.com

Audra J. Soloway (admitted *pro hac vice*)
Geoffrey R. Chepiga (admitted *pro hac vice*)
Caitlin Grusauskas (admitted *pro hac vice*)
David P. Friedman (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Tel: (212) 373-3573
Fax: (212) 492-0573
asoloway@paulweiss.com
gchepiga@paulweiss.com
cgrusauskas@paulweiss.com
dfriedman@paulweiss.com

*Attorneys for Defendants Citigroup Global Markets Inc., Goldman Sachs & Co. LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, and J.P. Morgan Securities LLC*

-18-

## CERTIFICATE OF WORD COUNT

I certify that the total number of words in the brief, exclusive of the caption, prefatory tables, the signature block, and the required certifications, is 3,996 words.

/s/ *Richard C. Pepperman II*
Richard C. Pepperman II

## CERTIFICATE OF SERVICE

I certify that on April 14, 2020, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF Filing System.

*/s/ Richard C. Pepperman II*
Richard C. Pepperman II
