IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

_____
                                       )
                                       )
IN RE: VENATOR MATERIALS PLC       ) CIVIL ACTION NO.
SECURITIES LITIGATION              ) 4:19-CV-3464
                                       )
                                       ) 1:35 P.M.
_____)


MOTION HEARING
BEFORE THE HONORABLE CHARLES ESKRIDGE
MAY 14, 2020

APPEARANCES: (ALL PARTIES APPEARED VIA VIDEO CONFERENCE)

**FOR LEAD PLAINTIFF:**
MR. Michael D. Blatchley
MS. KATE W. AUFSES
MR. NICHOLAS GERSH
Bernstein Litowitz Berger & Grossmann LLP
1251 Avenue of the Americas
New York, New York  10020
(212)554-1400

MR. JOHN S. "JACK" EDWARDS, JR.
Ajamie LLP
Pennzoil Place – South Tower
711 Louisiana, Suite 2150
Houston, Texas  77002
(713)860-1600

**FOR THE VENATOR DEFENDANTS:**
MR. RICHARD C. PEPPERMAN, II
MR. ANDREW J. FINN
MS. ELIZABETH A. ROSE
MS. ELIZABETH V. YOUNG
Sullivan & Cromwell LLP
125 Broad Street
New York, New York  10004
(212)558-4000


Proceedings recorded by mechanical stenography, transcript
produced by computer.

APPEARANCES CONTINUED:

**FOR THE VENATOR DEFENDANTS:**
MR. CRAIG SMYSER
MR. RAZVAN UNGUREANU
Smyser Kaplan Veselka, L.L.P.
717 Texas Avenue, Suite 2800
Houston, Texas   77002
(713)221-2330

**FOR THE HUNTSMAN DEFENDANTS:**
MR. R. THADDEUS BEHRENS
MR. DANIEL H. GOLD
MR. MATTHEW A. MCGEE
MR. WILLIAM D. MARSH
Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, Texas   75219
(214)651-5668

**FOR THE UNDERWRITER DEFENDANTS:**
MR. Jeffrey M. Tillotson
Tillotson Law
1807 Ross Avenue, Suite 325
Dallas, Texas   75201
(214)382-3040

MR. GEOFFREY R. CHEPIGA
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York   10019
(212)373-3573

**COURT REPORTER:**
Heather Alcaraz, FCRR, RMR
Official Court Reporter
515 Rusk, Suite 8004
Houston, Texas   77002
(713)250-5584

PROCEEDINGS

_____

*(The following proceedings held via video conference.)*

* * *

THE COURT:  Hi.  This is Judge Eskridge.  Am I on and able to be heard?

*(Collective affirmative response.)*

THE COURT:  Okay.  Thank you.

Let me check the participant list and make some adjustments here and see who all's on.

Okay.  Jennelle, we have a court reporter on and able to take the record?

THE CASE MANAGER:  Correct, Judge.

THE COURT:  Okay.  Thank you.

I will call In Re: Venator Materials PLC Securities Litigation, Civil Action No. 19-3464.  I know that we have a number of counsel, obviously, appearing.  Can one person from each side tell me how many lawyers from each side intend to be speaking at some point during the hearing today?

MR. BLATCHLEY:  Your Honor, this is Mike Blatchley from Bernstein, Litowitz, Berger, Grossman.  Can everyone hear me?

THE COURT:  Yes.

MR. BLATCHLEY:  Good afternoon, Your Honor.  Again, Mike Blatchley from Bernstein, Litowitz on behalf of lead

plaintiffs.  I will be presenting argument for plaintiffs.

THE COURT:  Okay.  On all issues?

MR. BLATCHLEY:  Correct.

THE COURT:  Okay.  Thank you.

And for defendants?

MR. PEPPERMAN:  Your Honor, this is Rick Pepperman from Sullivan & Cromwell --

THE COURT:  Yes.

MR. PEPPERMAN:  -- and I will be presenting arguments on all issues on behalf of all the defendants.

THE COURT:  Okay.  Well, that simplifies things.

I believe that my case manager has taken a record of attendance for counsel that are here.  So it's going to be a little bit difficult if we have a bunch of different people trying to talk, so if you haven't given your appearance to Jennelle Gonzalez, please do so by e-mail so that the record can reflect who is in attendance.

But for now, can I have the appearances for the counsel who will be speaking for the plaintiffs and defendants, just for the record, and we will proceed with the hearing?

MR. BLATCHLEY:  Good afternoon again, Your Honor. Mike Blatchley from Bernstein, Litowitz, Berger and Grossman on behalf of lead plaintiffs.

MR. PEPPERMAN:  Good afternoon, Your Honor.  Richard Pepperman from Sullivan, Cromwell, counsel for defendant Venator

and the individual defendants, and will be presenting argument on behalf of all defendants today.

THE COURT: Okay. Thank you.

Before we start, one thing that would help me to know is what -- and just briefly. I don't need details all the way through, but I'm aware that there have been some other proceedings related to this matter or this transaction, which I don't think was really fully explained in the briefing.

Can -- can Mr. Blatchley, and then Mr. Pepperman -- Mr. Blatchley, can you give me a very short summary of what other actions and proceedings there have been?

And then, Mr. Pepperman, if you want to add any comment to that, please do so.

MR. BLATCHLEY: Thank you, Judge Eskridge. Again, it's Mike Blatchley on behalf of plaintiffs.

Your Honor, my understanding is that there is a current action pending in Texas state court. That's the *Macomb County Employees' Retirement System* action. That originally named many of the same defendants at issue here and asserted the same Section 11, 12 and 15 Securities Act claims that are at issue in our case.

That action has survived a 91A motion to dismiss, and I believe there's been discovery in that case; however, many of the defendants in that action filed various motions, including for lack of personal jurisdiction. There was rulings in the

trial court denying those motions.  Those were appealed by defendants, and the appellate court reversed those -- that decision, and, currently, many of the defendants have been dismissed from the case.

And there was also a motion to transfer venue.  That was denied by the trial court and then reversed by the appellate court, and the case recently transferred to -- for the remaining defendant, which I believe is only one, to Monroe County, and that's where the action is currently pending.

Separately -- and Mr. Pepperman, can, I'm sure, fill you in on further details concerning the status of that action. My understanding is that there is also another action, I believe, filed by the same plaintiff naming additional defendants in New York state court, again, those defendants that were dismissed based on jurisdictional grounds by the Texas appellate court.

THE COURT:  Okay.  Mr. Pepperman?

MR. PEPPERMAN:  Yes, Your Honor.  I -- I can provide a little bit more detail.  Unfortunately, there will be a small bit of repetition from what Mr. Blatchley said.

THE COURT:  That's okay.

MR. PEPPERMAN:  Before the federal actions were filed, a case was filed in Texas state court in Dallas County against Venator, the underwriters, the Huntsman entities, and some of the individual defendants who are named in this action.  Various

motions to dismiss were filed.  I'm not a Texas lawyer.  I'm not going to get the names of the motions exactly right.

As Mr. Blatchley said, those motions were denied by the trial court.  There was an appeal taken.  The Dallas County Supreme Court reversed on the personal jurisdiction issue, holding that there is no personal jurisdiction over Venator, the individual defendants, and the underwriter defendants.  And with respect to the Huntsman entities, it reversed on the venue issue and transferred venue to Macomb County.

After those appellate decisions, the same plaintiffs' law firms brought a separate action in New York state court against the defendants who had been dismissed in Texas for lack of personal jurisdiction.  So that's Venator, certain of the individual defendants, and the underwriting defendants.

The difference between the two sets of actions is the actions in state court, whether they be Texas or New York, are only bringing claims under the Securities Act, whereas the complaint before Your Honor asserts claims under both the Securities Act and the Exchange Act.  The way it stands now is you have an action pending in Macomb County against the Huntsman defendants and an action pending in New York state court against everyone else.

The Huntsman defendants, yesterday, made a motion in the Macomb County Court of Appeals to stay that action in deference to the more comprehensive action pending before

Your Honor, and the defendants in the New York state court action are going to be similarly filing a stay motion tomorrow in New York state court asking for the same relief.

THE COURT: Okay. And it's been unclear to me, but I think -- at least in the Texas action, has there been some discovery that has gone forward, or is it -- has it been more of a posture like this where it's all sort of at the beginning, but actual discovery into the action hasn't commenced?

MR. PEPPERMAN: My understanding, Your Honor, is that there has been some minimal discovery in the Texas state court action. Mr. Smyser, my cocounsel, is on. Mr. Smyser was counsel to Venator in the proceedings in Dallas County, and he could provide the Court with more detail in terms of what discovery has occurred to date.

THE COURT: That's okay. I don't think that I need to know detail on that, unless it becomes relevant during arguments. Maybe he could comment on anything learned there.

Is there anything about the rulings -- I have the appellate ruling 2020 Westlaw 289296 that considered at least some of the jurisdictional issues. Is there anything in those proceedings that's gone on -- or that would be proceeding on that would be collateral estoppel or res judicata to anything that -- that's currently before me?

I haven't seen assertions about that. I just want to have a sense of whether there's another court whose toes I may

be stepping on.

**MR. PEPPERMAN:**  Your Honor, from the defendants' perspective I, don't think so.  I'm not aware of any such issue.

**MR. BEHRENS:**  Your Honor, this is Thad Behrens from Haynes and Boone on behalf of the Huntsman defendants.  We're in the state court case.  The motions to dismiss that were referenced are up on appeal.  The 91A motion, the -- a mandamus was taken.  There was a separate anti-SLAPP motion, and there was an appeal taken.

Since those cases have been transferred, they're now in the Beaumont Court of Appeals, and under Texas procedure, what will happen now, because you can't mandamus a different judge, is the Beaumont Court of Appeals should send that -- the 91A ruling back to the trial court in Montgomery County to be reconsidered.

So in our view, that previous ruling is of no effect.

**THE COURT:**  Okay.  Okay.

All right.  Mr. Pepperman and Mr. Blatchley, have you-all discussed which motion would make more sense to take up first?  I don't know that I really have a preference.  I was thinking maybe the personal jurisdiction issue, but have you-all discussed a preference in that regard?

**MR. PEPPERMAN:**  Your Honor, I mean, obviously, we'll be guided by whatever the Court would like.  From the defendants' perspective, our -- our hope was to devote our

argument time to the rule 12(b)(6) motion.  We would be content to rest on the papers on the personal jurisdiction motion, but are, of course, available to answer any questions from the Court.

MR. BLATCHLEY:  Your Honor, this is Mike Blatchley for plaintiffs.  I'm happy to proceed in -- in any -- obviously, any order Your Honor prefers, and Mr. Pepperman and I didn't get a chance to discuss.  I would like to address some issues with the personal jurisdiction matter, but I can do that whenever Your Honor prefers.

THE COURT:  Well, then, let's -- it sounds like argument will not be extensive on personal jurisdiction.  So I think that it probably makes more sense to simply take up -- and I've read the briefs on this, which are not -- obviously, they're not lengthy, but why don't we take that up for as long as necessary and devote the balance of the hearing to the motion to dismiss.

So let's see.  Mr. Pepperman, you're content to rest on the papers, but it is your motion.  Is there anything -- I mean, I would suggest that maybe you kick it off with position, and then Mr. Blatchley can respond.

MR. PEPPERMAN:  Yes, Your Honor.  I'm happy to do that, and, I mean, as the Court pointed out, the -- the briefs on this motion are -- are short.

For purposes of personal jurisdiction, there are two

issues, obviously, the Court needs to consider:  Whether the individual defendants are subject to general personal jurisdiction, and, secondarily, whether they're -- they're subject to specific personal jurisdiction.

On the issue of general jurisdiction, Your Honor, I think the allegations are quite clear.

With respect to Mahomed Maiter, he, you know, is domiciled in the UK.  He has lived and worked there for years before the IPO, whereby Venator became a separate company from Huntsman.  Mr. Maiter, again, worked and was domiciled in the UK.  I think he's clearly at home in the UK for purposes of general personal jurisdiction, and I think the -- you know, for that issue for Mr. Maiter, I think the issue is clear.

With respect to Mr. Stolle, the general counsel of Venator, when he was employed by Huntsman, he lived in -- in Texas, and that's where he maintained his home.  After the IPO, he -- he relocated to the United Kingdom and has been domiciled there since August 2017.  At this point, we're going on three years.

I mean, the presumption in terms of domicile is that you look at where someone is domiciled at the time the action was filed and the relevant events through that period. Mr. Stolle has been domiciled in the United Kingdom.

**THE COURT:**  Can I ask a question?

**MR. PEPPERMAN:**  Sure.

**THE COURT:**  It was -- as I understand the employment agreement, it could be extended, but it's, I believe, stated as a three-year term.  That would be coming to a conclusion in the near future.  I know that jurisdiction's measured at a prior time.  Then we have this question about intent to remain or intent to return.

Is he planning to return to The Woodlands this summer at the conclusion of that assignment?

**MR. PEPPERMAN:**  My understanding is no, Your Honor.  The -- the -- you know, Venator is now a separate company.  It's headquartered in the United Kingdom.  The general counsel needs to be where the company is headquartered.  So the plans are to remain there.

Your Honor, on the general jurisdiction point, you know, we discussed earlier the decision of the Dallas Court of Appeals, and Your Honor gave the citation.  For purposes of general jurisdiction over Mr. Stolle, I mean, that -- that decision is on point.  The same arguments that Mr. Blatchley made in his opposition brief were the arguments that the plaintiffs had raised in that case, and the Court of Appeals held principally, because Mr. Stolle has been domiciled in the UK since August 2017, that he's no longer at home in the United States and, therefore, subject to general personal jurisdiction there.

**THE COURT:**  Okay.

**MR. PEPPERMAN:** On --

**THE COURT:** And just so that I'm clear of any statement, work, mind, thought process by either Stolle or Maiter, whether or not the Court has personal jurisdiction over them for purposes of relevance to issues as to motion to dismiss, those would still be at issue, right? It's just a question of whether they remain as a defendant who could be liable?

**MR. PEPPERMAN:** Yes, Your Honor. I don't think -- I think whether they're in the case or out of the case doesn't otherwise affect the contours of the action before you, except that they wouldn't be defendants.

**THE COURT:** Okay.

**MR. PEPPERMAN:** It wouldn't reduce the number of statements at issue. It wouldn't reduce the number of claims in the case.

You know, for purposes of scienter, Mr. Blatchley makes arguments about scienter attributed to Mr. Maiter. I mean, they could still attempt to plead corporate scienter by reference to Mr. Maiter's mental state whether he's in the case or out of the case. It really just affects whether those two defendants are a part of the proceedings before you.

**THE COURT:** Okay. Okay. All right. I think that that takes care of general jurisdiction as to those two, and give me your thoughts on specific jurisdiction.

MR. PEPPERMAN: Well, Your Honor, specific jurisdiction, I think, is very easy. You know, for purposes of Mr. Maiter, I mean, there is no claim that he made any of the statements at issue in this case. There is no claim that he furnished information to the company for purposes of making statements.

I mean, his nexus to the case is very far removed, and you cannot make an argument that the claims against Mr. Maiter somehow arise out of any contacts of his with the United States. There really are -- are none.

You know, Your Honor, with respect to Mr. Stolle, it really comes --

THE COURT: Can I ask, as to Maiter, was his role -- are you saying that his role was strictly limited to internal reports?

MR. PEPPERMAN: Yes.

THE COURT: Okay.

MR. PEPPERMAN: Yes, and --

THE COURT: All right. And I'll get Mr. Blatchley's position on this, but in terms of personal involvement, involvement in investor presentations for the SEC documents, did Mr. Maiter have any?

MR. PEPPERMAN: Your Honor, I don't believe so, and, more importantly, none are alleged in this case.

THE COURT: Okay. Okay.

**MR. PEPPERMAN:**  You know, we'll -- in discussing the rule 12(b)(6) motion, we'll go through the various offering documents, we'll go through various earnings calls, various SEC filings.  He was not a maker of any of those statements.

But, again, for purposes of specific personal jurisdiction, there aren't any contacts of his with the United States that serve as a basis for the claims.

**THE COURT:**  Okay.  Thank you.

And as to Mr. Stolle?

**MR. PEPPERMAN:**  Well, Mr. Stolle, Your Honor, presents, I think, a clean issue.  Mr. Stolle was the general counsel.  Mr. Stolle did not sign any of the operative documents in his personal capacity.  He did not sign them as Russ Stolle, the individual.

In the registration statement, there is a requirement that the issuer, Venator Materials PLC, sign it, and he executed the registration stating that in a representative capacity on behalf of Venator.

**THE COURT:**  Was it -- I'm aware of -- of that.  I guess two questions.  He -- he, obviously, is not listed by title.  He's not a person listed as being required to affix his signature.

In terms of the fact that he was the one doing it, does it matter that he is a U.S. citizen as opposed to the others who were signing, who I think were not.  Is that a reason

why he was signing?

**MR. PEPPERMAN:** Your Honor, to be honest, I -- I do not know the answer to that question. I mean, I'm not aware of there being a requirement that -- you know, that all the signators for a registration statement need to be United States citizens. I mean, I think you're serving as an attorney-in-fact and signing in a representative capacity. I mean, that's the kind of things that in-house lawyers do --

**THE COURT:** Oh, yeah.

**MR. PEPPERMAN:** -- and I believe that he signed it in that capacity, you know, not thinking that by signing on behalf of the issuer, you know, he's subjecting himself to individual liability and, perhaps, jurisdiction based on that signature in a representative capacity.

**THE COURT:** Okay. And those filings, when made -- I'm just assuming they're electronically done. I'm just assuming that that was done from offices in the UK. Is that correct?

**MR. PEPPERMAN:** Your Honor, I -- I suspect, Your Honor, that when he did the signing in a representative capacity, I suspect that he was in Texas. I think he moved to the UK after the IPO, and so the -- the -- the -- the papers may well have been executed in the United States, and, obviously, they were filed electronically with the Securities and Exchange Commission in Washington.

I mean, our argument is, is that that action was not

an action that he took as an individual, you know, but rather -- I mean, in effect, because a corporation can't affix a signature as the in-house lawyer signing in a representative capacity.

THE COURT: Okay. I appreciate that. Why -- for purposes of that, why was he in Texas to then do that? I'm flipping back to -- the analyses are different. I appreciate that. But in terms of general jurisdiction, I thought we were in the world where he's entirely in the UK when things are going on.

Give me -- explain to me why he is in the -- potentially in Texas doing that, and, also, is that something that -- for the personal jurisdiction question, will there need to be some discovery on that before I can fully rule on it?

MR. PEPPERMAN: I don't think so, Your Honor. The -- the IPO occurred, I believe, on August 4th, 2017. Mr. Stolle moved to the UK in August 2017. I -- I just am comfortable sort of representing to the Court that, you know, chronologically speaking, I'm confident that he signed while in the UK versus Woodlands, Texas.

But I think -- I mean, for -- I think the location of where you are when you have affixed a signature, I don't think it matters. I mean, for example, the other individual defendants who were required signators of the registration statement and had to sign it in their individual capacity, if they were physically located in the United Kingdom and signed

the document there, and then filed it in Washington, I believe that that would give rise to personal jurisdiction over them.

I mean, from our perspective, what is key here is not the physical location of where someone is when they sign, but the capacity in which they're -- they're doing that. And that's why, Your Honor, we've limited our personal jurisdiction motion just to Mr. Maiter and to Mr. Stolle because, you know, Mr. Maiter did not sign any of the relevant offering documents, and Mr. Stolle only did in a representative capacity.

For the others that signed in their own individual capacity as required signators, we did not contest personal jurisdiction without regard to where they were physically located when they -- when they, I guess, probably electronically inked that signature.

THE COURT: Okay. Thank you. And I appreciate you bringing to my attention the uncertainty about where Mr. Stolle was when he signed. I understand that -- I'm not asking you to take a firm position on that. There hasn't been discovery. Just thank you for bringing it to my attention, and I don't know whether it matters to the analysis.

Do you have anything else?

MR. PEPPERMAN: No, Your Honor.

THE COURT: Okay. Thank you.

Mr. Blatchley?

MR. BLATCHLEY: Thank you, Your Honor. Again, Mike

Blatchley for lead plaintiffs.

Why don't I start with Mr. Stolle, because that's where we left off.  And I know Your Honor has the papers, but -- and, again, I'll start with general jurisdiction.

We provided a wealth of information concerning Mr. Stolle's extensive ties to not just the United States, which, again, is the relevant geographic forum, but to Texas and The Woodlands.  And, you know, he's lived here -- lived in Texas for 30 years prior to taking on the temporary assignment, again, temporary assignment where he negotiated and received compensation for returning to Texas several times a year where his family resides, where he owns property, where he pays taxes, where he voted in the most recent presidential election, where he serves on a number of corporate boards, and, with respect to this case, where he conducted a significant amount of activity that is directly relevant to plaintiffs' claims.

I -- again, I think -- I think the general jurisdiction evidence that we put before Your Honor, again, our burden at this stage, with zero discovery, is to show a prima facie case.  I think that's more than sufficient at this stage. Of course, if Your Honor has any questions, I think the appropriate course is for us to take some discovery on that.

For the --

**THE COURT:**  Can I ask a question?  And if it's different as to general versus specific, let me know that.

What is the point in time at which I measure whether there was general jurisdiction over these two defendants and whether there was specific jurisdiction?  Because the course of conduct that's alleged spans statements over a considerable period of time, and then, obviously, there's the time, the date on which the action was filed.

So within all of that, what -- what am I looking at to pick as the point in time?

**MR. BLATCHLEY:**  Your Honor, well, thank you.  You might be reading my mind.  That was a point I wanted to address next, which is, again, under the Supreme Court precedent, you're looking at a time span, you know, leading up to the filing of the action.  It's not just the commencement of the action.  It's leading up to the commencement of the action, certainly for general jurisdiction purposes, of a period between three and seven years.

Seven years is kind of the outer limit that the Supreme Court has noted.  And certainly, if we're looking at that time period, I don't think there's any question about Mr. Stolle's ties in the context -- or contacts for personal jurisdiction purposes.  I did want, if Your Honor thinks it's appropriate, to switch to specific jurisdiction because I think that is an area where both defendants really just don't have -- have a chance of trying to get out of the case at this stage, and certainly not before Your Honor orders discovery on the

jurisdiction issues.

THE COURT:  Let me ask this:  In terms of Mr. Stolle's location, when the IPO was done, was he already in the UK at the time of the IPO?  I believe so.

MR. BLATCHLEY:  Well, Your Honor, I think that that's not correct, and I think Mr. Pepperman, that's what he just stated, that -- what I saw, I think in their briefs, was he got to the UK at the end of August.  The IPO was beginning of August, and --

THE COURT:  And which year are we talking about?  I just want to be --

MR. BLATCHLEY:  Yeah.  2017.

THE COURT:  2017, okay.

So the IPO -- I guess I put it this way:  The IPO and his move to the UK occurred in August of 2017; is that --

MR. BLATCHLEY:  That's --

THE COURT:  -- right?

MR. BLATCHLEY:  And --

THE COURT:  As opposed, you know, by a few dates, which was in advance of others, but those both happened in the same month?

MR. BLATCHLEY:  Correct.  And, again, just to --

THE COURT:  Okay.

MR. BLATCHLEY:  August 4ish for the IPO, and then August 31st for the transition to the UK.

**THE COURT:**  Okay.  You wanted to move to a specific jurisdiction.

**MR. BLATCHLEY:**  Well, yeah, I thought that that made sense, again, because we were talking about what he was doing in The Woodlands in the months leading up --

**THE COURT:**  Actually, can I interrupt for just one second?

On general jurisdiction as to Mr. Maiter, you don't have -- you haven't stated a position as to that.  Are you really trying to push general jurisdiction for Mr. Maiter?  I think it's much more difficult.

**MR. BLATCHLEY:**  And, Your Honor, I agree with the standard for general jurisdiction, obviously, with Mr. Maiter's context.  They were -- they fit far more comfortably into specific jurisdiction.  I just didn't want to waive any argument --

**THE COURT:**  Okay.

**MR. BLATCHLEY:**  -- given that we don't -- we haven't had a single, you know, document produced in this case.

And I don't know his travel plans, given that he was, you know, heavily involved in running the North American business that he, you know, prepared and discussed investor presentations that were given in the United States with other senior executives, the defendants in this case, Defendant Ogden and Defendant Turner, that he was, you know, heavily involved

in -- in the Pori crisis that, you know, is the subject of this lawsuit and was speaking to those defendants and providing input, as we cited to Your Honor in our opposition brief, into the documents that were used to solicit investor interest in the offerings that are at issue in this case.

There's, you know -- again, I apologize.  I switched over to specific jurisdiction.  But, Your Honor, I think if you, you know, permitted discovery on that topic, I think what we would find is a significant amount of contacts with United States, meetings in Texas and elsewhere.  Again, we don't have that because that's not in the record, and I don't have that --

**THE COURT:**  Okay.  Understood.

**MR. BLATCHLEY:**  -- but I didn't want to waive an argument given -- given the --

**THE COURT:**  Okay.  All right.  Let's move to specific jurisdiction, then.

**MR. BLATCHLEY:**  So for Mr. Stolle, again, I think what we're talking about here is he's the general counsel of the company.  And, again, when we're talking about the time period when he's in Texas, what is he doing?  He is organizing the documents that are needed to be filed with the SEC for the IPO.  He's doing that from The Woodlands.  He's -- you know, has his address in The Woodlands.

When he's corresponding with the SEC about those

documents, he's answering questions from the EC -- SEC who -- you know, the agency's asking him as to that proceeding.  We need, you know, further and more detailed disclosures about the drivers of Venator's earnings, and he's responding to those questions, which goes directly to the heart of what this case is about, which is what is going on with this crisis at Pori, and that -- and he's doing that all from the -- all from Texas.

He is organizing the debt offerings that are at issue in this case and that are part of the proceeds that the company received -- sorry, that Huntsman received, and was a motivating factor for doing the IPO instead of the tax re-spin-off that they were going to do before the fire occurred.

And he's involved and intimately involved in signing documents, doing all of that from Texas in the months leading up to the IPO.  And then once we get -- obviously, of course, once we get the IPO in during the class period, he's still intimately involved in -- in, you know, the company's public messages and communications to -- to investors.

He's the general counsel.  That's in -- as we put forward in our papers.  That's his title, is to ensure, you know -- as part of it his job title at the company is to make sure that these disclosures are accurate, and, again, these are the disclosures we're challenging in this case.

And, you know, it's kind of interesting, for me, when we got defendants' motion to dismiss on personal jurisdiction,

they said in their brief, you know, We all agree if you sign an SEC document, that's probably enough to get personal jurisdiction.  Yet here they're challenging personal jurisdiction based on what we believe is an absolutely irrelevant technical distinction between, you know, the capacity of signing on behalf of Venator or in his individual capacity.

THE COURT:  Do you have -- is there clear case authority on that?  I mean, I'd be surprised that that issue hasn't been litigated and some court having said whether -- because I would think that general counsel do sign as attorney-in-fact, as Mr. Pepperman suggested.

Is there -- have y'all looked for cases on whether or not that's enough?

MR. BLATCHLEY:  Your Honor, I -- you know, I don't have a case to cite to you at the moment.  I'd be happy to go look for one.  I think what happens, and I think what was the situation here, you have Mr. Stolle signing documents left and right, you know, correspondence to the SEC that's going to Washington, D.C., you know, filing SEC filings in the United States.

And so it's kind of like that particular issue, I don't know if it gets litigated that much.  At least under the circumstances of this case, it's kind of almost superfluous even though, you know, obviously we have maintained as -- I --

THE COURT:  But as to -- as to the registration

statements in some of the other filings that are at issue, there are certain persons by capacity --

**MR. BLATCHLEY:** Correct.

**THE COURT:** -- by title that have to sign, which I don't believe includes the general counsel. And so if you-all want to look or delegate it to your trusty associates to look for a case as to a general counsel signing as an agent or as attorney-in-fact, and a court does consider it, I think that that could help simplify the issue.

**MR. BLATCHLEY:** Thank you, Your Honor. We'll certainly do that, Your Honor, and I -- I just wanted to just mention, too, make sure the --

**THE COURT:** Thank you.

**MR. BLATCHLEY:** -- record's clear, you know, we also contest that -- that he's signing not in capacity. That was --

**THE COURT:** I understand that.

**MR. BLATCHLEY:** Okay.

**THE COURT:** As to Mr. Maiter -- I think I have enough on Mr. Stolle. As to Mr. Maiter, what would you like to add?

**MR. BLATCHLEY:** Yeah. I think, again -- sorry, Your Honor. Mr. Maiter is -- is he's a key part of our case, and I did want to take exception to one thing Mr. Pepperman said, which was that he -- you know, there's no allegation that he wasn't involved in furnishing information for purposes of the statements in this case.

I think that that's not what the complaint alleges, and that's not what we put forward in our opposition to defendants' motion, and, again, this is all prediscovery.  We don't have a lick of discovery in this case yet, but we know that Mr. Maiter testified before an unrelated FDC proceeding that was occurring in the United States.

In that testimony, by happenstance, not because they were trying to obtain personal jurisdiction over Mr. Maiter -- but by happenstance, he starts providing testimony about his involvement in the investor relations communications that Venator's making to investors in the United States to, you know, prepare for -- to go on the road shows and to solicit investor interest in the IPO and the SPO.

And we know from -- as we've alleged in our complaint, he was integrally involved in the Pori crisis, in handling that -- that fallout from the fire from day one.  And, again, I don't have any documents, but when you're talking to the senior executives of the investor relations personnel, who are presenting to investors in New York and Boston and Baltimore about Venator, the top thing on everyone's minds is what's going on in Pori, and I think it would be implausible to suggest that that topic wasn't extensively discussed with those investor relations personnel and with Defendants [sic] Ogden and Defendants [sic] Turner.

And as we've alleged in the complaint, Mr. Maiter was

intimately involved in that process and spoke with -- with Mr. Turner and other senior executives about what we've called the Pori shuffle -- the Europe-Pori shuffle. And so his involvement and his knowledge and the expectation that the information that he was relaying to those -- those senior executives at Venator -- and, again, I'm taking exception to what Mr. Pepperman said. They were not internal communications. These were clearly directed to be, you know, communicated to the investment public because that's -- that's how companies operate.

And I did just want to add one other thing, which is defendants cited to Your Honor the decision in the New York -- I'm sorry, in the Texas state court concerning, you know, general jurisdiction, and they also mentioned it with respect to specific jurisdiction. I think there's a line in that opinion that shows you exactly why, while the Texas state court might have determined it doesn't have jurisdiction, this Court certainly does.

In that, specifically, Your Honor, the Macomb County court says, you know -- and I think it's the point that Mr. Pepperman was trying to articulate earlier, which is although he's in Texas, that doesn't really matter if he's signing documents. Again, the Texas state court said what would matter is that the statements that he -- you know, the investor communications were directed outward to regulators in

Washington, D.C., and to investors nationwide, and not in Texas, and that was the problem the state court had.

Here, the relevant geographic forum is the United States. It --

THE COURT: It's the United States.

MR. BLATCHLEY: It is Washington, D.C. It is nationwide --

THE COURT: Okay.

MR. BLATCHLEY: -- and that's exactly why we have specific jurisdiction on both defendants.

THE COURT: Okay.

MR. PEPPERMAN: Your Honor --

THE COURT: Yeah. Mr. Pepperman, please. Any response?

MR. PEPPERMAN: Yeah, just very briefly because I do want to move on to the 12(b)(6) motion --

THE COURT: Yeah.

MR. PEPPERMAN: -- which is the main event here.

Just very briefly, Your Honor, on general jurisdiction, as the Court knows, you know, the Supreme Court's decision in the *Daimler* case was really a sea change in the law of general personal jurisdiction. You know, post-*Daimler*, you know, courts don't really scrutinize contact by contacts -- people's contact with the forum. Do they own property there? Do they have a bank account there? Do they vote there?

It's much more of a bright-line test.  Someone is subject to general personal jurisdiction in the jurisdiction at which they're at home.  For a corporation, that's where they're incorporated and where they have their principal place of business.  For an individual, that's -- the presumption is that's where they're domiciled.  So many of the contacts in the post-*Daimler* world fall away a little bit with the focus being on the location of domicile.

And then the second point I would make, Your Honor, is, I mean, there is no question that the general counsel of Venator was heavily involved in the IPO in terms of communicating with the Securities and Exchange Commission, in terms of the sort of work that lawyers do.  But that work is not the basis for the claims here under the Securities Act and under the Exchange Act.

The basis for the claims are certain specific statements in those documents, you know, whether they were materially false or misleading, and, also, under the Exchange Act, whether they were made with scienter.  Back and forth with the SEC, I mean, that's not the -- the predicate for this claim, and that's why, for example, Mr. Stolle's role back and forth with the SEC and signing correspondence with the SEC, those aren't alleged in the complaint because they're not relevant to the underlying claims here.

So they can't give rise to specific personal

jurisdiction, Your Honor.

THE COURT: Because those aren't the material misstatements that are alleged. Okay.

All right. Thank you. I think I have enough on that. Let's move on to the motion to dismiss, and again, Mr. Pepperman, I think that you should start.

MR. PEPPERMAN: Perfect, Your Honor.

THE COURT: I have both of your PowerPoints. When you want to refer to them, just let me know what page you're looking at.

MR. PEPPERMAN: Okay, Your Honor. I can do that or, alternatively, I can share my screen with Your Honor, and they will go up on the screen. I'm happy to do that so that Your Honor isn't flipping through it. Really, whatever is most convenient for Your Honor.

THE COURT: I have it right here on my desktop right beside me. And so I think I'd rather be able to kind of more maintain eye contact with you, have it be more like the courtroom. So I've got it up here on my screen, so just let me know where you are.

MR. PEPPERMAN: Okay. Thank you, Your Honor.

So, Your Honor, just to set the table here, as the Court knows, at the end of January of 2017, roughly seven months before Venator went public, there was a fire at Venator's titanium dioxide facility in Pori -- Pori, Finland, that caused

extensive damage.  Venator fully disclosed both the fire and its impact on the company in its registration statement and prospectus for its IPO.

Indeed, Your Honor, if you look at those documents -- and they were exhibits to our motion -- there's an entire section in them titled "The Pori Fire."  And after the fire, Venator attempted to rebuild the Pori facility while restarting the less-damaged part of the facility that finished specialty products, which were the highest margin products that the facility produced.

After the IPO, throughout the rest of 2017 and into 2018, Venator regularly updated investors on its revised estimates for both the cost and the timeline to rebuild the Pori facility.  What happened, Your Honor, is over that 18-month-or-so period, both the estimated costs and the timeline for the rebuild increased substantially beyond what was initially expected, and this ultimately caused Venator to decide, in September 2018, to close its Pori facility.

And what's happened in this case, Your Honor, is based on hindsight, the plaintiffs argue that earlier statements in 2017 and 2018 in Venator's offering documents and on earnings calls and SEC filings were false and were misleading.

What I'd like to do, Your Honor, today is focus most of my argument on whether the complaint fails to allege false or misleading statements.  That failure, that issue, is case

dispositive.  It is fatal to all of plaintiffs' claims under both the Securities Act and the Exchange Act.

So what I'm going to do is I'm going to spend most of my time addressing those.  At the end, I want to address the complaint's failure to plead scienter with the particularity required by the PSLRA.  That failure would be fatal to the claims under the Exchange Act.  And then I'm going to very briefly touch on our arguments under the statute of limitations for the Securities Act and, also, standing under Section 12(a)(2) of the Securities Act.

So, Your Honor, if Your Honor starts looking at slide 2 --

THE COURT:  Okay.

MR. PEPPERMAN:  -- of our -- of our deck, the complaint alleges four categories of supposedly false or misleading statements, and the descriptions of those four categories on this slide are direct quotes from pages 14 through 16 of plaintiffs' opposition.

Now, Your Honor, although the plaintiffs allege four categories of misstatements, category one is far and away the most important.  It's really the key to the case, and I think as many as one-third of my slides are devoted to category one, what the plaintiffs call the "capacity statement."

THE COURT:  Okay.

MR. PEPPERMAN:  It is, Your Honor, we submit, the only

alleged misstatement of fact, and in defending the other three categories of misstatements, which we submit are all forward-looking statements or statements of opinion, plaintiffs, in their opposition, return again and again to this category one statement.  They say that Venator's capacity statement concerned an underlying fact that was a predicate for all of the other categories of misstatements.

So, Your Honor, if you skip to slide 4 --

THE COURT:  Okay.

MR. PEPPERMAN:  Slide 4 starts category one, and plaintiffs describe category one as that defendants falsely represented that Pori was operating at 20 percent capacity, and that claim, Your Honor, is based on the quoted sentence in the IPO registration statement.  And in that sentence, as the Court can see, Venator described its expectation for the timing of reopening Pori.

And according to plaintiffs, Venator falsely stated that Pori had already restored 20 percent capacity by the second quarter of 2017, which would be before the IPO.  And I think that's important, Your Honor, is that the claim here on the capacity relates to what capacity had been restored in the second quarter of 2017 before the IPO.

There's no --

THE COURT:  When was the registration statement filed?

MR. PEPPERMAN:  Your Honor, that's an excellent

question.  So I mean, I -- I think Your Honor has a general sense of how this works.  The registration statement was initially filed with the SEC on May 5th, 2017.  That fact is alleged in paragraph 307 of the complaint.  It --

THE COURT:  Okay.

MR. PEPPERMAN:  -- then, in response to questions from the SEC, went through, I believe, six amendments and became effective, I believe, on August 2nd, 2017.

So when this -- when the registration statement was filed, Venator -- or then it would be Huntsman -- was in the middle of the second quarter of 2017.  The second quarter of 2017 would be April, May, and June of 2017.

THE COURT:  Yeah.

MR. PEPPERMAN:  So you see, in the registration statement, there is the discussion of what was expected to occur in the second quarter of 2017, not what actually occurred.

THE COURT:  Did -- with the amendments that you just referenced -- I think that you said what we're looking at here on this slide is as stated in the initial or whatever the first filing of the registration statement was.  There are amendments, and then it became effective as of August 2017.

As effective in August 2017, had this statement been modified, or did it stay and carry through all the iterations?

MR. PEPPERMAN:  It stayed and carried through.

THE COURT:  Okay.

**MR. PEPPERMAN:**  And as I walk through this, Your Honor, I will show to the Court the documents that, once the second quarter closed, made clear what happened in the second quarter.

**THE COURT:**  Okay.

**MR. PEPPERMAN:**  The reason why I pause on this, Your Honor, is that there's no allegation in this case that after the IPO, Venator announced to the market or informed the market that additional capacity had been restored subsequent to the second quarter of 2017.  All of the statements relate to what happened, what was restored, what was restarted in that second quarter of 2017.

**THE COURT:**  And I know that you'll get to this, and it's part of the big dispute, but as to the meaning of what "capacity" even means, your statement just said it was focusing on 20 percent.  The other question is the word "capacity" and what the 20 percent is relating to.

So I'd invite you to address that as to what was being said versus what you believe was being understood about those terms.

**MR. PEPPERMAN:**  Correct, Your Honor.  I will do that.

What I'd like to do is walk through with the Court very carefully the disclosures in the registration statement and in the prospectus, as well as the disclosures by both Huntsman and Venator with respect to the second quarter of 2017 that

occurred both immediately before and immediately after the IPO.

I will walk through all those disclosures, and then I will address plaintiffs' argument about the meaning of capacity --

THE COURT:  Okay.

MR. PEPPERMAN:  -- based on the statements in -- I believe it is the Huntsman 2015 10K about the different Calais facility --

THE COURT:  Okay.  Good.

MR. PEPPERMAN:  So, Your Honor, I'm just going to walk through this chronologically.

If you turn to slide 5, and, you know, here we are. We're on February 15th, 2017.  This is Huntsman's earnings call for the fourth quarter of 2016, and during that earnings call -- and keep in mind this is less than a month after the fire occurred -- Peter Huntsman, Huntsman's CEO, disclosed that Huntsman was going to begin by restarting the white end of Pori.

THE COURT:  Yeah.

MR. PEPPERMAN:  And, Your Honor, as I think you know from the papers, that's the finishing portion of the facility, the white end, as opposed to the black end of the facility, which is where raw ore is converted to raw intermediate CD, and "CD" stands for calciner discharge.

So Mr. Huntsman, shortly after the fire, said that they would begin by restarting the white end, the finishing part

of the facility, over the next two months.  In other words, into April, the second quarter of 2017.  He further stated -- and this is not shown on the slide -- that the more damaged black end of the Pori site, that the restarting of that would most likely take several months longer to begin.

In other words, he was predicting, in February, that they would start restoring the black end in July of 2017, which would be after the second quarter.  And just so Your Honor knows what the importance is of restarting the white end of the facility, is that the Pori facility was one of only two Venator facilities capable of producing these high margin specialty products.  That's alleged in paragraph 200 of the complaint. And, in fact, Pori was the sole plant that manufactured numerous high-end titanium dioxide specialty products.

So that's alleged in paragraph 198 of the complaint.

So there is a goal to get the finishing portion of the plant, which is -- was less damaged by the fire, started so that these high-margin specialty products could be manufactured.

And, Your Honor --

**THE COURT:**  Okay.

**MR. PEPPERMAN:**  -- if you turn to slide 6, to me, Your Honor, this is the key document in the case.  This is Huntsman's form 10Q for the second quarter of 2017, which was filed with the SEC on July 27th, 2017.  So this is about a week before the IPO, and this is reporting about what actually

happened during the second quarter of 2017.

You're no longer talking, in the registration statement, about what is expected or what is anticipated.  This is what the market was informed actually happened, and you can see that Huntsman advises the market that a portion of our white end production, that's the finishing part of the plate, became operational during the second quarter of 2017.  There's no mention of any black end production becoming operational in the second quarter.

So investors, before the IPO occurred, knew that the only capacity that had been restored at Pori in the second quarter of 2017 was a portion of white end production.  And, Your Honor, if you turn to the next slide, I'm now going to walk through what were the more specific disclosures in both the registration statement and in the prospectus for the IPO.

In the registration statement -- again, this is written before the second quarter closes even though the IPO occurred after the close of the second quarter.  But, again, Venator advised the market, quote, we anticipate a portion of our white end production will be operational during the second quarter of 2017.

And if you look on the next slide, Your Honor, slide 8, you can see in the registration statement that Venator didn't say that once, it said it twice.  More specifically, what they're anticipating is that a portion of our white end

production will be operational during the second quarter of 2017.

If you look on slide 9, Your Honor, the exact same language is in the prospectus, and if you look, Your Honor, at slide 10, if there could be any doubt when Venator filed its form 10Q -- its first 10Q filing as a public company, when it filed its form 10Q for a second quarter of 2017 on August 28th, 2017, you know, in the -- the section of the 10Q devoted to the Pori fire, Venator told the market that a portion of our white end production became operational during the second quarter.

There's -- there's no -- nothing in the 10Q for the second quarter of 2017 about any black end production having been restored.  So, Your Honor, what -- what we have here on this -- and I'm going to turn, next, to the definition of "capacity."  You have the plaintiffs seizing on a very general sentence in the registration statement where Venator is providing its expected timeline for restoring.

You saw that in the very first slide I went through, slide 4, and they're saying, then, that they expect 20 percent capacity to be restarted in the second quarter, 40 percent capacity in the second quarter of 2018, and full capacity around the end of 2018.  It's a general timeline, but every specific disclosure in the registration statement, in the prospectus, in Huntsman's form 10Q for the second quarter, in Venator's form 10Q for the second quarter, all of them made clear that the

capacity that was restored in the second quarter of 2017 is only a portion of white end production, which finishes intermediate CD.

So, Your Honor, on the definition of "capacity" -- and this is slide 11.

THE COURT:  Okay.

MR. PEPPERMAN:  This -- this case is, I would submit, Your Honor, night-and-day different from the Fifth Circuit's decision in *Spitzberg*.  The Fifth Circuit's decision in *Spitzberg* involved a well-established SEC definition of the word "reserve," and that the company's disclosures there used the word "reserve" contrary to a widely accepted industry definition that was memorialized in the definition published by the SEC.

Here, we have -- we have nothing of the sort. Your Honor, plaintiffs' -- plaintiffs' definition argument is based on this chart from Huntsman's 2015 10K, and what this chart shows, Your Honor, is the total annual capacity for production of titanium dioxide.  That's what's called "nameplate capacity."  It's each facility's maximum production capabilities.

And the chart shows zero capacity for the facility in Calais, France, and that's because, Your Honor, Huntsman had decided, before February 2016, to close permanently black end production at Calais, France.  There was -- it was never a plan to reopen that black end production.

So if Huntsman had included tonnage for both Calais and, also, for the facility that produced the intermediate CD for finishing at Calais, it would have resulted in double counting of capacity and would have overstated Huntsman's annual capacity. But what's --

**THE COURT:** Let me ask this -- let me ask this, Mr. Pepperman. I understand that argument, and it's an explanation for the figures that are listed in the slide, but it's an explanation of what's there. It's -- and, you know, an explanation of the reason why Huntsman might have phrased it like that as opposed to what is there on the face of the document.

So it may be a very good explanation, but right now, in this posture, based on -- you know, I'm looking at their complaint and assuming those allegations to be true. Where does an explanation like that fit in on the standard of review?

**MR. PEPPERMAN:** Well, Your Honor, I think that the key thing -- and I do want to turn to the next slide, which is from the Venator IPO documents. The key point, Your Honor, is the distinction between nameplate capacity --

**THE COURT:** Right.

**MR. PEPPERMAN:** -- which is a facility's maximum production capabilities, and production capacity. And what the charts show, Your Honor -- what the charts show are nameplate capacity. What's the total productive capacity of each

facility?

And if you include -- if you include production from Calais, and then also include production from the other plant, you're overstating what the total nameplate capacity is.  And, Your Honor, it probably becomes clear if you go to slide 12 because --

THE COURT:  Okay.

MR. PEPPERMAN:  -- this -- this is -- this is the slide that was from the registration statement, the table from the registration statement.  And as you can see, I mean, what Venator is reporting on is, again, nameplate capacity, what's the total annual capacity.

So for Pori, what they show is Pori's total nameplate capacity of 130 metric tons per year.  If you look in the footnote three where we've highlighted, you can see what they're providing there is the nameplate capacity, the total productive capacity.  So that's the 130,000.  It's not -- it's not shown, the 20 percent.

I mean, this table has nothing to do with what is the actual production coming out of the facility, and so you can see and hear -- and here, Venator has dropped Calais completely from this because, at this point in time, the decision had been made not just to close black end production at Calais, but also to close white end production.

So Calais' not even listed here as providing any

nameplate capacity, and it provides the full 130,000 metric tons per year nameplate capacity of Pori, but makes clear that the facility experienced fire damage and was not currently operational.

THE COURT:  But wouldn't -- the fact that Calais has dropped from this slide, I don't see how that fits in when the argument is that Calais, at that prior time, was only doing finishing, and the allegation is that the Pori facility, after the fire, was only able to do finishing operations that were like the Calais facility.  Am I misunderstanding that?

MR. PEPPERMAN:  A little bit, Your Honor, and let me try to explain.  I mean, what this chart attempts to show is, as a public company, what will be Venator's total maximum capacity for production of titanium dioxide.  So because the plan was to rebuild Pori entirely and, ultimately, restart full production at Pori -- in terms of what the maximum productive capability of Venator's going to be, this provides the full nameplate capacity of up to 130,000 metric tons.

For -- for Calais, even though Calais --

THE COURT:  And can I -- can I -- so the difference between capacity and nameplate capacity is -- does nameplate capacity then reflect what is coming out of the facility that is simply being finished as opposed to being produced at the beginning?  I think I've got that.

MR. PEPPERMAN:  No.  So nameplate capacity results

to -- relates to the total maximum amount of titanium dioxide that a facility can manufacture if it was running at one hundred percent for a year.

THE COURT:  From start to finish?

MR. PEPPERMAN:  Right.

THE COURT:  Okay.

MR. PEPPERMAN:  100 percent per year.

THE COURT:  Okay.  And so -- and so that -- the figure here of 130,000 doesn't include, if you're bringing in the black end or whatever the rawer material is just to have it finished, it doesn't include that.

MR. PEPPERMAN:  Correct.  But what it is, is if -- if the plant is repaired and becomes fully operational, this will be the maximum productive capacity.

And, you know, the way you can sort of see how to look at this -- and we put this in our papers.  I don't have a slide on this.  But when Venator announced in September 2018 that it was going to close the Pori facility, it told the market that it was going to continue to finish product there, I think at the rate of 25,000 metric tons a year for the next three years, that it was going to continue to do that.

But as soon as it made the decision it was going to close the plant, in the very next 10Q, it eliminated Pori from the chart showing nameplate capacity.  It was in terms of, looking to the future, what the total ability of the company to

manufacture titanium dioxide is.  It's -- it's misleading to include a number that -- for a plant that you know you're going to shut down.

THE COURT:  Let me ask this:  From the -- I take it there's no dispute that some raw materials were being brought to the Pori facility to be finished, right?  I'm not going to use a pejorative term like the Europe-Pori Shuffle or whatever it was, but some of that material was moving there to be finished, correct?

MR. PEPPERMAN:  Correct.

THE COURT:  And was the amount that was being brought there and finished, did it equate to approximately 20 percent of the amounts that we see here of 130,000?

MR. PEPPERMAN:  Yes.  Yes.  So, Your Honor -- and I think this is -- there's an allegation in the complaint on this. I can't quote the paragraph number, but it's cited in our briefs.  I think, according to one of the former employees who's quoted in the complaint, the -- the plant was finishing product at 17 percent of prior capacity.

And so, I mean, the disclosures and the SEC filings said approximately 20 percent.  We also made this point in our papers, that plants never run at 100 percent --

THE COURT:  Right.

MR. PEPPERMAN:  -- productive capacity.  I mean, they typically run somewhere between 85 and 95 percent of productive

capacity.

So according to the allegations in the complaint, after the fire, the Pori plant was finishing product at approximately 7 percent of prefire capacity, and I don't think that the plaintiffs are arguing that the difference between 17 percent and approximately 20 percent is a material difference.  That's not their argument.

THE COURT:  Okay.  Let me think for just a second.

So is there a document or a statement that makes it clear that the 17 percent or 20 percent that's coming out is just material that's being done via finishing the white end as opposed to Huntsman or Venator, We've got it back up and running.  From start to finish, we're getting to 20 percent capacity?

MR. PEPPERMAN:  Your Honor, I mean, those are the statements that I reviewed earlier --

THE COURT:  It is that.  Okay.

MR. PEPPERMAN:  -- from the Huntsman 10Q, which states pretty clearly that the only capacity that was restored in the second quarter of 2017 was -- was a portion of white end production.

THE COURT:  Okay.

MR. PEPPERMAN:  Then you see that same language in the registration statement in two places, in the prospectus, and then in Venator's own form 10Q for the second quarter of 2017

shortly after the IPO.

The -- the two 10Qs for the second quarter of 2017, none of them say that any productive capacity is restarted other than a portion of the white end.

**THE COURT:** Okay. Got it. I -- and I recall this clearly. Okay. Go ahead.

**MR. PEPPERMAN:** So, Your Honor, slide 13 -- and this is my last slide on category one. I mean, you can see this is roughly half of my -- my presentation.

The plaintiffs contend that the truth emerged during a business update call on September 12th, 2018, and this is the call -- this is the call in which Venator announced its decision to close the Pori facility. And according to plaintiffs, this was the first time that Venator had disclosed to the market that Pori was finishing raw intermediate CD produced elsewhere.

And Your Honor can see the Q-and-A on the slide, and this is what I was saying before. You know, in announcing that Venator was anything to close the Pori facility, it said that it was going to continue to produce 25,000 tons of capacity from Pori through 2021. And an analyst asked: (Reading) On the 25,000 tons of capacity of Pori through 2021, is that just finishing and upgrading capacity that you will be running, or will you be processing ore there and producing base titanium dioxide?

And Simon Turner, the CEO of Venator, says: (Reading)

So it's the former, Duffy (phonetic), not the latter.  We'll be taking interim product from elsewhere and finishing it.

And this is what the plaintiffs claim was that corrective disclosure that revealed the truth to the market.  What's very notable, Your Honor, is if you look in paragraph 179 of the complaint, the plaintiffs quote six different analyst reports that were published after the business update call on September 12th, 2018, and not one of those analysts expressed any surprise that Pori was only finishing products from intermediate CD at other facilities.

This distinction on which this entire case is predicated from finishing products versus sort of a start-to-finish full capacity -- I mean, none of the analysts seized on that distinction, and that should come as no surprise because it's really what you would expect because both Venator and Huntsman had been very clear that the only capacity that previously had been restored was a portion of white end production.

So it's just -- if you look at this, none of the analysts seized on this, you know, 20 percent capacity versus only finishing.  If there was something in those analyst reports that expressed surprise about this or claimed that they had misunderstood the facts, I guarantee you Mr. Blatchley would have quoted it in his complaint.  If you look at paragraph 179, you see nothing.  It really is an after-the-fact manufactured

argument.

THE COURT:  Okay.  Over what period of time did the share price decline after this disclosure vis-a-vis what's at issue here?

MR. PEPPERMAN:  I believe -- and Mr. Blatchley can correct me if I get this wrong.  I believe that they allege three corrective disclosures in the complaint.

THE COURT:  Uh-huh.

MR. PEPPERMAN:  On the second quarter earnings call, I think in July of 2018, when Venator announced that it -- its costs and losses here were going to exceed the insurance limit, I think, by more than $375 million, and that Venator was taking a step back and studying the feasibility and wisdom of continuing to try to open the Pori facility, there was a stock drop in July of 2017.

There is a stock drop after this September 12, 2018, business update call when Venator announces that it's closing Pori, and what it also announces is the hundreds of millions of dollars of charges that it's going to incur over the next couple of years closing down the facility and transferring the capability of making these high-end specialty products to another facility.

And then the third corrective disclosure where you have a stock drop is in October of 2017 when Venator filed its 10Q for the third quarter of 2018.  So the case, I believe,

concerns stock drops in July 2018, September 2018, and October of 2018.

THE COURT:  Okay.  All right.  Thank you.

MR. PEPPERMAN:  So, Your Honor --

THE COURT:  So next category of alleged misstatements.

MR. PEPPERMAN:  And, Your Honor, these, I believe, will go much more quickly.

If you turn to slide 15 --

THE COURT:  Okay.

MR. PEPPERMAN:  -- and, you know, plaintiffs' second category, they say that defendants falsely told investors the Pori rebuild was, quote, on track, closed quote, to be rebuilt. And this category challenges Venator's statements about its expected timeline and intended plans to repair Pori.

Your Honor, these statements are either opinions under *Omnicare* or forward-looking statements protected by the bespeaks-caution doctrine and the PSLRA safe harbor.  These standards -- these statements also were accompanied by meaningful cautionary language warning of the possibility of delays.

Now, plaintiffs focus on the language in the IPO offering documents that I have on slide 15 saying that Venator expected to restart full capacity around the end of 2018.  In other words, in about 18 months.  Your Honor, on its face, this is a forward-looking statement talking about what Venator

expects.

Your Honor, if you turn to slide 16 --

THE COURT: Is that in the same -- this is in the same document?

MR. PEPPERMAN: Your Honor, correct. This is in the very same document, the IPO registration statement, and Venator is warning investors of the possibility of delay. It provided what its expectation is, but again warned of the possibility of delay.

What this is, Your Honor, it's in the risk factors section of the registration statement, and if you can see there, after stating that it anticipated full capacity to be available around the end of 2018, Venator expressly warned: (Reading) However, we may experience delays in construction or equipment procurement.

And so, Your Honor --

THE COURT: Okay.

MR. PEPPERMAN: -- if you turn to the next slide, slide 17, so what -- what -- what we're doing here, Your Honor, is we're fast-forwarding from August to October of 2017, and this is Venator's third quarter of 2017 earnings call on October 27th, 2017. It's -- it's Venator's first earnings call as a public company.

And what's significant, Your Honor, is rather than telling investors that the Pori rebuild was on track, a couple

of months later, Venator is already significantly revising its expected timeline.  They're not telling investors that they're on track to restore full capacity around the end of 2018.  In the very first earnings call, they're informing investors that, We intend -- again, We intend -- a forward-looking statement -- to restore only the 60 percent of Pori's capacity that produced specialty products in 2018.

So it's no longer 100 percent capacity in 2018.  Now it's just 60 percent capacity.  And with respect to the remaining 40 percent of said capacity, Venator says that that will not be reintroduced until some uncertain point in the future after 2018.

**THE COURT:**  Let me ask this:  As to both of these, the IPO registration statement and this earnings call, I agree that a lot of this is forward looking, it's talking about what may or may not happen in the future.  I think a lot of the plaintiffs' argument is as to a statement of, We intend, or, in the prior one, We expect these things to happen.

I -- whether or not persons at Venator or Huntsman actually expected or intended that is a statement of present fact at the time it was stated, but it's about something that may or may not happen in the future.  On a motion to dismiss, what's the standard by which to judge whether or not that goes to discovery to see whether there was, factually, an actual intent to do this, to restore manufacturing or to get back to

whatever "X" percent of capacity is there?

Because I think that, at base, they're ultimately saying, You were never intending to actually get production up and running, but to, instead, make it look like product was coming out.

MR. PEPPERMAN:  Well, Your Honor, I think -- I think, under the PSLRA safe harbor for forward-looking statements and the common law bespeaks doctrine, if you have a forward-looking statement, and it is accompanied by meaningful cautionary language, it cannot be the basis for a federal securities claim. And what Your Honor -- we'll get to this when I address scienter, but what you -- what you definitely can't do is point to the state of the world a year later, in 2018, and how this -- how this story ended --

THE COURT:  Right.

MR. PEPPERMAN:  -- saying, you know, it just could have been the case that you believed this, you know, back in August of 2017 or July of 2017.  I -- and, you know, the securities laws distinguish between representations of fact and forward-looking statements and statements of opinion.

For statements of opinion, you need to plead facts that show that the speaker of the opinion honestly didn't believe it at the time.  You know, I -- I say that, you know, I think that the Houston Astros are going to win the World Series in 2020 when I really don't think that.  That's not my opinion,

at all.  I'm falsely stating what my opinion is.

THE COURT:  That is -- but that is so inaccurate because if baseball does begin, the Astros are going to do just fine this season.  You realize that, don't you?

Past experience in World Series to one side, which will not be repeated.  Okay.  Keep going.

MR. PEPPERMAN:  But, you know, the -- and this is why, Your Honor, I believe, in plaintiffs' opposition in defending category two, category three and category four, given the uphill battle they have of pleading a claim based on statements of opinion and forward-looking statements, they double back to category one and say category one was a representation of fact, and that factual representation -- representation was a predicate for all of your estimates and all of your opinions and all of your expectations and intents and beliefs that the market -- market had --

THE COURT:  Let --

MR. PEPPERMAN:  -- had a factual predicate.

THE COURT:  Let me ask this, and I may have -- if I heard you correctly.  We'll stay on slide 17.

If Mr. Ogden, when he's saying, We intend to restore manufacture, et cetera, if that's not true, if there was discovery that showed there was no such intent at that time, does that mean it goes forward, or is it still not enough -- I mean, I know that there are special pleading rules on securities

actions and stuff.

Is that still not enough, because it's -- it is talking about something that may or may not be happening actually in the future?

MR. PEPPERMAN:  So if there was evidence that a speaker did not believe its statement of belief, its statement of intention, then the statement would be false.  And, actually, that, I -- if it was a knowingly false statement, if you were intentionally misstating your expectations or intent, that could be a predicate for a Section 10(b) case under the Exchange Act.

But it's not the case, with federal securities cases, that you can plead a forward-looking statement and then allege the conclusion, that the speaker didn't have that expectation, the speaker didn't have that belief, the speaker didn't have that intention, and then get into discovery and see what the discovery record would show.

I mean, you --

THE COURT:  Right.

MR. PEPPERMAN:  -- need to have the goods in your complaint to plead the claim, which is why, under the PSLRA particularly for Exchange Act cases, it's such a heavy lift.

THE COURT:  Okay.  And does it depend -- how much of it depends on the quality of the cautionary language or -- what was the term that you had used earlier?

I thought I wrote it down.  I guess I didn't.

Just other risk factors that are being disclosed, how much of that matters in terms of how I'm to evaluate a "we intend" or "we expect" type statement?

MR. PEPPERMAN:  I mean, I believe that the phrase that the cases use -- it may be in the statute, as well, is "meaningful cautionary language."  I believe that that's the phrase.  And, you know, we'll walk through it, and I'll point some of this out to you.  I pointed it out in the registration statement that after, you know -- I mean, I think it was a sentence after the anticipated timeline, you know, had the big "however" sentence where you're warning of the possibility of delays.

THE COURT:  Okay.  Okay.

MR. PEPPERMAN:  So, Your Honor, I'm just going to walk through the chronology of the statements.

If you look at slide 18 -- and this is the registration statement for the secondary public offering, the SPO, in December of 2017.  And, again --

THE COURT:  Okay.

MR. PEPPERMAN:  -- here you can see in the slide Venator is saying:  (Reading) We currently intend to restore manufacturing of the balance of these profitable specialty products by the fourth quarter of 2018; however, we may experience delays in construction, equipment procurement, or start-up or plant commissioning.

So you have -- right in that figure, you have both the statement of current intent, plus the warning, the cautionary language letting investors know, This is our current intent, but we may experience delays.

THE COURT:  And can I -- I don't I think I've seen anything.  I have no idea how much lead time it's taken to actually build something like this and get it ready for production, and we'll get into, I'm sure, from the plaintiffs' presentation, where construction or demolition actually was over this point in time.

But at this point in time, which is for the SPO registration statement, is that September of 2017?  Is that where we are?

MR. PEPPERMAN:  So I believe the SPO registration statement -- I'm doing this by memory.  I believe it was filed in November of 2017 and then became effective at the beginning of December of 2017.  So it's --

THE COURT:  Okay.

MR. PEPPERMAN:  -- roughly -- it's roughly -- what is that, roughly five months after the IPO.

THE COURT:  And if no -- if the demolition's not finished, and if no construction has begun, is it possible to have the -- the balance of these manufacturing facilities restored by fourth quarter 2018?  I mean, is it -- I have no idea.

Is it something that takes six months to do, or is it something that takes two and a half years to do or a year and a half?

MR. PEPPERMAN:  Well, Your Honor, I think if you sort of go back from the very first timeline, which, you know -- which projected that restoring full capacity was going to take 18 months, I mean, it turned out -- and, you know, Venator changed the timeline three months later.  Even that 18-month schedule turned out to be overly optimistic.

I mean, it's like anyone who does a major construction project knows, you start off thinking it's going to take "X" number of months and "Y" number of dollars, and then it ends up taking some significantly longer period of time and costing significantly more money.

So at the beginning, the expectation was to complete the rebuild.  It was going to take 18 months.  Three months after the IPO, you have a recognition that in that 18-month period, you know, we're now shooting to have only 60 percent capacity up for the specialty products.

So it takes a long time, and you'll see -- I have some slides at the end.  You know, the allegations, Your Honor, about demolition work, if you really look at them, it says, you know, demolition work was still ongoing in July of 2018.  There were still demolition trucks on the site in April 2018.  There was still a fence around the facility in July of 2018.

I mean, none of those facts, even if you accept them as true, establish that these earlier statements in 2017 or the beginning of 2018 were materially false or misleading.

THE COURT:  Okay.  Okay.

MR. PEPPERMAN:  So, Your Honor, slide 19 -- and this is a slide that requires some explanation.  As Your Honor knows from the quote up top, the claim here is that investors false- -- that defendants falsely told investors that the Pori rebuild was on track, and, you know, we've just seen a number of documents, after the IPO, where Venator's continuing to revise the timeline.

It's not assuring investors that the rebuild is on track.  And what you see here is the on-track language comes from an earnings call -- Venator's fourth quarter 2017 earnings call on February 23rd, 2018, it's a quote from Venator's CEO, Simon Turner, and this is the source of plaintiffs' on-track allegation.

THE COURT:  Uh-huh.

MR. PEPPERMAN:  So what you can see is in arguing that Venator assured investors that the Pori rebuild was on track, the plaintiffs aren't referring to any representation in the IPO or SPO offering documents.  They're referring to a statement during an earnings call made roughly three months after the SPO.

So the -- the claim about being on track, that's not made in an offering document.  So right there, that can't be the

basis for any claim under the Securities Act, which deals only with representations and registration statements and the prospectus.  And what you can see here -- I mean, it really is --

THE COURT:  Hold on.  Hold on one second, just briefly.

Mr. Blatchley, do you agree with that?  I mean, is your action limited to what's in the registration statement and the IPO, SPO papers?

MR. PEPPERMAN:  The Securities Act claims, not the Exchange --

THE COURT:  Yeah.

MR. BLATCHLEY:  Sorry.  I was on mute.

Yes, Your Honor, the distinction is between the Securities Act claims and the Exchange Act claims.  The Exchange Act claims also allege that the offering documents as actual --

THE COURT:  Just -- it's frozen.  Sorry.  It's okay.  My screen was freezing.  There we go.  Can you hear me now?

MR. BLATCHLEY:  I can hear you.  Can you hear me?

THE COURT:  I can now, yes.  So just briefly on that -- on that point, if you would.

MR. BLATCHLEY:  I think Mr. Pepperman and I are in agreement.  The Securities Act claims, those claims that do not require us to prove scienter or causation anything else besides material falsity, those statements are limited to those in the

IPO and the SPO.  This on-track statement is alleged to be actionable under the Exchange Act, as are all the other statements that were made, investor presentations, conference calls and the like.

THE COURT:  Okay.  Thank you.

Mr. Pepperman?

MR. PEPPERMAN:  So, Your Honor, what -- and in this earnings call, what Mr. Turner is saying, is that at this point in February 2018, that Venator remained on track to restore Pori's 60 percent specialty capacity by the end of 2018.  It's the statement that we saw in the SPO document from December and February.

Mr. Turner is telling the market that Pori remains on track.  I will note that there are no contemporaneous facts pled from February 2018 -- before February 2018 that pleads that this statement is inaccurate, that Venator wasn't on track to restore the high- -- higher profitability 60 percent special capacity by the end of 2018.

What's also notable, Your Honor, just showing how Venator's -- rather than assuring the market everything's on track, it's continuing to revise outward the timeline.  You can probably see in the text, after the highlighted text, that Mr. Turner is now telling investors that the 40 percent of capacity would not be reintroduced before 2020.  So in -- in six months since the IPO, it went from full capacity the end of

2018, to full capacity not before 2020.

So, Your Honor, all these slides, again, I mean, two points. One, it's false that this second category is Venator continuing to reassure the market that everything's on track. Instead, the timeline is continually being revised and modified and kicked out.

And, two -- and I'll make this point in the Sandress (phonetic) section. There are no contemporaneous facts alleged showing that these statements of expectations, of estimates, of intentions, of plans, of beliefs were not, in fact, the expectations or intentions at the time. And you'll see in all of these, together with the statements of the expectations, the cautionary language warning investors that, Hey, this is our expectation now, but we may experience delays.

THE COURT: Okay.

MR. PEPPERMAN: So, Your Honor, the next category is very brief. I mean, I -- I was joking with my colleagues that I included two slides here, slides 21 and slides 22, because I thought that if I didn't have slides on category three, it would seem odd, but the slides really aren't necessary to the argument.

I mean, this category of statements, what plaintiffs claim is that Venator incorrectly attributed rising titanium dioxide prices in 2017 and the first part of 2018 to increased demand. They -- they point to a decision in an unrelated FTC

opinion where a district court in Washington, after hearing competing expert testimony on the reason for market price movements, concluded that the loss of Pori's capacity caused titanium dioxide prices to increase.

But what's critical and dispositive here is the statements by Venator about the cause of price movements in the market. That is inherently a statement of opinion. As you saw in the FTC litigation where there were experts on different sides of it, reasonable people can differ.

To plead an actionable opinion under *Omnicare*, you need to allege facts that shows that the speaker of the opinion did not honestly believe the opinion, or else omitted material facts about the basis for the opinions, and no such facts are pled here. And you can't plead an actionable opinion statement under *Omnicare* simply by alleging that a court, in an unrelated -- related FTC action arrived at different conclusions after hearing expert testimony, that the fact that the cause of price movements was a subject of expert testimony, sort of definitionally establishes that what we're talking about here are opinions.

And the only -- the only thing that Mr. Blatchley, I think, does omit is he again tries to double back and leverage off at category one and say, Well, you know, your opinion didn't disclose that the 20 percent capacity that you said you restored was just finishing capacity, and, I mean, that means that your

whole opinion is actionable under *Omnicare*.  We cited this in, I mean, our papers.

In the -- in the IPO offering documents, Venator disclosed that the Pori facility was not operational, and also disclosed that facility -- what percentage of global production that facility produced.  I believe it was 2 percent.  The investors could make up their own mind about the -- whether the loss of 2 percent supply in the market was enough to move prices up.

But in all events, what we're dealing with here are your classic statements of opinions, someone opining on what's the cause of movement -- price movements in the marketplace.

**THE COURT:**  Okay.

**MR. PEPPERMAN:**  And, Your Honor, briefly on category four, if you turn to slide 24 -- and I believe, Your Honor, I can go through these -- these slides fairly quickly.

For their fourth category, what the plaintiffs contend is that Venator falsely assured investors that insurance would fully offset reconstruction costs and lost profits, and, Your Honor, I submit that that is simply not so.  Here, this is the registration statement for the IPO.

Venator disclosed to the market that the insurance was subject to a limit of $500 million, and it also expressly warned that insurance proceeds might not fully recover property damage and lost profits.  And Venator warned that if that happens,

insurance proceeds do not cover property damage and lost profits, that that's going to adversely affect earnings.

Then, Your Honor, in the next slide -- and we -- we quoted from this before.  This is the very first earnings call that Venator had as a public company.  It is a little over two months after the IPO and far from telling investors that insurance would fully offset restruction [sic] costs and lost profits.  You'll see right here they expressly said on the earnings call, We will exceed our insurance limit.

And at that point, Venator said that it expected to exceed the insurance limits by between $100 million and $150 million.  So right out of the bag, telling the market, We will exceed our insurance limits, directly contrary to what the claim is here.

On slide 26, this is the fourth quarter 2017 earnings call on February 23rd.  Again, you see there it says, quite clearly, that, We currently estimate the total rebuild the facility, including the commodities product portion, will exceed the limits of our insurance proceeds.  And at this point, Venator is telling the market that it anticipates -- it anticipates that it will exceed the insurance limit now between $325 million and $375 million.  But you can see Venator hastens to warn that even these estimates are based on assumptions.

So the uninsured costs could exceed these estimates. Again, Venator's not telling the market that insurance will

fully offset reconstruction costs and lost profits.  They're saying that, We will exceed our insurance.  We estimate it'll be between 325 million and $375 million, but it could be even more.

And then, lastly, Your Honor, on this, in July 2018, at Venator's second quarter 2018 earnings call, here they're -- they tell the market that they believe that the cost of the rebuild and the commissioning may require even more self-funding than the previous estimate of 325 million to $375 million.  So I -- I submit, Your Honor, the claim that the company was falsely telling investors that they -- that its insurance would fully offset reconstruction and lost profits is just inconsistent with what the documents say.

**THE COURT:**  Okay.

**MR. PEPPERMAN:**  And then, Your Honor, one last document on insurance.  I think I can go through the rest of this quickly.  I am sensitive of the time.

One thing that's odd about this category four is the plaintiffs, in their opposition brief, make a lot of references to the so-called fast-track premium, and I'm -- it wasn't really clear to me how these statements have anything to do with insurance except that the word "premium," obviously, is a terminology that's often associated with insurance.

But what -- what plaintiffs say is that Venator falsely told investors that it was paying a fast-track premium to rebuild Pori, and it's an argument, again, that's based on

this statement from the February 2018 earnings call.  And what you can see is all Venator was saying then is that, in order to restore the specialty product capacity -- the full specialty product capacity by the end of 2018, which was the plan at this time, that they were willing to pay premium prices, when necessary, to obtain equipment and services in order to hit that mark.

Now, if you look on the next slide, slide 29, plaintiffs claim that this statement is false in paragraph 126 of the complaint.  It's just based on a conclusion.  I mean, they just plead the -- make the conclusory assertion that, in fact, the fast-track premium was not spent on rebuilding the facility -- facility, but rather on what they call the Pori shuffle, the shipping of intermediate product to Pori where it was finished.

I mean, this is just -- this is just pleading a conclusion that the -- the statement about a fast-track premium is false.  It's not pleading any facts that establish that it's false.

THE COURT:  But I guess I asked this:  Was any -- was any rebuilding of the facility actually done?

MR. PEPPERMAN:  Well, yes, Your Honor.  And I -- I was going to -- I was going to touch on this in the end, but let me -- let me do this now.  It's -- I mean, I don't think, Your Honor, that there's any dispute in this case that hundreds

of millions of dollars were spent on the cleanup and reconstruction --

THE COURT:  Yeah.

MR. PEPPERMAN:  -- hundreds of millions of dollars.

You know, I looked through the record, what we have here, as something to quantify that, and if you look in the September 12, 2018, business update call, which is Defendants' Exhibit 7, when Venator's announcing that it's closing down the Pori facility, Venator says then that between the time of the IPO in August 2017 and the end of June 2018 -- so that's, effectively, 11 months --

THE COURT:  Yeah.

MR. PEPPERMAN:  -- that Venator spent a total of $247 million on cleanup and reconstruction.

And if you look in the complaint at paragraph 199, when I say there really isn't any dispute about this, you know, the plaintiffs allege that the magnitude of the reconstruction, when everything was said and done, I mean, ultimately, exceeded a billion dollars.

So I mean -- I mean --

THE COURT:  The -- but I guess that's my question from -- from what I've seen in the complaint.  Was any reconstruction done?  I know that there's been a lot of cleanup that was necessary, and then there was demolition that was left to be done.

But in terms of 247 million for cleanup and reconstruction or anything else, just the question is:  In terms of -- and I guess it matters as to, you know, what the speakers at Venator would mean by something like that.  Because, I mean, reconstruction, I can think of it in a lay term as where you have to be out in the field and actually building the new thing, but it may mean something else towards, you know -- what it means to reconstruct something when it is burned to the ground and you're getting ready -- you know, crediting your arguments that you're getting ready to rebuild it that might be phrasing some of those expenditures as reconstruction even though there's not something, at the end of the day, that was there that was being rebuilt, you know, that was going to last, if I'm making myself clear.

**MR. PEPPERMAN:**  You are, Your Honor.  I mean -- and what I will say is -- I mean, I don't think there's any dispute that there was reconstruction going on, and, I mean, to the extent that there is a dispute on that, it's a -- what I would describe as a rhetorical dispute rather than a dispute driven by pleading contrary facts.

The facility consisted of four separate production lines, and there's a -- a black end portion, and there's a white end portion, and I think the middle of it is something called the Moore facility.  There wasn't -- and this is, I think, the case of any major reconstruction project.  There wasn't

simultaneous reconstruction going on at each and every part and each and every place of the facility.  You take things in phases.

I mean, it turned out to be the case -- you've seen it from the statements -- that all of the progress was much slower than was initially anticipated.  I mean, much slower.  So much so that Venator ultimately made the decision to just close the facility down.

But, Your Honor, I just submit to you just sort of two things, and I'm leery to use sort of rhetorical questions, but I think they are kind of commonsense points.  Is -- I mean, the plaintiffs' whole theory sort of is, is that the reconstruction was a myth, the reconstruction was a fraud.  Well, then, what were hundreds of millions of dollars being spent on?  I mean, where was that money going?

If it was just going to, like, parking the demolition truck or two there -- and another thing is, is if -- if the Venator's senior management knew from the very beginning that the Pori facility, because of the fire, was damaged beyond repair -- they knew that in the beginning -- why would they spend hundreds of millions of dollars and, ultimately, a billion dollars on reconstruction that they supposedly knew was a futile effort from day one?

I mean, what we have here -- again, I think it's a -- an -- unfortunately, I mean, I don't know how many people in --

participating in the hearing have done -- have bought a house and done a major reconstruction. It turns out, often -- I mean, I've had a friend in South Carolina's whose house was destroyed in a hurricane. He spent 18 months trying to repair the house, and then eventually decided to tear it down and build it anew.

When my friend was giving me interim reports, he wasn't committing fraud. He was reporting on what he believed the plan was. It just turned out that the damage was greater than he expected, the cost was greater than he expected, the timeline was greater, and at a certain point you have to fish or cut bait. He said, Knock down the whole house and start over. And --

THE COURT: I -- I think, Mr. -- part of their allegations, I think, is that insurance proceeds were being used or somehow cropping up, what would, I guess, be expensive movement of facility -- of raw materials, the -- in the shuffle or whatever. There's something in -- in defendants' papers that, no, no, the insurance companies are obviously checking and making sure that, you know, proceeds that are being disbursed are being used appropriately.

What -- what do we have on that?

MR. PEPPERMAN: Right. So, Your Honor, the insurance here, as you've seen, covered both property damage and business interruption losses.

THE COURT: Right.

**MR. PEPPERMAN:** Up until September 2018, Venator just disclosed to the market the total amount of insurance it was receiving, and it told the market that it was recording those insurance proceeds as income that offset both the costs of the property damage and the lost profits through business interruption.

Now, the reason why, before September 2018, Venator didn't break it down between the two, is like a lot of public companies. Venator didn't disclose the profitability of individual facilities. That's viewed as being competitively sensitive information.

So Venator didn't disclose, for each of its production facilities, what the net income was for them, which is why, if you broke out property damage versus business interruption losses, you would be disclosing to your competitors how much profit your Pori facility would be generating.

Now, in September 2018, when Venator disclosed that it was shutting down Pori, I mean, that information, obviously, was no longer competitively sensitive going forward. So that's why, in September 2018, I believe Venator discloses, All right, of the $500 million of insurance proceeds, about half of that, 247 million, went to the reconstruction and the cleanup, and then the remainder is -- is business interruption.

But that breakdown was only disclosed in September 2018 once the decision was made to shut down Pori,

and, therefore, the profitability of that individual facility ceased to be competitively sensitive.

THE COURT: Okay. How much more time do you need? You have a few more slides.

MR. PEPPERMAN: Yeah. I will -- I will attempt to wrap this up in -- ten minutes?

THE COURT: Okay.

MR. PEPPERMAN: I'm looking at my clock.

So, Your Honor, slide 30 is just a timeline, and the timeline, I think, illustrates, Your Honor, our points on both scienter and on statute of limitations. It runs from January 30th, 2017, which is the date of the fire, through September 12th, 2018, which is the date of the call where Venator announced that it was closing Pori.

And on the statute of limitations point, Your Honor, we went through this, so I can do it briefly. By July 27th, 2017, in Venator's form 10Q for the second quarter of 2017 -- excuse me. This is August 4th, 2017 -- August 28th, 2017, venator's form 10Q.

Venator had disclosed to the market that the only production restored in the second quarter was a portion of white end production. So at that time, to the extent that any investors thought that the 20 percent capacity statement in the IPO documents was misleading, a few weeks later, they were informed by Venator that the only capacity restored in the

second quarter was white end production -- a portion of white end production.

And then, Your Honor, by October 27, 2017, Venator had disclosed to the market both that, one, the initial timeline no longer was valid and that full production would not be restored by the end of 2018, and, also, that Venator expected to exceed its insurance limits.  So by October 27, 2017, which is more than 19 months before this case was filed, the market was already advised of facts that plaintiffs say are contrary to the statements in the IPO offering documents, and at the very least, at that time, they could have discovered the same claims that they attempt to plead now.

And so that is 19 months before this action was filed, and, therefore, renders the Securities Act claims untimely under the one-year statute of limitations for Securities Act claims.

THE COURT:  Got it.

MR. PEPPERMAN:  So on -- on scienter, Your Honor -- can you hear me?  I'm getting a sign that my bandwidth is low.  Can you hear me okay?

THE COURT:  I can.  No problem.

MR. PEPPERMAN:  Okay.  On scienter, Your Honor, it's important to understand what our argument is and what it is not.  In many cases, defendants argue that their CEO and CFO cannot be expected to know what every employee was doing at every office in every corner of the company, and that's why, in many

securities fraud cases, the complaints plead that senior management received regular reports or attended weekly meetings, or they plead that the particular business line at issue was particularly important to create a -- a strong inference -- the required strong inference that senior management knew the details.

But our argument here, Your Honor, is different. We're not arguing that Simon Turner and Kurt Ogden, Venator's CEO and CFO, were unaware of the critical details at Pori. That's not our argument.

What we're instead contending is that the complaint fails to plead particularized facts showing that they received information that could be from reports, from meetings, or otherwise, that was inconsistent with their contemporaneous statements.

In other words, the plaintiffs allege that they received reports and that they attended meetings and that they talked to analysts on investor calls about Pori, but what they don't plead is that Mr. Turner and Mr. Ogden received information contemporaneous with the statements that they were making that were inconsistent with their statements, which would create the necessary strong inference under the PSLRA that their statements were either knowingly false or made with a reckless indifference to their accuracy.

And on my final three slides, Your Honor, what I'm

going to try to do --

**THE COURT:** And actually, because you're moving on to it, and it's my question, slides 32 and 33 and 34, the title is, you know, they attempt to plead fraud -- fraud by hindsight. So I take it that that's where you're going, that, you know, at the end of the day, none of this worked out, ergo, back at this time, it couldn't have been true.

I want to hear your argument on that, but -- but what inference, if any, am I able to take from where things ultimately did end up in assessing whether or not they could have been true or whether they were being, I don't know, knowingly reckless or, you know, meeting the standard at the time the statements were being made?

**MR. PEPPERMAN:** Well, Your Honor, what I believe is sort of most helpful is sort of explain what the legal standard is.

I mean, for scienter, which is what we're talking about now, there is a heightened pleading standard under the PSLRA. It's not a question of whether the complaint pleads a plausible inference. The question is whether the complaint pleads a strong inference.

And so I think the legal standard is -- under the PSLRA, is the complaint needs to plead particularized facts, not conclusions, that create a strong inference that the speakers, at the time they made their statements, either knew the

statements to be false or were highly reckless.  And the case law, as I'm sure Your Honor knows, "highly reckless" is something greater than gross negligence.

It's a -- it's -- it's almost inexcusable neglect for highly reckless.

So I would argue, but I'm a defense lawyer, that these after-the-fact allegations aren't enough even for them to raise a plausible inference.  Certainly not enough to plead the reckless and strong inference under the PSLRA.

**THE COURT:**  Okay.

**MR. PEPPERMAN:**  And, you know, what I did on these -- on these slides is I tried to -- again, I tried to look for allegations of fact that were grounded in a specific time period so you could see where those allegations of fact were relative to when the statements are made.

And I focused on paragraph 134 of the complaint, and there they have two photographs from March and April of 2018.  I mean, to be honest, Your Honor, I -- I, personally, can't really draw any conclusions from the photographs.  The plaintiffs allege that they show that demolition work was still ongoing then.

They allege that demolition vehicles were still on the site tearing down the Moore facility in April 2018, pointing to former employees one and two.  They allege that the demolition work was still ongoing in July 2018, and former employee two

says that Pori was, you know, still largely fenced off in July 2018.

I mean, all of these -- and these are what I could find that are -- that are sort of, like, well-pled allegations of fact. They're all after the challenged statements and, in some instances, well after the challenged statements.

And, Your Honor, I just have a few --

THE COURT: Let me ask: On the FE1, FE2, et cetera, those statements, in what context -- are those sworn statements? In what context were those gathered and being referred to here?

MR. PEPPERMAN: Yeah. I mean, I'm sure Mr. Blatchley can exercise this. My understanding is in these cases, the plaintiffs' counsel, after they're selected as lead plaintiff, they hire private investigators --

THE COURT: Okay.

MR. PEPPERMAN: -- to seek out and interview former employees and then report back to counsel the results of those interviews, and then those are pled in the complaint. So this, I would believe, is part of the investigation that Mr. Blatchley and his firm undertook through the use of private investigators.

THE COURT: Okay. Mr. Blatchley can explain that. I just, for purposes of considering it, was wondering the extent to which it was sworn or if it was testimony in some proceeding that has gone forward. Okay. Thank you.

MR. PEPPERMAN: So one last word on scienter, and

then, in order to be able to make this argument on behalf of all the defendants, I need to say something on Section 12(a)(2), but briefly on -- concluding on scienter, there are three defendants named in the Section 10(b) claim.  There is Simon Turner, Venator's CEO, Kurt Ogden, Venator's CFO, and Venator, the corporation.

I think we've discussed, over the course of today, the scienter allegations as directed at Mr. Turner and Mr. Ogden. Now, to plead corporate scienter on behalf of a corporation under Fifth Circuit law, because corporations don't have a mental state, you need to attribute to the corporation the mental state of an officer who was responsible for one of the challenged statements.  And in attempting to plead corporate scienter, the plaintiffs principally rely on the mental states of Simon Turner and Kurt Ogden, who are named as individual defendants on this claim, and we -- we've already addressed that.

But the plaintiffs also argue that the mental states of Mahomed Maiter and Peter Huntsman can be attributed to Venator, and though the point we made in our reply brief -- and we cited the relevant paragraphs of the complaint in our reply brief -- is the complaint does not allege that either of those defendants, either Mr. Maiter or Mr. Huntsman, furnished any information to Venator for inclusion in the specific corporate statements that are being challenged here, and nor does the

complaint allege that those specific defendants approved the corporate statements that are challenged here.

You know, they cite in their opposition brief a case versus -- *Lee versus Active Power* from the Western District of Texas, which is a very different case where a rogue employee knowingly provided false information for it to the company, knowing that that false information then would be reported to the SEC. There's no allegation here that either Mr. Maiter or Mr. Huntsman knowingly provided false information for Venator, for a corporation, into public filings.

**THE COURT:** Okay.

**MR. PEPPERMAN:** And then the last argument -- Your Honor has been very generous with the time. I do want to say something briefly about Section 12(a)(2). I will say -- and I don't -- I will say that this is an argument that is particularly important to the Huntsman defendants because, really, I think this is the principal hook of keeping them in the case.

And to have standing to bring a claim under Section 12(a)(2) of the Securities Act, the plaintiff must allege that each defendant either passed title directly to the plaintiff or successfully solicited the plaintiffs' purchase through direct communications. That's a standard set out in the Fifth Circuit *Rosenzweig* case. Judge Rosenthal, in *In Re Plain American Pipelines*, also wrote a very useful opinion on that.

Now, the complaint here attempts to assert a Section 12(a)(2) claim against Venator, the issuer, the Huntsman defendants, which were selling shareholders, and against the underwriting defendants.  But the complaint nowhere alleges that any of those defendants either passed title directly to the plaintiffs or solicited them through a direct communication, and the relevant allegations of the complaint are 368 and 369.  And I think the law is clear that to plead this claim is not enough simply to allege that those defendants were directly involved in the offerings or that plaintiffs bought shares in or traceable to the offerings.  You need to allege a direct passage of title or a direct solicitation through a direct communication.

**THE COURT:**  Okay.

**MR. PEPPERMAN:**  Now, in plaintiffs' opposition brief, they suggested that an unidentified underwriter defendant sold shares directly to them in the IPO and the SPO.  Notably, the complaint does not allege that anywhere, but also, significantly, plaintiffs nowhere suggest that Venator, the issuer, or the Huntsman defendants sold shares directly to them or solicited to them.  And really, Your Honor, they couldn't.

If you read Judge Rosenthal's decision or the *Rosenzweig* decision, in firm commitment offerings, like those here, the issuers, in selling shareholders, typically can't be liable under Section 12(a)(2) because they don't pass title directly to the purchasers in the offering, and they rarely,

through direct communications, solicit them.

Now, the plaintiffs would -- have requested leave to amend their complaint to include the allegation of who they bought shares from, but they don't dispute that the existing complaint doesn't do that, and nor, frankly, do they provide an explanation for that fatal omission even after we told them, pursuant to the pre-motion meet and confer, that we were moving on this ground.

THE COURT: Okay.

MR. PEPPERMAN: The plaintiffs presumably know who sold them shares, and they could have alleged that necessary fact. They didn't do it in their initial complaints. They didn't do it in their second -- in their consolidated complaint, and we think that they shouldn't be granted replead to do that, and any effort to replead against Venator and the Huntsman defendants would be futile anyway.

THE COURT: All right. Thank you very much.

MR. PEPPERMAN: Thank you, Your Honor.

THE COURT: Mr. Blatchley, we've been going for a while. This would be the point in time in the courtroom where I would say, Would anybody like to take a short break, or are you ready to proceed?

MR. BLATCHLEY: Your Honor, I think a short break, and the court reporter might appreciate that.

THE COURT: I agree. I agree.

Shall we say -- and, fortunately -- I didn't comment on the fact that we're proceeding during COVID-19 days.  I wish all of you were in my courtroom and that we were able to do it that way.  This is my first big hearing that I've done since this.  I've had sentencings.  I've had re-arraignments, et cetera.  Those are very different.

So I -- I have plenty of time.  I'm happy to be here. So as long as we need to stay on the record, that'll be fine with me.

It's 3:50 here, it looks like.  So why don't we plan to be back on the record around 4:00 o'clock, okay?  All right. Thank you.

MR. BLATCHLEY:  Thank you, Your Honor.

*(Recess taken from 3:53 p.m. to 4:05 p.m.)*

THE COURT:  All right.  I'm back.  Is Mr. Blatchley on yet?

*(No response.)*

THE COURT:  Okay.  We'll wait a couple minutes, obviously.

*(Discussion off record.)*

THE COURT:  All right.  Mr. Blatchley, wherever you would like to start, please.

MR. BLATCHLEY:  Great.  Thank you, Your Honor.

Is the court reporter ready?  Are we all back on?

THE COURT:  Good question.

Court reporter, do we have you on?

**THE REPORTER:**  Yes, Your Honor, I'm here.

**THE COURT:**  Okay.  Thank you very much.

Mr. Blatchley, go ahead.

**MR. BLATCHLEY:**  Thank you, Your Honor, and, again, thank you, everyone, for joining remotely.  Again, it's Mike Blatchley from Bernstein, Litowitz, Berger and Grossman on behalf of lead plaintiff.

I think what I would like to do is start off and just make a comment on, I think, you know, Mr. Pepperman's overall presentation.  I felt like, in a lot of places, we were at a summary judgment hearing, but there wasn't any evidence and just a lot of argument from counsel about what words mean and rationales about why Venator said what they said in a particular filing.

And that's not the stage of the case that we're at, and I think it's absolutely inappropriate to credit arguments of the kind that we heard earlier at this stage, and I think it's important that we focus on the right test, which is -- and, again, I think Mr. Pepperman's right that the focus of this case is on Venator's statements to investors about the Pori facility and what was actually going on at Pori during the class period, but it's the capacity to mislead.

That is the test for a false and misleading statement. Does the -- have the plaintiffs alleged that the statement had

the capacity to mislead? And I think here, with the statements that we'll go through, that is undoubtedly true and is the case.

And I think it's also important, you know, to just briefly note -- Mr. Pepperman finished with some scienter arguments that I -- that I think are relevant here, but it's important, I think, to provide a little bit of context as to how we got here. And, Your Honor, I think you have the slide presentation that I circulated earlier --

THE COURT: I do.

MR. BLATCHLEY: -- and I -- I was just going to turn to page 2, if that was okay with Your Honor, because I do want to give a little bit of the background because, you know, Mr. Pepperman had made the argument that why would Venator spend all this money on this, you know, futile exercise, or at least that's what he described, you know, plaintiffs' allegations to be.

That's wrong. That's not what we've alleged in this case. If you go to the slide 2, this is the -- you know, again, we're not to scale here, but these are some of the events that occurred before we got to our initial public offering that begins the class period, and that starts with the decision by Huntsman to spin off this business, the additives and pigments business, which they announced in October.

And when they first announced that, what they wanted to do is to give that business to existing Huntsman

shareholders.  Now, the biggest beneficiary of that spin-off would have been the Huntsman family.  Peter Huntsman, who is the CEO of the Huntsman Corporation, and his family are some of the largest shareholders of Huntsman Corp and would have been one of the largest beneficiaries of that spin-off and would have owned a significant stake in Venator.

Now, a couple weeks after they announce that plan to do a tax-free spin-off, you had the fire at Pori, and that's at the end of January.  Not a day goes by -- and Huntsman issues a press release saying, We've got the fire under control, and it was extinguished.  In reality, at Pori, the facility was still on fire.  It was still smoldering at the time that statement was made.  The very first mention of this facility was not true.

Next, the following week, Defendant Turner and other senior executives of the to-be-spun-off company went and visited the facility, and what did they see when they visited there?  We have accounts from former employees, and we have photographic evidence of what occurred months later.

What they saw was a complete destruction of that facility, including the Moore area, which is the primary physical space.  And again, just to give some concept to what we're talking about here and the destruction of the fire, it's 15,000 square meters ablaze during the fire.  That's 164 football fields.  That is a huge area.

And so once they go -- they go to see the facility,

they can't enter the facility because it's not safe.  It's not safe to enter it for at least another month and even longer based on the agencies -- the regulatory bodies that had to go in and inspect everything.  They find radiation leaking there, and it is a serious, serious problem.

Now, almost immediately defendants recognize that they have to get rid of this business.  On February 26, John -- Peter Huntsman mentions the spin-off in the plans, and analysts are asking them questions about it.  He says, We will absolutely not do a spin-off unless there's absolute -- quote, absolute clarity and certainty about how we're going and how we're operating.  That's to ensure Huntsman investors that we're not going to do any sort of transaction until we have certainty and clarity.

A couple of months later, you have rumors of a merger with Clariant, and it becomes apparent to them that the Huntsman -- that they have to rid themselves of this business.  Again, you can't enter the facility until a month afterwards, and they haven't even -- they started an investigation.  The Finnish authorities are asking questions of Huntsman executives about how they're handling the fire.  Huntsman tells them, We are doing our own investigation into the fire.

And while Peter Huntsman says, We're not going to do this spin-off without any -- under any cloud of uncertainty, they change the transaction structure in April 26 of 2017.  Now it's going to be an IPO.

That IPO means it's going to public investors instead of to the Huntsmans, and it also allows the Huntmans to earn -- or raise over $1.7 billion in proceeds.

So when Mr. Pepperman says, Listen, why would they go through with this?  What's the motivation here?  Well, the motivation here is, We get to get rid of a damaged -- irreparably damaged business.  Now, what investors don't know at the time, but the Huntsmans do, is that Pori was responsible for over one-third of the Venator businesses' profits.

It is, as Mr. -- as Mr. Pepperman described, that was a very significant, very profitable part of the business, of any facilities.  It represented over one-third of the profits.

Now, investors didn't realize that -- that really critical fact when -- when the IPO goes forward, and Venator describes how they've got a plan to restore the facility, how they're doing it in phases, and how that's going to be done with -- with, you know, their commitment to doing it as quickly as possible.

And, again, the IPO, that's the beginning of August, and still they have not completed their investigation into the fire.  That means that at that time, they didn't do the IPO without a cloud of certainty.  There was tremendous uncertainty.

So August 4th, the IPO materials themselves -- and this is something I think, you know, we're going to talk about quite a bit because it's the focus of Mr. Pepperman's argument.

I -- we highlighted this at the top of page 3. We're going to turn to this statement in a little bit, as well.

The IPO materials say: (Reading) We expect the Pori facility to restart in phases as follows: Approximately 20 percent in the second quarter of 2017, approximately 40 percent in second quarter of 2018, and full capacity around the end of 2018.

Now, that first phrase, We expect the facility to restart in phases, 20 percent capacity in the second quarter, the second quarter is in the past. That is a statement that can only be read to suggest that this 20 percent capacity has been achieved by the date the statement is made. There is no other valid way, certainly on a motion to dismiss, to read that statement.

As soon as the IPO, they get on their first public investor call with analysts. Again --

**THE COURT:** Mr. Blatchley, let me ask, on the August 4th -- I'm looking at the timeline that you have with you -- that you've given. Does -- so that's a statement that started prior -- it's a statement that began in second quarter of 2017 and wasn't altered until it then became something that continued as a statement in order three, talking about order two. So I understand your argument about that.

But when you move to the next one on September 6th and 13th, that's talking about second quarter 2017, 20 percent

capacity achieved.

MR. BLATCHLEY:  Correct.

THE COURT:  Do I need to -- do -- does it really matter, the August 4th statement, in terms of what was being said and what was meant there given that you got something?  I'm not saying --

MR. BLATCHLEY:  Right.

THE COURT:  -- where it goes, but at least in September 6th, you have something that is saying, as a fact, you know, this is something that is in the past.  Is that -- is that all that's necessary?

MR. BLATCHLEY:  I -- Your Honor, I think there's two points there.  One is the September 6th and September 13th statements are confirmation of the earlier August 4th statement. We haven't changed anything that we've said.  We have just affirmed that what we said in our IPO was true and correct. That was affirmation for investors that 20 percent capacity had been achieved.

THE COURT:  But that's presentations to analysts, but you need something that's in a registration statement or the IPO prospectus, correct?

MR. BLATCHLEY:  Again, two points on that.  We've challenged all three of these -- you know, all of these statements as actionable statements under Section 10(b).

THE COURT:  Okay.

**MR. BLATCHLEY:**  To get liability under the Securities Act, we are not required to prove scienter or loss causation. That is the August 4th statement in the IPO materials.

**THE COURT:**  Okay.

**MR. BLATCHLEY:**  And, again, you have those statements right in September affirming exactly what the IPO has said.  We have already got 20 percent capacity.  They say it again in the first conference calls -- public company first earnings call, We are already running at 20 percent capacity.  And they say it again on December 4 in the SPO materials, We are currently operating at 20 percent total prior capacity.

And again, on the bottom, you'll see what's -- you'll see some details about what's actually happening there, but I would like to turn to page 5 because this is, I think, a big focus of Mr. Pepperman's argument.  And what we mean -- or what Venator means when we say "production," when we say "manufacturing," and when we say "capacity," these are the statements that were in the IPO materials, the SPO materials, and in every conference call during the class period.

When they used those terms, Venator referred to the entire production process when discussing capacity.  I have given an example there.  Throughout the IPO documents, when they say "capacity," when they say "manufacturing," when they say "production," that means start to finish.  And they said specifically what "finishing" was.  That was a term we've heard

a lot today.

"Finishing" is not the entire production process. It's the second bullet here.  It's once an intermediate TI- -- TiO2 pigment has -- has been produced, okay, using either the chloride or sulfate process, it is then finished into a product with specific performance characteristics for particular end-use applications.  It is not being produced -- that's the first phrase of this sentence -- it is being finished.  That is separate and secondary.

And, again, what Venator said -- this was two points. In the 10K, Huntsman called the Calais facility a TiO2 finishing plant.  It did not produce TiO2.  This is what Venator told investors and what Huntsman told investors, and it's what the -- their competitors, Tronox, other chemical companies in the TiO2 business, this is what they said when they say "production," "manufacturing" and "capacity":  The TiO2 finishing plant at Calais contributed zero to total annual capacity.

The IPO documents excluded Calais, which was, again, a TiO2 finishing plant, from its total annual capacity.

And if I could direct your attention to slide 6, I just wanted to take you through this.  Again, we saw this -- Mr. Pepperman's presentation on the left.

You have the capacity levels for all these facilities --

THE COURT:  Where are we right now?  Is this slide --

**MR. BLATCHLEY:**  Slide 6.

**THE COURT:**  Six, okay.

**MR. BLATCHLEY:**  The Calais facility, again, zero annual capacity.  It's a TiO2 finishing plant.  If you have finishing capacity, you have zero annual capacity to produce TiO2.  It is a critical distinction.

Now, Mr. Pepperman suggested that, Well, listen, we had a plan.  We were going to close this facility altogether.  So you should give us the benefit of the doubt that this is what we were communicating to investors.  But that's not the law.  Let's take a look at -- if you go over on the right, that's the IPO and the SPO also put this chart in each of those documents explaining, again, what capacity means.

In footnote one of the chart, again, we are excluding Calais because it is a finishing plant.  It has zero capacity.  That's footnote one.

Just below it, in footnote three, Venator represents, We are currently operating at 20 percent of total prior capacity.  But producing -- it does not say finishing.  It says producing -- only specialty products, and we currently intend to restore manufacturing of the balance of these more profitable specialty products by the fourth quarter of 2018.

Now, there's no -- and we've alleged this in our complaint.  There is no other reasonable reading of that sentence with a footnote two sentence -- you know, two -- two

footnotes above, other than to suggest that capacity means what it says here, which is producing TiO2 from start to finish. If it was finishing, the sentence would have read differently.

It would have said, We are currently finish -- operating at 20 percent of total prior capacity, but finishing only specialty products, and we currently intend to restore maybe finishing of the balance, but they're not. They're using the terms "production," and they're using the terms "manufacturing."

Both of those terms have the meaning as described above. There's no other way to read that, consistent with each other, where finishing is the -- is the process, again, like we just discussed. After TiO2 has been produced, you then finish it. And here, you can't say or can't discern other -- any other invest- -- you know, reasonable reading of these two sentences right next to each other in the offering documents other than at -- certainly at this pleading stage that 20 percent meant actually producing TiO2.

I want to just go to the -- this page after that, slide 7, because these are the same statements conveying to investors that 20 percent capacity means producing TiO2 start to finish. Again, this is in the IPO:  (Reading) We are committed to repairing the facility as quickly as possible, and we anticipate that some level of production -- again, we just saw from the other page in the IPO that finishing occurs after TiO2

is produced.

(Reading) We anticipate that some level of production will have resumed prior to the completion of the separation, and we estimate that the Pori facility will be fully operational around the end of 2018.

Again, it's a level of production.  It is not a level of finishing.  We know that they can say "finishing" and communicate what finishing means, because they just said it in the chart on the previous page.

And, again, the timing here is the IPO is the separation.  You cannot anticipate an event that is in the past. When they say, We anticipate that some level of production will have resumed, they are talking about something that's happened in the past.

Looking at the second bullet, the IPO materials state that, We expect the Pori facility to restart in phases --

THE COURT:  Actually, back up on that because the date of -- the way you have it listed here is paragraph 67 to your complaint, Venator's IPO.  What's the -- what's the date of that filing or that statement?

MR. BLATCHLEY:  That would be -- August 4th is the date of the prosupp.

THE COURT:  And what date was the IPO completed?

MR. BLATCHLEY:  It was, I want to say, August 7th.  It was -- it's right around there.  I could --

**THE COURT:**  Okay.  But within a couple -- few days?

**MR. BLATCHLEY:**  Yeah.  The prospectus -- the prospectus is issued, the shares are delivered, and then you have the SEC filing.

**THE COURT:**  And, again, this is a statement.  It's -- as written, it's something that started in an earlier iteration that hadn't changed over months as it came to the August 4th final version?  Is that what it is?

**MR. BLATCHLEY:**  I want to make clear on that.  What it's saying is that in the second -- I'm sorry if I'm skipping down.

We anticipate some level of production will have resumed prior to completion of the separation.  The completion of the separation is the date the statement is made or within a day or two, thereabouts.  "Prior to" means before, before it happens.  We have --

**THE COURT:**  Right.

**MR. BLATCHLEY:**  -- some level of production.  There is no other way to read that statement other than to assume they have completed some level of production, and production is not finishing because they told us production was not finishing in that same SEC document.

**THE COURT:**  Okay.

**MR. BLATCHLEY:**  Okay.  So the second statement, again, the IPO materials:  (Reading) We expect the Pori facility to

restart in phases as follows: Approximately 20 percent capacity in the second quarter of 2017.

Again, the second quarter ended June 30th. This is a historical statement of fact.

You could say, you know, you anticipate the restart happening in the other phases. Those two things have not yet occurred, but there is no other way to read that statement consistent with logic, common sense and grammar than to understand that the 20 percent capacity was already completed in the second quarter of 2017.

**THE COURT:** And let me ask this -- let me ask this, because it's -- these are statements that began at one point in time and don't appear to have been updated as weeks pass, and you moved into a different time frame from second quarter to third quarter or into and out of the IPO.

If they're talking about -- the second one says, We expect. The first one says, We anticipate. Are you making an argument that if you -- if they didn't have a level of production up and running or the 20 percent capacity that's mentioned in the second one, that the statement should have been corrected or that there should have been a corrective statement, or what is it?

Because they are still talking about, you know, a future thought about what might happen, but it gets tricky since the date as to what you're referring to seems to have passed by

the time there's still this written statement on the page.

MR. BLATCHLEY:  So I -- let me just take that in -- I think the securities laws impose an obligation on defendants to be truthful.  That is the entire point of our securities fraud regime.  It's for honest and truthful disclosures, and particularly with respect to public offerings.  That's the entire premise of the securities laws with respect to those offerings, that they are to be truthful and accurate.

The second quarter occurs on June 30th.  They are misstating a material fact beginning July 1, all the way through July, until August.  There is no excuse or get-out-of-jail-free card for statements in offering documents because it was some- -- something left over from when we were drafting it, and we really meant it back in February or March.

That's not the standard.  Again, it's whether the statement has capacity to mislead, and, Your Honor, this is what that statement does.

And I would like --

THE COURT:  Okay.

MR. BLATCHLEY:  I'd like to turn to the SPO materials, and, again, we went over a little bit before, Section 10(b) imposes liability for all the statements that they -- the public statements that they made concerning this topic, but in these -- these statements are actionable under 10(b) and Section 11 as well.

So the -- the SPO materials, again, this is the secondary offering conducted in December. And Mr. Pepperman said earlier today, We hadn't changed anything. Again, we're relying on the 20 percent that they claimed was already existing back on June 30th, 2017.

It says: (Reading) We are currently operating at 20 percent of total prior capacity by producing only specialty products.

They're producing the products. They've explained in this document and in the IPO document that producing is not finishing. Finishing is something that happens after you produce the -- produced the TiO2.

And they say again, you know: (Reading) We are currently operating at 20 percent of total prior capacity by producing only specialty products, and we currently intend to restore manufacturing of the balance of these more profitable specialty products by the fourth quarter.

They're restoring the manufacturing of the balance.

Again, there is no other way for a reasonable investor to read that statement than to understand that 20 percent means start-to-finish production, that manufacturing means start-to-finish manufacturing. And we do know, and Mr. Pepperman has now, I believe, conceded it, that they never were producing TiO2 from start to finish. They were only finishing that product at the white end of the facility that

worked.

And, again, there's four lines at this facility.  The Moore facility, which is the central facility where the TiO2 production process occurs, was completely destroyed.  We have witness accounts describing that.  You have confirmation from, I think, Venator, itself, later after -- after the class period, and you have, of the four production lines, only one that has one part of it that is still working, and that's the production capacity.  That's all they got that -- all that was ever returned to any sort of functionality throughout the entire class period.

Now, I wanted to make sure I covered Mr. Pepperman's arguments about, We've disclosed the white end part of -- you know, investors understood because we had these one-line disclosures in our 10K -- or, sorry, in our 10Q, and in a section of the offered document.

Again, this is page 3 of the reply, focused on page 8 of our slide deck.  And this is what they really do, they hang their hat on these two disclosures.  They say, We told investors about it because we expect the Pori facility to restart in phases as follows.  Again, this is the same statement.  This does not disclose to investors anything about only finishing TiO2.  The only way to read that statement is that 20 percent capacity was already achieved, which was false.

They then point to the second disclosure:  (Reading)

We are committed -- committed to repairing the facility as quickly as possible, and we anticipate a portion of our white end production will be operational during the second quarter of 2017 and full capacity to be available around the end of 2018.

Again, what they are saying here is that investors should have understood that the Pori facility was only finishing TiO2.  Regardless of -- of all of the other mentions of actually producing specialty product, of actually producing 20 percent capacity, they say this revealed the entire end-all and be-all of what was actually going on at Pori, and that's just not true.

You can't take this as disclosing that critical piece of information.  Certainly on a motion to dismiss.  And, again, the statement above about the 20 percent capacity, that was mentioned over five or six times in the IPO materials.  The second statement here was mentioned once in connection with the risk disclosure that had a bunch of surrounding text about what they were planning to do at Pori.

And what they say here is not inconsistent with their statements above about the 20 percent capacity in the second quarter.  This does not put investors on notice that, in light of all their other statements about what capacity means, what finishing means, it means zero capacity and it occurs after production, that this statement can have -- you know, certainly, it had the danger of misleading investors, as it did.

They also want to point -- they also point to Peter

Huntsman's statement in February of 2017. Mr. Huntsman said at that point, We are going to be introducing intermediate TiO2 into the Pori facility and getting the black end operations up and running in a couple of months.

Now, defendants -- Mr. Pepperman conceded that timeline. The black end facility comes online in July, which is entirely 100 percent consistent with the notion that they had achieved 20 percent capacity at the end of June, which is what they say in the IPO materials and throughout the class period. This statement that white end production was going to be, you know -- sorry, the white end production was going to be operational doesn't contradict any of those other statements, and only, rather, serves to affirm investors' understanding that 20 percent capacity had been achieved.

Now, this was also borne out by -- during the class period, analysts were incredibly confused and unsure about what was actually going on at Pori. Pori was the subject of every investor call. There was repeated questions from analysts about what was going on. They provided an update on Pori every investor call during the class period.

They asked questions about it. They asked about what -- how much the insurance was going to -- business interruption versus -- versus rebuild and got frustrated with the refusal by the company to answer those questions. Now, this exchange here that from Mr. Duffy, again, the same analyst that

Mr. Pepperman highlighted earlier in September 2018 call, he's asking a question.

(Reading) Once you get the 60 percent special capacity towards the end of the year, two questions there.  One, will you be consuming enough ore to produce all the TiO2 on site, or will you ship it somehow or that you'll upgrade?

Okay.  That question only makes sense if you're under the mistaken belief that you're actually producing TiO2 from start to finish.  That's the only reason you could ask that question in that way.

Now, Mr. Turner has an opportunity to correct him, to explain, No, what we are doing currently at Pori is only finishing TiO2.  We are not producing it.  He does not say that.

In fact, he says the opposite.  He says, This is what we're going to be doing.  There will be some nominal, not ore, but some raw semi-unfinished -- semi-fished TiO2 to be brought into the finished operations during 2018, a small portion.

That's not what was happening.  That was the only thing that was going on at the time at Pori.

And, again, the majority would be produced under our fresh new project.  Again, start-to-finish TiO2 production.  The only way to interpret this exchange is to understand that the analyst did not understand what was happening at Pori, and when provided with an opportunity to clarify that to say, No, we are only finishing product at TiO2 -- finishing TiO2 at Pori, no,

we're, in fact, sending -- spending millions and millions of dollars shipping intermediate TiO2 to Pori, when the trains aren't even working -- it's costing us a bundle.

He doesn't say anything like that.  He says, No, we will be doing the majority of our production.  Again, full start-to-finish black end production.

And I think Mr. Pepperman said earlier that this case was night and day of -- you know, of the *Spitzberg* case *versus Houston Energy*.  I have to, you know -- I just would ask Your Honor to go back and read that case and to read the argument that the defendants in that case put forward about why reserves had the particular meaning -- or why investors would have understood that reserves in that case, that was the -- you know, term at issue -- why they would have ever understood that you didn't really mean the technical SEC term that is published and talked about.

They had all kinds of defendants -- defenses and explanations about what that term means.  They couldn't be more similar to what Mr. Pepperman was arguing earlier today.  The same kinds of arguments about, you know, We did have a disclosure that reserved in this capacity -- in this context might mean something different, or if -- you know, stand on one leg and look the right way.  That's not, actually, what we're talking about.

In every way that matters, Your Honor, his statements

here are stronger, and it's -- it's a more obvious answer for -- for discovery, as it is on the motion to dismiss, when you're talking about, in the same SEC document, they describe to you what finishing means, and they say it does not mean production, it does not mean capacity, it does not mean manufacturing.  It means finishing, and you don't hear the word "finishing" once from defendants throughout the class period, unless it's like the example I just described to you on slide 8 when they are misleading investors about what's going on at Pori and not explaining that the only thing that's happening there is -- is finishing TiO2.

**THE COURT:**  Okay.  I think I've got the capacity argument from your perspective, and that covers all your slides.

You ready to turn -- there's a lot of other issues and statements.  You want to turn to those and go through those?

**MR. BLATCHLEY:**  I do.  And I do want to -- I want to make sure that, you know, if you -- if Your Honor does have any questions about any of those issues, I want to make sure I'm answering them and am responsive to that because I know Mr. Pepperman did spend a lot of time going through those -- those issues today.

**THE COURT:**  No.  Actually, as to capacity, I think I've got it.  I understand the arguments from both sides.  I'm going to have to look at some of the cases and confirm what's forward looking versus actually present or backward-looking

statements and the extent to which this idea of capacity is an industry-specific term or something from the other referenced documents, you know, has a particular meaning.

But I understand your argument in that regard quite clearly. Why don't we take up on track?

MR. BLATCHLEY: Sure, Your Honor. And so I -- I did want to just point out, again, Mr. Pepperman did say -- briefly, if I may, Your Honor, going back to what 20 percent means, he did say, I don't think there's any reasonable dispute about the difference between the 17 percent and the 20 percent. And, again, our argument is there was zero production happening, right, which is different than 20 percent, and that even with the finishing that was occurring, it was much less than that.

It was much less than 20 percent. And 17 percent, again -- the primary argument is that it's zero versus 20, but I don't want to dismiss the 17 versus 20 percent as somehow not also misleading, particularly in light of the allegations that we have from -- and maybe this is the opportunity I can address it -- from the former employees we spoke to in Finland about what that meant.

Again, these are --

THE COURT: Which is the -- what the 17 percent meant?

MR. BLATCHLEY: Correct. What the 17 percent meant.

THE COURT: Okay.

MR. BLATCHLEY: And that was from an individual -- and

just for your back- -- Your Honor's --

THE COURT: Yeah.

MR. BLATCHLEY: -- edification, the way we prosecute these securities class actions, Mr. Pepperman is somewhat right in that we go out, and we investigate investors' claims. We have on staff at my firm investigators that help us do that. We also liaise with people, in this case, obviously, in Europe, who have helped put us in touch with witnesses.

But then we, the attorneys, go and speak with the witnesses. We do that over multiple rounds, and as you can tell, you know, some of the information we get includes, you know, photographic evidence and other materials. This is something that we take very seriously and are very careful in ensuring that the basis for our allegations is accurate and right.

And so with that, unless you have another -- Your Honor has any questions about that, I did want to comment: When we spoke to these witnesses that we cite in the complaint, one of them, former employee -- we've called Former Employee No. 2, he would describe how he was -- he was at the factory at the time when, supposedly, they're at 20 percent capacity.

It was a discussion among the workers at the facility, itself, who all knew what the company was publicly saying, and what they said about 20 percent was they laughed at that notion. They laughed at the notion that there was 20 percent capacity.

THE COURT: Let me ask this: As to the -- the former employees and what's recounted about them in the complaint, it -- I take it, it's drawn from your investigators' notes of conversations with them. It's not something that is prepared up into an actual sworn statement; is that correct?

MR. BLATCHLEY: Not in this instance, Your Honor.

THE COURT: Okay. That's fine. Just wondering in terms of, I don't know, the context within which it came.

MR. BLATCHLEY: Yes.

THE COURT: Okay.

MR. BLATCHLEY: Yeah. Again, it's phone conversations. And, again, it's Europe, so it's very late phone conversations, unfortunately.

THE COURT: Okay.

MR. BLATCHLEY: Or very early. But that's the way the -- the evidence was gathered.

THE COURT: Okay.

MR. BLATCHLEY: And, again, with the witnesses that we spoke to, these are -- these are the engineers and -- and the individuals who are at the facility at the time. Mr. Pepperman made the argument that our complaint is based on hindsight, that we just took what happened at the end of the day when Venator's stock lost 70 to 80 percent of its value. It's now trading at a dollar something -- that we said we took those facts and looked backward.

That's an -- absolutely not what we did.  Our investigation went and spoke -- and we spoke to five individuals we cited in the complaint about what was actually happening at the facility at the time, and they provided us with the information we allege in our complaint, including regarding the -- what we've called the Europe, you know, Pori shuffle.

Now, this was an activity that was overseen and directed by defendants.  They knew right from the beginning -- almost from the beginning that they would have to do this process, that they would have to ship intermediate TiO2 from Scarlino to Pori in order to get anything going at that facility, at all.  And what that did, it caused tremendous expense that investors never saw in the financial statements. It caused incredible amounts of resources and complexity having to deal with that situation.

Obviously, Defendant Turner, Defendant Ogden, Defendant -- or, sorry, Defendant Maiter were all involved in that process and in overseeing it.  We've discussed about the weekly meetings that they had updating them on the progress of this facility.  And, again, when they say the -- when they say what was -- what were they looking at, the reports would give them the production levels, and the production levels, again, Your Honor, are zero.

There are finishing levels, but the production at Pori is zero, and they are trying to figure out how to fill customer

orders, and they are precisely involved in that.

And, again, the employees who are at this facility who provided the documentary evidence, the photographs, I want to just touch on that, if I could.  This is not flawed by hindsight.  These photographs are taken in March and April in the middle of the class period.  This is the disaster that is Pori in March and April.

Think of what it was even before that time.  There wasn't even this -- it would have been a gaping hole.  These photographs are kind of at -- you know, they're defendants' best evidence of how far along we've come since, you know, the earlier time span.

To suggest that this doesn't show that their statements about an on-track and on-schedule rebuild are false I just think is an argument you can't credit on this motion.  So I did want to turn to those statements about being on track and being on schedule.

Mr. Pepperman made an argument that these statements that the -- that they changed the timeline, that timeline change somehow inoculates the notion that the rebuild was on track or on schedule.  And, again, I think, if you turn to page 4 of our slide presentation -- which I think I skipped over earlier -- that shows you, I think, what we're talking about when those statements were made.

This is in 2017, this timeline.  We are currently --

November 3rd, we are currently operating at 20 percent of total prior capacity but producing -- again, that term "producing." Not finishing, producing only specialty products. December 4th, that's the SPO date. That's when they do another secondary offering after reporting.

THE COURT: What is -- what is meant by "specialty products" there?

MR. BLATCHLEY: So -- yeah. So specialty products -- as Mr. Pepperman alluded to earlier, there's kind of what they call commoditized products, which is TiO2 that is used -- TiO2 is a pigment. So it's used for a lot of different things. And I'll give you the narrow example, but it's, obviously, a broader kind of application.

But specialty products mean things like the chemicals you put in -- TiO2, you put in sunscreen or you would put in specialty -- specialty -- it's basically what the term means, like pharmaceutical products, some other kinds of -- you know, it requires this -- specifications as opposed to commoditized TiO2, which is less specialized and is more -- it doesn't, you know, gain that kind of premium that specialty products do.

THE COURT: It doesn't have any -- specialty products doesn't have any meaning or relation to a production and manufacturing as opposed to finishing? It's --

MR. BLATCHLEY: Correct, Your Honor. So I want to make sure that that's clear.

**THE COURT:** In the end, whether you're starting from the beginning or whether you're just finishing, what you get to is commodity product or specialty product; is that right?

**MR. BLATCHLEY:** Exactly. So I want to make sure that that's --

**THE COURT:** Okay.

**MR. BLATCHLEY:** -- that's a point that's clear because I think defendants are trying to play a little bit of a game with that.

One of the arguments that they've made is that, We say we're only manufacturing specialty products, and that somehow meant investors were supposed to discern that they were only finishing products. That is not what that statement means, and, in fact, the focus on specialty products even further lulled investors to believe in the 20 percent capacity timeline.

Investors knew that it was important to get the most profitable parts of the operation up and running again, and when defendants spoke about that adjustment to the timeline that Mr. Pepperman talked about, what they said is, We are focused on getting the 60 percent of the specialty production done sooner because that's where we make our most money.

Now, what they said when they -- when they were talking about that is that part of that premium that they are able to earn is a function of Pori's ability to use low-cost aluminide, which is one of the raw materials used in the

production of TiO2, and they would say that in the same sentence as they would about returning to that 60 percent capacity.

And, again, what that conveys to investors is, Oh, so you're doing the production from start to finish, because why else are we talking about raw materials?  We're not talking about intermediate Ti2 -- TiO2 being shipped from Italy.  You're talking about the cost of raw materials when we're saying it's important to get the 60 percent back up and running.

So that --

THE COURT:  Okay.

MR. BLATCHLEY:  So that argument they're making, I just want to make sure that that's clear, that that -- that is a -- it's a fact that favors plaintiffs' allegation.  It does not in any way disclose to investors that they're -- that they're only finishing TiO2.

Does that --

THE COURT:  Okay.  No, I got it.  I got it.

MR. BLATCHLEY:  I think Your Honor was correct in what your -- some of your comments were earlier about, well, what does it mean when they're, you know -- when they're doing construction, and what we have here is demolition isn't even done.

Now, Mr. Pepperman gave the example of his friend's house, who was, you know -- they were having trouble, and they had to kind of restart again about, you know -- and sometimes it

takes longer than you think.  Well, the example here isn't Mr. Pepperman's example.  The complaint alleges that they recognized they had a huge, gaping hole in the house, and they decided to sell it to public investors.

That's what the complaint alleges.  It doesn't allege a caught by surprise, you know, they suddenly wake up one day in July and realize they hadn't made any progress at Pori.  They went to visit the facility, the defendants themselves, after it burned down.  It was 164 football fields worth of burned facility.

They -- they were supposed to complete an investigation into what happened there.  They did the IPO before they finished the investigation.  They have an extensive, extraordinary mass of, you know, trying to figure out the logistical nightmare of shipping TiO2 intermediate produced in Germany and in Italy, and shipping it to Pori when the train lines don't work, and so shipping costs doubled.  And none of this is disclosed to investors.

So when we're talking about, you know, defendants' statements about, you know, We -- we think we're on track, or, We have a timeline where we -- this is what we believe is going to happen, all of those statements are false for two reasons.  One is that they're conditioned upon a false statement of historical fact.

There is no 20 percent production occurring at Pori.

That is false, and all of those statements are premised on that false fact.  And at the same time, Your Honor asked about, Well, what if you didn't have the intention to rebuild?  I don't know what other explanation there could be when you have this little progress, when you don't have any reconstruction actually conducted in March, in April and in July.  You represent to the investors that your schedule is on track and that you're at 20 percent, and you expect to be at 100 percent in several months.

And, again, Your Honor, the reason why those statements are so important, think about it.  Your investors are looking for assurance that they've had this fire.  They said it was minimal.  They said they've got a plan.  They're going to reintroduce it in phases.  Getting to that first leg, that first 20 percent provides reassurance that, okay, so they are making money at Pori.  They are producing some product.

All of the investor analysts modeled that into their assessments of -- of Venator's shares, assuming that this product was actually entering into the marketplace because start to finish.  They didn't realize that Venator's facilities in Germany and Italy were running at extra capacity to make up for that lost capacity that was not being generated at Pori site.

They struggled on every investor call to get those answers, and they just were not provided to them.  And, again, it would be a different world if Mr. Turner and Mr. Ogden had

been clear and had disclosed the truth of what was happening, but when you're saying you're on track, and you're saying that you're on schedule, they're not also saying, Oh, and by the way, we're only finishing TiO2.  By the way, we're only -- we're shipping it from Pori -- or from Scarlino at tremendous cost.  By the way, you know, we haven't even completed the demolition of the -- of any part of the facility that would allow us to start black end production in April, in May, in June, July.

They've made the decision to shut down the facility before they even finish the demolition.  Those kinds of statement and those kind of facts cannot be squared with defendants' statements.

**THE COURT:**  Have you pleaded anything -- here's -- I'm looking at the (indiscernible) statements that have been made when you get to that.  There are statements made after that.  You know, doing a rebuild or repair or whatever it is, there's a lot of -- I mean, anybody knows that there's a lot of engineering that needs to go on.  There's a lot of supply procurement.  There's a lot of planning that needs to go on before you actually start to build.

Have you pleaded anything that indicates that any, you know, time -- you know, there's no way that it would have been built within that time, that, you know, from what we know about these right here, anybody looking at this -- because I don't know.  I don't think that I've seen it.

But, like, looking at this, have you pleaded anything that somebody said -- has said there's no way that you could have something rebuilt and working by the end of the year? Because I don't know that that's necessarily so just looking at the pictures.

I assume it's a complicated, you know, chemical process, but in terms of time and effort that it takes to get there, the picture, itself, doesn't indicate whether or not there's been planning and preparation going on that was then just abandoned, or that, well, they've just been trying to get rid of smoldering ruins, and, you know, we're never going forward with it.

The pictures don't say either way on that.

**MR. BLATCHLEY:** Right. So Former Employee No. 1 did, and he is someone we spoke to pretty extensively about this -- about this. He was actually in charge, at one point, of trying to come up with this quote, unquote, minimal level of finishing process. He was a manager at Pori at the time, and what he says is that, A, manufacturing start to finish is different from finishing, B, it was not reasonable to expect Pori to achieve the nameplate capacity to get to full capacity after the fire by virtue of the fact that the entire Moore facility was destroyed.

And, again, I don't want to overstate things because with any amount of money and any amount of resources, you know, anything is possible. But the reality is, according to the

folks at the ground -- on the ground and at Pori, that was an impossibility.  There was no way that was going to be able to be done, and that's, again, at paragraph 143 of the complaint.

THE COURT:  Okay.

MR. BLATCHLEY:  And there's more detail I can provide around that, you know.  It wasn't just the Moore facility.  There was electrical motors that were destroyed that were integral to running the facility.  None of that was rehabilitated.  There was -- you know, there's all kinds of -- I think we have some additional allegations about the water processing part of the plant that was needed to be rehabilitated.  Again, that wasn't happening.

There -- there are just a series of facts that show that it wasn't realistic to say that we're going to be, you know, finished by the 2018 or any of those revised timelines, as nothing progressed in the way that defendants represented to investors.

THE COURT:  Okay.

MR. BLATCHLEY:  And, again, if Your Honor has any questions, I just want to make sure that I'm not leaving any arguments unaddressed by Mr. Pepperman.

Again, a false statement -- or, sorry, an opinion statement that's premised on a false statement of fact, such as the 20 percent, that's an actionable opinion.  An opinion made with actual knowledge, which we also think we've alleged, is

actionable.  Same with forward-looking statements.  There are mixed statements of forward looking and historical or present aspects.

All of the statements concerning on trend -- on track, on schedule, those statements are all present tense.  They're not forward looking.  To the extent they have some, "We expect to complete," those statements are premised on false statements of historical fact, and they've all admitted the material facts we just talked about, that you're not producing TiO2, you're just finishing it.  You're spending millions and millions and millions of dollars on shipping it from Scarlino to Pori.

You're also doing a number of things, like not even demolishing the facility to get to anyplace where reconstruction can even begin.

THE COURT:  I think I've got your argument there.  Let's move on to the other false statements that you're alleging.

MR. BLATCHLEY:  Sure.  So let me...

THE COURT:  There's the TiO2 demands and the insurance spent.

MR. BLATCHLEY:  So the TiO2 pricing statements, again, when I -- when I heard Mr. Pepperman talking about this argument, it struck me as -- as pretty curious, that the notion that senior managers of -- of Venator, who are intimately involved in trying to manage this crisis at Pori, they're having

weekly reports and calls about what's going on and how they're going to, you know, get the TiO2 out the door and shipping it from Italy, that they don't know what's causing the decline in prices -- sorry, the increase in prices of TiO2 just doesn't pass, for me, the smell test.

The statement that, you know, We are going to do -- the statements they made about the improving dynamics for TiO2 were part of the other statements they had made to investors throughout to reassure them that there was going to be -- there is going to be a return of Pori and that this company was going to be successful, the analysts looked to them for their input into pricing dynamics because they saw them as the experts about this area.

And they must have known that Pori was not -- Pori was a significant driver, as a federal court found, of the increase in prices. And they knew that because they were dealing with a situation in which they were trying to get, you know, TiO2 to their customers. They are hearing from customers about their being upset about what's happening, and I guarantee they're also hearing about what is causing the increase in prices, as a federal court found.

It's simply not a credible defense, certainly on a motion to dismiss, to say, Well, we just -- we believed that, you know, this -- we believed the rise in prices were caused by something else other than the catastrophic fire at the Pori

facility.

And, again, what makes those statements actionable in this case are not just the things I just spoke about, but they are premised on the false statement that they're producing 20 percent capacity.  They're not producing 20 percent capacity.  So that is another reason why investors are so in the dark about what's causing the rise in TiO2 prices, and when invest- -- when senior managers of Venator say there's an increase in demand when, in actuality, it is the elimination of supply, that is an actually false statement.

THE COURT:  Is it accurate that the Pori plant accounted for 2 percent of global supply?

MR. BLATCHLEY:  I -- that's certainly what Venator represented.  I -- I haven't -- that -- I think that is true.  I think the numbers from the FTC proceeding might be a little bit different.

I think one of the things that is -- is important to realize, that is a global number, and what we were talking about, the price increase is really focused in Europe.  The real pricing impact from the Pori shutdown hit European prices, but, of course, that's the market where Venator, you know, makes its money.

So that's where the -- you know, the effect was more pronounced.  So just because we're 2 percent globally I don't think is the right framework to think about the impact of their

supply.  Does that make sense?  I don't --

THE COURT:  It -- it sort of does.  What -- in terms of the market -- excuse me -- the market price, it increased from what to what, roughly speaking?

MR. BLATCHLEY:  I'm trying to recall.  I believe it's in our complaint.  Again, I think the pricing dynamics for each -- for each TiO2 product can differ, but it was a substantial, significant increase, I want to say on the order of several, you know -- between 10 and 20 percent, or something like that, but I don't want to misspeak.

THE COURT:  Well, it just -- I mean, if 2 percent was eliminated, how am I supposed to say, well, that accounts for a 20 percent increase for that -- if 2 percent's eliminated, it accounted for 2 percent of that price increase, but then the rest of it would be, well, there actually was a global demand that was increasing at the time.  Is there --

MR. BLATCHLEY:  So --

THE COURT:  In the oil and gas industry, you know, the various producers are putting out their production amounts, and so you're able to tabulate, look at kind of what's going on in the markets in terms of here's the actual supply that's in the market, and then when you look at the prices as they fluctuate, you're able to see something about what the demand is because you know what the actual supply is.

Is there anything in this market that's like that?

**MR. BLATCHLEY:**  So there is a pricing service that's mentioned in -- in Venator's SEC filings.  I might get the acronym wrong.  It's like TMZI.  There's a bunch of industry publications like that, that follow pricing and, you know, produce reports that are used.  There's, obviously, some -- you know, the data, I think, is anonymous, but they do have that data, and they would get that information.

But from Venator's standpoint, it's -- again, they know what their contracts are with their customers.  They know those prices.  They know what's happening because they're actually on the front lines in determining those prices and hearing and getting intelligence from their competitors about what's going on.

And I just -- I would want to note this is -- this is an allegation that, again, this was litigated in the FTC proceeding against Tronox.  Again, it's a separate matter, but there was expert testimony for days, and documents and testimony from Defendant Maiter about what was causing the price increases, and based on all of that, it was -- it was very clearly -- and, again, this wasn't the focus of the litigation, per se, but the federal court there found that this was certainly the cause of -- of the increased prices in Europe.

**THE COURT:**  Is that finding binding on me?  I take it that it's not.

**MR. BLATCHLEY:**  No, I don't think it is, Your Honor,

but the reason why that --

**THE COURT:**  And then does it -- then does it boil down to -- and I don't know that we would get to bottom on this, but I -- I know you've put in as to what Maiter testified to there. Does it come down to looking at that statement and seeing if it squares with what they were saying in the other -- in these TiO2 demand statements?

**MR. BLATCHLEY:**  No, Your Honor.  So, again, the FTC proceeding is really focused on a separate matter.  It's an antitrust case.

**THE COURT:**  Right.

**MR. BLATCHLEY:**  It's not -- it's not our securities case, which is --

**THE COURT:**  No, no.  I understand that, but it's evidence that was gathered in that proceeding that you're saying, Oh, Maiter was saying -- I take it you're saying --

**MR. BLATCHLEY:**  Yeah.

**THE COURT:**  -- Mr. Maiter said one thing there, and it's at odds with securities statements that were being made and are at issue in this case.

So looking at what Maiter said, and you can see that what was being said here is true or false, is that essentially what you're trying to say?

**MR. BLATCHLEY:**  That's correct.  And, again, the core allegation there is a couple of things.  One, if you're -- so

one is, is that he was involved in statements.  He talked to Defendants Ogden and Turner about investor presentations that were going to be made in the United States.  Two is that he was -- he admitted under oath that he was aware of the, quote, unquote, shuffle, and that's where that "shuffle" term comes from.

He's asked whether he knows about the shuffle, and he says he does.  So he's aware of that process and what's being shipped from Scarlino to Pori.  He says, I would say the finishing process at Pori is not -- is not fully intact, somewhat intact.  I forget the exact language, but he concedes there, again, We're not finishing at the levels we used to --

THE COURT:  Okay.

MR. BLATCHLEY:  -- at Pori.  And --

THE COURT:  I -- so on this one, I -- I mean, I don't have a firm thought about it one way or the other, but if you took Mr. Maiter's statements out of the contention, these statements about the demand or otherwise, just simply market statements and they're forward looking or -- and you wouldn't have anything one way or the other to say -- there's nothing else that you're using to say those statements were false when made, right?

So I and my law clerks would just need to look at Mr. Maiter's statements and see if they square with these statements, right?

**MR. BLATCHLEY:**  Right.  So I think, Your Honor, what --

**THE COURT:**  Okay.

**MR. BLATCHLEY:**  I -- I think I understand your question.  Again, it's -- it's the proceedings in the FTC case, which we think establish kind of what -- you know, conclusively that the price increase was, in fact, caused by the Pori outage, and, again, I don't think you need Mr. Maiter's testimony about that to confirm, you know, that premise.

But, you know, in terms of Defendant Ogden and Defendant Turner's knowledge, again, I think it comes from what we've alleged in terms of what they're doing with their customers, the weekly meetings they had about production.  All of those interactions would have informed them about what was actually happening with those price increases.

**THE COURT:**  I guess I put it this way.  I mean, from Mr. Pepperman's argument -- I mean, I think it is generally correct that this idea of someone saying, Here's why we think this is happening in the market and why the price is moving one way or the other, this is what we think about that --

**MR. BLATCHLEY:**  Yeah.

**THE COURT:**  -- that's all fine.  And it may be wrong, and it may be right, but they're entitled to say that, and everybody else is able to go look at the market on their own and make a decision about what's driving the prices.

But what you're saying is, while they were saying that, they had someone else who was thinking and/or testifying, putting information in that that's not really their true belief about it.  So I'm just trying to zero in on what I go look at, and it's -- and I haven't looked closely at this testimony, at all, but I'll go take a look at what you've put in on that.

Is there anything else as to that demand question?

**MR. BLATCHLEY:**  So -- and, again, I think I would just put it a different way.  I think the primary reason why you can't say demand is gangbusters and that's causing the price increases, without also disclosing everything else they were concealing about Pori, that Pori was producing 0 percent, that Pori was -- you know, all of those other facts make that opinion actionable because, again, under *Omnicare*, you can't leave out the false statement about what your opinion turns on.

**THE COURT:**  Okay.

**MR. BLATCHLEY:**  False comment.

**THE COURT:**  All right.  Let's turn to the insurance.

**MR. BLATCHLEY:**  And, again, I think the insurance -- like Mr. Pepperman, I'll be fairly quick, but I think what -- what happens with the insurance there, the reason, again, the statements about the insurance are false are -- are that the investors didn't know what was -- how this was -- insurance money was being spent.  They didn't know about the millions and millions of dollars being used to ship intermediate TiO2 to

Pori.

And what that insurance money -- you know, the insurance statements were false and misleading because what they ended up doing is disguising the fact that Pori was -- was actually producing nothing.  They would report some of the best earnings that the company has ever had, blockbuster earnings, the first quarter as a public company immediately before they do the secondary offering, which was, you know, rushed by -- by two or three months sooner than they would have ordinarily done it under the lockup agreements they had with the underwriters.  And they're able to report those results by using the insurance proceeds to prop up their financial condition.

Again, that's what the witnesses told us.  They said this appeared to be a situation where they were using the insurance to prop up the company's financial condition so that they could exit -- so Huntsman could exit the company.

THE COURT:  Who said that, and how would they have knowledge of the underlying accounting for those proceeds?

MR. BLATCHLEY:  So we had a couple of witnesses say that, and, again, this is a discussion that was had.  Mr. -- sorry.  Former Employee No. 4 said that he --

THE COURT:  And what paragraph are you referring to, now?

MR. BLATCHLEY:  So this would be, I think, paragraph 140.

**THE COURT:** Okay.

**MR. BLATCHLEY:** Oh, I'm sorry.

It's a reason why he left the company.  I have 140, but I want to make sure I'm giving you the right citation.

**THE COURT:** Is there something -- and there may be.  I just -- it's a very long complaint.  Is there something that says -- that someone has said insurance proceeds were being used to do the shuffle?

**MR. BLATCHLEY:** Your Honor, we do not have that direct evidence --

**THE COURT:** Is that critical to the insurance claim -- the representation about insurance that you're making?

**MR. BLATCHLEY:** It's not -- I don't think it's a necessary component of that, Your Honor.  I think we've alleged numerous facts to show that the insurance played a critical part.  There are statements about the insurance misled investors about the reality at Pori.

I think you see that when -- like Mr. Pepperman had mentioned earlier, once they disclosed that they were shutting down Pori, Pori was actually earning zero, and that's, again, because they were finishing products there at such a high cost after shipping them from Scarlino.

**THE COURT:** Mr. Pepperman said that at the end of the day, when the $500 million -- how the insurance was used was ultimately broken out, it wasn't quite 50/50, but it was

50 percent towards, I don't know --

**MR. BLATCHLEY:**  Yeah.

**THE COURT:**  -- lost business, and 50 percent towards rebuild or whatever.  Is there anything in the disclosure that was made about that, that you looked -- that plaintiffs have looked at and said, No, no, no, no.  Based on that, we now know that the insurance proceeds was being used to do this other thing instead of --

**MR. BLATCHLEY:**  Right.

**THE COURT:**  -- either, be a proper accounting of that insurance for lost business, or for the rebuild -- for either preparing to or rebuilding?

**MR. BLATCHLEY:**  Correct.  So we don't have that granular detail.  We do have the disclosures, at the end of the class period, and -- and the quarter later when, you know, Venator finally provided some insight to investors about what was actually going on with Pori and their contributions to the bottom line.

Again, investors had no idea, before and during the class period, that Pori was responsible for a third of the company's profits out of eight facilities.  All of that information was knew and never previously disclosed.

You know, one of the things we've been looking at, and we think it's very consistent, again, Former Employee No. 4 said he's leaving -- he left the company because he believed they

weren't being honest with shareholders and that they were using the insurance to prop up the company's financial position and not being honest about it.

And, again, I -- I have every confidence that once we get into discovery, we would, you know, figure out how exactly those insurance proceeds were spent and how they helped to mask what was going on at the company, but, Your Honor, I don't have that at this moment.

**THE COURT:**  Okay.  Okay.  Go ahead.

**MR. BLATCHLEY:**  And if Your Honor -- unless you have any other questions about the statements, I think I'll just turned to scienter very briefly.

**THE COURT:**  That -- please do.  That's -- I think we've covered them all on the false statements.  So let's take up the other three issues that we have pending.

**MR. BLATCHLEY:**  Okay.  So I did want to start off -- again, Mr. -- Mr. Pepperman said earlier that this scienter case was not one where, you know, it was -- it was a small part of the company, and they didn't know about it, and he was trying to say that -- what the information that they got didn't contradict their public statements, and that's why we have an alleged scienter.

And again, Your Honor, I think that pretty much concedes scienter for plaintiffs.  I think that we have adequately alleged absolutely, based on that argument, that they

had the knowledge that they needed that contradicted their public statements.  Again, Mr. Pepperman's argument is that everything was fully disclosed.

We've alleged in our complaint that that is not remotely what happened and that defendants repeatedly lied to investors about what was actually going on in Pori, the capacity, the Pori shuffle.  And, I don't think Mr. Pepperman's really seriously arguing that they didn't have the information internally from -- from their internal sources.  They had the information.  He just disputes whether what they said was false.

And so --

THE COURT:  Right.  And so once I decide one way or the other on the -- I'm not deciding actual falsity.  I'm only deciding whether there's enough pleading as to that to go forward.

Once I decide that, does that resolve -- are you saying that resolves, also, the scienter question because of the nature of the disputes that you-all are having about the falsity of those statements?

MR. BLATCHLEY:  And, Your Honor, I think I just lost your -- okay.

THE COURT:  I'm getting a -- I started at 100 percent charge on my iPad, and I'm now down to 10 percent.  So good job.  Y'all are going to exhaust my iPad on this.  And I can plug it in, if I need to, but it's at a worse angle.

But does it come down to that, based on the nature of the disputes that you're having about the statements at issue?

**MR. BLATCHLEY:**  Yeah.  So I would leave that to Mr. Pepperman because I'm trying to interpret what his argument was.  I -- I don't -- I think that that's right.  I think we've more than adequately alleged whatever, you know, kind of knowledge could be expected at this stage with respect to Defendant Ogden -- Ogden and Turner's, you know, knowledge of what was actually going on at Pori.

I think the evidence we have about that is pretty overwhelming.  I think, as Mr. Pepperman put it -- and he'll correct me if I'm misspeaking -- that --

**THE COURT:**  Okay.

**MR. BLATCHLEY:**  -- they thought they were consistent -- their statements were consistent with what they knew internally, and that's certainly something that we believe is not true --

**THE COURT:**  Okay.

**MR. BLATCHLEY:**  -- when you have 0 percent, and you're saying 20 percent.

**THE COURT:**  Okay.

**MR. BLATCHLEY:**  But I would want to just briefly touch on argument that Mr. Pepperman was making about -- I think it's the *Southland* case.  I don't think he mentioned that term, but I think that's what he was alluding to, and it -- it's with

respect to Defendant Maiter and -- and the Huntsman defendants, which is Peter Huntsman, and the motive that they had to conduct the IPO and have it be as profitable and as high priced as it possibly could be -- and, again, we have a series of allegations about why that was a significant motivating factor behind the misstatements.

You know, Peter Huntsman, you know, was able to unload this basically damaged pigments business to public investors instead of continuing to own it.  He was able to do so at a very high premium and earned over $1.7 billion through the separation that they would not have otherwise received.  He enabled the Huntsman family -- again, this is Peter Huntsman's own family -- to avoid over $150 million in losses.

That is a substantial amount of money, and it is probative of scienter under any standard.  And I think what Mr. Pepperman's dispute here is that we haven't somehow shown that -- that Mr. -- sorry, Mr. Huntsman has, quote, unquote, furnished or approved the statements sufficient under *Southland*, and I think that is just flat wrong.  I think we've done that, you know, more than -- than anyone could possibly imagine.

Peter Huntsman is the chair of Venator.  He signed the SPO and the IPO.  He is the guy on the papers.  So, of course, we have alleged sufficiently that he approved or furnished information with respect to the statements sufficient for scienter purposes under *Southland*.

And, again, I think that's -- the exact same thing is true with respect to Defendant Maiter, who was involved in the discussions about the Pori shuffle.  He was intimately aware of how that was going.  He testified to it in the Tronox FTC proceeding, and he spoke with Defendant Ogden and Defendant Turner about the investor communications that they would have.  As we saw again in that testimony -- and this is all, again, before discovery -- he furnished information under the standards in that -- in this circuit and in the cases that we cited in our brief.

THE COURT:  Okay.

MR. BLATCHLEY:  I think that's it for scienter, unless I'm missing something.

THE COURT:  No, that's fine.

Statute of limitations?

MR. BLATCHLEY:  So, again, the statute of limitations, I think -- I was kind of surprised to hear that argument, Your Honor, and I don't know -- if you are concerned about it, I do want -- I would want to answer all of your questions.  It just struck me -- again, statute of limitations, this is a highly fact-intensive argument to make at any stage of the case.

It's, effectively, a truth on the market defense at this stage, that some disclosure in 10K -- sorry, the 10Q, before they do the secondary public offering, before they've made the majority of the false statements at issue in our case

about the 20 percent capacity, about the fact that they're producing and manufacturing specialty product, I didn't think much of the argument, but I want to make sure that I didn't misread anything there.

THE COURT: Well, I would say only that Mr. Pepperman identified clearly two statements which he says that was enough to get the -- start the clock running.

MR. BLATCHLEY: Uh-huh.

THE COURT: It's like everything else. I don't have a conclusion about that, but I know what I need to go look at to decide the statute of limitations question. If you want to say anything about those statements, that's fine, but, I mean, I see where the issues joined on it.

MR. BLATCHLEY: Great. Okay. So I just wanted to make sure that that was -- that was the case.

Those -- those statements, again, as we set forth in our argument today and in the papers, do not remotely disclose the truth about what was happening at Pori, that, you know, there wasn't any sort of reconstruction happening, there wasn't -- there was no -- demolition hadn't even gotten off the ground at that point. You know, all of those facts.

THE COURT: How much is it -- how much is it, in this context, that it's enough disclosure to put you on notice and be vigilant about the protection of your rights as opposed to -- I understand -- I understand clearly that you're saying, look,

there was a very different and much more full, corrective disclosure at a later point in time.

In context outside of securities, it's -- you know, a lot of times the argument is you knew enough to be on notice, and you should have been inquiring if you were actually concerned. Where does the standard -- because I think it's going to come down to a legal standard on that type of issue, at least as to this statute of limitations question.

MR. BLATCHLEY: So -- so under the federal securities laws, courts have pretty consistently followed a case, actually, that my firm prosecuted called *Merck*, and that's cited in the papers. That was a claim under Section 10(b), but the standard has been adopted for Securities Act claims by most courts. I think we've cited them to Your Honor.

Those -- that standard basically says that you have to have information for all elements of your claim before the statute begins to run, and, again, here, you know, the primary elements that there is a false and misleading statement and -- and that just simply wasn't disclosed remotely until, the earliest, when investors start learning that the Pori facility was being shut down.

At the time that Mr. Pepperman is talking about, they're led to believe that it's at 20 percent capacity. It's a highly, highly fact-intensive inquiry. The statute of limitations argument, I think even raising it at this stage, is

something I was really surprised by.  It was an argument they've always raised in state court, and it was -- it was swiftly rejected there, and I think, you know, this Court should do the same.

THE COURT:  Okay.  Okay.  I've got that.

MR. BLATCHLEY:  So the -- the section -- and, again, just for context, no one was harmed in -- in October, to the extent that that's relevant to Your Honor.  I'm not a plaintiff who has a damage, when I bought at the IPO price, and they make a disclosure in October and it's trading $2 higher -- I'm not about to go out and bring a securities lawsuit because of that. That goes with the timeline as well.

Sorry to jump.

THE COURT:  Okay.  Okay.

MR. BLATCHLEY:  So, again, I think -- just a couple of last-minute issues.  I hope we're nearing the end.

The Section 12(a)(2) standing, unless -- unless I have forgotten anything, again, this was -- this was an argument that I was -- I was kind of surprised by.

We've alleged -- we've provided -- and the way the securities cases work, you're required to provide what they call the PSOA certifications, which list the transactions of the plaintiffs in the securities at issue.  Those are sworn documents.  They're submitted under oath.  They're submitted with our, I think, lead plaintiff motion, and then referenced in

our complaint.

And those documents we also submitted in connection when the case was originally before, I think, Judge Rosenthal, a declaration that's part of the record stating that we purchased directly any offerings that the plaintiffs might have generally purchased in the IPO, and all three plaintiffs purchased directly in the secondary offering.  And the reason why you know that, based on the, you know, certifications is that it's on the date that the offering happened and investors could purchase in it, and it's at the offering price.

And those facts make it kind of undeniable that you wouldn't have transactions any other way except if you bought directly in the offering.  The only way to buy directly in an offering is to buy it from an underwriter, and that's what they did here.

As Mr., you know, Pepperman noted, I think that there's mixed case law in what is actually required at this stage.  We cited the case to Your Honor that it does not require the specifics that Mr. Pepperman alluded to, but, certainly -- it's certainly not a basis to dismiss the claims against the underwriters when we've alleged so much already.

We would be happy to specify the underwriters that they purchased from should Your Honor require it, but, again, it's a really -- it's a technical matter concerning what the actual -- what the actual defendant was.

THE COURT:  Okay.  Okay.

MR. BLATCHLEY:  And, Your Honor, I would -- Mr. Pepperman cited the plaintiffs' case.  I would cite that case to you as well.  I would also cite the *Adeptus* case, which is 2018 Westlaw 4352836.  The standard is, again, if we're purchasing from an underwriter, which we did -- and I don't think there should be any legal dispute about that given the information we've already provided.  We've satisfied the standing requirement for Section 12(a)(2).

THE COURT:  As to the -- not that it's necessarily pertinent here right now, but as to the class action allegations, is it -- I haven't looked at this closely in the complaint.  Are members of the class going to be limited to that particular group of -- of purchasers, or is the question only, right now as to our class representatives or claim plaintiffs, that they need to have?  I mean, how does that all fit in?

MR. BLATCHLEY:  Yeah.  So the -- let me -- if -- let me just walk you through.  I think that might be most helpful.

So if I might, Your Honor?  If I could take a step back?

THE COURT:  Sure.  Yeah.

MR. BLATCHLEY:  So we've pled Section 10(b) and Section 20 small A claims on behalf of the class during the class period.  That's every investor who purchased and was harmed by the disclosures at the end of the case.  Those

involved the statements that were made not just in the offering documents, but on investor calls and other media.

THE COURT: Right.

MR. BLATCHLEY: That's the Section 10(b) claim.

The section -- there's three claims under the Securities Act, that's the Section 11 claim, the Section 12(a)(2) claim that we were just discussing, and the Section 15 claim. The Section 11 claim is -- again, we have Miami General, which is one of the plaintiffs, purchased directly in that offering, and every other purchaser, every other plaintiff also has standing to assert a Section 11 claim because they purchased in between the offering and the secondary offering. That's the concept called "tracing."

So we have standing to assert that claim on behalf of the class given those facts. So all of the class members are protected with respect to the Section 11 claim on the IPO.

With respect to the secondary offering, which is -- again, it's a new offering. We are asserting, again, Section 11, 12(a)(2), and Section 15 claims arising from the misstatements in that offering. All three of the plaintiffs purchased directly in that offering. So that provides them with Section 11 standing on behalf of the class to bring that claim.

With respect to Section 12(a)(2), again, they purchased in the offering. So they have standing to assert the Section 12(a)(2) claim, certainly -- and I don't think

Mr. Pepperman would dispute, so long as I identified the underwriters -- and please let me know if I'm wrong -- that having purchased directly from the underwriters in that offering, we have standing certainly with respect to the Section 12(a)(2) underwriters who sold those shares in the offering.

I think Mr. Pepperman has a dispute about whether the Huntsman defendants and Venator are properly named, and I think we cited a case to Your Honor that suggested that they were, and Mr. Pepperman disagrees with that.

THE COURT: Okay. I think I have it. Thank you, Mr. Blatchley. Is there anything in conclusion that -- I think you've gotten it all off your chest. So I definitely have your argument.

MR. BLATCHLEY: Good. And if Your Honor has any questions, I want to make sure I've addressed them, but I think that does it for me for now.

THE COURT: Okay. Mr. Pepperman, how much time on -- I'm not going to do a back-and-forth here, and I think that Mr. Blatchley's, you know, basically been responsive to things that you've said.

MR. PEPPERMAN: Okay.

THE COURT: I think it's fair to let you, obviously, respond to any of that. I don't want to keep going back and forth --

**MR. PEPPERMAN:** No, no.

**THE COURT:** -- but I would like to give you a chance to conclude and respond to what you've heard.

**MR. PEPPERMAN:** Yeah, Your Honor, and I want to be very brief. Your Honor and the court staff has been very patient. I realize it's after 5:30, and we've been going for over three hours. So I do want to be brief. I just want to hit some high points right here and resist the temptation to pile upon.

First, Mr. Blatchley began his argument, in effect, suggesting that the argument I made was a summary judgment motion, and the point I want to make on that is every argument I made was grounded either in the offering -- IPO offering documents, the SPO offering documents, or other securities filings or earnings calls at issue in the complaint.

Those are all things that the Court can take judicial notice of in ruling on a motion to dismiss. We provided, with our opening brief and with our reply, the exhibits which cites the specific pages on which the information is found. So this is all fair grounds on the pleading.

The second point I'd like to make is I think Mr. Blatchley's argument today sort of underscored where I started about the centrality of the 20 percent capacity statement standards to the plaintiffs' claims. I think Your Honor had asked about the second and third and fourth

category, and in responding to each of those, Mr. Blatchley steered the conversation back to the 20 percent capacity statement.

And what that is, in effect, is a claim that the defendants falsely stated what production had been restored in the second quarter of 2017, because there's no claim that any production was restored after the second quarter of 2017.  And both Huntsman's form 10Q for the second quarter of 2017, which was filed a week before the IPO, and Venator's form 10Q for the second quarter of 2017, which was filed in the weeks after the IPO, made unmistakably clear that the only productive capacity that had been restored in the second quarter of 2017 was a portion of white end production.

It said that a portion of white end production became operational, and because those disclosures were so clear on -- in September 2018, when, according to the complaint, the defendants first revealed that Pori was simply finishing intermediate CD produced elsewhere, none of the analysts expressed any surprise about that.

I mean, you can see the -- the quotes in paragraph 179, and I'm sure if any analyst in any report expressed any surprise about that, Mr. Blatchley would have quoted it in the complaint.

THE COURT:  I got that from your original argument. Yes.

**MR. PEPPERMAN:** So, Your Honor, part of the thing that Mr. Blatchley focused on here -- and I wrote it in my notes -- which is that production does not equal finishing, that production is not finishing, and in going through and making his highly textual argument based on the offering documents, came back time and again that production is not finishing.

Now -- now, first -- I mean, that isn't an argument that was made in the opposition, but more importantly, it ignores the five different statements that I presented to the Court in slides 6 through 10, which talked about restoring a portion of white end production or about a portion of white end production becoming operational.

White end production is finishing.  In disclosing that white end -- only a portion of the white end had been restored, Venator referred to that as production, completely destroying this distinction between production and finishing.  It -- five separate times, the reference to white end production.

The one slide that I wanted to point to is slide No. 9.  Your Honor might recall it.  It's one that has the heading up top, "Defendants Lied," and there is a -- a back-and-forth quote there between an analyst, Mr. Fisher, and Simon Turner at Venator.

This back and forth, which was from a February 23rd, 2018, earnings call had nothing to do with the previous production that had been restored at Pori.  What Mr. Fisher is

asking about -- and we attached the entire transcript to our motion.  He's asking about Venator's future plans to restore the 60 percent of capacity for specialty products by the end of 2018, and he's asking -- you can see right there.

First question, As you move to the 60 percent on specialty towards the ends of the year, and he's asking what will they be doing.  And this is not, at all, a question about the prior capacity that had been restored at Pori.  It's a question about what they're planning on doing in the remainder of 2018 in restoring the additional 60 percent of specialty capacity that they said they expected to restore by the end of the year.

THE COURT:  Okay.

MR. PEPPERMAN:  Third, the -- the second, third and fourth categories of statements are all statements of opinion, statements of belief, statements of expectations, statements of intent, statements about what is anticipated.  The Supreme Court's decision in *Omnicare* sets forth what the plaintiffs pleading burden is there to get past the motion to dismiss and into discovery.

I mean, that's the Supreme Court's opinion.  The cite is 575 U.S. 175.  And the quote that I remember from it is, after describing this very difficult pleading standard to challenge under the securities laws a statement of belief or expectation or intent, what the Supreme Court says is, quote,

that is no small task for an investor, closed quote, underscoring how high the pleading burden is for those categories of statements to get past the motion to dismiss.

THE COURT: What was the caption? I got the cite. What's the case name?

MR. PEPPERMAN: It's a case they call *Omnicare*. I think it's cited throughout our briefs. Hold on.

THE COURT: Okay. Got it.

MR. PEPPERMAN: I'll give you the full name. The -- it is *Omnicare, Incorporated, Re [sic] versus Labor District's Counsel of Construction Industrial Pension Fund*. It's a 2015 Supreme Court case, 575 U.S. 175, and I think the quote I gave about it being no small task for an investor is off of page 194 of that opinion.

THE COURT: Okay. All right.

MR. PEPPERMAN: So I don't want to belabor the other categories of statements. I just want to do it briefly, and these are really responding, I think, to questions that Your Honor asked.

The fact that Pori's production was 2 percent of global demand, that's actually taken from the complaint in paragraph 159. And, I mean, I guess his argument is, is that for 2 percent of global demand, if 20 percent of that had been restored, as somehow the investors would have reacted completely differently to those statements, but the -- the bottom line is,

when you are saying what is the cause of price movements in the market, that is inherently an opinion, and the plaintiffs need to plead facts that the speaker of the opinion did not honestly hold that opinion.

Your Honor, I guess your 10 percent ran out.

**THE COURT:**  I'm at 2 percent, and I don't want to risk getting cut off at the very end here.  So I'm just going to plug in, but that's all right.

All right.  Keep going.

**MR. PEPPERMAN:**  So the other point I want to make -- there are a lot of references to Mr. Maiter.  Just so there's no confusion, Mahomed Maiter did not make any of the statements at issue in this case.  He's not named as -- none of the statements that are alleged to be false or misleading were statements made by Mr. Maiter.

**THE COURT:**  Okay.

**MR. PEPPERMAN:**  On -- on insurance -- just to be clear in terms of the accounting treatment of the insurance, I mean, I noticed that Mr. Blatchley didn't defend this claim that Venator was falsely representing that insurance was going to fully offset all of the construction lost profits.  But in terms of the accounting treatment of this, I covered this, and we addressed it in our opening brief.

Venator accounted for the insurance proceeds as income and said that that income offset both property damage and lost

profits. So it was treated as income, and that's how it was said in the accounting statements.

Now, the claim that, you know, the money coming from the carriers, the checks from the carriers were actually being sent to pay for the shipment of intermediate CD from Italy to Finland, I mean, that's really made up. The only former employee that Mr. Blatchley mentioned is Former Employee 4, whom he describes as a North American market manager, and how a North American market manager would be an authoritative statement on how the company accounted for insurance proceeds or whether, you know, the checks from Tokyo Marine were cashed and then spent, the ship products from Italy to Finland, I mean, it's just conclusory assertions and rhetoric. There are no facts.

So the last thing I wanted to end on is, you know -- and this is really where Mr. Blatchley started. You know, the -- the plaintiffs' theory of fraud here really turns on what Huntsman's motivation was. I mean, that's the fraud theory, and if you look at what the documents say that are subject to judicial notice, it -- it just doesn't withstand scrutiny.

What plaintiffs argue is that after the fire, Huntsman elected to IPO, to sell to public investors its pigments and additives business rather than spin it off to the existing shareholders, and plaintiffs suggest that this was an attempt to minimize any losses that Huntsman would suffer as a result of the fire. It -- it's belied by the documents.

The -- what -- what Huntsman announced -- and this is Defendants' Exhibit 22. It's at page 5. It is the third quarter 2016 earnings call, was that after the spin-off, Huntsman intended to retain only a 40 percent economic interest in the spun-off entity. So if there had been a spin-off, when it was done, Huntsman would have only a 40 percent economic interest, which was important because Huntsman wanted to preserve the tax-free status of the spin-off. So it could have only so much voting control, and it would have only 40 percent economic interest.

After the IPO, Huntsman owned 75.4 percent of Venator, and after the SPO, Huntsman owned 55 percent of Venator, and those numbers are Defendants' Exhibit 14 at page 156. So what these numbers show is after the IPO and after the SPO, Huntsman ended up owning more of Venator, having a greater economic interest in Venator than it would have had it done the spin-off, because under the spin-off, Defendants' Exhibit 22 at 5, the plan was that Huntsman would own -- retain only 40 percent economic interest in the spun-off entity.

So the whole theory of fraud here -- really, Mr. Blatchley's first slide -- that this was some slight of hand by Huntsman to try to wash its hands of Venator because Huntsman knew that the Pori facility was damaged beyond repair, and it quickly switched to an IPO, and it rushed through the SPO, through the IPO and the SPO Huntsman had a greater retained

Case 4:19-cv-03464   Document 79   Filed 05/21/20 in TXSD   Page 152 of 203   152

economic interest in Venator than it would have had it gone through with the spin-off.

So the whole theory of fraud, Your Honor, I submit, doesn't withstand scrutiny.

That's all I have, Your Honor.  Thank you.

**THE COURT:**  Thank you.

Mr. Smyser, since you're sitting here in Houston the whole time, I want to give you the opportunity to say something, and, also, Jack Edwards with the Ajamie firm.  I think it's only right that y'all have something to say, if you would like to.

**MR. SMYSER:**  Your Honor, what I'm going to say, on behalf of the Venator defendants and the individuals is that it's 6:00 o'clock, and I think --

**THE COURT:**  Okay.

**MR. SMYSER:**  -- I think that the individuals who have argued this, have done so very competently and capably, and I think that I would have nothing to add on top of what they have said that would advance the ball.

**THE COURT:**  Thank you.  I was being polite, and you have outpolited me.  So well done.

**MR. EDWARDS:**  Your Honor, I'm with Mr. Smyser.  I would like to thank the Court and their staff for their patience in giving us this hearing this afternoon that's gone as long as it has.  So thank you.

**THE COURT:**  Thank you.

On behalf of myself and my staff, I will tell you that we were all very glad to get back and do a real hearing with real lawyers arguing, and I imagine that you-all have enjoyed getting ready to do what it is that lawyers do.  I had an intern that started in my chambers on Monday.  So this was a big deal for her, and my law clerks have not seen a real hearing for several months now.

So I know that the defendants never want to be in my courtroom again, but all of you will be welcome there in person some day, and I -- if it gets to that.  Particularly for counsel that's on here from New York, I hope that your firms and your families are doing well.

MR. PEPPERMAN:  Thank you, Your Honor.

MR. BLATCHLEY:  Thank you, Your Honor.

THE COURT:  All right.  Thanks, everybody, very much.

MR. PEPPERMAN:  Thank you.

MR. BLATCHLEY:  Thanks, all.

*(Proceedings concluded at 5:54 p.m.)*

-o0o-

I certify that the foregoing is a correct transcript from the record of proceedings in the above matter.


Date:  May 20, 2020

*/s/ Heather Alcaraz*
Signature of Court Reporter

**MR. BEHRENS: [1]**  9/3
**MR. BLATCHLEY: [117]**
3/19 3/23 4/2 4/20 5/13 10/4
18/24 20/8 21/4 21/11 21/15
21/17 21/21 21/23 22/2
22/11 22/17 23/13 23/17
25/13 26/2 26/9 26/13 26/16
26/19 29/5 29/8 61/12 61/18
61/21 83/22 84/12 84/22
85/4 86/9 91/1 91/6 91/11
91/21 91/25 92/4 93/25 94/2
96/20 96/23 97/1 97/8 97/17
97/23 99/1 99/19 106/15
107/5 107/22 107/24 108/2
109/5 109/8 109/10 109/14
109/17 112/7 112/23 113/3
113/6 114/10 114/17 118/13
119/4 119/18 120/17 120/20
122/12 123/4 123/16 123/25
124/24 125/7 125/11 125/16
125/23 126/13 126/25 127/3
127/20 128/7 128/16 128/18
129/18 129/23 130/1 130/8
130/12 131/1 131/8 131/12
132/9 132/15 133/19 134/2
134/13 134/18 134/21
136/11 136/15 137/7 137/13
138/8 139/5 139/14 141/1
141/16 141/21 142/3 143/14
153/13 153/16
**MR. EDWARDS: [1]**
152/20
**MR. PEPPERMAN: [118]**
4/5 4/8 4/23 6/17 6/21 8/8
9/1 9/22 10/21 11/24 12/8
12/25 13/8 13/13 13/25
14/15 14/17 14/22 14/25
15/9 16/1 16/9 16/17 17/13
18/21 29/11 29/14 29/17
31/6 31/10 31/20 33/13
33/24 34/9 34/24 35/5 35/13
35/23 35/25 36/5 36/20 37/5
37/9 37/18 38/20 41/6 42/16

42/21 43/7 44/10 44/24 45/4
45/6 45/11 46/9 46/13 46/23
47/14 47/17 47/22 48/6 50/4
50/8 51/3 51/5 51/9 52/4
52/17 54/5 54/15 55/6 55/17
56/4 56/18 57/3 57/13 57/19
58/13 58/18 59/3 60/4 60/18
61/9 62/6 63/15 65/13 67/13
68/21 69/3 69/12 70/14
72/21 72/25 74/4 74/7 75/16
75/20 77/13 78/10 79/10
79/15 79/24 81/11 82/13
83/9 83/17 143/21 143/25
144/3 145/25 147/13 148/5
148/8 148/15 149/9 149/16
153/12 153/15
**MR. SMYSER: [2]**  152/10
152/14
**THE CASE MANAGER:
[1]**  3/12
**THE COURT: [239]**
**THE REPORTER: [1]**
85/1

**$**

**$1.7 [2]**  89/3 135/10
**$1.7 billion [2]**  89/3 135/10
**$100 [1]**  66/11
**$150 [2]**  66/12 135/13
**$150 million [2]**  66/12
135/13
**$2 [1]**  139/10
**$247 [1]**  69/14
**$247 million [1]**  69/14
**$325 [1]**  66/22
**$375 [4]**  50/12 66/22 67/3
67/8
**$375 million [4]**  50/12
66/22 67/3 67/8
**$500 [3]**  65/23 73/21 130/24
**$500 million [3]**  65/23
73/21 130/24

**-**

**-- the [2]**  97/2 99/22

you [2]  95/15 123/23
**-o0o [1]**  153/19

**/**

**/s [1]**  153/24

**0**

**0 percent [2]**  128/12 134/19

**1**

**10 [11]**  40/5 56/10 80/4
91/24 99/21 99/24 123/9
138/12 141/22 142/4 146/10
**10 percent [2]**  133/23 149/5
**100 percent [6]**  45/7 46/22
53/8 103/7 116/8 133/22
**10004 [1]**  1/22
**10019 [1]**  2/16
**10020 [1]**  1/14
**10K [5]**  37/7 41/16 93/11
101/15 136/23
**10Q [18]**  38/23 40/6 40/6
40/7 40/8 40/11 40/24 40/25
45/23 47/18 47/25 50/25
74/17 74/19 101/15 136/23
145/8 145/9
**10Qs [1]**  48/2
**11 [10]**  5/20 41/5 69/11
99/24 142/6 142/8 142/11
142/16 142/19 142/22
**12 [20]**  5/20 10/1 15/2 29/16
33/10 43/5 50/16 69/7 80/2
81/14 81/20 82/2 82/24
139/17 141/9 142/7 142/19
142/23 142/25 143/5
**125 [1]**  1/22
**1251 [1]**  1/13
**126 [1]**  68/9
**1285 [1]**  2/15
**12th [3]**  48/11 49/8 74/13
**13 [1]**  48/7
**130 [1]**  43/14
**130,000 [5]**  43/17 44/1
44/18 45/9 46/13
**134 [1]**  78/16

**1**

**13th [2]**  90/25 91/13
**14 [3]**  1/9 33/17 151/13
**140 [2]**  129/25 130/3
**1400 [1]**  1/14
**143 [1]**  119/3
**15 [5]**  5/20 51/8 51/22 142/7 142/19
**15,000 [1]**  87/23
**156 [1]**  151/13
**159 [1]**  148/22
**15th [1]**  37/13
**16 [2]**  33/18 52/2
**1600 [1]**  1/18
**164 [2]**  87/23 115/9
**17 [4]**  52/19 55/20 107/16 107/23
**17 percent [6]**  46/19 47/6 47/10 107/10 107/14 107/22
**175 [2]**  147/22 148/12
**179 [3]**  49/5 49/24 145/21
**18 [5]**  51/24 57/16 59/7 59/16 72/4
**18-month [2]**  59/8 59/17
**18-month-or-so [1]**  32/15
**1807 [1]**  2/12
**19 [4]**  60/5 75/8 75/13 84/2
**19-3464 [1]**  3/16
**194 [1]**  148/13
**198 [1]**  38/15
**199 [1]**  69/15
**1:35 [1]**  1/6

**2**

**2 percent [9]**  65/6 65/8 122/12 122/24 123/11 123/14 148/20 148/23 149/6
**2 percent's [1]**  123/13
**20 [4]**  107/14 107/15 141/23 153/23
**20 percent [62]**  34/12 34/18 36/16 36/17 40/19 43/18 46/12 46/21 47/6 47/10 47/13 49/20 64/24 74/23

90/5 90/9 90/11 90/25 91/17 92/7 92/9 92/11 94/18 95/5 95/17 95/21 98/1 98/9 98/19 100/4 100/7 100/14 100/20 101/23 102/8 102/13 102/19 103/8 103/14 107/8 107/10 107/12 107/16 108/21 108/24 108/25 112/1 113/15 115/25 116/8 116/15 119/24 122/5 122/5 123/9 123/13 134/20 137/1 138/23 144/23 145/2 148/23
**200 [1]**  38/12
**2015 [3]**  37/7 41/16 148/11
**2016 [3]**  37/14 41/23 151/3
**2017 [78]**  11/18 12/22 17/15 17/16 21/12 21/13 21/15 31/23 32/11 32/21 34/19 34/22 35/3 35/8 35/11 35/12 35/12 35/16 35/21 35/22 36/10 36/12 36/25 37/13 38/2 38/7 38/23 38/24 39/1 39/7 39/12 39/21 40/2 40/7 40/8 40/12 41/1 47/20 47/25 48/2 50/15 50/24 52/20 52/21 52/22 54/18 54/18 57/18 58/12 58/16 58/17 60/2 60/14 63/24 66/15 69/10 74/12 74/17 74/17 74/18 74/18 75/3 75/7 88/24 90/5 90/21 90/25 98/2 98/10 100/5 102/4 103/1 111/25 145/6 145/7 145/8 145/10 145/12
**2018 [65]**  32/12 32/18 32/21 40/21 40/22 45/17 48/11 49/8 50/10 50/16 50/25 51/1 51/1 51/2 51/23 52/13 53/3 53/7 53/8 53/12 54/13 57/23 58/24 59/23 59/24 59/25 60/3 60/15 62/9 62/10 62/15 62/15 62/18 63/1 63/24 67/4 67/5 68/1 68/4 69/7 69/10 73/1 73/7 73/17 73/20 73/25

74/13 75/6 78/17 78/23 78/25 79/2 90/6 90/7 94/22 96/5 102/4 104/1 104/17 119/15 141/5 145/16 146/24 147/4 147/10
**2020 [6]**  1/9 8/19 54/25 62/24 63/1 153/23
**2021 [2]**  48/20 48/21
**21 [1]**  63/18
**212 [3]**  1/14 1/23 2/16
**214 [2]**  2/10 2/13
**2150 [1]**  1/17
**22 [3]**  63/18 151/2 151/17
**221-2330 [1]**  2/5
**2323 [1]**  2/9
**2330 [1]**  2/5
**23rd [3]**  60/15 66/16 146/23
**24 [1]**  65/15
**247 million [2]**  70/1 73/22
**25,000 [2]**  45/20 48/19
**25,000 tons [1]**  48/21
**250-5584 [1]**  2/20
**26 [3]**  66/15 88/7 88/24
**27 [2]**  75/3 75/7
**27th [3]**  38/24 52/22 74/16
**2800 [1]**  2/4
**289296 [1]**  8/19
**28th [2]**  40/7 74/18
**29 [1]**  68/8
**2nd [1]**  35/8

**3**

**30 [2]**  19/9 74/9
**3040 [1]**  2/13
**307 [1]**  35/4
**30th [4]**  74/12 98/3 99/9 100/5
**31st [1]**  21/25
**32 [1]**  77/3
**325 [1]**  2/12
**325 million [2]**  67/3 67/8
**33 [1]**  77/3
**34 [1]**  77/3
**3464 [2]**  1/5 3/16
**3573 [1]**  2/16

**368 [1]** 82/7
**369 [1]** 82/7
**373-3573 [1]** 2/16
**382-3040 [1]** 2/13
**3:50 here [1]** 84/10
**3:53 [1]** 84/14
**3rd [1]** 112/1

## 4

**40 percent [8]** 40/20 53/10 62/23 90/6 151/4 151/6 151/9 151/18
**4000 [1]** 1/23
**4352836 [1]** 141/5
**4:00 o'clock [1]** 84/11
**4:05 [1]** 84/14
**4:19-CV-3464 [1]** 1/5
**4ish [1]** 21/24
**4th [10]** 17/15 74/18 89/23 90/18 91/4 91/14 92/3 96/21 97/7 112/3

## 5

**50 [1]** 130/25
**50 percent [2]** 131/1 131/3
**50/50 [1]** 130/25
**515 [1]** 2/19
**55 percent [1]** 151/12
**554-1400 [1]** 1/14
**558-4000 [1]** 1/23
**5584 [1]** 2/20
**5668 [1]** 2/10
**575 [2]** 147/22 148/12
**5:30 [1]** 144/6
**5:54 [1]** 153/18
**5th [1]** 35/3

## 6

**60 percent [12]** 53/6 53/9 59/18 62/10 62/17 104/3 113/20 114/2 114/8 147/3 147/5 147/10
**651-5668 [1]** 2/10
**67 [1]** 96/18

**6:00 [1]** 152/13
**6th [3]** 90/24 91/9 91/13

## 7

**7 percent [1]** 47/4
**70 [1]** 109/23
**700 [1]** 2/9
**711 [1]** 1/17
**713 [3]** 1/18 2/5 2/20
**717 [1]** 2/4
**75.4 percent [1]** 151/11
**75201 [1]** 2/13
**75219 [1]** 2/9
**77002 [3]** 1/17 2/4 2/19
**7th [1]** 96/24

## 8

**80 percent [1]** 109/23
**8004 [1]** 2/19
**85 [1]** 46/25
**860-1600 [1]** 1/18

## 9

**91A [3]** 5/22 9/7 9/14
**95 percent [1]** 46/25

## A

**abandoned [1]** 118/10
**ability [2]** 45/25 113/24
**ablaze [1]** 87/23
**able [15]** 3/6 3/11 31/17 44/9 77/9 80/1 84/3 113/24 119/2 123/20 123/23 127/24 129/11 135/7 135/9
**above [5]** 95/1 95/11 102/13 102/19 153/21
**absolute [2]** 88/10 88/10
**absolutely [5]** 25/4 85/17 88/9 110/1 132/25
**accept [1]** 60/1
**accepted [1]** 41/12
**accompanied [2]** 51/18 54/9
**according [6]** 34/17 46/17 47/2 48/13 118/25 145/16

**account [1]** 29/25
**accounted [4]** 122/12 123/14 149/24 150/10
**accounting [5]** 129/18 131/10 149/18 149/22 150/2
**accounts [3]** 87/17 101/5 123/12
**accuracy [1]** 76/24
**accurate [4]** 24/22 99/8 108/14 122/11
**achieve [1]** 118/20
**achieved [6]** 90/12 91/1 91/18 101/24 103/8 103/14
**acronym [1]** 124/3
**Act [27]** 5/20 7/17 7/19 7/19 30/14 30/15 30/19 33/2 33/2 33/7 33/9 33/10 56/10 56/21 61/1 61/10 61/15 61/15 61/16 61/23 62/2 75/14 75/15 81/20 92/2 138/13 142/6
**action [31]** 1/4 3/16 5/17 5/18 5/22 5/24 6/9 6/11 6/12 6/25 7/11 7/20 7/21 7/24 7/25 8/2 8/5 8/8 8/11 11/21 13/11 16/25 17/1 20/6 20/13 20/13 20/14 61/8 64/16 75/13 141/11
**actionable [10]** 62/2 64/10 64/14 65/1 91/24 99/24 119/24 120/1 122/2 128/14
**actions [6]** 5/11 6/22 7/15 7/16 56/1 108/4
**Active [1]** 81/4
**activity [2]** 19/15 110/7
**actual [11]** 8/8 43/20 53/24 61/16 109/5 119/25 123/21 123/24 133/13 140/25 140/25
**actuality [1]** 122/9
**actually [44]** 22/6 35/16 38/25 39/4 53/20 54/3 56/4 56/7 58/7 58/9 68/21 70/6 77/2 85/22 92/13 95/18

**actually... [28]** 96/17 102/7 102/8 102/10 103/17 104/8 105/23 106/22 106/25 110/3 116/5 116/19 117/20 118/16 122/10 123/15 124/11 127/15 129/5 130/20 131/17 133/6 134/9 138/5 138/10 140/17 148/21 150/4

**add [4]** 5/12 26/19 28/11 152/17

**additional [4]** 6/13 36/9 119/10 147/10

**additives [2]** 86/22 150/22

**address [8]** 10/8 20/10 23/24 33/4 36/18 37/3 54/11 107/18

**addressed [3]** 80/16 143/16 149/23

**addressing [1]** 33/4

**Adeptus [1]** 141/4

**adequately [2]** 132/25 134/6

**adjustment [1]** 113/18

**adjustments [1]** 3/10

**admitted [2]** 120/8 126/4

**adopted [1]** 138/13

**advance [2]** 21/20 152/18

**adversely [1]** 66/2

**advised [2]** 39/19 75/9

**advises [1]** 39/5

**affect [2]** 13/11 66/2

**affects [1]** 13/21

**affirm [1]** 103/13

**affirmation [1]** 91/17

**affirmative [1]** 3/7

**affirmed [1]** 91/16

**affirming [1]** 92/6

**affix [2]** 15/21 17/2

**affixed [1]** 17/21

**after [58]** 7/10 11/16 16/21 32/6 32/11 36/8 37/1 37/15 37/24 38/8 39/18 44/8 47/3 48/1 49/7 49/25 50/3 50/16 52/12 53/12 57/9 57/10 58/20 59/17 60/10 60/23 62/22 64/1 64/17 66/6 78/7 79/5 79/6 79/13 83/6 87/7 95/13 95/19 95/25 100/11 101/6 101/6 102/22 112/5 115/8 117/15 118/21 130/22 144/6 145/7 145/10 147/23 150/20 151/3 151/11 151/12 151/14 151/14

**after-the-fact [2]** 49/25 78/7

**afternoon [4]** 3/24 4/21 4/24 152/23

**afterwards [1]** 88/17

**again [151]** 3/24 4/21 5/14 6/14 11/10 15/5 18/25 19/4 19/7 19/9 19/17 19/18 20/11 21/22 22/4 23/6 23/10 23/18 23/20 24/22 26/20 27/3 27/16 28/6 28/23 31/5 34/4 34/4 39/16 39/18 43/11 52/8 53/5 57/18 63/2 64/22 66/16 66/25 67/25 71/24 78/12 85/5 85/6 85/20 86/18 87/21 88/17 89/19 90/16 91/22 92/5 92/7 92/10 92/12 93/10 93/18 93/21 94/3 94/13 94/14 95/12 95/22 95/24 96/6 96/10 97/5 97/24 98/3 99/15 99/21 100/1 100/3 100/13 100/19 101/2 101/17 101/21 102/5 102/12 103/25 104/20 104/21 105/5 107/7 107/11 107/15 107/21 109/11 109/12 109/18 110/20 110/22 111/2 111/21 112/2 113/17 114/3 114/25 116/10 116/24 118/23 119/3 119/12 119/19 119/22 120/21 122/2 123/6 124/8 124/15 124/16 124/20 125/8 125/24 126/12 127/5 127/8 127/11 128/8 128/14 128/19 128/21 129/13 129/20 130/20 131/19 131/24 132/4 132/17 132/23 133/2 135/4 135/12 136/1 136/7 136/7 136/16 136/20 137/16 138/17 139/6 139/15 139/18 140/23 141/5 142/8 142/18 142/18 142/23 146/6 153/9

**against [10]** 6/23 7/12 7/20 7/21 14/8 82/2 82/3 83/15 124/16 140/20

**agencies [1]** 88/3

**agency's [1]** 24/2

**agent [1]** 26/7

**agree [6]** 22/12 25/1 53/14 61/7 83/25 83/25

**agreement [2]** 12/2 61/23

**agreements [1]** 129/10

**ahead [3]** 48/6 85/4 132/9

**Ajamie [2]** 1/16 152/9

**Alcaraz [2]** 2/18 153/24

**all's [1]** 3/10

**allegation [10]** 26/23 36/7 44/8 46/15 60/17 81/8 83/3 114/13 124/15 125/25

**allegations [17]** 11/6 42/15 47/2 59/21 72/14 78/7 78/13 78/14 79/4 80/8 82/7 86/15 107/17 108/14 119/10 135/4 141/12

**allege [19]** 32/24 33/19 50/6 56/12 61/16 64/11 69/17 76/16 78/20 78/22 78/24 80/22 81/1 81/21 82/9 82/11 82/17 110/5 115/5

**alleged [28]** 14/24 20/4 27/14 27/25 30/23 31/3 34/1 35/4 38/12 38/15 51/5 62/1 63/8 83/11 85/25 86/17 94/23 119/25 127/12 130/14 132/21 132/25 133/4 134/6 135/23 139/20 140/21 149/14

**alleges [5]** 27/1 33/15 82/4

**A**

**alleges...** **[2]** 115/2 115/5
**alleging** **[2]** 64/15 120/17
**allow** **[1]** 117/7
**allows** **[1]** 89/2
**alluded** **[2]** 112/9 140/19
**alluding** **[1]** 134/25
**along** **[1]** 111/11
**already** **[12]** 21/3 34/18 53/1 75/9 80/16 92/7 92/9 98/9 100/4 101/24 140/21 141/8
**altered** **[1]** 90/21
**alternatively** **[1]** 31/12
**although** **[2]** 28/22 33/19
**altogether** **[1]** 94/8
**aluminide** **[1]** 113/25
**always** **[1]** 139/2
**amend** **[1]** 83/3
**amendments** **[3]** 35/7 35/17 35/20
**American** **[4]** 22/21 81/25 150/8 150/9
**Americas** **[2]** 1/13 2/15
**among** **[1]** 108/22
**amount** **[8]** 19/15 23/9 45/1 46/11 73/2 118/24 118/24 135/14
**amounts** **[3]** 46/13 110/14 123/19
**analyses** **[1]** 17/6
**analysis** **[1]** 18/20
**analyst** **[7]** 48/20 49/6 49/21 103/25 104/23 145/21 146/21
**analysts** **[12]** 49/8 49/13 49/20 76/18 88/8 90/16 91/19 103/16 103/18 116/17 121/11 145/18
**and/or** **[1]** 128/2
**ANDREW** **[1]** 1/20
**anew** **[1]** 72/5
**angle** **[1]** 133/25
**announce** **[1]** 87/7

**announced** **[8]** 36/8 45/17 48/12 50/10 74/14 86/23 86/24 151/1
**announces** **[2]** 50/17 50/18
**announcing** **[2]** 48/17 69/8
**annual** **[7]** 41/17 42/4 43/12 93/17 93/19 94/4 94/5
**anonymous** **[1]** 124/6
**another** **[8]** 6/12 8/25 50/22 71/17 88/2 108/16 112/4 122/6
**answer** **[5]** 10/3 16/3 103/24 106/1 136/19
**answering** **[2]** 24/1 106/19
**answers** **[1]** 116/24
**anti** **[1]** 9/8
**anti-SLAPP** **[1]** 9/8
**anticipate** **[9]** 39/19 95/24 96/2 96/11 96/12 97/12 98/5 98/17 102/2
**anticipated** **[5]** 39/3 52/12 57/10 71/6 147/17
**anticipates** **[2]** 66/20 66/21
**anticipating** **[1]** 39/25
**antitrust** **[1]** 125/10
**anybody** **[3]** 83/21 117/17 117/24
**anyone** **[2]** 59/10 135/20
**anyplace** **[1]** 120/13
**anything** **[28]** 8/17 8/18 8/20 8/22 10/19 18/21 48/18 58/6 61/24 67/20 70/2 91/15 100/3 101/22 105/4 110/11 117/13 117/21 118/1 118/25 123/25 126/20 128/7 131/4 137/4 137/12 139/18 143/12
**anyway** **[1]** 83/16
**anywhere** **[1]** 82/17
**apologize** **[1]** 23/6
**apparent** **[1]** 88/15
**appeal** **[3]** 7/4 9/7 9/9
**appealed** **[1]** 6/1
**Appeals** **[5]** 7/24 9/11 9/13 12/16 12/20

**appear** **[1]** 98/13
**appearance** **[1]** 4/15
**appearances** **[3]** 1/10 2/1 4/18
**appeared** **[2]** 1/10 129/14
**appearing** **[1]** 3/17
**appellate** **[5]** 6/2 6/6 6/16 7/10 8/19
**application** **[1]** 112/13
**applications** **[1]** 93/7
**appreciate** **[4]** 17/4 17/6 18/15 83/24
**appropriate** **[2]** 19/22 20/22
**appropriately** **[1]** 72/20
**approved** **[3]** 81/1 135/18 135/23
**approximately** **[7]** 46/12 46/21 47/4 47/6 90/4 90/5 98/1
**April** **[10]** 35/12 38/2 59/24 78/17 78/23 88/24 111/5 111/7 116/6 117/8
**April 2018** **[2]** 59/24 78/23
**April 26** **[1]** 88/24
**area** **[4]** 20/23 87/20 87/24 121/13
**aren't** **[7]** 15/6 30/23 31/2 60/21 63/20 78/7 105/3
**argue** **[5]** 32/20 75/23 78/6 80/18 150/20
**argued** **[1]** 152/16
**arguing** **[6]** 47/5 60/19 76/8 105/19 133/8 153/3
**argument** **[64]** 4/1 5/1 10/1 10/12 14/8 16/25 22/16 23/15 32/24 37/3 41/15 42/7 44/7 47/7 50/1 53/17 63/21 67/25 75/22 76/7 76/10 77/8 80/1 81/12 81/15 85/13 86/13 89/25 90/23 92/15 98/18 105/11 106/13 107/4 107/11 107/15 109/21 111/15 111/18 114/11 120/15 120/23 127/17

## A

**argument... [21]** 132/25 133/2 134/4 134/23 136/17 136/21 137/3 137/17 138/4 138/25 139/1 139/18 143/14 144/10 144/11 144/12 144/22 145/24 146/5 146/7 148/22

**arguments [14]** 4/9 8/17 12/18 12/19 13/18 33/8 70/9 85/17 86/5 101/13 105/20 106/23 113/10 119/21

**arise [1]** 14/9

**arising [1]** 142/19

**around [11]** 40/21 51/23 52/13 53/3 59/25 84/11 90/6 96/5 96/25 102/4 119/6

**arraignments [1]** 84/5

**arrived [1]** 64/16

**articulate [1]** 28/21

**ask [16]** 11/24 14/13 19/24 21/2 42/6 42/6 46/4 53/13 55/19 79/8 90/17 98/11 98/11 104/9 105/9 109/1

**asked [8]** 48/20 68/20 103/21 103/21 116/2 126/7 144/25 148/19

**asking [10]** 8/3 18/17 24/2 88/9 88/19 104/2 147/1 147/2 147/4 147/6

**aspects [1]** 120/3

**assert [4]** 82/1 142/11 142/14 142/24

**asserted [1]** 5/19

**asserting [1]** 142/18

**assertion [1]** 68/11

**assertions [2]** 8/24 150/13

**asserts [1]** 7/18

**assessing [1]** 77/10

**assessments [1]** 116/18

**assignment [3]** 12/8 19/9 19/10

**associated [1]** 67/22

**associates [1]** 26/6

**assume [2]** 97/19 118/6

**assuming [4]** 16/16 16/16 42/15 116/18

**assumptions [1]** 66/23

**assurance [1]** 116/12

**assured [2]** 60/20 65/18

**assuring [2]** 60/12 62/20

**Astros [2]** 54/24 55/3

**attached [1]** 147/1

**attempt [5]** 13/19 74/5 75/12 77/4 150/23

**attempted [1]** 32/7

**attempting [1]** 80/13

**attempts [2]** 44/12 82/1

**attendance [2]** 4/13 4/17

**attended [2]** 76/2 76/17

**attention [3]** 18/16 18/19 93/20

**attorney [3]** 16/6 25/11 26/8

**attorney-in-fact [3]** 16/6 25/11 26/8

**attorneys [1]** 108/9

**attribute [1]** 80/11

**attributed [3]** 13/18 63/23 80/19

**AUFSES [1]** 1/12

**August [28]** 11/18 12/22 17/15 17/16 21/8 21/9 21/15 21/24 21/25 35/8 35/21 35/22 40/7 52/20 54/18 69/10 74/18 74/18 89/19 89/23 90/18 91/4 91/14 92/3 96/21 96/24 97/7 99/11

**August 2017 [6]** 11/18 12/22 17/16 35/21 35/22 69/10

**August 28th [2]** 40/7 74/18

**August 2nd [1]** 35/8

**August 31st [1]** 21/25

**August 4ish [1]** 21/24

**August 4th [9]** 17/15 74/18 89/23 90/18 91/4 91/14 92/3 96/21 97/7

**August 7th [1]** 96/24

**authoritative [1]** 150/9

**authorities [1]** 88/19

**authority [1]** 25/8

**available [3]** 10/3 52/12 102/4

**Avenue [5]** 1/13 2/4 2/9 2/12 2/15

**avoid [1]** 135/13

**aware [7]** 5/6 9/3 15/19 16/3 126/4 126/8 136/3

**away [2]** 30/7 33/20

## B

**back [31]** 9/14 17/6 30/19 30/21 47/12 50/13 53/25 54/17 55/11 59/5 64/22 77/6 79/17 84/11 84/15 84/24 96/17 99/14 100/5 105/10 107/8 108/1 114/8 141/20 143/19 143/24 145/2 146/6 146/21 146/23 153/2

**back-and-forth [2]** 143/19 146/21

**background [1]** 86/12

**backward [2]** 106/25 109/25

**backward-looking [1]** 106/25

**bag [1]** 66/12

**bait [1]** 72/11

**balance [7]** 10/16 57/22 58/23 94/21 95/7 100/16 100/18

**ball [1]** 152/18

**Baltimore [1]** 27/19

**bandwidth [1]** 75/18

**bank [1]** 29/25

**base [2]** 48/23 54/2

**baseball [1]** 55/3

**based [20]** 6/15 16/13 25/4 32/19 34/13 37/6 41/16 42/14 55/10 66/23 67/25 68/10 88/3 109/21 124/19 131/6 132/25 134/1 140/8

**based...** [1]  146/5
**basically** [4]  112/16 135/8 138/15 143/20
**basis** [8]  15/7 30/14 30/16 54/10 61/1 64/13 108/14 140/20
**battle** [1]  55/10
**be-all** [1]  102/9
**Beaumont** [2]  9/11 9/13
**became** [8]  11/9 35/7 35/21 39/6 40/10 58/16 90/21 145/14
**becomes** [4]  8/16 43/5 45/13 88/15
**becoming** [2]  39/8 146/12
**been** [59]  5/6 5/11 5/23 6/3 7/12 8/4 8/5 8/6 8/10 9/10 11/17 11/23 12/21 16/22 18/18 25/9 34/21 35/22 36/9 39/11 40/13 43/22 49/16 49/17 54/17 69/23 77/7 77/11 81/13 83/19 87/2 87/4 90/11 91/18 93/4 95/13 98/13 98/20 98/21 103/14 111/9 117/1 117/14 117/22 118/9 118/10 131/23 138/5 138/13 143/20 144/5 144/6 145/5 145/12 146/14 146/25 147/8 148/23 151/5
**before** [46]  1/8 5/4 6/22 7/18 7/25 8/23 11/9 13/11 13/22 17/13 19/18 20/25 24/12 27/5 31/24 34/19 34/22 37/1 38/25 39/10 39/17 41/23 48/17 62/15 62/24 63/1 66/4 73/7 75/8 75/13 86/20 97/15 97/15 99/21 111/8 115/12 117/10 117/20 129/7 131/19 136/8 136/24 136/24 138/16 140/3 145/9
**began** [3]  90/20 98/12 144/10

**begin** [5]  37/17 37/25 38/5 55/3 120/14
**beginning** [13]  8/7 21/8 44/24 58/16 59/15 60/3 71/18 71/20 89/19 99/10 110/8 110/9 113/2
**begins** [2]  86/21 138/17
**begun** [1]  58/22
**behalf** [17]  3/25 4/10 4/23 5/2 5/15 9/5 15/18 16/11 25/6 80/1 80/9 85/8 141/23 142/14 142/22 152/12 153/1
**behind** [1]  135/5
**BEHRENS** [2]  2/6 9/4
**being** [44]  15/21 16/4 30/7 36/18 36/19 44/23 44/23 46/5 46/11 47/11 57/1 60/24 63/5 70/13 71/14 72/14 72/19 72/20 73/10 77/11 77/13 79/10 80/25 91/4 93/7 93/8 111/16 111/17 114/6 116/22 121/19 125/19 125/22 126/8 128/24 128/25 130/7 131/7 132/1 132/3 138/21 148/13 150/4 152/19
**belabor** [1]  148/16
**belied** [1]  150/25
**belief** [6]  56/6 56/14 104/8 128/3 147/16 147/24
**beliefs** [2]  55/15 63/10
**believe** [40]  4/12 5/23 6/8 6/13 12/2 14/23 16/10 17/15 18/1 21/4 25/4 26/5 35/7 35/8 36/19 37/7 50/5 50/6 50/25 51/6 54/23 55/8 56/6 57/4 57/6 58/14 58/15 64/12 65/6 65/15 67/6 73/20 77/14 79/19 100/23 113/15 115/21 123/5 134/16 138/23
**believed** [5]  54/17 72/7 121/23 121/24 131/25
**below** [1]  94/17
**beneficiaries** [1]  87/5
**beneficiary** [1]  87/1

**benefit** [1]  94/9
**Berger** [4]  1/13 3/21 4/22 85/7
**Bernstein** [5]  1/13 3/21 3/25 4/22 85/7
**beside** [1]  31/17
**besides** [1]  61/24
**bespeaks** [2]  51/17 54/8
**bespeaks-caution** [1]  51/17
**best** [2]  111/10 129/5
**between** [19]  7/15 20/15 25/5 42/20 44/21 46/25 47/5 54/19 61/14 66/11 66/21 67/3 69/9 73/8 107/10 123/9 142/12 146/16 146/21
**beyond** [3]  32/16 71/19 151/23
**big** [5]  36/14 57/10 84/4 92/14 153/5
**biggest** [1]  87/1
**billion** [4]  69/19 71/21 89/3 135/10
**binding** [1]  124/23
**bit** [12]  4/14 6/19 6/20 30/7 44/11 86/6 86/12 89/25 90/2 99/21 113/8 122/15
**black** [14]  37/21 38/3 38/7 39/8 40/12 41/23 41/25 43/23 45/9 70/22 103/3 103/6 105/6 117/8
**Blatchley** [37]  1/11 3/20 3/25 4/22 5/9 5/10 5/15 6/20 7/3 9/18 10/5 10/21 12/18 13/17 18/24 19/1 49/23 50/5 61/7 64/21 79/11 79/19 79/21 83/19 84/15 84/21 85/4 85/7 90/17 143/12 144/10 145/1 145/22 146/2 149/19 150/7 150/15
**Blatchley's** [4]  14/19 143/20 144/22 151/21
**blockbuster** [1]  129/6
**boards** [1]  19/14
**bodies** [1]  88/3

**B**

**boil [1]** 125/2
**Boone [2]** 2/8 9/5
**borne [1]** 103/15
**Boston [1]** 27/19
**both [24]** 7/18 20/23 21/20 29/10 31/8 32/1 32/13 32/15 33/2 36/24 37/1 39/14 42/1 49/15 53/13 58/1 72/23 73/4 74/10 75/4 95/10 106/23 145/8 149/25
**bottom [4]** 92/12 125/3 131/18 148/25
**bought [5]** 72/1 82/10 83/4 139/9 140/12
**break [3]** 73/8 83/21 83/23
**breakdown [1]** 73/24
**brief [14]** 12/19 23/3 25/1 63/17 67/18 80/20 80/22 81/3 82/14 136/10 144/5 144/7 144/18 149/23
**briefing [1]** 5/8
**briefly [15]** 5/5 29/15 29/19 33/8 61/6 61/20 65/14 74/16 80/3 81/14 86/4 107/7 132/12 134/22 148/17
**briefs [5]** 10/14 10/23 21/7 46/17 148/7
**bright [1]** 30/1
**bright-line [1]** 30/1
**bring [3]** 81/19 139/11 142/22
**bringing [4]** 7/17 18/16 18/19 45/9
**Broad [1]** 1/22
**broader [1]** 112/12
**broke [1]** 73/14
**broken [1]** 130/25
**brought [4]** 7/11 46/5 46/11 104/16
**build [3]** 58/7 72/5 117/20
**building [1]** 70/6
**built [1]** 117/23
**bullet [2]** 93/3 96/15

bunch [3] 4/14 102/16 124/3
**bundle [1]** 105/3
**burden [3]** 19/19 147/19 148/2
**burned [3]** 70/8 115/9 115/9
**business [24]** 22/22 30/5 48/11 49/7 50/17 69/7 72/23 73/5 73/14 73/23 76/3 86/22 86/23 86/25 88/7 88/16 89/7 89/11 93/15 103/22 131/3 131/11 135/8 150/22
**businesses' [1]** 89/9
**buy [2]** 140/13 140/14

**C**

**Calais [18]** 37/7 41/22 41/24 42/1 42/3 43/3 43/21 43/23 44/5 44/7 44/10 44/19 44/19 93/11 93/17 93/18 94/3 94/15
**Calais' [1]** 43/25
**calciner [1]** 37/23
**call [38]** 3/15 33/23 37/13 37/14 48/11 48/12 48/12 49/7 50/9 50/17 52/21 52/22 53/4 53/14 60/14 60/15 60/23 62/8 66/4 66/9 66/16 67/5 68/1 68/13 69/7 74/13 90/16 92/8 92/19 103/18 103/20 104/1 112/10 116/23 139/21 146/24 148/6 151/3
**called [9]** 28/2 41/18 67/19 70/23 93/11 108/19 110/6 138/11 142/13
**calls [8]** 15/3 32/22 62/4 76/18 92/8 121/1 142/2 144/15
**came [3]** 97/7 109/8 146/5
**can't [17]** 9/12 17/2 30/25 46/16 54/12 60/25 64/14 78/18 82/23 88/1 88/17 95/14 95/14 102/11 111/15 128/10 128/14

cannot [5] 14/8 54/10 75/23 96/11 117/11
**capabilities [2]** 41/20 42/23
**capability [2]** 44/16 50/21
**capable [1]** 38/11
**capably [1]** 152/16
**capacity [160]**
**caption [1]** 148/4
**card [1]** 99/12
**care [1]** 13/24
**careful [1]** 108/13
**carefully [1]** 36/23
**Carolina's [1]** 72/3
**carried [1]** 35/24
**carriers [2]** 150/4 150/4
**carry [1]** 35/23
**case [86]** 4/12 5/21 5/23 6/4 6/7 6/23 9/6 12/20 13/10 13/10 13/16 13/20 13/21 14/4 14/7 14/24 19/15 19/20 20/24 22/19 22/24 23/5 24/5 24/9 24/23 25/7 25/15 25/23 26/7 26/21 26/25 27/4 29/21 32/19 32/25 33/21 36/7 38/22 41/7 49/11 50/25 54/17 56/10 56/11 68/25 70/25 71/4 75/8 78/1 81/3 81/5 81/18 81/24 85/16 85/20 86/2 86/18 105/7 105/8 105/10 105/11 105/13 108/7 122/3 125/10 125/13 125/20 127/5 132/17 134/24 136/21 136/25 137/15 138/10 140/3 140/17 140/18 141/3 141/4 141/4 141/25 143/9 148/5 148/6 148/12 149/13
**cases [11]** 9/10 25/12 56/11 56/21 57/5 75/23 76/1 79/12 106/24 136/9 139/21
**cashed [1]** 150/11
**catastrophic [1]** 121/25
**categories [8]** 33/15 33/17 33/20 34/2 34/7 147/15

**categories... [2]** 148/3 148/17

**category [23]** 33/20 33/22 34/4 34/10 34/11 48/8 51/5 51/11 51/13 55/9 55/9 55/9 55/12 55/12 63/3 63/16 63/19 63/22 64/23 65/14 65/17 67/17 145/1

**caught [1]** 115/6

**causation [2]** 61/24 92/2

**cause [5]** 64/6 64/17 65/12 124/22 149/1

**caused [7]** 31/25 32/17 64/3 110/12 110/14 121/24 127/7

**causing [5]** 121/3 121/20 122/7 124/18 128/10

**caution [1]** 51/17

**cautionary [6]** 51/19 54/9 56/23 57/6 58/2 63/13

**CD [8]** 37/22 37/23 41/3 42/2 48/15 49/10 145/18 150/5

**ceased [1]** 74/2

**central [1]** 101/3

**centrality [1]** 144/23

**CEO [7]** 37/16 48/25 60/15 75/23 76/9 80/5 87/3

**certain [4]** 7/13 26/2 30/16 72/10

**certainly [18]** 20/14 20/18 20/25 26/11 28/18 78/8 90/13 95/17 102/12 102/23 121/22 122/13 124/22 134/16 140/19 140/20 142/25 143/4

**certainty [3]** 88/11 88/13 89/22

**certifications [2]** 139/22 140/8

**certify [1]** 153/20

**cetera [3]** 55/22 79/8 84/6

**CFO [3]** 75/23 76/9 80/5

**chair [1]** 135/21

**challenge [1]** 147/24

**challenged [6]** 79/5 79/6 80/13 80/25 81/2 91/23

**challenges [1]** 51/13

**challenging [2]** 24/23 25/3

**chambers [1]** 153/5

**chance [3]** 10/8 20/24 144/2

**change [3]** 29/21 88/24 111/19

**changed [5]** 59/8 91/15 97/7 100/3 111/19

**characteristics [1]** 93/6

**charge [2]** 118/16 133/23

**charges [1]** 50/19

**CHARLES [1]** 1/8

**chart [8]** 41/16 41/17 41/21 44/12 45/24 94/12 94/14 96/9

**charts [2]** 42/24 42/24

**check [1]** 3/9

**checking [1]** 72/18

**checks [2]** 150/4 150/11

**chemical [2]** 93/14 118/6

**chemicals [1]** 112/14

**CHEPIGA [1]** 2/14

**chest [1]** 143/13

**chloride [1]** 93/5

**chronologically [2]** 17/17 37/11

**chronology [1]** 57/15

**circuit [3]** 80/10 81/24 136/9

**Circuit's [2]** 41/8 41/9

**circulated [1]** 86/8

**circumstances [1]** 25/23

**citation [2]** 12/16 130/4

**cite [7]** 25/15 81/3 108/18 141/3 141/4 147/21 148/4

**cited [13]** 23/3 28/12 46/16 65/1 80/21 110/3 136/9 138/11 138/14 140/18 141/3 143/9 148/7

**cites [1]** 144/18

**citizen [1]** 15/24

**citizens [1]** 16/6

**CIVIL [2]** 1/4 3/16

**claim [39]** 14/3 14/4 30/20 34/13 34/20 49/3 54/10 55/10 56/20 60/7 60/24 61/1 63/23 66/14 67/9 68/9 80/4 80/16 81/19 82/2 82/8 130/11 138/12 138/16 141/15 142/4 142/6 142/7 142/8 142/8 142/11 142/14 142/16 142/22 142/25 145/4 145/6 149/19 150/3

**claimed [2]** 49/22 100/4

**claims [28]** 5/20 7/17 7/18 13/15 14/8 15/7 19/16 30/14 30/16 30/24 33/1 33/7 61/10 61/15 61/15 61/16 61/23 61/23 75/11 75/14 75/15 108/5 138/13 140/20 141/23 142/5 142/19 144/24

**Clariant [1]** 88/15

**clarify [1]** 104/24

**clarity [2]** 88/10 88/13

**class [22]** 24/16 85/22 86/21 92/19 101/6 101/11 103/9 103/15 103/20 106/7 108/4 111/6 131/15 131/20 141/11 141/13 141/15 141/23 141/24 142/15 142/15 142/22

**classic [1]** 65/11

**clean [1]** 15/11

**cleanup [5]** 69/1 69/14 69/23 70/1 73/22

**clear [22]** 11/6 11/13 13/2 25/7 26/14 36/3 40/25 43/5 44/2 47/10 49/16 67/20 70/14 82/8 97/9 112/25 113/7 114/12 117/1 145/11 145/15 149/17

**clearly [9]** 11/11 28/8 47/19 48/6 66/17 107/5 124/20 137/6 137/25

**clerks [2]** 126/23 153/6

**clock [2]** 74/8 137/7
**close [11]** 32/18 39/18 41/23 43/23 43/24 45/18 45/23 48/13 48/18 71/7 94/8
**closed [3]** 36/3 51/12 148/1
**closely [2]** 128/5 141/12
**closes [1]** 39/17
**closing [4]** 50/17 50/20 69/8 74/14
**cloud [2]** 88/23 89/22
**cocounsel [1]** 8/11
**collateral [1]** 8/22
**colleagues [1]** 63/17
**Collective [1]** 3/7
**come [6]** 49/14 111/11 118/17 125/5 134/1 138/7
**comes [5]** 14/12 60/13 103/6 126/5 127/11
**comfortable [1]** 17/16
**comfortably [1]** 22/14
**coming [6]** 12/3 43/20 44/22 47/10 54/5 150/3
**commenced [1]** 8/8
**commencement [2]** 20/13 20/14
**comment [6]** 5/13 8/17 84/1 85/10 108/17 128/17
**comments [1]** 114/19
**Commission [2]** 16/24 30/12
**commissioning [2]** 57/25 67/7
**commitment [2]** 82/22 89/17
**committed [3]** 95/22 102/1 102/1
**committing [1]** 72/7
**commodities [1]** 66/18
**commoditized [2]** 112/10 112/18
**commodity [1]** 113/3
**common [2]** 54/8 98/8
**commonsense [1]** 71/11

**communicate [1]** 96/8
**communicated [1]** 28/8
**communicating [2]** 30/12 94/10
**communication [2]** 82/6 82/12
**communications [7]** 24/18 27/10 28/7 28/25 81/23 83/1 136/6
**companies [4]** 28/9 72/18 73/9 93/14
**company [29]** 11/9 12/10 12/12 14/5 23/20 24/9 24/21 32/2 40/6 44/13 45/25 52/23 66/5 67/9 75/25 81/6 87/15 92/8 103/24 108/23 121/10 129/6 129/7 129/16 130/3 131/25 132/7 132/19 150/10
**company's [5]** 24/17 41/11 129/15 131/21 132/2
**compensation [1]** 19/11
**competently [1]** 152/16
**competing [1]** 64/2
**competitively [3]** 73/10 73/19 74/2
**competitors [3]** 73/15 93/14 124/12
**complaint [56]** 7/18 27/1 27/14 27/25 30/23 32/24 33/15 35/4 38/12 38/15 42/15 46/15 46/18 47/2 49/6 49/24 50/7 56/20 68/10 69/15 69/22 76/11 77/19 77/20 77/23 78/16 79/18 80/21 80/22 81/1 82/1 82/4 82/7 82/17 83/3 83/5 83/13 94/24 96/19 108/18 109/2 109/21 110/3 110/5 115/2 115/5 119/3 123/6 130/6 133/4 140/1 141/13 144/15 145/16 145/23 148/21
**complaint's [1]** 33/5
**complaints [2]** 76/1 83/12
**complete [4]** 59/15 87/19

**completed [5]** 89/20 96/23 97/20 98/9 117/6
**completely [4]** 43/21 101/4 146/15 148/24
**completion [3]** 96/3 97/13 97/13
**complexity [1]** 110/14
**complicated [1]** 118/6
**component [1]** 130/14
**comprehensive [1]** 7/25
**computer [1]** 1/25
**concealing [1]** 128/12
**conceded [2]** 100/23 103/5
**concedes [2]** 126/11 132/24
**concept [2]** 87/21 142/13
**concerned [3]** 34/5 136/18 138/6
**concerning [6]** 6/11 19/5 28/13 99/23 120/4 140/24
**concerns [1]** 51/1
**conclude [1]** 144/3
**concluded [2]** 64/3 153/18
**concluding [1]** 80/3
**conclusion [7]** 12/3 12/8 56/13 68/10 68/17 137/10 143/12
**conclusions [3]** 64/16 77/24 78/19
**conclusively [1]** 127/6
**conclusory [2]** 68/11 150/13
**condition [2]** 129/12 129/15
**conditioned [1]** 115/23
**conduct [2]** 20/4 135/2
**conducted [3]** 19/15 100/2 116/6
**confer [1]** 83/7
**conference [5]** 1/10 3/3 62/3 92/8 92/19
**confidence [1]** 132/4
**confident [1]** 17/18
**confirm [2]** 106/24 127/9
**confirmation [2]** 91/14

**confirmation... [1]** 101/5
**confused [1]** 103/16
**confusion [1]** 149/12
**connection [2]** 102/15 140/2
**consider [2]** 11/1 26/8
**considerable [1]** 20/4
**considered [1]** 8/19
**considering [1]** 79/22
**consisted [1]** 70/21
**consistent [6]** 95/11 98/8 103/7 131/24 134/15 134/15
**consistently [1]** 138/10
**consolidated [1]** 83/13
**construction [8]** 52/14 57/24 58/9 58/22 59/10 114/21 148/11 149/21
**consuming [1]** 104/5
**contact [3]** 29/23 29/24 31/18
**contacts [6]** 14/9 15/6 20/20 23/9 29/23 30/6
**contemporaneous [4]** 62/14 63/8 76/14 76/20
**contend [2]** 48/10 65/17
**contending [1]** 76/11
**content [2]** 10/1 10/18
**contention [1]** 126/17
**contest [2]** 18/11 26/15
**context [10]** 20/20 22/14 79/9 79/10 86/6 105/21 109/8 137/23 138/3 139/7
**continually [1]** 63/5
**continue [3]** 45/19 45/21 48/19
**continued [2]** 2/1 90/22
**continuing [5]** 50/14 60/10 62/21 63/4 135/9
**contours [1]** 13/11
**contracts [1]** 124/9
**contradict [2]** 103/12 132/20
**contradicted [1]** 133/1
**contrary [4]** 41/12 66/13

**contributed [1]** 93/17
**contributions [1]** 131/17
**control [2]** 87/10 151/9
**convenient [1]** 31/15
**conversation [1]** 145/2
**conversations [3]** 109/4 109/12 109/13
**converted [1]** 37/22
**conveying [1]** 95/20
**conveys [1]** 114/3
**core [1]** 125/24
**corner [1]** 75/25
**Corp [1]** 87/4
**corporate [6]** 13/19 19/14 80/9 80/13 80/24 81/2
**corporation [7]** 17/2 30/3 80/6 80/9 80/11 81/10 87/3
**corporations [1]** 80/10
**correct [25]** 3/13 4/3 16/17 21/6 21/22 26/3 36/21 45/12 46/9 46/10 50/6 52/5 91/2 91/16 91/21 104/11 107/23 109/5 112/24 114/18 125/24 127/18 131/13 134/12 153/20
**corrected [1]** 98/21
**corrective [5]** 49/4 50/7 50/23 98/21 138/1
**correctly [1]** 55/20
**correspondence [2]** 25/18 30/22
**corresponding [1]** 23/25
**cost [7]** 32/13 67/6 72/9 113/24 114/7 117/5 130/21
**costing [2]** 59/13 105/3
**costs [8]** 32/15 50/11 65/19 66/7 66/24 67/1 73/4 115/17
**could [34]** 8/13 8/17 12/2 13/7 13/19 26/9 38/18 40/5 54/16 56/9 65/7 66/24 67/3 75/11 76/13 77/10 78/14 79/3 83/11 93/20 96/25 98/5 104/9 111/4 116/4 118/2

**129/16 129/16 134/7 135/4 135/20 140/9 141/19 151/8
couldn't [3]** 77/7 82/20 105/18
**counsel [19]** 3/17 4/13 4/19 4/25 8/12 11/14 12/11 15/12 23/19 24/19 25/10 26/5 26/7 30/10 79/13 79/17 85/13 148/11 153/10
**counting [1]** 42/4
**County [10]** 5/18 6/8 6/23 7/4 7/9 7/20 7/24 8/12 9/14 28/19
**couple [10]** 50/19 52/25 84/18 87/7 88/14 97/1 103/4 125/25 129/19 139/15
**course [8]** 10/3 19/21 19/22 20/3 24/15 80/7 122/21 135/22
**court [67]** 1/1 2/17 2/18 3/11 5/17 6/1 6/2 6/6 6/7 6/14 6/16 6/23 7/4 7/5 7/11 7/16 7/21 7/24 8/1 8/3 8/10 8/13 8/25 9/6 9/11 9/13 9/14 9/24 10/4 10/23 11/1 12/15 12/20 13/4 17/17 20/11 20/18 25/9 26/8 28/13 28/16 28/17 28/20 28/23 29/2 29/20 31/23 34/14 36/2 36/22 64/1 64/15 83/24 84/24 85/1 121/15 121/21 124/21 139/2 139/3 144/5 144/16 146/10 147/25 148/12 152/22 153/24
**Court's [3]** 29/20 147/18 147/21
**courtroom [4]** 31/19 83/20 84/3 153/9
**courts [3]** 29/23 138/10 138/13
**cover [1]** 66/1
**covered [4]** 72/23 101/12 132/14 149/22
**covers [1]** 106/13

**C**

**COVID [1]** 84/2
**COVID-19 [1]** 84/2
**CRAIG [1]** 2/2
**create [3]** 76/4 76/22 77/24
**credible [1]** 121/22
**credit [2]** 85/17 111/15
**crediting [1]** 70/9
**crisis [4]** 23/1 24/6 27/15 120/25
**critical [7]** 64/5 76/9 89/14 94/6 102/11 130/11 130/15
**Cromwell [3]** 1/21 4/7 4/25
**cropping [1]** 72/15
**curious [1]** 120/23
**current [3]** 5/17 58/2 58/3
**currently [17]** 6/3 6/9 8/23 44/3 57/21 66/17 92/10 94/18 94/20 95/4 95/6 100/6 100/14 100/15 104/12 111/25 112/1
**customer [1]** 110/25
**customers [4]** 121/18 121/18 124/9 127/13
**cut [2]** 72/11 149/7
**CV [1]** 1/5

**D**

**D.C [3]** 25/19 29/1 29/6
**Daimler [3]** 29/21 29/22 30/7
**Dallas [6]** 2/9 2/13 6/23 7/4 8/12 12/15
**damage [10]** 32/1 44/3 65/24 66/1 72/8 72/23 73/5 73/14 139/9 149/25
**damaged [8]** 32/8 38/3 38/17 71/19 89/6 89/7 135/8 151/23
**danger [1]** 102/24
**DANIEL [1]** 2/7
**dark [1]** 122/6
**data [2]** 124/6 124/7
**date [14]** 8/14 20/5 74/12

74/13 90/12 96/17 96/19 96/22 96/23 97/14 98/25 112/4 140/9 153/23
**dates [1]** 21/19
**day [12]** 27/16 41/8 70/12 71/23 77/6 87/9 97/15 105/8 109/22 115/6 130/24 153/10
**days [3]** 84/2 97/1 124/17
**deal [2]** 110/15 153/5
**dealing [2]** 65/10 121/16
**deals [1]** 61/1
**debt [1]** 24/8
**December [6]** 57/18 58/17 62/11 92/10 100/2 112/3
**December 4 [1]** 92/10
**December 4th [1]** 112/3
**decide [4]** 32/18 133/12 133/16 137/11
**decided [3]** 41/23 72/5 115/4
**deciding [2]** 133/13 133/14
**decision [19]** 6/3 12/15 12/18 28/12 29/21 41/9 41/9 43/22 45/22 48/12 63/25 71/7 73/25 82/21 82/22 86/21 117/9 127/25 147/18
**decisions [1]** 7/10
**deck [2]** 33/14 101/18
**declaration [1]** 140/4
**decline [2]** 50/3 121/3
**defend [1]** 149/19
**defendant [21]** 4/25 6/8 13/7 22/24 22/25 81/21 82/15 87/14 110/16 110/16 110/17 110/17 124/18 127/10 127/11 134/8 135/1 136/2 136/5 136/5 140/25
**defendants [73]** 1/19 2/2 2/6 2/11 4/5 4/10 4/19 5/1 5/2 5/19 5/24 6/2 6/3 6/14 6/14 6/25 7/7 7/7 7/12 7/14 7/14 7/21 7/23 8/1 9/5 11/2 13/12 13/22 17/23 20/2 20/23 22/24 23/2 27/23

27/24 28/12 29/10 34/11 51/11 60/8 75/23 80/2 80/3 80/16 80/23 81/1 81/16 82/3 82/4 82/5 82/9 82/19 83/16 88/6 99/3 103/5 105/11 105/17 106/7 110/8 113/8 113/18 115/8 119/16 126/2 133/5 135/1 143/8 145/5 145/17 146/20 152/12 153/8
**defendants' [12]** 9/2 9/25 24/25 27/3 69/7 72/17 111/10 115/19 117/12 151/2 151/13 151/17
**defending [2]** 34/1 55/8
**defense [3]** 78/6 121/22 136/22
**defenses [1]** 105/17
**deference [1]** 7/25
**definitely [2]** 54/12 143/13
**definition [6]** 40/14 41/4 41/10 41/12 41/13 41/15
**definitionally [1]** 64/19
**delay [2]** 52/7 52/9
**delays [6]** 51/20 52/14 57/12 57/24 58/4 63/14
**delegate [1]** 26/6
**delivered [1]** 97/3
**demand [10]** 63/25 122/8 123/15 123/23 125/7 126/18 128/7 128/10 148/21 148/23
**demands [1]** 120/19
**demolishing [1]** 120/13
**demolition [13]** 58/9 59/22 59/23 59/24 69/24 71/16 78/20 78/22 78/24 114/21 117/6 117/10 137/20
**demolition's [1]** 58/21
**denied [2]** 6/6 7/3
**denying [1]** 6/1
**depend [1]** 56/22
**depends [1]** 56/23
**describe [4]** 34/11 70/19 106/3 108/20
**described [5]** 34/15 86/15

**D**

described... **[3]**  89/10 95/10 106/8

describes **[2]**  89/15 150/8

describing **[2]**  101/5 147/23

descriptions **[1]**  33/16

desktop **[1]**  31/16

destroyed **[4]**  72/3 101/4 118/22 119/7

destroying **[1]**  146/15

destruction **[2]**  87/19 87/22

detail **[5]**  6/19 8/13 8/16 119/5 131/14

detailed **[1]**  24/3

details **[5]**  5/5 6/11 76/6 76/9 92/13

determined **[1]**  28/17

determining **[1]**  124/11

devote **[2]**  9/25 10/16

devoted **[2]**  33/22 40/8

didn't **[31]**  10/7 22/15 23/14 39/24 54/22 56/13 56/14 56/14 56/25 63/19 64/23 73/8 73/9 73/12 83/12 83/13 84/1 89/13 89/21 98/18 105/15 116/3 116/20 128/23 128/24 132/19 132/20 133/8 137/2 137/3 149/19

differ **[2]**  64/9 123/7

difference **[5]**  7/15 44/20 47/5 47/7 107/10

different **[22]**  4/14 9/12 17/6 19/25 37/7 41/8 49/6 64/8 64/16 76/7 81/5 84/6 98/14 105/22 107/12 112/11 116/25 118/19 122/16 128/9 138/1 146/9

differently **[2]**  95/3 148/25

difficult **[3]**  4/14 22/11 147/23

dioxide **[9]**  31/25 38/14 41/18 44/14 45/1 46/1 48/24 63/24 64/4

direct **[9]**  33/17 81/23 82/6 82/11 82/12 82/12 83/1 93/20 130/9

directed **[4]**  28/8 28/25 80/8 110/8

directly **[16]**  19/16 24/5 66/13 81/21 82/5 82/9 82/16 82/19 82/25 140/5 140/7 140/13 140/13 142/9 142/21 143/3

disagrees **[1]**  143/10

disaster **[1]**  111/6

disbursed **[1]**  72/19

discern **[2]**  95/14 113/12

discharge **[1]**  37/23

disclose **[6]**  64/24 73/9 73/12 101/22 114/14 137/17

disclosed **[19]**  32/1 37/16 48/14 57/1 65/4 65/5 65/22 73/2 73/17 73/24 74/20 75/4 101/13 115/18 117/1 130/19 131/22 133/3 138/19

discloses **[1]**  73/20

disclosing **[4]**  73/15 102/11 128/11 146/13

disclosure **[12]**  40/23 49/4 50/3 50/23 101/25 102/16 105/21 131/4 136/23 137/23 138/2 139/10

disclosures **[16]**  24/3 24/22 24/23 36/23 36/24 37/2 39/14 41/11 46/20 50/7 99/5 101/15 101/19 131/14 141/25 145/15

discovered **[1]**  75/11

discovery **[20]**  5/23 8/6 8/8 8/10 8/14 17/13 18/18 19/19 19/22 20/25 23/8 27/4 53/24 55/23 56/15 56/16 106/2 132/5 136/8 147/20

discuss **[1]**  10/8

discussed **[8]**  9/19 9/22 12/15 22/22 27/22 80/7 95/13 110/18

discussing **[3]**  15/1 92/21

142/7

discussion **[4]**  35/15 84/20 108/22 129/20

discussions **[1]**  136/3

disguising **[1]**  129/4

dismiss **[17]**  5/22 7/1 9/6 10/17 13/6 24/25 31/5 53/22 90/13 102/12 106/2 107/16 121/23 140/20 144/17 147/19 148/3

dismissed **[3]**  6/4 6/15 7/12

dispositive **[2]**  33/1 64/5

dispute **[14]**  36/14 46/5 68/25 69/16 70/16 70/18 70/19 70/19 83/4 107/9 135/16 141/7 143/1 143/7

disputes **[3]**  133/10 133/18 134/2

distinction **[7]**  25/5 42/20 49/11 49/14 61/14 94/6 146/16

distinguish **[1]**  54/19

district **[4]**  1/1 1/1 64/1 81/4

District's **[1]**  148/10

DIVISION **[1]**  1/2

doctrine **[2]**  51/17 54/8

document **[16]**  18/1 22/19 25/2 38/22 42/12 47/9 52/4 52/6 60/25 62/11 67/15 97/22 100/10 100/10 101/16 106/3

documentary **[1]**  111/3

documents **[39]**  14/21 15/3 15/12 18/8 23/4 23/22 24/1 24/14 25/17 27/17 28/23 30/17 32/4 32/21 36/2 42/19 51/22 60/10 60/22 61/16 65/3 67/12 74/24 75/10 92/22 93/18 94/12 95/16 99/12 107/3 124/17 139/24 140/2 142/2 144/14 144/14 146/5 150/18 150/25

does **[41]**  15/24 26/8 28/18 42/15 44/21 55/3 55/24

## D

**does... [34]** 56/22 59/10 64/22 80/22 80/25 82/17 85/25 90/19 91/3 94/19 99/17 101/22 102/20 104/13 106/4 106/5 106/5 106/17 114/13 114/16 114/20 123/1 123/2 125/2 125/2 125/5 126/8 133/16 134/1 138/6 140/18 141/16 143/17 146/3

**doesn't [17]** 13/10 28/17 28/22 45/9 45/11 83/5 103/12 105/4 111/13 112/19 112/21 112/22 115/5 118/8 121/4 150/19 152/4

**doing [28]** 15/23 17/11 18/5 22/4 23/21 23/23 24/7 24/11 24/14 44/7 52/19 58/15 75/24 88/21 89/16 89/17 104/12 104/15 105/5 114/4 114/20 117/16 120/12 127/12 129/4 147/7 147/9 153/12

**dollar [1]** 109/24

**dollars [11]** 50/19 59/12 69/1 69/4 69/19 71/14 71/21 71/22 105/2 120/11 128/25

**domicile [2]** 11/20 30/8

**domiciled [7]** 11/8 11/10 11/17 11/21 11/23 12/21 30/6

**done [21]** 16/16 16/17 21/3 47/11 68/21 69/18 69/23 69/25 72/1 72/2 84/4 89/16 113/20 114/22 119/3 129/9 135/19 151/6 151/16 152/16 152/20

**door [1]** 121/2

**double [3]** 42/3 55/11 64/22

**doubled [1]** 115/17

**doubt [2]** 40/5 94/9

**down [21]** 46/3 50/20 56/25 69/8 71/8 72/5 72/11 73/8 73/18 73/25 78/23 97/11

115/9 117/9 125/2 125/5 130/20 133/23 134/1 138/7 138/21

**drafting [1]** 99/13

**draw [1]** 78/19

**drawn [1]** 109/3

**driven [1]** 70/19

**driver [1]** 121/15

**drivers [1]** 24/4

**driving [1]** 127/25

**drop [3]** 50/15 50/16 50/24

**dropped [2]** 43/21 44/6

**drops [1]** 51/1

**Duffy [2]** 49/1 103/25

**during [21]** 3/19 8/16 24/16 37/14 39/1 39/7 39/20 40/1 40/10 48/10 60/23 84/2 85/22 87/23 92/19 102/3 103/15 103/20 104/17 131/19 141/23

**dynamics [3]** 121/7 121/12 123/6

## E

**e-mail [1]** 4/16

**each [14]** 3/18 3/18 41/19 42/25 71/1 71/2 73/12 81/21 94/12 95/11 95/16 123/7 123/7 145/1

**earlier [20]** 12/15 28/21 32/20 47/16 56/24 60/2 85/18 86/8 91/14 97/6 100/3 104/1 105/7 105/19 111/12 111/22 112/9 114/19 130/19 132/17

**earliest [1]** 138/20

**early [1]** 109/15

**earn [2]** 89/2 113/24

**earned [1]** 135/10

**earning [1]** 130/20

**earnings [26]** 15/3 24/4 32/21 37/13 37/14 50/9 52/21 52/22 53/4 53/14 60/14 60/14 60/23 62/8 66/2 66/4 66/9 66/15 67/5 68/1

92/8 129/6 129/6 144/15 146/24 151/3

**easy [1]** 14/2

**EC [1]** 24/1

**economic [6]** 151/4 151/6 151/10 151/15 151/19 152/1

**edification [1]** 108/3

**EDWARDS [2]** 1/15 152/9

**effect [5]** 9/16 17/2 122/23 144/10 145/4

**effective [4]** 35/8 35/21 35/22 58/16

**effectively [2]** 69/11 136/22

**effort [3]** 71/23 83/15 118/7

**eight [1]** 131/21

**either [14]** 13/3 51/15 76/23 77/25 80/22 80/23 81/8 81/21 82/5 93/4 118/13 131/10 131/11 144/13

**elected [1]** 150/21

**election [1]** 19/13

**electrical [1]** 119/7

**electronically [3]** 16/16 16/23 18/13

**elements [2]** 138/16 138/18

**eliminated [3]** 45/23 123/12 123/13

**elimination [1]** 122/9

**ELIZABETH [2]** 1/20 1/21

**else [14]** 7/22 18/21 61/24 64/12 70/2 70/7 114/5 121/25 126/21 127/24 128/2 128/7 128/11 137/9

**elsewhere [4]** 23/10 48/15 49/2 145/18

**emerged [1]** 48/10

**employed [1]** 11/15

**employee [10]** 75/24 78/25 81/5 108/19 108/19 118/14 129/21 131/24 150/7 150/7

**employees [7]** 46/17 78/24 79/17 87/17 107/19 109/2 111/2

**Employees' [1]** 5/18

**employment [1]** 12/1
**enabled [1]** 135/11
**end [85]** 21/8 31/23 33/4
 37/17 37/21 37/21 37/25
 38/4 38/7 38/9 38/14 39/6
 39/8 39/12 39/20 39/25
 40/10 40/12 40/22 41/2
 41/23 41/25 43/23 43/24
 45/10 47/11 47/20 48/4
 49/17 50/21 51/23 52/13
 53/3 59/21 62/10 62/18
 62/25 68/4 68/23 69/10
 70/12 70/22 70/23 74/22
 75/1 75/2 75/6 77/6 77/10
 87/9 90/7 93/6 96/5 100/25
 101/13 102/3 102/4 102/9
 103/3 103/6 103/8 103/10
 103/11 104/4 105/6 109/22
 113/1 117/8 118/3 130/23
 131/14 139/16 141/25
 145/13 145/14 146/11
 146/11 146/13 146/14
 146/14 146/17 147/3 147/11
 149/7 150/14
**end-all [1]** 102/9
**end-use [1]** 93/6
**ended [4]** 54/14 98/3 129/4
 151/15
**ends [2]** 59/12 147/6
**Energy [1]** 105/9
**engineering [1]** 117/18
**engineers [1]** 109/19
**enjoyed [1]** 153/3
**enough [15]** 25/2 25/13
 26/18 31/4 55/24 56/2 65/8
 78/7 78/8 82/8 104/5 133/14
 137/6 137/23 138/4
**ensure [2]** 24/20 88/12
**ensuring [1]** 108/14
**enter [3]** 88/1 88/2 88/17
**entering [1]** 116/19
**entire [10]** 32/5 49/11 92/21
 93/2 99/4 99/7 101/10 102/9
 118/22 147/1
**entirely [3]** 17/8 44/15
 103/7
**entities [2]** 6/24 7/8
**entitled [1]** 127/23
**entity [2]** 151/5 151/19
**equal [1]** 146/3
**equate [1]** 46/12
**equipment [3]** 52/14 57/24
 68/6
**ergo [1]** 77/6
**ESKRIDGE [3]** 1/8 3/5
 5/14
**essentially [1]** 125/22
**establish [3]** 60/2 68/18
 127/6
**established [1]** 41/10
**establishes [1]** 64/19
**estimate [4]** 66/17 67/2 67/8
 96/4
**estimated [1]** 32/15
**estimates [5]** 32/13 55/14
 63/9 66/23 66/24
**estoppel [1]** 8/22
**et [3]** 55/22 79/8 84/6
**et cetera [3]** 55/22 79/8
 84/6
**Europe [7]** 28/3 46/7 108/7
 109/12 110/6 122/19 124/22
**Europe-Pori [2]** 28/3 46/7
**European [1]** 122/20
**evaluate [1]** 57/2
**even [27]** 25/23 36/15 39/17
 43/25 44/19 59/8 60/1 66/23
 67/3 67/7 70/11 78/7 83/6
 88/2 88/18 105/3 107/12
 111/8 111/9 113/14 114/21
 117/6 117/10 120/12 120/14
 137/20 138/25
**event [2]** 29/18 96/11
**events [3]** 11/22 65/10
 86/19
**eventually [1]** 72/5
**ever [3]** 101/9 105/14 129/6
**every [16]** 40/22 71/1 71/2
 75/24 75/24 75/25 92/19
 103/17 103/19 105/25
 116/23 132/4 141/24 142/10
 142/10 144/12
**everybody [2]** 127/24
 153/15
**everyone [3]** 3/21 7/22 85/6
**everyone's [1]** 27/20
**everything [5]** 69/18 88/4
 128/11 133/3 137/9
**everything's [2]** 62/20 63/4
**evidence [11]** 19/18 56/5
 85/12 87/18 108/12 109/16
 111/3 111/11 125/15 130/10
 134/10
**exact [3]** 40/3 126/11 136/1
**exactly [6]** 7/2 28/16 29/9
 92/6 113/4 132/5
**example [8]** 17/22 30/21
 92/22 106/8 112/12 114/23
 115/1 115/2
**exceed [9]** 50/11 66/9 66/11
 66/13 66/18 66/21 66/24
 67/2 75/6
**exceeded [1]** 69/18
**excellent [1]** 34/25
**except [3]** 13/11 67/21
 140/12
**exception [2]** 26/22 28/6
**exchange [15]** 7/19 16/23
 30/12 30/15 30/18 33/2 33/7
 56/10 56/21 61/11 61/15
 61/15 62/2 103/25 104/22
**excluded [1]** 93/18
**excluding [1]** 94/14
**excuse [3]** 74/18 99/11
 123/3
**executed [2]** 15/16 16/22
**executives [6]** 22/24 27/18
 28/2 28/6 87/15 88/19
**exercise [2]** 79/12 86/14
**exhaust [1]** 133/24
**Exhibit [4]** 69/8 151/2

# E

Exhibit... [2] 151/13 151/17
Exhibit 14 [1] 151/13
Exhibit 22 [2] 151/2 151/17
Exhibit 7 [1] 69/8
exhibits [2] 32/5 144/18
existing [4] 83/4 86/25
 100/4 150/22
exit [2] 129/16 129/16
expect [13] 40/19 49/15
 53/18 57/3 90/3 90/8 96/16
 97/25 98/17 101/20 116/8
 118/20 120/6
expectation [7] 28/4 34/15
 52/8 56/13 59/15 63/14
 147/25
expectations [6] 55/15 56/9
 63/9 63/11 63/12 147/16
expected [15] 32/17 35/15
 39/3 40/17 51/14 51/23 53/2
 53/20 66/10 72/9 72/9 75/6
 75/24 134/7 147/11
expects [1] 52/1
expenditures [1] 70/11
expense [1] 110/13
expensive [1] 72/15
experience [5] 52/14 55/5
 57/24 58/4 63/14
experienced [1] 44/3
expert [4] 64/2 64/17 64/18
 124/17
experts [2] 64/8 121/12
explain [5] 17/10 44/12
 77/15 79/21 104/12
explained [2] 5/8 100/9
explaining [2] 94/13 106/10
explanation [8] 42/8 42/9
 42/10 42/13 42/16 60/6 83/6
 116/4
explanations [1] 105/18
expressed [4] 49/8 49/22
 145/19 145/22
expressly [3] 52/13 65/23
 66/8

extended [1] 12/2
extensive [4] 10/12 19/6
 32/1 115/13
extensively [2] 27/22
 118/15
extent [6] 70/18 74/22
 79/22 107/1 120/6 139/8
extinguished [1] 87/11
extra [1] 116/21
extraordinary [1] 115/14
eye [1] 31/18

# F

face [2] 42/11 51/24
facie [1] 19/20
facilities [9] 38/11 49/10
 58/23 73/10 73/13 89/12
 93/24 116/20 131/21
facility [90] 31/25 32/7 32/8
 32/10 32/14 32/18 37/8
 37/20 37/21 38/1 38/10
 38/10 41/21 42/2 43/1 43/20
 44/3 44/8 44/10 44/22 45/2
 45/18 46/6 48/13 48/18
 50/14 50/20 50/22 59/25
 65/4 65/5 65/6 66/18 68/13
 68/13 68/21 69/9 70/21
 70/24 71/2 71/8 71/19 72/16
 73/16 74/1 78/23 85/21
 87/11 87/13 87/16 87/20
 87/25 88/1 88/17 89/15 90/4
 90/8 93/11 94/3 94/8 95/23
 96/4 96/16 97/25 100/25
 101/2 101/3 101/3 101/20
 102/1 102/6 103/3 103/6
 108/22 109/20 110/4 110/12
 110/20 111/2 115/8 115/10
 117/7 117/9 118/22 119/6
 119/8 120/13 122/1 138/20
 151/23
facility's [2] 41/19 42/22
fact [41] 15/23 16/6 25/11
 26/8 34/1 34/6 35/3 38/13
 44/5 49/25 53/21 54/19
 55/12 63/10 64/17 68/12

78/7 78/13 78/14 79/5 83/12
 84/2 89/14 91/9 98/4 99/10
 104/14 105/1 113/14 114/13
 115/24 116/2 118/22 119/23
 120/8 127/7 129/4 136/21
 137/1 138/24 148/20
fact-intensive [2] 136/21
 138/24
factor [2] 24/11 135/5
factors [2] 52/10 57/1
factory [1] 108/20
facts [24] 49/23 54/21 60/1
 62/14 63/8 64/11 64/13
 64/13 68/18 70/20 75/9
 76/12 77/23 109/24 117/11
 119/13 120/8 128/13 130/15
 137/21 140/11 142/15 149/3
 150/13
factual [2] 55/13 55/18
factually [1] 53/24
fails [2] 32/24 76/12
failure [3] 32/25 33/5 33/6
fair [2] 143/23 144/20
fairly [2] 65/16 128/20
fall [1] 30/7
fallout [1] 27/16
false [41] 30/18 32/22 32/24
 33/15 56/7 56/8 60/3 60/7
 63/3 68/9 68/18 68/19 76/23
 78/1 81/6 81/7 81/9 85/24
 101/24 111/14 115/22
 115/23 116/1 116/2 119/22
 119/23 120/7 120/16 122/4
 122/10 125/22 126/21
 128/15 128/17 128/22 129/3
 132/14 133/10 136/25
 138/18 149/14
falsely [10] 34/11 34/17
 51/11 55/1 60/8 65/18 67/10
 67/24 145/5 149/20
falsity [3] 61/25 133/13
 133/18
families [1] 153/12
family [5] 19/12 87/2 87/3

**family... [2]** 135/12 135/12
**far [5]** 14/7 22/14 33/20 66/6 111/11
**fast [5]** 52/20 67/19 67/24 68/12 68/17
**fast-forwarding [1]** 52/20
**fast-track [4]** 67/19 67/24 68/12 68/17
**fatal [3]** 33/1 33/6 83/6
**favors [1]** 114/13
**FCRR [1]** 2/18
**FDC [1]** 27/5
**FE1 [1]** 79/8
**FE2 [1]** 79/8
**feasibility [1]** 50/13
**February [14]** 37/13 38/6 41/23 60/15 62/9 62/12 62/15 62/15 66/16 68/1 88/7 99/14 103/1 146/23
**February 15th [1]** 37/13
**February 2016 [1]** 41/23
**February 2018 [4]** 62/9 62/15 62/15 68/1
**February 23rd [3]** 60/15 66/16 146/23
**February 26 [1]** 88/7
**federal [7]** 6/22 54/10 56/11 121/15 121/21 124/21 138/9
**felt [1]** 85/11
**fence [1]** 59/25
**fenced [1]** 79/1
**few [5]** 21/19 74/4 74/24 79/7 97/1
**field [1]** 70/6
**fields [2]** 87/24 115/9
**Fifth [4]** 41/8 41/9 80/10 81/24
**Fifth Circuit [2]** 80/10 81/24
**Fifth Circuit's [2]** 41/8 41/9
**figure [5]** 45/8 58/1 110/25 115/14 132/5
**figures [1]** 42/8

**filed [22]** 5/24 6/13 6/22 6/23 7/1 11/22 16/23 18/1 20/6 23/22 34/24 35/3 35/10 38/24 40/5 40/7 50/24 58/15 75/8 75/13 145/9 145/10
**filing [8]** 8/2 20/12 25/19 35/20 40/6 85/15 96/20 97/4
**filings [9]** 15/4 16/15 25/19 26/1 32/22 46/20 81/10 124/2 144/15
**fill [2]** 6/10 110/25
**final [2]** 76/25 97/8
**finally [1]** 131/16
**financial [4]** 110/13 129/12 129/15 132/2
**find [3]** 23/9 79/4 88/4
**finding [1]** 124/23
**fine [6]** 55/4 84/8 109/7 127/22 136/14 137/12
**finish [19]** 45/4 45/19 47/13 49/13 92/24 95/2 95/4 95/13 95/22 100/21 100/22 100/24 104/9 104/21 105/6 114/4 116/20 117/10 118/19
**finished [14]** 32/8 44/23 45/10 46/6 46/8 46/12 58/22 68/15 86/4 93/5 93/8 104/17 115/13 119/15
**finishes [1]** 41/2
**finishing [69]** 37/20 37/25 38/16 39/6 42/3 44/8 44/9 46/18 47/3 47/11 48/15 48/22 49/2 49/9 49/12 49/21 64/25 92/25 93/2 93/11 93/16 93/19 94/4 94/5 94/15 94/19 95/3 95/5 95/7 95/12 95/25 96/7 96/7 96/8 97/21 97/21 100/11 100/11 100/25 101/22 102/6 102/22 104/13 104/25 104/25 106/4 106/6 106/6 106/11 107/13 110/24 112/3 112/23 113/2 113/13 114/15 117/4 118/17 118/20 120/10 126/10 126/12

**filed [22]** 5/24 6/13 6/22 130/21 145/17 146/3 146/4 146/6 146/13 146/16
**Finland [4]** 31/25 107/19 150/6 150/12
**FINN [1]** 1/20
**Finnish [1]** 88/19
**fire [28]** 24/12 27/16 31/24 32/1 32/6 32/6 37/15 37/24 38/17 40/9 44/3 44/9 47/3 71/19 74/12 87/8 87/10 87/12 87/22 87/23 88/20 88/21 89/21 116/12 118/21 121/25 150/20 150/25
**firm [7]** 18/18 79/20 82/22 108/6 126/16 138/11 152/9
**firms [2]** 7/11 153/11
**first [27]** 9/20 35/19 40/6 40/18 48/14 52/22 53/4 59/5 63/24 66/4 84/4 86/24 87/13 90/8 90/15 92/8 92/8 93/7 98/17 116/14 116/14 129/7 144/10 145/17 146/7 147/5 151/21
**fish [1]** 72/10
**fished [1]** 104/16
**Fisher [2]** 146/21 146/25
**fit [3]** 22/14 42/16 141/16
**fits [1]** 44/6
**five [5]** 58/20 102/14 110/2 146/9 146/16
**flat [1]** 135/19
**flawed [1]** 111/4
**flipping [2]** 17/6 31/14
**fluctuate [1]** 123/22
**focus [9]** 30/7 32/23 51/21 85/19 85/20 89/25 92/15 113/14 124/20
**focused [6]** 78/16 101/17 113/19 122/19 125/9 146/2
**focusing [1]** 36/15
**folks [1]** 119/1
**follow [1]** 124/4
**followed [1]** 138/10
**following [2]** 3/3 87/14

**follows [3]** 90/4 98/1 101/21
**football [2]** 87/24 115/9
**footnote [5]** 43/15 94/14 94/16 94/17 94/25
**footnotes [1]** 95/1
**foregoing [1]** 153/20
**forget [1]** 126/11
**forgotten [1]** 139/18
**form [10]** 38/23 40/6 40/7 40/24 40/24 47/25 74/17 74/19 145/8 145/9
**former [15]** 46/17 49/1 78/24 78/25 79/16 87/17 107/19 108/19 108/19 109/1 118/14 129/21 131/24 150/6 150/7
**forth [8]** 30/19 30/21 137/16 143/19 143/25 146/21 146/23 147/18
**fortunately [1]** 84/1
**forum [3]** 19/7 29/3 29/24
**forward [25]** 8/6 24/20 27/2 34/3 51/16 51/25 53/5 53/15 54/7 54/8 54/20 55/11 55/24 56/12 73/19 79/24 89/14 105/11 106/25 118/12 120/1 120/2 120/6 126/19 133/15
**forward-looking [10]** 34/3 51/16 51/25 53/5 54/7 54/8 54/20 55/11 56/12 120/1
**forwarding [1]** 52/20
**found [4]** 121/15 121/21 124/21 144/19
**four [9]** 33/15 33/16 33/19 55/9 65/15 67/17 70/21 101/2 101/7
**fourth [10]** 37/14 57/23 58/24 60/14 65/17 66/15 94/22 100/17 144/25 147/15
**frame [1]** 98/14
**framework [1]** 122/25
**France [2]** 41/22 41/24
**frankly [1]** 83/5

**fraud [10]** 71/13 72/7 76/1 77/4 77/4 99/4 150/16 150/17 151/20 152/3
**free [3]** 87/8 99/11 151/8
**freezing [1]** 61/18
**fresh [1]** 104/21
**friend [2]** 72/3 72/6
**friend's [1]** 114/23
**front [1]** 124/11
**frozen [1]** 61/17
**frustrated [1]** 103/23
**FTC [8]** 63/25 64/8 64/16 122/15 124/15 125/8 127/5 136/4
**full [19]** 40/21 44/1 44/15 44/17 49/13 51/23 52/12 53/3 59/6 62/25 63/1 68/3 75/5 90/6 102/4 105/5 118/21 138/1 148/9
**fully [13]** 5/8 17/13 32/1 45/13 65/19 65/24 66/7 67/1 67/11 96/4 126/10 133/3 149/20
**function [1]** 113/24
**functionality [1]** 101/10
**Fund [1]** 148/11
**funding [1]** 67/7
**furnished [5]** 14/5 80/23 135/18 135/23 136/8
**furnishing [1]** 26/24
**further [4]** 6/11 24/3 38/2 113/14
**futile [3]** 71/22 83/16 86/14
**future [8]** 12/4 45/25 53/12 53/16 53/22 56/4 98/24 147/2

## G

**gain [1]** 112/20
**game [1]** 113/8
**gangbusters [1]** 128/10
**gaping [2]** 111/9 115/3
**Garrison [1]** 2/15
**gas [1]** 123/18
**gathered [3]** 79/10 109/16

**gave [3]** 12/16 114/23 148/12
**general [33]** 11/2 11/5 11/12 11/14 12/11 12/14 12/17 12/23 13/24 15/11 17/7 19/4 19/17 19/25 20/2 20/15 22/8 22/10 22/13 23/19 24/19 25/10 26/5 26/7 28/14 29/19 29/22 30/2 30/10 35/1 40/15 40/22 142/8
**generally [2]** 127/17 140/5
**generated [1]** 116/22
**generating [1]** 73/16
**generous [1]** 81/13
**GEOFFREY [1]** 2/14
**geographic [2]** 19/7 29/3
**Germany [2]** 115/16 116/21
**GERSH [1]** 1/12
**get-out-of-jail-free [1]** 99/11
**gets [3]** 25/22 98/24 153/10
**getting [11]** 47/13 70/9 70/10 75/18 103/3 113/20 116/14 124/12 133/22 149/7 153/4
**give [14]** 5/10 13/25 17/10 18/2 30/25 86/12 86/25 87/21 94/9 110/21 112/12 144/2 148/9 152/8
**given [12]** 4/15 22/18 22/20 22/23 23/15 23/15 55/9 90/19 91/5 92/22 141/7 142/15
**giving [3]** 72/6 130/4 152/23
**glad [1]** 153/2
**global [6]** 65/5 122/12 122/18 123/15 148/21 148/23
**globally [1]** 122/24
**goal [1]** 38/16
**goes [7]** 24/5 53/23 55/24

# G

**goes... [4]** 87/9 89/14 91/8 139/12

**going [101]** 4/13 7/2 8/2 11/18 17/8 24/6 24/12 25/18 27/20 33/3 33/3 33/7 37/10 37/17 39/13 40/14 44/17 45/18 45/19 45/21 45/22 46/2 46/6 48/19 50/11 50/19 54/24 55/3 55/6 57/14 59/6 59/11 59/16 66/2 68/23 68/23 70/13 70/17 71/1 71/15 71/16 73/19 77/1 77/5 83/19 85/22 86/10 88/11 88/12 88/22 88/25 89/1 89/16 89/24 90/1 94/8 102/10 103/2 103/10 103/11 103/17 103/19 103/22 104/15 104/19 106/9 106/20 106/24 107/8 110/11 115/21 116/13 118/9 118/11 119/2 119/14 121/1 121/2 121/6 121/9 121/10 121/10 123/20 124/13 126/3 131/17 132/7 133/6 133/24 134/9 136/4 138/7 141/13 143/19 143/24 144/6 146/4 149/7 149/9 149/20 152/11

**GOLD [1]** 2/7

**gone [5]** 8/6 8/21 79/24 152/1 152/23

**Gonzalez [1]** 4/16

**good [8]** 3/24 4/21 4/24 37/9 42/13 84/25 133/23 143/15

**goods [1]** 56/19

**got [26]** 21/7 24/25 31/19 44/24 47/12 48/5 75/16 86/7 86/20 87/10 89/15 91/5 92/7 101/9 103/23 106/12 106/23 114/17 114/17 116/13 120/15 132/20 139/5 145/24 148/4 148/8

**gotten [2]** 137/20 143/13

**grammar [1]** 98/8

**granted [1]** 83/14

**granular [1]** 131/14

**Great [2]** 84/23 137/14

**greater [6]** 72/8 72/9 72/10 78/3 151/15 151/25

**gross [1]** 78/3

**Grossman [3]** 3/21 4/22 85/7

**Grossmann [1]** 1/13

**ground [5]** 70/8 83/8 119/1 119/1 137/21

**grounded [2]** 78/13 144/13

**grounds [2]** 6/15 144/20

**group [1]** 141/14

**guarantee [2]** 49/23 121/19

**guess [11]** 15/20 18/13 21/14 56/25 68/20 69/21 70/3 72/15 127/16 148/22 149/5

**guided [1]** 9/24

**guy [1]** 135/22

# H

**hadn't [4]** 97/7 100/3 115/7 137/20

**half [4]** 48/9 59/2 59/3 73/21

**hand [1]** 151/21

**handling [2]** 27/15 88/20

**hands [1]** 151/22

**hang [1]** 101/18

**happen [6]** 9/12 53/16 53/18 53/22 98/24 115/22

**happened [12]** 21/20 32/14 32/19 36/3 36/11 39/1 39/4 96/13 109/22 115/12 133/5 140/9

**happening [16]** 56/3 92/13 98/6 104/18 104/23 106/10 107/11 110/3 117/1 119/12 121/19 124/10 127/15 127/19 137/18 137/19

**happens [5]** 25/16 65/25 97/16 100/11 128/21

**happenstance [2]** 27/7 27/9

**happy [6]** 10/6 10/22 25/15 31/13 84/7 140/22

**harbor [2]** 51/17 54/7

**harmed [2]** 139/7 141/25

**hasn't [3]** 8/8 18/18 25/9

**hastens [1]** 66/22

**hat [1]** 101/19

**have [219]**

**haven't [11]** 4/15 8/24 22/9 22/18 88/18 91/15 117/6 122/14 128/5 135/16 141/12

**having [9]** 25/9 40/12 110/14 114/24 120/25 133/18 134/2 143/3 151/15

**Haynes [2]** 2/8 9/5

**he [105]** 8/12 8/17 11/7 11/8 11/15 11/15 11/16 11/17 11/17 12/7 14/3 14/4 15/4 15/13 15/16 15/20 15/20 15/23 15/24 16/1 16/10 16/19 16/20 16/20 17/1 17/5 17/10 17/18 18/17 19/10 19/12 19/12 19/13 19/14 19/15 21/3 21/6 21/7 22/4 22/20 22/22 22/25 23/21 23/21 24/8 26/23 26/24 27/9 27/15 28/5 28/24 38/2 38/6 64/22 72/4 72/6 72/7 72/7 72/9 72/9 72/11 86/15 88/9 104/13 104/14 104/14 105/4 105/4 107/8 108/20 108/20 108/20 118/15 118/16 118/18 118/18 126/1 126/1 126/3 126/4 126/4 126/7 126/7 126/8 126/9 126/11 129/21 130/3 131/25 131/25 132/19 133/10 134/24 134/25 135/9 135/11 135/21 135/22 135/23 136/3 136/4 136/5 136/8 137/6 150/8

**he -- you [1]** 26/23

**he'll [1]** 134/11

**he's [31]** 11/11 12/22 13/20 15/21 16/12 17/8 19/8 23/19

**he's... [23]**  23/21 23/23 23/23 23/25 24/1 24/4 24/7 24/13 24/16 24/19 26/15 26/21 28/22 28/22 55/21 104/1 126/7 126/8 131/25 147/2 147/4 147/6 149/13
**heading [1]**  146/20
**headquartered [2]**  12/11 12/12
**hear [10]**  3/21 43/21 61/18 61/19 61/19 75/18 75/19 77/8 106/6 136/17
**heard [6]**  3/6 55/20 85/18 92/25 120/22 144/3
**hearing [15]**  1/8 3/19 4/20 10/16 64/1 64/17 72/1 84/4 85/12 121/18 121/20 124/12 152/23 153/2 153/6
**heart [1]**  24/5
**Heather [2]**  2/18 153/24
**heavily [3]**  22/21 22/25 30/11
**heavy [1]**  56/21
**heightened [1]**  77/18
**held [2]**  3/3 12/21
**help [3]**  5/4 26/9 108/6
**helped [2]**  108/8 132/6
**helpful [2]**  77/15 141/18
**her [1]**  153/6
**here [86]**  3/10 4/13 5/19 18/3 19/8 23/19 25/3 25/17 29/3 29/18 30/14 30/24 31/16 31/19 31/22 34/20 35/18 37/12 40/13 41/14 43/21 43/25 45/9 46/13 50/4 50/11 52/19 57/20 60/7 60/13 61/3 63/18 64/5 64/14 64/19 65/10 65/20 66/8 66/14 67/5 69/6 71/24 72/23 76/7 79/10 80/25 81/2 81/8 82/1 82/23 84/7 84/10 85/2 86/1 86/5 86/7 86/19 87/22 89/5 89/6 93/3 95/2 95/14

96/10 96/18 102/5 102/15 102/18 103/25 106/1 114/21 115/1 117/24 125/22 135/16 138/17 140/15 141/11 143/19 144/8 146/2 149/7 150/16 151/20 152/7 153/11
**here's [3]**  117/13 123/21 127/18
**Hey [1]**  63/13
**Hi [1]**  3/5
**high [10]**  38/11 38/14 38/18 50/21 62/17 130/21 135/3 135/10 144/8 148/2
**high-end [2]**  38/14 50/21
**high-margin [1]**  38/18
**higher [2]**  62/17 139/10
**highest [1]**  32/9
**highlighted [4]**  43/15 62/22 90/1 104/1
**highly [7]**  78/1 78/2 78/5 136/21 138/24 138/24 146/5
**him [2]**  24/2 104/11
**himself [1]**  16/12
**hindsight [4]**  32/20 77/4 109/21 111/5
**hire [1]**  79/14
**his [28]**  11/16 12/19 14/7 14/9 14/13 14/14 15/6 15/13 15/21 19/12 21/15 22/20 23/23 24/20 24/21 25/6 27/9 28/3 28/4 49/24 79/20 87/3 105/25 114/23 134/4 144/10 146/4 148/22
**historical [4]**  98/4 115/24 120/2 120/8
**hit [3]**  68/6 122/20 144/7
**hold [4]**  61/5 61/5 148/7 149/4
**holding [1]**  7/6
**hole [2]**  111/9 115/3
**home [4]**  11/11 11/16 12/22 30/3
**honest [5]**  16/2 78/18 99/5 132/1 132/3

**honestly [3]**  54/22 64/12 149/3
**Honor [204]**
**Honor's [1]**  108/1
**HONORABLE [1]**  1/8
**hook [1]**  81/17
**hope [3]**  9/25 139/16 153/11
**hours [1]**  144/7
**house [8]**  16/8 17/3 72/1 72/3 72/4 72/11 114/24 115/3
**HOUSTON [7]**  1/2 1/17 2/4 2/19 54/24 105/9 152/7
**however [4]**  5/23 52/14 57/11 57/23
**huge [2]**  87/24 115/3
**huh [3]**  50/8 60/18 137/8
**hundred [1]**  45/2
**hundreds [5]**  50/18 68/25 69/4 71/14 71/21
**Huntmans [1]**  89/2
**HUNTSMAN [67]**  2/6 6/24 7/8 7/20 7/23 9/5 11/10 11/15 24/10 35/10 36/24 37/7 37/16 37/17 37/24 39/5 41/22 42/1 42/10 47/12 47/18 49/16 53/19 80/19 80/23 81/9 81/16 82/2 82/19 83/15 86/22 86/25 87/2 87/2 87/3 87/4 87/9 88/8 88/12 88/16 88/19 88/20 88/22 93/11 93/13 103/1 129/16 135/1 135/2 135/7 135/12 135/17 135/21 143/8 150/20 150/24 151/1 151/4 151/6 151/7 151/11 151/12 151/14 151/18 151/22 151/22 151/25
**Huntsman's [10]**  37/13 37/16 38/23 40/24 41/16 42/4 103/1 135/12 145/8 150/17
**Huntsmans [2]**  89/2 89/8
**hurricane [1]**  72/4

**I**

I -- I [1] 78/18
I -- so [1] 126/15
I -- when [1] 120/22
I'd [8] 25/8 25/15 31/17
32/23 36/18 36/22 99/20
144/21
I'll [9] 14/19 19/4 57/7 63/7
112/12 128/6 128/20 132/11
148/9
I'm [71] 5/6 6/10 7/1 7/1 9/3
10/6 10/22 13/2 15/19 16/3
16/15 16/16 17/5 17/18
18/17 28/6 28/13 31/13 33/3
33/3 33/7 37/10 39/13 40/14
42/14 46/6 55/1 57/2 57/14
58/8 58/15 67/19 70/13
71/10 74/8 75/18 76/25 78/2
78/6 79/11 84/7 84/15 85/2
90/18 91/5 97/10 97/10
106/18 106/23 117/13
119/20 123/5 128/4 130/2
130/4 133/13 133/13 133/22
133/23 134/4 134/12 136/13
139/8 139/10 143/2 143/19
145/21 149/6 149/7 152/11
152/21
I've [15] 10/14 31/19 44/24
58/5 69/22 72/3 84/4 84/5
84/5 106/12 106/23 117/25
120/15 139/5 143/16
idea [5] 58/6 58/25 107/1
127/18 131/19
identified [2] 137/6 143/1
ignores [1] 146/9
II [1] 1/19
illustrates [1] 74/10
imagine [2] 135/20 153/3
immediately [4] 37/1 37/1
88/6 129/7
impact [3] 32/2 122/20
122/25
implausible [1] 27/21
importance [1] 38/9

important [13] 33/21 34/20
75/22 76/4 81/16 85/19 86/3
86/6 113/16 114/8 116/11
122/17 151/7
importantly [2] 14/24
146/8
impose [1] 99/3
imposes [1] 99/22
impossibility [1] 119/2
improving [1] 121/7
in-house [2] 16/8 17/3
inaccurate [2] 55/2 62/16
inappropriate [1] 85/17
include [7] 43/2 43/2 43/3
45/9 45/11 46/2 83/3
included [2] 42/1 63/18
includes [2] 26/5 108/11
including [4] 5/24 66/18
87/20 110/5
inclusion [1] 80/24
income [5] 73/4 73/13
149/24 149/25 150/1
inconsistent [4] 67/12 76/14
76/21 102/18
incorporated [2] 30/4
148/10
incorrectly [1] 63/23
increase [10] 64/4 121/4
121/15 121/20 122/8 122/19
123/8 123/13 123/14 127/7
increased [4] 32/16 63/24
123/3 124/22
increases [3] 124/19 127/15
128/11
increasing [1] 123/16
incredible [1] 110/14
incredibly [1] 103/16
incur [1] 50/19
Indeed [1] 32/4
indicate [1] 118/8
indicates [1] 117/21
indifference [1] 76/24
indiscernible [1] 117/14
individual [17] 5/1 6/25 7/7

7/14 11/2 15/14 16/12 17/1
17/22 17/24 18/10 25/6 30/5
73/10 74/1 80/15 107/25
individuals [4] 109/20
110/2 152/12 152/15
Industrial [1] 148/11
industry [4] 41/12 107/2
123/18 124/3
industry-specific [1] 107/2
inexcusable [1] 78/4
inference [9] 76/4 76/5
76/22 77/9 77/20 77/21
77/24 78/8 78/9
information [26] 14/5 19/5
26/24 28/5 73/11 73/18
76/13 76/20 80/24 81/6 81/7
81/9 102/12 108/11 110/5
124/7 128/3 131/22 132/20
133/8 133/10 135/24 136/8
138/16 141/8 144/19
informed [4] 36/8 39/4
74/25 127/14
informing [1] 53/4
inherently [2] 64/7 149/2
initial [4] 35/19 75/4 83/12
86/20
initially [3] 32/17 35/3 71/6
inked [1] 18/14
inoculates [1] 111/20
input [2] 23/3 121/11
inquiring [1] 138/5
inquiry [1] 138/24
insight [1] 131/16
inspect [1] 88/4
instance [1] 109/6
instances [1] 79/6
instead [7] 24/11 54/4 63/5
76/11 89/1 131/8 135/9
insurance [50] 50/11 65/18
65/22 65/24 66/1 66/7 66/9
66/11 66/13 66/19 66/21
66/25 67/2 67/10 67/15
67/21 67/22 72/14 72/18
72/22 73/2 73/4 73/21 75/7

**I**

**insurance... [26]** 103/22 120/19 128/18 128/19 128/21 128/22 128/23 129/2 129/3 129/11 129/15 130/7 130/11 130/12 130/15 130/16 130/24 131/7 131/11 132/2 132/6 149/17 149/18 149/20 149/24 150/10

**intact [2]** 126/10 126/11

**integral [1]** 119/8

**integrally [1]** 27/15

**intelligence [1]** 124/12

**intend [10]** 3/18 53/5 53/5 53/17 55/21 57/3 57/21 94/20 95/6 100/15

**intended [3]** 51/14 53/20 151/4

**intending [1]** 54/3

**intensive [2]** 136/21 138/24

**intent [9]** 12/5 12/6 53/25 55/23 56/9 58/2 58/3 147/17 147/25

**intention [3]** 56/7 56/15 116/3

**intentionally [1]** 56/9

**intentions [2]** 63/10 63/11

**intents [1]** 55/15

**interactions [1]** 127/14

**interest [8]** 23/4 27/13 151/4 151/7 151/10 151/16 151/19 152/1

**interesting [1]** 24/24

**interim [2]** 49/2 72/6

**intermediate [15]** 37/22 41/2 42/2 48/15 49/10 68/14 93/3 103/2 105/2 110/10 114/6 115/15 128/25 145/18 150/5

**intern [1]** 153/4

**internal [3]** 14/14 28/7 133/9

**internally [2]** 133/9 134/16

**interpret [2]** 104/22 134/4

**interrupt [1]** 22/6

**interruption [5]** 72/24 73/6 73/14 73/23 103/23

**interview [1]** 79/16

**interviews [1]** 79/18

**intimately [5]** 24/13 24/16 28/1 120/24 136/3

**introducing [1]** 103/2

**invest [2]** 95/15 122/7

**investigate [1]** 108/5

**investigation [7]** 79/19 88/18 88/21 89/20 110/2 115/12 115/13

**investigators [3]** 79/14 79/20 108/6

**investigators' [1]** 109/3

**investment [1]** 28/9

**investor [22]** 14/21 22/22 23/4 27/10 27/12 27/18 27/22 28/24 62/3 76/18 90/16 100/19 103/18 103/20 116/17 116/23 126/2 136/6 141/24 142/2 148/1 148/13

**investors [65]** 24/18 27/11 27/19 29/1 32/12 39/10 51/11 52/7 52/25 53/2 53/4 58/3 60/7 60/8 60/12 60/20 62/23 63/13 65/7 65/18 66/6 67/10 67/24 74/23 85/21 88/12 89/1 89/7 89/13 91/17 93/13 93/13 94/10 95/21 101/14 101/19 101/22 102/5 102/20 102/24 105/12 106/9 110/13 113/12 113/15 113/16 114/3 114/14 115/4 115/18 116/7 116/11 119/17 121/8 122/6 128/23 130/16 131/16 131/19 133/6 135/8 138/20 140/9 148/24 150/21

**investors' [2]** 103/13 108/5

**invite [1]** 36/18

**involved [17]** 22/21 22/25 24/13 24/13 24/17 26/24 27/15 28/1 30/11 41/10 82/9 110/17 111/1 120/25 126/1 136/2 142/1

**involvement [4]** 14/20 14/21 27/10 28/4

**iPad [2]** 133/23 133/24

**IPO [87]** 11/9 11/16 16/21 17/15 21/3 21/4 21/8 21/14 21/14 21/24 23/22 24/11 24/15 24/16 27/13 30/11 32/3 32/11 34/14 34/19 34/22 36/8 37/1 38/25 39/10 39/15 39/17 42/19 48/1 51/21 52/6 53/14 58/20 59/17 60/10 60/21 61/9 62/1 62/25 65/3 65/21 66/6 69/10 74/24 75/10 82/16 88/25 89/1 89/14 89/19 89/21 89/23 90/3 90/15 91/16 91/20 92/3 92/6 92/18 92/22 93/18 94/12 95/22 95/25 96/10 96/15 96/19 96/23 97/25 98/15 100/10 102/14 103/9 115/12 135/3 135/22 139/9 140/6 142/16 144/13 145/9 145/11 150/21 151/11 151/14 151/24 151/25

**irrelevant [1]** 25/5

**irreparably [1]** 89/7

**isn't [5]** 31/14 69/16 114/21 115/1 146/7

**issue [30]** 5/19 5/21 7/5 7/8 9/3 9/21 11/5 11/13 11/13 13/6 13/15 14/4 15/11 23/5 24/8 25/8 25/21 26/1 26/9 32/25 50/4 76/3 105/14 125/20 134/2 136/25 138/7 139/23 144/15 149/13

**issued [1]** 97/3

**issuer [4]** 15/16 16/12 82/2 82/19

**issuers [1]** 82/23

**issues [14]** 4/2 4/10 8/20 10/8 11/1 13/5 21/1 87/9 106/14 106/18 106/21

**I**

**issues...** [3] 132/15 137/13 139/16

**it'll** [1] 67/2

**Italy** [6] 114/6 115/16 116/21 121/3 150/5 150/12

**iteration** [1] 97/6

**iterations** [1] 35/23

**its** [27] 32/1 32/2 32/3 32/12 32/18 34/15 40/5 40/6 40/7 40/17 48/12 50/10 50/24 51/13 51/24 52/8 53/1 56/6 56/6 67/10 73/12 75/7 93/19 109/23 122/21 150/21 151/22

**itself** [3] 101/6 108/23 118/8

**J**

**JACK** [2] 1/15 152/9

**jail** [1] 99/11

**January** [3] 31/23 74/12 87/9

**January 30th** [1] 74/12

**Jeffrey** [1] 2/11

**Jennelle** [2] 3/11 4/16

**job** [2] 24/21 133/23

**JOHN** [2] 1/15 88/7

**joined** [1] 137/13

**joining** [1] 85/6

**joking** [1] 63/17

**JR** [1] 1/15

**judge** [8] 3/5 3/13 5/14 9/13 53/23 81/24 82/21 140/3

**Judge Rosenthal** [2] 81/24 140/3

**Judge Rosenthal's** [1] 82/21

**judgment** [2] 85/12 144/11

**judicata** [1] 8/22

**judicial** [2] 144/16 150/19

**July** [18] 38/7 38/24 50/10 50/15 51/1 54/18 59/23 59/25 67/4 74/16 78/25 79/2 99/10 99/11 103/6 115/7

116/6 117/8

**July 1** [1] 99/10

**July 2018** [4] 51/1 67/4 78/25 79/2

**July 27th** [2] 38/24 74/16

**jump** [1] 139/13

**June** [7] 35/12 69/10 98/3 99/9 100/5 103/8 117/8

**June 2018** [1] 69/10

**June 30th** [3] 98/3 99/9 100/5

**jurisdiction** [55] 5/25 7/5 7/6 7/13 9/21 10/2 10/9 10/12 10/25 11/3 11/4 11/5 11/12 12/14 12/17 12/24 13/4 13/24 13/25 14/2 15/6 16/13 17/7 17/12 18/2 18/6 18/12 19/4 19/18 20/2 20/3 20/15 20/21 20/22 21/1 22/2 22/8 22/10 22/13 22/15 23/7 23/17 24/25 25/3 25/4 27/8 28/14 28/15 28/17 29/10 29/20 29/22 30/2 30/2 31/1

**jurisdiction's** [1] 12/4

**jurisdictional** [2] 6/15 8/20

**just** [128] 4/20 5/5 8/24 13/2 13/6 13/21 16/16 16/16 17/16 18/7 18/19 19/6 20/13 20/23 21/6 21/11 21/22 22/6 22/15 26/11 26/11 28/11 29/15 29/19 31/9 31/19 31/22 35/17 36/15 37/10 38/8 43/23 45/10 47/8 47/11 48/21 49/19 53/9 54/16 55/3 57/1 57/14 60/9 61/5 61/17 61/20 62/19 64/25 67/11 68/10 68/11 68/16 68/16 70/2 71/7 71/9 71/9 71/16 72/8 73/1 74/9 79/7 79/22 85/9 85/12 86/3 86/10 87/21 91/15 93/21 94/17 95/13 95/19 95/24 96/8 99/2 102/10 105/9 106/8 107/7 108/1 109/7 109/22 111/4

118/4 118/10 118/10 119/6 119/13 119/20 120/9 120/10 121/4 121/23 122/3 122/3 122/24 123/11 124/14 126/18 126/23 128/4 128/8 130/6 132/11 133/10 133/20 134/22 135/19 136/20 137/14 138/19 139/7 139/15 141/18 142/1 142/7 144/7 148/17 149/7 149/11 149/17 150/12 150/19

**K**

**Kaplan** [1] 2/3

**KATE** [1] 1/12

**keep** [4] 37/15 55/6 143/24 149/9

**keeping** [1] 81/17

**key** [6] 18/3 26/21 33/21 38/22 42/17 42/19

**kick** [1] 10/20

**kicked** [1] 63/6

**kind** [20] 16/8 20/17 24/24 25/21 25/23 31/17 71/11 85/18 111/10 112/9 112/13 112/20 114/25 117/11 123/20 127/6 134/6 136/17 139/19 140/11

**kinds** [5] 105/17 105/20 112/17 117/10 119/9

**Kingdom** [4] 11/17 11/23 12/11 17/25

**knew** [14] 39/10 71/18 71/20 71/22 76/5 77/25 108/23 110/8 113/16 121/16 131/22 134/16 138/4 151/23

**Knock** [1] 72/11

**know** [222]

**knowing** [1] 81/7

**knowingly** [5] 56/8 76/23 77/12 81/6 81/9

**knowledge** [7] 28/4 119/25 127/11 129/18 133/1 134/7 134/8

**known [1]** 121/14
**knows [8]** 29/20 31/23 38/8 59/11 60/6 78/2 117/17 126/7
**Kurt [3]** 76/8 80/5 80/15

**L**

**L.L.P [1]** 2/3
**Labor [1]** 148/10
**lack [2]** 5/25 7/12
**language [11]** 40/4 47/23 51/19 51/21 54/10 56/23 57/6 58/3 60/13 63/13 126/11
**largely [1]** 79/1
**largest [2]** 87/4 87/5
**last [7]** 48/8 67/14 70/13 79/25 81/12 139/16 150/14
**last-minute [1]** 139/16
**lastly [1]** 67/4
**late [1]** 109/12
**later [9]** 53/1 54/13 59/8 74/24 87/18 88/14 101/6 131/15 138/2
**latter [1]** 49/1
**laughed [2]** 108/24 108/25
**law [11]** 2/12 7/11 29/21 54/8 78/2 80/10 82/8 94/10 126/23 140/17 153/6
**laws [5]** 54/19 99/3 99/7 138/10 147/24
**lawsuit [2]** 23/2 139/11
**lawyer [3]** 7/1 17/3 78/6
**lawyers [5]** 3/18 16/8 30/13 153/3 153/4
**lay [1]** 70/5
**lead [8]** 1/11 3/25 4/23 19/1 58/6 79/13 85/8 139/25
**leading [4]** 20/12 20/14 22/5 24/14
**leaking [1]** 88/4
**learned [1]** 8/17
**learning [1]** 138/20

**least [8]** 8/5 8/19 25/22 75/10 86/14 88/2 91/8 138/8
**leave [3]** 83/2 128/14 134/3
**leaving [2]** 119/20 131/25
**led [1]** 138/23
**Lee [1]** 81/4
**leery [1]** 71/10
**left [7]** 19/3 25/17 69/24 93/22 99/13 130/3 131/25
**leg [2]** 105/23 116/14
**legal [4]** 77/15 77/22 138/7 141/7
**lengthy [1]** 10/15
**less [6]** 32/8 37/15 38/17 107/13 107/14 112/19
**less-damaged [1]** 32/8
**let [26]** 3/9 19/25 21/2 31/9 31/19 42/6 42/6 44/11 46/4 47/8 53/13 55/17 55/19 68/23 68/24 79/8 90/17 98/11 98/11 99/2 109/1 120/18 141/17 141/17 143/2 143/23
**let's [8]** 10/11 10/18 23/16 31/5 94/11 120/16 128/18 132/14
**letting [1]** 58/3
**level [10]** 95/24 96/2 96/6 96/6 96/12 97/12 97/18 97/20 98/18 118/17
**levels [5]** 93/23 110/22 110/22 110/24 126/12
**leverage [1]** 64/22
**liability [3]** 16/13 92/1 99/22
**liable [2]** 13/8 82/24
**liaise [1]** 108/7
**lick [1]** 27/4
**lied [2]** 133/5 146/20
**lift [1]** 56/21
**light [2]** 102/20 107/17
**like [48]** 8/7 9/24 10/8 10/11 25/21 26/19 31/18 32/23 36/22 42/11 42/16 44/10

46/7 54/4 58/7 59/10 62/4 70/4 71/16 73/8 79/4 82/22 83/21 84/10 84/22 85/9 85/11 92/14 95/12 99/18 99/20 105/4 106/7 112/14 112/17 118/1 120/12 123/10 123/25 124/3 124/4 128/20 130/18 137/9 144/2 144/21 152/10 152/22
**likely [1]** 38/5
**limit [5]** 20/17 50/11 65/23 66/9 66/21
**limitations [10]** 33/8 74/11 74/15 75/15 136/15 136/16 136/20 137/11 138/8 138/25
**limited [5]** 14/14 18/6 61/8 61/25 141/13
**limits [4]** 66/11 66/13 66/19 75/7
**line [6]** 28/15 30/1 76/3 101/14 131/18 148/25
**lines [5]** 70/22 101/2 101/7 115/17 124/11
**list [2]** 3/9 139/22
**listed [5]** 15/20 15/21 42/8 43/25 96/18
**listen [2]** 89/4 94/7
**litigated [3]** 25/9 25/22 124/15
**litigation [4]** 1/5 3/16 64/8 124/20
**Litowitz [5]** 1/13 3/21 3/25 4/22 85/7
**little [12]** 4/14 6/19 30/7 44/11 66/5 86/6 86/12 90/2 99/21 113/8 116/4 122/15
**lived [4]** 11/8 11/15 19/8 19/8
**LLP [5]** 1/13 1/16 1/21 2/8 2/15
**located [2]** 17/25 18/13
**location [4]** 17/20 18/4 21/3 30/8
**lockup [1]** 129/10

**L**

**logic [1]** 98/8
**logistical [1]** 115/15
**long [6]** 10/15 59/20 84/8 130/6 143/1 152/23
**longer [9]** 12/22 38/5 39/2 53/8 59/13 73/19 75/5 88/2 115/1
**look [32]** 11/21 25/16 26/6 26/6 32/4 39/22 40/3 40/4 43/14 45/15 49/5 49/19 49/24 54/4 57/16 59/22 68/8 69/6 69/15 78/12 94/11 105/23 106/24 123/20 123/22 126/23 127/24 128/4 128/6 137/10 137/25 150/18
**looked [8]** 25/12 69/5 109/24 121/11 128/5 131/5 131/6 141/12
**looking [36]** 20/7 20/12 20/18 31/9 33/11 34/3 35/18 42/14 45/25 51/16 51/25 53/5 53/15 54/7 54/8 54/20 55/11 56/12 74/8 90/18 96/15 106/25 106/25 110/21 116/12 117/14 117/24 118/1 118/4 120/1 120/2 120/6 125/5 125/21 126/19 131/23
**looks [1]** 84/10
**loss [3]** 64/3 65/8 92/2
**losses [5]** 50/11 72/24 73/15 135/13 150/24
**lost [14]** 65/19 65/25 66/1 66/7 67/1 67/11 73/5 109/23 116/22 131/3 131/11 133/20 149/21 149/25
**lot [17]** 53/15 53/16 67/18 69/23 73/8 85/11 85/13 93/1 106/14 106/20 112/11 117/17 117/17 117/18 117/19 138/4 149/11
**Louisiana [1]** 1/17
**low [2]** 75/18 113/24
**low-cost [1]** 113/24

**lulled [1]** 13/14

**M**

**Macomb [5]** 5/17 7/9 7/20 7/24 28/19
**made [49]** 7/23 12/19 14/3 16/15 22/3 30/19 36/3 40/25 43/22 45/22 46/21 60/23 60/25 62/3 71/7 73/25 76/23 77/13 77/25 78/15 80/20 86/13 87/13 90/12 97/14 99/23 109/21 111/18 111/24 113/10 115/7 117/9 117/14 117/15 119/24 121/7 121/8 125/19 126/3 126/22 131/5 136/25 142/1 144/11 144/13 145/11 146/8 149/14 150/6
**magnitude [1]** 69/17
**Mahomed [3]** 11/7 80/19 149/12
**mail [1]** 4/16
**main [1]** 29/18
**maintain [1]** 31/18
**maintained [2]** 11/16 25/24
**Maiter [33]** 11/7 11/10 11/13 13/4 13/18 14/3 14/8 14/13 14/22 18/7 18/8 22/8 22/10 26/18 26/19 26/21 27/5 27/8 27/25 80/19 80/23 81/8 110/17 124/18 125/4 125/16 125/18 125/21 135/1 136/2 149/11 149/12 149/15
**Maiter's [5]** 13/20 22/13 126/17 126/24 127/8
**major [3]** 59/10 70/25 72/2
**majority [3]** 104/20 105/5 136/25
**make [37]** 3/9 9/19 14/8 24/21 26/12 30/9 54/4 63/7 65/7 67/18 68/11 80/1 85/10 97/9 101/12 106/17 106/18 112/25 113/4 113/21 114/12 116/21 119/20 123/1 127/25 128/13 130/4 136/21 137/3 137/15 139/9 140/11 143/16

**maker [1]** 15/4
**makes [7]** 10/13 13/18 44/2 47/9 104/7 122/2 122/21
**making [12]** 14/5 27/11 50/21 70/13 72/19 76/21 98/17 114/11 116/15 130/12 134/23 146/4
**manage [1]** 120/25
**management [3]** 71/18 76/2 76/5
**manager [4]** 4/12 118/18 150/8 150/9
**managers [2]** 120/24 122/8
**mandamus [2]** 9/7 9/12
**manufacture [3]** 45/2 46/1 55/22
**manufactured [3]** 38/13 38/18 49/25
**manufacturing [17]** 53/25 57/22 58/23 92/17 92/23 93/16 94/21 95/9 100/16 100/18 100/21 100/22 106/5 112/23 113/11 118/19 137/2
**many [9]** 3/18 5/19 5/23 6/3 30/6 33/22 71/25 75/23 75/25
**March [5]** 78/17 99/14 111/5 111/7 116/6
**margin [3]** 32/9 38/11 38/18
**Marine [1]** 150/11
**mark [1]** 68/7
**market [39]** 36/8 36/9 39/4 39/5 39/19 40/9 45/18 48/14 49/4 55/16 55/16 62/13 62/20 63/4 64/2 64/7 65/8 65/22 66/12 66/20 66/25 67/6 73/2 73/3 74/20 75/4 75/8 122/21 123/3 123/3 123/22 123/25 126/18 127/19 127/24 136/22 149/2 150/8 150/9

**marketplace [2]** 65/12 116/19

**markets [1]** 123/21

**MARSH [1]** 2/8

**mask [1]** 132/6

**mass [1]** 115/14

**material [9]** 31/2 45/10 46/8 47/6 47/11 61/25 64/12 99/10 120/8

**materially [2]** 30/18 60/3

**materials [21]** 1/4 3/15 15/16 46/5 72/16 89/23 90/3 92/3 92/10 92/18 92/18 96/15 97/25 99/20 100/1 102/14 103/9 108/12 113/25 114/5 114/7

**matter [10]** 5/7 10/9 15/24 28/22 28/24 91/4 124/16 125/9 140/24 153/21

**matters [5]** 17/22 18/20 57/2 70/3 105/25

**MATTHEW [1]** 2/7

**maximum [6]** 41/19 42/22 44/13 44/16 45/1 45/14

**may [26]** 1/9 8/25 16/21 35/3 35/12 42/13 52/14 53/15 53/16 53/22 53/22 55/19 56/3 56/3 57/5 57/23 58/4 63/14 67/7 70/7 107/8 117/8 127/22 127/23 130/5 153/23

**May 5th [1]** 35/3

**maybe [5]** 8/17 9/21 10/20 95/7 107/18

**MCGEE [1]** 2/7

**mean [92]** 9/23 10/20 10/23 11/20 12/17 13/19 14/3 14/7 16/3 16/6 16/7 16/25 17/2 17/20 17/22 18/3 25/8 30/10 30/20 35/1 43/10 43/19 44/12 46/20 46/24 47/15 48/8 49/13 55/24 55/25 56/17 57/4 57/9 58/24 59/7

59/10 60/1 61/3 61/7 63/2 63/17 63/22 64/25 65/2 68/10 68/16 68/24 69/18 69/20 69/20 70/4 70/4 70/7 70/15 70/16 70/17 71/4 71/6 71/11 71/14 71/24 71/25 72/2 73/18 77/17 78/18 79/3 79/11 85/13 92/15 105/15 105/22 106/4 106/5 106/5 112/14 114/20 117/17 123/11 126/15 127/16 127/17 137/12 141/16 145/20 146/7 147/21 148/22 149/18 150/6 150/12 150/17

**meaning [6]** 36/14 37/3 95/10 105/12 107/3 112/22

**meaningful [3]** 51/19 54/9 57/6

**means [23]** 36/15 64/25 70/8 89/1 89/21 92/16 92/24 94/13 95/1 95/21 96/8 97/15 100/20 100/21 102/21 102/22 102/22 105/18 106/4 106/6 107/8 112/16 113/13

**meant [8]** 91/5 95/17 99/14 107/20 107/22 107/23 112/6 113/12

**measure [1]** 20/1

**measured [1]** 12/4

**mechanical [1]** 1/25

**media [1]** 142/2

**meet [1]** 83/7

**meeting [1]** 77/12

**meetings [6]** 23/10 76/2 76/13 76/17 110/19 127/13

**members [2]** 141/13 142/15

**memorialized [1]** 41/13

**memory [1]** 58/15

**mental [5]** 13/20 80/11 80/12 80/14 80/18

**mention [3]** 26/12 39/8 87/13

**mentioned [8]** 28/14 98/20 102/14 102/15 124/2 130/19

**mentions [2]** 88/8 102/7

**Merck [1]** 138/11

**merger [1]** 88/14

**messages [1]** 24/17

**meters [1]** 87/23

**metric [4]** 43/14 44/1 44/18 45/20

**Miami [1]** 142/8

**Michael [1]** 1/11

**middle [3]** 35/11 70/23 111/6

**might [14]** 20/10 28/16 42/10 65/24 70/10 83/24 98/24 105/22 122/15 124/2 140/5 141/18 141/19 146/19

**Mike [7]** 3/20 3/25 4/22 5/15 10/5 18/25 85/6

**million [16]** 50/12 65/23 66/11 66/12 66/22 66/22 67/3 67/3 67/8 67/8 69/14 70/1 73/21 73/22 130/24 135/13

**millions [12]** 50/18 69/1 69/4 71/14 71/21 105/1 105/1 120/10 120/10 120/11 128/24 128/25

**mind [4]** 13/3 20/10 37/15 65/7

**minds [1]** 27/20

**minimal [3]** 8/10 116/13 118/17

**minimize [1]** 150/24

**minute [1]** 139/16

**minutes [2]** 74/6 84/18

**mislead [3]** 85/23 86/1 99/16

**misleading [14]** 30/18 32/22 32/25 33/16 46/1 60/3 74/24 85/24 102/24 106/9 107/17 129/3 138/18 149/14

**misled [1]** 130/16

**misread [1]** 137/4

**missing [1]** 136/13

**misspeak [1]** 123/10

**misspeaking [1]** 134/12

**misstatement [1]** 34/1

**misstatements [7]** 31/3 33/20 34/2 34/7 51/5 135/6 142/20

**misstating [2]** 56/9 99/10

**mistaken [1]** 104/8

**misunderstanding [1]** 44/10

**misunderstood [1]** 49/23

**mixed [2]** 120/2 140/17

**modeled [1]** 116/17

**modified [2]** 35/23 63/5

**moment [2]** 25/15 132/8

**Monday [1]** 153/5

**money [11]** 59/14 71/15 86/14 113/21 116/16 118/24 122/22 128/24 129/2 135/14 150/3

**Monroe [1]** 6/8

**Montgomery [1]** 9/14

**month [7]** 21/21 32/15 37/15 59/8 59/17 88/2 88/17

**months [28]** 22/5 24/14 31/23 38/1 38/5 51/24 53/1 58/20 59/1 59/7 59/8 59/12 59/16 59/16 60/23 62/25 66/6 69/11 72/4 75/8 75/13 87/18 88/14 97/7 103/4 116/9 129/9 153/7

**Moore [6]** 70/24 78/23 87/20 101/3 118/22 119/6

**more [37]** 6/19 7/25 8/6 8/13 9/19 10/13 14/24 19/20 22/11 22/14 24/3 30/1 31/17 31/18 38/3 39/14 39/24 50/12 51/7 59/14 67/3 67/7 74/3 74/4 75/7 94/21 100/16 105/18 106/1 112/19 119/5 122/23 134/6 135/20 138/1 146/8 151/15

**most [11]** 19/13 31/14 32/23

32/3 32/21 38/4 77/15 113/16 113/21 138/13 141/18

**motion [34]** 1/8 5/22 6/5 7/23 8/2 9/7 9/8 9/19 10/1 10/2 10/16 10/19 10/24 13/5 15/2 18/6 24/25 27/3 29/16 31/5 32/5 53/22 83/7 90/13 102/12 106/2 111/15 121/23 139/25 144/12 144/17 147/2 147/19 148/3

**motions [6]** 5/24 6/1 7/1 7/2 7/3 9/6

**motivating [2]** 24/10 135/5

**motivation [3]** 89/5 89/6 150/17

**motive [1]** 135/2

**motors [1]** 119/7

**move [9]** 21/15 22/1 23/16 29/16 31/5 65/8 90/24 120/16 147/5

**moved [3]** 16/20 17/16 98/14

**movement [2]** 65/12 72/16

**movements [5]** 64/3 64/6 64/18 65/12 149/1

**moving [4]** 46/8 77/2 83/7 127/19

**MR [19]** 1/11 1/12 1/15 1/19 1/20 2/2 2/3 2/6 2/7 2/7 2/8 2/11 2/14 72/13 89/10 129/20 132/17 135/17 140/16

**Mr. [168]**

**Mr. Blatchley [29]** 5/9 5/10 6/20 7/3 9/18 10/21 12/18 13/17 18/24 49/23 50/5 61/7 64/21 79/11 79/19 79/21 83/19 84/15 84/21 85/4 90/17 143/12 144/10 145/1 145/22 146/2 149/19 150/7 150/15

**Mr. Blatchley's [4]** 14/19 143/20 144/22 151/21

**Mr. Duffy [1]** 103/25

**Mr. Fisher [2]** 146/21 146/25

**Mr. Huntsman [5]** 37/24 80/23 81/9 103/1 135/17

**Mr. Maiter [21]** 11/10 11/13 13/18 14/3 14/8 14/22 18/7 18/8 22/8 22/10 26/18 26/19 26/21 27/5 27/8 27/25 80/23 81/8 125/18 149/11 149/15

**Mr. Maiter's [5]** 13/20 22/13 126/17 126/24 127/8

**Mr. Ogden [4]** 55/21 76/19 80/8 116/25

**Mr. Pepperman [53]** 5/9 5/12 6/10 6/17 9/18 10/7 10/18 21/6 25/11 26/22 28/7 28/21 29/13 31/6 42/7 61/22 62/6 86/4 86/13 89/4 89/10 94/7 100/2 100/23 103/5 104/1 105/7 105/19 106/20 107/7 108/4 109/20 111/18 112/9 113/19 114/23 119/21 120/22 128/20 130/18 130/23 132/17 134/4 134/11 134/23 137/5 138/22 140/19 141/3 143/1 143/7 143/10 143/18

**Mr. Pepperman's [11]** 85/10 85/20 89/25 92/15 93/22 101/12 115/2 127/17 133/2 133/7 135/16

**Mr. Smyser [4]** 8/11 8/11 152/7 152/21

**Mr. Stolle [17]** 11/14 11/23 12/17 12/21 14/11 15/9 15/10 15/11 15/12 17/15 18/7 18/9 18/16 19/2 23/18 25/17 26/19

**Mr. Stolle's [4]** 19/6 20/20 21/2 30/21

**Mr. Turner [8]** 28/2 62/8 62/13 62/23 76/19 80/8

**Mr. Turner... [2]** 104/11 116/25
**MS [3]** 1/12 1/20 1/21
**much [26]** 22/11 25/22 30/1 51/7 56/22 57/2 58/6 71/5 71/6 71/6 73/15 74/3 83/17 85/3 103/22 107/13 107/14 132/23 137/3 137/22 137/22 138/1 140/21 143/18 151/9 153/15
**multiple [1]** 108/10
**must [2]** 81/20 121/14
**mute [1]** 61/13
**my [41]** 4/12 5/16 6/12 8/9 8/11 12/9 18/16 18/19 20/10 31/12 31/16 31/19 32/24 33/4 33/22 48/8 48/9 48/9 54/25 55/1 61/18 63/17 69/21 72/6 74/8 75/18 76/25 77/3 79/12 84/3 84/4 108/6 126/23 133/23 133/24 138/11 146/2 153/1 153/5 153/6 153/8
**myself [2]** 70/14 153/1
**myth [1]** 71/13

# N

**name [2]** 148/5 148/9
**named [6]** 5/19 6/25 80/4 80/15 143/8 149/13
**nameplate [15]** 41/18 42/20 42/24 43/4 43/11 43/13 43/16 44/1 44/2 44/17 44/21 44/21 44/25 45/24 118/21
**names [1]** 7/2
**naming [1]** 6/13
**narrow [1]** 112/12
**nationwide [2]** 29/1 29/7
**nature [2]** 133/18 134/1
**near [1]** 12/4
**nearing [1]** 139/16
**necessarily [2]** 118/4 141/10

**necessary [8]** 10/16 62/20 68/6 69/24 76/22 83/11 91/11 130/14
**need [21]** 5/5 8/15 16/5 17/12 24/3 54/21 56/19 64/11 74/3 80/2 80/11 82/11 84/8 91/3 91/20 126/23 127/8 133/25 137/10 141/16 149/2
**needed [3]** 23/22 119/11 133/1
**needs [5]** 11/1 12/11 77/23 117/18 117/19
**neglect [1]** 78/4
**negligence [1]** 78/3
**negotiated [1]** 19/10
**net [1]** 73/13
**never [8]** 41/24 46/22 54/3 100/23 110/13 118/11 131/22 153/8
**new [18]** 1/14 1/14 1/22 1/22 2/16 2/16 6/14 7/11 7/16 7/21 8/1 8/3 27/19 28/12 70/6 104/21 142/18 153/11
**New York [9]** 6/14 7/11 7/16 7/21 8/1 8/3 27/19 28/12 153/11
**next [17]** 20/11 38/1 39/13 39/22 40/14 42/18 45/20 45/23 50/19 51/5 52/18 63/16 66/3 68/8 87/14 90/24 95/16
**nexus [1]** 14/7
**NICHOLAS [1]** 1/12
**night [2]** 41/8 105/8
**night-and-day [1]** 41/8
**nightmare [1]** 115/15
**no [72]** 1/4 3/16 7/6 9/16 12/9 12/22 14/3 14/4 18/22 26/23 30/10 34/23 36/7 39/2 39/7 40/11 44/25 46/5 49/14 53/8 55/23 58/6 58/21 58/22 58/24 62/14 63/8 64/13

72/18 72/18 73/19 75/4 75/20 81/8 84/17 90/12 94/23 94/24 95/11 97/19 98/7 99/11 100/19 104/12 104/24 104/25 105/4 106/22 114/17 115/25 117/22 118/2 119/2 124/25 125/8 125/14 125/14 131/6 131/6 131/6 131/6 131/19 136/14 137/20 139/7 144/1 144/1 145/6 148/1 148/13 149/11 150/13
**No. [5]** 108/20 118/14 129/21 131/24 146/19
**No. 1 [1]** 118/14
**No. 2 [1]** 108/20
**No. 4 [2]** 129/21 131/24
**No. 9 [1]** 146/19
**nominal [1]** 104/15
**none [11]** 14/10 14/24 48/3 49/13 49/19 60/1 77/6 115/17 119/8 145/18 149/13
**North [3]** 22/21 150/8 150/8
**not [181]**
**notable [2]** 49/5 62/19
**Notably [1]** 82/16
**note [3]** 62/14 86/4 124/14
**noted [2]** 20/18 140/16
**notes [2]** 109/3 146/2
**nothing [9]** 40/11 41/14 43/19 49/25 119/16 126/20 129/5 146/24 152/17
**notice [5]** 102/20 137/23 138/4 144/17 150/19
**noticed [1]** 149/19
**notion [5]** 103/7 108/24 108/25 111/20 120/23
**November [2]** 58/16 112/1
**November 3rd [1]** 112/1
**now [56]** 4/18 7/19 9/10 9/12 12/10 33/19 39/13 42/13 51/21 53/8 59/18 61/18 61/20 62/23 63/14 66/21 68/8 68/24 73/7 73/17 75/12 77/18 80/9 82/1 82/14

**now...** [31]  83/2 87/1 87/7 88/6 88/24 89/7 89/13 90/8 93/25 94/7 94/23 100/23 101/12 103/5 103/15 103/24 104/11 109/23 110/7 113/22 114/23 129/23 131/6 133/23 141/11 141/15 143/17 146/7 146/7 150/3 153/7

**nowhere** [2]  82/4 82/18

**number** [11]  3/17 13/14 13/15 19/14 46/2 46/16 59/12 59/12 60/9 120/12 122/18

**numbers** [3]  122/15 151/13 151/14

**numerous** [2]  38/13 130/15

# O

**o'clock** [2]  84/11 152/13

**o0o** [1]  153/19

**oath** [2]  126/4 139/24

**obligation** [1]  99/3

**obtain** [2]  27/8 68/6

**obvious** [1]  106/1

**obviously** [20]  3/17 9/23 10/6 10/14 11/1 15/20 16/22 20/5 22/13 24/15 25/24 67/21 72/18 73/18 84/19 108/7 110/16 112/12 124/5 143/23

**occur** [1]  35/15

**occurred** [12]  8/14 17/15 21/15 24/12 35/16 37/1 37/16 39/10 39/18 86/20 87/18 98/7

**occurring** [3]  27/6 107/13 115/25

**occurs** [4]  95/25 99/9 101/4 102/22

**October** [9]  50/24 51/1 52/20 52/22 75/3 75/7 86/23 139/7 139/10

**October 27** [2]  75/3 75/7

**October 27th** [1]  52/22

**odd** [2]  63/20 67/17

**odds** [1]  125/19

**of -- you** [1]  105/8

**off** [30]  10/20 19/3 24/11 59/11 64/23 79/1 84/20 85/9 86/22 87/1 87/5 87/8 87/15 88/8 88/10 88/23 132/16 137/20 143/13 148/13 149/7 150/22 151/3 151/5 151/5 151/8 151/16 151/17 151/19 152/2

**offered** [1]  101/16

**offering** [38]  15/2 18/8 32/21 51/22 57/17 60/22 60/25 61/16 65/3 75/10 82/25 86/20 95/16 99/12 100/2 112/5 129/8 136/24 140/7 140/9 140/10 140/13 140/14 142/1 142/10 142/12 142/12 142/17 142/18 142/20 142/21 142/24 143/4 143/6 144/13 144/13 144/14 146/5

**offerings** [8]  23/5 24/8 82/10 82/11 82/22 99/6 99/8 140/5

**office** [1]  75/24

**officer** [1]  80/12

**offices** [1]  16/17

**Official** [1]  2/18

**offset** [7]  65/19 66/7 67/1 67/11 73/4 149/21 149/25

**often** [2]  67/22 72/2

**Ogden** [15]  22/24 27/23 55/21 76/8 76/19 80/5 80/8 80/15 110/16 116/25 126/2 127/10 134/8 134/8 136/5

**Oh** [5]  16/9 114/3 117/3 125/16 130/2

**oil** [1]  123/18

**omission** [1]  83/6

**omit** [1]  64/22

**omitted** [1]  64/12

**Omnicare** [8]  51/16 64/10 64/15 65/1 128/14 147/18 148/6 148/10

**on -- you** [1]  42/14

**on-schedule** [1]  111/14

**on-track** [4]  60/13 60/16 62/1 111/14

**once** [14]  24/15 24/15 36/2 39/24 73/25 87/25 93/3 102/15 104/3 106/6 130/19 132/4 133/12 133/16

**one** [72]  3/17 5/4 6/8 15/23 22/6 25/16 26/22 27/16 28/11 33/20 33/22 33/22 34/4 34/10 34/11 38/10 45/2 46/17 48/8 49/8 53/18 55/5 55/12 55/12 61/5 63/3 64/23 67/14 67/17 71/23 75/4 75/15 78/24 79/25 80/12 87/4 89/9 89/12 90/24 91/13 94/14 94/16 98/12 98/16 98/17 98/20 101/7 101/8 101/14 104/4 105/22 108/19 113/10 113/25 115/6 115/23 118/16 122/17 125/18 125/25 126/1 126/15 126/16 126/20 127/19 131/23 132/18 133/12 139/7 142/9 146/18 146/19

**one-line** [1]  101/14

**one-third** [3]  33/22 89/9 89/12

**one-year** [1]  75/15

**ongoing** [3]  59/23 78/20 78/25

**online** [1]  103/6

**only** [58]  6/8 7/17 18/9 33/25 38/10 39/11 41/1 44/7 44/9 47/19 49/9 49/16 49/21 53/6 59/18 61/1 64/21 64/21 73/24 74/20 74/25 90/11 94/20 95/6 100/7 100/15 100/24 101/7 101/22 101/23 102/6 103/13 104/7 104/9

**only... [24]** 104/12 104/18 104/22 104/25 106/10 112/3 113/11 113/12 114/15 117/4 117/4 133/13 137/5 140/13 141/14 145/11 146/14 150/6 151/4 151/6 151/9 151/9 151/18 152/9

**open [1]** 50/14

**opening [2]** 144/18 149/23

**operate [1]** 28/10

**operating [8]** 34/12 88/11 92/11 94/18 95/5 100/6 100/14 112/1

**operation [1]** 113/17

**operational [13]** 39/7 39/8 39/20 40/1 40/10 44/4 45/13 65/4 96/4 102/3 103/12 145/15 146/12

**operations [3]** 44/9 103/3 104/17

**operative [1]** 15/12

**opining [1]** 65/11

**opinion [28]** 28/15 34/3 54/20 54/21 54/22 54/25 55/1 55/11 64/1 64/7 64/10 64/11 64/12 64/14 64/23 65/1 81/25 119/22 119/24 119/24 128/13 128/15 147/15 147/21 148/14 149/2 149/3 149/4

**opinions [5]** 51/15 55/14 64/13 64/20 65/11

**opportunity [4]** 104/11 104/24 107/18 152/8

**opposed [9]** 15/24 21/19 37/21 42/11 44/23 47/12 112/18 112/23 137/24

**opposite [1]** 104/14

**opposition [10]** 12/19 23/3 27/2 33/18 34/4 55/8 67/18 81/3 82/14 146/8

**optimistic [1]** 59/9

**order [8]** 10/7 68/2 68/6 80/1 90/22 90/23 110/11 123/8

**orders [2]** 20/25 111/1

**ordinarily [1]** 129/9

**ore [4]** 37/22 48/23 104/5 104/15

**organizing [2]** 23/21 24/8

**original [1]** 145/24

**originally [2]** 5/18 140/3

**other [63]** 5/6 5/11 17/22 22/23 26/1 28/2 28/11 34/1 34/6 36/16 38/1 38/6 43/3 48/3 49/10 51/24 57/1 62/2 76/16 87/14 90/12 93/14 94/24 95/1 95/11 95/12 95/14 95/14 95/16 95/16 95/25 97/19 97/19 98/6 98/7 100/19 102/7 102/21 103/12 106/14 107/2 108/12 112/17 116/4 120/16 121/8 121/25 125/6 126/16 126/20 127/20 128/13 131/7 132/11 132/15 133/13 140/12 142/2 142/10 142/10 144/14 148/16 149/10

**others [3]** 15/25 18/10 21/20

**otherwise [4]** 13/11 76/14 126/18 135/11

**our [70]** 5/21 9/16 9/25 9/25 9/25 16/25 18/3 18/6 19/18 23/3 24/20 26/21 27/2 27/14 32/5 33/8 33/14 33/14 39/5 39/20 39/25 40/9 45/16 46/16 46/21 58/3 63/13 65/2 66/9 66/13 66/19 67/2 74/10 75/22 76/7 76/10 80/20 80/21 86/20 88/21 91/16 94/23 99/4 101/15 101/15 101/18 102/2 104/20 105/5 107/11 108/14 109/21 110/1 110/5 111/21 113/21 123/6 125/12 133/4 136/9 136/25 137/17 139/25 140/1 141/15 144/18 144/18 147/1 148/7 149/23

**out [39]** 10/23 13/10 13/21 14/9 20/24 43/20 44/22 47/10 54/5 57/8 57/8 59/7 59/9 63/6 66/12 70/6 71/4 72/2 72/8 73/14 77/6 79/16 81/23 98/15 99/11 103/15 107/7 108/5 110/25 115/14 121/2 123/19 126/17 128/14 130/25 131/21 132/5 139/11 149/5

**outage [1]** 127/7

**outer [1]** 20/17

**outpolited [1]** 152/20

**outside [1]** 138/3

**outward [2]** 28/25 62/21

**over [29]** 7/6 12/17 13/4 18/2 20/2 20/4 23/7 27/8 32/14 38/1 50/2 50/19 58/9 66/5 72/11 80/7 89/3 89/9 89/12 94/11 97/7 99/13 99/21 102/14 108/10 111/22 135/10 135/13 144/7

**overall [1]** 85/10

**overly [1]** 59/9

**overseeing [1]** 110/18

**overseen [1]** 110/7

**overstate [1]** 118/23

**overstated [1]** 42/4

**overstating [1]** 43/4

**overwhelming [1]** 134/11

**own [9]** 18/10 29/24 47/25 65/7 88/21 127/24 135/9 135/12 151/18

**owned [3]** 87/5 151/11 151/12

**owning [1]** 151/15

**owns [1]** 19/12

**P**

**p.m [4]** 1/6 84/14 84/14 153/18

**page [14]** 31/9 86/11 90/1 92/14 95/19 95/25 96/9 99/1

**page... [6]** 101/17 101/17 111/21 148/13 151/2 151/13
**page 156 [1]** 151/13
**page 194 [1]** 148/13
**page 2 [1]** 86/11
**page 3 [2]** 90/1 101/17
**page 4 [1]** 111/21
**page 5 [2]** 92/14 151/2
**page 8 [1]** 101/17
**pages [2]** 33/17 144/19
**papers [14]** 10/2 10/19 16/21 19/3 24/20 37/20 45/16 46/22 61/9 65/2 72/17 135/22 137/17 138/12
**paragraph [15]** 35/4 38/12 38/15 46/16 49/5 49/24 68/9 69/15 78/16 96/18 119/3 129/22 129/25 145/21 148/22
**paragraph 126 [1]** 68/9
**paragraph 134 [1]** 78/16
**paragraph 140 [1]** 129/25
**paragraph 143 [1]** 119/3
**paragraph 159 [1]** 148/22
**paragraph 179 [3]** 49/5 49/24 145/21
**paragraph 198 [1]** 38/15
**paragraph 199 [1]** 69/15
**paragraph 200 [1]** 38/12
**paragraph 307 [1]** 35/4
**paragraph 67 [1]** 96/18
**paragraphs [1]** 80/21
**parking [1]** 71/16
**part [23]** 13/22 24/9 24/21 26/21 32/8 36/14 37/25 39/6 63/24 71/1 72/13 79/19 89/11 101/8 101/13 113/23 117/7 119/11 121/8 130/16 132/18 140/4 146/1
**participant [1]** 3/9
**participating [1]** 72/1
**particular [7]** 25/21 76/3 85/14 93/6 105/12 107/3

**particularity [1]** 33/5
**particularized [2]** 76/12 77/23
**particularly [6]** 56/21 76/4 81/16 99/6 107/17 153/10
**PARTIES [1]** 1/10
**parts [1]** 113/17
**pass [3]** 82/24 98/13 121/5
**passage [1]** 82/11
**passed [3]** 81/21 82/5 98/25
**past [7]** 55/5 90/10 91/10 96/11 96/14 147/19 148/3
**patience [1]** 152/22
**patient [1]** 144/6
**Paul [1]** 2/15
**pause [1]** 36/6
**pay [2]** 68/5 150/5
**paying [1]** 67/24
**pays [1]** 19/12
**pejorative [1]** 46/7
**pending [6]** 5/17 6/9 7/20 7/21 7/25 132/15
**Pennzoil [1]** 1/16
**Pension [1]** 148/11
**people [4]** 4/14 64/9 71/25 108/7
**people's [1]** 29/24
**PEPPERMAN [57]** 1/19 4/6 4/25 5/9 5/12 6/10 6/17 9/18 10/7 10/18 21/6 25/11 26/22 28/7 28/21 29/13 31/6 42/7 61/22 62/6 86/4 86/13 89/4 89/10 94/7 100/2 100/23 103/5 104/1 105/7 105/19 106/20 107/7 108/4 109/20 111/18 112/9 113/19 114/23 119/21 120/22 128/20 130/18 130/23 132/17 134/4 134/11 134/23 137/5 138/22 140/16 140/19 141/3 143/1 143/7 143/10 143/18
**Pepperman's [11]** 85/10

85/20 89/25 92/15 93/22 101/12 115/2 127/17 133/2 133/7 135/16
**per [4]** 43/14 44/2 45/7 124/21
**percent [118]** 34/12 34/18 36/16 36/17 40/19 40/20 43/18 45/3 45/7 46/12 46/19 46/21 46/22 46/25 47/4 47/6 47/6 47/10 47/10 47/13 49/20 53/6 53/8 53/9 53/10 54/1 59/18 62/10 62/17 62/23 64/24 65/6 65/8 74/23 90/5 90/6 90/9 90/11 90/25 91/17 92/7 92/9 92/11 94/18 95/5 95/17 95/21 98/1 98/9 98/19 100/4 100/7 100/14 100/20 101/23 102/8 102/13 102/19 103/7 103/8 103/14 104/3 107/8 107/10 107/10 107/12 107/14 107/14 107/16 107/22 107/23 108/21 108/24 108/25 109/23 112/1 113/15 113/20 114/2 114/8 115/25 116/8 116/8 116/15 119/24 122/5 122/5 122/12 122/24 123/9 123/11 123/13 123/14 128/12 131/1 131/3 133/22 133/23 134/19 134/20 137/1 138/23 144/23 145/2 147/3 147/5 147/10 148/20 148/23 148/23 149/5 149/6 151/4 151/6 151/9 151/11 151/12 151/18
**percent's [1]** 123/13
**percentage [1]** 65/5
**Perfect [1]** 31/7
**performance [1]** 93/6
**perhaps [1]** 16/13
**period [24]** 11/22 20/5 20/15 20/19 23/20 24/16 32/15 50/2 59/13 59/18 78/13 85/22 86/21 92/19

**period... [10]** 101/6 101/11 103/9 103/16 103/20 106/7 111/6 131/15 131/20 141/24

**permanently [1]** 41/23

**permitted [1]** 23/8

**person [3]** 3/17 15/21 153/9

**personal [29]** 5/25 7/5 7/6 7/13 9/21 10/2 10/9 10/12 10/25 11/2 11/4 11/12 12/23 13/4 14/20 15/5 15/13 17/12 18/2 18/6 18/11 20/20 24/25 25/2 25/3 27/8 29/22 30/2 30/25

**personally [1]** 78/18

**personnel [2]** 27/18 27/23

**persons [2]** 26/2 53/19

**perspective [4]** 9/3 9/25 18/3 106/13

**pertinent [1]** 141/11

**Peter [10]** 37/16 80/19 87/2 88/7 88/22 102/25 135/2 135/7 135/12 135/21

**pharmaceutical [1]** 112/17

**phases [9]** 71/3 89/16 90/4 90/9 96/16 98/1 98/6 101/21 116/14

**phone [2]** 109/11 109/12

**phonetic [2]** 49/1 63/8

**photographic [2]** 87/17 108/12

**photographs [5]** 78/17 78/19 111/3 111/5 111/10

**phrase [4]** 57/4 57/7 90/8 93/8

**phrased [1]** 42/10

**phrasing [1]** 70/10

**physical [2]** 18/4 87/21

**physically [2]** 17/25 18/12

**pick [1]** 20/8

**picture [1]** 118/8

**pictures [2]** 118/5 118/13

**piece [1]** 102/11

**pigment [2]** 93/4 112/11

**pigments [3]** 86/22 135/8 150/21

**pile [1]** 144/8

**Pipelines [1]** 81/25

**place [3]** 1/16 30/4 71/2

**places [2]** 47/24 85/11

**Plain [1]** 81/24

**plaintiff [9]** 1/11 6/13 79/13 81/20 81/22 85/8 139/8 139/25 142/10

**plaintiffs [51]** 4/1 4/1 4/19 4/23 5/15 10/6 12/20 19/1 32/20 33/19 33/23 34/3 34/11 34/17 40/15 47/5 48/10 48/13 49/3 49/6 51/21 60/21 63/22 65/17 67/18 67/23 68/9 69/17 75/9 76/16 78/19 80/14 80/18 82/6 82/10 82/18 83/2 83/10 85/25 131/5 132/24 139/23 140/5 140/6 141/15 142/9 142/20 147/18 149/2 150/20 150/23

**plaintiffs' [21]** 7/10 19/16 33/1 33/18 37/3 41/15 41/15 51/10 53/16 55/8 58/8 60/16 71/12 79/13 81/22 82/14 86/15 114/13 141/3 144/24 150/16

**plan [10]** 41/24 44/14 68/4 72/8 84/10 87/7 89/15 94/8 116/13 151/18

**planning [5]** 12/7 102/17 117/19 118/9 147/9

**plans [6]** 12/12 22/20 51/14 63/10 88/8 147/2

**plant [16]** 38/13 38/17 43/3 45/13 45/23 46/2 46/18 47/3 57/25 93/12 93/16 93/19 94/4 94/15 119/11 122/11

**plants [1]** 46/22

**plate [1]** 39/6

**plausible [2]** 77/20 78/8

**play [1]** 113/8

**played [1]** 130/15

**PLC [3]** 1/4 3/15 15/16

**plead [20]** 13/19 33/5 54/21 56/12 56/20 64/10 64/14 68/11 75/12 76/1 76/3 76/12 76/19 77/4 77/23 78/8 80/9 80/13 82/8 149/3

**pleaded [3]** 117/13 117/21 118/1

**pleading [12]** 55/10 55/25 68/16 68/18 70/20 77/18 95/17 133/14 144/20 147/19 147/23 148/2

**pleads [3]** 62/15 77/19 77/21

**please [6]** 4/16 5/13 29/13 84/22 132/13 143/2

**pled [5]** 62/14 64/14 79/4 79/18 141/22

**plenty [1]** 84/7

**plug [2]** 133/24 149/7

**plus [1]** 58/2

**point [42]** 3/19 11/18 12/14 12/18 20/1 20/8 20/10 28/20 30/9 42/19 43/22 46/21 53/11 54/12 57/7 58/10 58/11 61/21 62/8 63/7 63/25 66/10 66/19 72/10 74/15 80/20 83/20 98/12 99/4 101/25 102/25 102/25 103/2 107/7 113/7 118/16 137/21 138/2 144/12 144/21 146/18 149/10

**pointed [2]** 10/23 57/8

**pointing [1]** 78/23

**points [7]** 63/3 71/11 74/10 91/13 91/22 93/10 144/8

**polite [1]** 152/19

**Pori [126]** 23/1 24/6 27/15 27/21 28/3 28/3 31/25 31/25 32/6 32/7 32/13 32/18 34/12 34/16 34/18 37/17 38/4 38/10 38/13 39/11 40/9 43/13 44/2 44/8 44/15 44/16

**Pori... [100]** 45/18 45/23 46/6 46/7 47/3 48/13 48/15 48/18 48/20 48/21 49/9 50/14 50/18 51/12 51/14 52/25 60/8 60/20 62/13 65/4 67/25 68/13 68/14 69/9 71/19 73/16 73/18 73/25 74/14 76/9 76/18 79/1 85/21 85/22 87/8 87/11 89/8 90/3 96/4 96/16 97/25 101/20 102/6 102/10 102/17 103/3 103/17 103/17 103/19 104/12 104/19 104/23 104/25 105/2 106/9 110/6 110/11 110/24 111/7 115/7 115/16 115/25 116/16 116/22 117/5 118/18 118/20 119/1 120/11 120/25 121/10 121/14 121/14 121/25 122/11 122/20 126/9 126/10 126/14 127/7 128/12 128/12 128/13 129/1 129/4 130/17 130/20 130/20 131/17 131/20 133/6 133/7 134/9 136/3 137/18 138/20 145/17 146/25 147/8 151/23

**Pori's [6]** 43/13 53/6 62/10 64/3 113/24 148/20

**portion [23]** 37/20 38/16 39/5 39/12 39/19 39/25 40/9 41/2 47/20 48/4 49/17 66/18 70/22 70/23 74/21 75/1 102/2 104/17 145/13 145/14 146/11 146/11 146/14

**position [5]** 10/20 14/20 18/18 22/9 132/2

**possibility [4]** 51/19 52/7 52/8 57/11

**possible [5]** 58/22 89/18 95/23 102/2 118/25

**possibly [2]** 135/4 135/20

**post [2]** 29/22 30/7

**post-Daimler [2]** 29/22

30/7

**posture [2]** 8/7 42/14

**potentially [1]** 17/11

**Power [1]** 81/4

**PowerPoints [1]** 31/8

**pre [1]** 83/7

**pre-motion [1]** 83/7

**precedent [1]** 20/11

**precisely [1]** 111/1

**predicate [5]** 30/20 34/6 55/14 55/18 56/10

**predicated [1]** 49/12

**predicting [1]** 38/6

**prediscovery [1]** 27/3

**preference [2]** 9/20 9/22

**prefers [2]** 10/7 10/10

**prefire [1]** 47/4

**premise [2]** 99/7 127/9

**premised [4]** 116/1 119/23 120/7 122/4

**premium [9]** 67/19 67/21 67/24 68/5 68/12 68/17 112/20 113/23 135/10

**preparation [1]** 118/9

**prepare [1]** 27/12

**prepared [2]** 22/22 109/4

**preparing [1]** 131/12

**present [4]** 53/20 106/25 120/2 120/5

**presentation [6]** 48/9 58/9 85/11 86/8 93/22 111/22

**presentations [5]** 14/21 22/23 62/3 91/19 126/2

**presented [1]** 146/9

**presenting [4]** 4/1 4/9 5/1 27/19

**presents [1]** 15/11

**preserve [1]** 151/8

**presidential [1]** 19/13

**press [1]** 87/10

**presumably [1]** 83/10

**presumption [2]** 11/20 30/5

**pretty [6]** 47/19 118/15 120/23 132/23 134/10

138/10

**previous [4]** 9/16 67/8 96/9 146/24

**previously [2]** 49/17 131/22

**price [16]** 50/3 64/2 64/6 64/18 65/12 122/19 123/3 123/14 124/18 127/7 127/15 127/19 128/10 139/9 140/10 149/1

**priced [1]** 135/3

**prices [16]** 63/24 64/4 65/8 68/5 121/4 121/4 121/16 121/20 121/24 122/7 122/20 123/22 124/10 124/11 124/22 127/25

**pricing [6]** 120/21 121/12 122/20 123/6 124/1 124/4

**prima [1]** 19/19

**primary [4]** 87/20 107/15 128/9 138/17

**principal [2]** 30/4 81/17

**principally [2]** 12/21 80/14

**prior [16]** 12/4 19/9 44/7 46/19 53/17 90/20 92/11 94/18 95/5 96/3 97/13 97/15 100/7 100/14 112/2 147/8

**private [2]** 79/14 79/20

**probably [5]** 10/13 18/13 25/2 43/5 62/22

**probative [1]** 135/15

**problem [3]** 29/2 75/20 88/5

**procedure [1]** 9/11

**proceed [3]** 4/20 10/6 83/22

**proceeding [10]** 8/21 24/2 27/5 79/23 84/2 122/15 124/16 125/9 125/15 136/5

**proceedings [11]** 1/25 3/1 3/3 5/7 5/11 8/12 8/21 13/22 127/5 153/18 153/21

**proceeds [16]** 24/9 65/24 66/1 66/19 72/14 72/19 73/4 73/21 89/3 129/12 129/18 130/7 131/7 132/6 149/24

**P**

**proceeds... [1]** 150/10
**process [13]** 13/3 28/1 92/21 93/2 93/5 95/12 101/4 110/10 110/18 118/7 118/18 126/8 126/10
**processing [2]** 48/23 119/11
**procurement [3]** 52/15 57/24 117/19
**produce [6]** 48/19 93/12 94/5 100/12 104/5 124/5
**produced [16]** 1/25 22/19 32/10 42/2 44/23 48/15 53/6 65/6 93/4 93/7 95/13 96/1 100/12 104/20 115/15 145/18
**producers [1]** 123/19
**producing [26]** 38/11 48/23 94/19 94/20 95/2 95/18 95/21 100/7 100/9 100/10 100/15 100/24 102/8 102/8 104/8 104/13 112/2 112/2 112/3 116/16 120/9 122/4 122/5 128/12 129/5 137/2
**product [19]** 45/19 46/18 47/3 49/2 54/4 66/18 68/3 68/4 68/14 93/5 100/25 102/8 104/25 113/3 113/3 116/16 116/19 123/7 137/2
**production [88]** 39/6 39/8 39/12 39/20 40/1 40/10 40/12 41/2 41/18 41/19 41/24 41/25 42/23 42/23 43/2 43/3 43/20 43/23 43/24 44/14 44/15 47/21 49/18 54/3 58/8 65/5 70/21 73/12 74/21 74/22 75/1 75/2 75/5 92/16 92/21 92/24 93/2 93/15 95/8 95/24 96/2 96/6 96/12 97/12 97/18 97/20 97/20 97/21 98/19 100/21 101/4 101/7 101/8 102/3 102/23 103/10 103/11 104/21 105/5 105/6 106/4

107/11 110/22 110/22 110/24 112/22 113/20 114/1 114/4 115/25 117/8 123/19 127/13 145/5 145/7 145/13 145/14 146/3 146/4 146/6 146/11 146/12 146/13 146/15 146/16 146/17 146/25 148/20
**productive [8]** 42/25 43/16 44/16 45/14 46/24 46/25 48/3 145/11
**products [32]** 32/9 32/9 38/12 38/14 38/18 49/9 49/12 50/21 53/7 57/23 59/19 94/20 94/22 95/6 100/8 100/9 100/15 100/17 112/3 112/7 112/8 112/10 112/14 112/17 112/20 112/21 113/11 113/13 113/14 130/21 147/3 150/12
**profit [1]** 73/16
**profitability [3]** 62/17 73/9 74/1
**profitable [6]** 57/22 89/11 94/21 100/16 113/17 135/3
**profits [12]** 65/19 65/25 66/2 66/8 67/1 67/11 73/5 89/9 89/12 131/21 149/21 150/1
**progress [4]** 71/5 110/19 115/7 116/5
**progressed [1]** 119/16
**project [3]** 59/11 70/25 104/21
**projected [1]** 59/6
**pronounced [1]** 122/24
**prop [3]** 129/12 129/15 132/2
**proper [1]** 131/10
**properly [1]** 143/8
**property [8]** 19/12 29/24 65/24 66/1 72/23 73/5 73/14 149/25
**prosecute [1]** 108/3

**prosecuted [1]** 138/11
**prospectus [10]** 32/3 36/24 39/15 40/4 40/23 47/24 61/3 91/21 97/2 97/3
**prosupp [1]** 96/22
**protected [2]** 51/16 142/16
**protection [1]** 137/24
**prove [2]** 61/24 92/2
**provide [6]** 6/18 8/13 83/5 86/6 119/5 139/21
**provided [13]** 19/5 52/7 81/6 81/9 103/19 104/24 110/4 111/3 116/24 131/16 139/20 141/8 144/17
**provides [4]** 44/1 44/17 116/15 142/21
**providing [5]** 23/2 27/9 40/17 43/16 43/25
**PSLRA [8]** 33/6 51/17 54/7 56/20 76/22 77/19 77/23 78/9
**PSOA [1]** 139/22
**public [23]** 24/17 28/9 31/24 40/6 44/13 52/23 57/17 66/5 73/8 81/10 86/20 89/1 90/15 92/8 99/6 99/22 115/4 129/7 132/21 133/2 135/8 136/24 150/21
**publications [1]** 124/4
**publicly [1]** 108/23
**published [3]** 41/13 49/7 105/15
**purchase [2]** 81/22 140/9
**purchased [10]** 140/4 140/6 140/6 140/23 141/24 142/9 142/11 142/21 142/24 143/3
**purchaser [1]** 142/10
**purchasers [2]** 82/25 141/14
**purchasing [1]** 141/6
**purposes [14]** 10/25 11/11 12/16 13/5 13/17 14/2 14/5 15/5 17/5 20/15 20/21 26/24 79/22 135/25

**P**

pursuant [1]  83/7
push [1]  22/10
put [18]  19/18 21/14 24/19
 27/2 45/16 94/12 102/20
 105/11 108/8 112/15 112/15
 112/15 125/4 127/16 128/6
 128/9 134/11 137/23
putting [2]  123/19 128/3

**Q**

Q-and-A [1]  48/16
quality [1]  56/23
quantify [1]  69/6
quarter [68]  34/19 34/22
 35/11 35/11 35/16 36/3 36/4
 36/10 36/12 36/25 37/14
 38/2 38/8 38/23 39/1 39/7
 39/9 39/12 39/17 39/18
 39/21 40/1 40/7 40/10 40/12
 40/20 40/21 40/24 40/25
 41/1 47/20 47/25 48/2 50/9
 50/25 52/21 57/23 58/24
 60/14 66/15 67/5 74/17
 74/21 75/1 90/5 90/6 90/9
 90/10 90/20 90/25 94/22
 98/2 98/3 98/10 98/14 98/15
 99/9 100/17 102/3 102/20
 129/7 131/15 145/6 145/7
 145/8 145/10 145/12 151/3
question [28]  11/24 12/5
 13/7 16/3 17/12 19/24 20/19
 30/10 35/1 36/16 69/21 70/2
 77/3 77/19 77/20 84/25
 104/2 104/7 104/10 127/5
 128/7 133/17 137/11 138/8
 141/14 147/5 147/7 147/9
questions [20]  10/3 15/20
 19/21 24/1 24/5 35/6 71/10
 88/9 88/19 103/18 103/21
 103/24 104/4 106/18 108/17
 119/20 132/11 136/19
 143/16 148/18
quick [1]  128/20

quickly [7]  51/7 65/16
 67/16 89/17 95/23 102/2
 151/24
quite [5]  11/6 66/16 89/25
 107/4 130/25
quote [16]  39/19 46/16 49/6
 51/12 51/12 60/7 60/15
 88/10 118/17 126/4 135/17
 146/21 147/22 147/25 148/1
 148/12
quoted [5]  34/13 46/18
 49/24 66/4 145/23
quotes [2]  33/17 145/20

**R**

radiation [1]  88/4
raise [2]  78/7 89/3
raised [2]  12/20 139/2
raising [1]  138/25
ran [1]  149/5
rarely [1]  82/25
rate [1]  45/20
rather [8]  17/1 31/17 52/24
 62/20 68/13 70/19 103/13
 150/22
rationales [1]  85/14
raw [9]  37/22 37/22 46/5
 48/15 72/16 104/16 113/25
 114/5 114/7
rawer [1]  45/10
RAZVAN [1]  2/3
re [6]  1/4 3/15 24/11 81/24
 84/5 148/10
re-arraignments [1]  84/5
re-spin-off [1]  24/11
reacted [1]  148/24
read [12]  10/14 82/21 90/11
 90/13 95/3 95/11 97/19 98/7
 100/20 101/23 105/10
 105/10
reading [15]  20/10 48/20
 48/25 52/13 57/21 90/3
 94/24 95/15 95/22 96/2
 97/25 100/6 100/13 101/25
 104/3

ready [7]  58/7 70/9 70/10
 83/22 84/24 106/14 153/4
real [4]  122/19 153/2 153/3
 153/6
realistic [1]  119/14
reality [3]  87/11 118/25
 130/17
realize [6]  55/4 89/13 115/7
 116/20 122/18 144/6
really [39]  5/8 9/20 13/21
 14/10 14/12 20/23 22/10
 28/22 29/21 29/23 31/14
 33/21 49/15 49/25 54/25
 59/22 61/3 63/20 67/19
 69/16 78/18 81/17 82/20
 89/13 91/3 99/14 101/18
 105/15 122/19 125/9 128/3
 133/8 139/1 140/24 148/18
 150/6 150/15 150/16 151/20
reason [13]  15/25 36/6
 42/10 64/2 73/7 104/9
 116/10 122/6 125/1 128/9
 128/21 130/3 140/7
reasonable [6]  64/9 94/24
 95/15 100/19 107/9 118/20
reasons [1]  115/22
reassurance [1]  116/15
reassure [2]  63/4 121/9
rebuild [21]  32/7 32/13
 32/16 44/15 51/12 52/25
 59/16 60/8 60/12 60/20
 66/17 67/7 67/25 70/10
 103/23 111/14 111/20 116/3
 117/16 131/4 131/11
rebuilding [3]  68/12 68/21
 131/12
rebuilt [3]  51/12 70/13
 118/3
recall [3]  48/5 123/5 146/19
received [8]  19/10 24/10
 24/10 76/2 76/12 76/17
 76/19 135/11
receiving [1]  73/3
recent [1]  19/13

**recently [1]** 6/7
**Recess [1]** 84/14
**reckless [6]** 76/23 77/12 78/1 78/2 78/5 78/9
**recognition [1]** 59/17
**recognize [1]** 88/6
**recognized [1]** 115/3
**reconsidered [1]** 9/15
**reconstruct [1]** 70/8
**reconstruction [21]** 65/19 67/1 67/11 69/2 69/14 69/17 69/23 70/2 70/5 70/11 70/17 70/25 71/1 71/12 71/13 71/22 72/2 73/22 116/5 120/13 137/19
**record [12]** 3/12 4/12 4/16 4/20 23/11 56/16 69/5 84/8 84/11 84/20 140/4 153/21
**record's [1]** 26/14
**recorded [1]** 1/25
**recording [1]** 73/3
**recounted [1]** 109/2
**recover [1]** 65/24
**reduce [2]** 13/14 13/15
**refer [1]** 31/9
**reference [2]** 13/20 146/17
**referenced [4]** 9/7 35/18 107/2 139/25
**references [2]** 67/18 149/11
**referred [3]** 79/10 92/20 146/15
**referring [4]** 60/21 60/22 98/25 129/22
**reflect [2]** 4/17 44/22
**refusal [1]** 103/24
**regard [3]** 9/22 18/12 107/4
**regarding [1]** 110/5
**Regardless [1]** 102/7
**regime [1]** 99/5
**registration [33]** 15/15 15/17 16/5 17/23 25/25 32/2 34/14 34/24 35/2 35/9 35/14 35/20 36/23 39/2 39/15

39/16 39/23 40/16 40/23 43/9 43/10 47/24 52/6 52/11 53/14 57/8 57/17 58/12 58/14 61/2 61/8 65/21 91/20
**regular [1]** 76/2
**regularly [1]** 32/12
**regulators [1]** 28/25
**regulatory [1]** 88/3
**rehabilitated [2]** 119/9 119/12
**reintroduce [1]** 116/14
**reintroduced [2]** 53/11 62/24
**rejected [1]** 139/3
**relate [1]** 36/10
**related [2]** 5/7 64/16
**relates [2]** 34/21 45/1
**relating [1]** 36/17
**relation [1]** 112/22
**relations [3]** 27/10 27/18 27/23
**relative [1]** 78/14
**relaying [1]** 28/5
**release [1]** 87/10
**relevance [1]** 13/5
**relevant [11]** 8/16 11/22 18/8 19/7 19/16 29/3 30/23 80/21 82/7 86/5 139/8
**relief [1]** 8/3
**relocated [1]** 11/17
**rely [1]** 80/14
**relying [1]** 100/4
**remain [3]** 12/5 12/13 13/7
**remainder [2]** 73/23 147/9
**remained [1]** 62/9
**remaining [2]** 6/7 53/10
**remains [1]** 62/13
**remember [1]** 147/22
**remotely [4]** 85/6 133/5 137/17 138/19
**removed [1]** 14/7
**renders [1]** 75/14
**reopen [1]** 41/25
**reopening [1]** 34/16

**repair [5]** 51/14 71/20 72/4 117/16 151/23
**repaired [1]** 45/13
**repairing [2]** 95/23 102/1
**repeated [2]** 55/6 103/18
**repeatedly [1]** 133/5
**repetition [1]** 6/20
**replead [2]** 83/14 83/15
**reply [4]** 80/20 80/21 101/17 144/18
**report [4]** 79/17 129/5 129/11 145/21
**reported [1]** 81/7
**reporter [7]** 2/17 2/18 3/11 83/24 84/24 85/1 153/24
**reporting [4]** 38/25 43/11 72/7 112/5
**reports [10]** 14/15 49/7 49/21 72/6 76/2 76/13 76/17 110/21 121/1 124/5
**represent [1]** 116/6
**representation [5]** 55/12 55/13 55/13 60/21 130/12
**representations [2]** 54/19 61/2
**representative [6]** 15/17 16/7 16/14 16/19 17/3 18/9
**representatives [1]** 141/15
**represented [4]** 34/12 89/12 119/16 122/14
**representing [2]** 17/17 149/20
**represents [1]** 94/17
**requested [1]** 83/2
**require [4]** 61/24 67/7 140/18 140/23
**required [8]** 15/21 17/23 18/11 33/6 76/5 92/2 139/21 140/17
**requirement [3]** 15/15 16/4 141/9
**requires [2]** 60/6 112/18
**res [1]** 8/22
**reserve [2]** 41/11 41/12

**R**

**reserved [1]**  105/21
**reserves [2]**  105/12 105/13
**resides [1]**  19/12
**resist [1]**  144/8
**resolve [1]**  133/16
**resolves [1]**  133/17
**resources [2]**  110/14 118/24
**respect [18]**  7/8 11/7 11/14
 14/11 19/14 28/14 36/25
 53/9 99/6 99/7 134/7 135/1
 135/24 136/2 142/16 142/17
 142/23 143/4
**respond [3]**  10/21 143/24
 144/3
**responding [3]**  24/4 145/1
 148/18
**response [4]**  3/7 29/14 35/6
 84/17
**responsible [3]**  80/12 89/8
 131/20
**responsive [2]**  106/19
 143/20
**rest [5]**  10/2 10/18 32/11
 67/15 123/15
**restart [9]**  44/15 51/23 90/4
 90/9 96/16 98/1 98/5 101/20
 114/25
**restarted [3]**  36/11 40/20
 48/3
**restarting [5]**  32/7 37/17
 37/25 38/4 38/9
**restore [14]**  53/3 53/6 53/25
 55/21 57/21 62/9 62/16 68/3
 89/15 94/21 95/6 100/16
 147/2 147/11
**restored [21]**  34/18 34/21
 36/9 36/11 39/11 40/13 41/1
 47/19 49/17 58/24 64/24
 74/21 74/25 75/5 145/5
 145/7 145/12 146/14 146/25
 147/8 148/24
**restoring [6]**  38/7 40/17
 59/6 100/18 146/10 147/10

**restruction [1]**  66/7
**result [1]**  150/24
**resulted [1]**  42/3
**results [3]**  44/25 79/17
 129/11
**resumed [3]**  96/3 96/13
 97/13
**retain [2]**  151/4 151/18
**retained [1]**  151/25
**Retirement [1]**  5/18
**return [4]**  12/6 12/7 34/4
 121/10
**returned [1]**  101/10
**returning [2]**  19/11 114/2
**revealed [3]**  49/4 102/9
 145/17
**reversed [4]**  6/2 6/6 7/5 7/8
**review [1]**  42/16
**reviewed [1]**  47/16
**revise [2]**  60/10 62/21
**revised [3]**  32/12 63/5
 119/15
**revising [1]**  53/1
**rhetoric [1]**  150/13
**rhetorical [2]**  70/19 71/10
**RICHARD [2]**  1/19 4/24
**Rick [1]**  4/6
**rid [4]**  88/7 88/16 89/6
 118/11
**Rifkind [1]**  2/15
**right [68]**  7/2 9/18 13/6
 13/23 14/19 21/17 23/16
 25/18 31/4 31/16 31/16
 42/13 42/21 45/5 46/6 46/23
 51/3 54/15 56/18 58/1 60/25
 66/8 66/12 72/22 72/25
 73/20 83/17 84/11 84/15
 84/21 85/19 85/20 91/7 92/6
 93/25 94/11 95/16 96/25
 97/17 105/23 107/12 108/4
 108/15 110/8 113/3 117/24
 118/14 122/25 125/11
 126/22 126/25 127/1 127/23
 128/18 130/4 131/9 133/12

 134/5 141/10 141/15 142/3
 144/8 147/4 148/15 149/8
 149/9 152/10 153/15
**rights [1]**  137/24
**rise [4]**  18/2 30/25 121/24
 122/7
**rising [1]**  63/23
**risk [4]**  52/10 57/1 102/16
 149/6
**RMR [1]**  2/18
**road [1]**  27/12
**rogue [1]**  81/5
**role [3]**  14/13 14/14 30/21
**ROSE [1]**  1/20
**Rosenthal [2]**  81/24 140/3
**Rosenthal's [1]**  82/21
**Rosenzweig [2]**  81/24 82/22
**Ross [1]**  2/12
**roughly [7]**  31/23 48/9
 58/19 58/19 58/20 60/23
 123/4
**rounds [1]**  108/10
**ruins [1]**  118/11
**rule [3]**  10/1 15/2 17/13
**rules [1]**  55/25
**ruling [4]**  8/19 9/14 9/16
 144/17
**rulings [2]**  5/25 8/18
**rumors [1]**  88/14
**run [3]**  46/22 46/25 138/17
**running [13]**  22/21 45/2
 47/13 48/22 54/4 92/9 98/19
 103/4 113/17 114/8 116/21
 119/8 137/7
**runs [1]**  74/11
**rushed [2]**  129/8 151/24
**Rusk [1]**  2/19
**Russ [1]**  15/13

**S**

**safe [4]**  51/17 54/7 88/1
 88/2
**said [60]**  6/20 7/3 25/1 25/9
 26/23 28/7 28/23 35/18
 36/15 36/19 37/24 39/24

**said... [48]** 46/21 48/18 53/10 64/24 66/8 66/10 69/18 72/11 85/14 85/14 91/5 91/15 91/16 92/6 92/24 93/10 93/15 95/4 96/8 100/3 103/1 105/7 108/24 109/24 113/19 113/22 116/12 116/13 118/2 118/2 125/18 125/21 125/22 129/13 129/17 129/21 130/7 130/23 131/6 131/24 132/17 133/10 143/21 145/14 147/11 149/25 150/2 152/18

**same [24]** 5/19 5/20 6/13 7/10 8/3 12/18 21/21 40/3 47/23 52/3 52/3 52/6 75/11 95/20 97/22 101/21 103/25 105/20 106/3 114/1 116/2 120/1 136/1 139/4

**Sandress [1]** 63/7

**satisfied [1]** 141/8

**saw [10]** 21/7 40/18 62/11 64/7 87/19 93/21 95/24 110/13 121/12 136/7

**say [69]** 34/5 39/24 48/3 51/11 54/23 55/12 64/23 67/12 67/23 69/16 70/16 75/9 80/2 81/14 81/14 81/15 83/21 84/1 90/3 92/7 92/9 92/16 92/16 92/17 92/23 92/23 92/23 93/15 94/19 95/14 96/7 96/12 96/24 98/5 100/13 101/19 102/9 102/18 103/9 104/13 104/24 105/4 106/4 107/7 107/9 110/20 110/20 113/10 114/1 118/13 119/14 121/23 122/8 123/8 123/12 125/23 126/9 126/20 126/21 127/23 128/10 129/19 132/20 137/5 137/11 150/18 152/8 152/10 152/11

**saying [32]** 14/14 40/19 48/17 51/22 54/3 54/16

55/21 57/21 62/8 67/2 68/2 87/10 91/6 91/9 97/10 102/5 108/23 114/7 117/2 117/2 117/3 125/6 125/16 125/16 125/16 127/18 128/1 128/1 133/17 134/20 137/25 149/1

**says [25]** 28/20 48/25 53/10 59/22 66/16 69/9 79/1 88/9 88/22 89/4 94/19 95/2 98/16 98/17 100/6 104/14 104/14 105/4 118/18 126/8 126/9 130/7 137/6 138/15 147/25

**scale [1]** 86/19

**Scarlino [5]** 110/11 117/5 120/11 126/9 130/22

**schedule [7]** 59/9 111/14 111/17 111/21 116/7 117/3 120/5

**scienter [26]** 13/17 13/18 13/19 30/19 33/5 54/12 61/24 74/11 75/17 75/21 77/17 79/25 80/3 80/8 80/9 80/14 86/4 92/2 132/12 132/17 132/22 132/24 133/17 135/15 135/25 136/12

**screen [4]** 31/12 31/13 31/19 61/18

**scrutinize [1]** 29/23

**scrutiny [2]** 150/19 152/4

**se [1]** 124/21

**sea [1]** 29/21

**season [1]** 55/4

**SEC [24]** 14/21 15/3 23/22 23/25 24/1 25/2 25/18 25/19 30/20 30/22 30/22 32/22 35/3 35/7 38/24 41/10 41/13 46/20 81/8 97/4 97/22 105/15 106/3 124/2

**second [73]** 22/7 30/9 34/18 34/22 35/11 35/11 35/16 36/3 36/4 36/10 36/12 36/25 38/2 38/8 38/23 39/1 39/7 39/9 39/11 39/17 39/18

39/20 40/1 40/7 40/10 40/12 40/20 40/21 40/24 40/25 41/1 47/8 47/20 47/25 48/2 50/9 51/10 61/5 63/3 67/5 74/17 74/21 75/1 83/13 90/5 90/6 90/9 90/10 90/20 90/25 93/3 96/15 97/10 97/24 98/2 98/3 98/10 98/14 98/16 98/20 99/9 101/25 102/3 102/15 102/19 144/21 144/25 145/6 145/7 145/8 145/10 145/12 147/14

**secondarily [1]** 11/3

**secondary [9]** 57/17 93/9 100/2 112/4 129/8 136/24 140/7 142/12 142/17

**section [37]** 5/20 32/6 33/9 40/8 52/11 56/10 63/8 80/2 80/4 81/14 81/20 82/2 82/24 91/24 99/21 99/24 101/16 138/12 139/6 139/17 141/9 141/22 141/23 142/4 142/5 142/6 142/6 142/7 142/8 142/11 142/16 142/18 142/19 142/22 142/23 142/25 143/5

**securities [39]** 1/5 3/15 5/20 7/17 7/19 16/23 30/12 30/14 33/2 33/9 33/10 54/10 54/19 55/25 56/11 61/1 61/10 61/15 61/23 75/14 75/15 76/1 81/20 92/1 99/3 99/4 99/7 108/4 125/12 125/19 138/3 138/9 138/13 139/11 139/21 139/23 142/6 144/14 147/24

**see [42]** 3/10 10/18 34/15 35/14 39/5 39/23 43/10 43/15 43/20 44/6 45/15 46/13 47/23 48/8 48/16 49/25 52/11 53/24 56/15 57/20 59/20 60/13 60/19 61/3 62/22 63/11 66/8 66/16 66/22 68/2 78/14 87/16

see... **[10]** 87/25 92/12 92/13 123/23 125/21 126/24 130/18 137/12 145/20 147/4

seeing **[1]** 125/5

seek **[1]** 79/16

seem **[1]** 63/20

seems **[1]** 98/25

seen **[8]** 8/24 58/5 60/9 69/22 71/4 72/23 117/25 153/6

seized **[2]** 49/14 49/20

seizing **[1]** 40/15

selected **[1]** 79/13

self **[1]** 67/7

self-funding **[1]** 67/7

sell **[2]** 115/4 150/21

selling **[2]** 82/3 82/23

semi **[2]** 104/16 104/16

semi-fished **[1]** 104/16

semi-unfinished **[1]** 104/16

send **[1]** 9/13

sending **[1]** 105/1

senior **[10]** 22/24 27/17 28/2 28/5 71/18 76/1 76/5 87/15 120/24 122/8

sense **[8]** 8/25 9/19 10/13 22/4 35/2 98/8 104/7 123/1

sensitive **[4]** 67/16 73/11 73/19 74/2

sent **[1]** 150/5

sentence **[10]** 34/13 34/14 40/16 57/10 57/11 93/8 94/25 94/25 95/3 114/1

sentence -- you **[1]** 94/25

sentences **[1]** 95/15

sentencings **[1]** 84/5

separate **[9]** 7/11 9/8 11/9 12/10 70/21 93/9 124/16 125/9 146/17

Separately **[1]** 6/10

separation **[5]** 96/3 96/11 97/13 97/14 135/10

September **[21]** 32/18

45/17 48/11 49/8 50/16 51/1 58/12 69/7 73/1 73/7 73/17 73/20 73/25 74/13 90/24 91/9 91/13 91/13 92/6 104/1 145/16

September 12 **[2]** 50/16 69/7

September 12th **[3]** 48/11 49/8 74/13

September 13th **[1]** 91/13

September 2018 **[10]** 32/18 45/17 51/1 73/1 73/7 73/17 73/20 73/25 104/1 145/16

September 6th **[3]** 90/24 91/9 91/13

series **[4]** 54/24 55/5 119/13 135/4

serious **[2]** 88/5 88/5

seriously **[2]** 108/13 133/8

serve **[1]** 15/7

serves **[2]** 19/14 103/13

service **[1]** 124/1

services **[1]** 68/6

serving **[1]** 16/6

set **[3]** 31/22 81/23 137/16

sets **[2]** 7/15 147/18

seven **[3]** 20/16 20/17 31/23

several **[5]** 19/11 38/5 116/8 123/9 153/7

Shall **[1]** 84/1

share **[2]** 31/12 50/3

shareholders **[6]** 82/3 82/23 87/1 87/4 132/1 150/23

shares **[8]** 82/10 82/16 82/19 83/4 83/11 97/3 116/18 143/5

ship **[4]** 104/6 110/10 128/25 150/12

shipment **[1]** 150/5

shipped **[2]** 114/6 126/9

shipping **[9]** 68/14 105/2 115/15 115/16 115/17 117/5 120/11 121/2 130/22

shooting **[1]** 59/18

short **[4]** 5/10 10/24 83/21 83/23

shortly **[2]** 37/24 48/1

should **[11]** 9/13 31/6 49/14 94/9 98/20 98/21 102/6 138/5 139/3 140/23 141/7

shouldn't **[1]** 83/14

show **[13]** 19/19 36/2 42/24 42/24 43/13 44/12 54/22 56/16 78/20 111/13 119/13 130/15 151/14

showed **[1]** 55/23

showing **[4]** 45/24 62/19 63/9 76/12

shown **[3]** 38/3 43/17 135/16

shows **[6]** 27/12 28/16 41/17 41/21 64/11 111/23

shuffle **[12]** 28/3 28/3 46/7 68/14 72/16 110/6 126/5 126/5 126/7 130/8 133/7 136/3

shut **[4]** 46/3 73/25 117/9 138/21

shutdown **[1]** 122/20

shutting **[2]** 73/18 130/19

sic **[4]** 27/23 27/24 66/7 148/10

side **[3]** 3/18 3/18 55/5

sides **[2]** 64/9 106/23

sign **[10]** 15/12 15/13 15/16 17/24 18/4 18/8 25/1 25/10 26/4 75/18

signators **[3]** 16/5 17/23 18/11

signature **[6]** 15/22 16/13 17/2 17/21 18/14 153/24

signed **[6]** 16/10 17/18 17/25 18/10 18/17 135/21

significant **[8]** 19/15 23/9 52/24 87/6 89/11 121/15 123/8 135/5

significantly **[4]** 53/1 59/13 59/14 82/18

**S**

**signing [13]**  15/25 16/1 16/7 16/11 16/19 17/3 24/13 25/6 25/17 26/7 26/15 28/23 30/22

**similar [1]**  105/19

**similarly [1]**  8/2

**Simon [6]**  48/25 60/16 76/8 80/4 80/15 146/22

**simplifies [1]**  4/11

**simplify [1]**  26/9

**simply [9]**  10/13 44/23 64/15 65/20 82/9 121/22 126/18 138/19 145/17

**simultaneous [1]**  71/1

**since [8]**  9/10 11/18 12/22 62/25 84/4 98/24 111/11 152/7

**single [1]**  22/19

**site [5]**  38/4 59/24 78/23 104/5 116/22

**sitting [1]**  152/7

**situation [4]**  25/17 110/15 121/17 129/14

**six [6]**  35/7 49/6 59/1 62/24 94/2 102/14

**skip [1]**  34/8

**skipped [1]**  111/22

**skipping [1]**  97/10

**SLAPP [1]**  9/8

**slide [53]**  33/12 33/17 34/8 34/10 35/19 37/12 38/3 38/21 39/13 39/22 39/23 40/3 40/5 40/18 40/19 41/5 42/8 42/18 43/5 43/9 44/6 45/16 48/7 48/8 48/16 51/8 51/22 52/2 52/18 52/19 55/20 57/16 57/20 60/5 60/6 65/15 66/3 66/15 68/8 68/8 74/9 86/7 86/18 93/20 93/25 94/1 95/20 101/18 106/8 111/22 146/18 146/18 151/21

**slides [15]**  33/22 59/21 63/2

63/18 63/18 63/18 63/19 63/20 65/16 74/4 76/25 77/3 78/12 106/13 146/10

**slight [1]**  151/21

**slower [2]**  71/5 71/6

**small [6]**  6/19 104/17 132/18 141/23 148/1 148/13

**smell [1]**  121/5

**smoldering [2]**  87/12 118/11

**SMYSER [6]**  2/2 2/3 8/11 8/11 152/7 152/21

**so-called [1]**  67/19

**sold [4]**  82/15 82/19 83/11 143/5

**sole [1]**  38/13

**solicit [3]**  23/4 27/12 83/1

**solicitation [1]**  82/12

**solicited [3]**  81/22 82/6 82/20

**some [50]**  3/9 3/19 5/6 6/24 8/5 8/10 8/20 10/8 17/13 19/22 25/9 26/1 46/5 46/8 53/11 57/8 59/13 59/20 60/6 70/11 79/6 79/23 86/4 86/19 87/3 87/21 92/13 95/24 96/2 96/12 97/12 97/18 97/20 99/12 104/15 104/16 106/24 108/11 112/17 114/19 116/16 119/10 120/6 124/5 129/5 131/16 136/23 144/8 151/21 153/10

**somebody [1]**  118/2

**somehow [8]**  14/9 72/15 104/6 107/16 111/20 113/11 135/16 148/24

**someone [8]**  11/21 18/4 30/1 65/11 118/15 127/18 128/2 130/7

**something [43]**  17/11 49/21 53/21 56/3 58/7 59/1 59/2 69/6 70/4 70/7 70/8 70/12 70/23 72/17 78/3 80/2 81/14 89/24 90/21 91/5 91/9 91/10

91/20 96/13 97/6 99/13 100/11 105/22 107/2 108/13 109/4 109/24 118/3 121/25 123/9 123/23 130/5 130/6 134/16 136/13 139/1 152/8 152/10

**sometimes [1]**  114/25

**somewhat [2]**  108/4 126/11

**somewhere [1]**  46/25

**soon [2]**  45/22 90/15

**sooner [2]**  113/20 129/9

**sorry [16]**  24/10 26/20 28/13 61/13 61/17 97/10 101/15 103/11 110/17 119/22 121/4 129/21 130/2 135/17 136/23 139/13

**sort [19]**  8/7 17/16 30/13 41/14 45/15 49/12 59/4 64/18 71/9 71/10 71/12 77/15 77/15 79/4 88/13 101/10 123/2 137/19 144/22

**sounds [1]**  10/11

**source [1]**  60/16

**sources [1]**  133/9

**South [2]**  1/16 72/3

**SOUTHERN [1]**  1/1

**Southland [3]**  134/24 135/18 135/25

**space [1]**  87/21

**span [2]**  20/12 111/12

**spans [1]**  20/4

**speak [1]**  108/9

**speaker [7]**  54/22 56/6 56/13 56/14 56/14 64/11 149/3

**speakers [2]**  70/3 77/24

**speaking [5]**  3/19 4/19 17/18 23/2 123/4

**special [3]**  55/25 62/17 104/3

**specialized [1]**  112/19

**specialty [34]**  32/8 38/11 38/14 38/18 50/21 53/7 57/22 59/19 62/10 68/3 68/3

**specialty... [23]**  94/20 94/22 95/6 100/7 100/15 100/17 102/8 112/3 112/6 112/8 112/14 112/16 112/16 112/20 112/21 113/3 113/11 113/14 113/20 137/2 147/3 147/6 147/10

**specific [23]**  11/4 13/25 14/1 15/5 19/25 20/3 20/22 22/1 22/15 23/7 23/16 28/15 29/10 30/16 30/25 39/14 40/22 78/13 80/24 81/1 93/6 107/2 144/19

**specifically [3]**  28/19 39/24 92/25

**specifications [1]**  112/18

**specifics [1]**  140/19

**specify [1]**  140/22

**spend [4]**  33/3 71/21 86/13 106/20

**spending [2]**  105/1 120/10

**spent [9]**  68/12 69/1 69/13 71/14 72/4 120/20 128/24 132/6 150/11

**spin [15]**  24/11 86/22 87/1 87/5 87/8 88/8 88/10 88/23 150/22 151/3 151/5 151/8 151/16 151/17 152/2

**spin-off [12]**  87/1 87/5 87/8 88/8 88/10 88/23 151/3 151/5 151/8 151/16 151/17 152/2

**Spitzberg [3]**  41/9 41/10 105/8

**SPO [22]**  27/13 57/18 58/11 58/14 60/22 60/23 61/9 62/1 62/11 82/16 92/10 92/18 94/12 99/20 100/1 112/4 135/22 144/14 151/12 151/14 151/24 151/25

**spoke [10]**  28/1 107/19 108/18 109/19 110/2 110/2 113/18 118/15 122/3 136/5

**spun [3]**  87/15 151/5 151/19

**spun-off [2]**  151/5 151/19

**square [2]**  87/23 126/24

**squared [1]**  117/11

**squares [1]**  125/6

**staff [4]**  108/6 144/5 152/22 153/1

**stage [11]**  19/19 19/20 20/24 85/16 85/18 95/17 134/7 136/21 136/23 138/25 140/18

**stake [1]**  87/6

**stand [1]**  105/22

**standard [16]**  22/13 42/16 53/23 77/12 77/15 77/18 77/22 81/23 99/15 135/15 138/6 138/7 138/12 138/15 141/5 147/23

**standards [3]**  51/18 136/8 144/24

**standing [9]**  33/9 81/19 139/17 141/9 142/11 142/14 142/22 142/24 143/4

**standpoint [1]**  124/8

**stands [2]**  7/19 37/23

**start [30]**  5/4 19/2 19/4 31/6 38/7 45/4 47/13 49/13 57/25 59/11 72/11 84/22 85/9 92/24 95/2 95/21 100/21 100/22 100/24 104/9 104/21 105/6 114/4 116/19 117/8 117/20 118/19 132/16 137/7 138/20

**start-to-finish [5]**  49/13 100/21 100/22 104/21 105/6

**start-up [1]**  57/25

**started [8]**  38/17 88/18 90/20 97/6 133/22 144/23 150/15 153/5

**starting [1]**  113/1

**starts [4]**  27/9 33/11 34/10 86/21

**state [20]**  5/17 6/14 6/23 7/11 7/16 7/21 8/1 8/3 8/10

**spun [3]**  87/15 151/5 151/19 9/6 13/20 28/13 28/16 28/23 29/2 54/13 80/11 80/12 96/15 139/2

**stated [8]**  12/2 21/7 22/9 34/17 35/19 38/2 53/21 145/5

**statement [109]**  13/3 15/15 16/5 17/24 32/2 33/23 34/5 34/5 34/14 34/24 35/2 35/9 35/15 35/20 35/22 36/15 36/23 39/3 39/15 39/16 39/23 40/16 40/23 43/9 43/10 47/9 47/24 51/25 52/6 52/11 53/5 53/14 53/17 53/20 54/9 56/6 56/6 56/7 56/8 56/12 57/3 57/9 57/17 58/2 58/12 58/15 60/22 61/8 62/1 62/11 62/16 64/7 64/14 65/21 68/1 68/9 68/17 74/23 85/24 85/25 87/12 90/2 90/10 90/12 90/14 90/19 90/20 90/22 91/4 91/14 91/20 92/3 96/20 97/5 97/14 97/19 97/24 98/4 98/7 98/20 98/21 99/1 99/16 99/17 100/20 101/21 101/23 102/13 102/15 102/23 103/1 103/10 109/5 113/13 115/23 117/11 119/22 119/23 119/23 121/6 122/4 122/10 125/5 128/15 138/18 144/24 145/3 147/24 150/9

**statements [137]**  13/15 14/4 14/6 15/4 20/4 26/1 26/25 28/24 30/17 32/20 32/25 33/16 34/3 34/3 36/10 37/6 47/16 51/13 51/15 51/16 51/18 54/7 54/20 54/20 54/21 55/10 55/11 57/15 60/2 61/2 61/25 62/3 63/9 63/12 63/22 64/6 65/11 67/20 71/5 75/10 76/15 76/20 76/21 76/23 77/13 77/25 78/1 78/15 79/5 79/6

statements... [87] 79/9 79/9 80/13 80/25 81/2 85/21 86/1 91/14 91/24 91/24 92/5 92/18 95/20 98/12 99/12 99/22 99/23 99/24 102/19 102/21 103/12 105/25 106/15 107/1 110/13 111/14 111/16 111/18 111/24 115/20 115/22 116/1 116/11 117/12 117/14 117/15 120/1 120/2 120/4 120/5 120/7 120/7 120/16 120/21 121/7 121/8 122/2 125/7 125/19 126/1 126/17 126/18 126/19 126/21 126/24 126/25 128/22 129/3 130/16 132/11 132/14 132/21 133/2 133/19 134/2 134/15 135/18 135/24 136/25 137/6 137/12 137/16 142/1 146/9 147/15 147/15 147/16 147/16 147/16 147/17 148/3 148/17 148/25 149/12 149/13 149/14 150/2

states [18] 1/1 12/23 14/9 15/7 16/5 16/22 19/6 22/23 23/10 25/20 27/6 27/11 29/4 29/5 47/18 80/14 80/18 126/3

stating [4] 15/17 52/12 55/1 140/4

status [2] 6/11 151/8

statute [12] 33/8 57/5 74/11 74/15 75/15 136/15 136/16 136/20 137/11 138/8 138/17 138/24

stay [5] 7/24 8/2 35/23 55/20 84/8

stayed [1] 35/24

steered [1] 145/2

stenography [1] 1/25

step [2] 50/13 141/19

stepping [1] 9/1

still [18] 13/6 13/19 24/16

55/24 56/2 59/23 59/24 59/25 78/20 78/22 78/25 79/1 87/11 87/12 89/20 98/23 99/1 101/8

stock [5] 50/14 50/16 50/24 51/1 109/23

Stolle [19] 11/14 11/23 12/17 12/21 13/3 14/11 15/9 15/10 15/11 15/12 15/13 17/15 18/7 18/9 18/16 19/2 23/18 25/17 26/19

Stolle's [4] 19/6 20/20 21/2 30/21

story [1] 54/14

Street [1] 1/22

strictly [1] 14/14

strong [6] 76/4 76/5 76/22 77/21 77/24 78/9

stronger [1] 106/1

struck [2] 120/23 136/20

structure [1] 88/24

struggled [1] 116/23

studying [1] 50/13

stuff [1] 56/1

subject [9] 11/2 11/4 12/23 23/1 30/2 64/18 65/23 103/17 150/18

subjecting [1] 16/12

submit [7] 33/25 34/2 41/7 65/20 67/9 71/9 152/3

submitted [3] 139/24 139/24 140/2

subsequent [1] 36/9

substantial [2] 123/8 135/14

substantially [1] 32/16

successful [1] 121/11

successfully [1] 81/22

such [6] 9/3 55/23 56/21 64/13 119/23 130/21

suddenly [1] 115/6

suffer [1] 150/24

sufficient [3] 19/20 135/18 135/24

sufficiently [1] 125/23

suggest [7] 10/20 27/21 82/18 90/11 95/1 111/13 150/23

suggested [4] 25/11 82/15 94/7 143/9

suggesting [1] 144/11

Suite [5] 1/17 2/4 2/9 2/12 2/19

sulfate [1] 93/5

Sullivan [3] 1/21 4/7 4/25

summary [3] 5/10 85/12 144/11

summer [1] 12/7

sunscreen [1] 112/15

superfluous [1] 25/23

supply [7] 65/8 117/18 122/9 122/12 123/1 123/21 123/24

supposed [3] 113/12 115/11 123/12

supposedly [3] 33/15 71/22 108/21

Supreme [8] 7/5 20/11 20/18 29/20 147/17 147/21 147/25 148/12

sure [23] 6/10 11/25 24/22 26/12 58/8 72/19 78/2 79/11 101/12 106/17 106/18 107/6 112/25 113/4 114/12 119/20 120/18 130/4 137/3 137/15 141/21 143/16 145/21

surprise [6] 49/9 49/14 49/22 115/6 145/19 145/22

surprised [4] 25/8 136/17 139/1 139/19

surrounding [1] 102/16

survived [1] 5/22

suspect [2] 16/18 16/20

swiftly [1] 139/2

switch [1] 20/22

switched [2] 23/6 151/24

sworn [4] 79/9 79/23 109/5 139/23

**S**

**System [1]**  5/18

**T**

**table [3]**  31/22 43/9 43/19
**tabulate [1]**  123/20
**take [29]**  3/12 9/19 10/13
10/15 18/18 19/22 26/22
38/5 46/4 59/6 59/11 59/16
71/2 77/5 77/9 83/21 93/21
94/11 99/2 102/11 107/5
108/13 109/3 124/23 125/16
128/6 132/14 141/19 144/16
**taken [8]**  4/12 7/4 9/8 9/9
58/6 84/14 111/5 148/21
**takes [6]**  13/24 59/1 59/2
59/20 115/1 118/7
**taking [5]**  19/9 28/6 49/2
50/12 59/13
**talk [2]**  4/15 89/24
**talked [6]**  76/18 105/16
113/19 120/9 126/1 146/10
**talking [28]**  21/10 22/4
23/19 23/20 27/17 39/2
51/25 53/15 56/3 64/19
77/17 87/22 90/22 90/25
96/13 98/16 98/23 105/24
106/3 111/23 113/23 114/5
114/5 114/7 115/19 120/22
122/18 138/22
**task [2]**  148/1 148/13
**tax [3]**  24/11 87/8 151/8
**tax-free [2]**  87/8 151/8
**taxes [1]**  19/12
**tear [1]**  72/5
**tearing [1]**  78/23
**technical [3]**  25/5 105/15
140/24
**tell [4]**  3/18 67/6 108/11
153/1
**telling [9]**  52/25 53/2 62/13
62/23 66/6 66/12 66/20
66/25 67/10
**tells [1]**  88/20

**temporary [2]**  19/9 19/10
**temptation [1]**  144/8
**ten [1]**  74/6
**tense [1]**  120/5
**term [13]**  12/3 46/7 56/24
70/5 92/25 105/14 105/15
105/18 107/2 112/2 112/16
126/5 134/24
**terminology [1]**  67/22
**terms [27]**  8/13 11/20 14/20
15/23 17/7 21/2 30/11 30/13
36/20 44/16 45/24 57/2 70/1
70/2 91/4 92/20 95/8 95/8
95/10 109/8 118/7 123/2
123/21 127/10 127/12
149/18 149/21
**test [4]**  30/1 85/19 85/24
121/5
**testified [3]**  27/5 125/4
136/4
**testifying [1]**  128/2
**testimony [11]**  27/7 27/9
64/2 64/17 64/18 79/23
124/17 124/17 127/8 128/5
136/7
**TEXAS [34]**  1/1 1/17 2/4
2/4 2/9 2/13 2/19 5/17 6/15
6/23 7/1 7/12 7/16 8/5 8/10
9/11 11/16 16/20 17/5 17/11
17/19 19/7 19/8 19/11 23/10
23/21 24/7 24/14 28/13
28/16 28/22 28/23 29/1 81/5
**text [3]**  62/22 62/22 102/16
**textual [1]**  146/5
**Thad [1]**  9/4
**THADDEUS [1]**  2/6
**than [30]**  19/20 37/15 48/4
50/12 52/24 62/20 67/8
70/19 71/6 72/9 72/9 75/8
78/3 95/1 95/16 97/19 98/8
100/20 107/12 107/13
107/14 115/1 121/25 129/9
134/6 135/20 135/20 150/22
151/16 152/1

**thank [36]**  3/8 3/14 4/4 5/3
5/14 15/8 18/15 18/19 18/23
18/25 20/9 26/10 26/13 31/4
31/21 51/3 62/5 79/24 83/17
83/18 84/12 84/13 84/23
85/3 85/5 85/6 143/11 152/5
152/6 152/19 152/22 152/24
152/25 153/13 153/14
153/16
**Thanks [2]**  153/15 153/17
**that [1122]**
**that'll [1]**  84/8
**that's [144]**  5/17 6/9 6/21
7/13 8/15 8/21 8/23 11/16
16/7 18/5 19/2 19/20 20/4
21/5 21/6 21/16 23/11 24/19
24/20 25/2 25/13 25/18 27/1
27/2 28/9 28/9 29/9 30/3
30/5 30/6 30/20 30/21 34/20
34/25 37/20 38/12 38/15
39/6 41/18 41/22 43/17 47/7
47/10 47/11 54/25 55/22
57/6 60/24 66/2 67/17 67/22
67/25 69/10 69/21 73/10
73/19 75/25 76/10 77/5
81/23 85/16 86/15 86/17
86/17 87/8 87/23 88/12
89/16 89/19 90/19 90/25
91/11 91/19 91/20 93/7
94/10 94/11 94/16 96/13
98/19 99/6 99/15 101/8
101/9 102/10 104/9 104/18
105/23 106/10 109/7 109/15
110/1 112/4 112/4 112/25
113/5 113/7 113/7 113/21
114/12 115/5 118/4 119/3
119/23 119/24 122/13
122/21 122/23 123/21
123/25 124/1 125/24 126/5
127/22 128/3 128/10 129/13
130/20 132/13 132/21 134/5
134/16 134/25 136/1 136/12
136/14 137/12 138/11 139/8
140/4 140/14 141/24 142/4

**that's... [11]** 142/6 142/12 147/21 148/21 149/8 150/1 150/6 150/17 152/5 152/23 153/11

**the -- you [1]** 11/12

**their [51]** 17/24 18/10 21/7 25/1 30/4 34/4 42/14 47/7 65/7 65/17 67/18 72/13 75/23 76/14 76/21 76/22 76/24 77/25 81/3 83/3 83/12 83/13 83/13 89/17 89/20 90/15 93/14 101/19 102/18 102/21 111/13 116/17 121/11 121/18 121/18 122/25 123/19 124/9 124/9 124/12 127/12 127/24 128/3 129/12 131/17 132/21 133/1 133/9 134/15 152/22 152/22

**them [38]** 13/5 15/13 18/2 31/9 32/6 40/25 48/3 59/22 60/1 73/13 78/7 81/17 82/6 82/16 82/19 82/20 83/1 83/6 83/11 88/9 88/15 88/20 106/19 108/19 109/2 109/4 110/19 110/22 116/24 121/9 121/11 121/12 127/14 130/22 132/14 138/14 142/21 143/16

**themselves [3]** 88/16 89/23 115/8

**then [58]** 5/9 5/12 6/6 10/11 10/21 12/5 17/5 18/1 20/5 21/24 23/17 24/15 30/9 33/7 35/6 35/10 35/21 37/2 40/19 43/3 44/22 47/23 47/25 50/23 56/7 56/12 56/15 58/16 59/12 66/3 67/4 67/14 68/2 69/9 69/24 71/13 72/5 73/23 75/3 78/21 79/17 79/18 80/1 81/7 81/12 90/21 93/5 95/13 97/3 101/25 108/9 118/9 123/14 123/22 125/2 125/2 139/25 150/11

**theory [5]** 71/12 150/16 150/17 151/20 152/3

**there's [51]** 5/23 8/25 20/5 20/19 23/6 26/23 28/15 32/5 34/23 36/7 39/7 40/11 40/11 46/5 46/15 68/25 69/23 70/11 70/16 70/22 70/22 72/17 81/8 88/10 91/12 94/23 95/11 99/1 101/2 106/14 107/9 112/9 117/16 117/17 117/18 117/19 117/22 118/2 118/9 119/5 119/9 120/19 122/8 124/3 124/5 126/20 133/14 140/17 142/5 145/6 149/11

**thereabouts [1]** 97/15

**therefore [3]** 12/23 74/1 75/14

**these [58]** 20/2 24/22 24/22 28/8 38/11 38/18 50/21 51/6 51/15 51/17 51/18 53/13 53/18 57/22 58/23 60/2 63/2 63/9 63/12 65/16 65/16 66/23 66/24 67/20 78/6 78/11 78/12 79/3 79/3 79/12 86/19 91/23 91/23 92/17 93/23 94/21 95/15 95/20 98/12 99/23 99/24 100/16 101/14 101/19 107/21 108/4 108/18 109/19 109/19 111/5 111/9 111/18 117/24 125/6 126/17 126/24 148/18 151/14

**these -- you [1]** 91/23

**they [261]**

**they're [59]** 9/10 10/15 11/3 11/3 13/10 16/16 18/5 18/5 25/3 30/3 30/3 30/6 30/23 39/25 40/19 43/15 53/2 53/2 53/4 54/2 60/22 67/1 67/5 79/5 79/13 88/20 89/16 95/7 95/7 95/8 98/16 100/9 100/18 108/21 111/10 114/11 114/14 114/14

**114/20 114/20 115/23** 116/13 117/3 120/5 120/25 121/1 121/19 122/4 122/5 124/10 126/19 127/12 127/23 129/11 137/1 138/23 139/24 139/24 147/9

**they've [10]** 89/15 100/9 113/10 116/12 116/13 117/9 118/10 120/8 136/24 139/1

**thing [16]** 5/4 26/22 27/20 28/11 42/18 64/21 67/17 70/6 71/17 104/19 106/10 125/18 131/8 136/1 146/1 150/14

**things [18]** 4/11 16/8 17/8 53/18 71/2 71/10 77/9 98/6 112/11 112/14 118/23 120/12 122/3 122/17 125/25 131/23 143/20 144/16

**think [194]**

**thinking [4]** 9/21 16/11 59/11 128/2

**thinks [1]** 20/21

**third [12]** 33/22 50/23 50/25 52/21 89/9 89/12 98/15 131/20 144/25 147/14 147/14 151/2

**this [319]**

**those [103]** 6/1 6/1 6/2 6/14 7/3 7/10 8/20 9/10 13/6 13/21 13/24 15/4 16/15 21/20 23/2 23/25 24/4 27/22 28/5 28/5 30/17 30/22 31/2 32/4 33/4 33/16 36/19 37/2 42/15 47/15 49/8 49/21 60/1 61/23 61/25 61/25 70/11 73/3 78/14 79/9 79/9 79/10 79/17 79/18 80/22 81/1 82/5 82/9 82/22 84/6 92/5 92/20 94/12 95/10 98/6 99/7 103/12 103/24 106/15 106/15 106/18 106/20 106/21 109/24 111/16 111/23 115/22 116/1 116/10

**those... [34]** 116/23 117/10 117/11 119/15 120/5 120/7 122/2 124/10 124/11 126/21 127/14 127/15 128/13 129/11 129/18 132/6 133/19 137/12 137/16 137/16 137/21 138/15 139/23 140/2 140/11 141/25 142/15 143/5 144/16 145/1 145/15 148/2 148/25 151/13

**though [5]** 25/24 39/17 44/19 70/11 80/20

**thought [9]** 13/3 17/7 22/3 56/25 63/19 74/23 98/24 126/16 134/14

**thoughts [1]** 13/25

**three [23]** 11/18 12/3 20/15 34/1 43/15 45/20 50/7 55/9 59/8 59/16 60/23 63/19 76/25 80/3 90/22 91/23 94/17 129/9 132/15 140/6 142/5 142/20 144/7

**three-year [1]** 12/3

**through [43]** 5/6 11/22 15/2 15/3 31/14 33/17 35/7 35/23 35/24 36/1 36/22 37/2 37/11 39/14 40/18 48/20 48/21 57/7 57/15 65/16 67/15 69/5 73/5 74/12 74/16 79/20 81/23 82/6 82/12 83/1 86/2 89/5 93/21 99/10 106/15 106/20 135/10 141/18 146/4 146/10 151/24 151/25 152/2

**throughout [7]** 32/11 92/22 101/10 103/9 106/7 121/9 148/7

**TI [1]** 93/3

**Ti2 [1]** 114/6

**ties [2]** 19/6 20/20

**Tillotson [2]** 2/11 2/12

**time [62]** 10/1 11/21 12/5 20/1 20/5 20/5 20/8 20/12 20/19 21/4 23/20 33/4 43/22 44/7 48/14 50/2 53/21 54/23 55/23 58/6 58/10 58/11 59/13 59/20 63/11 67/16 68/5 69/9 74/3 74/22 75/11 77/7 77/13 77/25 78/13 81/13 83/20 84/7 87/12 89/8 89/21 98/13 98/14 99/1 104/19 106/20 108/21 109/20 110/4 111/8 111/12 116/2 117/22 117/23 118/7 118/18 123/16 138/2 138/22 143/18 146/6 152/8

**timeline [25]** 32/13 32/15 40/17 40/22 51/14 53/2 57/10 59/5 59/8 60/11 62/21 63/5 72/10 74/9 74/10 75/4 90/18 103/6 111/19 111/19 111/25 113/15 113/18 115/21 139/12

**timelines [1]** 119/15

**times [4]** 19/11 102/14 138/4 146/17

**timing [2]** 34/15 96/10

**TiO2 [49]** 93/4 93/11 93/12 93/14 93/16 93/19 94/4 94/6 95/2 95/13 95/18 95/21 95/25 100/12 100/24 101/3 101/23 102/7 103/2 104/5 104/8 104/13 104/16 104/21 104/25 104/25 105/2 106/11 110/10 112/10 112/10 112/15 112/19 114/1 114/6 114/15 115/15 117/4 120/9 120/19 120/21 121/2 121/4 121/7 121/17 122/7 123/7 125/6 128/25

**titanium [9]** 31/25 38/14 41/18 44/14 45/1 46/1 48/23 63/23 64/4

**title [9]** 15/21 24/20 24/21 26/4 77/3 81/21 82/5 82/11 82/24

**titled [1]** 32/6

**TMZI [1]** 124/3

**to-be-spun-off [1]** 87/15

**today [10]** 3/19 5/2 32/23 80/7 93/1 100/3 105/19 106/21 137/17 144/22

**toes [1]** 8/25

**together [1]** 63/12

**Tokyo [1]** 150/11

**told [12]** 40/9 45/18 51/11 60/8 67/24 73/3 83/6 93/12 93/13 97/21 101/19 129/13

**tomorrow [1]** 8/2

**tonnage [1]** 42/1

**tons [6]** 43/14 44/1 44/18 45/20 48/19 48/21

**too [1]** 26/12

**took [4]** 17/1 109/22 109/24 126/17

**top [5]** 27/20 60/7 90/1 146/20 152/17

**topic [3]** 23/8 27/22 99/23

**total [20]** 41/17 42/25 43/4 43/12 43/13 43/16 44/13 45/1 45/25 66/17 69/13 73/2 92/11 93/17 93/19 94/18 95/5 100/7 100/14 112/1

**touch [5]** 33/8 68/23 108/8 111/4 134/22

**towards [5]** 70/7 104/4 131/1 131/3 147/6

**Tower [1]** 1/16

**traceable [1]** 82/10

**tracing [1]** 142/13

**track [27]** 51/12 52/25 53/3 60/9 60/13 60/13 60/16 60/20 60/24 62/1 62/9 62/14 62/16 62/21 63/4 67/19 67/24 68/12 68/17 107/5 111/14 111/16 111/20 115/20 116/7 117/2 120/4

**trading [2]** 109/23 139/10

**train [1]** 115/16

**trains [1]** 105/2

**transaction [3]** 5/7 88/13 88/24

**transactions [2]** 139/22 140/12

**transcript [3]** 1/25 147/1 153/20

**transfer [1]** 6/5

**transferred [3]** 6/7 7/9 9/10

**transferring [1]** 50/20

**transition [1]** 21/25

**travel [1]** 22/20

**treated [1]** 150/1

**treatment [2]** 149/18 149/22

**tremendous [3]** 89/22 110/12 117/5

**trend [1]** 120/4

**trial [4]** 6/1 6/6 7/4 9/14

**tricky [1]** 98/24

**tried [2]** 78/12 78/12

**tries [1]** 64/22

**Tronox [3]** 93/14 124/16 136/4

**trouble [1]** 114/24

**truck [1]** 71/17

**trucks [1]** 59/24

**true [14]** 42/15 55/22 60/2 77/7 77/11 86/2 87/13 91/16 102/10 122/14 125/22 128/3 134/17 136/2

**trusty [1]** 26/6

**truth [5]** 48/10 49/4 117/1 136/22 137/18

**truthful [3]** 99/4 99/5 99/8

**try [4]** 44/12 50/14 77/1 151/22

**trying [18]** 4/15 20/24 22/10 27/8 28/21 72/4 110/25 113/8 115/14 118/10 118/16 120/25 121/17 123/5 125/23 128/4 132/19 134/4

**turn [18]** 37/12 38/21 39/13 40/14 42/18 51/8 52/2 52/18 65/15 86/10 90/2 92/14 99/20 106/14 106/15 111/16

**turned [5]** 59/7 59/9 71/4 72/8 132/12

**Turner [20]** 22/25 27/24 28/2 48/25 60/16 62/8 62/13 62/23 76/8 76/19 80/4 80/8 80/15 87/14 104/11 110/16 116/25 126/2 136/6 146/22

**Turner's [2]** 127/11 134/8

**turns [3]** 72/2 128/15 150/16

**twice [1]** 39/24

**two [38]** 7/15 10/25 13/21 13/24 15/20 20/2 38/1 38/10 47/24 48/2 55/9 59/2 63/2 63/7 63/18 66/5 71/9 71/17 73/8 78/17 78/24 78/25 90/23 91/12 91/22 93/10 94/25 94/25 94/25 95/15 97/15 98/6 101/19 104/4 115/22 126/3 129/8 137/6

**type [2]** 57/3 138/7

**typically [2]** 46/25 82/23

## U

**U.S [3]** 15/24 147/22 148/12

**Uh [3]** 50/8 60/18 137/8

**Uh-huh [3]** 50/8 60/18 137/8

**UK [13]** 11/8 11/11 11/11 12/22 16/17 16/21 17/8 17/16 17/18 21/3 21/8 21/15 21/25

**ultimately [8]** 32/17 44/15 54/2 69/18 71/7 71/21 77/10 130/25

**unaddressed [1]** 119/21

**unaware [1]** 76/9

**uncertain [1]** 53/11

**uncertainty [3]** 18/16 88/23 89/22

**unclear [1]** 8/4

**undeniable [1]** 140/11

**under [49]** 7/17 7/18 9/11 20/11 25/22 30/14 30/14

30/18 33/1 33/7 33/8 33/9 51/15 54/7 56/10 56/20 61/1 62/2 64/10 64/15 65/1 75/14 76/22 77/18 77/22 78/9 80/10 81/19 82/24 87/10 88/23 91/24 92/1 99/24 104/7 104/20 126/4 128/14 129/10 135/15 135/18 135/25 136/8 138/9 138/12 139/24 142/5 147/24 151/17

**underlying [3]** 30/24 34/6 129/18

**underscored [1]** 144/22

**underscoring [1]** 148/2

**understand [16]** 12/1 18/17 26/16 42/7 75/22 90/23 98/9 100/20 104/22 104/23 106/23 107/4 125/14 127/4 137/25 137/25

**understanding [6]** 5/16 6/12 8/9 12/9 79/12 103/13

**understood [6]** 23/13 36/19 101/14 102/6 105/13 105/14

**undertook [1]** 79/20

**underwriter [5]** 2/11 7/7 82/15 140/14 141/6

**underwriters [7]** 6/24 129/10 140/21 140/22 143/2 143/3 143/5

**underwriting [2]** 7/14 82/4

**undoubtedly [1]** 86/2

**unfinished [1]** 104/16

**unfortunately [3]** 6/19 71/25 109/13

**UNGUREANU [1]** 2/3

**unidentified [1]** 82/15

**uninsured [1]** 66/24

**UNITED [19]** 1/1 11/17 11/23 12/11 12/23 14/9 15/7 16/5 16/22 17/25 19/6 22/23 23/10 25/20 27/6 27/11 29/4 29/5 126/3

**United Kingdom [4]** 11/17 11/23 12/11 17/25

**U**

**United States [14]** 12/23 14/9 15/7 16/5 16/22 19/6 22/23 23/10 25/20 27/6 27/11 29/4 29/5 126/3
**unless [8]** 8/16 88/10 106/7 108/16 132/10 136/12 139/17 139/17
**unload [1]** 135/7
**unmistakably [1]** 145/11
**unquote [3]** 118/17 126/5 135/17
**unrelated [3]** 27/5 63/25 64/16
**unsure [1]** 103/16
**until [7]** 53/11 73/1 88/13 88/17 90/21 99/11 138/19
**untimely [1]** 75/14
**up [41]** 9/7 9/19 10/13 10/15 20/12 20/14 22/5 24/14 31/13 31/19 44/18 47/12 54/3 57/25 59/12 59/19 60/7 65/7 65/9 72/15 73/1 74/6 77/10 96/17 98/19 103/3 107/5 109/4 113/17 114/8 115/6 116/21 118/17 129/4 129/12 129/15 132/2 132/15 146/20 150/6 151/15
**update [5]** 48/11 49/7 50/17 69/7 103/19
**updated [2]** 32/12 98/13
**updating [1]** 110/19
**upgrade [1]** 104/6
**upgrading [1]** 48/22
**uphill [1]** 55/9
**upon [2]** 115/23 144/9
**upset [1]** 121/19
**us [11]** 19/22 61/24 94/9 97/21 105/3 108/6 108/8 110/4 117/7 129/13 152/23
**use [6]** 46/6 57/5 71/10 79/20 93/6 113/24
**used [15]** 23/4 41/11 56/24 72/14 72/20 92/20 112/10

112/11 113/25 124/5 126/12 128/25 130/7 130/24 131/7
**useful [1]** 81/25
**using [7]** 93/4 95/7 95/8 126/21 129/11 129/14 132/1

**V**

**valid [2]** 75/5 90/13
**value [1]** 109/23
**various [6]** 5/24 6/25 15/2 15/3 15/3 123/19
**vehicles [1]** 78/22
**VENATOR [124]** 1/4 1/19 2/2 3/15 4/25 6/24 7/6 7/13 8/12 11/9 11/15 12/10 15/16 15/18 25/6 27/20 28/6 30/11 31/24 32/1 32/7 32/12 32/17 34/15 34/17 35/10 36/8 36/25 38/10 39/19 39/23 40/5 40/9 40/16 42/19 43/11 43/21 45/17 47/12 48/12 48/14 48/18 48/25 49/15 50/10 50/12 50/17 50/24 51/22 51/25 52/6 52/13 53/1 53/10 53/19 57/21 59/7 60/20 62/9 62/16 63/3 63/23 64/6 65/3 65/18 65/22 65/25 66/5 66/10 66/20 66/22 67/23 68/2 69/9 69/13 70/4 71/7 73/1 73/7 73/9 73/12 73/17 73/20 74/14 74/20 74/25 75/3 75/6 80/5 80/20 80/24 81/9 82/2 82/18 83/15 85/14 86/13 87/6 89/9 89/14 92/16 92/20 93/10 93/12 94/17 101/6 120/24 122/8 122/13 122/21 131/16 135/21 143/8 146/15 146/22 149/19 149/24 151/11 151/12 151/15 151/16 151/22 152/1 152/12
**venator's [34]** 24/4 27/11 31/24 32/21 34/5 40/24 44/13 44/17 47/25 51/13 52/21 52/22 60/10 60/14

60/15 62/20 66/25 67/5 69/8 71/18 74/17 74/19 76/8 80/5 80/5 85/21 96/19 109/22 116/18 116/20 124/2 124/8 145/9 147/2
**venue [3]** 6/5 7/8 7/9
**version [1]** 97/8
**versus [15]** 17/18 19/25 36/19 49/12 49/20 73/14 81/4 81/4 103/23 103/23 105/8 106/25 107/15 107/16 148/10
**very [46]** 5/10 14/2 14/7 29/15 29/19 33/7 36/23 40/15 40/18 42/13 45/23 49/5 49/16 52/6 53/4 59/5 63/17 66/4 71/18 75/10 81/5 81/13 81/25 83/17 84/6 85/3 87/13 89/11 89/11 108/13 108/13 109/12 109/15 124/19 130/6 131/24 132/12 135/9 138/1 144/5 144/5 147/23 149/7 152/16 153/2 153/15
**Veselka [1]** 2/3
**via [3]** 1/10 3/3 47/11
**Victory [1]** 2/9
**video [2]** 1/10 3/3
**view [1]** 9/16
**viewed [1]** 73/10
**vigilant [1]** 137/24
**virtue [1]** 118/22
**vis [2]** 50/3 50/3
**vis-a-vis [1]** 50/3
**visit [1]** 115/8
**visited [2]** 87/15 87/16
**vote [1]** 29/25
**voted [1]** 19/13
**voting [1]** 151/9

**W**

**wait [1]** 84/18
**waive [2]** 22/15 23/14
**wake [1]** 115/6
**walk [8]** 36/1 36/22 37/2

**walk... [5]** 37/10 39/13 57/7 57/14 141/18

**want [56]** 5/12 8/24 20/21 21/11 22/15 23/14 26/6 26/22 28/11 29/16 31/9 33/4 42/18 77/8 81/13 86/11 95/19 96/24 97/9 102/25 106/15 106/16 106/16 106/18 107/7 107/16 108/17 111/3 111/16 112/24 113/4 114/12 118/23 119/20 123/8 123/10 124/14 130/4 132/16 134/22 136/19 136/19 137/3 137/11 143/16 143/24 144/4 144/7 144/7 144/12 148/16 148/17 149/6 149/10 152/8 153/8

**wanted [10]** 20/10 22/1 26/11 86/24 93/21 101/12 137/14 146/18 150/14 151/7

**warn [1]** 66/23

**warned [4]** 52/8 52/13 65/23 65/25

**warning [5]** 51/19 52/7 57/11 58/2 63/13

**was -- you [1]** 128/13

**wash [1]** 151/22

**Washington [6]** 16/24 18/1 25/19 29/1 29/6 64/1

**wasn't [18]** 26/24 27/22 62/16 67/19 70/24 70/25 72/7 85/12 90/21 111/9 119/6 119/12 119/14 124/20 130/25 137/19 137/20 138/19

**water [1]** 119/10

**way [37]** 5/5 7/19 21/14 45/15 84/4 90/13 95/11 96/18 97/19 98/7 99/10 100/19 101/23 104/10 104/22 105/23 105/25 108/3 109/15 114/14 117/3 117/4 117/6 117/22 118/2 118/13

119/2 119/16 126/16 126/20 127/16 127/20 128/9 133/12 139/20 140/12 140/13

**we [238]**

**we'll [12]** 9/23 15/1 15/2 15/3 26/10 49/1 54/11 55/20 57/7 58/8 84/18 86/2

**we're [46]** 9/5 11/18 20/18 23/19 23/20 24/23 35/18 37/13 47/13 52/19 52/20 59/18 64/19 65/10 76/8 76/11 77/17 84/2 85/16 86/19 87/22 88/11 88/11 88/12 88/22 89/24 90/1 100/3 104/15 105/1 105/23 111/23 113/11 114/5 114/7 115/19 115/20 117/4 117/4 117/4 118/11 119/14 122/24 126/12 139/16 141/5

**we've [37]** 18/6 27/14 27/25 28/2 43/15 47/12 60/9 80/7 80/16 83/19 86/17 87/10 91/15 91/22 92/25 94/23 101/13 108/19 110/6 110/18 111/11 119/25 127/12 130/14 131/23 132/14 133/4 134/5 135/19 138/14 139/20 139/20 140/21 141/8 141/8 141/22 144/6

**wealth [1]** 19/5

**week [3]** 38/24 87/14 145/9

**weekly [4]** 76/2 110/19 121/1 127/13

**weeks [4]** 74/24 87/7 98/13 145/10

**Weiss [1]** 2/15

**welcome [1]** 153/9

**well [37]** 4/11 10/11 14/1 15/10 16/22 20/9 21/5 22/3 36/24 41/10 42/17 54/6 57/5 59/4 64/23 68/22 71/13 77/14 79/4 79/6 89/5 90/2 94/7 99/25 114/19 115/1 116/2 118/10 121/23 123/11

123/12 123/15 137/5 139/12 141/4 152/20 153/12

**well-established [1]** 41/10

**well-pled [1]** 79/4

**went [10]** 31/24 35/7 40/18 62/25 73/22 74/16 87/15 99/21 110/2 115/8

**were [114]** 6/1 6/15 6/22 7/1 7/3 9/6 12/19 15/25 15/25 16/23 17/7 17/23 17/25 18/12 22/4 22/14 22/23 23/4 24/12 27/8 28/7 28/8 28/25 30/17 30/19 32/5 32/9 32/22 32/22 39/14 44/9 46/5 49/7 50/11 51/18 54/3 56/8 59/23 60/3 62/3 63/10 64/8 68/5 69/1 71/14 72/14 74/24 76/9 76/20 76/21 76/23 77/11 77/13 78/1 78/13 78/14 78/22 79/10 82/3 82/9 83/7 84/3 84/3 85/11 92/18 94/8 94/10 99/13 100/24 100/24 102/17 103/16 110/17 110/21 111/24 113/12 113/12 113/22 114/19 114/24 115/11 116/21 116/24 119/7 119/7 121/8 121/16 121/17 121/24 122/18 125/6 125/19 126/3 126/21 128/1 128/11 129/3 129/14 130/7 130/19 130/21 132/1 132/6 134/14 134/15 138/5 142/1 142/7 143/9 145/15 149/14 150/4 150/11 153/2

**weren't [1]** 132/1

**Western [1]** 81/4

**Westlaw [2]** 8/19 141/5

**Wharton [1]** 2/15

**what's [33]** 27/20 32/19 41/18 42/5 42/9 42/25 43/11 49/5 50/3 52/24 53/23 61/8 62/19 64/5 65/11 89/5 92/12 92/13 96/19 96/19 106/9

**what's... [12]** 106/24 109/2 121/1 121/3 121/19 122/7 123/20 124/10 124/13 126/8 127/25 148/5

**whatever [10]** 9/24 31/14 35/19 45/10 46/7 54/1 72/17 117/16 131/4 134/6

**whenever [1]** 10/9

**whereas [1]** 7/17

**whereby [1]** 11/9

**wherever [1]** 84/21

**whether [34]** 7/16 8/25 11/1 11/3 13/4 13/7 13/10 13/20 13/21 18/20 20/1 20/3 25/9 25/12 30/17 30/19 32/24 53/19 53/23 53/24 65/7 77/10 77/11 77/19 77/20 99/15 113/1 113/2 118/8 126/7 133/10 133/14 143/7 150/10

**which [87]** 5/7 6/8 9/19 10/14 18/5 19/7 20/1 20/6 20/11 21/10 21/20 24/5 24/6 26/4 26/23 28/11 28/21 29/18 30/3 32/9 34/2 34/19 37/22 38/7 38/17 38/23 41/2 42/18 42/22 47/18 48/12 49/11 53/23 55/5 56/20 58/11 59/5 59/6 61/1 68/4 69/7 73/13 74/12 74/13 75/7 76/21 77/17 79/23 81/5 82/3 85/19 86/23 87/20 93/18 95/2 101/3 101/24 103/6 103/8 107/1 107/12 107/22 109/8 111/22 112/10 112/19 113/25 119/25 121/17 125/13 127/6 129/8 135/2 137/6 139/22 141/4 141/6 142/9 142/17 144/18 144/19 145/8 145/10 146/3 146/10 146/23 151/7

**while [6]** 17/18 28/16 32/7 83/20 88/22 128/1

**white [32]** 37/17 37/21 37/25 38/9 39/5 39/12 39/20 39/25 40/9 41/2 43/24 47/11 47/20 48/4 49/17 70/22 74/21 75/1 75/1 100/25 101/13 102/2 103/10 103/11 145/13 145/14 146/11 146/11 146/13 146/14 146/14 146/17

**who [31]** 3/10 4/17 4/19 6/25 7/12 13/7 15/25 15/25 17/23 24/1 27/18 59/10 80/12 80/15 83/3 83/10 87/2 108/7 108/23 109/20 111/2 111/2 114/24 120/24 128/2 129/17 136/2 139/9 141/24 143/5 152/15

**who's [1]** 46/17

**whole [6]** 65/1 71/12 72/11 151/20 152/3 152/8

**whom [1]** 150/7

**whose [2]** 8/25 72/3

**why [38]** 10/15 16/1 17/4 17/5 17/10 18/6 19/2 28/16 29/9 30/21 36/6 42/10 55/7 56/20 71/20 73/7 73/13 73/19 75/25 84/10 85/14 86/13 89/4 105/11 105/12 105/14 107/5 114/4 116/10 122/6 125/1 127/18 127/19 128/9 130/3 132/21 135/5 140/7

**widely [1]** 41/12

**will [49]** 3/15 4/1 4/9 4/19 4/20 5/1 6/19 9/12 10/12 17/12 31/13 36/2 36/21 37/2 37/3 39/20 40/1 44/13 45/13 48/22 48/23 51/7 53/11 55/6 62/14 66/9 66/13 66/18 66/21 66/25 67/2 70/16 74/5 74/5 81/14 81/15 88/9 96/3 96/4 96/12 97/12 102/3 104/4 104/5 104/15 105/5 147/7 153/1 153/9

**WILLIAM [1]** 2/8

**willing [1]** 68/5

**win [1]** 54/24

**wisdom [1]** 50/13

**wish [1]** 84/2

**within [5]** 20/7 97/1 97/14 109/8 117/23

**without [4]** 18/12 88/23 89/22 128/11

**withstand [2]** 150/19 152/4

**witness [1]** 101/5

**witnesses [6]** 108/8 108/10 108/18 109/18 129/13 129/19

**wondering [2]** 79/22 109/7

**Woodlands [6]** 12/7 17/19 19/8 22/5 23/23 23/24

**word [6]** 36/16 41/10 41/12 67/21 79/25 106/6

**words [5]** 38/1 38/6 51/24 76/16 85/13

**work [9]** 13/3 30/13 30/13 59/22 59/23 78/20 78/25 115/17 139/21

**worked [4]** 11/8 11/10 77/6 101/1

**workers [1]** 108/22

**working [3]** 101/8 105/3 118/3

**works [1]** 35/2

**world [6]** 17/8 30/7 54/13 54/24 55/5 116/25

**worse [1]** 133/25

**worth [1]** 115/9

**would [119]** 5/4 8/21 8/22 9/19 9/24 10/1 10/8 10/20 12/3 13/6 18/2 23/9 25/10 26/19 27/21 28/23 30/9 33/6 34/19 35/10 35/12 37/25 38/4 38/7 38/8 41/7 42/3 42/4 49/15 49/23 56/7 56/16 61/21 62/24 63/19 65/18 66/7 67/10 70/4 70/18 71/20 72/15 73/15 73/16 75/5

**would... [74]** 76/21 78/6 79/19 81/7 83/2 83/16 83/20 83/21 83/21 84/22 85/9 86/13 87/2 87/4 87/5 89/4 92/14 95/3 95/4 96/21 99/18 104/20 105/9 105/12 105/14 108/20 110/9 110/10 110/21 111/9 112/15 114/1 114/2 116/25 117/7 117/22 123/15 124/7 124/14 125/3 126/9 126/23 127/14 128/8 129/5 129/9 129/17 129/24 132/5 134/3 134/22 135/11 136/6 136/19 137/5 140/22 141/2 141/3 141/4 143/1 144/2 145/22 148/24 150/9 150/24 151/6 151/9 151/16 151/18 152/1 152/10 152/17 152/18 152/22

**wouldn't [6]** 13/12 13/14 13/15 44/5 126/19 140/12

**wrap [1]** 74/6

**written [3]** 39/17 97/6 99/1

**wrong [6]** 50/6 86/17 124/3 127/22 135/19 143/2

**wrote [3]** 56/25 81/25 146/2

**Y**

**y'all [3]** 25/12 133/24 152/10

**yeah [25]** 16/9 21/12 22/3 26/20 29/13 29/15 29/17 35/13 37/18 61/12 69/3 69/12 74/5 79/11 97/2 108/2 109/11 112/8 125/17 127/21 131/2 134/3 141/17 141/21 144/4

**year [15]** 12/3 19/11 21/10 43/14 44/2 45/3 45/7 45/20 54/13 59/2 75/15 104/4 118/3 147/6 147/12

**years [8]** 11/8 11/19 19/9 20/16 20/17 45/20 50/20

**yes [15]** 3/23 4/8 6/18 10/22 13/9 14/16 14/18 46/14 46/14 61/14 61/20 68/22 85/2 109/9 145/25

**yesterday [1]** 7/23

**yet [4]** 25/3 27/4 84/16 98/6

**York [15]** 1/14 1/14 1/22 1/22 2/16 2/16 6/14 7/11 7/16 7/21 8/1 8/3 27/19 28/12 153/11

**you [454]**

**you'll [7]** 36/13 59/20 63/11 66/8 92/12 92/12 104/6

**you're [46]** 10/18 16/6 20/11 27/17 31/9 39/2 43/4 45/9 46/2 57/11 70/9 70/10 77/2 77/5 98/25 104/7 104/8 106/2 113/1 113/2 114/4 114/6 116/7 117/2 117/2 117/2 117/3 120/9 120/9 120/10 120/12 120/16 123/20 123/23 125/15 125/16 125/23 125/25 126/21 128/1 130/12 134/2 134/19 137/25 139/21 152/7

**you've [8]** 71/4 72/23 90/19 125/4 128/6 143/13 143/21 144/3

**you-all [5]** 9/19 9/21 26/5 133/18 153/3

**YOUNG [1]** 1/21

**your [249]**

**Your Honor [200]**

**Your Honor's [1]** 108/1

**Z**

**zero [13]** 19/19 41/21 93/17 94/3 94/5 94/15 102/22 107/11 107/15 110/23 110/25 128/4 130/20