# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588

WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

May 4, 2021

Via ECF

The Honorable Judge Charles R. Eskridge III
United States District Court
Southern District of Texas
515 Rusk St.
Houston, Texas  77002

> Re:    *In re Venator Materials PLC Securities Litigation*,
>           Case No. 19-cv-03464

Dear Judge Eskridge:

I write on behalf of Defendants in the above-referenced action in response to Plaintiffs' April 29, 2021 letter concerning Judge Hanks' recent decision in *Edwards* v. *McDermott International, Inc.*, 2021 WL 1421609 (S.D. Tex. Apr. 13, 2021).  Plaintiffs contend that this decision, in a case involving very different factual allegations, somehow supports their claim that Venator's statements that approximately 20% of Pori's capacity was restored in the second quarter of 2017 were both materially false or misleading and made with scienter, as required to state a claim under Section 10(b) of the Exchange Act. (Compl. ¶¶ 208-219; Letter at 1.)  The *Edwards* decision is inapplicable here for two primary reasons.

1.  The defendants in *Edwards* argued that their "repeated assurances" both before and after a merger about costs associated with certain liquefied natural gas projects were "either puffery or non-actionable opinions."  2021 WL 1421609, at *8.  The falsity of those statements was not in dispute.  By contrast, Defendants here do not contend that Venator's statements about the Pori capacity that was restored in the second quarter of 2017 were puffery or non-actionable opinions.  Instead, as set forth in their motion to dismiss, Defendants argue that Venator's statements that "approximately 20%" or "~20% capacity" had been "achieved" at Pori in "2Q 2017" (Compl. ¶¶ 209-211) and that the Pori plant was "currently operating at 20% of total prior capacity" (*id*. ¶¶ 212-219) were not materially false or misleading.  (Defs.' Mot. to Dismiss (ECF No. 58) at 18-20.)  Plaintiffs' own confidential witness confirms that the Pori plant did in fact restart approximately 20% of its finishing capacity in 2017.  (*Id*. at 15.)  And Venator repeatedly disclosed in its public statements that it intended to restore, and had restored, only "white end production" (*i.e.*,

The Honorable Charles R. Eskridge III                                                    -2-

finishing capacity) at Pori in the second quarter of 2017.  (*Id*. at 18-19.)  As a result, the reasoning of *Edwards* does not apply to Plaintiffs' claim that Venator's statements about Pori's restored capacity are actionable.

In their letter to the Court, Plaintiffs argue that Defendants "assured investors that the damaged Pori facility was 'already running at 20%' capacity—when in truth, and as shown in photographic evidence cited in the complaint—*zero* capacity was restored at Pori."  (Letter at 1 (citing Compl. ¶ 134).)  According to the Complaint, those photographs—taken on March 5, 2018 and April 13, 2018—purportedly show that "demolition vehicles from Delete, a Finnish demolition company, were still in the process of tearing down the damaged Moore facility" (*id.* ¶ 134), which is part of the intermediate processing of TiO2 (*see id.* ¶¶ 61, 78).  This intermediate-processing phase takes place in a part of the Pori plant that is separate from where the "white end" finishing production occurs. (*See id.* ¶¶ 61, 78.)  Accordingly, the photographs shed no light on the amount of saleable "white end production" that had been restored at Pori in the second quarter of 2017.  In fact, the Complaint does not argue that the photographs are relevant to Defendants' "capacity" statements at all.  It instead asserts (incorrectly) that they provide "evidence that Venator was never 'on track' or 'on pace' to rebuild Pori" (*id*. ¶ 134), which are different challenged statements (*see id*. ¶¶ 224-242).

2. The *Edwards* case is also wholly distinguishable on its facts.  In rejecting the defendants' argument that the challenged statements were puffery and non-actionable opinions, the court there held that "Defendants' repeated assurances regarding the [projects] before and after the merger were material and misleading." 2021 WL 1421609, at *9.  As the court explained, "[i]nternal . . . forecasts and risk registers compiled by project directors, cost managers, and executives, showed that, at the time of the merger, [the company] was understating the costs associated with the [projects] by about $1 billion." *Id*.  The complaint further alleged that Defendants "ignored or buried" internal forecasts at odds with their public assurances.  *Id*.  "After the merger," the court noted, the company "essentially bled out financially" and ultimately went bankrupt.  *Id*. at *4-5.  The court concluded based on these very different factual allegations that the defendants' supposed opinion statements "omitted material facts." *Id*. at *9.  The Complaint here alleges no facts comparable to those in *Edwards*.

In discussing scienter, the court emphasized that the company's CEO and CFO "engaged in suspicious stock, performance unit, and restricted stock unit transactions during the Class Period, before the scope of the problems with the [projects] became clear to investors."  *Id*.  The court also noted that "the SEC served subpoenas on [the company] and commenced an investigation into" one of the projects, which the defendants failed to disclose in a timely manner.  *Id*.  The court further stressed that the company's CEO and CFO received contemporaneous documents, internal forecasts, reports and emails that contradicted their public statements.  The court thus concluded that the complaint "alleged

The Honorable Charles R. Eskridge III                                           -3-

sufficient facts to establish that [the CEO and CFO] behaved in a manner that was, at a minimum, severely reckless." *Id*. The Complaint here is devoid of similar allegations. At most, Plaintiffs allege that Venator's CEO "visited Pori shortly after the IPO," attended meetings "about the Pori rebuild and related topics" and (together with Venator's CFO) generally had access to information about Pori based on his position. (Compl. ¶¶ 193-195, 198, 200.) Unlike in *Edwards*, the Complaint nowhere identifies any specific report, forecast, document or email that Venator's CEO or CFO received that supposedly contradicted their contemporaneous statements. And, unlike the allegations of suspicious equity transactions by the CEO and CFO in *Edwards*, the Complaint here simply asserts, in a single sentence, that Venator's CEO and CFO received board-authorized "incentive compensation" in connection with the two offerings. (*Id*. ¶ 206.) Finally, there is no mention of an SEC investigation in this case because there was none.

In sum, the *Edwards* decision offers no support for Plaintiffs' claims, and the Complaint should be dismissed for the reasons set forth in Defendants' motion to dismiss.

Respectfully,

/s/  *Richard C. Pepperman II*
Richard C. Pepperman II

cc:      All counsel of record (via ECF)