United States District Court
Southern District of Texas
ENTERED
July 07, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE VENATOR MATERIALS PLC SECURITIES LITIGATION | § § § § § § § | CIVIL ACTION NO. 4:19-cv-03464<br><br>JUDGE CHARLES ESKRIDGE |

# OPINION AND ORDER GRANTING MOTION TO DISMISS IN PART

Eight months before Venator Materials PLC went public, a massive fire caused extensive damage to one of its most important manufacturing plants in Pori, Finland. The fire was disclosed, along with statements of intention to restore the production capacity of the devastated plant. Venator's initial and secondary public offerings then proceeded in August and December of 2017. The price of that stock later suffered sharp declines in September and October of 2018, when Venator announced that it was abandoning the Pori facility altogether and had experienced previously undisclosed cost overruns amounting to hundreds of millions of dollars.

This securities class action largely concerns alleged misrepresentations and omissions by Venator executives and others prior to and after the IPO and SPO. These addressed information on such topics as the ability to rebuild the Pori facility after the fire, the pace and expectations in that regard, the restored production capacity and future benchmarks at various points along the way, the available insurance proceeds, and the anticipated costs. The overall contention is that it was only the alleged misrepresentations and omissions on these topics that even allowed the IPO and SPO to go forward in the first place, while fraudulently propping up the stock price thereafter.

Plaintiffs Cambria County Employees' Retirement System, City of Miami General Employees' & Sanitation Employees' Retirement Trust, Fresno County Employees' Retirement Association, and City of Pontiac General Employees' Retirement System, individually and on behalf of similarly situated persons and entities, bring action for violations of the Securities Act of 1933, the Securities Exchange Act of 1934, and related regulations against (i) Venator Materials PLC, whose shares they purchased; (ii) Simon Turner, Kurt D. Ogden, Stephen Ibbotson, Mahomed Maiter, and Russ R. Stolle, who were all Venator executives at the pertinent time; (iii) Douglas D. Anderson, Kathy D. Patrick, Sir Robert J. Margetts, and Daniele Ferrari, who were all Venator directors at the pertinent time; (iv) Peter R. Huntsman, who was a Venator director at the pertinent time, as well as Huntsman Corporation's CEO and one of its directors; (v) Huntsman Corporation, Huntsman (Holdings) Netherlands BV, and Huntsman International LLC, who sold the Venator shares; and (vi) Citigroup Global Markets Inc, Merrill Lynch, Pierce, Fenner & Smith Inc, Goldman Sachs & Co LLC, and JP Morgan Securities, who underwrote the sale of Venator's shares. Dkt 41.

Defendants move to dismiss the action in its entirety for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt 58. The motion is granted in part and denied in part.

As to the claims under section 10(b) of the Exchange Act and SEC Rule 10b-5 against Venator, Turner, and Ogden, it is granted with respect to statements regarding the market demand for titanium dioxide and Venator's insurance coverage, including as related to business-interruption coverage of events at the Venator facility in Pori, Finland. It is denied with respect to statements regarding the manufacturing capacity of the Pori facility and the timeline to rebuild it after the subject fire.

As to the control-person claims under section 20(a) of the Exchange Act for primary violations of section 10(b) against Huntsman Corporation, Turner, Ogden, Ibbotson, and Stolle, it is denied.

As to the claims under section 11 of the Securities Act against Venator, Turner, Ogden, Ibbotson, Stolle, Peter Huntsman, Anderson, Patrick, Margetts, Ferrari, Citigroup, Merrill Lynch, Goldman Sachs, and J.P. Morgan, it is denied.

As to the claims under section 12(a)(2) of the Securities Act against Venator, Citigroup, Merrill Lynch, Goldman Sachs, J.P. Morgan, Huntsman Corporation, Huntsman Holdings, and Huntsman International, it is granted.

As to the control-person claims under section 15 of the Securities Act for primary violations of section 11 against Turner, Ogden, Ibbotson, Stolle, Peter Huntsman, Anderson, Patrick, Margetts, Ferrari, Huntsman Corporation, Huntsman Holdings, and Huntsman International, it is denied. As to such claims for primary violations of section 12(a)(2), it is granted.

Contents

1. Background....4
   a. Parties....5
   b. Pertinent events....7
   c. Relevant statements....10
   d. Causes of action....18
2. Legal standard....20
   a. Motion to dismiss....20
      i. Rules 8, 9, and 12....20
      ii. The Private Securities Litigation Reform Act....21
   b. The Securities Exchange Act of 1934....22
      i. Section 10(b) and Rule 10b-5....22
      ii. Section 20(a) control-person claims....27
   c. The Securities Act of 1933....29
      i. Section 11....30
      ii. Section 12(a)(2)....31
      iii. Section 15 control-person claims....32

3. Analysis of Exchange Act claims ....................33
a. Section 10(b) and Rule 10b-5 claims ....................33
i. Materiality ....................33
A. Capacity statements ....................33
B. Rebuilding statements ....................35
C. Market-demand statements ....................38
D. Insurance and impact statements ....................40
ii. Scienter ....................43
A. Venator ....................44
B. Ogden and Turner ....................44
b. Section 20(a) control-person claims ....................50
c. Summary as to Exchange Act claims ....................52
4. Analysis of Securities Act claims ....................52
a. Statute of limitations ....................53
b. Section 11 claims ....................55
c. Section 12(a)(2) claims ....................56
d. Section 15 control-person claims ....................58
e. Summary as to Securities Act claims ....................58
5. Potential for repleading ....................59
6. Conclusion ....................59

## 1. Background

Securities law isn't for the faint of heart. It's a bit dense, to say the least. Justice Antonin Scalia once remarked the same as to administrative law, as he invited his audience to lean back, clutch the sides of their chairs, and steel themselves for what was ahead. Antonin Scalia, *The Essential Scalia: On the Constitution, the Courts, and the Rule of Law*, 283 (Crown Forum 2020) (Judge Jeffrey S. Sutton and Edward Whelan, eds) (speech delivered in 1989 on *Chevron* deference).

The reader here is similarly advised to buckle up. The law in this area may at first appear to be arcane, being neither intuitive

nor straightforward. But even a slightly better understanding of securities class actions hopefully provides its own reward.

a. Parties

*Plaintiffs*. Cambria County Employees' Retirement System, City of Miami General Employees' & Sanitation Employees' Retirement Trust, the County Employees' Retirement Association, and City of Pontiac General Employees' Retirement System are governmental entities that provide benefits to eligible public employees. They bring individual and class claims, complaining generally of losses sustained by purchasing shares of stock in Venator Materials PLC between August 3rd and November 30th of 2017. Dkt 41 at ¶¶ 20–22.

*Venator*. Venator Materials PLC manufactures and markets chemical products. Over 70% of its revenue is derived from selling just one product—titanium dioxide, which is "a white inert pigment that provides whiteness, opacity and brightness to a range of everyday products." Id at ¶ 24. Venator primarily focuses on producing specialty $TiO_2$, which is used in end products such as fibers, catalysts, food, pharmaceuticals, and cosmetics. Id at ¶¶ 57–58. Plaintiffs accuse Venator generally of knowing (or not exercising reasonable care to know) about alleged misrepresentations and omissions in its IPO and SPO materials along with other filings with the Securities and Exchange Commission. They further allege that Venator knew (or should have known) about alleged misrepresentations and omissions made by its executives during earnings calls. Id at ¶¶ 207–23, 292, 370.

*The Selling Shareholder Defendants*. Prior to its initial public offering in August 2017, Venator was organized as the Pigments & Additives Division within Defendant Huntsman Corporation, a multinational manufacturer of chemical products based in The Woodlands, Texas. Id at ¶¶ 24, 37. Defendants Huntsman (Holdings) Netherlands BV and Huntsman International LLC are wholly owned subsidiaries of Huntsman Corporation. These three Huntsman entities each sold shares offered in the IPO and a secondary offering shortly thereafter. Id at ¶¶ 40–41. Plaintiffs accuse Huntsman Corporation and its two subsidiaries generally of knowing (or not exercising reasonable

care to know) about the alleged misrepresentations and omissions in the IPO and SPO materials. Id at ¶¶ 43, 365–74. Plaintiffs further seek to hold Huntsman Corporation liable for the alleged misrepresentations and omissions made by Venator's executives because Huntsman maintained a controlling interest in Venator. Id at ¶ 300.

*The Executive Defendants*. Simon Turner is the chief executive officer of Venator and one of its directors. Kurt D. Ogden is the chief financial officer of Venator. Stephen Ibbotson was a vice president and the corporate controller for Venator. Mahomed Maiter is the executive vice president of Venator and was a senior vice president over the business operations of it "white pigments division." Russ R. Stolle was a senior vice president and deputy general counsel for Huntsman Corporation before the IPO and is now a senior vice president, general counsel, and chief compliance officer for Venator. Id at ¶¶ 25–29. Plaintiffs accuse these five generally of making materially false and misleading statements and omissions concerning the capacity of the Pori facility after a catastrophic fire described below, the rebuilding progress and costs, the impact on $TiO_2$ prices, the impact on Venator's business, and Venator's use of related insurance proceeds. Id at ¶¶ 207–23. They seek to hold Turner and Ogden liable for statements they each made during various earnings calls, and to hold all of them liable for Venator's alleged misrepresentations and omissions. Id at ¶¶ 287–303. Plaintiffs further seek to hold all but Maiter liable for the alleged misrepresentations and omissions in Venator's offering documents. Id at ¶¶ 352–64, 375–81.

*The Director Defendants*. Defendant Peter R. Huntsman was at all relevant times a Venator director, as well as the CEO of Huntsman Corporation and one of its directors. Id at ¶ 31. Douglas D. Anderson, Kathy D. Patrick, Sir Robert J. Margetts, and Daniele Ferrari were each Venator directors at the time of the IPO and SPO. Peter Huntsman and Margetts signed the IPO and SPO registration statements, while Anderson, Patrick, and Ferrari signed only the SPO registration statement. Id at ¶¶ 32–35. Plaintiffs accuse these five generally of making materially false and misleading statements and omissions in Venator's IPO and

SPO materials. Id at ¶¶ 354–59. But the claims against Patrick and Margetts appear to be brought only in connection with the SPO registration statement. Id at ¶ 354. It's also unclear how or why Plaintiffs seek to hold Anderson and Ferrari liable based on the IPO registration statement (which they apparently didn't sign), while they don't seek to hold Margetts liable based on the IPO registration statement (which he apparently did sign). Id at ¶¶ 34, 308.

*The Underwriter Defendants.* Citigroup Global Markets Inc, Goldman Sachs & Co LLC, Merrill Lynch, Pierce, Fenner & Smith Inc, and JP Morgan Securities served as lead underwriters for Venator's IPO and the SPO. Together, these four investment banking houses were allocated more than 35.2 million shares to sell during those offerings, while receiving more than $48 million in fees for their collective underwriting efforts. Id at ¶¶ 45–48. Plaintiffs accuse them generally of not conducting reasonable investigations of the statements contained in and incorporated by reference in the IPO and SPO materials and thus not possessing reasonable grounds for believing that the statements within them were true. Id at ¶ 348.

b. Pertinent events

Venator operated a facility in Pori, Finland that produced specialty products, including pharmaceutical-grade titanium dioxide, or $TiO_2$. The facility was Venator's second largest $TiO_2$ facility, with a nameplate capacity of 130,000 metric tons per year, accounting for approximately 17% of Venator's total capacity and 2% of global demand. Id at ¶¶ 59–60.

Most of Venator's facilities (including the Pori facility) produced $TiO_2$ by using a three-step sulfate process that turns raw iron ore feedstock into $TiO_2$. First, the iron feedstock is treated with sulfuric acid in what is known as the *black end* of the manufacturing facility to extract the $TiO_2$ pigment. Second, the $TiO_2$ is filtered out from the processing liquids and sent to a rotating cylinder inside a furnace where $TiO_2$ crystals form, dry, and grow. This intermediate product may be sold on its own. Third, the $TiO_2$ may be milled and chemically treated based on the product's intended end use in the *white end* of the manufacturing facility. This is a "finishing stage" that is the least

costly and labor-intensive step. The Pori facility included both a *black end* and a *white end* manufacturing facility. See generally id at ¶¶ 61–66, 78, 81.

Huntsman Corporation issued a press release on January 17, 2017 announcing its intention to spin Venator off as a separate, publicly traded corporation, with the shares distributed amongst its shareholders. This spin off was to occur during the first half of 2017. Id at ¶¶ 71–73. The transaction was necessary to effectuate a merger announced later in May 2017 between Huntsman and Clariant AG, one of its rivals. Id at ¶¶ 86–87.

A massive fire then broke out at the Pori facility thirteen days later, on the morning of January 30, 2017. The fire damaged a 15,000-square-meter area of the roof and remained smoldering within the walls for a week. The entire facility was damaged (save one auxiliary building), with all four production lines destroyed. Only the white-end finishing portion of one line (which produced inks) survived. Two weeks after the fire, the Radiation and Nuclear Safety Authority of Finland determined that the area was heavily irradiated. It would be over a month before the site was safe enough to enter and assess the damage. See generally id at ¶¶ 74–83, 143.

Peter Huntsman visited the facility in the weeks after the fire, and the damage was "immediately apparent" to him and other executives. Id at ¶ 84. During a February 26, 2017 earnings call, he stated that Huntsman Corporation was committed to rebuilding the Pori facility as quickly as possible and that Venator wouldn't be spun off until the company had "absolute clarity." Id at ¶¶ 90–91.

Huntsman Corporation then announced a change of plans in April 2017, stating that it would instead sell its interest in Venator through an initial public offering—rather than spinning it off directly to its existing shareholders. This strategy, Plaintiffs say, allowed the Huntsman family to offload shares in the pigments business and for the company to pay down debt prior to the Clariant merger. See generally id at ¶¶ 86–88. Plaintiffs further explain that paying off debt was necessary to "appease the activist investors who were opposed to the Huntsman–Clariant deal

precisely because of Huntsman's overburdened balance sheet." Id at ¶ 88.

Huntsman Corporation completed the initial public offering on August 8, 2017. This entailed the sale of 26,105,000 shares at an offering price of $20.00 per share, totaling approximately $522 million. It then completed a secondary public offering on December 4, 2017. This entailed the sale of 21,764,000 additional shares at an offering price of $22.50 per share, totaling approximately $490 million. The SPO was two months ahead of the scheduled, 180-day-lock-up period and required a waiver from the Underwriter Defendants. Plaintiffs claim this allowed Huntsman Corporation to further decrease its stake in Venator. See generally id at ¶¶ 44, 116.

Plaintiffs refer to what they call *the Europe–Pori Shuffle* as occurring throughout the time between the fire and the later IPO and SPO. Id at ¶¶ 144. What they mean by this is that Huntsman Corporation allegedly began shipping intermediate $TiO_2$ from other European facilities to the Pori facility solely for finishing as a ploy to assuage investor concerns about the capacity of that facility after the fire. And they further claim that Venator, Huntsman, and the Executive Defendants used this strategy to create the appearance that the Pori facility was actually producing $TiO_2$. See generally id at ¶¶ 135–39.

It's unclear if any rebuilding of the Pori facility ever began. Dkt 79 at 69–72 (hearing transcript). But it's alleged that demolition was still underway as late as July 2018, with former employees confirming that "no work beyond the ongoing demolition had occurred onsite since the fire occurred back in January 2017." Dkt 41 at ¶ 134. Regardless, Turner (as CEO of Venator) announced on September 12, 2018 that the Pori plant would be shut down and reconstruction would cease. Id at ¶ 173. Venator then issued another corrective disclosure on October 30th, acknowledging that it had "incurred an additional $415 million in restructuring expenses, and would incur additional 'charges of $220 million through the end of 2024.'" Id at ¶¶ 182–84 (quotation source not specified).

Plaintiffs allege that Venator's stock price ultimately fell from $22.00 to $6.47 per share during the relevant time frame of

August 3, 2017 to October 28, 2018. Id at ¶ 13. This represented a 68% decline from the IPO price and a 71% decline from the SPO price. Id at ¶ 186.

c. Relevant statements

Plaintiffs have identified a wide array of statements by various Defendants both before and after Venator's IPO and SPO that they allege were materially false or misleading. These generally concern four subject categories:

- *The capacity statements,* about the production capacity of the Pori facility and Venator overall;
- *The rebuilding statements,* about the rebuild of the Pori facility;
- *The market-demand statements,* about $TiO_2$ market demand; and
- *The insurance and impact statements,* about insurance coverage, including as related to business-interruption coverage of events at the Pori facility.

As to the first category, the complaint and quoted statements refer variously to *prior* capacity, *prior operating* capacity, *total nameplate* capacity, *full* capacity, *total* $TiO_2$ capacity, *total prior* capacity, *total prior site* capacity, and *former site* capacity. For example, see id at ¶¶ 12, 59, 108, 118, 122, 214–20, 241. The distinctions between these phrases isn't always clear and will require more precise delineation at later junctures. But all such terms and phrases are gathered together for present purposes as *capacity statements*.

Plaintiffs allege as actionable the following statements.

*January 31, 2017*. John Huntsman made a statement the day after the fire, announcing that the "fire brigade responded quickly and extinguished the fire." To the contrary, the fire burned for at least a further week after this statement. See id at ¶¶ 74, 80.

*March 27, 2017*. Huntsman Corporation represented in an investor disclosure "that the entire facility would return to 100% capacity in a year and a half—with approximately 20% of capacity restored by the end of the second quarter 2017, an additional 40% by the end of the first half 2018, and the site returning to full capacity by the end of 2018." Id at ¶ 92.

*May 5, 2017.* Huntsman Corporation repeated the March 27th statement in its Form S-1 filed with the SEC. Id at ¶ 95.

*July 24, 2017.* Venator filed an amended Form S-1. Plaintiffs reference it without specifying why it's problematic. Id at ¶¶ 39, 42. But Defendants attached an excerpt, which appears to again recite similar representations as to capacity and the status on rebuild:

> We expect the Pori facility to restart in phases as follows: approximately 20% capacity in the second quarter of 2017; approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018.

Dkt 58-1 at 9. The term *full capacity* isn't otherwise explained. And of note, the second quarter of 2017 had already closed at the time this assertion was made.

*August 4, 2017.* The IPO prospectus repeated identically the language from July 24th quoted above regarding *full capacity*. See Dkt 58-1 at 207, 212; see also Dkt 41 at ¶ 209. Plaintiffs allege that Venator's offering materials also stated:

> We realized approximately $300 per metric ton improvement in pricing over the course of 2016. TZMI estimates that the market price of global high quality $TiO_2$ will grow by more than $600 per metric ton, the equivalent of more than 24%, from December 31, 2016 through the end of 2017.

Dkt 41 at ¶ 248.

*August 28, 2017.* Venator issued its Form 10-Q for the second quarter of 2017, which stated that the Pori Facility was "currently not fully operational," but that it was "committed to repairing the facility as quickly as possible." Dkt 58-1 at 45; see also Dkt 41 at ¶ 226. The Form 10-Q further stated, "A portion of our white end production became operational during the second quarter of 2017, and we expect the Pori facility to restart in phases as follows: approximately 40% capacity in the second quarter of 2018; and full capacity around the end of 2018." Dkt 58-1 at 48; see also Dkt 41 at ¶ 227. Plaintiffs allege that it

also provided, "Average selling prices increased primarily due to continued improvement in business conditions for $TiO_2$." Dkt 41 at ¶ 249. And it finally stated in relevant part that "the site is insured for property damage as well as business interruption losses." Dkt 58-1 at 48; see also Dkt 41 at ¶ 260.

*August 28, 2017*. Venator issued a press release that quoted Turner as saying, "Selling prices for titanium dioxide continue to improve and we continue to work closely with our customers in this regard." Id at ¶ 226.

*September 6, 2017*. Venator appeared at a conference and posted a slide presentation used during the conference on its investor-relations website. Dkt 41 at ¶ 228. One slide specifically stated that the Pori site was "expected to be fully operational by 4Q 2018 through phased restart," with "~20% capacity 2Q 2017 achieved," "~40% capacity 2Q 2018," and "~100% capacity around year end 2018." Dkt 58-1 at 351.

*September 13, 2017*. Venator appeared at another conference and again posted a slide presentation on its investor-relations website. Dkt 41 at ¶¶ 211, 229. One slide repeated the same language from September 6th. See Dkt 58-1 at 375; see also Dkt 41 at ¶ 229.

*October 27, 2017*. Venator conducted its first earnings call as a public company. Plaintiffs allege that Turner announced that the $500 million insurance policy was more than enough to cover the costs of rebuilding and would also cover lost earnings. See Dkt 41 at ¶ 112. The transcript indicates that it was instead Ogden who made this statement, as follows:

> Our $500 million insurance policy is more than enough to cover the costs of the rebuild on its own, but the insurance policy also covers lost earnings. Due to prevailing strong market conditions, our $TiO_2$ selling prices continue to improve, and our business is benefiting from the improved profitability and cash flows. This also has the effect of increasing our insurance claim for lost earnings from the Pori site.

Dkt 58-1 at 74. Investors were also again told by Ogden that the Pori facility was "already running at 20% site capacity." Ibid; see

also Dkt 41 at ¶ 213. This comment was reiterated in a press release issued by Venator that same day. Dkt 41 at ¶ 212. Ogden also stated, “We intend to restore manufacture of the balance of these more profitable specialty products as quickly as possible in 2018.” Dkt 58-1 at 74; see also Dkt 41 at ¶ 231. And Ogden further commented, “Due to prevailing strong market conditions, our $TiO_2$ selling prices continue to improve, and our business is benefiting from the improved profitability and cash flows. This also has the effect of increasing our insurance claim or lost earnings from the Pori site.” Dkt 58-1 at 74; see also Dkt 41 at ¶ 263. Plaintiffs also claim that Turner told an analyst with RBC Capital Markets that Venator’s strong earnings “uplift” was “related to solid demand, good demand around the world.” Dkt 58-1 at 84; see also Dkt 41 at ¶ 252.

*October 27, 2017*. Venator issued a press release announcing its financial results for the third quarter of 2017 and filed it with the SEC on its Form 8-K. Dkt 41 at ¶ 251. The announcement stated, “We are already running at 20% of previous capacity,” and “we intend to restore manufacturing of the balance of these more profitable specialty products as quickly as possible in 2018. The remaining 40% of site capacity is more commoditized and may be reintroduced at a slower pace depending on market conditions cost and projected long term return.” Dkt 58-1 at 58; see also Dkt 41 at ¶¶ 212, 230. The press release also quoted Turner as saying, “Due to prevailing strong market conditions, our $TiO_2$ selling prices continue to improve and our business is benefitting from the improved profitability and cash flows.” Dkt 41 at ¶ 251. And he was further quoted as saying that “the combination of increased $TiO_2$ profitability and estimated reconstruction costs indicate that we will exceed our $500 million insurance limit. We expect to contain these over-the-limit costs within $100–150 million and account for them as capital expenditures.” Id at ¶ 261.

*October 27, 2017*. Venator released its earnings presentation for the third quarter of 2017. It stated, “We expect to contain over-the-limit costs within $100–$150 million,” which Turner repeated during the earnings call for the same quarter. Dkt 58-1 at 74; see also Dkt 41 at ¶ 262.

*October 27, 2017*. During Venator's first earnings call as a public company, Ogden stated:

> Our $500 million insurance policy is more than enough to cover the costs of the rebuild on its own, but the insurance policy also covers lost earnings. Due to prevailing strong market conditions, our $TiO_2$ selling prices continue to improve, and our business is benefiting from the improved profitability and cash flows. This also has the effect of increasing our insurance claim for lost earnings from the Pori site.

Dkt 58-1 at 74; see also Dkt 41 at ¶ 112. Ogden also commented, "We are already running at 20% site capacity, and we intend to restore manufacture of the balance of these more profitable specialty products as quickly as possible in 2018." Ibid.

*November 3, 2017*. Venator made another statement regarding already-achieved capacity with its Form 10-Q for the third quarter of 2017 filed with the SEC. It stated:

> We are currently operating at 20% of total prior capacity but producing only specialty products, and we currently intend to restore manufacturing of the balance of these more profitable specialty products by the fourth quarter of 2018.

Dkt 58-1 at 93; see also Dkt 41 at ¶¶ 214, 232. The Form 10-Q also stated:

> [W]e currently intend to restore manufacturing of the balance of these more profitable specialty products by the fourth quarter of 2018. The remaining 40% of site capacity is more commoditized and we will determine if and when to rebuild this commoditized capacity depending on market conditions, costs and projected long term returns relative to our other investment opportunities.

Dkt 58-1 at 93; see also Dkt 41 at ¶ 232. Plaintiffs allege that it also stated, "The fire at our Pori facility did not have a material

impact on our 2017 third quarter operating results as losses incurred were offset by insurance proceeds." Dkt 41 at ¶ 265.

*November 27, 2017*. Venator repeated these statements about Pori's post-fire capacity when filing the Form S-1 with the SEC in connection with the SPO. Dkt 58-1 at 100; see also Dkt 41 at ¶¶ 116, 310. Venator also repeated those statements in the SPO prospectus itself. Dkt 58-1 at 268. The SPO materials also included a chart listing the annual capacity of each Venator plant, with Pori listed at an annual capacity of 130,000 metric tons with a footnote explaining that it was "currently operating at 20% of total prior capacity." Dkt 41 at ¶ 332. Of note, all other plants on the chart conducted *black-end* production, with the sole *white-end*-only plant (in Calais, France) excluded.

*February 23, 2018*. With the filing of its Form 10-K for 2017, Venator stated that "we continue to repair the facility . . . . We are currently operating at 20% of total prior capacity producing specialty products." Dkt 58-1 at 125–26; see also Dkt 41 at ¶ 215. The Form 10-K further stated that "we intend to restore manufacturing of the balance of these more profitable specialty products by the end of 2018." Dkt 58-1 at 125; see also Dkt 41 at ¶ 236. It also said, "The improvement in [$TiO_2$] selling prices reflected continued improvement in business conditions for $TiO_2$, allowing for an increase in prices globally, and improvement from favorable exchange rates, primarily against the Euro." Dkt 41 at ¶ 253. And it further stated, "The fire at our Pori facility did not have a material impact on our 2017 fourth quarter operating results as losses incurred were offset by insurance proceeds." Dkt 58-1 at 125; see also Dkt 41 at ¶ 267.

*February 23, 2018*. Venator issued a press release announcing its financial results for the fourth quarter of 2017 and filed it with the SEC on its Form 10-K. The press release quoted Turner as saying, "We continue to see an elongated [titanium dioxide] cycle and despite significant rebuild cost escalation, we remain on schedule to restore our specialty business capacity, and ultimately full operation of the remaining capacity as economic conditions warrant at our Pori, Finland site." Dkt 41 at ¶ 234 (alteration in original). The press release further stated, "Construction for the specialty and differentiated products portion of the facility is on

pace and we expect it to be complete by the end of 2018, however we are paying a fast-track premium." Id at ¶ 235.

*February 23, 2018*. Venator released its earnings presentation for the third quarter of 2017. Plaintiffs allege that it stated:

> Construction for the specialty and differentiated products portion of the facility is on pace and we expect it to be complete by the end of 2018 . . . Current $TiO_2$ business conditions provide compelling economics for the rebuild of the remaining 40% commodity portion of the facility . . . Market introduction of commodity portion no sooner than 2020 . . . Estimated reconstruction costs continue to escalate and accuracy improves with elapsed time . . . Actively pursuing options to reduce the over-the-insurance-limit costs.

Id at ¶ 237.

*February 23, 2018*. In the first earnings call after the SPO, Turner stated that its cost estimates to rebuild the Pori facility would now exceed its insurance policy by $325–375 million. See id at ¶¶ 123, 151–55, 238–39. Turner also gave the following assurance to investors:

> At Pori, we remain on track with our fast-paced project to restore the higher profitability, 60% specialty capacity by the end of 2018 through our original plan, hitting both the midyear and end-year milestones. The economics to rebuild the remaining 40% of capacity are compelling, and these more commodity products will be reintroduced to the market at a more normalized pace but not before 2020.

Dkt 58-1 at 139; see also Dkt 41 at ¶ 123. Turner also stated, "Construction on the rebuild of the specialty products portion of the facility is on pace," and he expected it "to be complete by the end of 2018." Dkt 58-1 at 138; see also Dkt 41 at ¶ 238. To the contrary, Plaintiffs allege, the project was still in the demolition stage as of April 2018, with little to no reconstruction activity having taken place. Dkt 41 at ¶ 134. Plaintiffs also allege that

Turner further commented that "stronger $TiO_2$ pricing was supposedly caused by a 'positive underlying demand across the market,' for $TiO_2$ products." Dkt 58-1 at 137; see also Dkt 41 at ¶ 254. And he noted, "Our Titanium Dioxide segment delivered another great quarter, with $TiO_2$ pricing and business improvement benefits driving the results." Dkt 58-1 at 137; see also Dkt 41 at ¶ 254.

*May 1, 2018*. On Venator's earnings call, Turner again referred to Pori as having "20% of the total prior site capacity available for production of finished specialty product." Dkt 41 at ¶ 161. The earnings presentation reiterated this statement. Id at ¶ 218. Ogden also stated, "The reconstruction is still generally in line with what our expectations have been." Id at ¶ 163. And Turner further commented, "Pricing increased 23% compared with the prior year quarter and 5% compared to the fourth quarter of 2017, reflecting strong industry fundamentals." Id at ¶ 256.

*May 1, 2018*. Venator issued a press release announcing its financial results for the first quarter of 2018 and filed it with the SEC on its Form 8-K. Plaintiffs allege that the press release quoted Turner as saying, "Currently, 20% of the site's prior total capacity is available for production." Id at ¶ 216. He was also quoted as saying, "We continue to make progress on the construction phase of our complex Pori project." Id at ¶ 240.

*May 1, 2018*. The Form 10-Q filed by Venator with the SEC for the first quarter of 2018 reiterated, "We have restored 20% of total prior capacity, which is dedicated to production of specialty products." Dkt 58-1 at 287; see also Dkt 41 at ¶ 217. It also stated that "we continue to repair the [Pori] facility." Dkt 58-1 at 287; see also Dkt 41 at ¶ 217. It also said, "The increase in selling prices reflects continued improvement in business conditions for $TiO_2$, allowing for an increase in prices globally." Dkt 41 at ¶ 255. And it noted, "The fire at our Pori facility did not have a material impact on our 2018 first quarter or our 2017 year to date operating results as losses incurred were offset by insurance proceeds." Dkt 58-1 at 287; see also Dkt 41 at ¶ 274.

*July 31, 2018*. The 10-Q filed by Venator with the SEC for the second quarter disclosed that the cost of rebuilding would

exceed its insurance by greater than the $375 million previously estimated and would take a longer time than expected. Dkt 58-1 at 168; see also Dkt 41 at ¶ 167.

*September 12, 2018*. Turner announced that Venator was abandoning the Pori facility and that this would cost an additional $280 million. Dkt 58-1 at 191; see also Dkt 41 at ¶¶ 173–76.

*October 30, 2018*. Venator disclosed that it had "incurred an additional $415 million in restructuring expenses, and would incur additional charges of $220 million through the end of 2024 related to Pori." Dkt 41 at ¶ 182 (internal quotations omitted). It also announced that the prior positive demand trends weren't actually driven by increased demand but were instead a result of supply shortages caused by the Pori-facility fire. Id at ¶ 183.

Without alleging specific dates, Plaintiffs also assert that the IPO and SPO risk warnings that Venator provided according to SEC rules and regulations were inadequate and contained material misrepresentations. Id at ¶¶ 328–30, 341–43. For example, the IPO materials stated that "we *may* experience delays in construction or equipment procurement." Id at ¶ 330 (emphasis in original). Plaintiffs say that statement was false because "delays were already realized, rather than a mere possibility," given that "Venator still had not finished the demolition work at Pori or begun any new construction work on production lines 1, 2, or 3" by September 2017 (two months after the IPO registration statement was filed). Ibid. Plaintiffs raise the same argument regarding falsity as to those same statements appearing in the SPO materials. See id at ¶¶ 341–43.

d. Causes of action

Certain of the Plaintiffs here initially brought action in July 2019 against all Defendants in the Southern District of New York. See *City of Miami General Employees' & Sanitation Employees' Retirement Trust v Venator Materials PLC*, Civil Action No 4:19-cv-04266. Plaintiff Cambria County Employees' Retirement System then commenced this action against a number of the same Defendants in September 2019, with original assignment to Chief Judge Lee Rosenthal. Plaintiffs in the *City of Miami* action moved for appointment as lead plaintiff in both cases in September 2019, which Chief Judge Rosenthal promptly

granted. See Dkts 4, 7. The parties in the *City of Miami* action agreed in October 2019 to transfer that action here, which was then consolidated before Chief Judge Rosenthal. See Dkts 9, 10. Plaintiffs received leave and filed an amended consolidated class action complaint in January 2020. See Dkts 22, 41. The action was reassigned to this Court shortly thereafter. Dkt 43.

Plaintiffs bring five categories of claims against various combinations of Defendants, as follows.

*Under section 10(b) of the Exchange Act and SEC Rule 10b-5 against Venator, Turner, and Ogden.* These claims are based on allegedly false statements made during conference calls, along with allegedly false statements and omissions in Venator's Form 10-Q and Form 10-K filings and related IPO and SPO materials.

*Under section 20(a) of the Exchange Act for violations of section 10(b) against the Executive Defendants and Huntsman Corporation.* These claims are based on allegations that these Defendants had the power to control Venator's actions and the actions of its employees, thus making them liable for the underlying Exchange Act violations.

*Under section 11 of the Securities Act against Venator, Turner, Ogden, Ibbotson, Stolle, the Director Defendants, and the Underwriter Defendants.* These claims are based on allegedly false statements and omissions in the IPO and SPO materials.

*Under section 12(a)(2) of the Securities Act against Venator, the Underwriter Defendants, and the Selling Shareholder Defendants.* These claims seek rescissionary relief based on allegedly false statements and omissions in the IPO and SPO materials.

*Under section 15 of the Securities Act for violations of section 11 and 12(a)(2) against Turner, Ogden, Ibbotson, Stolle, the Director Defendants, and the Selling Shareholder Defendants.* As with the control-person claims under section 20(a) of the Exchange Act, these claims are based on allegations that these Defendants had the power to control Venator's actions and the actions of its employees, thus making them liable for the underlying Securities Act violations.

Defendants move to dismiss all claims pursuant to Rule 12(b)(6). Dkt 58. The claims against Maiter were previously dismissed without prejudice in March 2021 for lack of personal

jurisdiction. Dkt 86. Any claims that may survive as to the Executive Defendants will not proceed as against Maiter.

2. Legal standard

a. Motion to dismiss

i. Rules 8, 9, and 12

Review on motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is constrained. The reviewing court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Walker v Beaumont Independent School District*, 938 F3d 724, 735 (5th Cir 2019). The court must also generally limit itself to the contents of the pleadings and its attachments. *Brand Coupon Network LLC v Catalina Marketing Corp*, 748 F3d 631, 635 (5th Cir 2014), citing *Collins v Morgan Stanley Dean Witter,* 224 F3d 496, 498 (5th Cir 2000). A notable exception allows a defendant to attach documents or other undisputed materials if they are referred to in the complaint and are central to the claim. *Collins,* 224 F3d at 498–99, quoting *Venture Associates Corp v Zenith Data Systems Corp,* 987 F2d 429, 431 (7th Cir 1993).

Other, familiar standards on review of a motion to dismiss derive from the interplay of Rules 8 and 12. Rule 8(a)(2) requires a plaintiff's complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) allows the defendant to seek dismissal if the plaintiff fails "to state a claim upon which relief can be granted." Read together, the Supreme Court has held that Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v Iqbal*, 556 US 662, 678 (2009), quoting *Bell Atlantic Corp v Twombly*, 550 US 544, 555 (2007). To survive a Rule 12(b)(6) motion to dismiss, the complaint "must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v Taylor*, 503 F3d 397, 401 (5th Cir 2007), quoting *Twombly*, 550 US at 555.

A complaint must therefore contain enough facts to state a claim to relief that is plausible on its face. *Twombly*, 550 US at 570. A claim has *facial plausibility* "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 US at 678, citing *Twombly*, 550 US at 556. This standard on plausibility is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 US at 678, quoting *Twombly*, 550 US at 557.

Rule 9(b) demands that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." It also provides, "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." The Fifth Circuit holds, "Rule 9(b) requires the complaint to set forth the 'who, what, when, where, and how' of the events at issue." *Dorsey v Portfolio Equities Inc*, 540 F3d 333, 339 (5th Cir 2008), quoting *ABC Arbitrage Plaintiffs Group v Tchuruk*, 291 F3d 336, 350 (5th Cir 2002).

ii. The Private Securities Litigation Reform Act

A complaint alleging violations of section 10(b) of the Exchange Act and SEC Rule 10b-5 must of course comply with the pleading requirements of both Rules 8 and 9(b). But it must also meet the enhanced pleading requirements imposed by the Private Securities Litigation Reform Act, passed by Congress in 1995 and codified at 15 USC §§ 78u-4 and 78u-5. See *Tellabs, Inc v Makor Issues & Rights, Ltd*, 551 US 308, 322 (2007); *Lormand v United States Unwired, Inc*, 565 F3d 228, 239 (5th Cir 2009); *ABC Arbitrage*, 291 F3d at 350 (citations omitted). To satisfy PLSRA pleading standards, the Fifth Circuit holds that the plaintiff must:

- *First,* specify each statement alleged to have been misleading or contended to be fraudulent;
- *Second,* identify the speaker;
- *Third,* state when and where the statement was made;
- *Fourth,* plead with particularity the contents of the false representations;
- *Fifth,* plead with particularity what the person making the misrepresentation obtained thereby;

- *Sixth,* explain why the statement is misleading or fraudulent; and
- *Seventh,* state with particularity all facts on which allegations made upon information and belief are formed by setting forth a factual basis for such belief.

*ABC Arbitrage*, 291 F3d at 350 (citations omitted).

b. The Securities Exchange Act of 1934

Following the stock-market crash of 1929 and in the midst of the Great Depression, Congress enacted a number of laws to ensure that "the highest ethical standards prevail in every facet of the securities industry." *Securities and Exchange Commission v Capital Gains Research Bureau, Inc*, 375 US 180, 186–87, (1963) (internal quotations omitted). The Securities Exchange Act of 1934, codified at 15 USC §§ 78a, *et seq*, "was designed to protect investors against manipulation of stock prices." *Basic Inc v Levinson*, 485 US 224, 230 (1988) (citation omitted). The Supreme Court has repeatedly "described the fundamental purpose of the Act as implementing a philosophy of full disclosure." Ibid (internal quotations omitted).

i. Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act, codified at 15 USC § 78j(b), makes it unlawful to "use or employ . . . any manipulative or deceptive device or contrivance" in contravention of SEC rules and regulations. Congress vested rule-making authority in the SEC to enforce this provision. *Ernst & Ernst v Hochfelder*, 425 US 185, 212–13 (1976). The SEC promulgated Rule 10b-5, which makes it unlawful in connection with the purchase or sale of securities to "employ any device, scheme, or artifice to defraud," to "make any untrue statement of a material fact," or to "engage in any act, practice, or course of business" that "operates . . . as a fraud or deceit." 17 CFR § 240.10b-5.

Neither section 10(b) nor Rule 10b-5 expressly creates a private cause of action. But the Supreme Court has long recognized an implied private cause of action to enforce both of them. *Goldman Sachs Group, Inc v Arkansas Teacher Retirement System*, --- S Ct ---, 2021 WL 2519035, *3, citing *Halliburton Co v Erica P.*

*John Fund, Inc*, 573 US 258, 267 (2014); see also *Blue Chip Stamps v Manor Drug Stores*, 421 US 723, 730 (1975). The private right of action is "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc v Broudo*, 544 US 336, 345 (2005), citing *Basic*, 485 at 252 (White, J, concurring).

Section 10(b) applies to a broad range of conduct because actions under it may be "brought by a purchaser or seller of '*any* security' against '*any* person' who has used '*any* manipulative or deceptive device or contrivance' in connection with the purchase or sale of a security." *Herman & MacLean v Huddleston*, 459 US 375, 381 (1983) (emphasis in original), quoting 15 USC § 78j. But it only gives rise to liability under narrow circumstances. This is because plaintiffs bringing 10(b) claims "must prove that the defendant[s] acted with scienter, i.e., with intent to deceive, manipulate, or defraud." *Herman & MacLean*, 459 US at 381 (internal quotations omitted) (alterations in original).

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must allege that:

- *First,* a defendant made a material misrepresentation or an omission;
- *Second,* the material misrepresentation or omission was made with scienter;
- *Third,* a connection exists between the misrepresentation or omission and the plaintiff's purchase or sale of a security;
- *Fourth*, the plaintiff relied on the misrepresentation or omission in purchasing or selling the security;
- *Fifth,* the plaintiff suffered an economic loss; and
- *Sixth,* the plaintiff's injury was proximately caused by the material misrepresentation or omission.

*Edgar v Anadarko Petroleum Corp*, 2019 WL 1167786, *17 (SD Tex), citing *R2 Investments LDC v Phillips*, 401 F3d 638, 641 (5th Cir 2005).

The first two elements are frequently litigated (as they are here) and pertain to what are commonly referred to as *materiality*

and *scienter*. Standards as to each needn't be set out from scratch. Chief Judge Lee Rosenthal addressed both at length in *In re Plains All American Pipeline Securities Litigation*, 245 F Supp 3d 870, 890–91 (SD Tex 2017) (*In re Plains All American Pipeline I*); see also *In re Plains All American Pipeline Securities Litigation*, 307 F Supp 3d 583, 614–16 (SD Tex 2018) (*In re Plains All American Pipeline II*).

*As to materiality:*

> Even if misrepresentations and omissions are pleaded with sufficient specificity and individualization, they must be material to state a claim. There is no bright-line rule for materiality; it requires a fact-intensive inquiry into "the source, content, and context" of the allegedly misleading or omitted information. *Matrixx Initiatives, Inc v Siracusano*, 563 US 27, 43 (2011). The test for whether a representation is material [is] whether there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. *Basic Inc v Levinson*, 485 US 224, 231 (1988). Omitting facts from a statement is material only if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *BP I*, 843 F Supp 2d at 747, citing *Basic*, 485 US at 232.
>
> Applying these principles, courts have found that "corporate cheerleading" in the form of "generalized positive statements about a company's progress" is not a basis for liability under the securities laws. *Nathenson v Zonagen Inc*, 267 F3d 400, 419 (5th Cir 2001). "[N]o reasonable investor would consider such statements material and . . . investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *BP I*, 843 F Supp 2d at 748. The state-

> ments the plaintiffs rely on must be something more than a corporate officer's generalized optimistic comments about the company's policies, programs, or performance. As in other areas of the law, "puffery" is not actionable as a misrepresentation.

*In re Plains All American Pipeline I*, 245 F Supp 3d at 890–91 (citation form revised).

*As to scienter:*

> In addition to pleading that specific statements misrepresented or omitted material facts, the plaintiffs must plead that the person responsible for the misrepresentation acted with the necessary culpability, or scienter. *Tellabs*, 551 US at 319. Section 10(b) and Rule 10b-5 are not insurance against bad corporate management. Rather, they protect only against intentional or knowing misstatements. *Shaw Group*, 537 F3d at 535. "Scienter, in the context of securities fraud, is defined as 'an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Flaherty & Crumrine Preferred Income Fund, Inc v TXU Corp*, 565 F3d 200, 207 (5th Cir 2009), quoting *R2 Investments LDC v Phillips*, 401 F3d 638, 643 (5th Cir 2005. "[F]or 'each act or omission alleged,' securities fraud plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Shaw Group*, 537 F3d at 533, quoting 15 USC § 78u-4(b)(2); *TXU Corp*, 565 F3d at 207.
>
> In considering whether the specific factual allegations create a strong inference of scienter, the court can consider documents incorporated

by reference into the complaint and matters proper for judicial notice. *BP I*, 843 F Supp 2d at 748, citing *Tellabs*, 551 US at 323. The court looks to all of the allegations about a particular individual's state of mind when he or she made the statement at issue, to determine whether they support a strong inference of scienter. *Tellabs*, 551 US at 324; *Southland*, 365 F3d at 364–65. The inference of scienter must be "cogent and compelling," not simply "reasonable" or "permissive." The inference must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 US at 324. The court must consider "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id at 323–24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendants acted with the required state of mind.'" Id at 326, quoting 15 USC § 78u-4(b)(2)). "Although circumstantial evidence can support a strong inference of scienter, allegations of motive and opportunity standing alone will not suffice." *BP I*, 843 F Supp 2d at 749, citing *Abrams v Baker Hughes Inc*, 292 F3d 424, 430 (5th Cir 2002).

The rule against group pleading also applies to scienter allegations. The plaintiffs must make specific allegations about an individual's state of mind when the challenged statement was made. The plaintiffs cannot simply point to the fact that some other person at the corporation knew of facts that make the statement misleading and impute that knowledge to the speaker. *Southland*, 365 F3d at 366. Allegations about another person's knowledge, or "the defendants'" collective knowledge, are insufficient.

> The plaintiffs must plead facts that give rise to a strong inference of scienter for each individual defendant for each purported misstatement. Ibid. Simply pleading that a defendant had access to internal information that contradicted his or her public statements is not enough. To the extent that the plaintiffs' scienter argument is based on the availability of some internal document setting out certain facts, the complaint must make specific allegations about the character of the document, its author and contents, when it was received, and by whom it was received, to link it to the person making the challenged statement at the time the statement was made. *Abrams*, 292 F3d at 432.

*In re Plains All American Pipeline I*, 245 F Supp 3d at 891–92 (citation form edited).

ii. Section 20(a) control-person claims

The Exchange Act imposes liability on persons or entities who fall within its definition of *control* "and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons." *Lanza v Drexel & Co*, 479 F2d 1277, 1299 (2d Cir 1973, *en banc*). The purpose of control-person liability is to "prevent people and entities from using straw parties, subsidiaries, or other agents acting on their behalf to accomplish ends that would be forbidden directly by the securities laws." *Laperriere v Vesta Insurance Group, Inc*, 526 F3d 715, 721 (11th Cir 2008) (citations omitted); see also *Paul F. Newton & Co v Texas Commerce Bank*, 630 F2d 1111, 1115 (5th Cir 1980).

Section 20(a) of the Exchange Act, codified at 15 USC § 78t(a), in relevant part provides, "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." And regulation defines *control* in

this context to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 CFR § 230.405.

An important limitation on liability under section 20(a) is its predication "on the existence of an independent violation of the securities laws." *Rubinstein v Collins*, 20 F3d 160, 166 n 15 (5th Cir 1994) (citations omitted). This means that a party who doesn't sufficiently plead an underlying claim for an Exchange Act violation by a *controlled* person can't plead an independent claim under section 20(a) against the so-called *controlling* person. *Southland*, 365 F3d at 383, citing *Lovelace v Software Spectrum Inc*, 78 F3d 1015, 1021 n 8 (5th Cir 1996), in turn citing *Dennis v General Imaging, Inc*, 918 F2nd 469, 509 (5th Cir 1990); see also *Carlton v Cannon*, 2016 WL 3959164, *3 (SD Tex). But once a plaintiff sufficiently pleads an underlying Exchange Act violation by a controlled person, the plaintiff only needs to plead its control-person claims "in accordance with Rule 8(a)"—as neither "the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element)" are applicable. *Trendsetter Investors, LLC v Hyperdynamics Corp*, 2007 WL 172627, *15 (SD Tex); see also *In re Cobalt International Energy, Inc*, 2016 WL 215476, *11 (SD Tex).

Fifth Circuit precedent is unclear with respect to the exact showing that a plaintiff must make to hold a defendant liable under section 20(a). The Eighth Circuit has established a rigorous test requiring the plaintiff to show that the alleged control person "actually participated in (i.e., exercised control over) the operations of the corporation in general" and "possessed the power to control the specific transaction or activity upon which the primary violation is predicated," even though "he need not prove that this later power was exercised." *Metge v Baehler*, 762 F2d 621, 631 (8th Cir 1985) (citation omitted). But the Fifth Circuit has declined to address the extent to which it adopts the *Metge* framework. See *Heck v Triche*, 775 F3d 265, 283 n 18 (5th Cir 2014), citing *Abbott v Equity Group, Inc*, 2 F3d 613, 619–20 (5th Cir 1993).

Instead, when assessing control-person liability, the Fifth Circuit has at various times considered whether the alleged control-person had "effective day-to-day control" of the corporation, or had "the requisite power to directly or indirectly control or influence corporate policy," or had "actual power or influence over the controlled person." *Cameron v Outdoor Resorts of America, Inc*, 608 F2d 187, 195 (5th Cir 1979), modified on other grounds on panel reh'g, 611 F2d 105 (5th Cir 1980, *per curiam*); *Thompson*, 636 F2d at 958; *Dennis*, 918 F2d at 509. But none of these inquiries are dispositive. And it's unclear which (if any) should take precedence. At the very least, Plaintiffs must "show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Heck*, 775 F3d at 283 (internal quotations omitted).

c. The Securities Act of 1933

The Securities Act of 1933 is codified at 15 USC §§ 77a, *et seq*. Congress designed it to "protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce." *Pinter v Dahl*, 486 US 622, 638 (1988) (citations omitted).

A complaint alleging claims under the Securities Act is generally only required to comply with the pleading requirements of Rule 8, without needing to satisfy the more stringent standards required by Rule 9(b) and the PSLRA. See *Kapps v Torch Offshore, Inc*, 379 F3d 207, 210 (5th Cir 2004) (citations omitted). But the heightened pleading standard under Rule 9(b) continues to apply to any claims of fraud under the Securities Act. *Lone Star Ladies Investment Club v Schlotzsky's Inc*, 238 F3d 363, 368 (5th Cir 2001); see also *Kurtzman v Compaq Computer Corp*, 2002 WL 32442832, *24 (SD Tex). As explained by Chief Judge Rosenthal in *In re Plains All American Pipeline II*:

> Boilerplate disavowals of an intent to allege fraud do not change the analysis. *Melder v Morris*, 27 F3d 1097, 1100 n 6 (5th Cir 1994); *Kurtzman*, 2002 WL 32442832, at *24 (SD Tex 2002); see also *In re Stac Electronics Securities Litigation*, 89 F3d 1399, 1405 n 2 (9th Cir 1996). When the

> plaintiff's Securities Act allegations are substantively identical to the Exchange Act allegations, Rule 9(b) applies, and the Securities Act claims must be pleaded with particularity. *Schlotzsky's*, 238 F3d at 368–69; *Melder*, 27 F3d at 1100 n 6; *In re American Bank Note Holographics, Inc Securities Litigation*, 93 F Supp 2d 424, 440 (SDNY 2000).

307 F Supp 3d at 619 (citation form edited).

i. Section 11

Section 11 of the Securities Act, codified at 15 USC § 77k, is quite long but at base provides purchasers of registered securities with a cause of action against the issuer of the security, every person who signed the registration statement, every person who was a director of or partner in the issuer at the time, every person who prepared or certified any part of the registration statement, and every underwriter with respect to the security. See *Herman & MacLean*, 459 US at 381–82 n 13. This "allows purchasers of a registered security to sue certain enumerated parties in a registered offering when false or misleading information is included in a registration statement." Id at 381. It was designed to "assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." Id at 381–82 (citations omitted). And it's been described as "strong medicine," given that it "imposes near-strict liability" on issuers and other signatories "for untruths and omissions made in a registration statement." *Obasi Investment, Ltd v Tibet Pharmaceuticals, Inc*, 931 F3d 179, 182 (3d Cir 2019) (citations omitted).

To sufficiently plead a claim under section 11(a), plaintiffs must allege that:

- *First,* they purchased a registered security, either directly from the issuer or in the aftermarket following the offering;
- *Second,* the defendants participated in the offering in a manner sufficient to give rise to liability under section 11; and

- *Third,* the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

*In re Morgan Stanley Information Fund Securities Litigation*, 592 F3d 347, 358–59 (2d Cir 2010) (citations omitted), quoting section 11(a).

As with claims under section 10(b) of the Exchange Act, a fact is *material* if there's a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. *Basic*, 485 US at 234. This requires determination "whether 'the information allegedly omitted or misrepresented in the [registration statement] was material, in the sense that it would have altered the way a reasonable investor would have perceived the total mix of information available in the [registration statement] as a whole.'" *In re Franklin Bank Corporation Securities Litigation*, 782 F Supp 2d 364, 404 (SD Tex 2011), quoting *Krim v BancTexas Group*, 989 F2d 1435, 1445 (5th Cir 1993) (alterations in original). Inquiry into scienter isn't required. *In re Plains All American Pipeline II*, 307 F Supp 3d at 618 (quotation omitted).

ii. Section 12(a)(2)

Section 12(a)(2), codified at 15 USC § 77l(a)(2), affords securities purchasers an "express cause of action for rescission against sellers who make material misstatements or omissions by means of a prospectus" or oral communication. *Gustafson v Alloyd Co*, (1995) 513 US 561, 564 (1995) (internal quotations omitted).

To establish a *prima facie* claim under section 12(a)(2), plaintiffs must allege that:

- *First,* the defendant is a *statutory seller*;
- *Second,* the sale was effectuated by means of a prospectus or oral communication; and
- *Third,* the prospectus or oral communication included an untrue statement of a material fact or omitted a material fact necessary to make the statements not misleading.

*In re Morgan Stanley Information Fund*, 592 F3d at 359.

The term *statutory seller* isn't expressly defined. But courts have found it to encompass someone who "(1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicit[ed] the purchase [of a security], motivated at least in part by a desire to serve his own financial interests or those of the securities['] owner." Ibid, quoting *Pinter v Dahl*, 486 US 622, 641 n 18 (1988) (alterations in original).

iii. Section 15 control-person claims

Section 15 of the Securities Act, codified at 15 USC § 77o, provides that "anyone who controls persons liable under § 11 or § 12 of the Securities Act can be held jointly and severally liable to the same extent as the persons they control." This operates much like control-person liability under the Exchange Act, allowing plaintiffs "to bring claims against parties who are 'control persons' for a primary violation of the Securities Act." *Welgus v TriNet Group, Inc*, 2017 WL 6466264, *27 (ND Cal), citing *Hollinger v Titan Capital Corp*, 914 F2d 1564, 1578 (9th Cir 1990).

To allege control-person liability under the Securities Act, "the plaintiff must allege both a *primary violation* of § 11 or § 12 and the defendant's *control* over the primary violator." *In re Kosmos Energy Ltd Securities Litigation*, 955 F Supp 2d 658, 674 (ND Tex 2013) (emphasis added). Control-person liability under section 15 (as under section 20(a) of the Exchange Act) is thus "secondary or derivative, dependent on the plaintiff demonstrating an underlying 'primary' violation." *In re Plains All American Pipeline II*, 307 F Supp 3d at 618. Likewise, the same definition of *control* that applies to section 20(a) of the Exchange Act also pertains here, being "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 CFR § 230.405.

All of this means that the Fifth Circuit construes the control-person provisions of section 15 of the Securities Act and section 20(a) of the Exchange Act in the same manner. *Heck*, 775 F3d at 283. And as with control-person claims under the Exchange Act, there are no controlling decisions that establish precise pleading requirements for such a claim. Federal district courts in

Texas instead "apply a relaxed and lenient pleading standard for evaluating whether a plaintiff has sufficiently alleged a claim for control-person liability." *In re Cobalt International Energy*, 2016 WL 215476 at *9 (quotations omitted) (collecting cases).

3. Analysis of Exchange Act claims

The alleged misrepresentations and omissions that assertedly give rise to liability under the Exchange and Securities Acts are related, even if not entirely overlapping. The claims under the Exchange Act are addressed first because it applies more broadly while creating liability less readily. Further development is then devoted as necessary for claims under the Securities Act, which applies more narrowly but creates liability more readily.

a. Section 10(b) and Rule 10b-5 claims

Plaintiffs assert liability against Venator, Turner, and Ogden under section 10(b) of the Exchange Act and Rule 10b-5, at base alleging that Venator and the Executive Defendants knowingly misrepresented and omitted material facts that distorted Venator's stock price. Dkt 41 at ¶¶ 207–78, 287–97. To the contrary, Defendants argue that dismissal is warranted because Plaintiffs haven't sufficiently pleaded the necessary elements of materiality and scienter. Dkt 58 at 21, 23–33, 43.

i. Materiality

The *materiality* of the statements at issue will be assessed according to the standard set forth above from *In re Plains All American Pipeline I*, 245 F Supp 3d at 890–91. Such analysis typically presents "a mixed question of fact and law and generally a decision for the jury," but representations can at times be determined "immaterial as a matter of law" on review of a motion to dismiss. *In re Enron Corporation Securities, Derivative & ERISA Litigation*, 235 F Supp 2d 549, 573 (SD Tex 2002) (citations omitted).

A. Capacity statements

Plaintiffs claim that Venator and the Executive Defendants made materially false and misleading statements and omissions concerning the operating capacity of the Pori facility and Venator following the fire. Dkt 41 at ¶¶ 207–78. They seek to hold Venator, Turner, and Ogden liable based on such statements and

omissions. Id at ¶¶ 287–97. Plaintiffs in this regard point to various iterations of the proposition that the Pori facility had achieved "20% of total prior capacity," "20% of previous capacity," and "20% site capacity," among others. See generally id at ¶¶ 207–23. They reference this "20% capacity" benchmark over one hundred times throughout the complaint, but there are other statements that reference a higher degree of restored capacity. All of this includes the relevant statements set out above, for example, on the dates of August 4th, September 6th, September 13th, October 27th, November 3rd, and November 27th of 2017, and February 23rd and May 1st of 2018. Such statements are actionable, Plaintiffs contend, because the Pori facility never even reached 20% capacity after the fire.

Plaintiffs specifically claim that the statements regarding production capacity (and especially those referring to the 20% benchmark) were false and misleading because the only part of the Pori facility that was functioning after the fire was the part that conducted the $TiO_2$ finishing process for one of the four production lines. Id at ¶ 221. Plaintiffs assert that *finishing* doesn't impact *production* capacity. Id at ¶¶ 8, 119. They also point to the so-called Europe–Pori Shuffle, further alleging, "Venator was expending extraordinary amounts of money and going to extreme lengths to ship intermediate product—manufactured at other facilities . . . to the Pori facility for the finishing process." Id at ¶ 221. This, Plaintiffs say, "concealed the reality" that—instead of actually producing $TiO_2$—Defendants' efforts were "actually causing a substantial drain on Venator's other facilities in Scarlino and Duisburg, where $TiO_2$ was actually being produced." Id at ¶ 222.

Defendants argue that the many statements regarding the restoration of 20% capacity were neither materially false nor misleading. They assert that the Pori facility was actually finishing 17% of its prior $TiO_2$ amount after the fire and that this difference is insubstantial. Dkt 58 at 18, 24. But their primary argument is that investors weren't misled because they understood that *capacity* meant merely *finishing* (at the white end of the line)—and not *production* (at the black end of the line). Id at 24–25. Plaintiffs disagree with that, arguing that a reasonable

investor would have understood *capacity* to mean total *production* capacity—from raw iron ore—and not just *finishing*. Dkt 66 at 9.

Plaintiffs rely on *Spitzberg v Houston American Energy Corp*, where an energy company used the word *reserves* in the oil-and-gas context in a manner that varied from the industry-standard definition. 758 F3d 676, 690 (5th Cir 2014). The Fifth Circuit held that using an industry-specific term in an investor presentation while simultaneously claiming to connote a non-industry-specific definition is actionably misleading. Id at 690–91. Defendants argue that Plaintiffs haven't pleaded that *capacity* has an industry-standard definition akin to that of *reserves* in *Spitzberg*. Dkt 70 at 9. True, but the present posture is on motion to dismiss. The comparison to *Spitzberg* is thus apt, at least at this stage. Where terms are "reasonably susceptible to different interpretations," it's appropriate to resolve that issue with evidence at a later stage. *Carlton*, 184 F Supp 3d at 473, amended on denial of reconsideration, 2016 WL 3959164 (SD Tex).

It's conceivable here that investors could have understood references to *capacity* to mean *actual* or *full* (including *production*) capacity—not merely *finishing* capacity. Indeed, past conduct by Huntsman Corporation itself indicates that reference to $TiO_2$ *capacity* includes more than mere *finishing*. Plaintiffs allege that Huntsman closed the black end of its $TiO_2$ facility in Calais, France while still operating the white end at a point in time when Venator still existed as a division of Huntsman. Before closing the black end, Huntsman reported annual *capacity* at Calais of approximately 95,000 metric tons, but then reported annual capacity of zero after closing the black end, "even though the 'white end' of the facility was still finishing $TiO_2$." Dkt 41 at ¶ 65. Such allegation plausibly serves to link reference of $TiO_2$ *capacity* quite directly to black-end *production*, as opposed to mere white-end *finishing*.

Claims against Venator, Turner, and Ogden based on the statements regarding *capacity* will go forward.

B. Rebuilding statements

Plaintiffs allege that Venator and the Executive Defendants misrepresented the timeline to rebuild the Pori facility, the progress of rebuilding efforts, and the extent of damage caused

by the fire. Dkt 41 at ¶¶ 207, 224–246. They seek to hold Venator, Turner, and Ogden liable for such statements. Id at ¶¶ 287–97. These include those set out above, for example, on the dates of August 4th, August 28th, September 6th, September 13th, October 27th, and November 3rd of 2017, and February 23rd and May 1st of 2018.

Plaintiffs claim that these statements were misleading because "the rebuild of the Pori facility was not proceeding 'on pace.'" Id at ¶ 244. As an example, Plaintiffs claim that on February 23, 2018, Turner and Ogden "represented that they were 'on pace' and 'on schedule' to fully rebuild the specialty portion of Pori," but "Venator had not yet even completed the demolition phase of reconstruction at Pori." Id at ¶¶ 124, 154, 245. Plaintiffs further claim that on May 1, 2018, Turner "represented that Venator 'continue[s] to make progress on the construction phase of the rebuild,' and 'we expect some of this specialty capacity to be producing finished product during the second half of this year.'" Id at ¶¶ 161, 246 (alterations in original). To the contrary, Plaintiffs claim that Venator still hadn't even completed demolition work by July 2018, and that the status of the rebuild hadn't changed since March 2018. Ibid.

Defendants argue that Plaintiffs haven't "alleged with particularity that any Defendant responsible for these statements knew of material facts inconsistent with them at the time of the statements or failed to disclose material facts about the basis for the opinions." Dkt 58 at 28. They further argue that "statements about Venator's 'expected' or 'intended' plans are forward-looking statements protected by the bespeaks-caution doctrine and the PSLRA's safe-harbor provision." Ibid.

Plaintiffs respond that the subject statements were assertions of present fact and not merely forward-looking optimism. They also point to several specific statements claiming that the Pori rebuild was in progress and on pace. Dkt 66 at 27–28, citing Dkt 41 at ¶¶ 161, 235–38. But the Pori rebuild never even really began, Plaintiffs say, which necessarily means that it couldn't have been on pace. To further illustrate those points, Plaintiffs again point to the Europe–Pori Shuffle:

> Contrary to Defendants' representations that the facility had returned to 20% capacity—and in order to conceal the true extent of the damage to Pori's production capacity—Venator went to extraordinarily expensive and unsustainable lengths to ship "intermediate" $TiO_2$, manufactured at its facility in Italy, to Pori, where it was "finished" (the "Europe–Pori Shuffle"). But "finishing" $TiO_2$—the last and least expensive stage of manufacturing—is not the same thing as a plant's actual "capacity" to produce $TiO_2$.

Dkt 66 at 8.

The PSLRA provides a safe harbor for "any forward-looking statement, whether written or oral, if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 USC § 78u-5(c)(1)(A)(i). Where the safe-harbor provision applies, it means that "the statement is not actionable and the defendant's state of mind is irrelevant." *In re BP Securities Litigation*, 843 F Supp 2d 712, 777 (SD Tex 2012), citing *In re Enron*, 235 F Supp 2d at 575. But if "the representation or omission is fraudulent, independent of the existence of a forward-looking statement, the representation or omission is not shielded simply because a forward-looking statement exists." *Blockbuster Inc Securities Litigation*, 2004 WL 884308, *7 (ND Tex). The Fifth Circuit further holds that "a 'mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'" *Spitzberg*, 758 F3d at 691, quoting *Makor Issues & Rights, Ltd v Tellabs Inc*, 513 F3d 702, 705 (7th Cir 2008).

The complaint clearly alleges that Turner and Ogden knew of the damage to the Pori facility. Dkt 41 at ¶ 109. The further pleading as to the Europe–Pori Shuffle also supports an inference that Venator and the Executive Defendants knew that the timeline for rebuilding was misleading, if not outright false. Id

at ¶¶ 138, 145. As such, Plaintiffs have sufficiently pleaded that statements regarding the timeline to rebuild the Pori facility weren't solely *forward looking* within the comprehension of the safe-harbor provision. These are instead largely mixed present/future statements, and Plaintiffs have sufficiently pleaded that there are actionably false present or historical aspects that lacked sufficient cautionary language.

Claims against Venator, Turner, and Ogden based on the statements regarding the rebuild of the Pori facility will go forward.

C. Market-demand statements

Plaintiffs claim that Venator and the Executive Defendants misrepresented the cause of rising $TiO_2$ prices and concealed the impact of the Pori facility's decreased production on $TiO_2$ prices. Dkt 41 at ¶¶ 207, 247–58. They seek to hold Venator, Turner, and Ogden liable in this regard. Id at ¶¶ 287–97. They identify numerous statements from Venator's IPO offering materials, press releases, Form 10-Q and 8-K filings, and earnings calls that, Plaintiffs say, were designed to convince investors that $TiO_2$ prices were increasing due to demand and to predict a prosperous market. These include the relevant statements set out above, for example, on the dates of August 4th, August 28th, and October 27th of 2017, and February 23rd and May 1st of 2018.

Plaintiffs claim that these statements were false because ascendant $TiO_2$ prices were simply attributable to decreased supply after the fire at the Pori facility. Id at ¶ 247. Plaintiffs cite *Federal Trade Commission v Tronox Ltd*, 332 F Supp 3d 187 (DDC 2018), in support of their claim. Id at ¶¶ 148, 177. The *Tronox* action concerned alleged antitrust violations following an attempt by Tronox Limited to acquire the $TiO_2$ business of National Titanium Dioxide Company, known as Cristal. 332 F Supp 3d at 193. Tronox and Cristal are two of the world's largest $TiO_2$ producers, and the Commissioners of the Federal Trade Commission authorized the filing of an administrative complaint to block their merger due to its potential effects on competition. Id at 196. The judge there noted that "a fire at a large $TiO_2$ plant in Pori, Finland, decreased the available titanium dioxide in Europe and caused a rapid and significant price

increase." *Tronox*, 332 F Supp 3d at 203–04. He concluded that the "Pori fire thus shows a dramatic relative increase in European prices not disciplined by customer arbitrage." Ibid (internal quotations omitted).

Defendants argue that they disclosed Venator's lost capacity after the Pori fire and the extent to which Pori was responsible for the global supply of $TiO_2$. Dkt 58 at 30–31. They also argue that the statements complained of were opinions, and that Plaintiffs haven't sufficiently pleaded that those opinions weren't "honestly held by the speakers (to the extent they are even identified) at the time of the statements or that the speakers failed to disclose material facts about the basis for the opinions." Id at 31. As to the *Tronox* opinion, Defendants likewise argue that it doesn't suggest "that someone responsible for voicing the challenged opinions about prices did not honestly believe them." Ibid.

The Fifth Circuit holds, "Statements that are predictive in nature are actionable only if they were false when made." *Shushany v Allwaste, Inc*, 992 F2d 517, 524 (5th Cir 1993), citing *Isquith v Middle South Utilities, Inc*, 847 F2d 186, 203 (5th Cir 1988), cert denied, 488 US 926, 102 (1988). And "projections of future performance not worded as guarantees are generally not actionable under the federal securities laws." *Krim*, 989 F2d at 1446. This is so because "investors and analysts are too sophisticated to rely on vague expressions of optimism rather than specific facts." *In re BP*, 843 F Supp 2d at 748 (citation omitted).

Counsel for Plaintiffs conceded at hearing that their claims under section 10(b) and Rule 10b-5 regarding the statements about $TiO_2$ demand are based solely on statements made by Maiter in the *FTC v Tronox* action. Dkt 79 at 126–27. But the amended complaint only cites a few statements from his deposition, none of which support their claims. For example, Maiter stated that "there was some shuffling of production from plant to plant,"' and that "following the fire, Venator was forced to 'produce some semi-differentiated production at our Scarlino factory which we now finish off at our Pori, Finland facility for certain product requirements for our specialty business."' Dkt 41

at ¶ 138. But the cited testimony focuses solely on supply—not on demand. As to the latter, Plaintiffs haven't explained what Maiter knew about $TiO_2$ demand and when he knew it. As such, none of the cited statements demonstrate that Maiter (or any other Defendant) *knew* that $TiO_2$ prices were increasing because of lower production at the Pori facility. And Plaintiffs haven't connected his statements to any other Executive Defendant or to Venator—aside from his merely being its high-level employee.

Allegations as to the statements concerning $TiO_2$ market demand fall short of the pleading standards imposed by Rule 9(b) and the PSLRA. Claims against Venator, Turner, and Ogden based on those statements will be dismissed.

D. Insurance and impact statements

Plaintiffs allege a number of misrepresentations regarding insurance proceeds from the Pori fire. These include the statements set out above, for example, on the dates of August 28th, October 27th, and November 3rd of 2017, and February 23rd and May 1st of 2018. Such statements fall into the following four subcategories. None are sufficient to state a claim.

*First,* Plaintiffs claim that Venator and the Executive Defendants misrepresented the extent to which insurance proceeds would "cover the cost of both the facility rebuild and any earnings lost from Pori's outage." Dkt 41 at ¶¶ 98, 170, 259–277. They seek to hold Venator, Turner, and Ogden liable based on such statements. Id at ¶¶ 287–97. For example, during the October 2017 earnings call, Ogden said, "We *expect to contain* these over-the-limit costs within $100 million to $150 million, and account for it as capital expenditures spread over 2018 and 2019." Dkt 58-1 at 74 (emphasis added). During a February 2018 earnings call, Turner then commented that "applying additional contingency for the upper limits of design and our current construction cost estimates, the uninsured portion of the cost, it *could be* as much as $375 million." Id at 138 (emphasis added); see also Dkt 41 at ¶ 126. And a Venator press release from July 31, 2018 later stated that "a full rebuild and commissioning *may require* more self-funding than our previous estimate of $325 to $375 million and *may result* in a longer period of time for project completion." Dkt 41 at ¶ 166 (emphasis added). Plaintiffs further

point to both Form 10-Qs that Venator filed in August 2017 and November 2017 and the Form 10-K it filed in February 2018, each of which stated that the Pori fire didn't "have a material impact on . . . operating results" during the second, third, and fourth quarters of 2017 because "losses incurred were offset by insurance proceeds." Dkt 58-1 at 45, 126; see also Dkt 41 at ¶¶ 260, 265, 268.

These statements regarding rebuild costs—and the extent to which insurance proceeds would cover those costs—were "forward-looking" and accompanied by "meaningful cautionary language." 15 USC §§ 77z-2(c)(A)(i), (i)(1). For example, the statements during the earning calls included (as emphasized above) the words *expect*, *could*, and *may*, which clearly indicate their forward-looking nature. In terms of cautionary language, the Form 10-Q filed in November 2017 warned that "these are preliminary estimates based on a number of significant assumptions, and the amount by which insurance proceeds does not fully cover our damages may exceed current estimates." Dkt 58-1 at 93. And both the Form 10-Q filed in August 2017 and the Form 10-K filed February 2018 contain forward-looking-statement disclaimers. Id at 43, 120. This brings them within the safe-harbor provision of the PSLRA.

*Second,* Plaintiffs claim that Venator and the Executive Defendants misrepresented the extent to which the insurance claim for lost earnings and resulting proceeds were affected by $TiO_2$ demand and prices. Dkt 41 at ¶ 112. For example, Plaintiffs point to the October 2017 earnings call, during which Turner commented:

> Our $500 million insurance policy is more than enough to cover the cost of the rebuild on its own, but the insurance policy also covers lost earnings. Due to prevailing strong market conditions, our $TiO_2$ selling prices continue to improve, and our business is benefiting from the improved profitability and cash flows. This also has the effect of increasing our insurance claim or lost earnings from the Pori site.

Dkt 58-1 at 74; see also Dkt 41 at ¶ 112. They argue that such claims were materially false and misleading because they didn't disclose that "the increase in $TiO_2$ prices had been driven by the supply restriction triggered by the Pori outage," that the increased $TiO_2$ prices actually "harmed Venator because it could not take advantage of the increase in $TiO_2$ price because it lacked any ability to produce $TiO_2$ from its lowest-cost facility," and that "Venator had used the Pori outage to inflate its reported earnings using business interruption insurance proceeds." Dkt 41 at ¶ 340.

But a press release filed by Venator with its Form 8-K that same day clarified, "The improvements in selling price consisted primarily of a 22% increase as a result of continued improvements in business conditions for $TiO_2$, allowing for increased process and a 2% improvement primarily from favorable exchange rates against the Euro." Dkt 58-1 at 57. Plaintiffs don't address this more fulsome explanation that was provided concurrently with the Form 8-K. They also don't otherwise explain how Turner's statement regarding the impact of $TiO_2$ demand and prices was materially false or misleading *as it relates to insurance proceeds for business interruption coverage*. The extent to which the insurance proceeds related to lost profits were affected by $TiO_2$ demand and prices is far from clear. It's also not clear why the *reasons* for increased $TiO_2$ demand and prices are relevant in the insurance context at all.

*Third,* Plaintiffs claim that Venator and the Executive Defendants misrepresented the reasons why the rebuild cost exceeded insurance proceeds and how Venator used those proceeds. Dkt 41 at ¶¶ 126–27, 244. For example, Ogden claimed that the increased rebuilding costs were at least partially "associated with the fast-track premium escalation." Dkt 58-1 at 145. But, Plaintiffs say, Venator "was actually spending its insurance proceeds on the expensive, undisclosed 'shuffle' of unfinished products from Italy to the Pori facility in order to keep up the false appearance that Pori had production capacity." Dkt 41 at ¶ 244. Defendants argued at hearing that such claims are false, conclusory, and unsupported by any further facts. Dkt 79 at 68. And indeed, Plaintiffs don't specify what portion of the insurance proceeds were allegedly devoted to the Europe–

Pori Shuffle, or on what basis they rely to make such allegations. Defendants likewise represented in briefing that Venator received $500 million in insurance proceeds and that approximately $247 million "went to the reconstruction and the cleanup" with the remainder devoted to business interruption costs. Id at 73. On questioning at hearing, Plaintiffs essentially acknowledged that their allegations as to the relationship between insurance proceeds and the Europe–Pori Shuffle are unsupported by any direct evidence. Dkt 79 at 130–31.

*Fourth,* Plaintiffs claim that Venator and the Executive Defendants violated accounting standards by not correctly disclosing and classifying insurance proceeds, which ultimately inflated EBITDA (namely, earnings before interest, taxes, and depreciation). Dkt 41 at ¶¶ 59 n 3, 252, 278. For example, Plaintiffs allege that Venator and the Executive Defendants didn't "disclose the line items" in its "statement of operations in which the proceeds of its business interruption losses insurance were classified, as they were obligated to do under FASB Accounting Standards, ASX 220-30-45-1." Id at ¶ 278. They also allege that Venator and the Executive Defendants misled investors as to the true impact of the Pori fire on Venator's EBITDA because they didn't disclose that prices for $TiO_2$ were rising due to the fact that the Pori facility wasn't producing $TiO_2$. Ibid. But Defendants argue that neither generally accepted accounting principles nor relevant securities statutes and regulations required them to provide additional disclosures as to how the insurance proceeds were booked as income. Dkt 58 at 32–33. Plaintiffs don't contradict this, conceding at hearing that they don't have any support for their claims of improper accounting of insurance proceeds as to lost business or rebuilding costs. Dkt 79 at 130–31.

Allegations regarding insurance proceeds from the Pori fire fall short of Rule 9(b) and PSLRA pleading standards. Claims against Venator, Turner, and Ogden based on those statements will be dismissed.

ii. Scienter

The foregoing means that Plaintiffs have (at this juncture) established the *materiality* of statements regarding the capacity of

the Pori facility after the fire and the timeline to rebuild it. But liability under section 10(b) and Rule 10b-5 also depends upon *scienter*. Defendants argue that Plaintiffs haven't pleaded facts creating that necessary strong inference as to state of mind of Venator, Turner, and Ogden with respect to their statements regarding capacity and the rebuilding timeline. Dkt 56 at 33–39. This will be assessed according to the standard set forth above from *In re Plains All American Pipeline I*, 245 F Supp 3d at 891–92.

A. Venator

For purposes of determining "whether a statement made by the corporation was made by it with the requisite Rule 10(b) scienter," the Fifth Circuit holds that it's "appropriate to look to the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F3d at 366, citing *In re Apple Computer, Inc*, 243 F Supp 2d 1012, 1023 (ND Cal 2002).

Scienter here as to Venator thus rises or falls with its determination as to the corporate officers who made the challenged statements regarding the capacity of the Pori facility and the timeline to rebuild it. In short, Plaintiffs have sufficiently pleaded scienter as to Venator for those statements, given that it's determined next that Turner (as Venator's CEO) and Ogden (as its CFO) made them with the requisite scienter.

B. Ogden and Turner

Plaintiffs pleaded a number of specific statements attributable to Ogden and Turner as specified above. For example:

- Ogden said during an October 27, 2017 earnings call that Pori was "already running at 20% site capacity." Dkt 58-1 at 74; see Dkt 41 at ¶ 195.
- Ogden said during a February 23, 2018 earnings call that "as we think about the rebuild of Pori, I do want to just clarify that the project is fast-track" and that "we expect to have 60% of the plant back up and running by the end of 2018, and then the full 100%

of capacity by the end of 2019." Dkt 58-1 at 143, 148; see Dkt 41 at ¶¶ 239, 245, 292.

- Turner said during that same earnings call that "the specialty portion of the 60% [Pori] rebuild that we are going at a fast pace to restore, in which we are on pace, that's a very demanding timeline." Dkt 58-1 at 143; see Dkt 41 at ¶ 124.
- Turner also said during that same call, "There will be some nominal—not ores, but some raw semi-finished $TiO_2$ to [be] brought into the finished operation during 2018, a small portion" on the same call. Dkt 58-1 at 145; see Dkt 41 at ¶ 155.
- Turner said during that same February 2018 call, "At Pori, we remain on track with our fast-paced project to restore the higher profitability, 60% specialty capacity by the end of 2018 through our original plan, hitting both the mid-year and end-year milestones." Dkt 58-1 at 139; see Dkt 41 at ¶ 153.
- Turner said during a May 1, 2018 earnings call "that '20% of the site's prior capacity for the production of finished specialty products was available.'" Dkt 41 at ¶ 219.
- Ogden said during that same May 1, 2018 earnings call that the "reconstruction is still generally in line with what our expectations have been" when speaking about the Pori rebuild. Id at ¶ 163.
- Turner said during a September 12, 2018 conference call that Pori was "able to produce up to 25 kilotons or 20% of the site's operating capacity and will continue to supply the finished product to customers throughout the transition period which is expected to last through 2021." Dkt 58-1 at 191; see Dkt 41 at ¶ 175.

Plaintiffs also identify numerous iterations of these same assertions regarding capacity and construction progress as contained within Venator's Forms 10-Q filed on August 28, 2017, November 3, 2017, and May 1, 2018, and Form 10-K filed

on February 23, 2018, and the IPO and SPO materials. See Dkt 41 at ¶¶ 208–48, 292. Left unalleged is how or why Turner and Ogden should be liable for the allegedly actionable statements within those filings, but it presumably derives from their signatures and attestations within them. For example, Ogden (along with Ibbotson) signed the Form 10-Qs and the Form 10-K, while Turner and Ogden both certified the accuracy and completeness of each one. Id at ¶¶ 214, 215, 217, 226, 249. Turner and Ogden also signed the IPO registration statement (along with Ibbotson, Peter Huntsman, and Margetts) and the SPO registration statement (along with Ibbotson, Peter Huntsman, Margetts, Anderson, Ferrari, and Patrick). Id at ¶¶ 308, 311. Plaintiffs thus assert that Turner and Ogden acted with requisite scienter through their words and pens.

One argument supporting the inference of scienter must be rejected at the outset as unavailing. Plaintiffs assert that Turner and Ogden "received substantial incentive compensation" in connection with the IPO and SPO, garnering hundreds of thousands of dollars each as a result of their "contributions" to the separation. Id at ¶ 206. Factual allegations in the amended complaint must of course be accepted as true in this posture. *Local 731 IB of T Excavators & Pavers Pension Trust Fund v Diodes, Inc*, 810 F3d 951, 957 (5th Cir 2016), citing *Indiana Electrical Workers Pension Trust Fund IBEW v Shaw Group, Inc*, 537 F3d 527, 533 (5th Cir 2008). This includes allegations regarding motive and opportunity that enhance the strong inference of scienter. *Indiana Electrical Workers Pension Trust Fund IBEW*, 537 F3d at 533 (internal citation omitted). But such allegations must be considered holistically and not in isolation, including inferences supporting as well as opposing scienter. *Tellabs*, 551 US at 326. And in this regard the Fifth Circuit holds, "Incentive compensation can hardly be the basis on which an allegation of fraud is predicated, because it doesn't follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent." *Abrams*, 292 F3d at 434. As such, Plaintiffs can't support the inference of scienter as to Turner and Ogden based on their alleged incentive compensation without further allegations of motive and opportunity.

Beyond that, however, there's ample allegation of scienter. This includes substantial indication that Turner and Ogden had regular access to information regarding the Pori facility's capacity and construction progress. For instance, the former director of supply chain for the specialty chemical division at Venator claimed that Turner and other Venator executives received weekly progress reports regarding the capacity of the Pori facility. Dkt 41 at ¶ 145. He also claimed that Turner attended weekly meetings to discuss Pori throughout the class period. Id at ¶ 193. Several other employees relayed that "little to no reconstruction actually occurred at Pori following the fire." Id at ¶ 135.

Defendants argue that Plaintiffs haven't sufficiently pleaded "meaningful particulars as to what was stated at those meetings or in those reports, let alone how any information supposedly conveyed to Turner was contrary to his contemporaneous statements." Dkt 58 at 36 (internal quotations omitted). True, scienter can't be shown by mere inference that a corporate defendant *somehow* surely *must* have known of a misrepresentation or omission simply by virtue of position within the company. *Abrams,* 292 F3d at 432. But if a plaintiff can show that a defendant received and had actual knowledge that statements to investors were materially misleading, such facts would give rise to a strong inference of scienter. See *In re Odyssey Healthcare, Inc Securities Litigation*, 424 F Supp 2d 880, 889–90 (ND Tex).

In *Brody v Zix Corp*, for example, the plaintiff pleaded that, based on the testimony of confidential witnesses, the defendants "regularly received computer tracking reports from internal reporting systems which would have alerted them to the fact that their statements to analysts about physician deployment numbers were materially misleading." 2006 WL 2739352, *7 (ND Tex). The plaintiff further specified "each of the three tracking systems which were used, naming the systems and what each tracked, and what the confidential sources allege Defendants knew based on these reports." And so the court determined that the plaintiff sufficiently pleaded that the defendants "had actual knowledge to indicate their alleged misstatements and omissions could be materially misleading." Ibid.

So, too, here. Plaintiffs specifically allege that Turner and Ogden were privy to regular reports about the status of production at and rebuilding of the Pori facility. While they haven't pleaded the precise dates and contents of specific reports, that's not necessarily fatal at this juncture where there's a factual basis establishing that underlying specificity exists. And of considerable importance, Plaintiffs' source in this regard is the former director of supply chain for the specialty chemical division at Venator. Dkt 41 at ¶ 145. This person occupied a position that would quite plausibly possess the pleaded information. And where that's so, allegations attendant to transmission of that information to those making the challenged statements is sufficient to survive a motion to dismiss. *In re Dell Inc, Securities Litigation*, 591 F Supp 2d 877, 895 (WD Tex 2008).

The evidence of scienter also extends beyond these reports. Plaintiffs allege, "Pori's importance to Venator's business supports an inference of scienter." Dkt 41 at ¶ 198. They reason:

> [The Pori facility] manufactured the most profitable $TiO_2$ products Venator produced, was the sole plant that manufactured numerous high-margin Venator $TiO_2$ materials, accounted for 17% of the Company's total $TiO_2$ manufacturing capacity and . . . was responsible for approximately one-third of Venator's earnings every quarter. In other words, Pori was so material to the Company's business that it would be implausible for Defendants to have been ignorant of the truth. *Indeed, out of Venator's eight facilities, Pori alone accounted for one-third of the Company's earnings.*

Ibid (emphasis added).

Defendants argue that the "importance of Pori to Venator's business says nothing about Turner's or Ogden's knowledge of particular information that supposedly contradicted their statements." Dkt 58 at 37. Precedent is to the contrary. The Fifth Circuit in *Dorsey v Portfolio Equities, Inc* observed that "there can be 'a number of special circumstances' which, taken together with an officer's position, may support a strong inference of scienter."

540 F3d 333, 342 (5th Cir 2008), citing *Nathenson*, 267 F3d at 424. And in *Nathenson*, for example, the Fifth Circuit held that there was "a strong inference of scienter with respect to the CEO and the company" because (among other reasons) the company was essentially a one-product company, acquiring a patent for that product was crucial, and the CEO publicly stated that the company's patent covered the product even when the company had ample opportunity to discover whether or not that was true. 267 F3d at 425.

Venator isn't quite a one-product company. But even so, 73% of its total sales in 2017 were tied to $TiO_2$. Dkt 58-1 at 248. Venator itself claimed that "more than half of its sales" came from "high value $TiO_2$ categories." Id at 337. And Ogden stated on the February 2018 earnings call that "we believe that Pori is one of the most profitable facilities in Europe. It's certainly one of, *if not the most profitable*, manufacturing site that we have within our manufacturing network." Id at 144 (emphasis added).

This supports a strong inference of scienter with respect to Turner and Ogden because Venator was so heavily dependent on $TiO_2$, and the Pori facility was (from Ogden's own explanation) arguably Venator's most profitable $TiO_2$ facility. Indeed, reference to the word *Pori* appears nearly one hundred times in the earnings call transcripts alone. See Dkt 58-1. It defies reason and common sense to believe that Turner and Ogden would have been unaware of the capacity and status of arguably their most profitable facility given the frequency of that reference in calls with investors. To the contrary, it makes it quite clear how much Venator depended upon the Pori facility—given that it was addressed repeatedly, with Turner and Ogden having ample time to assess questions regarding capacity and construction progress.

As to the earnings-call statements referenced above, Turner and Ogden were on the line together. This means that they are each liable for statements the other made. "Whenever a defendant 'voluntarily chooses to speak publicly, he or she has a duty to tell the whole truth,' and must disclose material, adverse facts that affect the validity or plausibility of his statement." *Georgia Firefighters' Pension Fund v Anadarko Petroleum Corp*, --- F Supp 3d ---, 2020 WL 182316, *9 (SD Tex), citing *In re*

*ArthroCare Corp Securities Litigation*, 726 F Supp 2d 696, 716 (WD Tex 2010). And just because only one individual defendant made a challenged statement to the public, it "does not preclude an inference of scienter on the part of another Individual Defendant who was present and had the opportunity to correct the speaker at the time the inaccurate and misleading statements were made to the investing public." *Georgia Firefighters' Pension Fund*, 2021 WL 182316 at *9, citing *In re ArthroCare Corp*, 726 F Supp 2d at 716. More precisely, "a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements." *Barrie v Intervoice-Brite, Inc*, 397 F3d 249, 262 (5th Cir 2005).

With all of this in mind, Plaintiffs have sufficiently pleaded that Turner and Ogden made materially misleading statements with the requisite scienter regarding the capacity of the Pori facility after the fire and the timeline to rebuild it.

b. Section 20(a) control-person claims

Plaintiffs allege that the Executive Defendants and Huntsman Corporation are liable under section 20(a) as "controlling persons" for the acts by Venator, Turner, and Ogden in violation of section 10(b). Dkt 41 at ¶¶ 298–303.

*Overall,* Defendants broadly contend that the "control-person claims" asserted by Plaintiffs under section 20(a) should fail as a matter of law against all Defendants because they haven't alleged "a primary violation of the securities laws." Dkt 58 at 22, 42. In other words, because there aren't any *controlled* persons who could be liable, Defendants say that there can't possibly be any *controlling* persons. But this is unavailing, given that it's already been determined that Plaintiffs have sufficiently pleaded certain claims under section 10(b).

*As to Huntsman Corporation,* Defendants attack the sufficiency of pleading that it controlled Venator, Turner, and Ogden during each of the alleged violations of section 10(b). This claim fails, Defendants say, because Plaintiffs don't "plead that Huntsman 'actually controlled the public dissemination of the [allegedly] false statements in question.'" Id at 42, citing *In re ArthroCare Corp*, 726 F Supp 2d at 731 (alteration in original).

This misconstrues the standard, especially at the pleading stage. Plaintiffs here allege that Huntsman owned a majority share in Venator's common stock and voting securities. Dkt 41 at ¶ 300. Even in common parlance, such level of stock ownership is known as a *controlling interest*. But more important, it meets the regulatory definition of *control*, which in this context means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 CFR § 230.405.

The question under Fifth Circuit precedent, then, is whether the alleged control-person had "effective day-to-day control" of the corporation, or had "the requisite power to directly or indirectly control or influence corporate policy," or had "actual power or influence over the controlled person." *Cameron*, 608 F2d at 195; *Thompson*, 636 F2d at 958; *Dennis*, 918 F2d at 509. None of these inquiries are dispositive, but plaintiffs at a minimum must "show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Heck*, 775 F3d at 283 (internal quotations omitted). And on this front, Plaintiffs here allege that Huntsman Corporation appointed a majority of Venator's board of directors, hired its senior executive team prior to the IPO, and had "power to cause Venator to register and offer securities for sale to the public." Dkt 41 at ¶ 300.

The pleaded facts are thus sufficient to make quite plausible a conclusion that Huntsman did indeed control Venator. Perhaps discovery will adduce evidence showing that—despite such stake and appointments—Huntsman thereafter took a hands-off approach to the day-to-day conduct of Venator's business and (as pertinent here) didn't control the public dissemination of the misleading statements about Pori's capacity and construction status. See *In re ArthroCare Corp*, 726 F Supp 2d at 731. But whether or not it did exercise control over those who made the alleged misrepresentations and omissions is evidence within the control of Huntsman Corporation and the other Defendants, making it fair for Plaintiffs to seek its discovery. See *Innova Hospital San Antonio, LP v Blue Cross & Blue Shield of Georgia, Inc*,

892 F3d 719, 730 (5th Cir 2018), citing *Lincoln Benefit Life Co v AEI Life, LLC*, 800 F3d 99, 107 n 31 (3d Cir 2015).

Plaintiffs have sufficiently pleaded that Huntsman Corporation had and exercised the necessary control over Venator, Turner, and Ogden as to make it liable as a controlling person under section 20(a).

*As to the Executive Defendants,* Plaintiffs allege that they each acted as a control person of Venator under section 20(a) "by virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Venator." Dkt 41 at ¶ 302. The general contention to dismiss the control-person claims because Plaintiffs haven't alleged any primary Exchange Act violations has already been addressed. See Dkt 58 at 22, 42. The Executive Defendants don't otherwise appear to challenge the sufficiency of the control-person allegations against them.

The control-person claims under section 20(a) as to Huntsman Corporation and the Executive Defendants (aside from Maiter, who has already been dismissed for lack of personal jurisdiction) will proceed.

c. Summary as to Exchange Act claims

The claims against Turner, Ogden, and Venator under section 10(b) of the Exchange Act and Rule 10b-5 will proceed as to the statements regarding the capacity of the Pori facility after the fire and the status of rebuilding it. Those claims based on statements regarding $TiO_2$ demand and Venator's use of insurance proceeds will not go forward.

The control-person claims under section 20(a) against Huntsman Corporation and the Executive Defendants (besides Maiter) will go forward.

4. Analysis of Securities Act claims

Plaintiffs assert claims under sections 11, 12(a)(2), and 15 of the Securities Act, which generally "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material

misstatements or omissions." *In re Morgan Stanley Information Fund*, 592 F3d at 358. Defendants seek dismissal of each category of claims, while also asserting that the applicable statute of limitations bars them all. Dkt 58 at 21–22, 40–42.

a. Statute of limitations

The Securities Act provides in relevant part that "no action shall be maintained to enforce any liability" under sections 11 or 12(a)(2) "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 USC § 77m. The standard "is generally referred to as 'inquiry notice,' and it applies 'when a reasonable investor of ordinary intelligence would have discovered the information and recognized it as a storm warning.'" *Sudo Properties, Inc v Terrebonne Parish Consolidated Government*, 503 F3d 371, 376 (5th Cir 2007), quoting *DeBenedictis v Merrill Lynch & Co*, 492 F3d 209, 216 (3d Cir 2007).

What constitutes a sufficient *storm warning* isn't subject to precise definition, depending instead upon pertinent facts and their context. But typically, such occurrences include "disclosures in the media, a sudden drop in stock price, filing for bankruptcy, an SEC investigation, and warnings in a prospectus." *In re Franklin Bank Corporation*, 782 F Supp 2d at 384, citing *In re Dynegy, Inc Securities Litigation*, 339 F Supp 2d 804, 846 (SD Tex 2004). Investors needn't have notice of "the entire wrong" to be on inquiry notice, but "the facts relied upon to support inquiry notice must rise to a level of more than mere suspicion; they must be sufficiently confirmed or substantiated to a point at which the defendants are incited to investigate." *In re Franklin Bank*, 782 F Supp 2d at 384, citing *In re Dynegy*, 339 F Supp 2d at 846. And "the information constituting storm warnings must be such that it relates directly to the misrepresentations and omissions the plaintiffs later allege in their action against the defendants." *In re Franklin Bank*, 782 F Supp 2d at 384, citing *In re Dynegy*, 339 F Supp 2d at 846.

Defendants argue that all claims under the Securities Act are time-barred because Plaintiffs "could and should have discovered the allegedly material omissions more than a year before filing

this case on July 31, 2019." Dkt 58 at 41. Defendants note that the IPO offering document from August 2017 disclosed that Venator initially planned to only restore a portion of the "white end" of the Pori facility and that it had "lost access to" the facility's nameplate capacity. Ibid; Dkt 58-1 at 19. They further note that by October 2017, "Venator had disclosed revised estimates of the rebuilding timeline" and that it "expected reconstruction costs" to exceed "its $500 million aggregate insurance limit." Dkt 58 at 41 (internal quotations omitted). These, Defendants argue, make the claims untimely.

Plaintiffs argue that they "did not and could not have discovered sufficient information to plead a securities law violation until, at the very earliest, October 2018, after Venator disclosed that Pori would be shut down, first publicly indicated Pori was not operating at 20%, and revealed that costs would exponentially exceed insurance limits." Dkt 66 at 42. For example, the SPO registration statement said that Venator "would repair Pori's remaining specialty product capacity by the end of 2018." Dkt 41 at ¶ 120. That timeline was repeated in Venator's Form 10-K for 2017 (filed in February 2018) and during an earnings call in February 2018. Id at ¶¶ 123–24. And during a later earnings call in May 2018, Turner stated, "We expect to restore additional capacity and be producing some finished specialty product during the second half of 2018. And the remaining specialty capacity be restored and producing finished product during 2019." Id at ¶ 161. Only after that did Turner announce during a September 2018 conference call that Venator was abandoning Pori altogether. Id at ¶¶ 173–76. Plaintiffs also allege a chart as to Venator's stock price, showing that the stock traded at $20.89 per share on August 2, 2017, at $13.53 per share on July 31, 2018, at $10.31 per share on September 12, 2018, and at $6.47 per share on October 30, 2018. See id at ¶ 280.

A complaint filed after expiration of the applicable limitations must be dismissed "'where it is evident from the plaintiff's pleadings that the action is barred' and no grounds for tolling provisions are alleged." *In re Franklin Bank*, 782 F Supp 2d at 408, quoting *Jones v Alcoa, Inc*, 339 F3d 359, 366 (5th Cir 2003).

But such assertion of a statute of limitations is an affirmative defense. *Federal Trade Commission v National Business Consultants, Inc*, 376 F3d 317, 322 (5th Cir 2004), citing FRCP 8(c). This means that the burden of proof rests on the party pleading it. *National Business Consultants*, 376 F3d at 322, citing *United States v Central Gulf Lines, Inc*, 974 F2d 621, 629 (5th Cir 1992). And the question as to when a plaintiff was on inquiry notice is factually intensive. This makes it "often inappropriate" to resolve on motion to dismiss. *In re Dynegy*, 339 F Supp 2d at 846, citing *Marks v CDW Computer Centers, Inc*, 122 F3d 363, 367 (7th Cir 1997). It's instead typically more appropriate for consideration by a jury. *Margolies v Deason*, 464 F3d 547, 553 (5th Cir 2006); see also *Sudo Properties*, 503 F3d at 376.

Considering the mix of statements above, it's clear that Defendants haven't satisfied their burden of proof on limitations as a matter of law. And while share price isn't dispositive either way, "courts have considered fluctuations in share price following a disclosure when determining the presence of inquiry notice in the securities fraud context." *In re Nova Gold Resources Inc Securities Litigation*, 629 F Supp 2d 272, 289 (SDNY 2009), quoting *Newman v Warnaco Group, Inc*, 335 F3d 187, 195 (2d Cir 2003); see also *In re Franklin Bank*, 782 F Supp 2d at 384, citing *In re Dynegy*, 339 F Supp 2d at 846. Given the corrective disclosures alleged by Plaintiffs on July 31st, September 12th, and October 30th of 2018, the drop in share price seen in the chart certainly corresponds to a market perception of new information. See Dkt 41 at ¶ 280.

The allegations in the amended complaint plausibly support a finding that the statute of limitations didn't begin to run until July 31, 2018 or later. And so it can't be said at this stage that the claims under the Securities Act are time-barred. See *In re Cobalt International Energy*, 2016 WL 215476 at *9; *In re Franklin Bank Corp*, 782 F Supp 2d at 408–10 (citations omitted).

b. Section 11 claims

Plaintiffs bring claims under section 11 against Venator, Turner, Ogden, Ibbotson, Stolle, the Director Defendants, and the Underwriter Defendants. Dkt 41 at ¶¶ 352–64. Defendants argue that such claims should be dismissed because Plaintiffs

haven't adequately alleged a materially false or misleading statement. Dkt 58 at 21, 23–33.

Plaintiffs argue that the heightened pleading standard under Rule 9(b) shouldn't apply to their claims under section 11. Specifically, they say that their section 11 claims don't "sound in fraud, and any allegations of knowing or reckless misrepresentations and/or omissions in the IPO and SPO Materials are specifically excluded from this Count, except that any challenged statements of opinion or belief made in connection with the IPO or SPO is alleged to have been a materially misstated statement of opinion or belief when made and at the time of the offerings." Dkt 41 at ¶ 353.

To the contrary, Plaintiffs support both their section 11 claims and their Exchange Act claims with the same IPO and SPO materials. Id at ¶¶ 352–53, 355, 360. Boilerplate disavowal of an intent to plead fraudulent conduct is unpersuasive in this regard. Where the "Securities Act and Exchange Act allegations are substantively identical, Rule 9(b) applies, and the Securities Act claims must be pleaded with particularity." *In re Plains All American Pipeline II*, 307 F Supp 3d at 643 (citations omitted); see also *Kurtzman*, 2002 WL 32442832 at *24; *Melder v Morris*, 27 F3d 1097, 1100 n 6 (5th Cir 1994) (citations omitted).

This means that the section 11 claims are analyzed and resolved here as to *materiality* in the same manner as the Exchange Act claims—and to the same conclusion. See *In re Plains All American Pipeline II*, 307 F Supp 3d at 618, 643–44 (citations omitted). And so, the claims under section 11 against Venator, Turner, Ogden, Ibbotson, Stolle, the Director Defendants, and the Underwriter Defendants will proceed as to the statements in the IPO and SPO materials regarding the capacity of the Pori facility after the fire and the status of rebuilding it. The claims under section 11 against those same Defendants for any other statements in the IPO and SPO materials regarding $TiO_2$ demand and Venator's use of insurance proceeds will not go forward.

c. Section 12(a)(2) claims

Plaintiffs bring additional claims under section 12(a)(2) against Venator, the Underwriter Defendants, and the Selling Shareholders, seeking a rescissionary remedy against them as

statutory sellers. Dkt 41 at ¶¶ 365–74. These Defendants argue that such claims should be dismissed because Plaintiffs haven't sufficiently pleaded that any of them actually passed title to Plaintiffs or solicited their purchases through direct communications. Dkt 58 at 22, 41–42. Instead, Plaintiffs only allege that they each purchased Venator common stock "traceable to" the IPO and SPO. Dkt 41 at ¶¶ 20–22.

The amended complaint lacks direct allegations as to who purchased what securities and from which underwriter. See id at ¶¶ 367–74. It also elliptically pleads solicitation simply by reference that "Venator, the Underwriter Defendants, and the Selling Shareholder Defendants were sellers, officers, and/or solicitors of sales of the securities pursuant to the IPO Materials and SPO Materials" and "participat[ed] in the preparation of the untrue and misleading IPO Materials and SPO Materials." Id at ¶¶ 368–69 (alteration in original). The Fifth Circuit holds nonspecific allegations of this kind to be insufficient under section 12. See *Rosenzweig v Azurix Corp*, 332 F3d 854, 871 (5th Cir 2003) (citations omitted); see also *Lone Star Ladies Investment Club*, 238 F3d at 370 (citations omitted).

Counsel for Plaintiffs argued at hearing that this information isn't typically included in the complaint. Dkt 79 at 140. The holding by Chief Judge Barbra Lynn in *Dartley v Ergobilt Inc* is to the contrary. 2001 WL 313964, *2 (ND Tex) (citations omitted); see also *In re Kosmos Energy*, 955 F Supp 2d at 670–73; *In re Fleming Companies Inc Securities & Derivative Litigation*, 2004 WL 5278716, *50–51 (ED Tex) (citations omitted). Counsel also argued that such information could be specified if and when required. Dkt 79 at 140. And indeed, there are certain sworn affidavits to this effect. See Dkts 4-2, 4-6. But Plaintiffs at present haven't sufficiently demonstrated that they have standing to bring claims under section 12(a)(2) against Venator, the Underwriter Defendants, and the Selling Shareholders.

These claims must be dismissed as presently pleaded. But sufficient allegation in this regard may be attempted upon repleading if desired.

d. Section 15 control-person claims

Plaintiffs bring control-person claims under section 15 against a number of Defendants. Dkt 41 at ¶¶ 36, 378–81. With respect to Turner, Ogden, Ibbotson, Stolle, and the Director Defendants, Plaintiffs claim that each was a control person of Venator "by virtue of his or her position as a director and/or as senior officer of the Company" and that they "were able to, and did, exercise substantial control over the operations of Venator, including control of the materially untrue and misleading statements, omissions and course of conduct complained of herein." Id at ¶ 378. With respect to the Selling Shareholder Defendants, Plaintiffs claim that each was a control person of Venator because they "were the majority owners and controlled the Company before, during, and after the IPO and the SPO" and also "appointed and had significant influence over Venator's management and members of its Board of Directors." Id at ¶ 379.

Defendants argue only that the claims for control-person liability under section 15 should be dismissed because Plaintiffs haven't adequately alleged a primary violation of the Securities Act. Dkt 58 at 2, 42. But as already determined, Plaintiffs have sufficiently pleaded primary violations of section 11 against Venator, Turner, Ogden, Ibbotson, Stolle, the Director Defendants, and the Underwriter Defendants. There being no other challenge raised in this regard at present, the control-person claims based on primary violations of section 11 will go forward.

Plaintiffs also plead control-person liability based on a primary violation of section 12(a)(2). Dkt 41 at ¶ 380. Defendants don't directly address this in their motion. But it having been determined that Plaintiffs didn't sufficiently plead primary violations of section 12(a)(2), the control-person claims based on primary violations of section 12(a)(2) must be dismissed. *In re Kosmos Energy Ltd*, 955 F Supp 2d at 674.

e. Summary as to Securities Act claims

The claims under section 11 of the Securities Act against Venator, Turner, Ogden, Ibbotson, Stolle, the Director Defendants, and the Underwriter Defendants will proceed as to the statements in the IPO and SPO materials regarding the capacity of the Pori facility after the fire and the status of

rebuilding it. The claims against those same Defendants under section 11 for any other statements in the IPO and SPO materials regarding $TiO_2$ demand and Venator's use of insurance proceeds will not go forward.

The claims under section 12(a)(2) against Venator, the Underwriter Defendants, and the Selling Shareholders will not go forward as presently pleaded.

The control-person claims under section 15 of the Securities Act for primary violations of section 11 against Turner, Ogden, Ibbotson, Stolle, the Director Defendants, and the Selling Shareholder Defendants will go forward. The control-person claims for primary violations of section 12(a)(2) will not go forward.

5. Potential for repleading

A district court "should freely give leave [to amend] when justice so requires." FRCP 15(a)(2). The Fifth Circuit holds that this '"evinces a bias in favor of granting leave to amend."' *Carroll v Fort James Corp*, 470 F3d 1171, 1175 (5th Cir 2006) (citation omitted). But the decision whether to grant leave to amend is within the sound discretion of the district court. *Pervasive Software Inc v Lexware GmbH & Co KG*, 688 F3d 214, 232 (5th Cir 2012) (citation omitted). It may be denied "when it would cause undue delay, be the result of bad faith, represent the repeated failure to cure previous amendments, create undue prejudice, or be futile." *Morgan v Chapman*, 969 F3d 238, 248 (5th Cir 2020), citing *Smith v EMC Corp*, 393 F3d 590, 595 (5th Cir 2004).

The claims by Plaintiffs haven't been subject to a prior motion to dismiss. This warrants another opportunity to further amend the pleadings if desired. Plaintiffs must bring any motion seeking such leave (along with a specific draft proposal), by August 9, 2021.

6. Conclusion

The motion to dismiss for failure to state a claim by Defendants Venator Materials PLC, Simon Turner, Kurt D. Ogden, Stephen Ibbotson, Mahomed Maiter, and Russ R. Stolle, Peter R. Huntsman, Douglas D. Anderson, Kathy D. Patrick, the Huntsman Corporation, Huntsman (Holdings) Netherlands BV,

Huntsman International LLC, Citigroup Global Markets Inc, Merrill Lynch, Pierce, Fenner & Smith Inc, Goldman Sachs & Co LLC, and JP Morgan Securities is GRANTED IN PART and DENIED IN PART. Dkt 58.

The claims by Plaintiffs under section 10(b) of the Exchange Act and 17 CFR § 240.10b-5 against Venator, Turner, and Ogden for statements regarding the capacity of the Pori facility and the timeline to rebuild it will proceed. Such claims against them regarding statements of $TiO_2$ market demand and the use of insurance proceeds are DISMISSED WITHOUT PREJUDICE.

The control-person claims under section 20(a) of the Exchange Act against Huntsman Corporation, Turner, Ogden, Ibbotson, and Stolle will proceed.

The claims under section 11 of the Securities Act against Venator, Turner, Ogden, Ibbotson, Stolle, Peter Huntsman, Anderson, Patrick, Margetts, Ferrari, Citigroup, Merrill Lynch, Goldman Sachs, and JP Morgan will proceed.

The claims under section 12(a)(2) against Venator, Citigroup, Merrill Lynch, Goldman Sachs, JP Morgan, Huntsman Corporation, Huntsman (Holdings) Netherlands, and Huntsman International are DISMISSED WITHOUT PREJUDICE.

The control-person claims under section 15 of the Securities Act for primary violations of section 11 against Turner, Ogden, Ibbotson, Stolle, Peter Huntsman, Anderson, Patrick, Margetts, Ferrari, Huntsman Corporation, Huntsman (Holdings) Netherlands, and Huntsman International will proceed. Such claims under section 15 for primary violations of section 12(a)(2) are DISMISSED WITHOUT PREJUDICE.

Plaintiffs may bring a motion seeking leave to amend, along with a specific draft proposal, by August 9, 2021, if at all.

SO ORDERED.

Signed on July 7, 2021, at Houston, Texas.

Hon. Charles Eskridge
United States District Judge