**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: VENATOR MATERIALS PLC SECURITIES LITIGATION | Civil Action No. 4:19-cv-03464 |

**PLAINTIFFS' MOTION FOR FINAL APPROVAL**
**OF SETTLEMENT AND PLAN OF ALLOCATION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

NATURE AND STAGE OF THE PROCEEDINGS........................................................ 1

STATEMENT OF ISSUES ............................................................................................... 2

SUMMARY OF THE ARGUMENT................................................................................ 2

ARGUMENT...................................................................................................................... 5

I.      THE PROPOSED SETTLEMENT MEETS THE STANDARD FOR
FINAL APPROVAL UNDER RULE 23(e) ........................................................... 5

      A.     Plaintiffs and Lead Counsel Have Adequately Represented the
Settlement Class ........................................................................................ 6

      B.     The Settlement Was Negotiated at Arm's-Length and There Was No
Fraud or Collusion..................................................................................... 6

      C.     The Settlement is Fair and Adequate in Light of the Costs and Delay
of Further Litigation .................................................................................. 7

      D.     The Stage of the Proceedings Warrants Final Approval of the
Settlement ................................................................................................... 9

      E.     The Settlement is Fair and Reasonable in Light of the Risks of
Further Litigation .................................................................................... 10

      F.     The Settlement is Well Within the Range of Reasonableness .................... 14

      G.     Lead Counsel, Plaintiffs, and Settlement Class Members Support
Final Approval of the Settlement ............................................................. 17

      H.     The Other Factors Set Forth in Rule 23(e)(2) Support Final Approval
of the Settlement....................................................................................... 18

            1.     The Proposed Method of Distributing Settlement Proceeds is
Effective ....................................................................................... 19

            2.     The Requested Fees and Expenses are Fair and Reasonable ........... 19

   3. The Supplemental Agreement Does Not Affect the Fairness of the Settlement..................................................................................20

   4. The Settlement Treats Settlement Class Members Equitably ..........20

II. THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED ....................................................21

III. THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS......................23

IV. NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE PROCESS.................................................................................................24

CONCLUSION ........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Billitteri v. Sec. Am., Inc.*,
2011 WL 3586217 (N.D. Tex. Aug. 4, 2011)...............................................................14

*In re Biolase, Inc. Sec. Litig.*,
2015 WL 12720318 (C.D. Cal. Oct. 13, 2015)............................................................16

*In re Chicken Antitrust Litig. Am. Poultry*,
669 F.2d 228 (5th Cir. 1982) ...............................................................................2, 14, 21

*In re China Sunergy Sec. Litig.*,
2011 WL 1899715 (S.D.N.Y. May 13, 2011) .............................................................16

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
424 F. Supp. 3d 456 (E.D. La. 2020)...........................................................................7

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014) ...............................................................17

*In re Deepwater Horizon*,
739 F.3d 790 (5th Cir. 2014) .......................................................................................5

*In re Dell Inc., Sec. Litig.*,
2010 WL 2371834 (W.D. Tex. June 11, 2010), *aff'd*, 669 F.3d 632 (5th
Cir. 2012) ...............................................................................................8, 19, 20, 21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) ...........................................................14

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
141 S. Ct. 1951 (2021)...............................................................................................14

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012) ...................................................................8, 9

*Hefler v. Wells Fargo & Co.*,
2018 WL 4207245 (N.D. Cal. Sept. 4, 2018) ............................................................20

*In re Hemispherx Biopharma, Inc., Sec. Litig.*,
2011 WL 13380384 (E.D. Pa. Feb. 14, 2011) ...........................................................16

*In re Katrina Canal Breaches Litig.*,
628 F.3d 185 (5th Cir. 2010) .....................................................................................24

*Klein v. O'Neal*,
   705 F. Supp. 2d 632 (N.D. Tex. 2010) ....................................................................... 8

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) .................................................................................. 24

*Marcus v. J.C. Penney Co., Inc.*,
   2017 WL 6590976 (E.D. Tex. Dec. 18, 2017),*report and
   recommendation adopted*, 2018 WL 307024 (E.D. Tex. Jan. 4, 2018)...................... 17

*In re Microstrategy, Inc. Sec. Litig.*,
   148 F. Supp. 2d 654 (E.D. Va. 2001) ....................................................................... 23

*Murphy v. Precision Castparts Corp.*,
   2021 WL 2080016 (D. Or. May 24, 2021) ................................................................ 12

*Nathenson v. Zonagen Inc.*,
   267 F.3d 400 (5th Cir. 2001) .................................................................................. 15

*Newby v. Enron Corp.*,
   394 F.3d 296 (5th Cir. 2004) .................................................................................... 6

*In re OCA, Inc. Sec. & Derivative Litig.*,
   2009 WL 512081 (E.D. La. Mar. 2, 2009) ....................................................... 8, 10, 19

*In re Ocean Power Techs., Inc.*,
   2016 WL 6778218 (D.N.J. Nov. 15, 2016) ............................................................... 11

*Reed v. General Motors Corp.*,
   703 F.2d 170 (5th Cir. 1983) ...........................................................................*passim*

*Schwartz v. TXU Corp.*,
   2005 WL 3148350 (N.D. Tex. Nov. 8, 2005)........................................... 8, 10, 17, 25

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2020 WL 4196468 (S.D.N.Y. July 21, 2020) ........................................................... 20

*In re Waste Mgmt., Inc. Sec. Litig.*,
   2002 WL 35644013 (S.D. Tex. May 10, 2002), *amended*, 2003 WL
   27380802 (S.D. Tex. July 31, 2003)........................................................................ 23

*Welsh v. Navy Fed. Credit Union*,
   2018 WL 7283639 (W.D. Tex. Aug. 20, 2018).......................................................... 7

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ................................................................................ 12

iv

**STATUTES**

Fed. R. Civ. P. 23...............................................................................................*passim*

Securities Act of 1933 ................................................................................ 1, 4, 22, 23

Securities Exchange Act of 1934 .............................................................................*passim*

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs Fresno County Employees' Retirement Association ("Fresno"), City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami"), and City of Pontiac General Employees' Retirement System ("Pontiac"; together with Fresno and Miami, "Plaintiffs"), on behalf of themselves and the Settlement Class, hereby respectfully move for final approval of the proposed settlement of this action (the "Action") for $19 million in cash (the "Settlement"), and for approval of the proposed plan for allocating the proceeds of the Settlement (the "Plan of Allocation" or "Plan").[1]

### NATURE AND STAGE OF THE PROCEEDINGS

This is a securities class action asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 11, 12, and 15 of the Securities Act of 1933 (the "Securities Act") against Venator Materials PLC ("Venator") and certain of its executives, directors, and selling shareholders, and the underwriters of Venator's August 3, 2017 Initial Public Offering ("IPO") and December 4, 2017 Secondary Public Offering ("SPO").

Subject to the Court's approval, Plaintiffs have agreed to settle all claims in the Action in exchange for a cash payment of $19 million for the benefit of the Settlement

---

[1] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement dated March 11, 2022 (ECF No. 117-2) (the "Stipulation") or in the Declaration of Michael D. Blatchley in Support of: (A) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (IB) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Blatchley Declaration" or "Blatchley Decl."), filed herewith. Citations to "¶ __" refer to paragraphs in the Blatchley Declaration and citations to "Ex. __" refer to exhibits to the Blatchley Declaration.

Class. The Court granted preliminary approval on May 19, 2022 (ECF No. 119), and Plaintiffs now move for final approval of the Settlement and the proposed plan for allocating settlement funds among Settlement Class Members (the "Plan of Allocation").

## STATEMENT OF ISSUES

1.     Whether the Court should finally approve the proposed Settlement. The Court should grant such approval upon a finding that the Settlement is "fair, reasonable, and adequate," Rule 23(e)(2), after considering the factors set forth in Rule 23(e)(2) and *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

2.     Whether the Court should approve the proposed Plan of Allocation. Approval of a plan of allocation is governed by the same standard of fairness, reasonableness and adequacy applicable to approval of the settlement as a whole. *See In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982).

3.     Whether the Court should finally certify the Settlement Class under Rules 23(a) and (b)(3) for purposes of effectuating the Settlement.

4.     Whether the notice to the Settlement Class satisfied the requirements of Rules 23(c)(2) and 23(e), the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and due process.

## SUMMARY OF THE ARGUMENT

Plaintiffs respectfully submit that the proposed Settlement represents an excellent recovery and readily satisfies the standards for final approval under Rule 23(e)(2).

The proposed Settlement is the result of three years of hard-fought litigation between the Parties. As detailed in the Blatchley Declaration, the litigation efforts of

2

Plaintiffs and Plaintiffs' Counsel in this case were extensive and included, among other things, (i) conducting a thorough investigation of the claims against Defendants, including interviews with over 40 former Venator employees; (ii) drafting the initial complaint and the detailed consolidated Complaint based on this investigation; (iii) overcoming Defendants' motions to dismiss through briefing and oral argument; (iv) drafting an Amended Complaint; (v) preparing and responding to document requests and interrogatories and obtaining and reviewing over 10,000 pages of documents produced by Defendants; (vi) preparing and filing Plaintiffs' motion for class certification, including an accompanying expert report; (vii) consulting with industry and financial economics experts throughout the litigation; and (viii) engaging in arm's-length settlement negotiations, including a formal mediation with Jed Melnick of JAMS, a highly-experienced mediator. ¶¶ 3, 15-72.  This substantial work gave Plaintiffs and Plaintiffs' Counsel a thorough understanding of the strengths and weaknesses of the claims and defenses asserted in the Action at the time the Settlement was reached.  ¶¶ 4, 8.

The $19 million Settlement is a particularly beneficial result for Settlement Class Members in light of the risks of the litigation.  If the Action had continued, Plaintiffs and the Settlement Class would have faced significant risks in establishing Defendants' liability and proving damages in this Action that could have precluded securing any recovery at all, let alone a recovery greater than the Settlement Amount.  First, Plaintiffs faced significant risks in proving that the alleged misstatements remaining in the case following the resolution of the motions to dismiss were materially false.  ¶¶ 85-91.  Defendants argued vigorously that their statements were true at the time they were made, were forward-

3

looking, protected statements of opinion, or otherwise inactionable under the law.  ¶¶ 41, 86-87.  In addition, with respect to the Exchange Act claims, Defendants contended that any alleged misstatements were not made with "scienter," or fraudulent intent (¶¶ 92-94), and that Plaintiffs' Securities Act claims were time barred and otherwise infirm (¶¶ 41, 104-106).

Moreover, here, Defendants had substantial arguments that Plaintiffs would be unable to establish their claimed damages at trial.  Specifically, Defendants had significant arguments that a significant portion, if not all, of the price declines following the alleged corrective disclosures were not recoverable as damages because the corrective information allegedly revealed on those dates was related to misrepresentations and omissions that the Court had dismissed in its decision on Defendants' motion to dismiss.  ¶¶ 95-101, 105.

In light of these risks and the range of possible outcomes at trial, as discussed further below and in the Blatchley Declaration, Plaintiffs believe the Settlement is an excellent result for members of the Settlement Class and should be approved.

In addition to seeking approval of the Settlement, Plaintiffs request that the Court approve the Plan of Allocation, which was set forth in the Notice mailed to potential Settlement Class Members.  The Plan, which was developed by Lead Counsel in consultation with Plaintiffs' damages expert, provides a reasonable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims based on the damages they suffered and the different categories of claims they possessed.

Plaintiffs also respectfully submit that the Court should finally certify the Settlement Class for purposes of effectuating the Settlement pursuant to Rules 23(a) and (b)(3).

## ARGUMENT

**I.   THE PROPOSED SETTLEMENT MEETS THE STANDARD FOR FINAL APPROVAL UNDER RULE 23(e)**

Federal Rule of Civil Procedure 23(e) requires judicial approval for the settlement of class action claims. *See* Fed. R. Civ. P. 23(e). A class action settlement should be approved if the court finds it "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Fifth Circuit has recognized a strong public policy in favor of settlement of class action lawsuits. *See In re Deepwater Horizon*, 739 F.3d 790, 807 (5th Cir. 2014) (noting the "overriding public interest in favor of settlement" in class action cases).

Rule 23(e)(2) provides that, in determining whether a class action settlement is fair, reasonable, and adequate, the Court should consider whether:

> (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. Rule 23(e)(2).

Courts in this Circuit also consider the following six factors in determining whether a class action settlement is fair, reasonable, and adequate:

> (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and absent class members.

*Reed*, 703 F.2d at 172; *see also Newby v. Enron Corp.*, 394 F.3d 296, 301 (5th Cir. 2004).

For the reasons discussed herein, the proposed Settlement readily meets the criteria set forth by Rule 23(e)(2) and the Fifth Circuit.  It should be approved.

### A.   Plaintiffs and Lead Counsel Have Adequately Represented the Settlement Class

In determining whether to approve a class action settlement, the Court should consider whether Plaintiffs and Lead Counsel "have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A).  Here, Plaintiffs are sophisticated institutional investors that vigorously litigated this Action on behalf of the Settlement Class for three years.  Plaintiffs have claims that are typical of other Settlement Class Members and have no conflict of interests with other members of the Settlement Class.  *See* Plaintiffs' Motion for Class Certification (ECF No. 110), at 8-9.  In addition, Plaintiffs retained counsel who are highly experienced and qualified in securities litigation, as set forth in Lead Counsel's firm resume.  S*ee* Ex. 6A-3.  Lead Counsel vigorously litigated the claims on behalf of the Settlement Class and ultimately negotiated a favorable Settlement.  Accordingly, Plaintiffs have adequately represented the Settlement Class in litigating the claims in this Action and in reaching the Settlement, and this factor supports final approval of the Settlement.

### B.   The Settlement Was Negotiated at Arm's-Length and There Was No Fraud or Collusion

Rule 23(e)(2)(B) and the first *Reed* factor also support final approval because the Settlement was negotiated at arm's-length after substantial discovery and there is no evidence of fraud or collusion.  On the contrary, the Settlement was reached only after vigorous negotiations by experienced counsel, including a mediation overseen by Jed

6

Melnick of JAMS, an experienced and well-respected mediator.  ¶¶ 66-72.  The Parties engaged in a formal mediation session with Mr. Melnick on December 6, 2021.  ¶ 68.  Prior to the mediation, the Parties prepared and exchanged detailed mediation statements that addressed liability, damages, and class certification, and submitted the mediation statements to Mr. Melnick.  ¶ 67.  While no settlement was reached at the mediation, at the conclusion of the mediation session, Mr. Melnick made a mediator's recommendation that the Action be settled for $19 million, which the Parties later accepted.  ¶¶ 69-70.  Mr. Melnick has submitted a declaration describing the negotiations, attesting to their arm's-length nature, and his belief that the Settlement is reasonable.  *See* Melnick Decl. (Ex. 1) ¶¶ 5-8.

The arm's-length settlement negotiations and involvement of an experienced mediator demonstrate that the Settlement is procedurally fair and should be approved.  *See, e.g.*, *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 424 F. Supp. 3d 456, 486 (E.D. La. 2020) ("arms-length negotiations between sophisticated parties with the guidance of an experienced, professional mediator" provides strong presumption of fairness); *Welsh v. Navy Fed. Credit Union*, 2018 WL 7283639, at *12 (W.D. Tex. Aug. 20, 2018) (mediator involvement supports fairness).  Thus, this factor powerfully supports final approval.

### C.    The Settlement is Fair and Adequate in Light of the Costs and Delay of Further Litigation

Rule 23(e)(2)(C)(i) and the second *Reed* factor further support final approval of the Settlement.  Continued litigation of the Action would involve complex and costly pre-trial, trial, and post-trial proceedings that would delay the ultimate resolution of the claims

without any guarantee of recovery for the Settlement Class. "When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Klein v. O'Neal*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010); *see also In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1064 (S.D. Tex. 2012) (approving settlement and noting that litigating case to trial would be "time consuming, and '[i]nevitable appeals would likely prolong the litigation, and any recovery by class members, for years.'"); *In re Dell Inc., Sec. Litig.*, 2010 WL 2371834, at *7 (W.D. Tex. June 11, 2010) (noting that "[s]ecurities litigation on the whole is 'notoriously difficult and unpredictable' . . . . [t]hus the complexity, expense, and likely duration of the suit weighs in favor of approval of the settlement."), *aff'd*, 669 F.3d 632 (5th Cir. 2012).

Continuing to litigate this Action would have required substantial additional time and expense in the face of serious risks and with no guarantee of success. Moreover, if Plaintiffs did succeed at trial, it is virtually certain that Defendants would appeal, further delaying the receipt of any recovery by the Settlement Class. *See In re OCA, Inc. Sec. & Derivative Litig.*, 2009 WL 512081, at *11 (E.D. La. Mar. 2, 2009) ("After trial, the parties could still expect years of appeals."); *Schwartz v. TXU Corp.*, 2005 WL 3148350, at *19 (N.D. Tex. Nov. 8, 2005) (noting that even "if Plaintiffs were to succeed at trial, they still could expect a vigorous appeal by Defendants and an accompanying delay in the receipt of any relief"). Further, there is always a risk that a verdict could be reversed by the trial court or on appeal. All of the foregoing would pose substantial expense for the Settlement Class and delay the ability to recover damages—assuming, of course, that Plaintiffs were

ultimately successful on their claims.

In contrast, the Settlement provides an immediate, substantial, and certain cash recovery of $19 million, without exposing the Settlement Class Members to the risk, expense, and delay of continued litigation.

### D.      The Stage of the Proceedings Warrants Final Approval of the Settlement

The third *Reed* factor also weighs in favor of final approval of the Settlement.  The Settlement was reached after the Parties engaged in extensive litigation efforts over the course of three years.  This included a detailed investigation by Lead Counsel, including numerous witness interviews; preparing a detailed Complaint; thorough briefing and argument on Defendants' motions to dismiss; preparing document requests and interrogatories; and reviewing over 10,000 pages of documents from Defendants.

In addition, as noted, the Parties also engaged in arm's-length settlement negotiations conducted under the supervision of Mr. Melnick and exchanged detailed mediation statements.  ¶¶ 66-70.  Accordingly, Plaintiffs and Lead Counsel had "a full understanding of the legal and factual issues surrounding this case," including the strengths and weaknesses, when negotiating and evaluating the proposed Settlement.  *See Heartland*, 851 F. Supp. 2d at 1064 ("Under [this] factor, the key issue is whether 'the parties and the district court possess ample information with which to evaluate the merits of the competing positions'").  Based on the information developed, Plaintiffs and Lead Counsel were able to make a well-informed appraisal of the case, and they believe that the Settlement represents a resolution that is highly favorable to the Settlement Class without the

substantial risk, uncertainty, and delay of continued litigation. ¶¶ 4, 8. Thus, this factor further supports approval of the Settlement.

> **E.     The Settlement is Fair and Reasonable in Light of the Risks of Further Litigation**

Rule 23(e)(2)(C)(i) and the fourth *Reed* factor further support final approval of the Settlement. Plaintiffs recognize that, although they believed that substantial evidence supported their claims, there were also substantial risks in establishing Defendants' liability and damages at summary judgment, trial, and in any appellate proceedings. Weighing these risks against the certain and substantial recovery for the Settlement Class demonstrates that the Settlement is fair, reasonable, and adequate. *See, e.g., OCA*, 2009 WL 512081, at *13 (settlement approval favored where plaintiffs faced substantial risks in establishing elements of securities law violations); *Schwartz*, 2005 WL 3148350, at *18 ("plaintiffs' uncertain prospects of success through continued litigation" supported approval of securities class action settlement).

*First*, Plaintiffs faced substantial risks in proving that Defendants made materially false and misleading statements—an essential element of both their Exchange Act and Securities Act claims. Defendants vigorously argued at the motion to dismiss stage—and would continue to argue—that Plaintiffs cannot show that any of Defendants' remaining challenged statements were false. While the Court rejected certain of Defendants' falsity arguments at the pleading stage, Defendants would have raised their falsity arguments again at summary judgment—and, if Lead Plaintiff survived summary judgment, again at trial before a jury, which could have easily credited Defendants' arguments. ¶¶ 85-91.

Specifically, Plaintiffs would have faced challenges in proving that Defendants' statements that Venator's Pori facility was operating at 20% of its prior capacity after the fire were false at the time they were made. ¶ 86. In the context of Defendants' motion to dismiss, Plaintiffs successfully argued that a reasonable investor would understand that the representation that Pori was operating at 20% of its prior capacity conveyed that Pori was manufacturing TiO2 from start-to-finish, not merely "finishing" TiO2. However, Defendants would likely continue to argue it was not misleading to state that Pori was operating at 20% prior capacity—even if it was only "finishing" TiO2—because the context of Defendants' statements conveyed the true meaning and the distinction between "finishing" capacity and "production" capacity was immaterial to investors. *Id*. Indeed, the Court itself had noted that "evidence at a later stage" could support Defendants' argument on this point. ECF No. 89 at 35. Moreover, given the highly technical and industry-specific nature of Defendants' "capacity" statements, this dispute could come down to a "battle of the experts," where Plaintiffs and Defendants offer differing expert testimony on what Defendants' words meant and how reasonable investors in this industry would have interpreted them. ¶ 87. The uncertainty as to how the jury might resolve such a "battle of experts" further supports the approval of the Settlement. *See, e.g.*, *In re Ocean Power Techs., Inc.*, 2016 WL 6778218, at *20 (D.N.J. Nov. 15, 2016),

Defendants would also have likely asserted a truth-on-the-market defense, contending that Venator and Huntsman had disclosed sufficient information about Venator's plans to ship intermediate TiO2 to Pori to be "finished" that the market could not have been misled by Defendants' statements about the Pori plant's "capacity." ¶ 88.

11

Moreover, with respect to Defendants' alleged misstatements that rebuilding of the Pori facility was "on track" and "on pace," Plaintiffs faced risks that these statements might have been found to be not concrete or specific enough to survive summary judgment. ¶ 90. *See, e.g.*, *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1195-96 (9th Cir. 2021); *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *4-5 (D. Or. May 24, 2021).

***Second***, even if Plaintiffs succeeded in proving that the statements in the offering documents were false, the Underwriter Defendants could still have escaped liability by showing that they exercised "reasonable care" in conducting due diligence of the offerings and Venator's operations. ¶ 108. The Underwriter Defendants would have argued that their actions easily satisfied what they believe is a fairly low standard of care. *Id*.

***Third***, Defendants argued that Plaintiffs would be unable to establish scienter in connection with their Exchange Act claims. Defendants would have likely continued to argue that, in light of investors' focus on the status of the Pori rebuild, Venator's senior executives had little incentive to defraud investors over such a narrow interpretation of the term "capacity." ¶ 93. Defendants would likely argue that Peter Huntsman's February 2017 statement that Venator would ship intermediate TiO2 to Pori undermines any inference of fraudulent intent in representing that Pori was operating at "20% capacity." *Id*. Defendants would also likely continue to argue that their significant investment in the effort to rebuild Pori shows that Venator genuinely believed (at that time) that the facility could be rebuilt, and undermines any inference of fraudulent intent. *Id*. Defendants would also likely continue to point to their lack of personal financial motivation to commit fraud. ¶ 94. While Plaintiffs had responses to these arguments, they recognized that it was far

from certain that either the Court or the jury would accept their counterarguments. If Defendants had persuaded the Court or a jury to accept their *scienter* arguments, the Settlement Class's Exchange Act claims would fail and overall damages that could be potentially recovered would be significantly reduced, if not eliminated entirely.

*Fourth*, Plaintiffs faced significant risks in proving loss causation and damages. In order to establish loss causation, Plaintiffs would be required to show that the stock declines that give rise to their damages were caused by the revelation of the truth that had previously been concealed by Defendants' alleged misstatements. Establishing damages would have been particularly difficult here because at the time of the three alleged corrective disclosures (July 31, 2018, September 12, 2018, and October 30, 2018), Venator also released a considerable amount of other information about Venator's business that was unrelated to alleged misrepresentations remaining in the case. ¶¶ 95-98. Thus, establishing what portion (if any) of the subsequent price declines resulted from the revelation of those alleged misstatements (rather than other, confounding information) would have been difficult and subject to considerable dispute at trial. Defendants would have likely contended that all or nearly all of the price declines following the three alleged corrective disclosures were not recoverable as damages because the corrective information was related to alleged misrepresentations and omissions that the Court had dismissed in its decision on Defendants' motion to dismiss. ¶ 95. Indeed, Defendants most likely contend that there were no statistically significant price declines on the alleged corrective disclosure dates attributable to the misrepresentations that remained in the case. ¶ 98. While Plaintiffs had responses to these arguments, they recognize that it was far from certain the trier of

13

fact would adopt Plaintiffs' view.  Moreover, resolution of the issues concerning loss causation and "negative causation" would have involved complex expert testimony, which would have again presented the "battle-of-experts" risk discussed above.[2]

In sum, there were substantial risks to continued litigation and no guarantee that Plaintiffs would prevail at both summary judgment or at trial.

### F.      The Settlement is Well Within the Range of Reasonableness

Rule 23(e)(2)(C)(i) requires the Court to consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal," Fed. R. Civ. P. 23(e)(2)(C)(i), and the fifth *Reed* factor considers "whether the terms of the settlement 'fall within *a reasonable range of recovery*, given the likelihood of the plaintiffs' success on the merits.'"  *Billitteri v. Sec. Am., Inc.*, 2011 WL 3586217, at *12 (N.D. Tex. Aug. 4, 2011) (emphasis in original).  In assessing the reasonableness of a proposed settlement under both these analyses, the inquiry "should contrast settlement rewards with likely rewards if [the] case goes to trial."  *Chicken Antitrust Litig.*, 669 F.2d at 239; *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227, at *5 (N.D. Tex. Apr. 25, 2018) ("In ascertaining whether a settlement falls within the range of

---

[2] Plaintiffs and the Settlement Class also faced risks that the litigation class would not be certified by the Court.  At the time the Settlement was reached, Defendants had not filed their opposition to Plaintiffs' motion for class certification, but Plaintiffs anticipated that Defendants would likely oppose class certification of the Exchange Act claims by arguing, based on the Supreme Court's decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951, 1960 (2021) that there was a "mismatch between the contents of the misrepresentation[s] and the corrective disclosure[s]" in the case, which would allow Defendants to demonstrate the lack of "price impact" of the alleged misstatements here and thus rebut the presumption of reliance.  ¶ 102.

possible approval, courts will compare the settlement amount to the relief the class could expect to recover at trial, *i.e.*, the strength of the plaintiffs' case."). In conducting this inquiry, courts recognize the uncertainty of securities litigation and the potential difficulty of proving liability and damages at trial. *See Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001) (recognizing the complexity of securities fraud class action claims).

Here, the $19 million Settlement is well within the range of reasonableness given the risks of continued litigation. Lead Plaintiffs' damages expert has estimated reasonably that the likely maximum damages for the Settlement Class that could be proved at trial would be approximately $215.7 million. ¶ 99. This maximum damages amount assumes that Plaintiffs would be able to prove full damages based on *all* alleged corrective disclosures and that they would not need to disaggregate confounding non-fraud related information for *any* of the corrective disclosure dates. *Id*.

However, as noted above, Defendants argued that *none* of the alleged corrective disclosures caused damages arising from the alleged fraud and had substantial arguments that at least some portions, if not all, of the price declines were related to news other than alleged misstatements at issue. ¶¶ 95-98. Defendants had particularly strong arguments that the price declines following the July 31, 2018 and October 30, 2018 disclosures were related to alleged misrepresentations that had been eliminated from the case as a result of the Court's order on Defendants' motion to dismiss. ¶¶ 96-97. If Defendants succeeded in having one or more of the alleged corrective disclosures dismissed—or succeeded in proving that Plaintiffs had to disaggregate purportedly confounding information—damages would be significantly smaller. For example, even if only the October 30, 2018 decline

was eliminated, the reasonably likely maximum damages would be approximately $137 million, and only approximately $46 million if the declines following both the October 30, 2018 and July 31, 2018 corrective disclosures were eliminated.  ¶ 100.  Thus, the $19 million Settlement represents approximately 8.8% to 41.3% of the reasonably likely maximum damages, which still assumes success by Plaintiffs on all liability issues, including the stringent scienter standard for the Exchange Act claims.  *Id*.

This level of recovery as compared to maximum damages is well above the norm in securities class actions.  *See In re Biolase, Inc. Sec. Litig*., 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (finding that a settlement recovery of 8% of estimated damages "equals or surpasses the recovery in many other securities class actions"); *In re China Sunergy Sec. Litig.*, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting that the average settlements in securities class actions "have ranged from 3% to 7% of the class members' estimated losses"); *In re Hemispherx Biopharma, Inc., Sec. Litig*., 2011 WL 13380384, at *6 (E.D. Pa. Feb. 14, 2011) (approving settlement representing 5.2% of the maximum damages and finding that it "falls squarely within the range of reasonableness approved in other securities class action settlements").

Indeed, as noted above, Defendants contended that Plaintiffs suffered no cognizable damages at all because there were no statistically significant price declines on the alleged corrective disclosure dates attributable to any misrepresentation or omission that remained in the case (¶¶ 98-100)—demonstrating that the $19 million Settlement represents a very favorable resolution for the Settlement Class.  This factor therefore supports final approval.

16

**G.     Lead Counsel, Plaintiffs, and Settlement Class Members Support Final
            Approval of the Settlement**

Lead Counsel, Plaintiffs, and Settlement Class Members all support final approval

of the Settlement, thereby satisfying the sixth *Reed* factor.  *See Marcus v. J.C. Penney Co.,

Inc.*, 2017 WL 6590976, at *3 (E.D. Tex. Dec. 18, 2017) ("Significant weight is given to

the opinion of class counsel concerning whether the settlement is in the best interest of the

class"), *report and recommendation adopted*, 2018 WL 307024 (E.D. Tex. Jan. 4, 2018);

*Schwartz*, 2005 WL 3148350, at *21 ("where the parties have conducted an extensive

investigation, engaged in significant fact-finding and Lead Counsel is experienced in class-

action litigation, courts typically 'defer to the judgment of experienced trial counsel'").

Lead Counsel have conducted a thorough fact-finding investigation into the claims

against Defendants and, after three years of intense litigation and hard-fought settlement

negotiations, have a firm understanding of the strengths and risks attendant to these claims.

Based on this understanding, as well as Lead Counsel's substantial experience litigating

complex securities class actions like this one, Lead Counsel have concluded that the

Settlement is fair, reasonable, and adequate.  Moreover, Plaintiffs strongly endorse the

Settlement.  *See* Declaration of Donald Kendig on behalf of Fresno (Ex. 2), at ¶ 5;

Declaration of Edgard Hernandez on behalf of Miami (Ex. 3), at ¶ 5; and Declaration of

Sheldon Albritton on behalf of Pontiac (Ex. 4), at ¶ 5.  Each Plaintiff is a sophisticated

institutional investor that closely supervised Plaintiffs' Counsel throughout the Action, and

was kept apprised of the mediation and settlement negotiations with Defendants.  Plaintiffs'

recommendation supports approval of the Settlement.  *See City of Providence v.*

*Aeropostale, Inc.*, 2014 WL 1883494, at *4 (S.D.N.Y. May 9, 2014) ("the recommendation of Lead Plaintiff, a sophisticated institutional investor, also supports the fairness of the Settlement.").

The positive response of the Settlement Class to date also supports final approval of the Settlement. The Court-appointed Claims Administrator, JND Legal Administration ("JND"), has mailed 24,827 copies of the Notice Packet to potential Settlement Class Members and nominees through August 3, 2022. *See* Declaration of Luiggy Segura ("Segura Decl.") (Ex. 5), at ¶ 9. The Notice describes the essential terms of the Settlement and informs Settlement Class Members of their right to opt-out of the Settlement Class or object to the Settlement. As set forth in the Notice, the deadline for Settlement Class Members to submit objections or request exclusion is August 19, 2022. While this deadline has not yet passed, to date, there have been no objections and no requests for exclusion from the Settlement Class. ¶ 114; Segura Decl. ¶ 13.[3] In sum, all of the *Reed* factors support a finding that the Settlement is fair, reasonable, and adequate.

### H.    The Other Factors Set Forth in Rule 23(e)(2) Support Final Approval of the Settlement

Rule 23(e)(2) also considers (i) the effectiveness of the proposed method of distributing relief to the class; (ii) the terms of any proposed award of attorneys' fees; (iii) any agreements made in connection with the proposed settlement; and (iv) the equitable treatment of class members. *See* Fed. R. Civ. P. 23(e)(2)(C)(ii), (iii), and (iv);

---

[3] Under the Court-approved schedule, Plaintiffs will file reply papers on September 2, 2022, addressing any requests for exclusion and objections that may be received.

Fed. R. Civ. P. 23(e)(2)(D).  All of these factors also support approval of the Settlement.

### 1.    The Proposed Method of Distributing Settlement Proceeds is Effective

The proceeds of the Settlement will be distributed to Settlement Class Members who submit eligible Claim Forms with required documentation to JND.  JND will review and process the claims received, provide claimants with an opportunity to cure any deficiency or request review of the denial of their claim by the Court, and will ultimately mail or wire claimants their *pro rata* share of the Net Settlement Fund as calculated under the Plant of Allocation.[4]  This type of claims processing is standard in securities class actions and has long been used and found to be effective.  *See, e.g.*, *OCA*, 2009 WL 512081, at *6; *Dell*, 2010 WL 2371834, at *10.

### 2.    The Requested Fees and Expenses are Fair and Reasonable

Lead Counsel have filed a motion for an award of attorneys' fees and Litigation Expenses concurrently with this motion.  As detailed therein, Lead Counsel have applied for attorneys' fees in the amount of 25% of the Settlement Fund, net of Litigation Expenses, which is consistent with attorneys' fee awards approved in comparable securities class actions and is reasonable in light of the extensive efforts of Plaintiffs' Counsel and the substantial risks in the litigation.  Pursuant to the terms of the Stipulation, and as is standard in securities class actions, attorneys' fees and expenses will be paid upon award by the Court and shall be reimbursed to the Settlement Fund if the award is reduced or reversed

---

[4]   The Settlement is not a claims-made settlement.  If the Settlement is approved, Defendants will have no right to the return of any portion of Settlement based on the number or value of Claims submitted.  *See* Stipulation ¶ 13.

19

in any subsequent legal proceedings.  *See* Stipulation ¶ 16.  Most importantly, with respect to the Court's consideration of the fairness of the Settlement, is the fact that approval of attorneys' fees is entirely separate from approval of the Settlement, and neither Plaintiffs nor Plaintiffs' Counsel may terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees or expenses.  *See id*.

### 3.     The Supplemental Agreement Does Not Affect the Fairness of the Settlement

Rule 23(e)(2)(C)(iv) asks the Court to consider any additional agreements made by the Parties in connection with the Settlement.  Here, the only such agreement is the Parties' confidential Supplemental Agreement that sets forth the conditions under which Venator would be able to terminate the Settlement if the number of Settlement Class Members who request exclusion from the Settlement Class reaches a certain threshold.  That type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement.  *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *13 (S.D.N.Y. July 21, 2020) ("This type of agreement is a standard provision in securities class actions and has no negative impact on the fairness of the Settlement.").[5]

### 4.     The Settlement Treats Settlement Class Members Equitably

Finally, the proposed Settlement treats members of the Settlement Class equitably

---

[5] As is also standard in securities class actions, the agreement is not being made public to avoid incentivizing individuals to leverage the opt-out threshold to exact individual settlements at the class's expense.  *See, e.g.*, *Hefler v. Wells Fargo & Co.*, 2018 WL 4207245, at *7 (N.D. Cal. Sept. 4, 2018) ("There are compelling reasons to keep this information confidential in order to prevent third parties from utilizing it for the improper purpose of obstructing the settlement and obtaining higher payouts.").

relative to one another. There is no preferential treatment for any members of the Settlement Class. Plaintiffs will receive recoveries based on the same formula under the Plan of Allocation as all other Settlement Class Members (other than awards for reimbursement for the time their employees spent working on the Action as permitted by the PSLRA). As discussed immediately below, the Net Settlement Fund will be distributed among Settlement Class Members in accordance with the Plan of Allocation, which provides a fair and equitable method of allocation.

## II. THE PLAN OF ALLOCATION IS FAIR, REASONABLE, AND ADEQUATE AND SHOULD BE APPROVED

The standard for approval of a plan of allocation of the settlement funds is the same as that for approving a settlement: whether it is "fair, adequate and reasonable." *Chicken Antitrust Litig.*, 669 F.2d at 238. A plan of allocation need not be perfect—to be fair, reasonable, and adequate, "[t]he allocation formula 'need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel.'" *Dell*, 2010 WL 2371834, at *10.

The proposed Plan of Allocation here was developed by Lead Counsel in consultation with Plaintiffs' damages expert. The Plan takes into account the economic losses that Settlement Class Members suffered as a result of Defendants' alleged violations of the federal securities laws and the different statutes under which members of the Settlement Class had claims against Defendants.

Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase or acquisition of Venator Common Stock during the Class Period, which

21

will be the greater of the claimant's "Exchange Act Loss Amount" or "Securities Act Loss Amount" for that purchase.

The formula for calculating a claimant's Exchange Act Loss Amount is the same as that typically used in plans of allocations in similar class actions. ¶ 120. In general, for each purchase of Venator Common Stock during the Class Period, the Exchange Act Loss Amount will be (a) the difference between the estimated artificial inflation in the stock price on date of purchase and the date of sale, or (b) the difference between the actual purchase price and sales price of the stock, whichever is less. *Id*. Plaintiffs' expert calculated the amount of estimated artificial inflation by considering price changes in the stock in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes on those days that were attributable to market or industry forces. ¶ 121.[6]

Claimants who purchased shares of Venator Common Stock in either the August 2017 IPO or December 2017 SPO (or who purchased shares in the Class Period traceable to one of those offerings) will also have a Securities Act Loss Amount calculated under the Plan. ¶ 123. This calculation is based on the statutory formula for damages set out in Section 11(e) of the Securities Act. *Id*.

As noted above, for each purchase or acquisition of Venator Common Stock during

---

[6] With respect to the October 30, 2018 disclosure, the amount of artificial inflation that is deemed to have been dissipated by that disclosure is 50% of the abnormal price decline in Venator Common Stock on that day to account for the presence of confounding non-fraud-related disclosures and the relatively greater litigation risk in establishing that the alleged misstatements were the cause of the decline that day. ¶ 121.

the Class Period, the Claimant's Recognized Loss Amount will be the greater of the Exchange Act Loss Amount, if any, or Securities Act Loss Amount, if any. ¶ 124. The sum of the Recognized Loss Amounts for all of a claimant's purchases or acquisitions of Venator Common Stock during the Class Period is the claimant's "Recognized Claim" and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. *Id*.

Thus, the Plan of Allocation fairly accounts for each Settlement Class Members' purchases and sales, the specific claims they have under the federal securities laws, and the strength of their claims. *See In re Waste Mgmt., Inc. Sec. Litig.*, 2002 WL 35644013, at *20 (S.D. Tex. May 10, 2002) (approving plan of allocation where class received proceeds "based on the size and strength of their claims"), *amended*, 2003 WL 27380802 (S.D. Tex. July 31, 2003); *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 669 (E.D. Va. 2001) (approving plan that "sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims").

Accordingly, Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as result of the alleged misconduct. ¶¶ 117, 126. Moreover, to date, no objections to the proposed Plan of Allocation have been received. ¶ 125.

## III.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS

As set forth in Plaintiffs' motion for preliminary approval of the Settlement, the Settlement Class satisfies all the requirements of Rule 23. *See* Preliminary Approval Brief (ECF No. 117), at 19-23; *see also* Preliminary Approval Order (ECF No. 119) ¶¶ 1-3

(finding the Court will likely be able to certify the Settlement Class).  None of the facts supporting certification of the Settlement Class have changed since Plaintiffs submitted their preliminary approval motion.  Accordingly, Plaintiffs respectfully request that the Court finally certify the Settlement Class for purposes of effectuating the Settlement.

## IV.   NOTICE TO THE SETTLEMENT CLASS SATISFIED RULE 23 AND DUE PROCESS

Notice to the Settlement Class satisfied the requirements of Rule 23, which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable" – *i.e.*, it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them."  *Maher v. Zapata Corp.*, 714 F.2d 436, 451 (5th Cir. 1983); *see In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010) ("a settlement notice need only satisfy the 'broad reasonableness standards imposed by due process'").

Both the substance of the notice and the method of its dissemination to potential Settlement Class Members satisfied these standards.  The Court-approved Notice includes all of the information required by Rule 23(c)(2)(B) and the PSLRA, including, among other things: (i) the nature of the Action and the claims asserted; (ii) the definition of the Settlement Class; (iii) the amount of the Settlement; (iv) the Plan of Allocation; (v) reasons why the parties are proposing the Settlement; (vi) the maximum amount of attorneys' fees and expenses that will be sought; (vii) a description of Settlement Class Members' right to

request exclusion from the Settlement Class or to object to the Settlement, the Plan of Allocation, or the requested attorneys' fees or expenses; and (viii) notice of the binding effect of a judgment on Settlement Class Members.

In accordance with the Court's Preliminary Approval Order, JND began mailing copies of the Notice and Claim Form to potential Settlement Class Members and nominees on June 10, 2022. *See* Segura Decl. ¶¶ 3-6. As of August 3, 2022, A.B. Data had disseminated 24,827 copies of the Notice Packet to potential Settlement Class Members and nominees. *See id*. ¶ 9. In addition, Lead Counsel caused the Summary Notice to be published in *Investor's Business Daily* and transmitted over the *PR Newswire* on June 27, 2022 and JND has established, maintained, and updated a website and toll-free telephone number dedicated to the Settlement. *See id*. ¶¶ 10, 12. This combination of individual mail to all Settlement Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely-circulated publication, and transmitted over a newswire, was "the best notice . . . practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B); *see also Schwartz*, 2005 WL 3148350, at *9-10.

## CONCLUSION

Plaintiffs respectfully request the Court approve the Settlement and Plan of Allocation as fair, reasonable, and adequate, and grant certification of the Settlement Class.[7]

---

[7] A proposed Judgment approving the Settlement and a proposed order approving the Plan of Allocation will be submitted with Plaintiffs' reply papers, after the deadline for objecting has passed.

25

Dated: August 5, 2022                Respectfully submitted,

                                     /s/ *Michael D. Blatchley*
                                     Michael D. Blatchley, Attorney-in-Charge

                                     **BERNSTEIN LITOWITZ BERGER**
                                        **& GROSSMANN LLP**
                                     Hannah Ross (*Pro Hac Vice*)
                                     Michael D. Blatchley (*Pro Hac Vice*)
                                     Kate W. Aufses (*Pro Hac Vice*)
                                     1251 Avenue of the Americas, 44th Floor
                                     New York, NY 10020
                                     Tel: (212) 554-1400
                                     Fax: (212) 554-1444
                                     Hannah@blbglaw.com
                                     MichaelB@blbglaw.com
                                     Kate.Aufses@blbglaw.com

                                     *Counsel for Lead Plaintiff and Lead*
                                     *Counsel for the Class*

                                     Thomas R. Ajamie
                                     Texas Bar No. 00952400
                                     Southern District Bar No.
                                     6165 John S. "Jack" Edwards,
                                     Jr. Texas Bar No. 24040851
                                     Southern District Bar No.
                                     38095
                                     **AJAMIE LLP**
                                     Pennzoil Place – South Tower
                                     711 Louisiana, Suite 2150
                                     Houston, Texas 77002
                                     Tel: (713) 860-1600
                                     Fax: (713) 860-1699
                                     tajamie@ajamie.com
                                     jedwards@ajamie.com

                                     *Liaison Counsel for Lead Plaintiff*

26

Robert D. Klausner
**KLAUSNER KAUFMAN JENSEN**
 **& LEVINSON**
7080 Northwest 4th Street
Plantation, FL 33317
Tel: (954) 916-1202
bob@robertdklausner.com

*Additional Counsel for City of Miami General Employees' & Sanitation Employees' Retirement Trust*

Cynthia J. Billings-Dunn
**ASHERKELLY**
25800 Northwestern Highway
Suite 1100
Southfield, MI 48075
Tel: (248) 746-2747
cbdunn@asherkellylaw.com

*Additional Counsel for the City of Pontiac General Employees' Retirement System*

27

## CERTIFICATE OF CONFERENCE

I certify that Lead Counsel and Defendants' Counsel have conferred regarding the substance of the relief sought in this motion and that Defendants consent to the relief sought in this motion, as set forth in the Stipulation and Agreement of Settlement, dated March 11, 2022.

*/s/ Michael D. Blatchley*
Michael D. Blatchley

## CERTIFICATE OF SERVICE

I certify that on August 5, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

*/s/ Michael D. Blatchley*
Michael D. Blatchley

28