**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: VENATOR MATERIALS PLC SECURITIES LITIGATION | Civil Action No. 4:19-cv-03464 |

**DECLARATION OF MICHAEL D. BLATCHLEY IN SUPPORT OF:**
**(A) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND**
**PLAN OF ALLOCATION; AND (B) LEAD COUNSEL'S MOTION FOR**
**ATTORNEYS' FEES AND LITIGATION EXPENSES**

# TABLE OF CONTENTS

TABLE OF EXHIBITS ...................................................................................................iv

I.      INTRODUCTION .............................................................................................2

II.     PROSECUTION OF THE ACTION .................................................................7

      A.      Background .............................................................................................7

      B.      The Commencement of the Action and the Appointment of Lead
            Plaintiffs and Lead Counsel ...................................................................8

      C.      The Investigation and Filing of the Consolidated Complaint .....................10

      D.      Defendants' Motions to Dismiss .................................................................14

            1.      Defendant Stolle's and Maiter's Motion to Dismiss for Lack
                    of Personal Jurisdiction .....................................................................14

            2.      Defendants' Motion to Dismiss for Failure to State a Claim...........17

      E.      Plaintiffs File the Amended Consolidated Class Action Complaint...........23

      F.      Plaintiffs Pursue Discovery .....................................................................23

      G.      The Motion for Class Certification .............................................................27

      H.      Work with Experts.....................................................................................27

      I.      The Parties' Mediation and the Settlement of the Action ..........................28

      J.      The Court Grants Preliminary Approval of the Settlement ........................30

III.    RISKS OF CONTINUED LITIGATION ............................................................31

      A.      General Risks in Prosecuting Securities Class Actions ..............................31

      B.      Specific Risks Concerning this Action.......................................................33

            1.      Risks Concerning Liability .................................................................33

                a.      Falsity...................................................................................33

                b.      Scienter................................................................................36

                c.      Loss Causation and Damages ..............................................37

2. Risks Associated with Class Certification .......................................41

3. Risks Associated with Plaintiffs' Securities Act Claims .................42

4. Risks Concerning Appeals ................................................................43

IV. PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY
APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE ..........................44

V. ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT ........................46

VI. THE FEE AND EXPENSE APPLICATION..........................................................51

    A. The Fee Application .....................................................................................52

        1. Plaintiffs Have Authorized and Support the Fee Application..........52

        2. The Time and Labor of Plaintiffs' Counsel .....................................53

        3. The Skill and Experience of Plaintiffs' Counsel..............................55

        4. Standing and Caliber of Defendants' Counsel .................................56

        5. The Risks of Litigation and the Need to Ensure the
Availability of Competent Counsel in High-Risk Contingent
Cases..................................................................................................56

        6. The Reaction of the Settlement Class to the Fee Application..........58

    B. The Litigation Expense Application ...........................................................59

VII. CONCLUSION ......................................................................................................63

## **TABLE OF EXHIBITS**

**Exhibit 1**     Declaration of Jed D. Melnick in Support of Final Approval of Settlement

**Exhibit 2**     Declaration of Donald C. Kendig, CPA, Retirement Administrator for the Fresno County Employees' Retirement Association, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 3**     Declaration of Edgard Hernandez, Pension Administrator for City of Miami General Employees' & Sanitation Employees' Retirement Trust, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 4**     Declaration of Sheldon Albritton, Chairman of the Board of Trustees of the City of Pontiac General Employees' Retirement System, in Support of (I) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 5**     Declaration of Luiggy Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date

**Exhibit 6**     Summary of Plaintiffs' Counsel's Lodestar and Expenses

**Exhibit 6A**     Declaration of Michael D. Blatchley on Behalf of Bernstein Litowitz Berger & Grossmann LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 6B**     Declaration of John S. Edwards, Jr. on behalf of Ajamie LLP in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 6C**     Declaration of Robert D. Klausner on Behalf of Klausner, Kaufman, Jensen & Levinson in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

iv

**Exhibit 6D**    Declaration of Cynthia J. Billings-Dunn on Behalf of AsherKelly in Support of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses

**Exhibit 7**    Breakdown of Plaintiffs' Counsel's Expenses by Category

**Exhibit 8**    *Berger v. Compaq Computer Corp.*, Civil Action No. 98-1148, slip op. (S.D. Tex. Nov. 22, 2002), ECF No. 148

**Exhibit 9**    *SEB Inv. Mgmt. v. Symantec Corp.*, 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021)

MICHAEL D. BLATCHLEY declares as follows:

1.      I am an attorney admitted *pro hac vice* to this Court. I am a partner in the law firm of Bernstein Litowitz Berger & Grossmann LLP ("BLB&G" or "Lead Counsel"). BLB&G was appointed Lead Counsel for Lead Plaintiffs the Fresno County Employees' Retirement System ("Fresno"), the City of Miami General Employees' & Sanitation Employees' Retirement Trust ("Miami"), and the City of Pontiac General Employees' Retirement System ("Pontiac") (collectively, "Plaintiffs") and Class Counsel for the Settlement Class in the above-captioned Action (the "Action").  I submit this declaration in support of Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation (the "Settlement Motion"), and Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (the "Fee Motion").  I have personal knowledge of the matters set forth herein based on my active participation in the prosecution and settlement of this action and could and would testify competently thereto.[1]

---

[1] All capitalized terms that are not otherwise defined herein shall have the meanings provided in the Stipulation and Agreement of Settlement dated March 11, 2022 (ECF No. 117-2) (the "Stipulation"), which was entered into by and among (i) Plaintiffs, on behalf of themselves and the Settlement Class, and (ii) defendant Venator Materials PLC ("Venator" or the "Company"); (iii) defendants Simon Turner, Kurt D. Ogden, Stephen Ibbotson, Mahomed Maiter, Russ R. Stolle, Peter R. Huntsman, Douglas D. Anderson, Kathy D. Patrick, Sir Robert J. Margetts, and Daniele Ferrari (the "Individual Defendants"); (iv) defendants Huntsman Corporation, Huntsman (Holdings) Netherlands B.V., and Huntsman International LLC (the "Huntsman Defendants"); and (v) defendants Citigroup Global Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Goldman Sachs & Co. LLC, and J.P. Morgan Securities LLC (the "Underwriter Defendants," and together with Venator, the Individual Defendants, and the Huntsman Defendants, "Defendants").

## I.    INTRODUCTION

2.    The proposed Settlement before the Court provides for resolution of all claims in the Action in exchange for a cash payment of $19 million, plus interest, for the benefit of the Settlement Class.  The Settlement Amount has been paid into an escrow account and is earning interest.  As detailed below, the Settlement provides a benefit to the Settlement Class by conferring a substantial, certain, and immediate recovery while avoiding the risks of continued litigation, including the risk that the Settlement Class could recover nothing or less than the Settlement Amount after years of additional litigation, appeals, and delay.

3.    The proposed Settlement is the result of extensive efforts by Plaintiffs and Lead Counsel, which included, among other things:

(i)    conducting an extensive investigation into the alleged fraud, including interviews of over 40 former employees of Venator, and a thorough review of all publicly available information about Venator, including all of its Class Period filings with the U.S. Securities and Exchange Commission ("SEC"), analyst reports, conference call transcripts, and news articles, as well as news coverage of the Pori fire from Finland and regulatory findings from Finnish fire and safety authorities;

(ii)    drafting a detailed consolidated complaint based on Lead Counsel's investigation;

(iii)    responding to Defendants' two motions to dismiss, which together comprised over 75 pages of briefing and were accompanied by more than 50 exhibits totaling over 700 pages;

(iv)    arguing Defendants' motions to dismiss during an approximately four-hour argument held over Zoom, and drafting and submitting supplemental arguments as requested by the Court;

(v)     drafting a second amended complaint to address the Court's concern (described in more detail in Section II.E below) that the Securities Act claims alleged in the amended complaint did not adequately plead which Plaintiff purchased what securities from which underwriter, and obtaining Defendants' consent not to oppose this amendment so that the action could proceed into discovery;

(vi)    negotiating a case schedule, joint discovery plan, and ESI protocol, and successfully opposing Defendants' request to "bifurcate" discovery into two phases;

(vii)   preparing and responding to extensive discovery requests, including requests for the production of documents and interrogatories;

(viii)  reviewing and analyzing over 10,000 pages of documents obtained from Defendants with assistance from an industry expert, and preparing memoranda and chronologies concerning the relevant evidence to support the claims alleged;

(ix)    drafting and filing Plaintiffs' motion for class certification, including consulting with financial economics experts concerning loss causation and a report concerning the efficient market for Venator common stock;

(x)     participating in an arm's-length mediation session before a highly respected mediator, Jed Melnick, Esq. of JAMS, which included the exchange of detailed mediation statements; and

(xi)    drafting and negotiating a Term Sheet, the Stipulation setting out the terms of the Settlement, and related documentation.

4.      As a result of these efforts, Plaintiffs and Lead Counsel were well informed of the strengths and weaknesses of the claims and defenses in the Action at the time they achieved the proposed Settlement. Indeed, the $19 million settlement represents between 8.8% and 41.3% of the investors' potentially recoverable damages under Lead Counsel's experts' analysis, depending on how many corrective disclosures remained viable in the case. Defendants have argued that the Court's order on the motion to dismiss severely

limited investors' recoverable damages—potentially dismissing two of the three alleged disclosures entirely from the case—and they would have continued to argue at class certification, summary judgment, and trial that the remaining corrective disclosure did not cause a statistically significant decline in the price of Venator's stock. In light of these strong arguments, and the fact that loss causation and damages issues would boil down to a "battle of the experts," Lead Counsel is confident that the $19 million Settlement here was a particularly favorable result.

5.      The Settlement was achieved only after arm's-length negotiations between the Parties, including a mediation session before Jed Melnick of JAMS, an experienced class action mediator. The Settlement is the product of a mediator's recommendation issued by Mr. Melnick. Mr. Melnick has submitted a Declaration in support of the Settlement in which he describes the Parties' mediation efforts, his observation that the "mediation process involved significant disputed issues and hard-fought, arm's-length negotiations," Declaration of Jed D. Melnick ("Melnick Decl."), attached hereto as Exhibit 1, at ¶ 8, and his belief that that the Settlement is "reasonable, arm's length, and consistent with the risks and potential rewards of the claims asserted in the Action." *Id*. ¶ 2.

6.      In addition, Fresno, Miami, and Pontiac are sophisticated institutional investors who actively participated in the Action and closely supervised the work of Lead Counsel, and they fully endorse the approval of the Settlement. *See* Declaration of Donald C. Kendig, CPA, Retirement Administrator for the Fresno County Employees' Retirement Association ("Kendig Decl."), attached hereto as Exhibit 2, at ¶¶ 2-5; Declaration of Edgard Hernandez, Pension Administrator for City of Miami General Employees' &

4

Sanitation Employees' Retirement Trust ("Hernandez Decl.") attached hereto as Exhibit 3, at ¶¶ 2-5; Declaration of Sheldon Albritton, Chairman of the Board of Trustees of the City of Pontiac General Employees' Retirement System ("Albritton Decl."), attached hereto as Exhibit 4, at ¶¶ 2-5.

7.      Fresno, Miami, and Pontiac's close attention to and oversight of this action, as well as their approval of the Settlement, supports the reasonableness of the Settlement. In enacting the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), Congress expressly intended to give control over securities class actions to sophisticated investors and noted that increasing the role of institutional investors in class actions would ultimately benefit shareholders and assist courts by improving the quality of representation in this type of case.  H.R. Conf. Rep. No. 104-369, at *34 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 733.  Here, Fresno, Pontiac, and Miami's representatives were actively involved in overseeing the litigation and settlement negotiations.

8.      Plaintiffs and Lead Counsel believe that the Settlement is in the best interests of the Settlement Class.  Due to their substantial efforts, Plaintiffs and Lead Counsel are well-informed of the strengths and weaknesses of the claims and defenses in the Action, and they believe that the Settlement represents a highly favorable outcome for the Settlement Class.

9.      As discussed in further detail below, the proposed Plan of Allocation, which was developed with the assistance of Plaintiffs' damages expert, provides for the equitable distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment by the Court.  The proposed Plan of Allocation

provides for distribution to eligible claimants on a *pro rata* basis, fairly based on losses attributable to the wrongdoing alleged in the Complaint, and taking into account the different statutes under which claimants could assert their claims.

10.    Lead Counsel worked diligently and efficiently to achieve the proposed Settlement in the face of significant risk.  Lead Counsel prosecuted this case on a fully contingent basis and advanced all litigation-related expenses, and thus bore substantial risk of an unfavorable result.  For its efforts in achieving the Settlement, Lead Counsel is applying for an award of attorneys' fees for all Plaintiffs' Counsel[2] in the amount of 25% of the Settlement Fund, net of Litigation Expenses, and for payment of litigation expenses that Plaintiffs' Counsel incurred in connection with the institution, prosecution, and settlement of the Action.  The requested fee has been endorsed by Plaintiffs, and is reasonable and well within the range of fees that courts in this Circuit and elsewhere have awarded in securities class actions and other complex class actions with comparable recoveries on a percentage basis.  Moreover, the requested fee represents a multiplier of approximately 1.8 on Plaintiffs' Counsel's total lodestar, which is on the low end of the range of multipliers typically awarded in class actions with contingency risks.

11.    Lead Counsel's Fee and Expense Application also seeks payment of Litigation Expenses incurred by Plaintiffs' Counsel in connection with the institution, prosecution, and settlement of the Action, and payments to Plaintiffs for their costs and

---

[2] Plaintiffs' Counsel consist of Lead Counsel BLB&G; Liaison Counsel Ajamie LLP; additional counsel for Miami, Klausner, Kaufman, Jensen & Levinson ("Klausner Kaufman"); and additional counsel for Pontiac, AsherKelly.

expenses directly related to their representation of the Settlement Class, as authorized by the PSLRA.

12. For all of the reasons discussed in this Declaration and in the accompanying motions and declarations, including the quality of the result obtained and the numerous significant litigation risks discussed fully below, Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation are "fair, reasonable, and adequate" in all respects, and that the Court should approve them under Federal Rule of Civil Procedure 23(e). For similar reasons, and for the additional reasons discussed below, we respectfully submit that Lead Counsel's Fee and Expense Application is also fair and reasonable and should be approved.

## II. PROSECUTION OF THE ACTION

### A. Background

13. Venator is a manufacturer and marketer of chemical products that derives the vast majority of its revenues from the sale of titanium dioxide (TiO2"). Before its Initial Public Offering ("IPO") on August 3, 2017, Venator was the additives and pigments division of Huntsman Corporation, a global chemical corporation. Following the IPO, Venator common stock traded on the New York Stock Exchange under the ticker symbol VNTR.

14. This case concerns Defendants' public statements to investors in the aftermath of a catastrophic fire that occurred at Venator's most important and profitable TiO2 manufacturing facility in Pori, Finland in January 2017. In this Action, Plaintiffs allege that Huntsman had initially planned to spin off Venator to existing Huntsman

shareholders, but that after the fire in January 2017 irreparably damaged the Pori facility—which generated some of Huntsman's most important products—Huntsman determined to unload the damaged division via a public offering instead. Plaintiffs allege that, in order to successfully complete the IPO (and a Secondary Public Offering ("SPO") on December 4, 2017), Defendants led investors to believe that Pori was operating at 20% of its prior capacity and that the Company was "on pace" and "on track" to restoring full production in the coming months. Plaintiffs allege that the truth emerged through a series of disclosures revealing that the costs and work to rebuild Pori were far more extensive than Defendants had represented, and that Pori would ultimately be abandoned, and that investors incurred substantial damages, with Venator shares losing over 70% of their value, falling from $22 per share at the time of the SPO to just $6.47 at the end of the Class Period.

## B.    The Commencement of the Action and the Appointment of Lead Plaintiffs and Lead Counsel

15.    This litigation, initially captioned *City of Miami General Employees' & Sanitation Employees' Retirement Trust v. Venator Materials PLC et al.* (the "Miami Action"), was commenced on July 31, 2019 with BLB&G's filing of a securities class action complaint in the U.S. District Court for the Southern District of New York on behalf of Miami. The filing of that complaint followed a substantial analysis of the merits of the case, including substantial factual research concerning the fire at Venator's Pori facility, Venator's initial and secondary public offerings, and the Defendants' decision to conduct those offerings rather than—as originally planned—spin off Venator to existing Huntsman shareholders. That investigation also involved discussions with former employees of

8

Venator.  The complaint filed in the Miami Action asserted claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 against Venator and the Individual Defendants, and Section 20(a) of the Exchange Act against the Individual Defendants.  *See City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. Venator Materials PLC et al.*, No. 1:19-cv-07182-ER (S.D.N.Y. July 31, 2019), ECF No. 1.

16.     In accordance with the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"), notice was published in a national newswire service on July 31, 2019 alerting potential class members of the pendency of the action, the claims asserted, and the deadline by which putative class members could move the Court for appointment as lead plaintiff, which was September 30, 2019.

17.     On September 13, 2019, an additional class action complaint, styled *Cambria County Employees' Retirement System v. Venator Materials PLC, et al.* (the "Cambria Action") was filed in the U.S. District Court for the Southern District of Texas and assigned to Chief Judge Lee H. Rosenthal.  *See Cambria Cnty. Emps.' Ret. Sys. v. Venator Materials PLC*, No. 4:19-cv-03464 (S.D. Tex. Sept. 13, 2019), ECF No. 1.

18.     On September 30, 2019, Fresno, Miami, and Pontiac, represented by Lead Counsel, filed a motion before the Court for appointment as lead plaintiff on behalf of the putative class in the Cambria Action.  ECF No. 4.  Plaintiffs simultaneously filed a motion for appointment as lead plaintiff in the Miami Action.

19.     By order dated October 21, 2019, Judge Rosenthal granted Fresno, Miami, and Pontiac's motion for appointment as lead plaintiff.  ECF No. 7.

9

20.     Following the appointment of Fresno, Miami, and Pontiac as lead plaintiff, Lead Counsel negotiated with Defendants to stipulate to the transfer of the Miami Action to the U.S. District Court for the Southern District of Texas.  On October 29, 2019, pursuant to an order by Judge Ramos, the Miami Action was transferred to the U.S. District Court for the Southern District of Texas under the caption *City of Miami General Employees' & Sanitation Employees' Retirement Trust*.

21.     On November 8, 2019, the Parties filed an agreed motion in the Cambria Action seeking consolidation of the Miami Action with the Cambria Action and, on November 11, 2019, Chief Judge Rosenthal granted the motion and styled the new consolidated action *In re Venator Materials PLC Securities Litigation* (the "Action").  ECF No. 10.[3]

22.     On December 19, 2019, the Parties filed a stipulation regarding the schedule to file a consolidated amended complaint and for briefing Defendants' motion to dismiss.

### C.     The Investigation and Filing of the Consolidated Complaint

23.     Prior to the filing of the initial complaints in this case and continuing through preparation of the consolidated complaint on behalf of Plaintiffs, Lead Counsel undertook an extensive investigation into the alleged misstatements and potential claims that could be asserted in this Action.  Lead Counsel's investigation included a review and analysis of: (a) Venator's public filings with the SEC; (b) research reports by securities and financial

---

[3]  Separately, in February 2019, a case alleging claims under the Securities Act of 1933 (the "Securities Act") arising out of alleged misstatements in the IPO and SPO was filed in Texas state court.  *See Macomb Cnty. Emps.' Ret. Sys. v. Venator Materials PLC*, Case No. DC-19-20230 (Tex. Dist. Ct. Dallas Cnty. Feb. 8, 2019) (the "Macomb County Action").

analysts; (c) transcripts of Venator's conference calls with analysts and investors; (d) Venator's presentations, press releases, and reports; (e) news and media reports concerning Venator and other facts related to this action, including regarding other players in the TiO2 industry; (f) documents filed in and testimony given by Defendant Maiter and other executives of TiO2 companies, including Huntsman, in regulatory proceedings; (g) documents obtained under Freedom of Information Act statutes; (h) price and volume data for Venator securities; and (i) information from consultations with experts.

24.     In addition, in connection with its investigation, Lead Counsel and its in-house investigators conducted an extensive search to locate former employees of Venator and industry participants who might have relevant information pertaining to the claims asserted in the Action.  This included developing a database of over 5,700 potential witnesses and contacting over 290 former Venator employees who were believed to have potentially relevant information.  Lead Counsel's in-house investigators spoke to over 40 of these individuals, and Lead Counsel's attorneys and in-house investigators conducted multiple interviews with numerous witnesses, including the five former employees ultimately cited in the Complaint.  Lead Counsel also obtained documents and photographs from several of the former employees they interviewed, and this documentary evidence was incorporated into the Complaint.

25.     In addition, because the events underlying the case—which concerned a fire at Venator's facility in Pori, Finland—occurred overseas, many of the witnesses that Lead Counsel and its investigators interviewed did not speak English.  As such, in addition to working with German and other foreign language-speaking attorneys at BLB&G, Lead

Counsel also retained a team of investigators based in Europe who assisted with scheduling and conducting interviews in Finnish, which often incurred in the early morning and late-night given the seven-hour time difference.

26.    In connection with its investigation and the preparation of the consolidated complaint, Lead Counsel also consulted with an industry expert with substantial experience analyzing businesses in the titanium pigment, minerals, and chemicals industries. This expert assisted Lead Counsel in analyzing the process of TiO2 production that occurred at Venator's Pori facility.

27.    In connection with the preparation of the consolidated complaint, Lead Counsel also consulted with Chad Coffman of Global Economics, LLC, a Chartered Financial Analyst with substantial experience in providing expert analysis and testimony regarding loss causation and damages in securities class actions, concerning the impact of Defendants' alleged misstatements and omissions on the market price of Venator securities, and the damages suffered by Venator shareholders.

28.    On January 17, 2020, Plaintiffs filed the Consolidated Class Action Complaint (the "Complaint"). The detailed Complaint asserted claims against Venator and the Individual Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. The Complaint also asserted claims under Sections 11, 12(a)(2), and 15 of the Securities Act against Venator, the Individual Defendants, the Huntsman Defendants, and the Underwriter Defendants stemming from material misstatements and omissions

12

made in connection with Venator's August 4, 2017 IPO and December 4, 2017 SPO (together, the "Offerings").  ECF No. 41.

29.     The Complaint alleged that, after a catastrophic fire in January 2017 at Venator's most valuable and important TiO2 plant in Pori, Finland, Defendants falsely reassured investors that the damaged facility had returned to producing 20% of its prior capacity, was "on pace" to restoring full production in just months, and that Venator's insurance would fully cover the rebuild expense and any lost profits.  These assurances were false.  In fact, nearly every corner of the facility at Pori, including all four production lines, suffered extensive damage in the fire.  In fact, the "Moore" section of the plant— which served as the critical component of the manufacturing process for all four separate production lines—suffered near "complete destruction."

30.     The Complaint further alleged that, according to numerous former Venator employees, the only part of the Pori facility that could function at all at any point after the fire was a small component of the "white end" finishing portion of just one of the facility's four production lines.  Instead of rebuilding Pori, Defendants created the false appearance of actual production so that they could profitably price the Venator stock offerings.  In doing so, Venator went to expensive and unsustainable lengths to ship "intermediate" TiO2 manufactured at its facility in Scarlino, Italy to Pori, where the intermediate product would then be "finished" at the one part of the facility that actually worked.

31.     The Complaint further alleged that Defendants Turner and Maiter and other senior executives attended meetings about the Pori rebuild and received detailed weekly

updates concerning the work (or lack thereof) at Pori, and senior management had "monthly meetings to review site activities" with Venator's insurers.

32.     The Complaint further alleged that the price of Venator's common stock was artificially inflated as a result of Defendants' false statements concerning the rebuild of the Pori facility, and that the stock price declined substantially when the truth about Pori was revealed through a series of disclosures on July 31, 2018, September 12, 2018, and October 30, 2018.

33.     On January 21, 2020, the Action was reassigned from Judge Rosenthal to the Honorable Charles R. Eskridge, III.

### D.     Defendants' Motions to Dismiss

34.     Defendants filed and served two motions to dismiss the Complaint in this Action.

#### 1.     Defendant Stolle's and Maiter's Motion to Dismiss for Lack of Personal Jurisdiction

35.     First, on February 18, 2020, Defendants Maiter and Stolle filed and served a motion to dismiss the Complaint for lack of personal jurisdiction.  ECF No. 57.[4]

---

[4] In the Macomb County Action, a Texas state court previously dismissed claims against Defendants Maiter and Stolle and all other Defendants (except the Huntsman Defendants) on personal jurisdiction grounds.  *See Venator Materials PLC v. Macomb Cnty. Emps.' Ret. Sys.*, No. 05-19-01177-CV (Tex. App. Jan. 21, 2020).  When plaintiffs in the Macomb County Action refiled their case in New York state court they included allegations (mirroring the Complaint in this Action) concerning Defendants' misstatements about Pori operating at 20% of its prior capacity that they had not previously asserted.  However, these claims were subsequently dismissed by the New York court on statute of limitation grounds.  *See Macomb Cnty. Emps.' Ret. Sys. v. Venator Materials PLC*, Case No. 651771/2020 (N.Y. Sup. Ct. Mar. 22, 2021).  The plaintiffs in the Macomb County Action ultimately settled their claims on a non-class basis.

36.    In their motion to dismiss in this Action, Defendants Maiter and Stolle argued that the Court lacked personal jurisdiction over them.  Specifically, Defendants Maiter and Stolle argued that the Complaint failed to allege either general or specific jurisdiction over them, including by contending that neither of them signed Venator's SEC filings containing the alleged misrepresentations, or played any role whatsoever in making, proposing, editing, or approving the challenged statements.

37.    On March 24, 2020, Plaintiffs filed their opposition to Defendants Maiter and Stolle's motion to dismiss for lack of personal jurisdiction.  This opposition was based on extensive investigation, including Lead Counsel's work in obtaining and analyzing public records, social media posts, and SEC filings concerning the Defendants' compensation and contacts with the United States.  In the opposition, which totaled 29 pages and was accompanied by 30 exhibits totaling over 300 pages, Plaintiffs argued that both Defendants Maiter and Stolle were subject to personal jurisdiction in the Southern District of Texas.  As to general jurisdiction, Plaintiffs argued that Defendant Stolle was domiciled in Texas, having lived in Texas for his entire adult life before temporarily relocating to the United Kingdom on assignment with Venator, and maintained property in Texas, paid taxes in Texas, voted in Texas, and was licensed to practice law in Texas.  Plaintiffs further argued that Defendant Stolle was subject to specific jurisdiction because he signed documents that Venator filed with the SEC to register shares for the IPO and

15

SPO, and was involved in drafting and executing documents necessary to effectuate Venator's two offerings.[5]

38.    Similarly, Plaintiffs argued the Court had both general and specific jurisdiction over Defendant Maiter.  As to general jurisdiction, Plaintiffs argued that Maiter had sufficient contacts with the United States through his years of service as a high-ranking executive of Huntsman, a Texas-based company.  For example, Defendant Maiter provided evidence of those contacts during his testimony as Venator's corporate representative in a deposition in a U.S. proceeding concerning his involvement in overseeing Venator's North American business, working with Huntsman and Venator's U.S.-based employees, communicating with and serving their U.S. customers, and interacting with U.S. government regulators. As to specific jurisdiction, Plaintiffs argued that Defendant Maiter's alleged misconduct was directed at the United States—including, for example, because he provided input into communications shared with investors in the United States regarding the IPO.

39.    On March 31, 2021, the Court issued an opinion on the Defendants Maiter and Stolle's motion to dismiss, holding that the Court had jurisdiction over Defendant Stolle, but did not have jurisdiction over Defendant Maiter.

---

[5] The PSLRA discovery stay was in place at the time Defendants filed their motion to dismiss, and thus Plaintiffs' investigation and evidentiary support in opposing the personal jurisdiction motion was based on informal discovery.  While Plaintiffs requested that the Court allow limited discovery into the personal jurisdictional issues that Defendants Maiter and Stolle raised in their motion, that request was denied.

## 2.    Defendants' Motion to Dismiss for Failure to State a Claim

40.    Second, also on February 18, 2020, the Venator, the Huntsman Defendants, the Individual Defendants, and the Underwriter Defendants filed a motion to dismiss the Complaint for failure to state a claim.    Defendants' motion was 48 pages long and accompanied by 22 exhibits totaling over 400 pages. ECF No. 58.

41.    Defendants argued that the Complaint should be dismissed for numerous reasons, including:

(a)    ***Statements About Pori's Post-Fire Capacity Were Not Materially False or Misleading.***    Defendants argued that the Complaint's challenged statements regarding Pori's post-fire capacity, including their statements that the facility was operating at "approximately 20%" or that "~20% capacity" had been "achieved," were not false or misleading because the difference between 17%—the amount of TiO2 the facility was actually producing—and 20% was not material to investors, and analysts understood that plants of Pori's nature did not always run at full available capacity.    Defendants also argued that the Complaint's interpretation of the word "finishing" was based on an artificially narrow reading of the word "capacity" and that from the outset, Defendants disclosed that it only planned to restart a portion of Venator's white end production in the second quarter of 2017. Defendants further argued that they had, in fact, disclosed that Venator was shipping intermediate product from other facilities to Pori for finishing and had no duty to disclose further information about its internal operations.

(b)    ***Statements About "Expected" or "Intended" Rebuild of Pori Were Not Actionable Opinions or Were Protected by the PSLRA Safe-Harbor and the Bespeaks Caution Doctrine.***    Defendants argued that Plaintiffs failed to allege that any of the Defendants responsible for the "expected timeline" statements knew material facts that were inconsistent with their statements or failed to disclose material facts about the basis for their opinions.    Similarly, Defendants argued that these statements were protected by the bespeaks-caution doctrine and the PSLRA safe-harbor for forward-looking statements.    Defendants also argued that they warned investors that the restart of Pori could experience delays that could adversely impact Venator's business.

17

Moreover, Defendants argue, they had no duty to cast their business in a negative light as long as their statements are consistent with reasonably available data.   Finally, Defendants argue that the Complaint pled fraud by hindsight by using the September 2018 decision to close Pori to suggest that the Company's estimates and forecasts in 2017 were misleading.  And Defendants argued that, in any event, the Company regularly disclosed and updated its costs and timeline estimates for the Pori rebuild.

(c)   ***Statements About TiO2 Prices Were Not Actionable Opinions.*** Defendants argued that the challenged statements regarding market-wide TiO2 prices were not misleading because Venator did, in fact, disclose the relevant facts that Pori supplied approximately 2% of the total global TiO2 demand and that until the plant was rebuilt, its nameplate capacity of 130,000 metric tons was lost.  Venator also disclosed that it had increased its own prices and warned investors about the volatility of TiO2 pricing but was not required to further interpret the market for investors.

(d)   ***Statements About Venator's Use of Insurance Proceeds Were Not Materially False or Misleading.***  Defendants argued that their statements about Venator's use of its insurance to cover business-interruption losses and reconstruction costs were not materially false or misleading because they were either non-actionable statements of opinion, or the relevant facts were disclosed.

(e)   ***The Complaint Failed to Plead a Strong Inference of Scienter.*** Defendants argued that the Complaint failed to raise a strong inference of Defendants' scienter because it did not sufficiently allege a motive to commit fraud or conscious misbehavior or recklessness and, moreover, that the inference of non-fraudulent intent is more compelling.  Defendants argued that the Complaint inappropriately relied on group pleading to allege scienter and failed to allege which corporate official was responsible for each challenged statement and acted with scienter.  Defendants also argued that the Complaint failed to allege Defendants Turner or Ogden's scienter and relied inappropriately on generalized allegations from former employees and vague allegations about incentive compensation.  Defendants further argued that the Complaint's scienter allegations concerning Huntsman, Peter Huntsman, and Defendant Maiter were irrelevant because the Complaint does not assert Section 10(b) claims against them.

18

(f) ***Securities Act Statute of Limitations.*** Defendants argued that the Complaint's Securities Act claims were time-barred by the law's one-year statute of limitations because Plaintiffs could and should have discovered the allegedly material omissions from Venator's offering documents more than a year before filing the initial complaint on July 31, 2019.

(g) ***Standing Under Section 12(a)(2) of the Securities Act.*** Defendants argued that Plaintiffs lacked standing to sue under Section 12(a)(2) of the Securities Act because the Complaint does not allege that any Defendant named in the Section 12(a)(2) claim passed title to any of the Plaintiffs or solicited their purchases through direct communications with them—only that each Plaintiff purchased Venator common stock "traceable to the IPO" and "in the SPO."

(h) ***Control Person Claims Fail.*** Defendants argued that Plaintiffs failed to allege a primary violation of either the Exchange or Securities Act, so their control person claims under both laws must fail.

42. On March 24, 2020, Plaintiffs filed their opposition to Defendants' motion to dismiss. ECF No. 66. In their opposition, Plaintiffs argued that Defendants' motion to dismiss should be denied for numerous reasons, including:

(a) ***The 20% Statements Were Actionable.*** Plaintiffs argued that Defendants misrepresent their own statements to investors about the meaning of "capacity," having disclosed in Venator's IPO and SPO offering materials that, when Venator closed the "black end" portion of the Calais plant but kept open only the "white end" (or finishing) portion, Calais lost all capacity. Thus, investors would have understood that if only the finishing portion of Pori was operating after the fire, it was not operating at 20% capacity. Moreover, analysts relied on these representations.

(b) ***The Timeline and "On Track" Statements Were Actionable.*** Plaintiffs argued that the timeline and "on track" statements regarding Venator's progress in rebuilding Pori were not forward-looking but concerned present or historical statements of existing fact, were not accompanied by meaningful cautionary language, omitted highly material facts that rendered any opinions actionable, and were made with actual knowledge of their falsity.

19

(c)    ***The Statements About the Price of TiO2 Were Actionable.***  Plaintiffs argued that the TiO2 pricing statements were actionable because Defendants misrepresented to investors Pori's production capacity after the fire at Pori, and its disclosures regarding price fluctuations did not insulate Defendants' statements about the reasons for the increase in TiO2 prices.

(d)    ***The Insurance Statements Were Actionable.***  Plaintiffs argued that Defendants' statements describing the expenditures and allocations of Venator's insurance proceeds were actionable because they concerned then-existing facts and omitted critical facts from investors. Specifically, Defendants failed to disclose that Pori was producing no TiO2, that the reconstruction of the facility never began in earnest, and that Venator was spending millions shipping intermediate TiO2 from Italy to Pori.

(e)    ***The Complaint Adequately Alleged Scienter.***  Plaintiffs argued that the Complaint adequately alleged myriad facts to support the strong inference of Defendants' scienter, including Defendants' personal knowledge of facts contradicting their public statements, the importance of Pori and its rebuild to investors and Defendants, Defendants' personal tracking of the "Europe-Pori Shuffle," and Defendants' personal and financial motive to mislead investors. Plaintiffs argued further that the Complaint alleged Defendants Ogden's and Turner's scienter with particularity; that the Complaint did not rely on group pleading; and that the Huntsman Defendants' motive and Defendant Maiter's scienter are not only relevant, but also attributable to Venator.

(f)    ***The Securities Act Claims Are Not Time-Barred.***  Plaintiffs argued that its Securities Act claims are timely because Plaintiffs did not and could not have discovered sufficient information to plead a securities law violation until, at the very earliest, October 2018, after Venator disclosed that Pori would be shut down, first publicly indicated Pori was not operating at 20%, and revealed that costs would exponentially exceed insurance limits.  These events occurred less than a year before Plaintiffs filed their Complaint on July 31, 2019.

(g)    ***Standing.***  Plaintiffs argued that the Complaint adequately pleads Plaintiffs' standing to assert claims under Section 12(a)(2) where Plaintiffs submitted sworn certifications providing their transactions, showing they bought shares of Venator stock in Venator's public offerings, and affirming those facts in a Joint Declaration.  Plaintiffs asserted that the Underwriter Defendants know that they sold directly

20

to Plaintiffs and that Defendants concede that the Complaint alleges that "each Plaintiff purchased Venator common stock 'traceable to the IPO' and 'in the SPO'" and the Huntsman entities and Venator itself were actively and directly involved in the offerings, thus soliciting Plaintiffs' purchases.

(h) **Control Person Claims.** Plaintiffs contended that the Complaint sufficiently alleged primary violations of both the Exchange Act and Securities Act and, where required, Defendants' scienter.

43. On April 14, 2020, Defendants Maiter and Stolle filed a reply brief in further support of their motion to dismiss for lack of personal jurisdiction (ECF No. 69) and all Defendants filed a reply brief in further support of their motion to dismiss for failure to state a claim (ECF No. 70). In their reply briefs, Defendants largely restated their opening arguments.

44. On May 14, 2020, the Court heard extensive oral argument over the course of several hours on both of Defendants' motions to dismiss and Plaintiffs' responses. Following the hearing, and at the Court's request, both parties submitted additional letter briefs addressing certain issues that arose during the hearing. ECF Nos. 81, 82.

45. On July 7, 2021, the Court issued a lengthy decision granting in part and denying in part Defendants' motion to dismiss for failure to state a claim. ECF No. 89. In his opinion, Judge Eskridge specifically credited the Complaint's allegations based on the accounts of former employees of Venator.

46. Notably, the Court sustained two of the Complaint's four categories of alleged misstatements. The Court held that Defendants' statements concerning the operating capacity of Pori after the fire—in particular, the statements that the facility was operating at "20%" capacity and that the rebuild was "on track"—were actionable, but

21

Defendants' statements concerning the causes of rising titanium dioxide prices and the use of Venator's insurance proceeds were not.

47.     The Court further held that the Complaint adequately alleged the scienter of Venator, Defendant Ogden, and Defendant Turner as to the actionable misrepresentations. In particular, the Court credited the Complaint's allegations that Turner and Ogden had access to information contradicting their public statements about Pori's capacity and construction progress, in particular relying on the Complaint's allegations based on former employee statements.  The Court also noted that Turner and other Venator executives received weekly progress reports about the capacity of Pori and attended weekly meetings about the Pori rebuild at which employees relayed the fact that no reconstruction was actually occurring.  The Court also agreed with the Complaint's allegations regarding the critical importance of the Pori facility to Venator's business, holding that it defies reason that Turner and Ogden would have been unaware of the capacity and status of the Company's most profitable facility.

48.     The Court further held that the Complaint adequately pleaded control person claims as to Huntsman Corporation and the Individual Defendants (except Defendant Maiter, who was dismissed for lack of personal jurisdiction).

49.     As to the Complaint's Securities Act claims, the Court found that they were not time-barred by the statute of limitations; that the Securities Act claims would proceed as to the 20% statements and the "on track" statements; and that the Complaint's Section 12(a)(2) claims must be dismissed for lack of particularity but could be repleaded.

22

**E.    Plaintiffs File the Amended Consolidated Class Action Complaint**

50.    Based on the Court's holding that, as to the Section 12(a)(2) claims under the Securities Act, the "amended complaint lacks direct allegations as to who purchased what securities and from which underwriter" (ECF No. 89 at 57), Plaintiffs sought Defendants' agreement not to oppose a motion to amend the Complaint based on this holding, so that the case could proceed into discovery in parallel.  Defendants consented to Plaintiffs' request, and Plaintiffs filed an unopposed motion to amend the Complaint (ECF No. 91), which the Court granted (ECF No. 92).  Then, on August 16, 2021, Plaintiffs filed the Amended Consolidated Class Action Complaint (the "Amended Complaint") that addressed the Court's holding concerning the Securities Act claims in its motion to dismiss decision.  ECF No. 93.

51.    On September 9, 2021, Defendants filed their answers to the Amended Consolidated Class Action Complaint.  ECF Nos. 96-98.

**F.    Plaintiffs Pursue Discovery**

52.    Following the Court's decision on the motion to dismiss, the Parties immediately began to negotiate a schedule for the remainder of the case.  While negotiating the schedule, however, Defendants sought to "bifurcate" discovery into two phases. Specifically, Defendants argued the Parties should first be limited to discovery concerning class certification and, second—and only after a decision by the Court certifying the class—should discovery proceed into "merits" issues.  In advancing this argument, Defendants pointed to Judge Eskridge's individual rules and the Court's standard "form"

23

scheduling order requiring bifurcation, where discovery was "limited to topics necessary to class certification" until the Court ruled otherwise.

53.     On August 27, 2021, the Parties filed a letter brief setting forth their opposing positions on Defendants' bifurcation request.  ECF No. 95.  On September 10, 2021, the Court entered an Order finding that "recent practice in other, similar actions pending in the Houston Division of the Southern District of Texas counsels against bifurcating class and merits discovery here" and requested that the Parties confer and submit a scheduling order in line with that ruling.  ECF No. 99.  The Parties did so on September 20, 2021.  ECF No. 101.

54.     Simultaneously, the Parties negotiated a Protective Order, a protocol governing the production of electronically stored information ("ESI"), and an Amended Rule 26(f) Report.  Several issues were in dispute during the Parties' negotiations, including the number of custodians from each defendant whose files may be searched, and the scope of electronically stored material to be searched (i.e., whether voicemails, PDAs, and mobile phones would be collected).  After several meet-and-confers, the Parties ultimately came to an agreement on these issues and filed an Amended Joint Discovery and Case Management Plan and proposed Protective Order on September 30, 2021 (ECF No. 102), and a proposed E-Discovery Order on October 6, 2021 (ECF No. 104).  The Court entered the Protective Order on October 6, 2021 and the E-Discovery Order on October 12, 2021.  ECF Nos. 103, 105.

55.     With a case schedule in place, the Parties began propounding discovery requests upon one another.  The Parties exchanged Rule 26(a) Initial Disclosures and issued

24

requests for the production of documents and interrogatories. Plaintiffs also identified third party subpoena targets, followed up with witnesses in Europe, and continued their investigation. Plaintiffs also responded to Defendants' requests for production of documents and interrogatories issued to Plaintiffs.

56.     Specifically, Plaintiffs issued document requests to the Venator and the Huntsman Defendants which sought production of documents and communications concerning, among other things: the fire at Pori; the efforts to rebuild the Pori Facility; the timeline for rebuilding the Pori Facility; the status of the Pori Facility's operations and production of TiO2 after the fire; detailed information about Venator's TiO2 products manufactured at Pori before and after the fire; the impact of the Pori fire on Venator's sales and other financial metrics; the Pori Facility's "white end" and "black end" operations; Venator's practice of shipping unfinished TiO2 to Pori from elsewhere in Europe for finishing; the impact of the Pori fire on Venator's other facilities; Defendants' insider trading policies; materials used to prepare for Venator's and Huntsman's investor meetings and Board meetings; Defendants' original decision to spin-off Venator to Huntsman shareholders and subsequent decision to offer it to public investors instead; workplace safety incidents at Pori following the fire; disagreements among Venator employees regarding the rebuilding of Pori; the departures of certain employees of Venator after the Pori fire; communications with the SEC or Venator's investors; communications with Finnish regulatory and safety authorities; Defendants' compensation; Defendants' communications with Venator's insurers; and the movements in Venator's stock price following the alleged false statements and corrective disclosures.

25

57.     Separately, Plaintiffs issued requests for the production of documents to the Underwriter Defendants, which sought production of documents concerning: Venator's IPO and SPO; fees or compensation received by the Underwriter Defendants in connection with the IPO or SPO; agreements among the Underwriter Defendants and/or Venator and the Huntsman Defendants concerning the IPO or SPO; documents provided to the Underwriter Defendants by Venator and the Huntsman Defendants; the Underwriter Defendants' due diligence or other review of Venator in connection with the IPO or SPO; comfort letters reviewed in connection with the IPO or SPO; presentations made in connection with the IPO or SPO; and other categories of documents concerning the alleged false statements included in Venator's offering materials.

58.     Defendants produced an initial tranche of approximately 10,000 pages of documents.  These documents included internal Venator presentations that were provided to the Individual Defendants and other senior Venator executives during the Class Period. The Underwriter Defendants also produced documents concerning the alleged false statements included in the IPO and SPO offering documents.

59.     Lead Counsel reviewed Defendants' production, and analyzed the documents together with other materials and information gathered during Lead Counsel's pre-complaint investigation.  That review also included close consultation with a chemical manufacturing plant expert, which helped to decipher documents containing technical and industry-specific terms to support Plaintiffs' allegations that Venator lacked any realistic plan to rebuild Pori.

26

60.     On November 22, 2021, the Court entered the agreed-upon Scheduling and Docket Control Order, which largely tracked the schedule initially proposed by Plaintiffs and rejected Defendants' request to bifurcate discovery.  ECF No. 111.

### G.     The Motion for Class Certification

61.     While fact discovery was ongoing, on November 19, 2021, Plaintiffs filed a motion for class certification.  ECF No. 110.  Plaintiffs sought to certify a class consisting of "[a]ll persons and entities who: (i) purchased or otherwise acquired the publicly traded common stock of Venator between August 2, 2017 and October 29, 2018, inclusive (the 'Class Period'); and/or (ii) purchased or otherwise acquired Venator stock either in or traceable to Venator's August 3, 2017 IPO or December 4, 2017 SPO during the Class Period."  ECF No. 110 at 3.  Plaintiffs' motion was accompanied by a nearly 50-page report filed by Plaintiffs' expert financial economist, Dr. Michael L. Hartzmark, PhD, concerning the efficiency of the market for Venator common stock and Plaintiffs' ability to calculate damages on a class-wide basis.  ECF No. 110-2.

### H.     Work with Experts

62.     Lead Counsel worked with several experts throughout the litigation, whose insight and expertise were essential to the successful prosecution of Plaintiffs' claims.

63.     As noted above, Plaintiffs retained Dr. Hartzmark to prepare an expert report on market-efficiency and class-wide damages in connection with their motion for class certification.   Lead Counsel also consulted with Dr. Hartzmark in preparing for the settlement mediation discussed below.

27

64.     Plaintiffs also retained Chad Coffman of Global Economics Group, a highly qualified expert in loss causation and damages and Lead Counsel consulted with him throughout the litigation. Mr. Coffman provided Plaintiffs with expert advice on damages and loss causation issues, and, in particular, the impact of Defendants' alleged misstatements and omissions on the market price of Venator securities, and the damages suffered by Venator shareholders. Then, after the Settlement was reached, Lead Counsel worked with Mr. Coffman and his team at Global Economics Group to develop the Plan of Allocation.

65.     Plaintiffs also consulted with two industry experts in the course of the litigation. First, in connection with its investigation and the preparation of the Complaint, Lead Counsel also consulted with an industry expert with substantial experience providing analysis of businesses in the titanium pigment, minerals, and chemicals industries who assisted Lead Counsel in analyzing the process of TiO2 production that occurred at Venator's Pori facility. Second, after documents were received from Defendants, Plaintiffs consulted with a highly experienced chemical manufacturing plant expert who provided crucial analysis of Defendants' documents concerning the Pori rebuild efforts.

## I.     The Parties' Mediation and the Settlement of the Action

66.     In October 2021, the Parties discussed the possibility of resolving the Action through settlement and engaged Jed Melnick, Esq. of JAMS, one of the nation's preeminent mediators for complex securities class action cases, to serve as mediator. *See* Melnick Decl. (Ex. 1) ¶¶ 3-5.

28

67.    A mediation session with Mr. Melnick was scheduled for December 6, 2021. In advance of the mediation, the Parties exchanged detailed mediation statements addressing liability, damages, and class certification, and supporting exhibits, and submitted the mediation statements to Mr. Melnick.

68.    On December 6, 2021, counsel for Plaintiffs, counsel for Defendants, and representatives of the Defendants' insurance carriers participated in a full-day mediation session, which was conducted by videoconference.  During the mediation session, each side made extensive presentations largely on the issues of loss causation and damages. Following a full day of vigorous negotiations, the Parties were unable to reach an agreement.

69.    At the conclusion of the mediation, in an effort to help the Parties resolve their impasse, Mr. Melnick proposed a formal mediator's recommendation that the Action be resolved in exchange for payment of $19 million.  The proposal was issued on a double-blind basis, meaning that if one of the Parties had rejected the proposal they would not find out whether the other side had accepted the proposal.

70.    On December 10, 2021, Mr. Melnick informed the Parties that both sides had accepted his recommendation and agreed to the $19 million settlement.

71.    On January 10, 2022, the Action was reassigned from Judge Eskridge to the Honorable George C. Hanks, Jr.

72.    On January 28, 2022, the Parties executed a Term Sheet documenting their agreement-in-principle to settle the Action.  Thereafter, the Parties negotiated the full settlement terms and executed the Stipulation, setting forth that final agreement, on March

11, 2022, as well as related documentation, such as the form of notice to be provided to Settlement Class Members.  On March 11, 2022, Plaintiffs and Venator also executed a Supplemental Agreement setting forth the conditions under which Venator can terminate the Settlement if requests for exclusion from the Settlement Class exceed an agreed-upon threshold.

**J.      The Court Grants Preliminary Approval of the Settlement**

73.      On March 21, 2022, Plaintiffs filed a motion for preliminary approval of the Settlement and for authorization to disseminate the notice of Settlement.  ECF No. 117.

74.      On May 19, 2022, the Court entered the Order Preliminarily Approving Settlement and Authorizing Dissemination of Notice of Settlement (ECF No. 119) (the "Preliminary Approval Order") which, among other things: (a) preliminarily approved the Settlement; (b) approved the form of Notice, Summary Notice, and Claim Form, and authorized notice to be given to Settlement Class Members through mailing of the Notice and Claim Form, posting of the Notice and Claim Form on a Settlement website, and publication of the Summary Notice in *Investor's Business Daily* and over the *PR Newswire*; (c) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application; and (d) set a schedule for the filing of opening papers and reply papers in support of the proposed Settlement, Plan of Allocation, and the Fee and Expense Application.

75.      The Preliminary Approval Order also scheduled the Settlement Hearing for September 9, 2022 at 10:00 a.m. Central Time either in person or by videoconference (at

30

the Court's discretion) to determine, among other things, whether the Settlement should be finally approved.

## III.    RISKS OF CONTINUED LITIGATION

76.    The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a $19,000,000 cash payment.  Plaintiffs and Lead Counsel believe that the proposed Settlement is a fair and favorable result for the Settlement Class.

77.    As explained below, Plaintiffs faced meaningful risks with respect to proving liability and recovering full damages in this case.  Absent the Settlement, Plaintiffs would still need to overcome Defendants' challenges to Plaintiffs' motion to certify the class, and prevail at additional stages of the litigation, including defeating Defendants' anticipated motion for summary judgment, at trial, and on appeal.  Even after any trial, Plaintiffs would have faced post-trial motions, including a potential motion for judgment as a matter of law, as well as further appeals that might have prevented Plaintiffs from successfully obtaining a recovery for the class.

### A.    General Risks in Prosecuting Securities Class Actions

78.    In recent years, securities class actions have faced greater risks than in prior years, and it is not uncommon for district courts to dismiss securities class actions at the summary judgment stage.  *See, e.g.*, *Murphy v. Precision Castparts Corp.*, 2021 WL 2080016, at *1 (D. Or. May 24, 2021); *Fosbre v. Las Vegas Sands Corp.*, 2017 WL 55878, at *28 (D. Nev. Jan. 3, 2017), *aff'd Pompano Beach Police & Firefighters' Ret. Sys. v. Las Vegas Sands Corp.*, 732 F. App'x 543 (9th. Cir. 2018); *In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 554-55 (S.D.N.Y. 2008), *aff'd* 597 F.3d 501 (2d Cir. 2010); *In*

*re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 496 (D. Conn. 2013), *aff'd Dalberth v. Xerox*, 766 F.3d 172 (2d Cir. 2014).

79.    And even cases that have survived summary judgment can be dismissed prior to trial in connection with *Daubert* motions, such as those likely to be filed by Defendants here. For example, in *In re Pfizer Inc. Securities Litigation*, the district court granted the defendants' motion *in limine* to exclude the testimony of the plaintiffs' proffered damages expert. 2014 WL 3291230, at *1 (S.D.N.Y. July 8, 2014). Subsequently, the court also granted the defendants' renewed motion for summary judgment based on the plaintiffs' failure to proffer admissible loss causation and damages evidence. *Id.*; *see also Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Boston*, 853 F. Supp. 2d 181, 197-98 (D. Mass. 2012), *aff'd* 752 F.3d 82 (1st Cir. 2014) (granting summary judgment *sua sponte* in favor of the defendants after finding that the event study offered by plaintiffs' expert was unreliable and that there was accordingly no evidence that the market reacted negatively to disclosures).

80.    Even when securities class action plaintiffs successfully overcome multiple substantive and procedural hurdles pre-trial, there remain significant risks that a jury will not find the defendants liable or award expected damages.

81.    Further, post-trial motions, based on a complete record, also present substantial risks. For example, in *In re BankAtlantic Bancorp, Inc.*, following a jury verdict in the plaintiffs' favor, the district court granted the defendants' motion for judgment as a matter of law and entered judgment in favor of the defendants on all claims. 2011 WL

1585605, at *14-22 (S.D. Fla. Apr. 25, 2011), *aff'd* 688 F.3d 713 (11th Cir. 2012) (finding that there was insufficient trial evidence to support a finding of loss causation).

82.     Intervening changes in the law may also impact a successful trial verdict. For example, a district court in Oregon reconsidered its order denying defendants' motion for summary judgment and granted the motion more than a year later based on a new decision by the Ninth Circuit. *See Precision Castparts*, 2021 WL 2080016, at *6.

83.     Securities class actions face serious risks of dismissal and non-recovery at all stages of litigation.

### B.     Specific Risks Concerning this Action

84.     Plaintiffs and Lead Counsel believe the claims asserted against Defendants in this action are meritorious. They recognize, however, that this action presented a number of serious risks to establishing Defendants' liability, to successfully certifying the class, and to proving the class's damages. Therefore, the risks of continuing on with the litigation were heightened, and the class's ultimate potential for recovery was significantly diminished.

#### 1.     Risks Concerning Liability

#### a.     Falsity

85.     Defendants vigorously argued at the motion to dismiss stage—and would likely continue to argue—that Plaintiffs cannot show that any of Defendants' remaining challenged statements were materially false or misleading. While the Court largely rejected Defendants' falsity arguments at the pleading stage, this opinion was preliminary, and not binding on this issue. Defendants would have raised their falsity arguments again

at summary judgment—and, if Plaintiffs survived summary judgment, again at trial before a jury, which could have easily credited Defendants' arguments.

86.     Specifically, while the Court sustained as actionable Defendants' statements that Pori was operating at 20% of its prior capacity after the fire, there a significant risk that Plaintiffs would be unable to demonstrate these statements were false at the time they were made.  In countering Defendants' motion to dismiss, Plaintiffs successfully argued that a reasonable investor would understand that the representation that Pori was operating at 20% of its prior capacity conveyed that Pori was manufacturing TiO2 from start-to-finish, not merely "finishing" TiO2.  However, as they did at the motion to dismiss, Defendants would likely continue to argue that a reasonable investor would have understood that, in this context, it was not misleading to state that Pori was operating at 20% prior capacity—even if it was only "finishing" TiO2—because the context of Defendants' statements would have conveyed the true meaning, or that the distinction between "finishing" capacity and "production" capacity was immaterial to investors.  Indeed, Judge Eskridge, in denying the motion to dismiss had noted that "evidence at a later stage" could demonstrate that Plaintiffs' interpretation of "capacity" is wrong.  ECF No. 89 at 35.

87.     Moreover, given the highly technical and industry-specific nature of Defendants' "capacity" statements, this dispute could come down to a "battle of the experts," where Plaintiffs and Defendants offer differing expert testimony on what Defendants' words meant, how the market would have interpreted them, and how they reflected the true state of affairs at Pori after the fire.  Although the Court credited the

34

allegations in the Complaint, additional expert witness testimony from experts, analysts, industry participants, and investors could have convinced the Court or a jury that Defendants' "capacity" statements were not materially misleading.

88.     In addition, it is likely that Defendants would have asserted a truth-on-the-market defense, which they previewed in their motion to dismiss, to contend that Venator and Huntsman disclosed sufficient information about Venator's plans to ship intermediate TiO2 to Pori to be "finished" such that Defendants' representations about Venator's "capacity" were immaterial.   If the case remained in litigation, Plaintiffs faced the possibility that the Court or a jury could agree with Defendants that they adequately disclosed sufficient information to investors to counterbalance their misleading statements.

89.     Moreover, Plaintiffs faced significant risk in proving Defendants' liability with respect to the "on track" and "on pace" rebuilding statements.  Specifically, although the Court sustained these statements on the basis that they were not forward-looking and were mixed present/future statements, the present or historical portions of the statements that the Court held actionable largely consist of Defendants' representations that Pori had "already returned to 20% capacity."  Accordingly, Defendants would likely have sought dismissal of these statements at later stages of the litigation by invoking the same or similar arguments they raised in seeking dismissal of the "20% capacity" statements.

90.     Statements of this nature face legal hurdles of their own.  Numerous recent court decisions suggest that the "on track" statements the Court sustained may be subject to dismissal, including at summary judgment.  In one recent example, a district court that had upheld all of plaintiff's "on track" statements at the motion to dismiss stage dismissed

the case in its entirety at summary judgment. *See Murphy v. Precision Castparts Corp.*, 2021 WL 2080016 (D. Or. May 24, 2021). The court found that these statements were not "sufficiently concrete" or "specific" to be actionable—even though the court specifically found that the plaintiffs had developed evidence suggesting that the defendant "knew the announced target was close to impossible to attain." *Id*. at *5.

91.     Finally, with respect to the categories of alleged misstatements that Judge Eskridge had previously dismissed from the case—Defendants' statements concerning the causes of rising TiO2 prices and the use of Venator's insurance proceeds—Plaintiffs faced substantial challenges in obtaining evidence in discovery that would be sufficient to seek a reversal of the Court's decision dismissing these claims. Those challenges include the fact that the Court dismissed certain of these alleged misstatements in significant part based on its view of the actual content of the statements themselves which, by their very nature, would not change with additional discovery. ECF No. 89 at 38-43.

### b.     Scienter

92.     Even if Plaintiffs were able to prove that Defendants' statements were false or misleading and material to investors, they would still need to prove to a jury that Defendants knew or recklessly disregarded that their statements were false. This risk pertains solely to Plaintiffs' Exchange Act claims, but is critical nonetheless.

93.     While the Court found that the Complaint adequately pleaded scienter at the motion to dismiss stage, the Court or a jury could find otherwise as the case proceeded. Defendants would have likely continued to argue that, in light of investors' focus on the status of the Pori rebuild, Venator's senior executives had little incentive to defraud

36

investors over such a narrow interpretation of the term "capacity." Indeed, Defendants will likely argue that Peter Huntsman's February 2017 statement that Pori would ship intermediate TiO2 to Pori undermines any inference of fraudulent intent in representing that Pori was operating at "20% capacity." Defendants would also likely continue to make the common-sense argument that their spending substantial amounts of Venator's money on the effort to rebuild Pori—including the expense of shipping intermediate TiO2 to Pori for "finishing"—undermines any inference of fraudulent intent. Instead, Defendants would argue that their significant investment in Pori shows that Venator genuinely believed the facility could be rebuilt but changed course when the reconstruction proved to be more time-consuming and costly than expected.

94.    Defendants would also likely continue to point to their lack of personal financial motivation to commit fraud. Indeed, at the motion to dismiss stage, the Court rejected the Venator executives' personal financial motivation as a basis for pleading scienter, and the Executive Defendants here—Venator's CEO and CFO—would undoubtedly continue to argue they obtained no personal benefit by engaging in the fraud.

### c.    Loss Causation and Damages

95.    One of the most significant risks that Plaintiffs faced in continuing to litigate this action stemmed from Defendants' loss-causation arguments which, if successful, would have significantly reduced or even eliminated entirely the Settlement Class's ability to recover damages. Specifically, Defendants would have likely argued that Judge Eskridge's motion to dismiss opinion severely narrowed the scope of the case by eliminating two of the four categories of false statements pled in the Complaint, and as a

result, there was a mismatch between the three corrective disclosures alleged in the Complaint—which occurred on July 31, 2018, September 12, 2018, and October 30, 2018—and the remaining categories of false statements. We address each of Defendants' potential arguments, and the risks they posed to the Settlement Class's ability to recover damages in this case, below.

96. Plaintiffs alleged in the Complaint that, on July 31, 2018, Venator announced its financial results for the second quarter of 2018, during which Defendants disclosed that the Pori rebuild "may require more self-funding than [Venator's] previous estimate of $325 to $375 million." The Complaint alleged that, on this news, Venator's stock price declined by 4.75%, from a closing price of $15.35 on July 30, 2018 to close at $14.62 the following day. Defendants would likely argue, however, that because the Court dismissed the insurance-related statements from the case—and because on July 31, 2018 the Company disclosed other, non-Pori related information about the Company, including an earnings miss, which contributed to the stock decline—the alleged July 31, 2018 corrective disclosure was no longer viable.

97. Similarly, Defendants would likely argue that the October 30, 2018 corrective disclosure alleged in the case was no longer viable after the Court's motion to dismiss opinion. Specifically, the Complaint alleged that, on October 30, 2018, Venator disclosed that, in addition to the over $500 million in costs and lost business associated with the Pori fire that Venator had incurred to date—which, by that point, had been covered entirely by Venator's insurance policy—the Company incurred an additional $415 million in restructuring expenses and "lower-than-expected" TiO2 demand. This, Plaintiffs

38

alleged, caused the price of Venator shares to decline more than 19%, from a closing price of $8.00 on October 29, 2018 to close at $6.47 the following day—which is the largest alleged stock decline, responsible for the largest component of Plaintiffs' potentially recoverable damages, in the case.  Defendants would likely contend that the information Venator disclosed on October 30, 2018 also related to the "insurance" and "market demand" categories of false statements that the Court rejected at the motion to dismiss, and therefore there are no recoverable damages associated with that stock decline.

98.     Finally, Defendants would have likely argued that the only viable corrective disclosure that remained following the Court's dismissal of two of the four categories of alleged misstatements was the September 12, 2018 announcement that Venator was planning to abandon the Pori facility.  However, Defendants would have likely contended that the stock price decline following that disclosure was not statistically significant, and thus not compensable as damages.

99.     In light of these substantial risks, the settlement of $19 million is a very favorable result for the Settlement Class.  Based on extensive analysis conducted by Plaintiffs' damages expert, the estimated reasonably likely maximum damages that could be proved at trial would be approximately $215.7 million.  But this maximum damages amount assumes that Plaintiffs would be able to prove full damages based on all the alleged corrective disclosures—even though the Court had, in reality, dismissed two of the four categories of alleged misstatements—and that they would not need to disaggregate, or parse out, confounding non-fraud related information for any of the corrective disclosure dates.

39

100.    However, as noted above, Defendants would have argued that none of the alleged corrective disclosures caused damages arising from the alleged fraud—and, in particular, that the Court's order on the motion to dismiss drastically reduced investors' recoverable damages by eliminating or substantially limiting certain corrective disclosures. At summary judgment and trial, Defendants would likely claim that damages were far lower, if not zero. If Defendants succeeded in having one or more of the alleged corrective disclosures dismissed or succeeded in proving that Plaintiffs had to disaggregate purportedly confounding information, damages would be significantly smaller. For example, even if only the October 30, 2018 decline was eliminated, the reasonably likely maximum damages would be approximately $137 million, and only approximately $46 million if the declines following both the October 30, 2018 and July 31, 2018 corrective disclosures were eliminated. Thus, the $19 million Settlement represents approximately 8.8% to 41.3% of the reasonably likely maximum damages, which still assumes success by Plaintiffs on all liability issues, including the stringent scienter standard for the Exchange Act claims. Indeed, Defendants would likely have contended that Plaintiffs suffered no cognizable damages at all because there were no statistically significant price declines on the alleged corrective disclosure dates attributable to any misrepresentation or omission that remained in the case—demonstrating that the $19 million Settlement represents a very favorable resolution for the Settlement Class.

101.    The resolution of disputed issues regarding damages and loss causation likely would have boiled down to a "battle of experts," and Defendants would undoubtedly have presented a well-qualified expert who would opine that the class's damages were smaller

40

or nonexistent.  If Defendants prevailed on their loss-causation and damages arguments, recoverable damages would be eliminated or significantly reduced.

### 2.    Risks Associated with Class Certification

102.    Plaintiffs also faced risks at class certification.  Defendants would have likely opposed class certification by relying on the U.S. Supreme Court's recent decision in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951, 1960 (2021) ("*Goldman*").  In *Goldman*, the Supreme Court made clear that defendants may rebut the presumption of reliance by showing a lack of "price impact"—i.e., that the alleged misstatements did not *in fact* impact the stock price or cause the price to be inflated—but have the burden of persuasion in doing so.  However, in *Goldman*, the Supreme Court provided defendants with new arguments to rebut the presumption by suggesting that evidence of a lack of price impact may be more readily established in cases, like this one, where there "is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Id.* at 1961.  Here, Defendants would likely contend that no one corrective disclosure or series of disclosures "corrected" Defendants' "20% capacity" statements, and thus they are able to establish a lack of price impact under *Goldman*.

103.    Based on all the factors summarized above, Plaintiffs and Lead Counsel respectfully submit that it was in the best interest of the Settlement Class to accept the immediate and substantial benefit conferred by the $19 million Settlement, instead of incurring the significant risk that the Settlement Class would recover a lesser amount, or nothing at all, after several additional years of arduous litigation, even assuming that they obtained a favorable ruling on the motion to dismiss.  Indeed, the Parties were deeply

41

divided on several key factual issues central to the litigation, and there was no guarantee that Plaintiffs' positions on these issues would prevail on at class certification, summary judgment, or trial.  If Defendants had succeeded on any of their substantial defenses, Plaintiffs and the Settlement Class would have recovered nothing at all or, at best, would likely have recovered far less than the Settlement Amount.

### 3. Risks Associated with Plaintiffs' Securities Act Claims

104.   While Plaintiffs are confident in the strength of the Securities Act claims asserted in the Complaint, those claims also faced substantial risks.

105.   First, while Plaintiffs would have borne the burden of proving loss causation in connection with their Exchange Act claims, the Securities Act Defendants would have the opportunity to prove negative causation—in other words, the absence of loss causation. Here they would likely assert negative causation as an affirmative defense, which would assert that the declines in Venator's stock price were caused by factors other than the misrepresentations or omissions alleged in the Complaint.  Had Defendants succeeded in establishing, in whole or in part, this affirmative defense, they would have limited their liability substantially—and potentially even reduced any recoverable damages to zero.

106.   Second, the Underwriter Defendants are likely to have asserted a due diligence defense in response to the Securities Act claims against them. Plaintiffs believe that the Underwriter Defendants would have faced an uphill battle to succeed in establishing this defense; however, it presented a clear risk to Plaintiffs' and the Settlement Class's success in the case.  If established, this affirmative "due diligence" defense would

have immunized those Defendants from any liability for the Securities Act claims alleged against them.

### 4.     Risks Concerning Appeals

107.   Even if Plaintiffs prevailed at summary judgment and trial, Defendants would likely have appealed the judgment—leading to many additional months, if not years, of further litigation.   On appeal, Defendants likely would have renewed their host of arguments as to why Plaintiffs failed to establish liability and damages, thereby exposing Plaintiffs and the Settlement Class to the risk of having any favorable judgment reversed or reduced below the Settlement Amount.   *See, e.g.*, *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on loss causation grounds and judgment entered for defendant).

### 5.     Additional Risks

108.   Finally, Plaintiffs additional risks as the litigation progressed, including with respect to Defendants' arguments concerning the statute of limitations first raised at the motion to dismiss stage.   Indeed, the $19 million Settlement here stands in stark comparison to the results achieved by the plaintiffs in the securities action pending against Venator in state court, which was largely dismissed—first by a Texas state court on jurisdictional grounds and then by a New York state court on statute of limitations grounds.

43

**IV.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF NOTICE**

109.    The Court's Preliminary Approval Order directed that the Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Hearing; and (III) Motion for Attorneys' Fees and Litigation Expenses (the "Notice") and Proof of Claim and Release Form ("Claim Form") be disseminated to the Settlement Class.    The Preliminary Approval Order also set an August 19, 2022 deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application or to request exclusion from the Settlement Class, and set a final approval hearing date of September 9, 2022.

110.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed JND Legal Administration ("JND"), the Court-approved Claims Administrator, to begin disseminating copies of the Notice and the Claim Form by mail and to publish the Summary Notice.    The Notice contains, among other things, a description of the Action, the Settlement, the proposed Plan of Allocation, and Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the Fee and Expense Application, or exclude themselves from the Settlement Class.    The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for Litigation Expenses in an amount not to exceed $350,000.    To disseminate the Notice, JND obtained information from Venator and from banks, brokers, and other nominees regarding the names and addresses of potential Settlement Class Members.    *See* Declaration of Luiggy

44

Segura Regarding: (A) Mailing of the Notice and Claim Form; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion Received to Date ("Segura Decl."), attached hereto as Exhibit 5, at ¶¶ 3-7.

111.    JND began mailing copies of the Notice and Claim Form (together, the "Notice Packet") to potential Settlement Class Members and nominee owners on June 10, 2022. *See* Segura Decl. ¶¶ 3-6. As of August 3, 2022, JND had disseminated a total of 24,827 Notice Packets to potential Settlement Class Members and nominees. *Id.* ¶ 9.

112.    On June 27, 2022, in accordance with the Preliminary Approval Order, JND caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over the *PR Newswire*. *Id.* ¶ 10.

113.    Lead Counsel also caused JND to establish a dedicated settlement website, www.VenatorSecuritiesLitigation.com, to provide potential Settlement Class Members with information concerning the Settlement and access to copies of the Notice and Claim Form, as well as the Stipulation, Preliminary Approval Order, and Amended Complaint. *See* Segura Decl. ¶ 12. That website became operational on June 10, 2022. *Id.* Lead Counsel also made copies of the Notice and Claim Form and other documents available on its own website, www.blbglaw.com.

114.    As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, and/or Fee and Expense Application, or to request exclusion from the Settlement Class is August 19, 2022. To date, no requests for exclusion have been received. *See* Segura Decl. ¶ 13. In addition, no objections to the Settlement, Plan of Allocation, or Lead Counsel's Fee and Expense Application have been

received.  Lead Counsel will file reply papers on or before September 2, 2022 that will address any requests for exclusion and any objections that may be received.

## V.    ALLOCATION OF THE PROCEEDS OF THE SETTLEMENT

115.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less any (i) Taxes, (ii) Notice and Administration Costs, (iii) Litigation Expenses awarded by the Court, (iv) attorneys' fees awarded by the Court, and (v) any other costs or fees approved by the Court) must submit a valid Claim Form with all required information postmarked no later than October 17, 2022.  The Net Settlement Fund will be distributed among Settlement Class Members who submit eligible claims according to the plan of allocation approved by the Court.

116.    The plan of allocation for the Net Settlement Fund proposed by Plaintiffs and Lead Counsel (the "Plan of Allocation" or "Plan") is set forth in Appendix A of the Notice mailed to potential Settlement Class Members.  *See* Notice at 18-23.  If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Authorized Claimants.[6]

117.    Lead Counsel believes that the Plan provides a fair and reasonable method to equitably allocate the Net Settlement Amount among Settlement Class Members, taking into account the damages each Settlement Class Member suffered as a result of Defendants'

---

[6] An "Authorized Claimant" means a person or entity who or which submits a Claim to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund.

alleged misconduct and the statute under which their claim(s) arose.  Lead Counsel developed the Plan of Allocation in consultation with Plaintiffs' damages expert.

118.    The proposed Plan of Allocation is designed to achieve an equitable and rational distribution of the Net Settlement Fund.  However, it is not a formal damages analysis, and the calculations made pursuant to the Plan are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Plan ¶ 3.  Instead, the calculations under the Plan are only a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Amount.  *Id*.

119.    The Plan of Allocation creates a framework for equitable distribution of the Net Settlement Fund among Settlement Class Members who suffered economic losses as a result of Defendants' alleged violations of the federal securities laws.  The Plan also takes into the account the statute under which those violations arose, such that all members of the Settlement Class who purchased publicly traded Venator common stock ("Venator Common Stock") during the Class Period have a potential claim under Section 10(b) of the Exchange Act, and members of the Settlement Class who purchased Venator Common Stock in or traceable to Venator's August 3, 2017 IPO or December 4, 2017 SPO also have a potential Securities Act claim.

120.    **Exchange Act Loss Amounts**. The formula for calculating a Claimant's Exchange Act Loss Amount under the Plan is the same as that typically used in plans of allocations in other securities class action asserting Section 10(b) claims.  An Exchange

47

Act Loss Amount will be calculated for each purchase or acquisition of Venator Common Stock during the Class Period. In general, that amount is equal to (a) the difference between the estimated artificial inflation in the price of Venator Common Stock on the date of purchase and the estimated artificial inflation on the date of sale, or (b) the difference between the actual purchase price and sales price of the stock, whichever is less. *See* Plan ¶¶ 6, 9.[7]

121. Plaintiffs' damages expert calculated the amount of artificial inflation in the price of Venator common stock by considering price changes in Venator Common Stock in reaction to the public disclosures allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces. *See* Plan ¶ 4. In addition, with respect to the final disclosure (on October 30, 2018), the amount of artificial inflation related to the alleged misstatements that is deemed to have been dissipated by that disclosure is 50% of the abnormal price decline in Venator Common Stock on that day to account for the presence of confounding non-fraud-related disclosures and the relatively greater litigation risk in establishing that the alleged misstatements were the cause of the decline on that day. *Id.*

---

[7] In addition, in accordance with the PSLRA, Exchange Act Loss Amounts for Venator Common Stock sold during the 90-day period after the end of the Class Period are further limited to the difference between the purchase price and the average closing price of the stock from the end of the Class Period to the date of sale. Plan ¶ 9(c)(iii). Exchange Act Loss Amounts for shares of Venator Common Stock still held as of the close of trading on January 25, 2019, the end of the 90-day period, will be the lesser of (a) the amount of artificial inflation on the date of purchase or (b) the difference between the purchase price and $5.02, the average closing price for the stock during that 90-day period. *Id.* ¶ 9(d).

122. Claimants who did not hold their Venator Common Stock over one of the disclosure dates in the Plan of Allocation—that is, those who sold their shares before the first disclosure date or who purchased and then sold all their shares between two such disclosure dates—will have no Exchange Act Loss Amount as to those transactions under the Plan because the level of alleged artificial inflation would be the same on their date of purchase as on their date of sale. *Id.* ¶¶ 5-6, 9.

123. **<u>Securities Act Loss Amounts</u>**. Claimants who purchased shares of Venator Common Stock (a) directly in either the August 2017 IPO or December 2017 SPO; (b) during the period after the IPO but before the SPO, when all shares were traceable to the IPO; or (c) after the SPO through the end of the Class Period and who are able to submit documentation tracing the specific shares they purchased to shares issued in the IPO or SPO, may have a Securities Act Loss Amount on these purchases. *See* Plan ¶¶ 10-11. The Securities Act Loss Amount is calculated based on the statutory formula for damages under Section 11 of the Securities Act, 15 U.S.C. § 77k(e). Specifically, the Plan provides that:

(a) for shares sold before the suit was brought (July 31, 2019), the Securities Act Loss Amount is the purchase price per share (not to exceed the offering price) minus the sale price;

(b) for shares sold after the suit was brought and before March 11, 2022 (the date the Stipulation was executed)[8], the Securities Act Loss Amount is the

---

[8] The date the Stipulation was executed is a substitute for the "date of judgment" under the statute in this formula. *See* 15 U.S.C. § 77k(e).

49

purchase price per share (not to exceed the offering price) minus the greater of (i) the sale price per share or (ii) $3.83, the closing price of Venator Common Stock on July 31, 2019; and

(c)    for shares still held as of March 11, 2022, the Securities Act Loss Amount is the purchase price per share (not to exceed the offering price) minus $3.83.

*See* Plan ¶¶ 10-11.

124.    **"Recognized Loss Amounts"** and **"Recognized Claim" Amounts**.  For each Claimant's purchase or acquisition of Venator Common Stock during the Class Period, a "**Recognized Loss Amount**" will be calculated, which will be the greater of the Exchange Act Loss Amount, if any, or the Securities Act Loss Amount, if any, for each eligible purchase or acquisition.  Plan ¶¶ 8, 12.  If a Recognized Loss Amount calculates to a negative number, the Recognized Loss Amount for that transaction will be zero.  The sum of a Claimant's Recognized Loss Amounts for all their purchases or acquisitions of Venator Common Stock during the Class Period is the Claimant's "**Recognized Claim**." Plan ¶ 14.  The Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.  Plan ¶ 20.

125.    As noted above, as of August 3, 2022, more than 24,800 copies of the Notice, which contains the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, had been sent to potential Settlement Class Members and nominees.  S*ee* Segura Decl. ¶ 9.  To date, no objections to the proposed Plan of Allocation have been received.

50

126.    In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on damages they suffered on purchases or acquisitions of Venator Common Stock during the Class Period, taking into account the statutory basis of each Settlement Class Member's claim.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

## VI.    THE FEE AND EXPENSE APPLICATION

127.    In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees of 25% of the Settlement Fund, net of Litigation Expenses, plus interest earned at the same rate as the Settlement Fund (the "Fee Application").  Lead Counsel also requests payment for litigation expenses incurred by Plaintiffs' Counsel in connection with the prosecution and settlement of the Action in the amount of $240,253.64.  Lead Counsel further requests reimbursement to Plaintiffs of a total of $14,569.35 in costs and expenses that Plaintiffs incurred directly related to their representation of the Settlement Class, in accordance with the PSLRA, 15 U.S.C. §§ 77z-1(a)(4), 78u-4(a)(4).  The requested attorneys' fees, litigation expenses, and PSLRA awards are to be paid from the Settlement Fund.  The legal authorities supporting the requested fee and expenses are discussed in Lead Counsel's Fee Motion.  The primary factual bases for the requested fee and expenses are summarized below.

51

### A. The Fee Application

128. Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis. As set forth in the accompanying Fee Motion, the percentage method is the appropriate method of fee recovery because it aligns the lawyers' interest in being paid a fair fee with the interest of the Plaintiffs and the Settlement Class in achieving the maximum recovery in the shortest amount of time required under the circumstances and taking into account the litigation risks faced in a class action. Use of the percentage method has been recognized as appropriate by the Fifth Circuit in comparable cases.

129. Based on the quality of the result achieved, the extent and quality of the work performed by Plaintiffs' Counsel, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submits that the requested fee award is reasonable and should be approved. As discussed in the Fee Motion, a 25% fee award is fair and reasonable for attorneys' fees in common fund cases such as this and is within the range of percentages awarded in securities class actions in this Circuit with comparable settlements.

### 1. Plaintiffs Have Authorized and Support the Fee Application

130. Plaintiffs Fresno, Miami, and Pontiac are sophisticated institutional investors that closely supervised and monitored the prosecution and settlement of the Action. *See* Kendig Decl. (Ex. 2), at ¶¶ 2-4; Hernandez Decl. (Ex. 3), at ¶¶ 2-4; Albritton Decl. (Ex. 4), at ¶¶ 2-4. Plaintiffs have carefully evaluated the Fee Application and believe that it is fair and reasonable in light of the result obtained for the Settlement Class, the substantial risks in the litigation, and the work performed by Plaintiffs' Counsel. *See* Kendig Decl. ¶¶ 6-7;

52

Hernandez Decl. ¶¶ 6-7; Albritton Decl. ¶¶ 6-7. Plaintiffs' endorsement of Lead Counsel's fee request further demonstrates its reasonableness and should be given weight in the Court's consideration of the fee award.

### 2.      The Time and Labor of Plaintiffs' Counsel

131.   The time and labor expended by Plaintiffs' Counsel in pursuing this Action and achieving the Settlement support the reasonableness of the requested fee. Attached as Exhibits 6A through 6D are declarations from each Plaintiffs' Counsel firm in support of Lead Counsel's motion for attorneys' fees and litigation expenses ("Fee and Expense Declarations"). The Fee and Expense Declarations indicate the amount of time spent by each attorney and the professional support staff employed by each firm, and the lodestar calculations based on their current hourly rates, as well as a schedule of expenses incurred by the firm, delineated by category. These Declarations were prepared from contemporaneous daily time records and expense records regularly maintained and prepared by the respective firms, which are available at the request of the Court.

132.   As set forth in the Fee and Expense Declarations, Plaintiffs' Counsel have collectively expended 4,209.4 hours in the prosecution of this Action, with a total lodestar of $2,585,150.25. Lead Counsel's lodestar represented 96% of the total lodestar of all Plaintiffs' Counsel. If Lead Counsel's request for Litigation Expenses is granted, the requested fee of 25% of the Settlement Fund, net of Litigation Expenses, will be

$4,686,294, plus interest.[9]   Accordingly, the requested fee results in a multiplier of approximately 1.8 of Plaintiffs' Counsel's lodestar.  As discussed in the Fee Motion, the requested multiplier is well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in this Circuit and elsewhere.

133.   As described above in greater detail, the work that Plaintiffs' Counsel performed in this Action included: (i) conducting an extensive investigation into the claims asserted, including through a detailed review of public documents and interviews with witnesses believed to potentially have information about the claims at issue in the Action, including former Venator employees located in United States, Finland, Germany, and elsewhere; (ii) researching and drafting an initial complaint, a detailed consolidated Complaint, and the operative Amended Complaint; (iii) fully briefing and arguing Plaintiffs' opposition to Defendants' motions to dismiss the Complaint; (iv) issuing document requests and obtaining thousands of pages of documents produced by Defendants; (v) filing Plaintiffs' motion for class certification, including an accompanying expert report from Plaintiffs' financial economics expert on the efficiency of the market for Venator Common Stock and the calculation of damages on a class-wide basis; (vi) consulting extensively throughout the litigation with a variety of experts and consultants, including industry experts and experts in market efficiency, loss causation,

---

[9] The requested fee is calculated as $19 million minus $254,822.99 (the Litigation Expenses sought), which is $18,745,177.01, then multiplied by 0.25, which comes to $4,686,294.

and damages; and (vii) engaging in extensive arm's-length settlement negotiations to achieve the Settlement, including a full-day mediation session with Mr. Melnick of JAMS.

134. As detailed above, throughout this case, Plaintiffs' Counsel devoted substantial time to the prosecution of the Action. I maintained control of and monitored the work performed by other lawyers at BLB&G. While I personally devoted substantial time to this case, and personally reviewed and edited all pleadings, court filings, and other correspondence prepared on behalf of Plaintiffs, other experienced attorneys at my firm were involved in settlement negotiations and other matters. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. For example, an experienced BLB&G staff attorney helped to assist in the review and analysis of Defendants' initial production of approximately 10,000 documents, including by participating in meetings with more senior lawyers and myself to discuss critical documents, preparing memoranda and timelines that included analysis of Defendants' documents, and otherwise assisting in preparing Lead Counsel's submissions in connection with the mediation. Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

### 3. The Skill and Experience of Plaintiffs' Counsel

135. The skill and expertise of Lead Counsel and the other Plaintiffs' Counsel also support the requested fee. As demonstrated by the firm resume attached as Exhibit 6A-3 hereto, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases.

BLB&G is consistently ranked among the top plaintiffs' firms in the country. Further, BLB&G has taken complex cases such as this to trial, and it is among the few firms with experience doing so on behalf of plaintiffs in securities class actions. Liaison Counsel Ajamie LLP is also high skilled and extremely knowledgeable counsel. I believe Plaintiffs' Counsel's skill and their willingness and ability to prosecute the claims vigorously through trial, if necessary, added valuable leverage in the settlement negotiations.

### 4. Standing and Caliber of Defendants' Counsel

136. The quality of the work performed by Plaintiffs' Counsel in attaining the Settlement should also be evaluated in light of the quality of its opposition. Defendants were represented by attorneys from Sullivan & Cromwell LLP, Haynes & Boone, LLP, Shearman & Sterling, LLP, and Paul, Weiss, Rifkind, Wharton & Garrison LLP—all of which are highly experienced and highly skilled law firms that zealously represented their clients. In the face of this skillful and well-financed opposition, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the case on terms that will significantly benefit the Settlement Class.

### 5. The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk Contingent Cases

137. The prosecution of these claims was undertaken entirely on a contingent-fee basis, and the considerable risks assumed by Plaintiffs' Counsel in bringing this Action to a successful conclusion are described above. Those risks are relevant to the Court's evaluation of an award of attorneys' fees. Here, the risks assumed by Plaintiffs' Counsel, and the time and expenses incurred without any payment, were extensive.

138.    From the outset, Plaintiffs' Counsel understood that they were embarking on a complex, expensive, lengthy, and hard-fought litigation with no guarantee of ever being compensated for the substantial investment of time and the outlay of money that vigorous prosecution of the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources (in terms of attorney and support staff time) were dedicated to the litigation, and that Lead Counsel would further advance all of the costs necessary to pursue the case vigorously on a fully contingent basis, including funds to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case such as this typically demands.  Because complex securities litigation generally proceeds for several years before reaching a conclusion, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Indeed, Plaintiffs' Counsel have received no compensation during the three-year duration of this Action and no reimbursement of out-of-pocket expenses, yet they have devoted more than 4,200 hours and incurred more than $200,000 in expenses in prosecuting this Action for the benefit of Venator investors.

139.    Plaintiffs' Counsel also bore the risk that no recovery would be achieved.  As discussed above, from the outset this case presented a number of significant risks and uncertainties.

140.    As noted above, the Settlement was reached only after Lead Counsel had overcome Defendants' motion to dismiss, begun the process of document discovery, and filed Plaintiffs' class certification motion.  However, had the Settlement not been reached when it was and this litigation continued, Lead Counsel would have been required to

57

complete fact and expert discovery, oppose Defendants' motions for summary judgment, and prepare and take the case to trial. Moreover, even if the jury returned a favorable verdict after trial, it is likely that any verdict would be the subject of post-trial motions and appeals.

141. Lead Counsel's persistent efforts in the face of significant risks and uncertainties have resulted in a significant and certain recovery for the Settlement Class. In light of this recovery and Plaintiffs' Counsel's investment of time and resources over the course of the litigation, Lead Counsel believes the requested attorneys' fee is fair and reasonable and should be approved.

### 6.    The Reaction of the Settlement Class to the Fee Application

142. As noted above, as of August 3, 2022, over 24,800 Notice Packets had been sent to potential Settlement Class Members advising them that Lead Counsel would apply for attorneys' fees in an amount not to exceed 25% of the Settlement Fund. *See* Segura Decl. ¶ 9 and Ex. A (Notice ¶¶ 5, 56). In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*. *See* Segura Decl. ¶ 10. To date, no objections to the request for attorneys' fees have been received.

143. In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that the requested fee is fair and reasonable.

**B.     The Litigation Expense Application**

144.    Lead Counsel also seeks payment from the Settlement Fund of $240,253.64 for litigation expenses reasonably incurred by Plaintiffs' Counsel in connection with the prosecution and resolution of the Action (the "Expense Application").

145.    From the outset of the Action, Plaintiffs' Counsel have been aware that they might not recover any of their expenses (if the litigation was unsuccessful), and, further, if there were to be reimbursement of expenses, it would not occur until the Action was successfully resolved, often a period lasting several years.    Plaintiffs' Counsel also understood that, even assuming that the case was ultimately successful, reimbursement of expenses would not necessarily compensate them for the lost use of funds advanced by them to prosecute the Action.    Consequently, Plaintiffs' Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

146.    As set forth in the Fee and Expense Declarations included in Exhibit 6, Plaintiffs' Counsel have incurred a total of $240,253.64 in unreimbursed litigation expenses in connection with the prosecution of the Action.  The expenses are summarized in Exhibit 7, which identifies each category of expense, *e.g.*, expert fees, mediation fees, on-line legal and factual research, document management costs, telephone, and photocopying expenses, and the amount incurred for each category.  These expenses are reflected on the books and records maintained by Plaintiffs' Counsel, which are prepared from expense vouchers, check records, and other source materials and are an accurate

record of the expenses incurred. These expenses are recorded separately by Plaintiffs' Counsel and are not duplicated by the firms' hourly rates.

147. Of the total amount of expenses, $141,141.15, or approximately 59%, was expended for the retention of experts. As discussed above, Lead Counsel consulted with industry experts and financial economics experts during its investigation and the preparation of the Complaint and during the course of discovery. These experts' advice was instrumental in Lead Counsel's appraisal of the claims and in helping achieve the favorable result. This category also includes the costs for the European investigation firm who aided in the investigation by assisting with interviews conducted in Finnish.

148. The cost of on-line factual research was $10,082.36 and the cost for on-line legal research was $41,598.27, which together account for approximately 21.5% of the total expenses.

149. Plaintiffs' share of the mediation costs paid to JAMS for the services of Mr. Melnick were $13,164.72 or 5.5% of the total expenses.

150. Another significant cost was the expense of document management and litigation support, which included the costs of creating and maintaining the database containing the documents produced in the Action. These document management costs in total came to $6,210.16, or approximately 2.6% of the total expenses.

151. Lead Counsel also incurred $855.00 in attorneys' fees for the retention of independent counsel, Calcani & Kanefsky LLP, to represent a former Venator employee that Lead Counsel contacted during the course of its investigation and who wished to be represented by independent counsel.

152. The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These expenses include, among others, court fees, service of process costs, the costs of publishing the notice required by the PSLRA at the outset of the case, copying costs (in-house and through outside vendors), translation costs, telephone charges, and postage and delivery expenses.

153. In addition, Plaintiffs seek reimbursement of the reasonable costs and expenses that they incurred directly in connection with their representation of the Settlement Class. Such payments are expressly authorized and anticipated by the PSLRA, as more fully discussed in the Fee Motion at 23-24. Plaintiff Fresno seeks reimbursement of $12,150.44 for the 58 hours expended in connection with the Action by its Retirement Administrator, Investment Officer, and Principal Accountant. *See* Kendig Decl. ¶¶ 8-10. Plaintiff Miami seeks reimbursement of $1,500.00 for the 15 hours devoted to the Action by its Pension Administrator. *See* Hernandez Decl. ¶¶ 8-10. Plaintiff Pontiac seeks reimbursement of $918.91 for the time expended in connection with the Action by its Executive Director. *See* Albritton Decl. ¶¶ 8-10.

154. The Notice informed potential Settlement Class Members that Lead Counsel would be seeking reimbursement of Litigation Expenses in an amount not to exceed $350,000, which might include PLSRA awards for Plaintiffs. Notice ¶¶ 5, 56. The total amount requested, $254,822.99, which includes $240,253.64 for Plaintiffs' Counsel's litigation expenses and $14,569.35 for Plaintiffs' PSLRA awards, is well below the

$350,000 that Settlement Class Members were advised could be sought.  To date, no objection has been raised as to the maximum amount of expenses set forth in the Notice.

155.    The expenses incurred by Plaintiffs' Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement.  Accordingly, Lead Counsel respectfully submits that the application for payment of Litigation Expenses from the Settlement Fund should be approved.

156.    Attached hereto is a true and correct copy of the following unpublished opinion cited in the Fee Motion:

> Ex. 8:    *Berger v. Compaq Computer Corp.*, Civil Action No. 98-1148, slip op. (S.D. Tex. Nov. 22, 2002), ECF No. 148

157.    In addition, attached hereto as Exhibit 9 is a true and correct copy of an order issued by the United States District Court for the Northern District of California in April 2021 in an unrelated action where BLB&G served as lead counsel for a different lead plaintiff, SEB Investment Management, and as class counsel for a certified class.  *See SEB Inv. Mgmt. v. Symantec Corp.*, 2021 WL 1540996 (N.D. Cal. Apr. 20, 2021).  As reflected in the order, counsel for a lead plaintiff movant (that was not appointed) raised questions about BLB&G's hiring of a former employee of the lead plaintiff in that case.  Following discovery and extensive briefing, the court found that the evidence did not establish a *quid pro quo*, and allowed BLB&G to continue as class counsel.  *See id.* at *1-2.[10]  The court nevertheless ordered BLB&G to bring the order to the attention of any court in which

---

[10] The *Symantec* action was subsequently resolved with a $70 million settlement for the benefit of the class, and the settlement was approved by the court.

BLB&G seeks appointment as class counsel. *See id*. at *2. Accordingly, because BLB&G seeks appointment as class counsel for the Settlement Class in connection with final approval of the Settlement, BLB&G is submitting the Order to the Court's attention. BLB&G previously submitted the *Symantec* order to the Court at the time Plaintiffs filed their motion for class certification. *See* ECF Nos. 110-1, 110-7.

## VII.    CONCLUSION

158.    For all the reasons set forth above, Plaintiffs respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate. Lead Counsel further submit that the requested fee in the amount of 25% of the Settlement Fund, net of expenses, should be approved as fair and reasonable, and the request for payment of total Litigation Expenses in the amount of $254,822.99, should also be approved.

I declare, under penalty of perjury that the foregoing is true and correct.

Dated: August 5, 2022                    Respectfully submitted,

                                         /s/ *Michael D. Blatchley*
                                         Michael D. Blatchley

63

64

**CERTIFICATE OF SERVICE**

I certify that on August 5, 2022, a copy of the foregoing Declaration of Michael D. Blatchley in Support of (A) Plaintiffs' Motion for Final Approval of Settlement and Plan of Allocation; and (B) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ *Michael D. Blatchley*

64